James E. Magleby (7247)
  magleby@mcgiplaw.com
Christine T. Greenwood (8187)
  greenwood@mcgiplaw.com
Adam Alba (13128)
  alba@mcgiplaw.com
**MAGLEBY CATAXINOS & GREENWOOD**
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Plaintiff Purple Innovations, LLC

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **PURPLE INNOVATIONS, LLC, A Delaware limited liability company,**<br><br>  **Plaintiff,**<br><br>**v.**<br><br>**HONEST REVIEWS, LLC, a Florida Corporation, RYAN MONAHAN, an individual, and GHOSTBED, INC., a Delaware corporation,**<br><br>  **Defendants.** | **COMPLAINT AND DEMAND FOR JURY TRIAL**<br><br><br><br><br><br><br><br>**Case No.:  2:17-cv-00138-PMW**<br><br>**Magistrate Judge Paul M. Warner** |

Plaintiff Purple Innovations, LLC, by and through its counsel MAGLEBY CATAXINOS

& GREENWOOD, alleges and complains against Defendants Honest Reviews, LLC, dba

as or through www.honestmattressreviews.com, Ryan Monahan, and GhostBed, Inc.,

(collectively, "Defendants") as follows:

## INTRODUCTION

1.      This case involves false and misleading statements disseminated across the internet about Purple Innovations, LLC ("Purple"), a Utah-based mattress company, by a primary competitor, Defendant GhostBed, Inc. ("GhostBed"), including specific statements that GhostBed had previously agreed to remove from its website and various social media platforms.  Now, however, those and other false and misleading statements are being made on a newly-created mattress-industry related blog, www.honestmattressreviews.com (the "Blog"), which purports to be "honest," but is anything but.  Specifically, Defendants Honest Reviews, LLC ("HMR") and Ryan Monahan ("Monahan") have begun a groundless campaign against Purple, which has enjoyed recent and rapid success in the "bed-in-a-box" ("BIB") mattress market and is quickly overtaking GhostBed as an industry leader.  Upon information and belief, GhostBed, where Monahan is or recently was employed, is participating in or sponsoring the campaign, as well as substantially benefiting from the campaign.

2.      The campaign launched by Defendants includes numerous false and misleading statements about Purple and its products and services, including without limitation false allegations regarding the safety of Purple's mattresses, the purported lack of adequate safety testing for Purple's products, and Purple's alleged deception of its customers in this regard.  In fact, many of the statements go so far as to imply that Purple's mattresses are dangerous and can lead to serious diseases or even death. These statements are false and unfounded, and Defendants provide no basis or evidence to support any such statements in the Blog or elsewhere.

3.      Even more troubling, HMR makes a number of purported "disclaimers" on the Blog (the "Disclaimers"), which are also false and misleading.  Among other things, HMR and Monahan purport to be independent and unaffiliated with any particular mattress company, such that their reviews are entirely without bias, but they fail to disclose that Monahan has or had in the past very close ties to GhostBed, which as noted is one of Purple's main competitors.  Indeed, Monahan was previously employed as GhostBed's Chief Brand Officer (and, HMR consistently ranks GhostBed as one of the top BIB mattresses).  This association is referenced nowhere on the Blog, and in fact it appears that Monahan has attempted to conceal his association with GhostBed. At or about the time that Monahan created HMR and the Blog, Monahan attempted to scrub his digital footprint reflecting that affiliation.  The Disclaimers are false and misleading in this regard.

4.      In addition, the Disclaimers represent in misleading fashion that HMR and Monahan are not compensated directly by mattress manufacturers, stating that the "website receives zero affiliate commissions."  However, this carefully worded language leaves open the possibility that HMR or Monahan receive direct or indirect payments or other valuable consideration, including without limitation advertising income from favorably-reviewed companies, which payments are not characterized as "commissions" but nevertheless directly or indirectly benefit HMR, Monahan, or a related entity.

5.      This evidence establishes a reasonable belief that HMR, Monahan, and/or other entities owned or controlled by Monahan, are directly or indirectly – and surreptitiously – working with GhostBed to make false and misleading statements of fact

that are specifically designed to promote GhostBed's products over those of Purple and other manufacturers and that, in return, GhostBed is compensating HMR, Monahan, or other related entities, and in this way engaging in and attempting to conceal conduct Defendants know to be illegal.

## PARTIES

6.      Plaintiff Purple Innovations, LLC (i.e., "Plaintiff" or "Purple"), is a Delaware limited liability company with its principal place of business in Utah County, Utah.  The principals of Purple are residents of Utah County, Utah.

7.      Defendant Honest Reviews, LLC, dba as or through www.honestmattressreviews.com (i.e., "HMR") is a Florida limited liability company with its principal place of business in Plantation, Florida.

8.      Defendant Ryan Monahan (i.e., "Monahan") is an individual who, upon information and belief resides and conducts business in Plantation, Florida.  Upon information and belief, Monahan is the owner, Editor in Chief, and primary architect of HMR.

9.      Defendant GhostBed, Inc. (i.e., "GhostBed"), is a Delaware corporation, with its principal place of business in Plantation, Florida.

## JURISDICTION AND VENUE

10.      This is a civil action for unfair competition under Section 43(a) of the Lanham Act and Utah common law.  Jurisdiction in this Court is founded upon 28 U.S.C. §§ 1331, 1332, and 1338.

11.     With respect to 28 U.S.C. § 1332, diversity jurisdiction is present because, while Purple is a citizen of Utah, all of the Defendants reside in other states.  The amount in controversy is in excess of $75,000.

12.     This Court has personal jurisdiction over Defendants because they have conducted continuous and systematic business in the state of Utah, have numerous contacts with the state of Utah, and have committed and continue to commit acts of false advertising and related tortious acts in this district, as alleged herein.

13.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1400(b) and 1391(b) and (c).

## FACTUAL ALLEGATIONS

### Purple

14.     Purple is an innovative and successful Utah company focused upon bringing technologically advanced comfort products to the market to resolve and alleviate pain experienced by consumers while lying in bed, sitting, or standing.

15.     Since launching its first mattress product, the Purple® Bed, Purple has enjoyed tremendous success, growing from fewer than 50 employees in January 2016 to over 600 employees in February 2017.

16.     Purple has also expanded its business beyond the Purple® Bed, and now provides a variety of innovative, quality products related to the mattress and sleep market, including the Purple® Pillow.

17.     The seeds of Purple's business were planted in 1989, when brothers Tony and Terry Pearce, both engineers, decided to apply their engineering skills to develop innovative products that would improve the quality of life for their customers.

18.     By 1993, the Pearces discovered that there was a pressing need for better wheelchair cushioning. Pressure sores were a common and extremely painful reality in the lives of wheelchair users. Taking on that challenge, the Pearces created Floam™, the world's lightest-weight cushioning fluid. Soon, the Pearces obtained five patents associated with Floam™, which was being used in not only wheelchair cushions, but also by major licensees in products such as critical-care medical beds (Hill-Rom), footwear (Nike), ankle/knee braces (Johnson & Johnson), and golf bag straps.

19.     The key discovery came when Hyper-Elastic Polymer™ was molded in a shape that could "relax" under pressure points, redistributing the pressure to other areas. The same feature turned out to provide highly effective back support in mattresses.

20.     As time went on, the Pearces or their companies licensed predecessor products of Purple to numerous different entities, including makers of critical care medical beds (Stryker Medical); consumer mattresses in Europe (Svane by Ekornes), Japan (Francebed), and Australia (Sleepmaker); backpack straps (Jansport); shoe insoles (Dr. Scholl's Massaging Gel and Sof-Sole); pillows (Sleep Innovations); soft-catch toy balls (Nickelodeon); wheelchair cushions (EquaPressure); and many other advanced cushioning products.

21.     Eventually, the Pearce brothers created a patented machine called Mattress Max™, which took over two years and several million dollars to develop.  Now, the Mattress Max™ is used to make Hyper-Elastic Polymer™ in the USA in sizes large enough to fully cover a king-sized mattress, and at production rates and costs that allow the products to be sold affordably online.  Additional innovations and improvements were made over time, including as to the proprietary non-toxic anti-tack powder, for which Purple is seeking patent protection, that effectively prevents the mattresses and pillows from sticking to themselves when compressed for shipment, enabling more effective packaging and delivery to customers.

22.     In all, the Pearce brothers have over 30 cushioning patents, and they are known the world over as the premier source for superior cushioning technology.

### Purple's Online Marketing Strategy

23.     Beginning in 2016, Purple embarked upon a marketing and sales strategy designed to get its products into the hands of consumers at better-than-competitive prices.

24.     In particular, and in addition to its efforts to keep costs for its made-in-the USA products low, Purple has successfully focused upon the "Bed in a Box" ("BIB") mattress market segment.  Purple does not have brick and mortar stores but instead sells its bedding products solely through an e-commerce platform.

25.     Purple's competitors in the BIB market include GhostBed, Casper, Leesa, and Tuft & Needle, among others.

26.     The cost savings from this market strategy, which are passed along to consumers, are illustrated by a graphic on Purple's website:



27.     In response to online orders, Purple delivers mattresses to consumers for a risk free trial of the Purple®Bed.  In fact, Purple currently offers consumers 100 days to try its mattress product, and it provides a full refund if the customer is not satisfied.

28.     The BIB segment is the fastest growing segment in the multi-billion-dollar mattress industry.  In 2015, the BIB market only accounted for an estimated 9% of online mattress purchases, but by 2016 the BIB market had grown to an estimated 30% of online purchases, representing a growth in the hundreds of millions of dollars.

29.     For example, one estimate is that the BIB market share of $800 million in 2016 will grow to $1.4 billion by the end of 2017.

30.     Although Purple did not launch its mass production and major marketing campaign until January 2016, Purple has become one of the four leading BIB companies, experiencing exponential and rapid growth.

31.     Indeed, Purple's website has drawn at least tens of millions of visitors, and its marketing videos have been viewed by hundreds of millions of viewers.  Purple's popularity and high online visibility may actually be contributing to Defendants' efforts to malign Purple by drawing additional visitors to the HMR Blog and related social media, because the HMR Blog and social media posts are likely to appear as search results, thus diverting potential customers to the Blog and GhostBed's "world class" rating on the Blog.

32.     Given Purple's success, Purple poses a significant threat to its competitors, including in particular GhostBed, which accordingly has a strong incentive to undermine Purple in the BIB market.

**The Mattress Review Business**

33.     Because of the already-large traditional mattress market and the growing BIB market, and because of the importance of customer and other reviews to an e-commerce market strategy, a number of websites have emerged that include reviews of both traditional and BIB mattresses.  These websites include not just platforms for consumer reviews, but also websites that purport to offer "professional" or "test-based" reviews of mattresses, such as the HMR Blog.

34.     Because Purple relies strictly on an e-commerce sales strategy, online comments and reviews can be very significant to its business.

35.     For example, a March 2016 Wall Street Journal article described the importance of reviews in this new market segment, discussing one such customer named Will Haley:

It is a process aimed at the often wealthier, younger and busy shoppers who care less about kicking the tires and more about convenience. Mr. Haley says <u>he felt comfortable buying the mattress sight unseen **because online reviews are enough quality control**</u>. "Anything I can buy online, I do," he says.

(Emphasis added).

36.     Defendants HMR and Monahan appear to agree with this perspective.  As they posted on the Blog:

*Reviewers possess a unique, influential power that if misused could unintentionally (or intentionally) steer a consumer into the wrong decision.*

https://www.honestmattressreviews.com/mattress-reviewers/

37.     Purple welcomes the intense customer and reviewer scrutiny that is found in the marketplace of ideas that is the internet.  Purple's products are high-quality, safe, and deliver on the promise of providing a superior sleep experience to its customers.

38.     Reviews that are false or likely to confuse or mislead consumers pose a substantial threat to Purple, which relies so heavily upon an e-commerce platform, including the associated marketing of its products.

**The "honestmattressreviews.com" Blog and the Campaign Against Purple**

39.     In recent months, Purple became aware of a new mattress review website, "honestmattressreviews.com," (i.e., the "Blog"), which purports to be an "honest" and "unbiased" mattress review service.  Starting in January 2017, Purple discovered that the HSR Blog had begun posting false information regarding Purple and its products, including posts calling into question the safety of the Purple® Bed products.

40.     Over the course of just a few weeks, the Blog has made five (5) posts regarding Purple, which are prominently displayed on the Blog and are misleadingly represented as "articles" and/or "breaking news."   These posts directly attack Purple and its products, making both literally false statements and statements that are highly likely to mislead consumers.

41.     Each of these posts or "articles" is readily accessible to the public.  The Blog contains multiple links to each post, such that the posts can be accessed in numerous ways through the Blog, and the images associated with the posts are continually displayed to consumers throughout the Blog.  Defendants have also posted some or all of these posts (or links to the posts) on various social media platforms, including Facebook and Twitter.  The posts can also be located through simple internet searches, including through Google.

42.     The "Articles" are titled as follows:

(a)     "WHAT EXACTLY IS THAT WHITE POWDER ON PURPLE'S MATTRESS?" (the "White Powder 'Article'"), attached hereto as Exhibit "1."

(b)     "A DEEPER INVESTIGATION INTO PURPLE MATTRESS & PILLOWS WHITE POWDER" (the "Purple Investigation 'Article'"), attached hereto as Exhibit "2."

(c)     "PSA | DUE TO PURPLE'S UNKNOWN POWDER WE'RE REVOKING OUR ENDORSEMENT" (the "Revoked Endorsement 'PSA'"), attached hereto as Exhibit "3."

(d)     "PURPLE ACKNOWLEDGEMENT OF THE WHITE POWDER STILL MISLEADS CONSUMERS" (the "Purple Misleads Consumers 'Article'"), attached hereto as Exhibit "4."

(e)     "MATTRESS REVIEWERS HAVE A RESPONSIBITY TO
ACKNOWLEDGE CONSUMER SAFETY" (the "Responsibility
'Article'"), attached hereto as Exhibit "5."

**Defendants Have No Evidence That Purple's Products Are Unsafe**

43.     The overall message of the "Articles" posted by Defendants is clear:

Purple's products are unsafe, pose a danger to consumers, and Purple has something

to hide.  This message, however, is demonstrably false and unsupported by any

evidence.

44.     For instance, upon information and belief, none of Defendants have

conducted any safety or other testing of Purple's products.

45.     Defendants also have no evidence to suggest that Purple's products are in

any way unsafe.

46.     Despite these facts, and despite HMR having obtained at least one

materials information statement regarding the Purple® Bed product, HMR has chosen to

ignore both the publicly-available safety information regarding Purple's products and the

lack of any information to suggest that Purple's products are unsafe.  Instead

Defendants have intentionally elected to launch an unfounded campaign of false and

misleading statements and innuendos against Purple and its products, causing

reasonable consumers to believe that Purple's mattress and pillow products have been

reported in "articles" founded upon an independent investigation to be unsafe and in

need of warnings, that Purple is hiding those facts from consumers, and that Purple is

knowingly putting the health of consumers at risk.

**The First Post:  The White Powder "Article"**

47.      The White Powder "Article" was posted on the Blog in approximately mid-January 2017, setting the stage for Defendants' smear campaign.

48.      The White Powder "Article" purports to ask a series of inflammatory questions about a white, powdery substance that appears on Purple® Bed products. The "Article" also makes statements that are false and likely to mislead or confuse consumers to believe (among other things) that Purple's products – including the powder substance on the mattresses – are dangerous and that Purple is deliberately withholding safety information from consumers.

<u>False and Misleading Statements Regarding Product Safety</u>

49.      The inflammatory questions in the White Powder "Article" include the following:

**Specifically, the top layer that has a powder coating.**

*What is this white powder?  <u>Is it safe?</u>  <u>Is it safe to touch your skin?</u>  <u>Is it safe to inhale?</u>*

50.      Despite the lack of any evidence to support the claim, these questions clearly are designed to mislead consumers to believe that Purple's products are unsafe.

51.      Moreover, the White Powder "Article" falsely suggests that the powder on Purple's products is "Talcum Powered," references multi-million dollar lawsuits involving babies," and indicates that baby powder has been found to cause Ovarian cancer:

We were extremely concerned when we were informed (via telephone call) the power is a <u>Talcum Powered</u> after having watched <u>Johnson & Johnson's multiple multi-million dollar baby powder lawsuits</u> found <u>to cause Ovarian Cancer.</u>  *We've been reassured that Purple does NOT use Talcum Powder.*

52.     As with the other inaccurate and unfounded statements in the White Powder "Article," these statements deliver the unmistakable message that the powder is or contains talcum powder (when the call referenced on the website makes clear that the powder is not talcum powder) or some other unknown harmful substance, and that Purple's products are unsafe, toxic, and cause cancer.

<u>False Statements Regarding Purple's Alleged Lack of Responsiveness</u>

53.     The White Powder "Article" also includes statements falsely representing that Purple is withholding safety information from consumers and has failed to respond to inquiries regarding the safety of its products:

> *Since Purple <u>elected not to respond via email or social networks</u> – we tried the most direct route to receive an answer by simply calling and asking.*

54.     The White Powder "Article" further falsely asserts that Purple is not interested in the consumer or consumer safety:

> **Final Thought** – we were relieved to see some documentation regarding the materials used finally.  As our focus is <u>*consumer interest* and *consumer safety,*</u> it's crucial we ask the tough questions.

55.     Another statement in the White Powder "Article" likewise falsely indicates that Purple is not transparent with consumers, is withholding safety information from consumers, and (again) that Purple's products are not safe:

> In a perfect world and in a <u>transparency to consumers,</u> we'd like Purple to better disclose what powder material they are introducing into consumers homes *before* the customer receives the product.  <u>Especially as consumers will spend 1/3 of their lives</u> over the next years <u>with this powder directly touching their skin or even potentially inhaling.</u>

14

56.    In fact, the White Powder "Article" intentionally cements the suggestion that Purple is improperly withholding safety from consumers by giving it an "F" grade in that category:

**Major Key: Marketing A+. Product Quality A+. Disclosing Information F.**

### The Second Post:  The Investigation "Article"

57.    The Investigation "Article" was posted within a week of the White Powder "Article," and it builds upon the same theme.  The Investigation "Article" was posted with the headline "BREAKING NEWS" in all capital letters.

58.    Like the White Powder "Article," the Investigation "Article" purports to ask a series of inflammatory questions calling both the safety of Purple's products and the integrity of its business into question, including numerous false and misleading statements regarding those topics.

59.    For example, the Investigation "Article" repeats the statements falsely suggesting that Purple has been withholding safety information from consumers and has not responded to inquiries, such as that "Purple elected not to respond" to email or social network inquiries (and Purple is not aware of any such attempts):

*Since Purple elected not to respond via email or social networks – we tried the most direct route to receive an answer by simply calling and asking.*

60.    The Investigation "Article" also reiterates the inflammatory questions included in the White Powder "Article," again strongly suggesting that Purple's products are unsafe:

**In last week's article, we asked these four simple questions;**

1. **What is this white powder?**
2. **Is it safe?**
3. **Is it safe to touch your skin?**
4. **Is it safe to inhale?**

61.     Although Purple uses only new materials in its manufacturing, the

Investigation "Article" inaccurately states that Purple does not use new materials in its

products, again raising the specter that Purple's products are dangerous:

One major key that isn't included or very easily found via Purple's documentation is that they *do not utilize new materials to make this plastic layer*.  Rather, they use recycled manufactured products.

62.     The Investigation "Article" makes unsupported statements to the effect

that consumers will inhale the powder for eight hours while sleeping, again for purposes

of suggesting that Purple's products are dangerous:

This substance *may be* approved safe to use in small quantities after having been tested by scientific professionals.  *That same substance that's intended to be consumed via tablet form in small controlled doses may have very different outcomes regarding the effect on a human body or while inhaled for eight plus hours a night while you sleep.*

63.     In addition, the Investigation "Article" suggests that Purple is obligated to

have a certain level of "scientific proof" about its products, that it does not have this level

of proof, and that Purple's products are unsafe as a result:

**Does Purple have scientific proof from multiple third party sources confirming through comprehensive testing that this substance is safe to lay on and inhale nightly for years?**

64.     Again creating the impression that Purple's products are unsafe and its

product testing is inadequate, the Investigation "Article" makes statements that Purple's

16

products are not safe for long term contact, that Purple is acting "recklessly" as to an "untested substance," and that Purple's products will "impact one's short or long-term health:"

> On the contrary, if they do not have scientific proof from multiple credible sources that confirms the use long-term use of this substance with Purple's intended use, (to reduce the sticking of the plastic grids) as safe for long-term contact and inhalation – then we feel they are recklessly predisposing consumers to an untested substance that could directly impact one's short or long-term health.  When we asked hyper-specifically this question we found the same answer, 'It's food-grade material'.

65.     As yet another example of these groundless claims, the Investigation "Article" makes statements suggesting that the powder is the same as a "ground down" "plastic mustard container" or "glass coke bottle," which consumers will inhale every night for "eight to ten hours," yet again suggesting that Purple's products are not safe:

> In this instance we know it's safe to touch a plastic mustard container or a glass coke bottle.  But, the applications of those food-contact materials are not ground down into a small microscopic powder and inhaled for eight to ten hours a night over the course of the mattresses lifespan.

66.     Following these statements, the Investigation "Article" embeds a YouTube video showing the well-known-to-internet-users "cinnamon challenge," in which a person attempts to swallow a spoon of cinnamon.  The video includes an opening image of a woman who appears to be exhaling a caustic, brown substance:



67.     The title page of the video is as follows:



68.     The cinnamon challenge video, which has absolutely nothing to do with Purple or its products, shows people choking, coughing, gagging, spitting, crying, and attempting to rinse their mouths out with water.

69.     It has been reported in the media that some people have literally died as a result of the cinnamon challenge.

70.     The Investigation "Article" goes on to discuss the cinnamon challenge as if to compare it to the Purple products, emphasizing the words "dragon breath" and reports to "poison control:"

> Should a person elect to consume a teaspoon of cinnamon based on the knowledge of what this will physically do to one's body, the fault resides on the individual.  The ingestion of the (cinnamon) powder invariably stimulates the gag reflex followed by inhalation of the powder that's stuck inside the mouth and throat.  The pain then causes rapid exhalation characterized by "**dragon breath**" upon blowing the powder out.  ***Over 200 different reported cases by the U.S. Poison control this year alone.***

71.     The Investigation "Article" further makes statements suggesting that Purple was approached by "customers" "with respiratory conditions such as Asthma," when – according to the Blog – there was a single telephone call made by someone who did not say they had asthma (and Purple is unaware of any additional approaches by "customers" with asthma).  The statements are designed to confuse consumers and cause them to believe that Purple's products are harmful to persons with asthma, that Purple's products are not safe, and that Purple is withholding safety information from consumers:

> Inversely, Purple's prior and current business practices involve deliberately choosing not to inform consumers of the powders existence in the first place.  When pressed by customers with respiratory conditions such as Asthma, Purple remains secure in their position not to disclose the contents that consumers are subjected to.

72.    The Investigation "Article" falsely asserts that Purple is engaging in a "deceptive business practice" that could "potential [sic] irritate or even impact they [sic] health of tens of thousands of unknowing consumers," suggesting that Purple is acting intentionally and illegally to deceive its customers, including by hiding the fact that its products are unsafe and pose health risks to "tens of thousands" of customers:

> When you look on Purple's website, their high-resolution product images do not show the final product they are shipping.  We believe this is a deceptive business practice that could potential irritate or even impact they health of tens of thousands of unknowing consumers.

73.    The Investigation "Article" likewise alleges that Purple is unlawfully withholding information from consumers that it should be required to have a disclosure regarding the powder on its "law tag" (also suggesting that Purple is violating the law):

> In a consumer safe perfect world, Purple would willing disclose the substance, include it on their law tag and have a warning to consumers before the point of purchase.

**The Third Post:  The Revoked Endorsement "PSA"**

74.    The Revoked Endorsement "PSA" was posted the week following the Investigation Article (just two weeks ago).  Its purpose and effect is to increase the significance of the campaign in the minds of reasonable consumers.

75.    The Revoked Endorsement "PSA" is or was prominently displayed on the homepage of the HMR website, in a series of stories that are presented as if they are legitimate news articles, with the headlines in all capitals of "EDITOR'S TOP PICKS" and "INDUSTRY NEWS", with the tag line "PSA | Due to Purple's Unknown Powder We're Revoking Our Endorsement," as follows:



76.   The top of the Responsibility "Article" also includes, in larger form, the image of a large ""X" in the red circle:



77.   The Revoked Endorsement "PSA" is and was also accessible to the public in a number of other ways through the Blog, and as a result of internet searches such as through Google.

78.     These images and language are false and misleading because they suggest to consumers that HMR is reporting objective "news," through the use of the prominently displayed headlines "EDITOR'S TOP PICKS" and "INDUSTRY NEWS," when HMR is not a news organization.

79.     The Revoked Endorsement "PSA," like the prior "Articles," purports to ask a series of inflammatory questions, designed to convey to consumers a literally false and misleading message that the Purple mattress is unsafe, and that Purple is withholding safety information from consumers.

80.     The Revoked Endorsement "PSA" includes the initials "PSA," obviously standing for "Public Service Announcement," which falsely suggests independence and altruism, that the "PSA" originated from or is endorsed by a governmental body, and that it is related to health and safety, that is, that Purple's products are not safe.

81.     The Revoked Endorsement "PSA" includes statements about Purple failing to give a "consumer warning," "deliberately choosing not to inform customers," and "deliberately" deceptive "business practices;" and references to multiple customers "with respiratory conditions," "Asthma," and the "seriousness" of "inhalation of this powder." Again, these statements are designed to suggest – without any evidence – that Purple's products are unsafe and that Purple is withholding safety information from consumers:

> *Our core beliefs at Honest Reviews revolve around one core question, "Does this benefit the consumer?" As we prior published our concern for an unknown substance Purple continues to coat their products in without consumer warning.*
>
> Purple's previous and current business practices involve deliberately choosing not to inform customers of the powders existence in the first place. When pressed by customers with respiratory conditions such as Asthma, Purple remains secure in their position not to disclose the contents that consumers are subjected to.
>
> **We've reached out to Purple on via multiple communications platforms, and yet they continue to ignore the potential seriousness of inhalation of this powder.**

82.     The Revoked Endorsement "PSA" also alleges that Purple has decided to "run fast and figure out problems later," suggesting that Purple's products are not safe and that Purple is withholding safety information from consumers:

> Competition and commerce drive innovation. But, as some companies become red hot they tend to run fast and figure out problems later. It's clear the unknown white powder used is there to help with the plastic grid walls as they stick together.

83.     Also included are statements that Purple is "subjecting consumers to a powder that could impair or impact their physical health:"

> Success and rapid growth is no excuse for potentially subjecting consumers to a powder that could impair or even impact their physical health.

84.     As with the other "Articles," the Revoked Endorsement "PSA" falsely suggests that consumers purchasing Purple's products will be "directly inhaling a white powder substance" which "could be damaging to those with respiratory issues," and falsely asserts that Purple has used "made up tests:"

*With that, we regret to inform you that until Purple Mattress discloses to consumers that they will be subjected to and* <u>*directly inhaling a white powder substance*</u> *that could* <u>*be damaging to those with respiratory issues*</u> *we're going to revoke our endorsement of this mattress.* We value consumer knowledge and safety far greater to our organization that funny videos and <u>made up tests.</u>

**Purple Responds to the Misleading Posts by Defendants HMR and Monahan**

85.    Convinced that HMR and www.honestmattressreviews.com are not interested in an actual, fair dialogue, and that HMR would intentionally continue its clever use of innuendo, indirect intimations, and ambiguous suggestions to misrepresent anything submitted by Purple to HMR, Purple attempted to respond to Defendants' false, misleading, and confusing statements by posting truthful information about the non-toxic plastic powder on its own blog:









**THE BEST MATTRESS FOR BACK PAIN**

What is the best mattress for back pain? One that keeps your spine in natural alignment of course! Learn more about the best mattress... Read more ›

**ALL ABOUT OUR NON-TOXIC PLASTIC POWDER**

Purple uses a non-toxic powdered polymer coating on some of our Purple products. Learn more about this super safe powder so you can rest... Read more ›

**THE BEST MATTRESS FOR COUPLES**

Purple gives you one less compromise in your relationship. Get the best of firm and soft, cool and quiet, bounce and motion isolation... Read more ›

86.     Purple explained, among other things, that the purpose of the non-toxic powder was to prevent Purple's Hyper-Elastic Polymer™ from sticking to itself, that the powder is non-toxic, chemically inactive, is harmless, and is as safe as eating with a plastic fork:

> We now lightly coat our Purple® mattress and pillow that go through a tight-compression process to enable door-to-door shipping with our non-toxic plastic powder to prevent the Hyper-Elastic Polymer™ from sticking to itself.
>
> . . .
>
> Here are the details about the inert non-toxic plastic powder that we invented to solve our packaging conundrum:
>
> 1. It is NOT a talc powder. Talc is a mineral and our plastic powder contains no talc whatsoever, or any mineral for that matter.
> 2. It is chemically inactive, AKA an inert substance.
> 3. It is a food-contact-grade material, meaning that this family of plastic materials can be used for eating utensils, children's toys, etc.
> 4. It is 100% non-toxic and is completely harmless.
> 5. You can think of it being as safe as eating with a plastic fork, so you can rest easy on our bed! In fact, it may be even safer—no Purple product ever stabbed anyone in the lip!

87.     Purple also explained that the powder was so innovative as to be proprietary, and that it could not release the details until after its pending patents became publicly available, a standard and well-known business strategy employed by every responsible corporate entity that is protecting its intellectual property:

> Our scientists didn't just solve the problem, they found a safe option in doing so and have applied for a patent. Until the patent is issued, Purple is keeping the exact type of plastic a "trade secret," which helps protect the jobs of those 600 people from competitors who would love to figure out how to do what Purple does. But know that it is a very common type of plastic used in many human-touch products, even in products for children.

**The Fourth Post:  The Purple Misleads Consumers "Article"**

88.     The Purple Misleads Consumers "Article" was posted shortly after

February 13, 2017 (late last week).

89.     Like the Revoked Endorsement "PSA," the Purple Misleads Consumers

"Article" is or was prominently displayed on the homepage of the HMR website, in the

top-left of a series of stories that are depicted as if they are legitimate news articles, with

the headlines in all capitals of "BREAKING NEWS" and "INDUSTRY NEWS," with the

tag line "Purple's Acknowledgement Of The White Powder STILL Misleads Consumers,"

as follows:

■ LASTEST NEWS



Purple's Acknowledgement Of The White Powder STILL Misleads Consumers



Mattress Firm Hires Sicily Dickenson As New CMO



We Received Something BIG To Review Today − Something HUGE!



The RiteBed Arrives As A New Player In The Online Mattress Space



Simba Sleep Raises £9m From Raft Of New City Investors



Bedgear Hopes To Triple Revenue With New Mattresses



This Indiegogo Project Has Reimagined Bedding Basics



Sleep Outfitters And Tempur Sealy To Present $25,000 To



PangeaBed Copper Mattress Review

90.    These images and language are false and misleading because they suggest to consumers that HMR is reporting objective "news," through the use of the prominently displayed headlines ""LATEST NEWS," "BREAKING NEWS," and INDUSTRY NEWS," when HMR is not a news organization.

91.     The Purple Misleads Consumers "Article," like the prior "Articles," asks a series of inflammatory questions designed to convey to consumers a literally false and misleading message that the Purple mattress is unsafe and that Purple is withholding safety information from consumers.

92.     By virtue of its title, the Purple Misleads Consumers "Article" falsely asserts that Purple is engaged in a deliberate campaign to deceive consumers, including by improperly withholding safety information from consumers.

93.     The Purple Misleads Consumers "Article" claims that HMR has been making repeated inquiries to Purple for information, for "159" days, when the Blog identifies only two such instances, generic telephone inquiries to the general customer service department (and Purple is unaware of any other such inquiries), again for purposes of demonstrating that Purple's products are hazardous and that Purple is withholding safety information from consumers:

Since September 9, 2016, we've been inquiring directly with Purple about the use of an unknown powder.  That's 159 days before they even start to acknowledge of the powder's existence on their website.

94.     The Purple Misleads Consumers "Article" falsely suggests that Purple is rejecting accountability for consumer safety:

Thus, every business innately inherits the highest level of accountability regarding consumer safety.

95.     For example, the Purple Misleads Consumers "Article" reports that Purple does not have safety documentation, that Purple has an obligation to release such information, and that Purple's public statements on these issues are false:

| **What is stopping you (Purple) from conducting and releasing independent accredited laboratory tests that prove this is safe under the use case of coating Purple mattresses and pillows?**

In your published statement to the public, although comically written, clearly shows your position remains that consumer safety should *rely solely on your written word.*

96.     The Purple Misleads Consumers "Article" further claims Purple is not transparent and is not "honest and upfront" about the "microscopic powder form that could be inhaled," in yet another transparent attempt to harm Purple's reputation, integrity, and goodwill:

| **It took 159 days of inquiry for you to acknowledge it; please forgive us if we're not willing to take you at your trusted word.**

Your track record continues to show a reactive transparency approach. You only began to acknowledge customers if they contact *you (in regards to the powder)*. To date, you still do not include this information directly on your product information page (see screenshot below). **You** claim, "*Everything we do here at Purple centers on our customers*" when will you be **honest and upfront** about the use of this in a **microscopic powder form that could be inhaled?** Don't customers have a right to be informed?

97.     The Purple Misleads Consumers "Article" also implies that Purple had experienced an "unforeseen problem" in its product development and was making "adjustments" as a result, again for purposes of showing that Purple's products are unsafe and that Purple is withholding safety information from consumers:

We understand that when a product experiences an unforeseen problem that adjustments might have to be made. *Consumers understand and also seek a solution.*

98.     The Purple Misleads Consumers "Article" asserts that Purple has or is going to change the powder to hide the fact that it was not safe, that Purple is treating its customers as "guinea pigs," and that Purple does not have safety information:

**Here's where the issue arises.**

**Since you're not willing to educate and pre-disclose (at the point of sale);**

a) the existence

b) what it is or

c) that's it's proven safe

*How do we,* the consumer *know* what you're coating all over your products today are the same as what you coated products in last week, last month or during your "product solution testing?"

Consumers are not guinea pigs. It's the responsibility of the company to conduct all of these product safety tests before shipping product and clearly disclosing the results to inquiring consumers.

99.     Defendants further assert in the Purple Misleads Consumers "Article" that Purple does not use "science," that Purple does not think facts and science are important and that, because Purple has a patent pending, it should disclose its secret formula – misleading the consumer into believing that patent applications are public (and failing to disclose to consumers the risks from a premature disclosure):

### Science is rooted in truth and proven fact.

*For a company that claims to be Super Sciencey, you continue to neglect a few very scientific components (such as material disclosure), that you clearly don't see as important per your comical response.*

 **Purple: So Sciencey It'll Put You To Sleep - YouTube**
https://www.youtube.com/watch?v=qCuP6frAqpA
Feb 4, 2016 - Uploaded by Purple
See just how **Purple's** hyper-elastic polymer will give you the best nights sleep you
have ever had! **Purple** ...

You also seek sympathy in 'protecting 600 jobs' and in your 'trade secrets' which provides you some form of shielding from disclosure.

> Our scientists didn't just solve the problem, they found a safe option in doing so and have applied for a patent. Until the patent is issued, Purple is keeping the exact type of plastic a "trade secret," which helps protect the jobs of those 600 people from competitors who would love to figure out how to do what Purple does. But know that it is a very common type of plastic used in many human-touch products, even in products for children.

*But, your processes is patented and protected.  If it wasn't already protected intelliBED wouldn't have to have this disclosure on the footer of their website.  After all, they use the same technology or process, right?  It says it's licensed to a company owned by Tony Pierce.*



intelliBED's Footer, "**INTELL-GEL® IS A REGISTERED TRADEMARK OF EDIZONE, LLC OF ALPINE, UTAH USA. PROTECTED BY U.S. PATENTS 5,749,111, 6,026,527, 6,413,458, 7,060,213, 7,076,822, 7,666,341. INTELLIBED® IS A REGISTERED TRADEMARK OF ADVANCED COMFORT TECHNOLOGIES INC. OF SALT LAKE CITY, UTAH USA.**"

Purple's Footer, "**Protected by one or more of U.S. Patents 5,749,111; 6,026,527; 7,076,822; 7,730,566; 7,823,233; 7,827,636; 7,964,664; 8,607,387, and 9,051,169, with others pending. Purple and all product names comprising Purple, Hyper-Elastic Polymer, and No Pressure are trademarks of EdiZONE, LLC of Alpine, Utah USA.**"

Protected by one or more of U.S. Patents 5,749,111; 6,026,527; 7,076,822; 7,730,566; 7,823,233; 7,827,636; 7,964,664; 8,607,387 and 9,051,169 with others pending. Purple and all product names comprising Purple, Hyper-Elastic Polymer, and No Pressure are trademarks of EdiZONE, LLC of Alpine, Utah USA.

100.    Defendants further claim that Purple is dismissive of its customers, that

Purple thinks they are "naïve," that Purple is "insulting" its customers, and that Purple is

otherwise withholding safety information from consumers:

> | **Purple's publication is proof of how <u>naive they truly believe</u> <u>American Consumers are</u>. To say, it's safe because it comes from the same family of plastic forks, neglecting the fact that in Purple's use case (coating mattresses and pillows) it could be inhaled directly into your lungs, <u>is downright insulting.</u>**

101.    The Purple Misleads Consumers "Article" includes an inflammatory

graphic depicting Purple's products as sausage, complete with an image of a meat

grinder with plastic items being poured onto a Purple mattress:



102.    The Purple Misleads Consumers "Article" includes statements that are designed to mislead consumers into believing that Purple has definitively refused to provide information to demonstrate that its products are safe, despite the fact that Purple has posted such information on its own website, and again makes numerous inflammatory and misleading statements in an effort to support its allegation that Purple's products are unsafe:

PURPLE HAS TAKEN THE DEFINITIVE POSITION THAT COVERING THEIR MATTRESS AND PILLOW IN THIS PLASTIC POWDER THAT'S INHALED NIGHTLY FOR THE DURATION OF THEIR PRODUCT'S LIFECYCLE IS THE EQUIVALENT OF EATING WITH A PLASTIC FORK.

YES, IT'S SAFE TO EAT WITH A PLASTIC FORK.  PURPLE CONSUMERS AREN'T EATING IN BED — THEIR INHALING THE MATTRESS.

PLEASE DISCLOSE THE SCIENTIFIC PROOF THAT INHALING THAT PLASTIC WILL NOT INDUCE ANY LUNG OR RESPIRATORY IRRITATION. ONCE WE RECEIVE THIS PROOF WE WILL UPDATE OUR REVIEW IMMEDIATELY.

ADDITIONALLY, PLEASE SHARE ACCREDITED THIRD PARTY STUDIES THAT SHOW SCIENTIFIC EVIDENCE SUPPORTING YOUR POSITION IN A MULTI—YEAR TEST WITH EIGHT HOURS USE PER NIGHT. ONCE WE RECEIVE THIS PROOF WE WILL UPDATE OUR REVIEW IMMEDIATELY.

103.   The Purple Misleads Consumers "Article" has statements to the effect that Purple's products are like "inhaling gasoline," that Purple does "not put[] consumer safety first," and that Purple has directly contradicted itself:

Your blanket statement quoted above is like saying "Gas is safe in a car, so inhaling gasoline must also be safe." Obviously, you're not using gasoline – but – it's an example that a different use cases a product, chemical or substance can have very different effects.

### Intended Use is the issue at hand.

*Merely acknowledging existence (only after constant questioning) is not putting consumer safety first – in our opinion.* Which is a direct contradiction of your published response (again, see here).

104.   The Purple Misleads Consumers "Article" suggests that Purple is putting its 600 employees' health at risk, that Purple should be providing "training and education" on health risks to its employees, and that Purple should have its employees wear protective gloves:

## You did raise one point in your response that we did not initially think to question.

Your 600 employees who are in direct contact with this substance don't appear to have protected masks to shield their inhalation. If a factory worker's shift is eight hours, then sleeps eight hours on a Purple mattress; *what are the effects of 16 hours a day exposure?* Do you provide training and education to your employees who are on the floor manufacturing these products? Do you provide gloves and mask to every employee?



105.   Like the previously-discussed "Articles," the Purple Misleads Consumers "Article" falsely suggests that consumers purchasing Purple's products will be "directly inhaling a white powder substance," which "could be damaging to those with respiratory issues," and falsely accuses Purple of using "made up tests:":

*With that, we regret to inform you that until Purple Mattress discloses to consumers that they will be subjected to and directly inhaling a white powder substance that could be damaging to those with respiratory issues we're going to revoke our endorsement of this mattress.* We value consumer knowledge and safety far greater to our organization that funny videos and made up tests.

**The Fifth Post: The Responsibility "Article"**

106.    The Responsibility "Article" was posted the next day (again, late last week), and it attempts to deflect Defendants' singular attack on Purple by trying to guilt other reviewers into joining its campaign of false and misleading statements against Purple.

107.    A link to the Responsibility Article is or was prominently displayed on the homepage of the HMR website, below the top "Article," with the headline in all capitals of "BREAKING NEWS" and "INDUSTRY NEWS," with the tag line "Do Mattress Reviewers Have A Responsibility To Acknowledge Consumer Safety?," and including a large "X" in a red circle – as if to designate a poisonous substance – as follows:



108.    The top of the Responsibility "Article" also includes, in larger form, the image of the large "X" in the red circle:



## Do Mattress Reviewers Have A Responsibility To Acknowledge Consumer Safety?

By honest mattress reviews   ⏱ 12 min read

109.    These images and language are false and misleading because they suggest to consumers that HMR is a legitimate news source reporting objective "news," through the use of the prominently displayed headlines "BREAKING NEWS" and "INDUSTRY NEWS," when HMR is not a news organization.

110.    The Responsibility "Article," like the prior "Articles," includes a series of inflammatory questions and statements, all of which are designed to convey to consumers the literally false and misleading message that the Purple mattress is unsafe, and that Purple is withholding safety information from consumers.

111.    For example, the Responsibility "Article" has statements suggesting that a physician's Hippocratic Oath is applicable to mattress makers and referencing "poison,"

falsely suggesting that Purple's products are not only unsafe, but might poison the customer:

> *A doctor is required to take the Hippocratic Oath before officially becoming a doctor. Reviewers possess a unique, influential power that if misused could unintentionally (or intentionally) steer a consumer into the wrong decision.*
>
> In this oath doctors truly commit to the mindset, "**First do no harm.**"
>
> Followed by humility, "**I will not be ashamed to say "I know not.**"
>
> Finally, orally confirming, "**Neither will I administer a poison** to anybody when asked to do so, nor will I suggest such a course.**"

112.   The Responsibility "Article" includes a statement that mattress makers have a responsibility to ensure the complete safety of their products, which again falsely suggests that Purple has not comported with its safety obligations and that its products are unsafe:

> As more companies enter the direct to consumer mattress space its the responsibility of each individual company to ensure the products they ship are completely safe.

(Emphasis added).

113.   The Responsibility "Article" has a bolded, red statement not only falsely suggesting that Purple's products are not safe, but also that Purple has not provided any evidence of safety (when in fact Purple has posted evidence to support the safety of its products), which also challenges other reviewers to join Defendants' campaign of wrongfully harming Purple's reputation with false and misleading statements and innuendos:

40

**| What is your position on Purple's use of a plastic powder without any clear and concise evidence this is safe under these conditions?**

114.   The Responsibility "Article" falsely states that consumers purchasing Purple's products will be "directly inhaling a white powder substance" which "could be damaging to those with respiratory issues," and falsely referring that Purple was using "made up tests," suggesting that Purple's products are not safe and that Purple is withholding safety information from consumers:

> With that, we regret to inform you that until Purple Mattress discloses to consumers that they will be subjected to and *directly inhaling a white powder substance* that could *be damaging to those with respiratory issues* we're going to revoke our endorsement of this mattress.   We value consumer knowledge and safety far greater to our organization that funny videos and made up tests.

115.   The Responsibility "Article" closes by providing link to the other false and misleading "Articles" and the Revoked Endorsement "PSA," compounding and expanding the overall false and misleading messages that Purple's products are not safe and that Purple is misleading consumers:

### If this Powder is completely brand new to you here are some reference articles

| *What Exactly Is That White Powder On Purple's Mattress?*

| *A Deeper Investigation Into Purple Mattress & Pillows White Powder*

| *PSA – Due To Purple's Unknown Powder We're Revoking Our Endorsement*

| *Purple's Acknowledgement Of The White Powder STILL Misleads Consumers*

### Cumulative Impact and Grouping

116.    The overall, cumulative impact of the five separate "Articles," the numerous inflammatory, false and misleading statements, and the groupings of images and the statements combine to create the overall false and misleading impression that Purple is hiding information and that its products are dangerous, all in an effort to smear Purple's reputation, products, and goodwill, and to divert sales to Purple's competitors, including GhostBed.

### Purple Discovers Monahan's Affiliation with GhostBed

117.    Despite Monahan's efforts to hide his involvement with GhostBed, upon investigation, Purple discovered that Monahad had (at least in the past) been closely associated with Purple's competitor, GhostBed.  Specifically, Monahan was previously employed GhostBed's Chief Brand Officer.

118.    On October 10, 2016, Monahan formed Honest Reviews, LLC.

119.    Upon information and belief, Monahan is sole the owner of HMR, has actively and knowingly caused and supported the statements on the HMR Blog; has directed, authorized and participated in the creation and publishing of the statements; and has been the active and conscious force behind the creation and publishing of the statements.

120.    Upon information and belief, GhostBed has actively and knowingly caused and supported the statements on the HMR Blog; has directed, authorized and participated in the creation and publishing of the statements; and has been the active and conscious force behind the creation and publishing of the statements.

121.    At or around the same time he formed Honest Reviews, LLC, it appears that Monahan commenced efforts to reduce or remove evidence of his association with GhostBed from his digital footprint.

122.    For example, a cached Google page showed that Monahan was an author on www.ghostbed.com:



123.   Similarly, a cached Google page identifies Monahan as an author on

www.ghostbed.com:



124.    However, at least some of these pages are now apparently unavailable, or at least they are not easily discoverable through typical internet searches.  Upon information and belief, the information has been intentionally removed and/or made more difficult to locate.

125.    Similarly, Monahan's Twitter profile previously identified him as the Chief Brand Officer of GhostBed:



126.    Upon information and belief, the reference to GhostBed was removed in approximately October 2016, but in any event it no longer appears on Monahan's Twitter profile:



127.   Similarly, Monahan's LinkedIn also previously identified him as the "Chief

Brand Officer" for GhostBed:



128.    Upon information and belief, the reference to GhostBed was removed in approximately October 2016, but in any event, it has been removed from Monahan's LinkedIn profile.

## The GhostBed CEO's Daughter
## Has Posted False Reviews of Purple on Amazon.com

129.    As Purple just recently discovered, in May of 2016, the daughter of GhostBed's CEO posted a review on Amazon.com of the Purple® Bed, making false and misleading statements remarkably similar to some of those now appearing on the Blog,

including purported concerns about the "powder," a baby, "Johnson and Johnson,"

"cancer," and "safety:"



### Defendants Are Surreptitiously Working to Promote GhostBed Over Other Mattress Companies

130.    Upon information and belief, HMR, Monahan, and/or other entities owned

or controlled by Monahan, are working directly with GhostBed to promote GhostBed

products over those of other manufactures, and in return GhostBed is compensating

HMR, Monahan, and/or other related entities.

131.    Upon information and belief, Monahan has continued his association with

GhostBed, and is now attacking Purple on the HMR Blog for purposes of benefitting

GhostBed and damaging Purple, likely in exchange for some form of financial or other

remuneration from GhostBed or related persons or entities.

132.    Upon information and belief, Defendants are acting in concert to hide the fact that GhostBed is behind the campaign of false and misleading information unleashed on Purple.

### The Blog's Claims of Neutrality and Independence Are False, Misleading, and Highly Likely to Confuse Consumers

133.    The Blog is carefully designed to convey the overall message and impression to consumers that it is independent, unbiased, and unaffiliated with any particular mattress company.

134.    Among other things, the numerous "disclaimers" on the Blog are designed to contribute to this overall perception.

### The Compensation Disclaimers

135.    The Blog contains a number of disclaimers to the effect that the Blog, HMR, and Monahan are not compensated by any party for any of the content on the Blog, including the purported mattress reviews and comparisons (the "Compensation Disclaimers").

136.    For example, a statement that, "Our website receives zero affiliate commissions" appears on the footer of every page of the Blog:



137.    The "What is Honest Mattress Reviews" page includes the following statement:

Honest Mattress Reviews does not seek affiliate relationships.  Nor are we positioned to gain monetary benefits based on consumer buying behavior or decisions.

138.   The Responsibility "Article" includes additional statements disclaiming any commission or other relationship with mattress companies, and emphasizing integrity:

Honest Mattress Reviews does not have any affiliate commission sales relationships with mattress companies.  This is by design to ensure that our focus is on the consumer, not direct commissions for ourselves.  We believe that long-term integrity is more valuable than short-term monetary gain.

### The "Ethics and Free From Influence Disclaimers"

139.   The Blog also contains a number of disclaimers to the effect that the Blog, HMR and Monahan are ethical and free from the influence of any mattress manufacturers (the "Ethics and Free From Influence Disclaimers").

140.   Initially, the Compensation Disclaimers are clearly designed to convey the overall message that the Blog, HMR, and Monahan are ethical and free from the influence of mattress manufactures.

141.   The Blog includes a number of other statements to this same effect, such as statements on the "Disclaimer" page referencing Monahan's purported "ethics," i.e., "my ethics," a statement that the Blog is "Free from corporate or conglomerates … [that] silence or shape editorial narratives and truths," that the posts on the Blog "have total editorial independence," and that "No one has influence on … the posts."

142.   The "What is Honest Mattress Reviews" page similarly includes a number of statements to this effect, such as claims that the Blog is not interested in "influencing a purchase decision to promote a company;" the Blog does not reflect "a few large companies controlling the narrative;" the Blog "allows companies and consumers

uncensored truth;" the Blog provides "the most accurate data available;" the Blog does "not want just a few giant companies to own the narrative;" and information shared on the Blog must be "accurate and true."

### The Blog's Mattress Rankings Are Not Independent and Unbiased

143.   Despite the Blog's numerous representations of its independence and neutrality, the HMR rankings of mattress manufacturers appearing on the Blog are materially misleading to consumers.

144.   For instance, GhostBed is listed as one of the very highest rated mattresses, appearing as the third entry on the list of companies on the "Reviews" tab of the Blog.  The only other mattress companies that have received similarly-high rankings are either not actually in the BIB market, or are small players in the BIB market that pose no threat to GhostBed.

145.   As noted, GhostBed is ranked third by the Blog, after two mattresses which are not in the BIB market or otherwise competitive with GhostBed.  First is a $4,699 mattress from Tempur-Pedic which is not in the BIB segment and is not price-competitive.  Second is a $1,199 mattress from Nest which, although it is part of the BIB market, is not price-competitive and has not yet even been reviewed on the Blog, yet has nevertheless been ranked as "World-Class:"



146.    Besides GhostBed and Nest, which has not even been reviewed yet, none of the other players in the BIB market are given the "World-Class" rating on the Blog.  In fact, the next competitor that poses any threat to GhostBed is Casper, which is ranked far down – 19th – on the list.

147.    Purple's mattress, which is 29th on the list, is the <u>only</u> product that has received a "Poor" rating on the list (purportedly because of the "white powder" issue), which is depicted through the use of the poison-suggesting red X:

                               $999         

**The Blog and the Disclaimers are False and Misleading**

148.    The overall impression that the Blog is unbiased and independent is literally false and is significantly likely to mislead or confuse consumers, including for the following reasons:

(a)    The Blog fails entirely to disclose that Monahan was or remains affiliated with GhostBed, including as a spokesman for the company.

53

(b)     The Blog fails to disclose that Monahan has served as or has been the Chief Brand Officer of GhostBed.

(c)     The Blog fails to disclose that Monahan has received, at least in the past, financial compensation from GhostBed.

(d)     The Blog fails to disclose that, at or about the time that he created HMR and the Blog, Monahan attempted to scrub evidence of his prior affiliation with GhostBed from his digital footprint.

(e)     The Blog does not disclose that Monahan has continued his association with GhostBed, is promoting GhostBed and attacking Purple on the HMR Blog, and that he is doing so in exchange for some form of financial or other remuneration from GhostBed and/or related persons or entities.

### Purple Has Been Injured, Irreparably Harmed, and Faces Additional and Continuing Irreparable Harm

149.    Since HMR began publishing the "Articles" and the "PSA" on the Blog, a number of customers have demonstrated actual confusion and concern regarding Purple and its mattress and pillow products.

150.    For example, consumers have asked questions of Purple that are clearly related to the false and misleading statements on the Blog, making references to Purple's products being "toxic," "lawsuits," "toxic chemicals," "a cloud of powder" that would be inhaled, the powder being "talc," and "asthma."

151.    The BIB market is in a period of rapid expansion and growth.

152.    Capturing market share during a period of rapid expansion and growth is critical for competitors like Purple.

153.    As noted, although Purple did not deliver its first mattress until January 2016, Purple has become one of the four leading BIB companies, and has experienced exponential and rapid growth.

154.    Purple is the fastest growing player in the BIB segment.

155.    In one year, Purple nearly caught up to the market leaders in revenue generation, and if its growth continues, it will surpass its competitors.

156.    Purple's very positive goodwill and reputation in the marketplace have been critical to its rapid growth and success, and Purple has worked hard and made substantial expenditures to develop these qualities.

157.    Because Purple relies strictly upon an ecommerce platform for selling its bedding products to its customers, its online reputation and goodwill are of critical importance to its success.

158.    Defendants' actions have already harmed and will continue to tarnish Purple's goodwill and reputation in the marketplace.

159.    Defendants' actions, if successful, threaten to slow Purple's growth rate, causing the loss of tens or hundreds of millions of dollars in damage to Purple, which will be difficult to calculate.

160.    Defendants' actions threaten to adversely affect Purple's ability to attract and retain key employees needed to manage its growth.

161.    Defendants' actions threaten to adversely affect the value that potential equity partners place on Purple, making it more difficult and expensive – if not impossible – to raise additional capital.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (LANHAM ACT FALSE ADVERTISING – 15 U.S.C. § 1125(a)(1))

162.    Plaintiff incorporates the preceding paragraphs by reference.

163.    Defendants, through the Blog and otherwise, are making in commerce numerous false and misleading descriptions and statements of fact regarding Purple and its goods and services.

164.    Defendants, through the Blog and otherwise, are engaging in commercial advertising and promotion that materially misrepresent the nature, characteristics and qualities of Purple and its products, and which are designed to promote Purple's competitors over Purple, including, upon information and belief, by selling advertising to competitors who receive favorable ratings and reviews on the Blog.

165.    Upon information and belief, Defendants are making material misrepresentations and misleading descriptions and statements of fact that are confusing or likely to cause confusion, mistake, and deception as to, among other things, Defendants' affiliation or association with other persons or entities, and as to the sponsorship or approval of Defendants' services or commercial activities.

166.    Upon information and belief, Defendants are engaging in commercial advertising or promotion that misrepresents the nature, characteristics, and qualities of their own services and commercial activities.

167.    Many of Defendants' statements are literally false, both facially and by necessary implication, and highly likely to mislead, deceive, and confuse consumers.

168.   Defendants' misrepresentations have caused and are highly likely to continue to cause consumer confusion and deceive consumers as to Purple's goods and services and the nature, characteristics, and qualities of Purple and its products.

169.   Purple is suffering and is likely to continue to suffer both lost and diverted sales and harm to its reputation and goodwill, in which it has invested heavily and which it has worked hard to develop over time.

170.   Purple has suffered and will continue to suffer irreparable injury and damages as a result of Defendants' conduct, including harm to its goodwill, reputation, and market position.

171.   Monahan, the owner and Editor in Chief of the HMR Blog, is personally liable for Defendants' violations of the Lanham Act because his is an actual participant in the conduct at issue, including because he creates, directs, and controls all content on the Blog, including all of the material related to Purple.

172.   Purple is entitled to recover its damages, Defendants' profits, the costs of suit, and pre- and post-judgment interest as allowed by law.  Because of the willful nature of Defendants' conduct and exceptional nature of this action, Purple is likewise entitled to enhanced damages and attorney's fees.

## SECOND CAUSE OF ACTION
### (TORTIOUS INTERFERENCE WITH ECONOMIC RELATIONS)

173.   Plaintiff incorporates the preceding paragraphs by reference.

174.   Through the conduct set forth above, Defendants have intentionally interfered with Purple's existing and prospective economic relations, including without limitation its customers, repeat customers, and potential customers.

175.    Defendants' intentional interference has been conducted through improper means, including but not limited to making false and misleading representations of fact regarding Purple and its goods and services, and by falsely promoting its own "reviews" of Purple's products as truthful and legitimate, supported by evidence, sanctioned, and made for purposes of protecting the public, rather than to generate advertising and other income.

176.    Purple has been injured and will continue to suffer injury as a result of Defendants' conduct, including in the form of lost sales, profits diverted to competitors, including GhostBed, and irreparable harm to its goodwill and reputation.

177.    As a result, Purple is entitled to damages, costs, attorney's fees, and pre- and post-judgment interest as allowed by law.

178.    Because HMR's conduct was willful and/or reckless, Purple is entitled to punitive damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
**(DEFAMATION)**

179.    Plaintiff incorporates the preceding paragraphs by reference.

180.    Defendants have made and continue to make numerous express and implied false, misleading, and material statements about Purple.

181.    Defendants' express and implied statements about Purple are not subject to privilege.

182.    Defendants published the statements with negligence, or knowing that the statements were false, with reckless disregard of whether the statements were true or false, or with malice.

183.   As a result of Defendants' conduct, Purple has been damaged and harmed in an amount to be determined at trial, which damages include, without limitation, damages harm caused to Plaintiff's property, business, trade, profession, reputation, and goodwill.

184.   Purple has also suffered and will continue to suffer irreparable harm, including to its business, goodwill, reputation, and market position, due to Defendants conduct.

185.   Defendants' false statements constitute defamation per se, in that that the statements implicate conduct that is incompatible with the exercise of a lawful business, trade, or profession, such that Purple is entitled to recover general damages without proof of special damages.

186.   Purple is entitled to damages, costs, attorney's fees, and pre- and post-judgment interest as allowed by law.

187.   Because Defendants' conduct was willful and/or reckless, Purple is entitled to punitive damages in an amount to be determined at trial.

### FOURTH CAUSE OF ACTION
### (TRADE LIBEL AND INJURIOUS FALSEHOOD)

188.   Plaintiff incorporates the preceding paragraphs by reference.

189.   Defendants have made and continue to make numerous express and implied material statements about Plaintiff's goods and services.

190.   Defendants' express and implied statements about Purple's goods and services are false.

191.    Defendants' express and implied statements about Plaintiff's goods and services are not subject to privilege.

192.    Defendants' express and implied statements about Purple's goods and services were intended to cause financial harm to Purple.

193.    Defendants published the statements with negligence, or knowing that the statements were false, with reckless disregard of whether the statements were true or false, or with malice.

194.    As a result of Defendants' conduct, Plaintiff has been damaged and harmed in an amount to be determined at trial, which damages include, without limitation, damages for harm caused to Purple's property, business, trade, profession, reputation, goodwill, and reputational damage in the BIB industry.

195.    Purple has also suffered and will continue to suffer irreparable harm, including to its business, goodwill, reputation, and market position, due to Defendants conduct.

196.    Defendants' false statements constitute trade libel per se, in that that the statements implicate conduct that is incompatible with the exercise of a lawful business, trade, or profession, such that Purple is entitled to recover general damages without proof of special damages.

197.    Purple is entitled to damages, costs, attorney's fees, and pre- and post-judgment interest as allowed by law.

198.    Because Defendants' conduct was willful and/or reckless, Purple is entitled to punitive damages in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
## (TEMPORARY RESTRAINING ORDER AND INJUNCTION)

199.   Plaintiff incorporates the preceding paragraphs by reference.

200.   Defendants have violated Purple's rights and have otherwise acted in an unlawful manner, as set forth in the preceding causes of action.  Purple has a substantial likelihood of prevailing on the merits of these claims.

201.   Unless an injunction issues to require Defendants to remove their "Articles" and "PSA," and to restrain Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, from publishing any similar information, Purple will suffer irreparable harm, including but not limited to injury to its goodwill, ability to do business, market position, and/or loss of business in an amount difficult or impossible to quantify.

202.   An injunction prohibiting the publication of false and misleading statements and descriptions would not be adverse to the public interest.

203.   The threatened injury to Purple far outweighs whatever damage an injunction would or could cause to Defendants, who would not be prohibited from engaging in other lawful activities.

204.   There is a substantial likelihood that Purple will prevail on the merits of the claims for which injunctive relief is sought, or there are serious issues on the merits which should be the subject of further litigation.

205.   Therefore, under Rule 65 of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(a), Plaintiff is entitled to a temporary restraining order and preliminary injunction that includes, at a minimum, the following relief:

(a)     That Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, be ordered immediately to discontinue making any and all false and misleading statements with regard to Purple, in any medium or format, including but not limited to removing the "Articles" and "PSA" specifically referenced in this Complaint;

(b)     That Defendants be required to issue corrective advertising or statements on the Blog and elsewhere to remedy the confusion and deception caused by the false and misleading statements with regard to Purple;

(c)     That Defendants be required to issue corrective advertising or statements to correct any and all false and misleading statements regarding, and to fully disclose Monahan's association or former association with GhostBed, and/or HMR's association, affiliation, or receipt of compensation in any form from competitors of Purple;

(d)     That Defendants be required to file with the Court and serve upon Purple a report under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

(e)     That Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them, be restricted from making false or misleading or confusing posts or discussions on social media or otherwise about the existence of this lawsuit, the Court's temporary restraining order or other any other orders that may be issued

by the Court, or Purple's efforts herein to restrain Defendants from continuing to engage in the conduct at issue, in an attempt to circumvent the purpose of the injunctive relief sought by Purple; and

(f)     Any additional relief warranted at law or necessary to protect Plaintiff's rights, to be determined by the facts and circumstances at the time of entry of the order.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court enter judgment against Defendants as follows:

1.     For a temporary restraining order and preliminary and permanent injunction enjoining Defendants, their officers, agents, servants, employees and attorneys, successors and assigns, and all other persons acting in concert or participation with Defendants, as set forth above;

2.     For damages sufficient to compensate Plaintiff for Defendants' wrongful conduct and infringement, including for Plaintiff's lost profits, lost sales, Defendants' sales, and/or for lost license fees and royalties;

3.     An award of pre-judgment and post-judgment interest and costs;

4.     An award of reasonable attorneys' fees pursuant to 15 U.S.C. § 1117, 35 U.S.C. § 285, and Utah law; and

5.     For such other further relief to which Plaintiff may be entitled in law and in equity.

## DEMAND FOR JURY TRIAL

Purple demands a trial by jury on all matters herein so triable in accordance with

Federal Rule of Civil Procedure 38(b).

DATED this 24th day of February, 2017.

**MAGLEBY CATAXINOS & GREENWOOD**


/s/ James E. Magleby
James E. Magleby
Christine T. Greenwood
Adam Alba
*Attorneys for Plaintiff Purple Innovations, LLC*