James E. Magleby (7247)
 magleby@mcgiplaw.com
Christine T. Greenwood (8187)
 greenwood@mcgiplaw.com
Adam Alba (13128)
 alba@mcgiplaw.com
**MAGLEBY CATAXINOS & GREENWOOD**
170 South Main Street, Suite 1100
Salt Lake City, Utah 84101-3605
Telephone: 801.359.9000
Facsimile: 801.359.9011

Attorneys for Purple Innovations, LLC

---

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **PURPLE INNOVATIONS, LLC, A Delaware limited liability company,**<br><br>　　　**Plaintiff,**<br>**v.**<br><br>**HONEST REVIEWS, LLC, a Florida Corporation, RYAN MONAHAN, an individual, and GHOSTBED, a Delaware corporation,**<br><br>　　　**Defendants.** | **MOTION FOR TEMPORARY RESTRAINING ORDER**<br><br><br><br><br><br>**Case No.:  2:17-cv-00138-PMW**<br><br>**Magistrate Judge Paul M. Warner** |

Under Rule 65(b) of the Federal Rules of Civil Procedure, Plaintiff Purple

Innovations, LLC ("Purple"), by and through its counsel MAGLEBY CATAXINOS &

GREENWOOD, respectfully moves the Court for entry of a temporary restraining order

against Defendants Honest Reviews, LLC, dba as or through

www.honestmattressreviews.com, Ryan Monahan, and GhostBed, Inc. (collectively,

"Defendants").

## INTRODUCTION

Purple has recently become the target of a concerted, widespread, and public online smear campaign, which threatens to go viral if it has not already, falsely accusing Purple's products of being unsafe and dangerous to the public,[1] attacking Purple's stellar reputation and goodwill, and attempting to displace its prominent position in the rapidly-expanding "bed-in-a-box" ("BIB") market.  These statements are both literally false, false by necessary implication, and likely to mislead and confuse consumers, taken separately or in the context of the overall message and the dozens of statements. These statements include (i) accusing Purple of "administer[ing] a poison," "deceitful business practice[s]," "recklessly predisposing consumers to an untested substance," using its customers as "guinea pigs," and putting its employees' health at risk; (ii) using inflammatory language in connection with Purple's products, such as "ovarian cancer," "made up tests," "impact the[] health of tens of thousands of unknowing consumer[s]," "damaging to those with respiratory issues," "short or long-term health," "dragon breath," "U.S. poison control, "lung and respiratory irritation," and "inhaling gasoline; and (iii) analogizing Purple's products to "Johnson & Johnson's multiple multi-million dollar baby powder lawsuits."  These false and misleading statements are often bolded or otherwise

---

[1] Purple is not a fly-by-night company.  Its founders are engineers with experience in advanced aerospace materials, manufacturing, design, and project management.  They have over 30 patents in cushioning technology, and they have designed and sold products in the medical-device industry, including cushioning for wheelchairs and used by licensees for critical care medical beds and knee and ankle braces.

emphasized, so as to present them in the most alarming manner possible, including by attaching a large red circle with a big letter "X" in the center.

The problem is compounded because Defendants are misleading the public into believing that they are independent and unbiased reviewers of mattress products, when in fact they are not. While the publishers of these false, misleading, and defamatory statements purport to be independent and unbiased, unaffiliated with any of Purple's competitors, the drivers of the campaign are Ryan Monahan ("Monahan"), a former officer of Purple's primary competitor, Defendant GhostBed, Inc. ("GhostBed"); Monahan's newly-formed company, Defendant Honest Reviews, LLC ("HMR"), which owns and operates the affiliated website or blog www.honestmattressreviews.com (the "Blog"); and GhostBed. The evidence shows that GhostBed has surreptitiously conspired with Monahan and HMR to pursue the campaign against Purple. Until at least October 2016, Monahan was employed as GhostBed's Chief Brand Officer. However, at about the same time he founded HMR and launched the Blog, Monahan took steps to remove from his online profile any references to his past affiliation with GhostBed. Specifically, while various websites, including Monahan's Twitter profile, previously identified Monahan as having been affiliated with GhostBed, evidence of that affiliation is now curiously absent, or at least much more difficult to find.

Moreover, Purple recently learned that the daughter of GhostBed's CEO had previously made posts about Purple on Amazon.com, under a fake name, and – just as Defendants are now doing on the Blog – analogizing Purple's products to those that cause "cancer," like Johnson & Johnson baby powder. It is clear that the purpose of the

campaign is to disparage Purple to the benefit of GhostBed, including by giving extremely negative reviews to Purple and extremely positive reviews to GhostBed on the Blog, such that GhostBed can unfairly disadvantage its chief, up-and-coming competitor.

GhostBed has incentive to pursue this smear strategy.  While GhostBed has been a leader in the BIB market for some time, Purple's success and rapid growth have made it a strong new entrant.  Since shipping its first mattress in 2016, Purple has become one of the top four players in the quickly-growing market.  In accordance with this tactic, beginning in January 2017, HMR and Monahan have published five separate and lengthy posts or "articles" regarding Purple on the Blog, each of which is also readily available through basic internet searches and on various social media platforms, including Facebook and Twitter.  These "articles," which are specifically designed to appear as "official" news items, bearing taglines such as "BREAKING NEWS," all contain demonstrably false and misleading statements to the effect that Purple's products are unsafe and dangerous to the public.  In addition, the "articles" falsely and misleadingly attack Purple as being untruthful, evasive, and seeking to hide pertinent safety information from its customers.

The statements on the Blog are false and misleading in yet another respect. Through a series of "Disclaimers," HMR and Monahan assert that the reviews and product comparisons they conduct and post on the Blog are fully independent and unbiased.  Among other things, they claim that they are not affiliated with any mattress company appearing on the Blog, including those who purchase advertising on the Blog,

and that they receive no monetary compensation from any mattress company.  Given

the affiliation with GhostBed, however, these statements appear to be false.  If

GhostBed or any other mattress company is receiving favorable reviews in exchange for

monetary or other benefits, including by virtue of a mattress company's purchase of

advertising on the Blog, then the statements regarding HMR's and Monahan's

"neutrality" are untrue and, at a minimum, materially misleading to the public.

Purple is entitled to a temporary restraining order to enjoin Defendants' improper

conduct, and each of the requirements for obtaining such relief is clearly satisfied in this

case.  First, Defendants' false and misleading statements have already caused and will

continue to cause irreparable injury to Purple, including to its goodwill, reputation, and

market position.  In fact, numerous consumers have already reported being confused

and made inquiries questioning the safety Purple's products and the integrity of the

company.[2]  Second, the requested temporary injunction will serve the public interest by

ceasing the publication of false and misleading consumer information, encouraging the

publication of truthful consumer information, protecting Purple's goodwill, and promoting

honest and fair competition.  Third, the balance of harms weighs strongly in favor of

issuing a temporary restraining order.  While Purple faces the prospect of substantial

and continuing irreparable harm, the requested temporary restraining order would

restrain Defendants only from doing what they should not be doing in the first place;

namely, creating and widely disseminating false and misleading statements about

---

[2] Some of the consumer inquiries to Purple utilize language that is very similar or identical to the false and misleading statements being published online by Defendants.

Purple and its products over the internet.  Finally, as set forth below, the facts make clear that Purple is substantially likely to prevail on the merits of its claims for Lanham Act false advertising, tortious interference with economic relations, defamation, and trade libel.  For all of these reasons, including the minimal or non-existent risk that Defendants will be harmed by any wrongfully-entered injunction, no bond should be required if a temporary restraining order issues.

In short, Purple respectfully requests that the Court grant its motion and enter a temporary restraining order without bond against Defendants.

## STATEMENT OF FACTS[3]

### Purple

1.      Purple is an innovative and successful Utah company focused upon bringing technologically advanced comfort products to the market to resolve and alleviate pain experienced by consumers while lying in bed, sitting, or standing.  *See* Declaration of Sam Bernards ("Bernards Decl.") ¶ 4, attached hereto as Exhibit "A."

2.      Since launching its first mattress product, the Purple® Bed, Purple has enjoyed tremendous success, growing from fewer than 50 employees in January 2016 to over 600 employees in February 2017, all of whom are located in Utah and many of whom are involved in the manufacturing of Purple's products.  *See id.* ¶ 5.

---

[3] Many of the facts set forth herein and in the attached declaration of Purple's CEO are included in Purple's Complaint filed against Defendants on February 24, 2017.  [*See* Doc. No. 2].  However, certain additional facts have been added since that date, such that it is not practical to incorporate the Complaint by reference.

3.      Purple has also expanded its business beyond the Purple® Bed, and now provides a variety of innovative, quality products related to the mattress and sleep market, including the Purple® Pillow.  *See id.* ¶ 6.

4.      The seeds of Purple's business were planted in 1989, when brothers Tony and Terry Pearce, both engineers, decided to apply their engineering skills to develop innovative products that would improve the quality of life for their customers.  *See id.* ¶¶ 7-8.

5.      By 1993, the Pearce brothers discovered that there was a pressing need for better wheelchair cushioning.  Pressure sores were a common and extremely painful reality in the lives of wheelchair users.  Taking on that challenge, the Pearce brothers created Floam™, the world's lightest-weight cushioning fluid. Soon, the Pearces obtained five patents associated with Floam™, which was being used in not only wheelchair cushions, but also by major licensees in products such as critical-care medical beds (Hill-Rom), footwear (Nike), ankle/knee braces (Johnson & Johnson), and golf bag straps (Top-Flite).

6.      The key discovery came when Hyper-Elastic Polymer™ was molded in a shape that could "relax" under pressure points, redistributing the pressure to other areas.  *See id.* ¶ 9.  The same feature turned out to provide highly effective back support in mattresses.

7.      As time went on, the Pearces or their companies licensed predecessor products of Purple to numerous different entities, including makers of critical care medical beds (Stryker Medical); consumer mattresses in Europe (Svane by Ekornes),

Japan (Francebed), and Australia (Sleepmaker); backpack straps (Jansport); shoe insoles (Dr. Scholl's Massaging Gel and Sof-Sole); pillows (Sleep Innovations); soft-catch toy balls (Nickelodeon); wheelchair cushions (EquaPressure); and many other advanced cushioning products.

8.     Eventually, the Pearce brothers created a patented machine called Mattress Max™, which took over two years and several million dollars to develop.  Now, the Mattress Max™ is used to make Hyper-Elastic Polymer™ in the USA in sizes large enough to fully cover a king-sized mattress, and at production rates and costs that allow the products to be sold affordably online.  *See id.* ¶ 10.

9.     Additional innovations and improvements have been made over time, including as to the discovery of the proprietary non-toxic anti-tack powder, which is made from plastic from a family of plastics used for food containers and children's toys, and which has been allowed for use in surgical implants by the FDA.  The plastic powder used by Purple sticks to the Hyper-Elastic Polymer™ and prevents the mattresses and pillows from sticking to themselves when they are compressed for shipping.  Purple is currently seeing patent protection for the use of the anti-tack powder in this manner.  *See id.* ¶ 11.

10.     The Pearce brothers own numerous cushioning-related patents and pending patent applications.  *See id.* ¶ 12.

11.     Purple would not sell product to consumers if it had any reason to believe its products were unsafe.  *See id.* ¶ 13.

12.     Purple attempts to continually improve its processes to use the appropriate amount of powder on its products for shipping to consumers.  Both mattress and pillow products having this powder have covers over the powdered Hyper-Elastic Polymer™ when shipped to consumers as finished products, and these products are typically used by consumers with a mattress protector and/or sheet (bed only) or a pillow case.  *See id.* ¶ 34.

13.     Apart from the obviously edited clips of telephone calls posted on the Blog, which purport to be calls to Purple from HMR representatives (who do not identify themselves as such, or the fact that the conversations are being recorded), Purple is unaware of any efforts by GhostBed, HMR, or Monahan to contact Purple about the safety of its products or the anti-tack powder, and is unaware of any Purple representatives who have refused to provide pertinent, non-confidential information. *See id.* ¶ 35.

14.     Because Purple discovered the innovative anti-tack powder itself, the exact identification of the powder is currently proprietary.  Purple has applied for patent protection related to the use of the powder.  *See id.* ¶ 36.

### Purple's Online Marketing Strategy

15.     Beginning in 2016, Purple embarked upon a marketing and sales strategy designed to get its products into the hands of consumers at better-than-competitive prices.  *See id.* ¶ 14.

16.    Purple has successfully focused upon the "Bed-in-a-Box" ("BIB") mattress market segment.  Purple does not have brick and mortar stores but instead sells its bedding products solely through an e-commerce platform.  *See id.* ¶ 15.

17.    Purple's competitors in the BIB market include GhostBed, Casper, Leesa, and Tuft & Needle, among others.

18.    Purple passes along to its consumers the cost savings it achieves through its vertical integration strategy of innovation, manufacturing, and marketing, as illustrated by a graphic on Purple's website:



https://onpurple.com/mattress; *see also* Bernards Decl. ¶ 17.

19.    In response to online orders, Purple delivers mattresses to consumers for a risk free trial.  In fact, Purple currently offers consumers 100 days to try its mattress product, and it provides a full refund if the customer is not satisfied.  *See* Bernards Decl. ¶ 18.

20.     The BIB segment is the fastest growing segment in the multi-billion-dollar mattress industry.  *See id.* ¶¶ 19-20.  In 2015, the BIB market only accounted for an estimated 9% of online mattress purchases, but by 2016 the BIB market had grown to an estimated 30% of online purchases, representing a growth in the hundreds of millions of dollars.

21.     For example, one estimate is that the BIB market share of $800 million in 2016 will grow to $1.4 billion by the end of 2017.

22.     Although Purple did not launch its mass production and major marketing campaign until January 2016, Purple has become one of the four leading BIB companies, experiencing exponential and rapid growth.  *See id.* ¶ 22.

23.     Purple places a high value on the safety, reliability, and quality of its products.  Purple has invested millions of dollars into research and development and our manufacturing processes.  Its mattresses have passed all governmental safety requirements, enabling Purple to deliver on the promise of providing a superior sleep experience.  *See id.* ¶ 23.

24.     Purple's positive goodwill and reputation in the marketplace have been critical to its rapid growth and success, and Purple has worked hard and made substantial expenditures to develop these qualities, including our unique, effective, and innovative marketing and the development of our online presence.  *See id.* ¶ 24.

25.     Indeed, Purple's website has drawn at least tens of millions of visitors, and its marketing videos have hundreds of millions of views.  Purple's popularity and high online visibility may actually be contributing to Defendants' efforts to malign Purple by

drawing additional visitors to the HMR Blog and related social media, because the HMR Blog and social media posts are likely to appear as search results, thus diverting potential customers to the Blog and GhostBed's "world class" rating on the Blog.

26.     Given Purple's success, Purple poses a significant threat to its competitors, including in particular GhostBed, which accordingly has a strong incentive to undermine Purple in the BIB market.

**The Mattress Review Business**

27.     Because of the already-large traditional mattress market and the growing BIB market, and because of the importance of customer and other reviews to an e-commerce market strategy, *see, e.g., id.* ¶¶ 27, 44, a number of websites have emerged that include reviews of both traditional and BIB mattresses.  These websites include not just platforms for consumer reviews, but also websites that purport to offer "professional" or "test-based" reviews of mattresses, such as the HMR Blog.

28.     Because Purple relies strictly on an e-commerce sales strategy, online comments and reviews are very significant to its business.  *See id.* ¶ 27.

29.     For example, a March 2016 Wall Street Journal article described the importance of reviews in this new market segment, discussing one such customer named Will Haley:

> It is a process aimed at the often wealthier, younger and busy shoppers who care less about kicking the tires and more about convenience. Mr. Haley says he felt comfortable buying the mattress sight unseen **because online reviews are enough quality control**. "Anything I can buy online, I do," he says.

"Bed-in-a-Box Startups Challenge Traditional Mattress Makers," Wall Street

Journal, March 7, 2016, attached as Exhibit "B," (emphasis added).

30.     Defendants HMR and Monahan appear to agree with this perspective.  As

they posted on the Blog:

*Reviewers possess a unique, influential power that if misused could unintentionally (or intentionally) steer a consumer into the wrong decision.*

https://www.honestmattressreviews.com/mattress-reviewers/.

31.     Purple welcomes the intense customer and reviewer scrutiny that is found

in the marketplace of ideas that is the internet, including factually accurate negative

reviews, which can provide valuable input to the company.  *See* Bernards Decl. ¶ 28.

32.     Reviews that are false or likely to confuse or mislead consumers pose a

substantial threat to Purple, which relies so heavily upon an e-commerce platform,

including the associated marketing of its products.  *See id.*

**The "honestmattressreviews.com" Blog and the Campaign Against Purple**

33.     In recent months, Purple became aware of a new mattress review

website, "honestmattressreviews.com," (i.e., the "Blog"), which purports to be an

"honest" and "unbiased" mattress review service.  *See id.* ¶ 30.

34.     Starting in January 2017, Purple discovered that the HSR Blog had begun

posting false information regarding Purple and its products, including posts calling into

question the safety of the Purple® Bed products, the anti-tack powder, and the integrity

and honesty of the business.  *See.*

35.     Over the course of just a few weeks, the Blog has made five (5) posts regarding Purple, which are prominently displayed on the Blog and are misleadingly represented as "articles" and/or "breaking news."   These posts directly attack Purple and its products, making both literally false statements and statements that are highly likely to mislead consumers.

36.     Each of these posts or "articles" is readily accessible to the public.  The Blog contains multiple links to each post, such that the posts can be accessed in numerous ways through the Blog, and the images associated with the posts are continually displayed to consumers throughout the Blog.  Defendants have also posted some or all of these posts (or links to the posts) on various social media platforms, including Facebook and Twitter.  The posts can also be located through simple internet searches, including through Google.  *See id.* ¶ 31.

37.     The "Articles" are titled as follows:

(a)     "WHAT EXACTLY IS THAT WHITE POWDER ON PURPLE'S MATTRESS?" (the "White Powder 'Article'"), https://www.honestmattressreviews.com/purple-mattress-powder/, attached hereto as Exhibit "C."

(b)     "A DEEPER INVESTIGATION INTO PURPLE MATTRESS & PILLOWS WHITE POWDER" (the "Purple Investigation 'Article'"), https://www.honestmattressreviews.com/purple-mattress-white-powder/, attached hereto as Exhibit "D."

(c)     "PSA | DUE TO PURPLE'S UNKNOWN POWDER WE'RE REVOKING OUR ENDORSEMENT" (the "Revoked Endorsement 'PSA'"), https://www.honestmattressreviews.com/purples-unknown-powder/, attached hereto as Exhibit "E."

(d)     "PURPLE ACKNOWLEDGEMENT OF THE WHITE POWDER STILL MISLEADS CONSUMERS" (the "Purple Misleads Consumers 'Article'"),

https://www.honestmattressreviews.com/purples-acknowledgement-white-powder/, attached hereto as Exhibit "F."

(e)　"MATTRESS REVIEWERS HAVE A RESPONSIBITY TO ACKNOWLEDGE CONSUMER SAFETY" (the "Responsibility 'Article'"), https://www.honestmattressreviews.com/mattress-reviewers/, attached hereto as Exhibit "G."

**Defendants Have No Evidence That Purple's Products Are Unsafe**

38.　The overall message of the "Articles" posted by Defendants is clear: Purple's products are unsafe, pose a danger to consumers, and Purple has something to hide.  This message, however, is demonstrably false and unsupported by any evidence.

39.　For instance, upon information and belief, none of the Defendants have conducted any safety or other testing of Purple's products.

40.　Defendants also have no evidence to suggest that Purple's products are in any way unsafe.

41.　Despite the lack of any support for their claims, and despite HMR having obtained at least one materials information statement regarding the Purple® Bed product, HMR has chosen to ignore both the publicly-available safety information regarding Purple's products and the lack of any information suggesting that Purple's products are unsafe.  Instead, Defendants have intentionally elected to launch an unfounded campaign of false and misleading statements and innuendos against Purple and its products, causing reasonable consumers to believe that Purple's mattress and pillow products are unsafe and in need of warnings, that Purple is hiding those facts from consumers, and that Purple is knowingly putting the health of consumers at risk.

**The First Post:  The White Powder "Article" (Exhibit C)**

42.     The White Powder "Article" was posted on the Blog in approximately mid-January 2017, setting the stage for Defendants' smear campaign.

43.     The White Powder "Article" purports to ask a series of inflammatory questions about a white, powdery substance that appears on Purple® Bed products. The "Article" also makes statements that are false and likely to mislead or confuse consumers to believe (among other things) that Purple's products – including the powder substance on the mattresses – are dangerous and that Purple is deliberately withholding safety information from consumers.

<u>False and Misleading Statements Regarding Product Safety</u>

44.     The inflammatory questions in the White Powder "Article" include the following:

**Specifically, the top layer that has a powder coating.**
*What is this white powder?  Is it safe?   Is it safe to touch your skin?   Is it safe to inhale?*

45.     Despite the lack of any evidence to support the claim, these questions clearly are designed to mislead consumers to believe that Purple's products are unsafe.

46.     Moreover, the White Powder "Article" falsely suggests that the powder on Purple's products is "Talcum Powered," [sic] references multi-million dollar lawsuits involving babies," and indicates that baby powder has been found to cause Ovarian cancer:

> We were extremely concerned when we were informed (via telephone call) the power is a Talcum Powered after having watched Johnson & Johnson's multiple multi-million dollar baby powder lawsuits found to cause Ovarian Cancer. We've been reassured that Purple does NOT use Talcum Powder.

47. As with the other inaccurate and unfounded statements in the White Powder "Article," these statements deliver the unmistakable message that the powder is or contains talcum powder (when the call referenced on the website makes clear that the powder is not talcum powder) or some other unknown harmful substance, and that Purple's products are unsafe, toxic, and cause cancer.

<u>False Statements Regarding Purple's Alleged Lack of Responsiveness</u>

48. The White Powder "Article" also includes statements falsely representing that Purple is withholding safety information from consumers and has failed to respond to inquiries regarding the safety of its products:

> Since Purple elected not to respond via email or social networks – we tried the most direct route to receive an answer by simply calling and asking.

49. The White Powder "Article" further falsely asserts that Purple is not interested in the consumer or consumer safety:

> Final Thought – we were relieved to see some documentation regarding the materials used finally. As our focus is consumer interest and consumer safety, it's crucial we ask the tough questions.

50. Another statement in the White Powder "Article" likewise falsely indicates that Purple is not transparent with consumers, is withholding safety information from consumers, and (again) that Purple's products are not safe:

> In a perfect world and in a transparency to consumers, we'd like Purple to better
> disclose what powder material they are introducing into consumers homes *before* the
> customer receives the product.  Especially as consumers will spend 1/3 of their lives
> over the next years with this powder directly touching their skin or even potentially
> inhaling.

51.     In fact, the White Powder "Article" intentionally cements the suggestion

that Purple is improperly withholding safety from consumers by giving it an "F" grade in

that category:

> Major Key:  Marketing A+.  Product Quality A+.  Disclosing Information F.

**The Second Post:  The Investigation "Article" (Exhibit D)**

52.     The Investigation "Article" was posted within a week of the White Powder

"Article," and it builds upon the same theme.  The Investigation "Article" was posted with

the headline "BREAKING NEWS" in all capital letters.

53.     Like the White Powder "Article," the Investigation "Article" purports to ask

a series of inflammatory questions calling both the safety of Purple's products and the

integrity of its business into question, including numerous false and misleading

statements regarding those topics.

54.     For example, the Investigation "Article" repeats the statements falsely

suggesting that Purple has been withholding safety information from consumers and

has not responded to inquiries, such as that "Purple elected not to respond" to email or

social network inquiries (and Purple is not aware of any such attempts):

> Since Purple *elected not to respond via email or social network*s – we tried the most
> direct route to receive an answer by simply calling and asking.

55.    The Investigation "Article" also reiterates the inflammatory questions included in the White Powder "Article," again strongly suggesting that Purple's products are unsafe:

> In last week's article, we asked these four simple questions;
>
>   1. What is this white powder?
>   2. Is it safe?
>   3. Is it safe to touch your skin?
> "  4. Is it safe to inhale?

56.    Although Purple uses only new materials in its manufacturing, the Investigation "Article" inaccurately states that Purple does not use new materials in its products, again raising the specter that Purple's products are dangerous:

> One major key that isn't included or very easily found via Purple's documentation is that they _do not utilize new materials to make this plastic layer_.  Rather, they use recycled manufactured products.

57.    The Investigation "Article" makes unsupported statements to the effect that consumers will inhale the powder for eight hours while sleeping, again for purposes of suggesting that Purple's products are dangerous:

> This substance _may be_ approved safe to use in small quantities after having been tested by scientific professionals.  _That same substance that's intended to be consumed via tablet form in small controlled doses may have very different outcomes regarding the effect on a human body or while inhaled for eight plus hours a night_ while you sleep.

58.    In addition, the Investigation "Article" suggests that Purple is obligated to have a certain level of "scientific proof" about its products, that it does not have this level of proof, and that Purple's products are unsafe as a result:

**Does Purple have scientific proof from multiple third party sources confirming through comprehensive testing that this substance is safe to lay on and inhale nightly for years?**

59.     Again creating the impression that Purple's products are unsafe and its product testing is inadequate, the Investigation "Article" makes statements that Purple's products are not safe for long term contact, that Purple is acting "recklessly" as to an "untested substance," and that Purple's products will "impact one's short or long-term health:"

> On the contrary, if they do not have scientific proof from multiple credible sources that confirms the use long-term use of this substance with Purple's intended use, (to reduce the sticking of the plastic grids) as safe for long-term contact and inhalation – then we feel they are recklessly predisposing consumers to an untested substance that could directly impact one's short or long-term health.  When we asked hyper-specifically this question we found the same answer, 'It's food-grade material'.

60.     As yet another example of these groundless claims, the Investigation "Article" makes statements suggesting that the powder is the same as a "ground down" "plastic mustard container" or "glass coke bottle," which consumers will inhale every night for "eight to ten hours," yet again suggesting that Purple's products are not safe:

> In this instance we know it's safe to touch a plastic mustard container or a glass coke bottle.  But, the applications of those food-contact materials are not ground down into a small microscopic powder and inhaled for eight to ten hours a night over the course of the mattresses lifespan.

61.     Following these statements, the Investigation "Article" embeds a YouTube video showing the well-known-to-internet-users "cinnamon challenge," in which a person attempts to swallow a spoon of cinnamon.  *See also*

https://www.youtube.com/watch?v=KZ6bzrqjo4M.  The video includes an opening

image of a woman who appears to be exhaling a caustic, brown substance:



62.     The title page of the video is as follows:



63.     The cinnamon challenge video, which has absolutely nothing to do with Purple or its products, shows people choking, coughing, gagging, spitting, crying, and attempting to rinse their mouths out with water.

64.     It has been reported in the media that some people have literally died as a result of the cinnamon challenge.

65.     The Investigation "Article" goes on to discuss the cinnamon challenge as if to compare it to the Purple products, emphasizing the words "dragon breath" and reports to "poison control:"

Should a person elect to consume a teaspoon of cinnamon based on the knowledge of what this will physically do to one's body, the fault resides on the individual.  The ingestion of the (cinnamon) powder invariably stimulates the gag reflex followed by inhalation of the powder that's stuck inside the mouth and throat.  The pain then causes rapid exhalation characterized by "**dragon breath**" upon blowing the powder out.  ***Over 200 different reported cases by the U.S. Poison control this year alone.***

66.     The Investigation "Article" further makes statements suggesting that Purple was approached by "customers" "with respiratory conditions such as Asthma," when – according to the Blog – there was a single telephone call made by someone who did not say they had asthma (and Purple is unaware of any additional approaches by "customers" with asthma).  The statements are designed to confuse consumers and cause them to believe that Purple's products are harmful to persons with asthma, that Purple's products are not safe, and that Purple is withholding safety information from consumers:

Inversely, Purple's prior and current business practices involve deliberately choosing not to inform consumers of the powders existence in the first place.  When pressed by customers with respiratory conditions such as Asthma, Purple remains secure in their position not to disclose the contents that consumers are subjected to.

67.     The Investigation "Article" falsely asserts that Purple is engaging in a "deceptive business practice" that could "potential [sic] irritate or even impact they [sic] health of tens of thousands of unknowing consumers," suggesting that Purple is acting intentionally and illegally to deceive its customers, including by hiding the fact that its products are unsafe and pose health risks to "tens of thousands" of customers:

> When you look on Purple's website, their high-resolution product images do not show the final product they are shipping.  We believe this is a deceptive business practice that could potential irritate or even impact they health of tens of thousands of unknowing consumers.

68.     The Investigation "Article" likewise alleges that Purple is unlawfully withholding information from consumers that it should be required to have a disclosure regarding the powder on its "law tag" (also suggesting that Purple is violating the law):

> In a consumer safe perfect world, Purple would willing disclose the substance, include it on their law tag and have a warning to consumers before the point of purchase.

**The Third Post:  The Revoked Endorsement "PSA" (Exhibit E)**

69.     The Revoked Endorsement "PSA" was posted the week following the Investigation Article (just two weeks ago).  Its purpose and effect is to increase the significance of the campaign in the minds of reasonable consumers.

70.     The Revoked Endorsement "PSA" is or was prominently displayed on the homepage of the HMR website, in a series of stories that are presented as if they are legitimate news articles, with the headlines in all capitals of "EDITOR'S TOP PICKS" and "INDUSTRY NEWS", with the tag line "PSA | Due to Purple's Unknown Powder We're Revoking Our Endorsement," as follows:



71.     The top of the Responsibility "Article" also includes, in larger form, the image of a large ""X" in the red circle:



72.     The Revoked Endorsement "PSA" is and was also accessible to the public in a number of other ways through the Blog, and as a result of internet searches such as through Google.

73.     These images and language are false and misleading because they suggest to consumers that HMR is reporting objective "news," through the use of the prominently displayed headlines "EDITOR'S TOP PICKS" and "INDUSTRY NEWS," when HMR is not a news organization.

74.     The Revoked Endorsement "PSA," like the prior "Articles," purports to ask a series of inflammatory questions, designed to convey to consumers a literally false and misleading message that the Purple mattress is unsafe, and that Purple is withholding safety information from consumers.

75.     The Revoked Endorsement "PSA" includes the initials "PSA," obviously standing for "Public Service Announcement," which falsely suggests independence and altruism, that the "PSA" originated from or is endorsed by a governmental body, and that it is related to health and safety, that is, that Purple's products are not safe.

76.     The Revoked Endorsement "PSA" includes statements about Purple failing to give a "consumer warning," "deliberately choosing not to inform customers," and "deliberately" deceptive "business practices;" and references to multiple customers "with respiratory conditions," "Asthma," and the "seriousness" of "inhalation of this powder." Again, these statements are designed to suggest – without any evidence – that Purple's products are unsafe and that Purple is withholding safety information from consumers:

*Our core beliefs at Honest Reviews revolve around one core question, "Does this benefit the consumer?" As we prior published our <u>concern for an unknown substance</u> Purple continues to coat their products in <u>without consumer warning</u>.*

Purple's previous and current <u>business practices involve deliberately</u> choosing not to inform customers of the powders existence in the first place. When pressed by customers with <u>respiratory conditions such as Asthma,</u> Purple remains secure in their position not to disclose the contents that consumers are subjected to.

**We've reached out to Purple on via multiple communications platforms, and yet they continue to ignore the <u>potential seriousness of inhalation of this powder.</u>**

77.     The Revoked Endorsement "PSA" also alleges that Purple has decided to "run fast and figure out problems later," suggesting that Purple's products are not safe and that Purple is withholding safety information from consumers:

Competition and commerce drive innovation. But, as some companies become red hot they tend <u>to run fast and figure out problems later.</u> It's clear the unknown white powder used is there to help with the plastic grid walls as they stick together.

78.     Also included are statements that Purple is "subjecting consumers to a powder that could impair or impact their physical health:"

Success and rapid growth is no excuse for potentially <u>subjecting consumers to a powder that could impair or even impact their physical health.</u>

79.     As with the other "Articles," the Revoked Endorsement "PSA" falsely suggests that consumers purchasing Purple's products will be "directly inhaling a white powder substance" which "could be damaging to those with respiratory issues," and falsely asserts that Purple has used "made up tests:"

*With that, we regret to inform you that until Purple Mattress discloses to consumers that they will be subjected to and <u>directly inhaling a white powder substance</u> that could <u>be damaging to those with respiratory issues</u> we're going to revoke our endorsement of this mattress.* We value consumer knowledge and safety far greater to our organization that funny videos and <u>made up tests.</u>

## Purple Responds to the Misleading Posts by Defendants HMR and Monahan

80.     Convinced that HMR and www.honestmattressreviews.com are not interested in an actual, fair dialogue, and that HMR would intentionally continue its clever use of innuendo, indirect intimations, and ambiguous suggestions to misrepresent anything submitted by Purple to HMR, Purple attempted to respond to Defendants' false, misleading, and confusing statements by posting truthful information about the non-toxic plastic powder on its own blog:









**THE BEST MATTRESS FOR BACK PAIN**

What is the best mattress for back pain? One that keeps your spine in natural alignment of course! Learn more about the best mattress... Read more ›

**ALL ABOUT OUR NON-TOXIC PLASTIC POWDER**

Purple uses a non-toxic powdered polymer coating on some of our Purple products. Learn more about this super safe powder so you can rest... Read more ›

**THE BEST MATTRESS FOR COUPLES**

Purple gives you one less compromise in your relationship. Get the best of firm and soft, cool and quiet, bounce and motion isolation... Read more ›

https://onpurple.com/blog/non-toxic-plastic-powder, attached as Exhibit "H;" *see also* Bernards Decl. ¶ 32.

81.     Purple explained, among other things, that the purpose of the non-toxic plastic powder is to prevent Purple's Hyper-Elastic Polymer™ from sticking to itself, that the powder is non-toxic and chemically inactive, and that it is from a family of plastics used for food containers and children's toys.  *See* Bernards Decl. ¶ 33.  The website also indicates that the powder does not contain talc and contains no mineral products, and is entirely safe:

> We now lightly coat our Purple® mattress and pillow that go through a tight-compression process to enable door-to-door shipping with our non-toxic plastic powder to prevent the Hyper-Elastic Polymer™ from sticking to itself.
>
> . . .
>
> Here are the details about the inert non-toxic plastic powder that we invented to solve our packaging conundrum:
>
> 1. It is NOT a talc powder. Talc is a mineral and our plastic powder contains no talc whatsoever, or any mineral for that matter.
> 2. It is chemically inactive, AKA an inert substance.
> 3. It is a food-contact-grade material, meaning that this family of plastic materials can be used for eating utensils, children's toys, etc.
> 4. It is 100% non-toxic and is completely harmless.
> 5. You can think of it being as safe as eating with a plastic fork, so you can rest easy on our bed! In fact, it may be even safer—no Purple product ever stabbed anyone in the lip!

82.     Purple also explained that the powder was so innovative as to be proprietary, and that it could not release the details – which are currently trade secrets – until after its pending patents became publicly available, a standard and well-known

business strategy employed by every responsible corporate entity that is protecting its

intellectual property:

> Our scientists didn't just solve the problem, they found a safe option in doing so and have
> applied for a patent. Until the patent is issued, Purple is keeping the exact type of plastic a
> "trade secret," which helps protect the jobs of those 600 people from competitors who
> would love to figure out how to do what Purple does. But know that it is a very common
> type of plastic used in many human-touch products, even in products for children.

**The Fourth Post:  The Purple Misleads Consumers "Article" (Exhibit G)**

83.    The Purple Misleads Consumers "Article" was posted shortly after

February 13, 2017.

84.    Like the Revoked Endorsement "PSA," the Purple Misleads Consumers

"Article" is or was prominently displayed on the homepage of the HMR website, in the

top-left of a series of stories that are depicted as if they are legitimate news articles, with

the headlines in all capitals of "BREAKING NEWS" and "INDUSTRY NEWS," with the

tag line "Purple's Acknowledgement Of The White Powder STILL Misleads Consumers,"

as follows:

■ LASTEST NEWS



Purple's Acknowledgement Of The White Powder STILL Misleads Consumers



Mattress Firm Hires Sicily Dickenson As New CMO



We Received Something BIG To Review Today – Something HUGE!



The RiteBed Arrives As A New Player In The Online Mattress Space



Simba Sleep Raises £9m From Raft Of New City Investors



Bedgear Hopes To Triple Revenue With New Mattresses



This Indiegogo Project Has Reimagined Bedding Basics



Sleep Outfitters And Tempur Sealy To Present $25,000 To



PangeaBed Copper Mattress Review

85.    These images and language are false and misleading because they suggest to consumers that HMR is reporting objective "news," through the use of the prominently displayed headlines ""LATEST NEWS," "BREAKING NEWS," and INDUSTRY NEWS," when HMR is not a news organization.

86.     The Purple Misleads Consumers "Article," like the prior "Articles," asks a series of inflammatory questions designed to convey to consumers a literally false and misleading message that the Purple mattress is unsafe and that Purple is withholding safety information from consumers.

87.     By virtue of its title, the Purple Misleads Consumers "Article" falsely asserts that Purple is engaged in a deliberate campaign to deceive consumers, including by improperly withholding safety information from consumers.

88.     The Purple Misleads Consumers "Article" claims that HMR has been making repeated inquiries to Purple for information, for "159" days, when the Blog identifies only two such instances, generic telephone inquiries to the general customer service department (and Purple is unaware of any other such inquiries), again for purposes of demonstrating that Purple's products are hazardous and that Purple is withholding safety information from consumers:

> Since September 9, 2016, we've been inquiring directly with Purple about the use of an unknown powder.  That's 159 days before they even start to acknowledge of the powder's existence on their website.

89.     The Purple Misleads Consumers "Article" falsely suggests that Purple is rejecting accountability for consumer safety:

> Thus, every business innately inherits the highest level of accountability regarding consumer safety.

90.     For example, the Purple Misleads Consumers "Article" reports that Purple does not have safety documentation, that Purple has an obligation to release such information, and that Purple's public statements on these issues are false:

**| What is stopping you (Purple) from conducting and releasing independent accredited laboratory tests that prove this is safe under the use case of coating Purple mattresses and pillows?**

In your published statement to the public, although comically written, clearly shows your position remains that consumer safety should **rely solely on your written word.**

91.     The Purple Misleads Consumers "Article" further claims Purple is not transparent and is not "honest and upfront" about the "microscopic powder form that could be inhaled," in yet another transparent attempt to harm Purple's reputation, integrity, and goodwill:

**| It took 159 days of inquiry for you to acknowledge it; please forgive us if we're not willing to take you at your trusted word.**

Your track record continues to show a reactive transparency approach. You only began to acknowledge customers if they contact *you (in regards to the powder)*. To date, you still do not include this information directly on your product information page (see screenshot below). **You** claim, "*Everything we do here at Purple centers on our customers*" when will you be **honest and upfront** about the use of this in a **microscopic powder form that could be inhaled?** Don't customers have a right to be informed?

92.     The Purple Misleads Consumers "Article" also implies that Purple had experienced an "unforeseen problem" in its product development and was making "adjustments" as a result, again for purposes of showing that Purple's products are unsafe and that Purple is withholding safety information from consumers:

We understand that when a product experiences an unforeseen problem that adjustments might have to be made. *Consumers understand and also seek a solution.*

93.     The Purple Misleads Consumers "Article" asserts that Purple has or is going to change the powder to hide the fact that it was not safe, that Purple is treating its customers as "guinea pigs," and that Purple does not have safety information:

**Here's where the issue arises.**

**Since you're not willing to educate and pre-disclose (at the point of sale);**

a) the existence

b) what it is or

c) that's it's proven safe

*How do we,* the consumer *know* what you're coating all over your products today are the same as what you coated products in last week, last month or during your "product solution testing?"

Consumers are not guinea pigs.  It's the responsibility of the company to conduct all of these product safety tests before shipping product and clearly disclosing the results to inquiring consumers.

94.    Defendants further assert in the Purple Misleads Consumers "Article" that Purple does not use "science," that Purple does not think facts and science are important and that, because Purple has a patent pending, it should disclose its secret formula – misleading the consumer into believing that patent applications are public (and failing to disclose to consumers the risks from a premature disclosure):

### Science is rooted in truth and proven fact.

*For a company that claims to be <u>Super Sciencey, you continue to neg</u>lect a few very
<u>scientific components</u> (such as material disclosure), that you clearly don't see as
important per your comical response.*

**Purple: So Sciencey It'll Put You To Sleep - YouTube**

 https://www.youtube.com/watch?v=qCuP6frAqpA
Feb 4, 2016 - Uploaded by Purple
See just how **Purple's** hyper-elastic polymer will give you the best nights sleep you
have ever had! **Purple** ...

You also seek sympathy in 'protecting 600 jobs' and in your 'trade secrets' which provides you
some form of shielding from disclosure.

> Our scientists didn't just solve the problem, they found a safe option in doing so and have
> applied for a patent. Until the patent is issued, Purple is keeping the exact type of plastic a
> "trade secret," which helps protect the jobs of those 600 people from competitors who
> would love to figure out how to do what Purple does. But know that it is a very common
> type of plastic used in many human-touch products, even in products for children.

*<u>But, your processes is patented and protected.</u>  If it wasn't already protected intelliBED
wouldn't have to have this disclosure on the footer of their website.  After all, they use
the same technology or process, right?  It says it's licensed to a company owned by
Tony Pierce.*



intelliBED's Footer, "**INTELL-GEL® IS A REGISTERED TRADEMARK OF EDIZONE, LLC OF
ALPINE, UTAH USA. PROTECTED BY U.S. PATENTS 5,749,111, 6,026,527, 6,413,458,
7,060,213, 7,076,822, 7,666,341. INTELLIBED® IS A REGISTERED TRADEMARK OF
ADVANCED COMFORT TECHNOLOGIES INC. OF SALT LAKE CITY, UTAH USA.**"

INTELL-GEL® IS A REGISTERED TRADEMARK OF EDIZONE, LLC OF ALPINE, UTAH USA. PROTECTED BY U.S. PATENTS 5,749,111, 6,026,527, 6,413,458, 7,060,213, 7,076,822, 7,666,341.
INTELLIBED® IS A REGISTERED TRADEMARK OF ADVANCED COMFORT TECHNOLOGIES INC. OF SALT LAKE CITY, UTAH USA.

Purple's Footer, "**Protected by one or more of U.S. Patents 5,749,111; 6,026,527;
7,076,822; 7,730,566; 7,823,233; 7,827,636; 7,964,664; 8,607,387, and 9,051,169,
with others pending. Purple and all product names comprising Purple, Hyper-Elastic
Polymer, and No Pressure are trademarks of EdiZONE, LLC of Alpine, Utah USA.**"

Protected by one or more of U.S. Patents 5,749,111; 6,026,527; 7,076,822; 7,730,566; 7,823,233; 7,827,636; 7,964,664; 8,607,387, and 9,051,169, with others pending. Purple and all product names comprising Purple, Hyper-Elastic Polymer, and No
Pressure are trademarks of EdiZONE, LLC of Alpine, Utah USA.

95.     Defendants further claim that Purple is dismissive of its customers, that
Purple thinks they are "naïve," that Purple is "insulting" its customers, and that Purple is
otherwise withholding safety information from consumers:

| Purple's publication is proof of how naive they truly believe
American Consumers are.  To say, it's safe because it comes from
the same family of plastic forks, neglecting the fact that in Purple's
use case (coating mattresses and pillows) it could be inhaled directly
into your lungs, is downright insulting.

96.     The Purple Misleads Consumers "Article" includes an inflammatory
graphic depicting Purple's products as sausage, complete with an image of a meat
grinder with plastic items being poured onto a Purple mattress:



97.     The Purple Misleads Consumers "Article" includes statements that are designed to mislead consumers into believing that Purple has definitively refused to provide information to demonstrate that its products are safe, despite the fact that Purple has posted such information on its own website, and again makes numerous inflammatory and misleading statements in an effort to support its allegation that Purple's products are unsafe:

PURPLE HAS TAKEN THE DEFINITIVE POSITION THAT COVERING THEIR MATTRESS AND PILLOW IN THIS PLASTIC POWDER THAT'S INHALED NIGHTLY FOR THE DURATION OF THEIR PRODUCT'S LIFECYCLE IS THE EQUIVALENT OF EATING WITH A PLASTIC FORK.

YES, IT'S SAFE TO EAT WITH A PLASTIC FORK.  PURPLE CONSUMERS AREN'T EATING IN BED — THEIR INHALING THE MATTRESS.

PLEASE DISCLOSE THE SCIENTIFIC PROOF THAT INHALING THAT PLASTIC WILL NOT INDUCE ANY LUNG OR RESPIRATORY IRRITATION. ONCE WE RECEIVE THIS PROOF WE WILL UPDATE OUR REVIEW IMMEDIATELY.

ADDITIONALLY, PLEASE SHARE ACCREDITED THIRD PARTY STUDIES THAT SHOW SCIENTIFIC EVIDENCE SUPPORTING YOUR POSITION IN A MULTI–YEAR TEST WITH EIGHT HOURS USE PER NIGHT. ONCE WE RECEIVE THIS PROOF WE WILL UPDATE OUR REVIEW IMMEDIATELY.

98.     The Purple Misleads Consumers "Article" has statements to the effect that Purple's products are like "inhaling gasoline," that Purple does "not put[] consumer safety first," and that Purple has directly contradicted itself:

Your blanket statement quoted above is like saying "Gas is safe in a car, so inhaling gasoline must also be safe." Obviously, you're not using gasoline – but – it's an example that a different use cases a product, chemical or substance can have very different effects.

### Intended Use is the issue at hand.

*Merely acknowledging existence (only after constant questioning) is not putting consumer safety first* – in our opinion.  Which is a direct contradiction of your published response (again, see here).

99.     The Purple Misleads Consumers "Article" suggests that Purple is putting its 600 employees' health at risk, that Purple should be providing "training and education" on health risks to its employees, and that Purple should have its employees wear protective gloves:

## You did raise one point in your response that we did not initially think to question.

Your 600 employees who are in direct contact with this substance don't appear to have protected masks to shield their inhalation. If a factory worker's shift is eight hours, then sleeps eight hours on a Purple mattress; *what are the effects of 16 hours a day exposure?* Do you provide training and education to your employees who are on the floor manufacturing these products? Do you provide gloves and mask to every employee?



100.   Like the previously-discussed "Articles," the Purple Misleads Consumers "Article" falsely suggests that consumers purchasing Purple's products will be "directly inhaling a white powder substance," which "could be damaging to those with respiratory issues," and falsely accuses Purple of using "made up tests:":

*With that, we regret to inform you that until Purple Mattress discloses to consumers that they will be subjected to and directly inhaling a white powder substance that could be damaging to those with respiratory issues we're going to revoke our endorsement of this mattress.* We value consumer knowledge and safety far greater to our organization that funny videos and made up tests.

**The Fifth Post: The Responsibility "Article" (Exhibit G)**

101.    The Responsibility "Article" was posted the next day, and it attempts to deflect Defendants' singular attack on Purple by trying to guilt other reviewers into joining its campaign of false and misleading statements against Purple.

102.    A link to the Responsibility Article is or was prominently displayed on the homepage of the HMR website, below the top "Article," with the headline in all capitals of "BREAKING NEWS" and "INDUSTRY NEWS," with the tag line "Do Mattress Reviewers Have A Responsibility To Acknowledge Consumer Safety?," and including a large "X" in a red circle – as if to designate a poisonous or dangerous substance – as follows:



103.    The top of the Responsibility "Article" also includes, in larger form, the

image of the large "X" in the red circle:



**Do Mattress Reviewers Have A Responsibility To Acknowledge Consumer Safety?**

By honest mattress reviews    12 min read

104.    These images and language are false and misleading because they suggest to consumers that HMR is a legitimate news source reporting objective "news," through the use of the prominently displayed headlines "BREAKING NEWS" and "INDUSTRY NEWS," when HMR is not a news organization.

105.    The Responsibility "Article," like the prior "Articles," includes a series of inflammatory questions and statements, all of which are designed to convey to consumers the literally false and misleading message that the Purple mattress is unsafe, and that Purple is withholding safety information from consumers.

106.    For example, the Responsibility "Article" has statements suggesting that a physician's Hippocratic Oath is applicable to mattress makers and referencing "poison,"

falsely suggesting that Purple's products are not only unsafe, but might poison the customer:

> *A doctor is required to take the Hippocratic Oath before officially becoming a doctor. Reviewers possess a unique, influential power that if misused could unintentionally (or intentionally) steer a consumer into the wrong decision.*
>
> In this oath doctors truly commit to the mindset, "**First do no harm.**"
>
> Followed by humility, "**I will not be ashamed to say "I know not.**"
>
> Finally, orally confirming, "**Neither will I administer a poison** to anybody when asked to do so, nor will I suggest such a course.**"

107.   The Responsibility "Article" includes a statement that mattress makers have a responsibility to ensure the complete safety of their products, which again falsely suggests that Purple has not comported with its safety obligations and that its products are unsafe:

> As more companies enter the direct to consumer mattress space its the responsibility of each individual company to ensure the products they ship are completely safe.

(Emphasis added).

108.   The Responsibility "Article" has a bolded, red statement not only falsely suggesting that Purple's products are not safe, but also that Purple has not provided any evidence of safety (when in fact Purple has posted evidence to support the safety of its products), which also challenges other reviewers to join Defendants' campaign of wrongfully harming Purple's reputation with false and misleading statements and innuendos:

**| What is your position on Purple's use of a plastic powder without any clear and concise evidence this is safe under these conditions?**

109.    The Responsibility "Article" falsely states that consumers purchasing Purple's products will be "directly inhaling a white powder substance" which "could be damaging to those with respiratory issues," and falsely referring that Purple was using "made up tests," suggesting that Purple's products are not safe and that Purple is withholding safety information from consumers:

> With that, we regret to inform you that until Purple Mattress discloses to consumers that they will be subjected to and *directly inhaling a white powder substance* that could *be damaging to those with respiratory issues* we're going to revoke our endorsement of this mattress.   We value consumer knowledge and safety far greater to our organization that funny videos and *made up tests.*

110.    The Responsibility "Article" closes by providing link to the other false and misleading "Articles" and the Revoked Endorsement "PSA," compounding and expanding the overall false and misleading messages that Purple's products are not safe and that Purple is misleading consumers:

## If this Powder is completely brand new to you here are some reference articles

| *What Exactly Is That White Powder On Purple's Mattress?*

| *A Deeper Investigation Into Purple Mattress & Pillows White Powder*

| *PSA – Due To Purple's Unknown Powder We're Revoking Our Endorsement*

| *Purple's Acknowledgement Of The White Powder STILL Misleads Consumers*

**Cumulative Impact and Grouping**

111. The overall, cumulative impact of the five separate "Articles," the numerous inflammatory, false and misleading statements, and the groupings of images and the statements combine to create the overall false and misleading impression that Purple is hiding information and that its products are dangerous, all in an effort to smear Purple's reputation, products, and goodwill, and to divert sales to Purple's competitors, including GhostBed.

**Purple Discovers Monahan's Affiliation with GhostBed**

112. Despite Monahan's efforts to hide his involvement with GhostBed, upon investigation, Purple discovered that Monahan had (at least in the past) been closely associated with Purple's competitor, GhostBed. Specifically, Monahan was previously employed GhostBed's Chief Brand Officer. *See* Bernards Decl. ¶ 37.

113. Purple believes that Monahan may still maintain an office at GhostBed and can be reached by calling the number on the GhostBed's website. *See id.* ¶ 37.

114. On October 10, 2016, Monahan formed Honest Reviews, LLC. *See* Articles of Organization, attached as Exhibit "I" (listing registered agent as Monhan agent).

115. Upon information and belief, Monahan is the sole owner of HMR, has actively and knowingly caused and supported the statements on the HMR Blog, has directed, authorized and participated in the creation and publishing of the statements, and has been the active and conscious force behind the creation and publishing of the statements.

116.    Upon information and belief, GhostBed has actively and knowingly caused and supported the statements on the HMR Blog; has directed, authorized and participated in the creation and publishing of the statements; and has been the active and conscious force behind the creation and publishing of the statements.

117.    At or around the same time he formed Honest Reviews, LLC, it appears that Monahan commenced efforts to reduce or remove evidence of his association with GhostBed from his digital footprint.

118.    For example, a cached Google page showed that Monahan was an author on www.GhostBed.com:



*See* search results attached as Exhibit "J."

119.   Similarly, a cached Google page identifies Monahan as an author on

www.GhostBed.com:



*See* search results attached as Exhibit "K."

120.   However, at least some of these pages are now apparently unavailable, or at least they are not easily discoverable through typical internet searches.  Upon information and belief, the information has been intentionally removed and/or made more difficult to locate.

121.   Similarly, Monahan's Twitter profile previously identified him as the Chief Brand Officer of GhostBed:



*See* search results attached as Exhibit "L."

122.   Upon information and belief, the reference to GhostBed was removed in approximately October 2016, but in any event it no longer appears on Monahan's Twitter profile:



*See* search results attached as Exhibit "M."

123.    Similarly, Monahan's LinkedIn also previously identified him as the "Chief Brand Officer" for GhostBed:



*See* search results attached as Exhibit "N."

124.    Upon information and belief, the reference to GhostBed was removed in approximately October 2016, but in any event, it has been removed from Monahan's LinkedIn profile.

**The GhostBed CEO's Daughter
Has Posted False Reviews of Purple on Amazon.com**

125.    As Purple has discovered, *see* Bernards Decl. ¶ 39, in May of 2016, the daughter of GhostBed's CEO posted a review on Amazon.com of the Purple® Bed, making false and misleading statements remarkably similar to some of those now

appearing on the Blog, including purported concerns about the "powder," a baby,

"Johnson and Johnson," "cancer," and "safety:"



*See* review attached as Exhibit "O."

### Defendants Are Surreptitiously Working to Promote GhostBed Over Other Mattress Companies

126.    Upon information and belief, HMR, Monahan, and/or other entities owned

or controlled by Monahan, are working directly with GhostBed to promote GhostBed

products over those of other manufactures, and in return GhostBed is compensating

HMR, Monahan, and/or other related entities.

127.    Upon information and belief, Monahan has continued his association with

GhostBed, and is now attacking Purple on the HMR Blog for purposes of benefitting

GhostBed and damaging Purple, likely in exchange for some form of financial or other

remuneration from GhostBed or related persons or entities.

128.    Upon information and belief, Defendants are acting in concert to hide the fact that GhostBed is behind the campaign of false and misleading information unleashed on Purple.

### The Blog's Claims of Neutrality and Independence Are False, Misleading, and Highly Likely to Confuse Consumers

129.    The Blog is carefully designed to convey the overall message and impression to consumers that it is independent, unbiased, and unaffiliated with any particular mattress company.

130.    Among other things, the numerous "disclaimers" on the Blog are designed to contribute to this overall perception.

### The Compensation Disclaimers

131.    The Blog contains a number of disclaimers to the effect that the Blog, HMR, and Monahan are not compensated by any party for any of the content on the Blog, including the purported mattress reviews and comparisons (the "Compensation Disclaimers").

132.    For example, a statement that, "Our website receives zero affiliate commissions" appears on the footer of every page of the Blog:



See, e.g. https://www.honestmattressreviews.com/.

133.    The "What is Honest Mattress Reviews" page includes the following

statement:

> Honest Mattress Reviews does not seek affiliate relationships.  Nor are we positioned to gain monetary benefits based on consumer buying behavior or decisions.

*See* https://www.honestmattressreviews.com/what-is-honest-mattress-reviews/

134.    The Responsibility "Article" includes additional statements disclaiming any

commission or other relationship with mattress companies, and emphasizing integrity:

> Honest Mattress Reviews does not have any affiliate commission sales relationships with mattress companies.  This is by design to ensure that our focus is on the consumer, not direct commissions for ourselves.  We believe that long-term integrity is more valuable than short-term monetary gain.

*See* https://www.honestmattressreviews.com/mattress-reviewers/

### The "Ethics and Free From Influence Disclaimers"

135.    The Blog also contains a number of disclaimers to the effect that the Blog,

HMR and Monahan are ethical and free from the influence of any mattress

manufacturers (the "Ethics and Free From Influence Disclaimers").

136.    Initially, the Compensation Disclaimers are clearly designed to convey the

overall message that the Blog, HMR, and Monahan are ethical and free from the

influence of mattress manufactures.

137.    The Blog includes a number of other statements to this same effect, such

as statements on the "Disclaimer" page referencing Monahan's purported "ethics," i.e.,

"my ethics," a statement that the Blog is "Free from corporate or conglomerates … [that]

silence or shape editorial narratives and truths," that the posts on the Blog "have total

editorial independence," and that "No one has influence on … the posts."

*See* https://www.honestmattressreviews.com/disclaimer/

138.    The "What is Honest Mattress Reviews" page similarly includes a number

of statements to this effect, such as claims that the Blog is not interested in "influencing

a purchase decision to promote a company;" the Blog does not reflect "a few large

companies controlling the narrative;" the Blog "allows companies and consumers

uncensored truth;" the Blog provides "the most accurate data available;" the Blog does

"not want just a few giant companies to own the narrative;" and information shared on

the Blog must be "accurate and true."

*See* https://www.honestmattressreviews.com/what-is-honest-mattress-reviews/

**The Blog's Mattress Rankings Are Not Independent and Unbiased**

139.    Despite the Blog's numerous representations of its independence and

neutrality, the HMR rankings of mattress manufacturers appearing on the Blog are

materially misleading to consumers.

140.    For instance, GhostBed is listed as one of the very highest rated

mattresses, appearing as the third entry on the list of companies on the "Reviews" tab of

the Blog.  *See* https://www.honestmattressreviews.com/mattress-reviews/.  The only

other mattress companies that have received similarly-high rankings are either not

actually in the BIB market, or are small players in the BIB market that pose no threat to

GhostBed.  *See* Bernards Decl. ¶ 38.

141.   As noted, GhostBed is ranked third by the Blog, after two mattresses which are not in the BIB market or otherwise competitive with GhostBed.  First is a $4,699 mattress from Tempur-Pedic which is not in the BIB segment and is not price-competitive.  Second is a $1,199 mattress from Nest which, although it is part of the BIB market, is not price-competitive and has not yet even been reviewed on the Blog, yet has nevertheless been ranked as "World-Class:"



142.   Besides GhostBed and Nest, which has not even been reviewed yet, none of the other players in the BIB market are given the "World-Class" rating on the Blog.  In fact, the next competitor that poses any threat to GhostBed is Casper, which is ranked far down – 19th – on the list.

143.   Purple's mattress, which is 29th on the list, is the only product that has received a "Poor" rating on the list (purportedly because of the "white powder" issue), which is depicted through the use of the poison-suggesting red X:

   

**The Blog and the Disclaimers are False and Misleading**

144.    The overall impression that the Blog is unbiased and independent is literally false and is significantly likely to mislead or confuse consumers, including for the following reasons:

(a)    The Blog fails entirely to disclose that Monahan was or remains affiliated with GhostBed, including as a spokesman for the company.

(b)    The Blog fails to disclose that Monahan has served as or has been the Chief Brand Officer of GhostBed.

(c)    The Blog fails to disclose that Monahan has received, at least in the past, financial compensation from GhostBed.

(d)    The Blog fails to disclose that, at or about the time that he created HMR and the Blog, Monahan attempted to scrub evidence of his prior affiliation with GhostBed from his digital footprint.

(e)    The Blog fails to disclose that Monahan can still be contacted by calling GhostBed.

(f)    The Blog does not disclose that Monahan has continued his association with GhostBed, is promoting GhostBed and attacking Purple on the HMR Blog, and that he is doing so in exchange for some form of financial or other remuneration from GhostBed and/or related persons or entities.

**Purple Has Been Injured, Irreparably Harmed, and
Faces Additional and Continuing Irreparable Harm**

145.    Since HMR began publishing the "Articles" and the "PSA" on the Blog, a number of customers have demonstrated actual confusion and concern regarding Purple and its mattress and pillow products.  *See* Bernards Decl. ¶ 40.

146.    For example, consumers have asked questions of Purple that are clearly related to the false and misleading statements on the Blog, making references to Purple's products being "toxic," "lawsuits," "toxic chemicals," "a cloud of powder" that would be inhaled, the powder being "talc," and "asthma."  *See id.* ¶ 41.

147.    The BIB market is in a period of rapid expansion and growth.  *See id.* ¶ 19.

148.    Capturing market share during a period of rapid expansion and growth is critical for competitors like Purple.  *See id.* ¶ 21.

149.    As noted, although Purple did not deliver its first mattress until January 2016, Purple has become one of the four leading BIB companies, and has experienced exponential and rapid growth.  *See id.* ¶ 22.

150.    Purple is the fastest growing player in the BIB segment.

151.    Purple's very positive goodwill and reputation in the marketplace have been critical to its rapid growth and success, and Purple has worked hard and made substantial expenditures to develop these qualities.

152.    Because Purple relies strictly upon an e-commerce platform for selling its bedding products to its customers, its online reputation and goodwill are of critical importance to its success.

153.    Defendants' actions have already harmed and will continue to tarnish Purple's goodwill and reputation in the marketplace.

154.    Defendants' actions, if successful, threaten to slow Purple's growth rate, causing the loss of tens or hundreds of millions of dollars in damage to Purple, which will be difficult to calculate.

155.    Defendants' actions threaten to adversely affect Purple's ability to attract and retain key employees needed to manage its growth.

156.    Defendants' actions threaten to adversely affect the value that potential equity partners place on Purple, making it more difficult and expensive – if not impossible – to raise additional capital.

## ARGUMENT

**I.   PURPLE IS ENTITLED TO A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION TO ENJOIN DEFENDANTS' WRONGFUL CONDUCT**

The standard for a temporary restraining order is the same as for a preliminary injunction.  *See Klein-Becker USA, LLC v. Collagen Corp.*, No. 2:07-CV-873 TS, 2008 WL 4681781, *1-*2 (D. Utah Oct. 22, 2008) (citing *Bauchman by and through Bauchman v. West High Sch.*, 900 F. Supp. 248, 250 (D. Utah 1995)).  A federal court may issue preliminary injunctive relief when the movant establishes (1) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (2) that the balance of equities tips in movant's favor; (3) that the injunction is in the public interest; and (4) a likelihood of success on the merits.  *See Community Television of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191, 1197 (D. Utah 2014) (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009)).  Here, each prong is met, and Purple is entitled to a temporary restraining order.

### A.   PURPLE IS SUFFERING AND WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT THE REQUESTED INJUNCTIVE RELIEF

"[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks and citations omitted).  Irreparable harm is present where the injury at issue "is incapable of being

fully compensated for in damages or where the measure of damages is so speculative that it would be difficult if not impossible to correctly arrive at the amount of the damages." *Southwest Stainless, LP v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009).

Courts have often recognized that the loss of goodwill or damage to a business reputation amounts to irreparable harm because "it is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill." *TY, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 902 (7th Cir. 2001). Similarly, this district has stated that "irreparable harm findings are based on such factors as the difficulty in calculating damages, the loss of a unique product, and existence of intangible harms such as *loss of goodwill* or *competitive market position.*" *Community Television of Utah, LLC v. Aereo, Inc.*, 997 F. Supp. 2d 1191, 1203 (D. Utah 2014) (emphasis added) (quoting *Dominion Video Satellite*, 356 F.3d at 1260).    The United States Supreme Court has also stated that "a substantial loss of business . . . sufficiently meets the standards for granting interim relief, for otherwise a favorable final judgment might well be useless." *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975).

In this case, Purple is suffering and will continue to suffer irreparable harm if an order is not granted to enjoin Defendants from continuing to impugn Purple's products and business without any legitimate basis or evidence for doing so.  The harm facing Purple is irreparable in that Purple's reputation and goodwill are seriously at risk, and it is faced with a substantial loss of business.  These are harms that cannot be readily be quantified or fully compensated by monetary damages.  Purple is a relatively young but

highly successful company that is in the process of establishing itself and its products as staples in the BIB market.  To be successful in this process, Purple has expended significant resources and time, including by developing its exclusively e-commerce platform through innovative marketing and exposure.  Purple's products are high-quality, innovative, and patented or patent-pending products that have been well received by the consumer market.

Despite these successes, due to Defendants' smear campaign, Purple's efforts may prove fruitless.  Defendants have taken steps to malign and create the impression that Purple's products, including the Purple® Bed, are unsafe and even dangerous, even going so far as to suggest that Purple's mattresses and pillows could cause cancer.  Critically, Defendants have made these statements with no proof whatsoever.  Instead, Defendants have merely observed the presence of a powder-like substance on Purple's mattresses and pillows and utilized that fact to generate numerous "articles" and posts containing multiple inflammatory statements and accusations – which are now available not only on the Blog but on various platforms throughout the internet.  The cumulative effect of these statements is unmistakably false and highly likely to lead to customer confusion, which has already commenced.

Defendants' widespread accusations regarding Purple's integrity are likewise causing irreparable harm.  By falsely stating over and over that Purple has "failed" to respond to inquiries regarding the safety of its products, has "failed" to adequately test its products, and has "failed" to provide any safety information about its products, Defendants are directly attacking Purple's reputation and goodwill.  The impact of such

statements is obvious.  They will and have already led customers and potential customers to question the integrity of the company, resulting in undeniable irreparable harm.

For these and other reasons, without an order enjoining Defendants from the above conduct, Purple stands to lose competitive position, its favorable reputation, and its goodwill in the market.  These harms are unquantifiable and relate to Purple's unique market position and investment in that market position.  *See, e.g., MonaVie, LLC v. Wha Lit Loh*, Case No. 2:11-cv-265 TS, 2011 WL 1233274, *3 (D. Utah March 31, 2011) (granting an *ex parte* temporary restraining order where the threatened irreparable harm included "(1) diminished sales and diluted trademarks, trade names, and goodwill; (2) lost control and quality of its products and business . . .; or (3) exclusion from the market altogether.").  Consequently, Defendants' conduct has and is causing Purple irreparable harm, entitling Purple an immediate temporary restraining order.

### B. THE HARM FACING PURPLE FAR OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS FROM THE REQUESTED TEMPORARY RESTRAINING ORDER

In determining whether to grant an injunction, consideration must be given to whether the defendant would suffer greater harm than the plaintiff if the requested injunctive relief is granted.  *See Davis v. Minetta*, 302 F.3d 1104, 1116 (10th Cir. 2002). If a defendant's alleged harm from the injunction is of a "self-inflicted nature," this consideration will weigh in favor of granting injunctive relief.  *Id*.  There is little doubt that the equities weigh strongly in favor of granting Purple's requested injunctive relief in this instance.  As described above, Purple has and will suffer significant harm irreparable to

4

its reputation and goodwill, and it could lose substantial business and its market

position.  By contrast, any harm or loss of "investment" that Defendants may purport to

claim as a result of the injunction is harm that Defendants inflicted upon themselves.

Defendants have knowingly posted false and materially misleading information

regarding Purple and its products on the internet, in the process generating substantial

controversy about the issues and causing consumers to question Purple's products and

integrity.  Defendants are likely to suffer very little harm, if any, and any harm they may

suffer is self-inflicted because they took the risk of posting unsubstantiated and false

statements and claims for the sole purpose of harming Purple and confusing the public

about the company and its products.  Moreover, given the circumstances, Purple should

not be required to post a bond to cover any harm, if the temporary restraining order

issues.

Accordingly, the balance of harm weighs significantly in favor of Purple, and

Purple's requested temporary restraining order should be entered.

**C.    ISSUANCE OF THE REQUESTED INJUNCTIVE RELIEF WILL SERVE THE PUBLIC INTEREST**

Injunctive relief in this case is not adverse to the public interest, but instead will

serve the public interest.

To prevail on this element, Purple need only establish that injunctive relief will not

be adverse to the public interest.  *See City of Chanute v. Kansas Gas & Elec. Co.*, 754

F.2d 310, 312 (10th Cir. 1985).  The public interest favors protection of the goodwill of

businesses.  *See, e.g., Morgan Stanley Smith Barney LLC v. O'Brien*, No. 3:13-CV-

01598 (VLB), 2013 WL 5962103, at*8 (D. Conn. Nov. 6, 2013) (explaining that "there is

a public interest in the protection of the goodwill of businesses."); *Tootsie Roll Indus., Inc. v. Sathers*, Inc., 666 F. Supp. 655, 661 (D. Del. 1987) (recognizing that "the public has an interest in protecting business goodwill.").  The public interest is also served by "preventing customer confusion or deception" and preventing the spread of "unsupported statements."  *Osmose, Inc. v. Viance*, 612 F.3d 1298, 1321 (11th Cir. 2010) (affirming trial court's conclusion that injunction did not disserve public interest).

    In this case, temporary injunctive relief will protect and prevent additional harm to Purple's reputation and goodwill, just as it will prevent consumer confusion and deception, deter unfair business practices, and promote fair and honest competition.  Thus, this factor also weighs significantly in favor of issuing a temporary restraining order.

### D.    A TEMPORARY RESTRAINING ORDER IS APPROPRIATE BECAUSE PURPLE IS LIKELY TO PREVAIL ON THE MERITS OF ITS CLAIMS

    Purple is also entitled to a temporary restraining order because it is highly likely to prevail on the merits of its substantive claims, including for false advertising under the Lanham Act, tortious interference with economic relations, defamation, and trade libel.

    With respect to this element of the standard for injunctive relief, the Tenth Circuit has explained that

> "[t]he very purpose of an injunction under Rule 65(a) is to give temporary relief based on a *preliminary estimate* of the strength of the plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case.'  Although "[t]he courts use a bewildering variety of formulations of the need for showing some likelihood of success," "[a]ll courts agree that plaintiff must present a prima facie case but *need not show a certainty of winning*."

6

*Planned Parenthood Ass'n of Utah v. Herbert*, 828 F.3d 1245, 1252 (10th Cir. 2016) (emphases added) (citations omitted).  Further, Purple need not establish a likelihood of success on *all* of its claims; instead, Purple is entitled to an injunction even if it meets the standard as to just one of its claims.  *See, e.g., id.* at 1252 (holding that plaintiff was entitled to a preliminary injunction where it established a likelihood of success on the merits on two of its three claims).

The Tenth Circuit has also held that, "[i]f the plaintiff can establish that the . . . three requirements [other than likelihood of success] tip strongly in his favor, the test is modified, and the plaintiff may meet the requirements for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."  *Greater Yellowstone Coal v. Flowers*, 321 F.3d 1250, 1255-56 (10th Cir. 2003) (quoting *Davis v. Mineta*, 302 F.3d 1104,1111 (10th Cir. 2002); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).  Because the first three elements of the standard weigh heavily in favor of granting a temporary restraining order in this case, Purple need only meet the modified standard.  Nevertheless, as set forth below, the evidence shows that Purple readily satisfies the traditional standard.

### 1.   Lanham Act – Section 43(a)(1)(A)-(B)

To prevail on a claim of false advertising under the Section 43(a) of the Lanham Act, a plaintiff must show by a preponderance of the evidence that the defendant made a materially "false designation of origin, false or misleading description of fact, or false

or misleading representation of fact" in commerce in connection with its advertising of a product which is either:

    (A) likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person; or

    (B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities.

15 U.S.C. § 1125(a)(1)(A)-(B).   A plaintiff must also show that it is "likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products."  *Zoller Labs., LLC v. NBTY, Inc.*, 111 F. Appx. 978, 982 (10th Cir. 2004); *see also Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 980 (10th Cir. 2002) ("The elements of a claim for false statements under the Lanham Act are "(1) that the defendant made material false or misleading representations of fact in connection with the commercial advertising or promotion of [a] product; (2) in commerce; (3) that are either likely to cause confusion or mistake as to . . . the characteristics of the goods or services; and (4) injure the plaintiff.").

    With respect to the first element, "[t]o show a qualifying false or misleading statement, a plaintiff must demonstrate that the defendant's statement was either (1) literally false or (2) literally true or ambiguous but implicitly false, misleading in context, or likely to deceive."  *Gen. Steel Domestic Sales, LLC v. Chumley*, 627 F. App'x 682, 684 (10th Cir. 2015); *accord Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3d Cir. 2002) ("Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or

ambiguous, but has the tendency to deceive consumers."); *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir.1993) ("[A] plaintiff must prove either literal falsity or consumer confusion, but not both.").  There are two ways to satisfy the false and misleading element of the claim for a reason:  "'Section 43(a) . . . encompasses more than literal falsehoods,' because otherwise, 'clever use of innuendo, indirect intimations, and ambiguous suggestions could shield the advertisement from scrutiny precisely when protection against such sophisticated deception is most needed.'"  *Cotrell, Ltd. v. Biotrol Int'l, Inc.*, 191 F.3d 1248, 1252 (10th Cir. 1999) (citations omitted).  Defendants' actions in this case meet both standards for the first element because their statements are literally false and because the statements, even if ambiguous or true, have already led and are likely to continue to mislead consumers and cause consumer confusion.

The standard for literal falsity may be met in two different ways.  "A 'literally false' message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as it if had been explicitly stated."  *Vitamins Online, Inc. v. HeartWise, Inc.*, No. 2:13-CV-982-DAK, 2016 WL 5106990, at *9 (D. Utah Sept. 19, 2016) (citations omitted) (denying summary judgment in Lanham Act false advertising case).  Here, as to explicit literal falsity, many of the statements and much of the information published by Defendants on the Blog are untrue in numerous respects, including the wholly unsubstantiated and false statements regarding the alleged dangers of Purple's products, the alleged lack of adequate product testing by Purple, Purple's alleged unwillingness to respond to inquiries about the safety of its products, and the alleged

9

neutrality of the reviews on comments on the Blog.  These statements are also literally false when considered in their entirety and in light of their cumulative effect, because the viewers of the Blog are likely to "recognize the claim[s] as readily as it [they] had been explicitly stated."  *Vitamins Online*, 2016 WL 510990, at *9.  That is, the overall impact of the statements is to convey the (false) messages that Purple's products are dangerous, that Purple is not truthful and is hiding information, and that the information posted on the Blog is entirely without bias or affiliation.

Even if Defendants' statements were ambiguous or true, which they are not, they satisfy the first element of the Lanham Act claim because they are "implicitly false, misleading in context, [and] likely to deceive."  *Gen. Steel Domestic Sales,* 627 F. App'x at 684.  As detailed above and in the Complaint, many of the statements on the Blog and in the "Articles" clearly *imply* that Purple is not forthcoming and that its products are unsafe, even where broad qualifying language is used.  This is particularly true with regard to many of the inflammatory questions in the "Articles," which ask, for example, whether the powder is safe, but which obviously intentionally raise the question and cause confusion in the minds of consumers as to that very issue, despite the lack of any proof to show that the powder is unsafe, and despite the fact that the *only* available evidence (of which Defendants are aware) is that the powder *is* safe.  The vast number of the statements and assertions involved, especially when viewed in context and as a whole, are highly misleading to consumers, some of whom have already expressed confusion as to whether Purple's products are safe and whether Purple is being honest.

Second, under Section 43(a)(1)(B), Defendants' statements and representations constitute "commercial advertising or promotion," and are clearly misrepresenting the nature and characteristics of Purple's products, services, and commercial activities.  Not only do the statements – without any substantiation at all – accuse Purple of selling unsafe products and refusing to disclose information related to those products, but they also falsely inform the public that Purple is not to be trusted.  Further, Defendants' statements misrepresent the nature and characteristics of their own services, in that HMR's reviews and rankings are not unbiased or neutral, including because of HMR's and Monahan's affiliation with GhostBed.

Likewise, the evidence establishes that Defendants' misrepresentations of fact are likely to cause confusion or mistake as to the affiliation of Defendants with the mattress companies that appear and are reviewed on the Blog, including GhostBed in particular, satisfying section 43(a)(1)(A) of the Lanham Act.  Specifically, the Blog and Monahan repeatedly assert they are unbiased and neutral, and that they receive no compensation of any kind from any mattress company.  If this proves to be untrue, as the evidence strongly suggests, due to Monahan's prior and/or continuing affiliation with GhostBed and the highly favorable reviews of GhostBed's products on the Blog, among other things, then the statements are causing and likely to continue to cause confusion as to Defendants' affiliation, whether HMR and Monahan are in fact neutral, and whether HMR or Monahan are being compensated for their "sponsorship."

False or misleading statements regarding endorsements, including endorsements that mislead consumers as to whether they are biased and independent,

11

are also in violation of the regulations and guidelines promulgated under Section 5 of the Federal Trade Commission Act (the "FTC Act").  *See* 16 C.F.R. §§ 255.0-255.5. Although these regulations do not provide a private cause of action, "a plaintiff may and should rely on FTC guidelines as a basis for asserting false advertising under the Lanham Act."  *Manning Int'l, Inc. v. Home Shopping Network, Inc.*, 152 F. Supp. 2d 432, 437 (S.D.N.Y 2001); *see also Casper Sleep, Inc. v. Mitcham*, No. 16 Civ. 3224, ___ F. Supp. 3d ___, 2016 WL 4574388, *4 (S.D.N.Y. Sept. 1, 2016 ) (same).

Finally, there is no doubt that Purple faces substantial harm as a result of Defendants' conduct.  Customers who otherwise might have purchased from Purple are highly likely, upon viewing Defendants' false statements, to reconsider their decisions or be steered to competitive products such as GhostBed's mattresses.  These diverted sales will result in substantial losses of profits that would otherwise come to Purple, which is not to mention the harm resulting to Purple's goodwill and reputation.  In the absence of injunctive relief, Defendants will continue to flood the internet with false and misleading statements, drowning out Purple's efforts to counteract those statements and maintain its place in the BIB market.

In addition to the other remedies offered under the Lanham Act, the statute specifically authorizes injunctive relief in these circumstances, stating that courts may grant injunctions to prevent violations under, among other provisions, 15 U.S.C. § 1125(a).  *See* 15 U.S.C. § 1116(a).

In short, because Purple is likely to prevail on its claim under Section 43(a)(1) of the Lanham Act, immediate injunctive relief is warranted.

2.   Tortious Interference with Economic Relations

Purple is also likely to prevail on the merits of its claim for tortious interference with economic relations.

To establish tortious interference, a plaintiff must show "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff."  *Eldridge v. Johndrow*, 345 P.3d 553, 565 (Utah 2015).  The improper means element is satisfied when "the means used to interfere with a party's economic relations are contrary to law, such as violations of statutes, regulations, or recognized common law rules. Improper means include violence, threats or other intimidation, *deceit or misrepresentation*, bribery, unfounded litigation, *defamation, or disparaging falsehood.*'"  *Keith v. Mountain Resorts Dev., L.L.C.*, 2014 UT 32, ¶ 46, 337 P.3d 213 (emphasis added) (quoting *Overstock.com, Inc. v. SmartBargains, Inc.*, 2008 UT 55, ¶ 18, 192 P.3d 858).

The evidence in this case readily shows that Defendants are acting intentionally to harm and interfere with Purple's economic relationships with both its existing and prospective customers.  Absent their desire to harm Purple, the reviews on the Blog would likely appear just as the reviews it conducts for any other mattress company. Instead, Defendants have deliberately elected – with no evidence at all – to launch a campaign attacking the safety of Purple's products, the company's business practices, and its honesty with consumers.  As noted above and as reflected in posts to Purple's Facebook page, customers who would otherwise have purchased from Purple are being

13

diverted, including to GhostBed, as a result of Defendants' campaign of false, misleading, and confusing statements.

Moreover, Defendants are utilizing improper means to achieve their goals, satisfying the second element of the claim for tortious interference.  As set forth in detail above and in the Complaint, Defendants' statements on the Blog and elsewhere regarding Purple are in violation of the Lanham Act, which alone is sufficient to constitute improper means.  The statements also constitute deceit or misrepresentation, defamation, and disparaging falsehood, any one of which is sufficient to meet this element.

The injury element of tortious interference is also met, as Purple is already experiencing irreparable harm to its reputation and goodwill, lost profits, and diverted sales.  Customers who otherwise might have purchased from Purple are highly likely, upon viewing Defendants' false statements, to reconsider their decisions or be steered to competitive products such as GhostBed's mattresses.  These diverted sales will result in substantial losses of profits that would otherwise come to Purple, which is not to mention the harm resulting to Purple's goodwill and reputation.  Absent injunctive relief, these injuries will only worsen and increase.

Accordingly, Purple is likely to succeed on the merits of its claim for intentional interference with economic relations.

       3.   <u>Defamation</u>

A plaintiff makes a prima facie case for defamation if he shows that "(1) the defendant published . . .  statements [in print or orally]; (2) the statements were false;

(3) the statements were not subject to privilege; (4) the statements were published with the requisite degree of fault; and (5) the statements resulted in damages." *Jacob v. Bezzant*, 2009 UT 37, ¶ 21, 212 P.3d 535 (quotations omitted).  The requisite degree of fault for a defamation claim brought by a private plaintiff is negligence.  *See Seegmiller v. KSL, Inc.*, 626 P.2d 968, 973 (Utah 1981).  That is, if the defendant published the statement with negligence as to the truth or falsity of the statements, then the defendant will be liable if the other elements of the claim are met.[4]  *See id.*  Statements are defamatory per se if they "charge of conduct that is incompatible with the exercise of a lawful business, trade, [or] profession[.]"  *Baum v. Gillman*, 667 P.2d 41, 43 (Utah 1983).  Even if the statements are qualifiedly privileged, a defendant may still be liable if the statements were made with reckless disregard for their truth or falsity or with malice.  *See Alford v. Utah*, 791 P.2d 201, 204 (Utah Ct. App. 1990); *see also Seegmiller*, 626 P.2d at 978-9.

Defendants' false statements are not subject to any kind of privilege, and Purple has been damaged as a result.  Accordingly, the temporary restraining order should be granted.

First, there is no question that Defendants have published statements concerning Purple, including on the Blog and on various social media platforms.  Second, the

---

[4] The degree of fault for a defamation claim brought by a public figure is reckless disregard for the truth or falsity of the statements, or actual malice.  *See Wayment v. Clear Channel Broadcasting, Inc.*, 116 P.3d 271, 278 (Utah 2005).  Even if this higher standard of fault were applied to Purple's claims, Defendants would still be liable, since they published their statements with reckless disregard as to their truth or falsity, as demonstrated more fully above.

express and implied statements are false.  Indeed, Defendants are clearly misrepresenting the nature and characteristics of Purple's products, services, and commercial activities.  Not only do the statements accuse Purple of selling unsafe products and refusing to disclose information related to those products, but they also falsely inform the public that Purple is not to be trusted.  Defendants are making these statements in an effort to create a viral online controversy related to Purple and the alleged lack of safety of its products.  The statements are false because Purple has extensively tested its products for safety, and Purple is responsive to customer concerns and inquiries.  Purple would not sell an unsafe product.

Third, Defendants published the statements with negligence, or with reckless disregard as to the truth or falsity of the statements.  In determining whether a defendant published a statement with negligence, the question is whether the defendant "acted reasonably in checking on the truth or falsity" before publishing.  *Seegmiller*, 626 P.2d at 976 (quotations omitted).   Here, there is no question that Defendants acted *unreasonably* before publishing the false statements, including because Defendants have absolutely no reason to believe or suggest that Purple's products are harmful or somehow unsafe.  Additionally, by stating that Purple is unresponsive to its customers concerns, Defendants have blatantly disregarded Purple's repeated and public efforts to address the safety of its products.  These facts demonstrate that Defendants have not acted reasonably, and have therefore published their statements with negligence.

Reckless disregard as to falsity "exists when there is a high degree of awareness of probable falsity or serious doubt as to the truth of the statement."  *Ferguson v.*

16

*Williams & Hunt, Inc.*, 2009 UT 49, ¶ 30, 221 P.3d 205.  While reckless disregard is

subjective, "certain facts may show . . . that there are obvious reasons to doubt the

veracity of the informant or the accuracy of his reports."  *Id.* (quotations omitted).  Here,

Defendants had more than "obvious reasons" to doubt the veracity of their statements.

As noted above, Defendants have absolutely *no reason* to believe or suggest that

Purple's products are harmful or somehow unsafe.  Additionally, by stating that Purple is

unresponsive to its customers concerns, Defendants have blatantly disregarded

Purple's repeated and public efforts to address the safety of its products.  These facts

demonstrate that Defendants have acted with reckless disregard of the truth, or with

actual knowledge of the falsity of their statements.

   Fourth, the statements are not subject to any privilege.[5]  However, even if the

statements are subject to a qualified privilege, that privilege can be overcome because

Defendants have published their statements with reckless disregard or knowledge of

---

[5] There are two types of privilege in the defamation context: absolute privilege and
qualified privilege.  Statements made by a party in the course of judicial proceedings, for
example, are absolutely privileged, and the publisher is free from any liability.  *See Price
v. Armour*, 949 P.2d 1251, 1256 (Utah 1997).  On the other hand, the publisher of
statements that are qualifiedly privileged may still be liable if he published the
statements with knowledge of their falsity, with reckless disregard of the statements'
truth or falsity or with malice.  *See Alford v. Utah*, 791 P.2d 201, 204 (Utah Ct. App.
1990); *see also Seegmiller*, 626 P.2d at 978-9. Statements are qualifiedly privileged if
they are intended to "protect a legitimate interest of the publisher, the recipient, or a
third person."  *Ferguson*, 2009 UT 49 at ¶ 27.  Such statements would include an
employer's communication to other interested parties concerning the reasons for an
employee's discharge.  *See id.* Defendants cannot claim any privilege, absolute or
qualified, in this case.

their falsity, as demonstrated above.  *See Alford v. Utah*, 791 P.2d 201, 204 (Utah Ct. App. 1990); *see also Seegmiller*, 626 P.2d at 978-9.

Fifth, the statements are defamatory per se, and have resulted in damages. Because the statements impugn Purple's customer-service practices and the safety of its products, they "charge conduct that is incompatible with the exercise of a lawful business," and are defamatory per se.  *See Baum*, 667 P.2d at 43.  Moreover, the damages caused by the false statements is evident from the voluminous customer inquiries concerning the safety of the anti-tack powder.  Additionally, there is no doubt that Purple has been damaged as a result of Defendants' conduct.  Customers who otherwise might have purchased from Purple are highly likely, upon viewing Defendants' false statements, to reconsider their decisions or be steered to competitive products, such as GhostBed's mattresses.  These diverted sales will result in substantial losses of profits that would otherwise come to Purple, which is not to mention the harm resulting to Purple's goodwill and reputation.

Therefore, because Purple is likely to prevail on its claim for defamation, immediate injunctive relief is warranted.

### 4.   Trade Libel / Injurious Falsehood

In order to recover under a claim of injurious falsehood or trade libel,[6] a plaintiff must prove "(a) falsity of the statement made, (b) malice by the party making the

---

[6] The terms "injurious falsehood" and "trade libel" are synonymous.  *Farm Bureau Life Ins. Co. v. American Nat. Ins. Co.*, 505 F.Supp.2d 1178, 1191 (D. Utah 2007).  At its core, this cause of action "concerns statements regarding the quality of the plaintiff's product or the character of the plaintiff's business."  *Watkins v. General Refractories*

statement, and (c) special damages." *Farm Bureau Life Ins. Co. v. American Nat. Ins. Co.*, 505 F.Supp.2d 1178, 1191 (D. Utah. 2007). Here, Purple has demonstrated that Defendants made false statements, that the statements were made with malice, and that Purple has suffered special damages, namely, the revenue from the loss of potential customers.

As to the first element, Purple has demonstrated that the statements are false. There is absolutely no basis in fact for Defendants to claim or imply that Purple's products are hazardous, or that Purple is unresponsive to its customers' questions and concerns.

As to the second element, Purple has demonstrated that Defendants made the statements with malice. To show malice, a plaintiff may demonstrate that the statements were "were excessively published," or that the publisher "did not reasonably believe his or her statements." *Wayment v. Clear Channel Broadcasting, Inc.*, 116 P.3d 271, 288 (Utah 2005) (quotations omitted). Here, Defendants could not have reasonably believed their statements concerning Purple's products. As noted above, Defendants have absolutely *no reason* to believe or suggest that Purple's products are harmful or somehow unsafe. Additionally, by stating that Purple is unresponsive to its customers concerns, Defendants have blatantly disregarded Purple's repeated and public efforts to address the safety of its products.

---

*Co.*, 805 F.Supp. 911, 917 (D. Utah. 1992) (citing *Direct Import Buyers Ass'n v. KSL, Inc.*, 538 P.2d 1040 (Utah 1975)).

With regard to the third element, special damages are those damages representing actual pecuniary losses suffered, as opposed to general damages, which cover pain and loss of reputation.  *See e.g.*, *Balderas v. Starks*, 2006 UT App 218, ¶ 16, 138 P.3d 75.  Here, Purple has adequately demonstrated that it has suffered special damages, namely, the revenues from customers who otherwise might have purchased from Purple and are highly likely, upon viewing Defendants' false statements, to reconsider their decisions or be steered to competitive products, such as those offered by GhostBed.  These diverted sales will result in substantial losses of profits that would otherwise come to Purple.

Because Purple is likely to prevail on its claim for injurious falsehood, immediate injunctive relief is warranted.

## CONCLUSION

For all of the foregoing reasons, Purple respectfully asks the Court to grant its motion for temporary restraining order without bond, and to set a hearing for a preliminary injunction at a reasonable interval thereafter.

DATED this 27th day of February, 2017.

MAGLEBY CATAXINOS & GREENWOOD


/s/ James E. Magleby
James E. Magleby
Christine T. Greenwood
Adam Alba
*Attorneys for Plaintiff Purple Innovations, LLC*

20

**CERTIFICATE OF SERVICE**

I hereby certify that I am employed by the law firm of MAGLEBY CATAXINOS &

GREENWOOD, 170 South Main Street, Suite 1100, Salt Lake City, Utah 84101, and that

pursuant to Rule 5 of the Federal Rules of Civil Procedure, I am attempting to serve a

true and correct copy of the foregoing **MOTION FOR TEMPORARY RESTRAINING**

**ORDER** upon the following via personal service:

HONEST MATTRESS REVIEWS                Ryan Monahan
c/o Ryan Monahan                       900 North Federal HWY
900 North Federal HWY                  Suite 220
Suite 220                              Boca Rotan, Florida 33432
Boca Rotan, Florida 33432

GHOSTBED
7143 West Broward Blvd.
Plantation, Florida 33317

A report concerning service will be made to the Court as soon as possible.

Dated this 27th day of February, 2017.

/s/ Adam Alba