# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PURPLE INNOVATIONS, LLC, a Delaware limited liability company,<br><br>               Plaintiff,<br><br>v.<br><br>HONEST REVIEWS, LLC, a Florida Corporation, RYAN MONAHAN, an individual, and GHOSTBED, INC., a Delaware corporation,<br><br>           Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:17-cv-138-DB<br><br>District Judge Dee Benson |

      Before the court are two Motions to Dismiss, one filed by Defendants Honest Reviews, LLC ("HMR") and Ryan Monahan ("Monahan") (collectively "HMR Defendants") (Dkt. No. 64), and the other filed by Defendant GhostBed, Inc. ("GhostBed"). (Dkt. No. 67.) The court held a hearing on the Motions on July 7, 2017. Plaintiff was represented by James E. Magleby, Christine T. Greenwood, and Adam Alba. The HMR Defendants were represented by Marc J. Randazza, D. Gill Sperlein, and W. Andrew McCullough. GhostBed was represented by Eleanor M. Yost and Kathryn Smith. At the hearing, the court heard argument with respect to the above motions.[1] At the conclusion of the hearing, the court took the motions under advisement. Now being fully informed, the court issues the following Memorandum Decision and Order.

---

[1] At the hearing, the court denied the HMR Defendants' Motion to Strike and for Sanctions (Dkt. No. 139) and granted Plaintiff's Motion for Leave to File Supplemental Memoranda (Dkt. No. 140). The evidence submitted in Plaintiff's supplemental memoranda (Dkt. Nos. 137 and 138), as well as Ghostbed's supplemental authority (Dkt. No. 129) are included in the court's analysis.

<u>BACKGROUND FACTS</u>

Plaintiff is a manufacturer and online distributor of mattresses and related products. (Compl.[2] at ¶¶ 14-27.) Plaintiff is a Delaware limited liability company with its principal place of business in Utah County, Utah. (*Id.* at ¶ 6.) Plaintiff manufactures its products in Utah but does not maintain any brick and mortar stores for the sale of its products. (*Id.* at ¶ 24.) Instead, Plaintiff sells its bedding products solely through an e-commerce platform. (*Id.*)

Plaintiff alleges that, beginning in January 2017, the HMR Defendants began a smear campaign against Plaintiff on their purportedly independent mattress review website, honestmattressreviews.com. (*Id.* at ¶ 39.) Plaintiff alleges that the HMR Defendants made numerous false and misleading statements regarding Plaintiff's products, including posts attacking the safety of Plaintiff's products without factual support. (*Id.* at ¶¶ 39-117.) In its Complaint, Plaintiff identifies several specific posts that link Plaintiff's products to cancer-causing agents, provide unsubstantiated false information about the make-up of Plaintiff's products, and post inflammatory images with respect to Plaintiff's products. (*Id.* at ¶¶ 67, 68, 77, 90, 92.)

Plaintiff identifies other posts in which the HMR Defendants state that they made "repeated inquiries to [Plaintiff] for information" including a post that states that the HMR Defendants attempted to contact Plaintiff for "159 days", and posts specifically identifying two separate phone calls to Plaintiff in Utah. (*Id.* at ¶¶ 54, 60, 82, 94, 97.) The website also includes several images of Plaintiff's products, some of which have an unidentified source, some which

---

[2] All citations to the Complaint refer to the First Amended Complaint, Dkt. No. 63.

appear to be taken from Plaintiff's website, and others which are labeled as being drawn from a Utah news source, KUTV 2 News. (*Id.* at ¶¶ 76, 77, 90, 102, 105, 109.)

Plaintiff further alleges that the HMR Defendants, while claiming to provide independent consumer reviews, are actually closely associated with Plaintiff's competitor, GhostBed. (*Id.* at ¶ 118.) In support of its allegations, Plaintiff provides facts showing that Monahan was an author on the GhostBed's website on several occasions (*id.* at ¶¶123-129), that Monahan's Twitter and LinkedIn profiles identified him as the Chief Brand Officer of GhostBed until approximately October 2016 (*id.*), that Monahan identified himself as Chief Brand Officer of GhostBed when he spoke at a Content and Commerce Summit in September 2016 (*id.*at ¶130), that Monahan used the email address "ryan@GhostBed.com" and was responsible for handling GhostBed inquiries to that email (*id.* at ¶¶132-133), that the HMR Defendants, as well as Social Media Sharks—another company owned by Monahan—are jointly represented in other litigation by the same law firm representing GhostBed in this litigation (*id.* at ¶134), and that GhostBed has admitted to continuing to maintain a connection with Monahan through Social Media Sharks and another entity, Achieve Agency. (*Id.* at ¶¶ 135-136.) The honestmattressreviews.com website makes several affirmative representations of independence from all mattress manufacturers, including that the website does not receive "affiliate commissions" or seek "affiliate relationships" with mattress companies, that the website is not interested in "influencing a purchase decision to promote a company", and that the website is "free from corporate or conglomerates." (*Id.* at ¶¶ 148-155.)

Plaintiff further alleges that GhostBed representatives have independently posted false or misleading statements about Plaintiff's products. Plaintiff alleges that the daughter of

GhostBed's CEO, an employee of GhostBed, posted a review under a false name, stating that Plaintiff's mattress had a "whitish powder" all over it and expressing concern that the powder would cause cancer. (*Id.* at ¶ 137.)

Plaintiff provided the court with additional facts supporting its allegations of a close association between GhostBed and the HMR Defendants and GhostBed's independent defamatory comments in its Opposition to the Motions to Dismiss, including various emails between Monahan and GhostBed representatives and various posts or comments made by GhostBed employees. (Dkt. No. 94.) The court does not rely on the additional facts presented in Plaintiff's Opposition in determining the issue of jurisdiction here, but rather relies on Plaintiff's Complaint with its attachments and the Declarations submitted by the parties. (Dkt. Nos. 30, 31, 137.)

In support of their motions, Defendants reference two Declarations previously submitted to the court[3], the Declaration of Ryan Monahan (Dkt. No. 30) and the Declaration of Marc Werner (Dkt. No. 31). In his Declaration, Monahan states that he is the sole member and president of HMR, which operates honestmattressreviews.com, and the founder, co-owner, and CEO of Social Media Sharks, a Florida marketing company. Monahan maintains a current business relationship with GhostBed through Achieve Agency and Social Media Sharks, but those services do not involve HMR. (*Id.* at ¶ 6.) Monahan has identified himself as Chief Brand Officer of GhostBed on LinkedIn, Twitter, and a conference in September 2016, but was later asked by GhostBed to stop using the title. (*Id.* at ¶¶ 7-8.) Monahan has never had an office or phone extension with GhostBed. (*Id.* at ¶ 9.) Monahan further states that HMR has a single

---

[3] Monahan and Mr. Werner's Declarations were submitted to the court in connection with the HMR Defendants' motion to stay temporary restraining order.

source of income—Google Adsense—and that HMR has never received any consideration from GhostBed, nor has any company, person, or product had any influence over reviews on HMR. (*Id.* at ¶¶ 11-13.)

In the Declaration of Marc Werner, CEO of GhostBed, Mr. Werner disavows any relationship with the HMR Defendants, stating that "GhostBed does not have any affiliation whatsoever with co-defendants Honest Reviews LLC or Mr. Monahan." (Dkt. No. 31 at ¶ 6.) GhostBed does not own, operate, direct, control or contribute to honestmattressreviews.com. (*Id.* at ¶¶ 4-5.) GhostBed "did not, and does not, remunerate Mr. Monahan or Honest Reviews LLC in any way for anything they do in connection with the honestmattressreviews.com website." (*Id.* at ¶ 7.) "Mr. Monahan is not, and has never been, an employee, director, or officer of GhostBed." (*Id.* at ¶ 11.) When Monahan identified himself on Twitter and LinkedIn as "Chief Brand Officer" of GhostBed, he did so "mistakenly." (*Id.* at ¶ 14.) Monahan is "not a member of GhostBed's marketing department or any other GhostBed department" and does not have an office, phone extension, or email address with GhostBed. (*Id.* at ¶¶ 15-19.) Monahan has "no monetary interest in the success of GhostBed" and "receives no compensation either directly or indirectly from GhostBed for the content he publishes on honestmattressreviews.com." (*Id.* at ¶ 20.) However, Werner acknowledges a connection with Monahan through Achieve Agency and Social Media Sharks. (*Id.* at ¶ 12.)

In a supplemental memorandum, Plaintiff submitted a Declaration of GhostBed's former Director of Marketing, Calisha Anderson, which disputes Werner's Declaration and provides additional information indicating a close relationship between Monahan and Ghostbed. (Dkt. No. 137.) Anderson was employed as Director of Marketing of GhostBed from October 2016 until

June 7, 2017. (Dkt. No. 137-1 at ¶ 4.) She had "very little actual authority for GhostBed's marketing" and Monahan "was the real 'Director of Marketing.'" (*Id.* at ¶¶ 5, 8.) Monahan "controlled every aspect of the GhostBed website from before the time [Anderson] was hired until the day that [she] left GhostBed." (*Id.* at ¶ 11.) Monahan "was on the agenda" for every weekly staff meeting Anderson attended. (*Id.* at ¶¶ 14, 15.) Monahan attended GhostBed staff meetings telephonically and "led the discussion" regarding marketing. (*Id.* at ¶ 16.) Monahan "frequently used the email address ryan@ghostbed.com to communicate with others, including in the system used to send out email blasts." (*Id.* at ¶ 43.) Monahan "was the Chief Brand Officer of GhostBed, and he held himself out as such in his communications with others…." (*Id.* at ¶ 41.) During Anderson's employment, Monahan spoke on the telephone regularly with Werner, visited GhostBed's offices from time to time, and went to Werner's house for dinner. (*Id.* at ¶¶ 17, 21.)

Shortly after being hired, Anderson was informed by CEO Werner's daughter, Ashley Werner, "that Ryan was the real 'Director of Marketing'" and that "Monahan's marketing decisions trumped [Anderson's] marketing decisions." (*Id.* at ¶ 8.) Monahan "could and did and several occasions veto [Anderson's] decisions." (*Id.*) Based on Anderson's observations and experience, she "suspect[s] that [Monahan] is being paid under the table by GhostBed." (*Id.* at ¶ 22.)

Anderson's Declaration also provided support for the proposition that GhostBed independently made statements substantially similar to those alleged in the Complaint. She stated that CEO Werner "would tell [Anderson] and other GhostBed employees about a powder on [Plaintiff's] mattress", "saying that a competitor was using talcum powder and talking about

lawsuits against Johnson & Johnson because talcum powder caused cancer." (*Id.* at ¶ 24.) Anderson further stated that she believed that Werner "wanted consumers to know about this." (*Id.*)

GhostBed is a Delaware corporation with its principal place of business in Plantation, Florida. (Compl. at ¶ 9.) Similarly, HMR is a Florida limited liability company with its principal place of business in Plantation, Florida. (*Id.* at ¶ 7.) Monahan is an individual domiciled in Florida. (*Id.* at ¶ 8.) Monahan is the sole member and president of HMR, which operates honestmattressreviews.com. (Dkt. No. 30 at ¶ 2.) None of the defendants appears to have a residence or place of business in the state of Utah. (*Id.*at ¶¶ 4-5; Compl. at ¶ 9.)

## DISCUSSION

When, as in this case, a court considers a motion to dismiss "on the basis of the complaint and affidavits," a plaintiff must "only make a *prima facie* showing of personal jurisdiction." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). The plaintiff may make this prima facie showing by demonstrating by affidavit or other written materials, facts that if true would support jurisdiction over the defendant. *OMI Holdings, Inc. v. Royal Ins. Co.*, 149 F.3d 1086, 1091 (10th Cir. 1998). "[A]ny factual disputes in the parties' affidavits must be resolved in plaintiffs' favor." *Dudnikov*, 514 F.3d at 1070. In order to defeat the plaintiff's prima facie showing of personal jurisdiction, the moving defendant must present a compelling case demonstrating "that the presence of some other considerations would render jurisdiction unreasonable." *OMI Holdings*, 149 F.3d at 1091 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show (1) that jurisdiction is legitimate under the laws of the forum state, and (2) that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment. *Soma Medical Int'l v. Standard Chartered Bank*, 196 F.3d 1292, 1295 (10th Cir. 1999).

## I. Jurisdiction Under State Law

Utah law expressly states that the Utah state long arm statute must be interpreted broadly "so as to assert jurisdiction over nonresident defendants to the fullest extent permitted by the due process clause of the Fourteenth Amendment to the United States Constitution." Utah Code § 78B-3-201; *see also Starways, Inc. v. Curry*, 980 F.2d 204, 206 (Utah 1999) ("We have held that the Utah long-arm statute 'must be extended to the fullest extent allowed by due process of law.") (quoting *Synergetics v. Marathon Ranching Co.*, 701 F.2d 1106, 1110 (Utah 1985)). Because the Utah long-arm statute confers the maximum jurisdiction permissible consistent with the Due Process Clause, the court proceeds to determine whether the exercise of personal jurisdiction over Defendants meets federal due process standards.

## II. Due Process Analysis

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'" *Burger King*, 471 U.S. at 471-72 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)). Accordingly, a "court may exercise personal jurisdiction over a nonresident defendant only so long as there exist 'minimum contacts' between the defendant and the forum state." *World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980) (quoting

*International Shoe*, 326 U.S. at 316). The minimum contacts standard can be met in two ways. First, a court may assert specific personal jurisdiction over a nonresident defendant where "the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or are related to those activities." *Burger King*, 471 U.S. at 472. Where no nexus exists between the forum-related activity and the injury sustained, the court may nevertheless exercise general jurisdiction over the defendant when the defendant's contacts are "so pervasive that personal jurisdiction is conferred by the 'continuous and systematic' nature of the defendant's in-state activities." *OMI Holdings*, 149 F.3d at 1090-91. The court does not find that any of the Defendants have continuous and systematic contacts with the State of Utah such that they would be subjected to general personal jurisdiction in Utah. As such, the court proceeds with the specific personal jurisdiction analysis as to each defendant.

### A. Specific Jurisdiction

The court's specific jurisdiction inquiry is two-fold. First, the court must determine whether the defendant has such "minimum contacts" with the forum state "that he should reasonably anticipate being haled into court there. *World-Wide Volkswagen*, 444 U.S. at 297. These "minimum contacts" are established "'if the defendant has "purposefully directed" his activities at residents of the forum and the litigation results from alleged injuries that "arise out of or relate to" those activities.'" *OMI Holdings*, 149 F.3d at 1091 (quoting *Burger King*, 471 U.S. at 472.) Second, if the defendant's activities create sufficient minimum contacts, then the court must consider "whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Asahi Metal Indus. Co. v. Superior Court of California*, 480 U.S. 102, 113 (1987)). The latter inquiry requires a

determination of whether a district court's exercise of personal jurisdiction over a defendant with minimum contacts is "reasonable" in light of the circumstances surrounding the case. *OMI Holdings*, 149 F.3d at 1091.

### 1. Minimum Contacts – HMR Defendants

"[T]he Supreme Court has instructed that the "minimum contacts" standard requires, first, that the out-of-state defendant must have "purposefully directed" its activities at residents of the forum state, and second, that the plaintiff's injuries must "arise out of" defendant's forum-related activities." *Dudnikov*, 514 F.3d at 1071 (quoting *Burger King*, 471 U.S. at 472.) The United States Court of Appeals for the Tenth Circuit has explained, however, that the "purposeful direction" requirement can appear in "different guises." *Id.* In contract cases, "we sometimes ask whether the defendant "purposefully availed" itself of conducting business in the forum state; in the tort context, meanwhile, "we often ask whether the non resident defendant 'purposefully directed' its activities at the forum state." *Id.* (citing *Bell Helicopter Textron, Inc. V. Hekiqwest Int'l, Ltd.*, 385 F.3d 1291, 1296 (10th Cir. 2004). Under either approach, the "shared aim of purposeful direction" is to "ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.* (quoting *Burger King*, 471 U.S. at 475.)

In this case, Plaintiff attempts to satisfy the "purposeful direction" requirement by application of the "effects test" set forth by the United States Supreme Court in *Calder v. Jones*, 465 U.S. 783, 789-90 (1984), and more recently applied by the Tenth Circuit in *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063 (2008). Specifically, Plaintiff contends that the HMR Defendants' false and misleading statements about a Utah resident and its activities in

Utah, combined with the HMR Defendants' purchase of Plaintiff's products and use of materials

on Plaintiff's website, demonstrate that the HMR Defendants expressly aimed their activities at

Utah residents, and that Utah has been the focal point of the tortious conduct and of the resulting

harm.

In *Dudnikov*, the Tenth Circuit explained that purposeful direction may be found where

plaintiff has alleged "(a) an intentional action . . . that was (b) expressly aimed at the forum state

. . . with (c) knowledge that the brunt of the injury would be felt in the forum state." *Id.* In the

internet context, the Tenth Circuit has recognized that "a person who simply places information

on the Internet does not subject himself to jurisdiction in each State into which the electronic

signal is transmitted and received." *Shrader v. Biddinger*, 633 F.3d 1235, 1240–41 (10th Cir.

2011) (quoting *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.,* 293 F.3d 707, 712 (4th

Cir.2002)). Rather, to subject himself to personal jurisdiction in a state, a defendant must direct

actionable electronic activity into the state "with the manifested intent of engaging in business or

other interactions within the State." *Id.*

Applying the *Calder* effects test, as set forth in *Dudnikov* and clarified in *Shrader*, this

court finds that Plaintiff has sufficiently alleged "purposeful direction" with respect to the HMR

Defendants, such that they have the requisite minimum contacts with Utah. First, Plaintiff has

sufficiently alleged that the HMR Defendants intentionally posted materially false and

misleading statements about Plaintiff's products on the honestmattressreviews.com website.

(Compl. at ¶¶ 39-117.) The HMR Defendants also do not dispute that the alleged conduct was

intentional. (Dkt. No. 64 at 7 n. 3.)

Second, the court finds that the HMR Defendants' conduct was expressly aimed at the state of Utah. The *Dudnikov* court explained that the "express aiming" test focuses on a defendant's intentions–what was the "focal point of [the defendant's] purposive efforts." *Dudnikov*, 514 F.3d at 1075. In this case, the focal point of the HMR Defendants' alleged efforts was to damage a Utah-based competitor. Stated another way, the "express aim" of the HMR Defendants' conduct was to effectively reach into Utah and damage Plaintiff's business and reputation. *See Dudnikov*, 514 F.3d at 1075.

The HMR Defendants targeted Plaintiff, knowing that Plaintiff is a Utah-based company, operating primarily in Utah. (Compl. at ¶¶ 94, 102.) The HMR Defendants acknowledge on the honestmattressreviews.com website that they made "repeated inquiries to [Plaintiff] for information, for 159 days", including two specifically identified phone calls to Plaintiff in Utah. (*Id.* at ¶¶ 54, 60, 82, 94, 97.) Such extensive contact with Plaintiff, acknowledged by the HMR Defendants, indicates that they intentionally and regularly reached into Utah to harm a Utah-based competitor. Furthermore, many of the materials used on the honestmattressreviews.com website to damage Plaintiff were taken from Utah sources, such as Plaintiff's own marketing photos and videos posted to its website and social media, and KUTV 2 News in Utah. (*Id.* at ¶¶ 102, 105.) Such direct acquisition of Utah-based materials creates "an actual, not merely a possible, contact with the forum", which "constitute[s] a purposeful availment of the Utah forum." *Kindig It Design, Inc. v. Creative Controls, Inc.*, 157 F. Supp. 3d 1167, 1179 (D. Utah 2016); *see also SelectHealth, Inc. v. Risinger*, 18 F. Supp. 3d 1268, 1275 (D. Utah 2014) (holding that "copying Plaintiff's website content and using it" for an allegedly unlawful purpose was sufficient to demonstrate that the defendant purposely directed his activities to the state of

Utah). The court is satisfied that the HMR Defendants expressly aimed the allegedly tortious conduct at the forum state of Utah and, as such, have sufficient minimum contacts to satisfy the exercise of personal jurisdiction.

The court also finds that the third element—knowledge that the brunt of the injury would be felt in the forum state of Utah—is met, for many of the same reasons. The HMR Defendants were aware, based on conversations with Plaintiff and the materials used from KUTV and Plaintiff's website for the honestmattressreviews.com site, that Plaintiff is a Utah-based company with many Utah customers. The HMR Defendants' posts specifically and negatively targeted Plaintiff to the exclusion of other mattress retailers it reviewed. (Compl. at ¶¶ 39-117.) Plaintiff has sufficiently alleged that the HMR Defendants had knowledge that the brunt of the injury from their actions would be felt in the forum state of Utah.

Having determined that the HMR Defendants "purposefully directed" their activities at the forum state, the court has no difficulty concluding that Plaintiff's injuries "arise out of " the HMR Defendants' contacts with the forum jurisdiction. *See Burger King*, 471 U.S. at 472. Plaintiff's claims arose from the HMR Defendants' posts on the honestmattressreviews.com website, which include materials taken from Plaintiff's website and references to the HMR Defendants' telephonic and electronic contact with Plaintiff. Those same actions also constitute the HMR Defendants' contacts with Utah. Therefore, the court concludes that Plaintiff has alleged facts sufficient to support a finding that the HMR Defendants' conduct was "purposefully directed" at Utah and that Plaintiff's claims arose out of those contacts such that the HMR Defendants have minimum contacts with Utah.

### 2.   Minimum Contacts – GhostBed

Having determined that Plaintiff has sufficiently alleged minimum contacts with respect to the HMR Defendants, the court turns now to Plaintiff's allegations with respect to GhostBed. As discussed above, to defeat dismissal for lack of personal jurisdiction, Plaintiff must make a prima facie showing that GhostBed engaged in "(a) an intentional action . . . that was (b) expressly aimed at the forum state . . . with (c) knowledge that the brunt of the injury would be felt in the forum state." *Dudnikov*, 514 F.3d at 1075. Plaintiff again attempts to make this showing by application of the *Calder* "effects test." More specifically, Plaintiff alleges that GhostBed conspired with the HMR Defendants to target Plaintiff with false and misleading statements for purposes of obtaining a competitive advantage. (*See* Compl. at ¶¶ 39-117.) Accordingly, Plaintiff asserts that GhostBed's creation of contacts in Utah, both independently and through the HMR Defendants, are sufficient here to establish minimum contacts for purposes of Due Process. (*Id.*)

The court agrees. With respect to the first *Calder* factor, Plaintiff has sufficiently alleged that GhostBed acted intentionally, both through the HMR Defendants and independently. The allegations of an association between Monahan and GhostBed in the Complaint (Compl. at ¶¶123-136,) along with Anderson's statements that Monahan "was the real 'Director of Marketing'", "was on the agenda" for every weekly staff meeting Anderson attended, "led the discussion" regarding marketing, and had a close relationship with GhostBed's CEO and his daughter, are sufficient to establish at this stage that GhostBed intentionally associated with Monahan. (Dkt. No. 137-1 at ¶¶ 8, 14-17, 21.) That intentional association, combined with the intentional actions of the HMR Defendants to damage a competitor of GhostBed are sufficient to

establish an intentional action for purposes of minimum contacts with respect to GhostBed. The inference of intent is further strengthened by the express disavowal of any relationship with any mattress company on the honestmattressreviews.com website. (*See* Compl. at ¶¶ 39, 118.)

Plaintiff has also alleged additional, independent actions taken by GhostBed that satisfy the standard. In its Complaint, Plaintiff alleges that the daughter of GhostBed's CEO, an employee of GhostBed, posted a review under a false name, stating that Plaintiff's mattress had a "whitish powder" all over it and expressing concern that the powder would cause cancer. (Compl. at ¶ 137.) In Anderson's Declaration, Plaintiff submits that GhostBed's CEO discussed the powder on Plaintiff's mattress with GhostBed employees and compared it to cancer causing agents, and wanted consumers to be aware of it. (Dkt. No. 137-1 at ¶ 24.) Plaintiff has alleged sufficient intentional actions taken by GhostBed to satisfy the first prong of the *Calder* test.

Second, Plaintiff must make a prima facie showing that these intentional actions were expressly aimed at the forum state of Utah. Plaintiff asserts that GhostBed has worked with the HMR Defendants to target Plaintiff and its manufacturing process in Utah, to such a degree that the forum state of Utah has become the focal point of their efforts. The facts alleged by Plaintiff relating to GhostBed's connection to the HMR Defendants, combined with allegations that high-level GhostBed employees made substantially similar comments during the same time period, corroborate Plaintiff's assertion that GhostBed acted in concert with the HMR Defendants to reach into Utah to damage Plaintiff, a direct competitor of GhostBed. As discussed above, Plaintiff has made a prima facie showing that GhostBed closely associated with Monahan during the time period when he was posting the allegedly defamatory statements on the honestmattressreviews.com website. (Dkt. No. 137-1 at ¶¶ 8, 14-17, 21; Compl. at ¶¶ 39, 118,

137.) Plaintiff has also established a prima facie case that the HMR Defendants reached into Utah and established minimum contacts, by contacting Plaintiff in Utah regularly, using Utah sources on its website, and targeting Plaintiff to the exclusion of other mattress providers. (*Id.* at ¶¶ 54, 60, 82, 94, 97, 102-105.) By virtue of the alleged close connection and collusion between the HMR Defendants and GhostBed, the court similarly finds that GhostBed has "'purposefully directed' its activities at the forum state" of Utah. *Dudnikov*, 514 F.3d at 1071.

This finding is further supported by Plaintiff's evidence that, during the same time period, the CEO of GhostBed and his daughter, an employee of GhostBed, made comments online and to GhostBed employees that were substantially similar to those posted on the honestmattressreviews.com website. (Dkt. No. 137-1 at ¶¶ 8, 14-17, 21; Compl. at ¶¶ 39, 118, 137.) Plaintiff has sufficiently alleged a prima facie showing that GhostBed acted in concert with the HMR Defendants to intentionally reach into Utah to damage its Utah-based competitor.

Third, as with the HMR Defendants, the court finds that GhostBed had knowledge that the brunt of the injury resulting from its intentional conduct would be felt in the forum state of Utah. Plaintiff has alleged that Monahan was on the agenda for every weekly staff meeting that Anderson attended, that he led the discussion regarding marketing, and that he had regular telephonic and in-person contact with GhostBed's CEO and his daughter, an employee of GhostBed. (Dkt. No. 137-1 at ¶¶ 8, 14-17, 21.) Given the closeness and regularity of the connection between Monahan and GhostBed, Monahan's knowledge that the brunt of the injury inflicted by the honestmattressreviews.com website may reasonably be imputed to GhostBed, particularly in light of the related comments made by GhostBed's CEO and his daughter to

others. *Id.* As such, Plaintiff has sufficiently alleged that GhostBed was aware that the brunt of the injury inflicted by its actions would be felt in the forum state of Utah.

Finally, as with the HMR Defendants, having found that GhostBed "purposefully directed" its activities at the forum state of Utah, the court also concludes that Plaintiff's injuries "arise out of" GhostBed's contacts with the forum jurisdiction. *See Burger King*, 471 U.S. at 472. Plaintiff's claims arose from the posts on the honestmattressreviews.com website, for which Plaintiff has sufficiently alleged collusion between the HMR Defendants and GhostBed. Those same actions also constitute GhostBed's contacts with Utah. Therefore, the court concludes that Plaintiff has alleged facts sufficient to support a finding that GhostBed's conduct was "purposefully directed" at Utah and that Plaintiff's claims arose out of GhostBed's contacts with Utah such that GhostBed has minimum contacts with Utah.

### 3.   Reasonableness

Having determined that Plaintiff has met its burden of establishing "minimum contacts" with all Defendants, the court must still inquire whether the existence of personal jurisdiction would "offend traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1080 (quoting *International Shoe*, 326 U.S. at 316). This inquiry requires a determination of whether a district court's exercise of personal jurisdiction is "reasonable" in light of the circumstances surrounding the case. *OMI Holdings*, 149 F.3d at 1091. In this regard, the court should consider: (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the

shared interest of the several states in furthering fundamental substantive social policies. *Id.* at 1095; *World-Wide Volkswagen*, 444 U.S. at 292.

The analyses of minimum contacts and reasonableness are complimentary, such that the reasonableness prong of the due process inquiry evokes a sliding scale:

> the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts].

*Pro Axess, Inc. v. Orlux Distribution, Inc.* , 428 F.3d 1270, 1280 (10th Cir. 2005) (quoting <u>OMI</u> at 1092 (alterations in original) (quotations omitted)). However, in a case such as this, where the court has found that the defendants "purposefully ... directed [their] activities" at Utah, in order to defeat jurisdiction, the defendants "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. The Defendants are unable to meet this high standard.

### a.   Burden on Defendants of Litigating in the Forum

Regarding the first factor, Defendants reside in Florida. To defend a suit in Utah will create a burden to them. However, "[m]odern transportation and communication, and in particular the implementation of electronic case filing, noticing, and teleconferences, have to some extent lessened the burden to out-of-state defendants." *Toytrackerz LLC v. Koehler*, 2009 WL 1505705, at *18 (D. Kan. May 28, 2009). Accordingly, although the court recognizes that Defendants may face some burden if required to litigate in Utah, "[i]n the modern world of air transportation and digital communication, the court has no difficulty in finding that litigating in Utah will not create so substantial a burden on [Defendants] as to violate Due Process." *Kindig It Design*, 157 F. Supp. at 1180.

### b. Forum State's Interest in Resolving the Dispute

States have "an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors." *OMI Holdings*, 149 F.3d at 1096. In this case, the court finds that Utah has a strong interest in adjudicating this controversy. Plaintiff not only resides in Utah, but also claims to have suffered significant injury and monetary damages within the state. *See Burger King*, 471 U.S. at 483-84.

### c. Plaintiff's Interest in Convenient and Effective Relief

Plaintiff similarly has a strong interest in obtaining relief in Utah, where it operates and has suffered significant injury.

### d. Interstate Judicial System's Interest in Obtaining Efficient Resolution

With respect to the fourth factor, the court evaluates whether the forum state is the most efficient place to litigate the dispute. *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1281 (10th Cir. 2005). In evaluating this factor, courts look to the location of witnesses, the location of the underlying wrong, what forum's substantive law governs the case, and whether jurisdiction is necessary to prevent piecemeal litigation. *Id.* Here, the location of witnesses seems to be neutral, as most of Plaintiff's witnesses appear to be in Utah, while most of Defendants' witnesses appear to reside primarily in Florida. The underlying wrong is primarily electronic, but the brunt of the injury is felt here in Utah, which weighs in favor of litigating the dispute in Utah. The parties disagree about what substantive law will apply to the case. However, this court is fully capable of applying the state law of Utah or Florida, as the case may be. Litigating this matter in Utah allows all parties to resolve the dispute expeditiously and in one forum. Accordingly, this factor does not indicate that the exercise of jurisdiction in Utah would be unreasonable.

### e.  States' Interest in Furthering Fundamental Substantive Social Policies

Finally, the fifth factor of the reasonableness inquiry focuses on whether the exercise of personal jurisdiction by the forum state affects the "substantive social policy interests of other states or foreign nations." *OMI Holdings*, 149 F.3d at 1097. The court finds no facts suggesting that the exercise of personal jurisdiction in Utah would affect the substantive social policy interests of any other state or foreign nation.

After evaluating the relevant factors, the court finds that Defendants have failed to establish a "compelling case" that the exercise of jurisdiction would be unreasonable. *Burger King*, 471 U.S. at 477. Accordingly, the court determines that the exercise of jurisdiction in Utah is reasonable and would not run afoul of Due Process.

### B.  Venue

Venue is similarly proper in Utah, pursuant to 28 U.S.C. § 1391(b)(2), because Defendants intentionally reached into Utah to target a Utah-based competitor. The statute provides that venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred [.]" 28 U.S.C. § 1391(b)(2). This court has previously recognized that where a defendant's allegedly unlawful acts occurred over the internet, "a substantial part of the events occurred in Utah" for purposes of venue if the defendant "intentionally reached" into the forum "in an effort to do harm to the Utah business, knowing its location in Utah." *Diesel Power Source, L.L.C. v. Crazy Carl's Turbos Inc.*, 2015 WL 1034231, at *10 (D. Utah Mar. 10, 2015). Here, Defendants reached out to Plaintiff on many occasions regarding its product and used Utah-based materials to post allegedly defamatory statements about the product, knowing that Plaintiff is a Utah-based company and that the brunt of the harm

would be felt in Utah. Such intentional actions directed at Utah are sufficient to satisfy the venue requirements of 28 U.S.C. § 1391(b)(2).

## III.  Defendants' Motions, in the Alternative, to Transfer Venue

Having determined that venue is proper in Utah, the court must determine whether it should exercise its discretion to transfer the action "[f]or the convenience of parties and witnesses, [and] in the interest of justice,…to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Defendants acknowledge that they "bear[] the burden of establishing that the existing forum is inconvenient" and that "[m]erely shifting the inconvenience from one side to the other…is not a permissible justification for a change of venue." *Scheidt v. Klein*, 956 F.2d 963, 965 (10th Cir. 1992).

In considering a motion to transfer venue under § 1404(a), courts in the Tenth Circuit weigh the following discretionary factors:

the plaintiff's choice of forum; the accessibility of witnesses and other sources of proof, including the availability of compulsory process to insure attendance of witnesses; the cost of making the necessary proof; questions as to the enforceability of a judgment if one is obtained; relative advantages and obstacles to a fair trial; difficulties that may arise from congested dockets; the possibility of the existence of questions arising in the area of conflict of laws; the advantage of having a local court determine questions of local law; and [ ] all other considerations of a practical nature that make a trial easy, expeditious and economical.

*Chrysler Credit Corp. v. Country Chrysler, Inc.*, 928 F.2d 1509, 1516 (10th Cir. 1991) (internal quotation marks omitted). Defendants argue that the witnesses and proof in this case are in Florida, that judgments would be more easily enforced in Florida, and that Florida law would apply, weighing in favor of transfer to a Florida forum. The court does not find support for Defendants' arguments. The parties disagree about which state's law will apply in this case. However, as discussed above, this court is fully capable of applying Florida law—including

Florida Anti-SLAPP law—should it be found applicable. The witnesses and proof in this case appear to be neutral with respect to venue, as Plaintiff's witnesses and proof are found in Utah, while Defendants' witnesses and proof are in Florida. Merely transferring the burden of inconvenience from Defendants to Plaintiff is an insufficient basis for a transfer of venue. Considering the factors above, the court finds that Defendants have not carried their burden to establish that Utah is an inconvenient forum in this case.

## IV.  GhostBed's Motion to Dismiss Pursuant to Rule 12(b)(6)

In addition to its Motion to Dismiss pursuant to Rule 12(b)(2), GhostBed moves to dismiss the Complaint pursuant to Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. Proc. 12(b)(6). To survive a Rule 12(b)(6) motion, "a complaint must have enough allegations of fact, taken as true, 'to state a claim to relief that is plausible on its face.'" *Kansas Penn Gaming, LLC v.Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570). In considering a motion to dismiss, "[a] court must not weigh potential evidence that the parties might present at trial," but instead must "assess whether the plaintiff's . . . complaint alone is legally sufficient to state a claim for which relief may be granted." *Checkley v. Allied Prop. & Cas. Ins. Co.*, 635 Fed. Appx. 553, 555-56 (10th Cir. 2016) (quotation marks and citation omitted). The Court "accept[s] all well-pleaded facts as true, along with reasonable inferences from those facts." *Id.*at 556.

GhostBed first moves to dismiss the Complaint pursuant to Rule 12(b)(6) on the grounds that Ghostbed "does not own, control, operate, or contribute in any way to the honestmattressreviews.com website", and "does not have any affiliation whatsoever with co-defendant Honest Reviews, LLC," and, as such, cannot be held liable for the content posted on

the honestmattressreviews.com website. (Dkt. No. 67 at 15.) Accepting all of the facts in the Complaint as true, the court cannot accept GhostBed's argument.

In the Complaint, Plaintiff alleges that the HMR Defendants, are "closely associated" with GhostBed. (*Id.* at ¶ 118.) In support of this assertion, Plaintiff states that Monahan was an author on the GhostBed's website on several occasions (*id.* at ¶¶123-129), that Monahan's Twitter and LinkedIn profiles identified him as the Chief Brand Officer of GhostBed until approximately October 2016 (*id.*), that Monahan identified himself as Chief Brand Officer of GhostBed when he spoke at a Content and Commerce Summit in September 2016 (*id.*at ¶130), that Monahan used the email address "ryan@GhostBed.com" and was responsible for handling GhostBed inquiries to that email (*id.* at ¶¶132-133), that the HMR Defendants, as well as Social Media Sharks—another company owned by Monahan—are jointly represented in other litigation by the same law firm representing GhostBed in this litigation (*id.* at ¶134), and that GhostBed has admitted to continuing to maintain a connection with Monahan through Social Media Sharks and another entity, Achieve Agency. (*Id.* at ¶¶ 135-136.) These factual allegations are sufficient to support a close connection between the HMR Defendants and GhostBed, such that Plaintiff's allegations of collusion in the allegedly defamatory posts are plausible on their face. Plaintiff also alleges independent conduct—a review posted by the daughter of GhostBed's CEO under a false name, stating that Plaintiff's mattress had a "whitish powder" all over it and expressing concern that the powder would cause cancer (*id.* at ¶ 137)—that support Plaintiff's assertions of collusion between Defendants and independent wrongful conduct on the part of GhostBed. The court finds that the facts alleged allow the court to "draw the reasonable inference that

[GhostBed] is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Accordingly, GhostBed's Motion to Dismiss on those grounds is denied.

GhostBed also moves to dismiss Plaintiff's claim for contributory false association and false advertising on the grounds that it is not a viable legal theory in this jurisdiction.[4] The court agrees. Plaintiff has cited to cases in other jurisdictions indicating that claims for contributory false association or false advertising under the Lanham Act may be viable, and cases in this jurisdiction in which courts recognized a cause of action for contributory trademark or patent infringement. However, Plaintiff has provided no case law in this jurisdiction, nor has the court found any, recognizing a cause of action for contributory false association or false advertising under the Lanham Act. The court declines to extend the Act to allow such a claim here.[5] As such, GhostBed's Motion to Dismiss Plaintiff's claim for Contributory False Association and False Advertising is granted.

---

[4] GhostBed also mentions another ground for dismissal in the introduction section of its Motion to Dismiss—that Plaintiff's claim for violations of the Utah Truth in Advertising Act ("UTIAA") must be dismissed because the UTIAA applies only to advertisements that originate in Utah and target consumers in Utah, or to advertisements that originate outside of Utah, but that target consumers in Utah. GhostBed did not address this argument in the Argument section of its Motion, but did briefly discuss it again in its Reply briefing. To the extent that GhostBed properly raised this issue to the court, the court finds sufficient allegations to support a finding that the alleged defamatory statements target consumers in Utah, for the same reasons discussed in the court's minimum contacts analysis of GhostBed's intentional actions reaching into Utah.

[5] The court also recognizes that Plaintiff's claim against GhostBed for Civil Conspiracy is largely duplicative of Plaintiff's claims for contributory false advertising in any event.

<u>CONCLUSION</u>

For the foregoing reasons, the court DENIES Defendants' Motions to Dismiss for lack of personal jurisdiction and improper venue, DENIES Defendants' Motions to Transfer Venue, DENIES GhostBed's Motion to Dismiss pursuant to Rule 12(b)(6), except with respect to Plaintiff's Second Cause of Action for Contributory False Association and False Advertising, for which GhostBed's Motion is GRANTED.

DATED this 25th day of July, 2017.

BY THE COURT:

_____

Dee Benson
United States District Judge