1           THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF UTAH

3                 CENTRAL DIVISION

4

5   PURPLE INNOVATIONS, a      )

6   Delaware limited liability )

7   company,                   )

8           Plaintiff,         )

9   vs.                        )    Case No. 2:17-CV-138DB

10  HONEST REVIEWS, a Florida  )

11  corporation, et al.,       )

12          Defendants.        )

13  _____)

14

15

16        BEFORE THE HONORABLE DEE BENSON

17        -------------------------------

18                March 14, 2017

19

20                Motion Hearing

21

22

23

24

25

```
1                    A P P E A R A N C E S

2

3    For Plaintiffs:          JAMES MAGLEBY
                              ADAM ALBA
4                             CHRISTINE GREENWOOD
                              170 South Main Street
5                             Suite 1100
                              Salt Lake City, Utah
6

7

8    For Defendant:           ANDREW McCULLOUGH
     Honest Reviews           6885 South State Street
9                             Suite 200
                              Midvale, Utah
10

11                            D. GILL SPERLEIN
                              345 Grove Street
                              San Francisco, California
12

13                            MARC J. RANDAZZA
                              4035 South El Capitan Way
                              Las Vegas, Nevada
14

15

16   For Defendant:           ELEANOR YOST
     GhostBed                 1025 Thomas Jefferson Street NW
                              Suite 400 West
17                            Washington , D.C.

18                            PHILLIP FERGUSON
                              BRYSON BROWN
19                            257 East 200 South
                              Suite 1100
20                            Salt Lake City, Utah

21

22

23

24   Court Reporter:          Ed Young
                              351 South West Temple
                              Room 3.302
25                            Salt Lake City, Utah 84101-2180
                              801-328-3202
```

```
 1   March 14, 2017                              11:00 a.m.
 2                  P R O C E E D I N G S
 3
 4           THE COURT:  Good morning.
 5           We'll go ahead in Purple Innovations versus Honest
 6   Reviews, L.L.C., 17-CV-138.  Let me look and see who I
 7   recognize.  Not that many.  We'll start with Mr. Magleby,
 8   who represents the plaintiff, and I will ask him to
 9   introduce himself and the other people at his table.
10           MR. MAGLEBY:  Thank you, Your Honor.
11           Jim Magleby, and with me also is Christine
12   Greenwood and Adam Alba of our law firm and, Casey McGarvey,
13   who is the chief legal officer for Purple Innovations.
14           THE COURT:  Thank you, Mr. Magleby.
15           Mr. McCullough, nice to see you again.
16           MR. McCULLOUGH:  Thank you, Your Honor.
17           THE COURT:  Could I ask you to do the same thing
18   so that we know who is who?
19           MR. McCULLOUGH:  Yes.  I am Andrew McCullough, and
20   I am local counsel for Honest, and my associates here are
21   Marc Randazza from Las Vegas and Gill Sperlein from San
22   Francisco.  I have known them both for many years.
23           THE COURT:  Thank you.
24           Mr. Ferguson, how about you on the back table?
25           MR. FERGUSON:  Phil Ferguson for GhostBed, and
```

1    with me is lead counsel, Eleanor Yost, from the firm Carlton

2    Fields, and Bryson Brown from my office.

3              THE COURT:  Thank you, Mr. Ferguson.

4              I have on for hearing and what we have noticed for

5    hearing is the plaintiff's motion for an order to show cause

6    why the defendants should not be held in contempt, and an

7    emergency motion to stay the temporary restraining order,

8    and that is a motion brought by the defendants, and I

9    believe all of them, and then there is a motion whether the

10   temporary restraining order entered on March 2, 2017 should

11   be converted into a preliminary injunction.  That has to be

12   a motion by the plaintiff.

13             Is that in the form of a motion?  That is what I

14   requested this hearing to be about, but I don't know if

15   there is an actual motion.

16             MR. MAGLEBY:  I don't know if there is an actual

17   motion.  I know that we requested it or talked about it in

18   our most recent filings, and we saw that in the Court's

19   notice, and to the extent I need to make an oral motion for

20   that, certainly we will do that.

21             THE COURT:  Well, that will be a large part of the

22   conversation here this morning.

23             The other motions that I am planning on hearing

24   arguments about today is the motion for leave to conduct

25   expedited discovery, and that is docket number 39, and that

```
 1    is at the plaintiff's request.

 2              Next would be the informal motion, if I can call

 3    it that, by Honest Review, L.L.C. in opposition to the

 4    motion for order to show cause.  That is a request or a

 5    motion for sanctions and fees against Purple for bringing

 6    the motion for a temporary restraining order.

 7              Then defendant GhostBed in their motion to dismiss

 8    requests dissolution of the temporary restraining order.

 9    I'm referring to docket number 36.

10              A pending motion that I am not planning to

11    consider today or hear argument on is that portion of

12    defendant GhostBed's motion to dismiss that requests the

13    dismissal of the entire lawsuit for failure to state a

14    claim.

15              So if we're all on the same page or number of

16    pages, that would be terrific.  I think a lot of this will

17    interrelate, so tell me what your suggestion is on the way

18    to proceed.

19              What should we hear first?

20              MR. MAGLEBY:  Your Honor, I think it makes sense,

21    and it is interrelated, and I think it makes sense for us to

22    go first on both the validity of the T.R.O. and whether it

23    ought to be extended and then the order to show cause,

24    because they are going to interrelate, and then the

25    defendants can come back and beat me up.
```

```
 1                THE COURT:  Did you say beat you up?

 2                MR. MAGLEBY:  Yes.

 3                THE COURT:  Okay.  Attempt to beat you up you

 4     should say.

 5                MR. MAGLEBY:  Thank you, Your Honor.

 6                THE COURT:  Because you're going to attempt to

 7     beat them up.

 8                You described it as to defend your temporary

 9     restraining order first, correct?

10                MR. MAGLEBY:  Yes, and move to have it converted

11     into a preliminary injunction.  In particular, one of the

12     issues that will be relevant to both motions is the

13     relationship between Monahan and GhostBed and the increasing

14     level of evidence that we keep discovering about that

15     relationship, and so I think that overlaps, and that also

16     relates to the expedited discovery.  Frankly, I am going to

17     mix it all up and make a mess of it, but I think the Court

18     will be able to sort it out.

19                THE COURT:  It will all get mixed up.

20                The basis upon which the T.R.O. was granted, from

21     the Court's standpoint, which is the only one that matters,

22     is that it rested on two major pillars and then was propped

23     up by another one.  The first one was the information

24     presented by the plaintiffs that Honest Reviews was not

25     honest because it was omitting an important fact that Mr.
```

1    Monahan was working for a competitor, a significant

2    competitor of Purple, and that the real purpose of the

3    disparaging remarks and false remarks was to enhance the

4    sales of GhostBed, or at least reduce the sales of Purple,

5    the competitor, and that that connection needed to be

6    disclosed.  That was one important aspect of the factual

7    presentation upon which the Court acted.

8          Second was that the various statements made on the

9    website were false, false and misleading in that they had

10   essentially, according to the allegations that were

11   presented to me, that there was no justification for the

12   suggestions and the many suggestions and the clever ways in

13   which those suggestions were made, that a person could

14   contract a serious illness or suffer injuries from sleeping

15   on one of Purple's mattresses from the powder, the white

16   powder that was in it, and that that was based on nothing

17   and that it was false and that it was knowingly false, and

18   that the defendants were engaging in this conduct knowing

19   that they were misrepresenting the truth.

20         Those two pillars were propped up by the Court's

21   assessment of the defendants' at least initially apparent

22   knowledge of the T.R.O. request, and their efforts to dodge

23   service of process, and to continue to do what they were

24   doing without notifying the Court that there was an

25   opposition.  That was important to me.

1           I don't know how much time elapsed, but when I

2     became convinced that there was notice given, and not a

3     phone call or any indication from any lawyer or any person

4     that there was an opposition, it enhanced the Court's belief

5     that those other two things were true, that there was no

6     basis for contending that this was a dangerous product and

7     could cause cancer and maybe other serious maladies through

8     their clever, and what appeared to be advertising, as

9     opposed to an honest review and the link between GhostBed

10    and the site.

11          That has all now been addressed in what is

12    becoming voluminous briefing, and so we have a different

13    story now and certainly lawyers at some point got involved

14    and agitated and here we are.  You're going to need to

15    convince me, Mr. Magleby, that what I did should be

16    continued, and the defendants will try to convince me that

17    it should be dissolved and discontinued.

18          With that preamble, Mr. Magleby, fire away.

19          MR. MAGLEBY:  Thank you, Your Honor.

20          As always I appreciate the Court's thoughts and

21    guidance and will address those.  By way of introduction,

22    Your Honor, this is an interesting case, because since the

23    case was filed it actually has gotten better and better in

24    terms of my side of the case and worse and worse in terms of

25    what has been happening to my client.

1          I would ask a couple of opening queries as you

2     consider the arguments we are about to hear from the

3     defendants.  The first query is if GhostBed was directly

4     publishing on its website these articles and these public

5     service announcements saying the things that they have said

6     or that H.M.R. has said, would it be actionable?  The answer

7     is of course it would.  False commercial speech is not

8     protected.  That addresses about 90 percent of the

9     defendants' arguments.

10          Then the next query is if GhostBed was secretly

11     publishing through a sham website this exact same

12     information, would that be actionable?  The answer is of

13     course it would be because of the first question, but even

14     more so because of the additional layer of deception about

15     the purported independence and the source.

16          The evidence in this case shows that that is

17     exactly what has been happening and is continuing to happen

18     today.  The Honest Mattress Review website is supported if

19     not directly controlled by Purple's probably number one

20     competitor, GhostBed.  I'm not going to mince words.  Your

21     Honor, it is a fake website with the purpose of directly

22     attacking Purple, and it is a massive lie to the public and

23     consumers, and it is a clever and ruthless Internet smear

24     campaign.  You can't dress it up to be anything else,

25     including by way of one example, if there is nothing wrong

1    with Monahan having these relationships with GhostBed, then

2    why in the world if you're so, quote, honest, why don't you

3    put them front and center on the website?

4           The Court has recognized that fact and entered a

5    T.R.O., and then the defendants promptly violated it.  Today

6    what we're going to ask you to do at the end of my argument

7    is convert that order to a preliminary injunction and

8    enforce that order, because if you don't enforce it we're

9    going to have to keep coming back here.  In fact, we can't

10   keep up with the number of changes that are being made to

11   this website.  For a period there we were filing

12   supplemental memos either every day or every other day.

13          Let me walk through the elements of the T.R.O. in

14   my attempt to convince you to continue the T.R.O. or convert

15   it to a preliminary injunction.  I want to start with the

16   obvious one and maybe the easier one which is the

17   irreparable harm.  It is interesting the response that we

18   get from H.M.R. on irreparable harm.  Their response is not,

19   gee, there is not really any harm to Purple.  Their response

20   is, well, we are being harmed because our First Amendment

21   rights are being violated and that is a bigger harm and so

22   you ought to ignore what is happening to Purple.

23          As an initial observation that is a concession

24   that there is no economic harm to H.M.R.  And, of course,

25   H.M.R. has represented that it does not really make any

```
 1    money off of this website, also a very suspicious
 2    representation considering the obvious huge amount of work
 3    that goes into maintaining and rapidly adjusting the website
 4    to come after Purple.  Why would you do it if you are not
 5    making any money?  The point is on the balance of the harms
 6    H.M.R. has said we are not making any money.  And GhostBed
 7    has said we have nothing to do with it, so there is no harm
 8    to GhostBed in extending the T.R.O.
 9            The important thing, again, is the H.M.R.
10    defendants have no First Amendment harm.  They actually
11    admit that very briefly in their opposition, that if it is
12    economic commercial competitive advertising the First
13    Amendment does not apply.  They give it short shrift, of
14    course, and then they cite dozens of cases, and Mr. Randazza
15    is a well-known and prolific First Amendment lawyer, and he
16    cites dozens of cases, many of which, Your Honor, have to do
17    with whether or not a government can issue a blanket
18    prohibition by way of a statute on free speech, including
19    during World War I and World War II.  What he does not quite
20    acknowledge, though, are cases like the Vidal Sassoon case
21    that we cite which says, quote, misleading commercial speech
22    is beyond the protective reach of the First Amendment.  It
23    is that simple.
24            Now, I suspect we're going to hear First
25    Amendment, First Amendment, First Amendment,
```

1   anti-S.L.A.P.P., S.L.A.P.P. suits, all of those kinds of

2   arguments for a long time.  Those arguments go out the

3   window, and then what we are left with are the statements

4   confusing or likely to confuse.

5        Let's compare that to Purple's arm, which really

6   has not been challenged.  False advertising is a classic

7   irreparable harm.  There are probably hundreds or thousands

8   of Lanham Act cases that say damage to goodwill and to your

9   reputation and to your standing in the market are all

10  irreparable harm.  And certainly if I turned to my opponents

11  and I said, well, number one, do you have the money to pay

12  any damages?  Number two, will you stipulate to the amount

13  of damages that we think we have been harmed by?  H.M.R.

14  would say, no, I don't have the money, and both defendants

15  would say we are never going to stipulate to your damages.

16  In fact, they are going to challenge them and fight them and

17  say that they are speculative and that we have not been

18  damaged, and that is one of the reasons we are entitled to

19  injunctive relief.

20       But here, Your Honor, it is actually way worse

21  than that.  We are talking about the Internet and the harm

22  to Purple could be devastating and, in fact, it has already

23  started.  We all know the destructive power of the Internet.

24  Lives have been ruined.  Rumors have gone out of control and

25  people have been killed because of false things that have

1   been said on the Internet.  Companies have been bankrupted

2   because of false things that are said on the Internet, and a

3   viral video, while it can make somebody's career, can

4   destroy them just as quickly.

5           Here we are not just talking about that potential.

6   We submitted the Sam Bernards declaration and he has 11

7   instances of people saying things like, well, I hear your

8   bed is toxic.  It is aggravating asthma.  It is doing some

9   of these things.  Now, a couple of those quotes, Your Honor,

10  are very interesting, because they read as though they were

11  written by Mr. Monahan himself.  When we get to discovery

12  one of the things we're going to want to find out is did Mr.

13  Monahan or others on the GhostBed side actually go onto

14  Purple's Facebook site and post some of those?  Either way,

15  irreparable harm has been shown and they lose.

16          It may have gotten lost in the papers, Your Honor,

17  because there is so much of them, but at one point in time

18  the daughter of Marc Werner, the C.E.O. of GhostBed, got

19  onto Amazon and posted almost identical statements to those

20  that are found on the H.M.R. site, saying it has got this

21  powder and there is this Johnson & Johnson baby powder

22  lawsuit, and I have got a baby and I would never buy this

23  product or words to that effect.

24          One of the visitors to that site, a customer of

25  Purple, actually tracked it down through the links and got

1    to her baby shower site and realized it was the daughter of

2    Marc Werner, the GhostBed C.E.O.  Is it just an incredible

3    coincidence that those same comments are showing up on the

4    H.M.R. site?  I don't think so.

5              And then the final point is Mr. McGarvey informed

6    me this morning that there have been drops in traffic,

7    internet traffic and customer purchases.  That is the harm.

8              Let's get to the Lanham Act and false statements.

9    As the Court knows probably better than any of us, there are

10   really three ways that a statement can be false and all

11   three of those apply here.  Number one, the statement is

12   explicitly literally false.  So one example is they say that

13   Purple has, quote, made up tests.  I don't know where they

14   got that.  I don't know what tests they are talking about.

15   They certainly have zero evidence that tests were made up.

16             The second way a statement can be false is that it

17   is literally false by necessary implication, which is a

18   necessary implication considering the advertisement in its

19   entirety, that the audience would have recognized the claim

20   as readily as if it had been explicitly stated.

21             Then, of course, there is the third way, and that

22   is likely to mislead and confuse consumers.  This is the

23   language that I have been harping on in the papers and which

24   the Court adopted in its orders, Section 43 of the Lanham

25   Act, quote, encompasses more than literal falsehoods because

1    otherwise clever use of innuendo, indirect intimations and

2    ambiguous suggestions could shield the advertisement from

3    scrutiny precisely when protection against such

4    sophisticated deception is most needed.

5          Your Honor, this is a very sophisticated group of

6    defendants.  This is not their first rodeo.  GhostBed is in

7    a number of other litigations.  Well, I guess I should know

8    of at least one with Casper, which is another manufacturer,

9    and Marc Werner has been in a number of litigations, but you

10   don't need that to know how sophisticates they are.  Take a

11   look at the website and how carefully designed it is.  It

12   throws in the word opinion, in my opinion I believe, and all

13   of that was in anticipation of this lawsuit coming, and they

14   knew it was coming and they did their best to try to

15   insulate themselves.  The law says that that does not

16   happen, because of the same case, the Copla case, false

17   statements include those that are implicitly false,

18   misleading in context and likely to deceive.

19         You don't have to take my word for it.  We have

20   given 11 examples of people who were actually deceived.  For

21   every person who actually shows up on Purple's Facebook and

22   says, oh my gosh, I heard your mattress was toxic, there are

23   100 or 1,000 or 5,000 other ones that don't take the time to

24   come to the Facebook page and say what they thought, they

25   just don't buy the mattress or investigate the mattress.

```
 1            The categories of false statements, Your Honor,
 2   and you touched upon them, and there is really two, and
 3   there is a third, a false association argument we talk about
 4   in the brief, but let's talk about this independence
 5   argument, that Mr. Monahan is independent.
 6            I have a hearing handout, Your Honor, which I
 7   would like to distribute if I could.  And I apologize to
 8   counsel, because I only brought four for counsel table and I
 9   did not realize I would be so outnumbered.  They can share.
10            The first page of this are the defendants'
11   admissions regarding Mr. Monahan's relationship with
12   GhostBed.  So in the opposition brief we finally get an
13   admission about this relationship.  Do you remember when I
14   said the case kept getting better and better?  I thought I
15   was going to have to do discovery to get to this, but here
16   is what they have admitted that GhostBed and its C.E.O.,
17   Marc Werner, has a contract with Achieve, which has a
18   contract with Social Media Sharks, which is Ryan Monahan's
19   company, and then presumably money would go to Ryan Monahan.
20            That admission by itself, Your Honor, reflects a
21   complete and utter lack of independence or, as you put it,
22   describing at the beginning the T.R.O. and what led you to
23   enter it, that Honest Mattress Reviews was not being honest.
24   There is an old saying, and I learned it from George Haley,
25   another lawyer in town, and it is anytime somebody tells you
```

 1    how honest they are, grab your wallet.  This is one of those

 2    times.

 3            What is notable is what they don't disclose on

 4    this first page, and that is how much money goes there, what

 5    is it for, and what are the services and those kinds of

 6    things.  Now, they are going to stand up here in a minute

 7    and say, Your Honor, the plaintiff has no evidence, no

 8    evidence to support that this is a close economic tie.  That

 9    is what defense lawyers like to say.  They like to say that

10    you have no evidence, and it always drives me crazy when the

11    lack of evidence they are talking about is the evidence that

12    is in their control.  So there was nothing to stop them from

13    providing the Court a candid disclosure about the level of

14    involvement, how much money, what the terms were, and how

15    many hours Mr. Monahan stays at GhostBed.

16            Let's go to the second page and let's look at the

17    actual evidence that we have put in the record.  What you

18    see kind of at the top right there are some of the things

19    that we have discovered both before and after filing the

20    papers.  Mr. Monahan was previously identified as the chief

21    brand officer for GhostBed.  The word officer has some

22    significance.  As we all know, there is a C.E.O., a C.F.O.

23    and a C.T.O., and apparently now there is a C.B.O., but it

24    denotes a high level with the company and it is a

25    representation made to the public.

1          When our private investigator called he was told

2     Mr. Monahan was in the, quote, marketing department.  They

3     come back in the papers and say, oh, the receptionist was

4     confused and Magleby miscites or does not accurately report

5     what was said.  Thank heavens, Your Honor, they attached the

6     transcript.  Let me say this.  We did not record the call,

7     not because we didn't want to, but because Florida is a

8     two-party consent state, as far as I know, and so I think

9     they broke the law when they recorded it, but I'm glad they

10    did, because if you read that transcript you will see we did

11    not misrepresent anything.

12          In fact, the receptionist puts our investigator on

13    hold and goes and talks to somebody and comes back and says

14    that Mr. Monahan is in the marketing department.  So it must

15    have been not one person that was confused, but two people

16    at the company must have been confused about Mr. Monahan's

17    association.  What she didn't say is I have no idea who that

18    guy is.  He does not work here.  She said I know him, but I

19    don't.  In other words, he is around.  Right?  She just does

20    not have a personal relationship.

21          Then she tells us to contact him at

22    marketing@ghostbed.com.  That is a GhostBed domain name.

23    Then later on we discover the Amazon post, which was

24    submitted in the recent papers where he has an e-mail domain

25    of ryan@ghostbed.com, and GhostBed's lawyers are

1    representing him in that other lawsuit with Casper, very

2    expensive lawyers from New York and very good lawyers.

3         So that begs the question again of what is the

4    nature and extent of this relationship?  Your Honor, until

5    we get to the bottom of that, this T.R.O. needs to stay in

6    place, because one of the two fundamental pillars upon which

7    the Court based the T.R.O. is just getting firmer and

8    firmer.

9         Let's not beat around the bush.  One thing Your

10   Honor could do today is say to counsel, counsel, what's the

11   real relationship with Mr. Monahan?  Have you investigated

12   it?  How much money does he get paid?  Does he get the same

13   amount of money from any other mattress makers and so on and

14   so forth?  I would be interested in those answers.

15        Let's talk about the false statements about

16   safety.

17        No, I just want to quickly touch on the law.

18        Your Honor, you were on firm footing when you

19   found that it is misleading not to disclose these kinds of

20   relationships, and I know you know that, but just to remind

21   all of us here, the F.T.C. guidelines say so, that such

22   connection must be fully disclosed.  I guess the argument

23   they are making now, which Ms. Greenwood had to tell me

24   about on the way down to court, because I didn't have time

25   to read the final paper, and it is that Mr. Monahan or

1    H.M.R. is saying something like, well, I do have a sentence

2    on the side that says in the past I have taken, you know,

3    speaking fees for various mattress companies and, therefore,

4    I have made a disclosure.

5         Your Honor, I read that cite nine ways to Sunday

6    getting ready for this case and if I found it I don't

7    remember it, but it is certainly not what the F.T.C. calls a

8    full disclosure, nor has any of the other information I just

9    talked about been disclosed.  You don't even have to take my

10   word that that applies to a mattress case, because there are

11   two mattress cases we cite, Casper Sleep versus Hales and

12   Casper Sleep versus Mitcham, both of which talk about

13   economic relationships and inadequate disclosures.

14        What I would say is that whatever was in that case

15   we have it here on steroids.  I mean, this is just actually

16   incredible to me.  As I was doing the analysis I thought,

17   well, this can't be true, and nobody working with a

18   sophisticated large company would do this, but it appears

19   that at every turn it is in fact true and the silence is

20   deafening.

21        You indicated that one of the things that propped

22   up your two conclusions was the fact that the defendants had

23   not responded or reached out to the Court or to counsel once

24   they had notice of the lawsuit.  I would say another pillar

25   that props this up is the fact that this information is in

1    their possession, and they have willfully chosen not to

2    provide it to the Court and, instead, provided incomplete

3    statements, which I think are just as misleading as the

4    incomplete statements on the blog, but which raise more

5    questions than they answer.

6          Now let's talk about the second pillar of the

7    Court's analysis which is the false statements.  I want to

8    preface this by providing a compare and contrast.  The First

9    Amendment arguments that we are about to hear from Mr.

10   Randazza are going to go something like this.  It was not a

11   statement of fact.  It was an expression of opinion which is

12   protected.  It was a suggestion that maybe, hypothetically,

13   possibly Purple's products were not safe.  Well, Your Honor,

14   I think if that is what it was, I would still win, but my

15   argument would be harder.

16         My argument, however, is incredibly easy, because

17   what they have done is set up a straw man that basically

18   says our statements were innocuous without ever quoting them

19   to you or analyzing them.  So I challenge you to challenge

20   Mr. Randazza and to tell you if they have any evidence or

21   proof of the following.  This is right from the website.

22   Administering a poison, deceitful business practices,

23   recklessly predisposing consumers to an untested substance,

24   using consumers as guinea pigs, ovarian cancer, made-up

25   tests, impacts the health of tens of thousands of unknowing

 1    consumers, and damaging to those with respiratory issues,

 2    short or long-term health, dragon breath, and I am not quite

 3    sure what that means but I am sure that it is bad, and I

 4    think that is in conjunction with the cinnamon challenge

 5    video, U.S. poison control, lung and respiratory irritation,

 6    and, one of my favorites, inhaling gasoline, that sleeping

 7    on the mattress is like inhaling gasoline, which I guess

 8    also implies that maybe it will burst into flames, and

 9    comparison to Johnson & Johnson's multimillion dollar baby

10    powder lawsuits when, by the way, they know there is no baby

11    powder in the products and they admit that in a very small

12    comment somewhere on the website.

13         That is just the statements as I read them.  You

14    have seen them in their context and in their context they

15    are overwhelming and they are offensive and, frankly, they

16    are terrifying.  Then you look at the cinnamon challenge

17    video, and this is a little juvenile I think of them to put

18    this up there.  I was aware of this cinnamon challenge

19    because I have children, and one of the things that you say

20    to your children when you find out about this is that kids

21    have died from this.  Do not do this.  It is incredibly

22    dangerous.

23         I mean, as a parent I was seriously worried.  It

24    was never the girls.  I was afraid it was the boys that were

25    going to do it.  It is the kind of thing boys do.  They know

1    that.  Any parent who sees that cinnamon challenge video

2    knows exactly what it is.  The comparison to Purple's

3    mattress is going to have one of two effects.  It might have

4    the effect I saw which was, come on.  Really?  I mean, that

5    is too much and it is a little juvenile, but it might have

6    the opposite effect of, oh, my God, people have died from

7    this or my kid tried this and it didn't work out.  There is

8    no way I'm buying that mattress.  The defendants are

9    incredibly sophisticated and besides that, Judge, it is just

10   mean.  It is just completely over the top.

11         Then they put these things up with breaking news,

12   a public service announcement.  A public service

13   announcement?  You're doing a public service?  That is

14   misleading, incredibly misleading.  The statements are

15   false.

16         Then they want to talk about safety, and then they

17   have this -- I will use quotes marks in the air here --

18   expert report of Mr. Godleski.  I hope I'm pronouncing that

19   right.  We thought long and hard about whether to respond to

20   those safety arguments, because it really takes us off of

21   what we ought to be considering, because the statements that

22   they are making are not that there might be a safety

23   problem.  I think the most you could get out of

24   Mr. Godleski's report is that there is a remote possibility

25   that if you inhaled a massive amount of this powder you

1  would have a safety problem.  That is not the message they

2  are sending.  The message they are sending is poison,

3  cancer, that it is a statement of fact, you know,

4  respiratory problems, a puff of powder when you sleep on

5  this mattress, and so you never get to their self-serving

6  safety analysis, because that is not the false and

7  misleading claims that we're talking about.

8          If there was one sentence on this website that

9  said there is a powder and we don't know if it is safe or

10 not, I would have a harder argument.  There is actually case

11 law that would support me getting there, which we have not

12 put in the briefs yet, because I only recently found it, but

13 that is not what they say.

14         Purple's products are safe and I detailed that in

15 the filing yesterday.  I am not going to belabor the point

16 for two reasons.  One is I think it is pretty clear and the

17 other one is that it is a distraction, but I will say this

18 about Mr. McGarvey's company that he works for, that it was

19 founded by engineers.  They used to work in the medical

20 products business.  They made cushions for medical products.

21 They have 16 patents.  Any implication that this is a

22 fly-by-night company is not only incorrect but it is kind of

23 offensive.  One of the things that Mr. Monahan says on the

24 website is, well, I understand if you grow fast and maybe

25 you get reckless and make some bad decisions.  He has no

1    evidence of that.  It is really just troubling.

2            Ironically on top of this you add the fact that in

3    the GhostBed materials they use latex.  Everything they have

4    said about Purple could be said about GhostBed's mattress

5    times ten, because there are proven medical consequences

6    with not only contact with latex but inhaling latex.  You

7    don't have to take my word for it.  Again, it is the Mayo

8    Clinic that says it and it is all over the internet.

9    GhostBed knows about it, because they try to explain it away

10   on their website.

11           By the way, they don't acknowledge the medical

12   risks.  They don't come forward with an independent study.

13   They don't do any of the things that H.M.R. and Monahan

14   critique Purple for not doing.  If they are really an

15   independent website and they are going to treat everybody

16   equally, gee, why not?  It is a lot easier to find that kind

17   of stuff about latex on the internet.

18           Now let's talk about the Godleski report.  I love

19   this.  I have to admit that one of the worst moments for any

20   lawyer is when you open up the other side's brief and read

21   it for the first time.  I don't like it.  I see it there on

22   the screen and I open it and I go, eww, what am I going to

23   find?  I've got to admit that for about 30 seconds when I

24   saw Harvard, I thought, oh my gosh, they have got some

25   Harvard expert that has done a real study.

1           Then I read it.  I read all three paragraphs of

2    it.  That was the sum total.  What they put above that is a

3    bunch of technical jargon about the equipment and the

4    microns and what they use and all of that, which I'm sure is

5    standard equipment, but also which was designed to try to

6    lend an air of credibility to a report that is nothing.

7           So the first point I would make about that is if

8    we were going to trial, that report would never see the

9    jury.  Under Rules 702 and 703 it would never come in.

10   There are a number of reasons.  Number one, he didn't

11   measure the right conditions.  He measured a one-by-one cut

12   out piece of a mattress that was sent to him.  By cut out we

13   know that means it didn't have the two covers on it, and we

14   don't know what H.M.R. or GhostBed did with it and we don't

15   know where it came from, but certainly that is not the

16   situation in which a consumer would be exposed to the

17   mattress.

18           He reached no conclusion about consumer exposure.

19   There is zero evidence that a consumer is exposed to the

20   powder at all, and there certainly is no expert evidence.

21   He reached no conclusion about the amount of the exposure

22   needed for it to be unsafe.  There is the key, right?  First

23   you have got to find that he tested the right exposure, and

24   then you have got to say how much of this would be

25   dangerous?

1          This room is full of dust, Your Honor.  It is all

2     around us.  We breathe it all day long.  Could I get a

3     report that says if you breathe enough of the dust that is

4     in the air that it could be bad for you?  Sure.  Especially

5     in Utah in the winter.  But that does not make a product or

6     this courtroom safe.

7          I can't come back and post something on my website

8     that says that the United States federal courthouse is

9     unsafe.  It might cause cancer.

10         Then he reaches no conclusion that Purple's

11    products result with enough exposure to be unsafe.  In fact,

12    what he actually does is he exonerates Purple.  My heavens,

13    look how hard they are fighting and look how hard they are

14    trying and what they have managed to do is find a guy that

15    has a truism that says, well, gee, maybe under certain

16    circumstances this would be unsafe, but no conclusion that

17    that is what is going on here.

18         What we are dealing with is the lawyer equivalent

19    of the H.M.R. website, which is we're going to throw a lot

20    of stuff up there, and we are going to leave some stuff out,

21    and we're going to try to create enough mud that it has the

22    desired effect.

23         The next point on the likelihood of success is

24    this competition angle.  They make, I would call it, a

25    halfhearted attempt to say that H.M.R. is not in

```
 1    competition.  Therefore, because they are not direct

 2    competitors there is no standing.  That is interesting,

 3    because Mr. Randazza is an expert in First Amendment law.

 4    Clearly he is.  I mean, he knows way more than I will ever

 5    know, yet in all of the briefing that he did, he must have

 6    forgotten about the United States Supreme Court decision in

 7    Lexmark.  At least I didn't see it in his papers.  If it is

 8    in there, then I am going to be embarrassed when he says it

 9    is.  I don't think it is in there.

10            Lexmark came out in 2014, I believe, and it was

11    authored by Justice Scalia.  Justice Scalia said by the time

12    the Lanham Act was adopted, the common law tort of unfair

13    competition was understood not to be limited to actions

14    between competitors.  One leading authority in the field

15    wrote that there need be no competition in unfair

16    competition, just as there is no soda in soda water, no

17    grapes in grapefruit, no bread in breadfruit, and a

18    clotheshorse is not a horse.  I love that quote.  That is

19    why I read it.

20            It is thus a mistake to infer that --

21            THE COURT:  Slow down just a little when you're

22    reading.  You speak very fast always, but even faster when

23    you are reading.

24            MR. MAGLEBY:  I do.

25            THE COURT:  Ed has a --
```

1          MR. MAGLEBY:  The Lexmark case goes on to say that

2     it is thus a mistake to infer that because the Lanham Act

3     treats false advertising as a form of unfair competition, it

4     can protect only the false advertiser's direct competitors,

5     and the simple test was have the defendants' statements

6     caused consumers to withhold trade from the plaintiffs?  We

7     have actual evidence of that effect.

8          And then we discuss, and Ms. Greenwood is the

9     brilliant writer in our office, the Handsome Brook Farms

10    case, which held no direct competition requirement,

11    including making the salient observation, which the courts

12    have kind of overlooked for a number of years, that there is

13    no competition requirement in the language of the statute.

14         THE COURT:  What direct evidence do you have that

15    you have lost sales?

16         MR. MAGLEBY:  If you look at the Sam Bernards

17    declaration, there were 11 statements from consumers saying

18    things like it is toxic and so on.  Let me see if I can get

19    you a couple.

20         Then Mr. McGarvey informed me this morning that we

21    do have evidence of sales going down.  We also have evidence

22    that there was a lot of chatter about the powder issue out

23    there.

24         THE COURT:  You just said that you have direct

25    evidence --

```
1                MR. MAGLEBY:  Direct evidence, yes.

2                THE COURT:  -- that you have lost sales.

3                MR. MAGLEBY:  Yes.  Let's see.

4                THE COURT:  It sounds like you have indirect

5     evidence.

6                MR. MAGLEBY:  I have indirect evidence, right.

7                Let's see here.  Where is the one where they say

8     it is a deal breaker?

9                THE COURT:  Well, that is all right.

10               MR. MAGLEBY:  One of these posts says something

11    like it is a deal breaker for me because of this problem.

12               THE COURT:  Just one person?

13               MR. MAGLEBY:  One out of the 11, but I think you

14    can infer if you read all 11 that those people are not

15    buying the mattress.

16               THE COURT:  Okay.  This may be not very relevant,

17    but I wondered when I received your first submissions and

18    read the Honest Reviews website materials that you had

19    submitted, and all of the ways they were referencing their

20    belief that this white powder in your product may be the

21    cause of some serious health problems, right?

22               MR. MAGLEBY:  Right.

23               THE COURT:  That is what you submitted to me.

24    Many of their statements said that they had tried to contact

25    or they had contacted Purple and that they had never
```

```
 1    received any word back.

 2              Do you remember that?

 3              MR. MAGLEBY:  I do remember that.

 4              THE COURT:  Okay.  I am just curious and, again,

 5    this may have very little relevance, but I would just like

 6    to hear your comments, and I understood from what you

 7    submitted to me in the beginning that Purple is run by

 8    engineers as I recall it --

 9              MR. MAGLEBY:  Yes.

10              THE COURT:  -- and that these people have tested

11    their product and found it to be safe, correct?

12              MR. MAGLEBY:  Right.

13              THE COURT:  And there is a patent pending --

14              MR. MAGLEBY:  Yes.

15              THE COURT:  -- correct, on this very material and

16    technology or whatever kind of patent it is, correct?

17              MR. MAGLEBY:  Right.

18              THE COURT:  Why don't you just tell them --

19              MR. MAGLEBY:  There are a number of reasons.

20              THE COURT:  Is it because you want to keep it a

21    trade secret until you get a patent?

22              MR. MAGLEBY:  That is one reason.

23              THE COURT:  They say we don't even hear back from

24    Purple.  We have asked them several times is this safe?

25    They don't tell us.  That seems to be a trigger for their
```

1    going wilder and crazier in your opinion, and having this

2    conspiracy afoot, and you could maybe kill it just by

3    putting out these very sophisticated, if they are,

4    intelligent tests that have been done by engineers or

5    whomever, that this is safe.

6              MR. MAGLEBY:  Right.

7              THE COURT:  Why not?

8              MR. MAGLEBY:  I want to clarify that we have not

9    done the tests, like they say we want this independent

10   eight-year-long test and --

11             THE COURT:  But I had the impression that you had

12   done something to assure yourselves that it was safe.

13             MR. MAGLEBY:  Absolutely.  They are safe, yes.

14             THE COURT:  Why not give that to the other side

15   and then maybe the whole thing goes away, maybe not.

16             MR. MAGLEBY:  There are a number of reasons for

17   that.  I am going to do this based on memory, and then Mr.

18   McGarvey will correct me if I am wrong maybe at a break.

19             There are a number of reasons.  You said it was a

20   trigger, but, Your Honor, what it really was was a trick.

21   It was a trick.  They said we have contacted Purple multiple

22   times.  They have made two, as far as we can tell, one or

23   two telephone calls to the customer service department and

24   they posted those recordings on the website where they call

25   up and they ask some questions and they get a couple of

```
1    high-level answers, but they never actually go directly to
2    Purple formally, hi, I'm H.M.R. and I'm doing a mattress
3    review.  Will you provide this information?  It is a fake
4    phone call designed to set us up.
5           Then they say we found something and we are going
6    to publish this on the website and here are all of the
7    problems with it and it is only with the mattress and so on
8    and so forth.
9           By that point, Your Honor, Purple was
10   investigating this and they had come to the conclusion, that
11   we have now proven to be true, which is it is not going to
12   matter what you give to H.M.R.  They are, number one, in bed
13   with the competitor, GhostBed, and, number two, they are
14   going to spin it in the worst possible way that they can and
15   you can never win.
16          THE COURT:  You don't need to give it to H.M.R.,
17   you could just give it to the world.
18          MR. MAGLEBY:  We could.
19          THE COURT:  Not just directly to H.M.R.
20          MR. MAGLEBY:  Then that is the trade secret issue,
21   right, that we have a patent pending which includes the use
22   of the powder, and we do publish an informational response
23   on the blog, which they of course then go after, and one of
24   the things that say on the blog is that this is our trade
25   secret, so then this is a whole other level of misleading
```

```
 1    statements that they make.

 2            They say, well, wait a minute, you claim you have

 3    a patent pending and you can't disclose it but that is crap,

 4    because you disclosed all these patent numbers on your other

 5    products.  Well, that is either an intentional

 6    misunderstanding or an actual misunderstanding, because

 7    there is a difference between a pending patent, which is not

 8    public, and a patent that has actually been public.  At the

 9    end of the day, Your Honor, the product is safe and it has

10    never been shown not to be safe.

11            THE COURT:  But you only get so many days before

12    that becomes public.  What is it?  Do you know?

13            MR. MAGLEBY:  I don't know, which is --

14            THE COURT:  You have got that window, and maybe it

15    is a year and a half, and I'm not sure how long it is, but

16    it is an interesting --

17            MR. MAGLEBY:  I am hearing that it is 18 months.

18            THE COURT:  That is what I said, a year and a

19    half.  That's what I had in my mind.  So you have 18 months

20    to keep it secret, as secret as you can, and then it is

21    known to the world, even if you don't get the patent.

22            MR. MAGLEBY:  Right.

23            THE COURT:  It is tricky business.

24            MR. MAGLEBY:  It is tricky.

25            THE COURT:  And you say you're in that window?
```

```
1              MR. MAGLEBY:  Yes.

2              THE COURT:  That is the reason you don't disclose

3    this to the world now?

4              MR. MAGLEBY:  That is a reason we don't disclose

5    it to the world, and then there are additional reasons why

6    there is no way we're going to give it to H.M.R., and

7    especially now that we know that H.M.R. is either affiliated

8    with if not controlled by GhostBed.  Right.

9              Why in the world would we give our competitor this

10   information, especially when they have lawyers standing in

11   front of you, Judge, that say your order was

12   unconstitutional and we can post whatever we want.  We can

13   say whatever we want.  You can't restrain us before we post

14   it.  There is no prior restraint.  They have shown that they

15   are incredibly clever, and I would say devious, in how they

16   would use this information.  In that sense I'm really glad

17   it was not provided.

18             Does that answer your question?

19             THE COURT:  Yes.

20             MR. MAGLEBY:  I mean, if we thought it would have

21   gone away, we would have done that.  It is much easier to do

22   that than hire me.  You don't hire me unless you are sure

23   that you have a problem.

24             The balance of the harms, I have talked about that

25   and the public interest and I don't think I need to spend a
```

```
 1    lot of time on that.

 2              In terms of the Court converting the T.R.O. into a

 3    preliminary injunction, I mean, the defendants are not

 4    challenging that the statements were made.  The H.M.R.

 5    defendants are admitting they made the statements.  GhostBed

 6    claims it didn't make the statements and had nothing to do

 7    with it, so it does not matter really from their perspective

 8    whether you enter an order telling them not to do that which

 9    they have said they won't do.

10              Then we cite to you a number of cases at I think

11    the end of our brief from yesterday that say -- of course it

12    is a truism almost -- that the Court has the ability to

13    convert the T.R.O. into a preliminary injunction, especially

14    when we have this magnitude of harm and potential harm.

15              With that, Your Honor, I will turn to the order to

16    show cause, if that is okay.  I will try to be brief,

17    because I know I have been up here and our time is limited,

18    and we appreciate you giving us the time.

19              Some big picture overview thoughts, and the first

20    one is an order is an order is an order, and even if the

21    order is wrong, a party can violate the order.  What they

22    have done here is they have violated the order.  In a minute

23    I have got a time line that I want to pass out and walk

24    through, but the point is simply that as a matter of policy

25    and as a matter of respect to the Court, and as a matter of
```

1    sending a message to a recalcitrant defendant, the Court

2    should enforce its order even if you dissolve the T.R.O.,

3    which I strongly -- you should not dissolve the T.R.O., but

4    at the very least you should enforce the order.

5          Now, there is a case down here and it is still

6    going on and Judge Nuffer has it now and it is called

7    ClearOne versus Wideband.  It involved a number of contempt

8    orders.  As I look back on that case, which ended up with

9    the defendants actually going to prison for violating the

10   court's orders, one thing I always wonder is would all of

11   this have happened if on the very first day they had

12   violated the order the Court had said if you violate again

13   you're going to pay X dollars per day and if you violate it

14   twice you're going to go to jail?  I think that might have

15   actually stopped them.  Maybe not.  I mean, they ended up in

16   jail, so they were pretty bad guys.

17         I think there is a tendency, and now I am treading

18   on thin ice here, Your Honor, and I don't want to offend the

19   Court at all, but I think there is a tendency among judges

20   to believe that everybody is good at heart and, of course,

21   they will follow my orders.  For whatever reason my

22   experience has been that I have ended up bringing multiple

23   and multiple contempt proceedings.  So I would say that

24   there is also a reason to be proactive here and to put an

25   end to this so that we don't have to keep filing things.

1        The next overview is that the Court can find

2   contempt today as to the H.M.R. defendants, and then allow

3   expedited discovery into the full nature and extent of the

4   competent.  In other words, what the case law says, as you

5   know, is that when you are considering the appropriate

6   remedy one of the things you look at is culpability.  Was it

7   big culpability or was it little culpability?  Was it maybe

8   a mistake?  Was it intentional or clever?

9        Then the third overview is what the Court should

10  do with regard to GhostBed is issue an order to show cause

11  that they need to come forward with some evidence and we'll

12  do some discovery and we'll see if they were involved or

13  knew about or encouraged the violations of the order,

14  because that is what I expect.  I don't think Monahan posts

15  anything on the H.M.R. site without talking to Marc Werner

16  or somebody at GhostBed.

17        Briefly to get into those points, and I also want

18  to make one more overall observation, and that is that I am

19  impressed in this sense, because I have received not one but

20  two Rule 11 threats, and now they want sanctions and Rule 11

21  against us, and the one observation is this.  Sometimes

22  lawyers think that Rule 11 threat makes the argument better.

23  My view is that a Rule 11 threat does not make the argument

24  better, and it is usually combined with a poor argument, a

25  weak argument.  That is how I would look at this.

1          With regard to the order is the order, I think I

2     have covered that, except I want to point out that in the

3     Crowe versus Zeigler case, the fact that an injunction was

4     erroneous or unconstitutional is not a defense against

5     contempt sanctions.  They cite that case.  Good for them.  I

6     am glad they cited it.  They say we understand that it is

7     not a defense, and then incredibly on the very next page

8     they say this:  Given the defects in the T.R.O., defendants

9     were under no obligation to do anything, italics emphasis.

10    So here we have the defendants and their lawyer advancing

11    the argument to the Court that because they believe, they

12    have a subjective belief that has yet to be resolved by the

13    Court that the order was wrong, that they can go ahead and

14    do whatever they want.  We need to stop that.  That is not

15    the law.

16         In terms of the timing, note how carefully the

17    opposition is written.  The opposition does not disclose

18    when actual notice was received.  It only talks about when

19    service was made.  It says after service was made, we went

20    ahead within a few hours and took down the offending

21    statements.  From this I conclude that they received notice,

22    but they waited until service, and certainly what they do

23    not do is they do not deny receipt of the e-mail or the

24    FedEx packages with the T.R.O., and they do not identify for

25    the Court when they took down the offending site.

```
 1              I have another handout, if I could, Your Honor.

 2              This is a modified version of the chart that I

 3    understand was attached with our reply this morning.

 4    Actually, I have not had time to read that reply, so this is

 5    slightly different, I think.  Here is the notice.  March 2,

 6    2017, 1:00 p.m. exactly, and I went back and checked because

 7    I thought could it be exactly 1:00 p.m., and it really is,

 8    and the Court enters the T.R.O., and we sent it out at 2:16

 9    p.m. mountain time via e-mail and we received no bounce

10    back.  Let's pause there.

11              We also sent out the much larger complaint by

12    e-mail to them and we also received no bounce back.  We know

13    that they got the complaint before they were formally

14    served, because that massive lawsuit article which quotes

15    from the complaint appears on the website before they were

16    served.  So we know the e-mail works.  By the way, they are

17    tech guys so we know their e-mail works.

18              What I believe is that that is when they got the

19    notice.  Then I have put in blue the contempt, the articles

20    and the public service announcement remain, so then we have

21    got us sending the T.R.O., and we capture the massive

22    lawsuit article, FedEx delivers, we file a motion for order

23    to show cause, and now we're up to March 3rd, and we capture

24    the censorship article on March 5th, we capture the -- March

25    5th, and they post the living a lie images on Facebook and
```

1    Instagram, and we capture the Sleepopolis article, which

2    includes quotes that are the subject of the Court's order,

3    and we capture the powder gloves article, and we file the

4    supplemental memorandum, and somewhere around March 5th or

5    the 6th -- by March 6th we check and it appears that they

6    have removed some but not all of the posts.  What they have

7    not come back and shown you, Your Honor, is when they took

8    them down.  This is the evidence that you have got.

9           If you go to the second page, as we noted, certain

10   posts remain and then new posts follow as of March 6th, and

11   we filed the second supplemental memorandum on March 6th and

12   the contempt continues through today.

13          So, boy, I mean, here is the thing, every hour

14   they have it up they know it is doing damage.  They know

15   that there are thousands of visitors to the site, so why not

16   if your goal is to do harm, why not leave it up?  By the

17   way, it takes about two minutes to take down a web page.

18   This is not like they have to go out to the publisher and

19   grab the newspapers off the shelves like in the old days and

20   get them out of the newspaper delivery boy's basket.

21          THE COURT:  What is up right now that is doing you

22   damage?

23          MR. MAGLEBY:  You know, I'm a little behind

24   because so much has been happening, but there is the

25   Sleepopolis article, and a bunch of this stuff is getting

1    pushed out to third parties.

2         Here is another thing which we mentioned but

3    didn't have time to explore, that you can pay Facebook to

4    push out an article or a posting.  They were doing that.

5    I'm not sure at what time, but I think they are still

6    pushing out certain articles, and that is one of the things

7    we want to do as part of the expedited discovery.  We have

8    got the glove article talking about the powder, which is

9    clearly aimed at Purple.  Why else would you have something

10   about F.D.A. powder gloves and it says powder gloves on the

11   site.  It is a mattress site not a glove site.

12        The irony of that is they don't say why the F.D.A.

13   banned those gloves, and I think that may be the ban on

14   latex gloves, which is the material that GhostBed uses.  I

15   guess they could stand up and say, well, no, that was not

16   really pointed at Purple.  That was pointed at GhostBed

17   because they use latex.  I don't know.  I feel like I'm not

18   giving you a precise answer, and that is because things have

19   happened so fast I don't have a more precise answer, but we

20   could get you that.

21        What kind of relief do we want?  I think today you

22   find H.M.R. in contempt, but you hold the appropriate

23   sanction until we do some discovery.  I think you should

24   issue an O.S.C. against GhostBed and allow the expedited

25   discovery that we generally described in the proposed

1    O.S.C., and which I have tried in the last few hours to make

2    more detailed.

3              This is the last handout, Your Honor, and then I

4    will sit down.

5              What I anticipated was the other side would say,

6    well, we don't know, and if you tell us what the discovery

7    is, we'll think about it and maybe we can agree to it.

8    These are high-level discovery requests or topics.  I don't

9    think we need to read them, but I want to get them in

10   everybody's hands.  The first category relates to when they

11   got the T.R.O. and received it and whether it was by e-mail

12   or otherwise.  The next category relates to the

13   GhostBed-Monahan relationship, and the last category relates

14   to the blog and who runs it and who can put it up and who

15   could take it down and when did they take down the posts,

16   when did they create the new posts that have gone up and

17   those kinds of things.  Then depending on what we find from

18   that, we would like to take probably a couple of

19   depositions.  Then we would come back to the Court and

20   submit to the Court our findings.

21             I will tell you this, that if they establish to

22   our satisfaction that they did not get notice in a certain

23   way, and that they promptly took the stuff down, then, you

24   know, I mean, I don't want to come down and make an argument

25   I am going to lose, because my credibility with the Court

```
 1   and my client's credibility to the Court is important, but I
 2   don't think that is what we're going to find.
 3           Does the Court have any questions?
 4           THE COURT:  I don't.  Thank you.
 5           Who is going to address the Court, Mr. Sperlein or
 6   Mr. Randazza?
 7           MR. RANDAZZA:  Mr. Randazza.
 8           Thank you, Your Honor.
 9           THE COURT:  Please.
10           MR. RANDAZZA:  Your Honor, I appreciate my new
11   friend giving you a pre-game on my arguments, because you
12   are going to hear the words First Amendment, and you are
13   going to hear the word S.L.A.P.P., and you're going to hear
14   our explanation of that.  I am not going to get into the
15   weeds of the facts that much, because if we are already
16   there, then we have already disregarded the First Amendment
17   and we have already disregarded the law.  However, I am
18   delighted to answer any questions that the Court may have in
19   order to explore those issues.
20           What is this case really?  This is a defamation
21   case in disguise.  This is a case because Purple does not
22   like an investigator journalist looking into their business
23   and looking into their products, as you identified yourself,
24   Your Honor.  The first article was simply asking the
25   question what is this stuff?
```

1          Now, we did refer to the Dr. Godleski report.  It

2    does not conclude that this is dangerous.  It does not

3    conclude that you're going to get cancer from this.  For all

4    I know, once Dr. Godleski has time for a complete report,

5    given the expedited nature of these proceedings we asked him

6    to do the quickest report he could, and that is what he gave

7    us.  Should this proceed and Dr. Godleski comes to the

8    conclusion that this is actually beneficial to your health,

9    that it cures 17 different known diseases, so what?  I am

10   not here on a products liability case.  That may happen here

11   one day, I don't know.  If breathing in aerosolized plastic

12   is not going to harm you or may have some unknown beneficial

13   effects, I really don't care.

14         What I care about is my client is a consumer

15   journalist.  This is a consumer journalism publication just

16   like Consumer Reports except it is smaller and newer.  It

17   only launched in October of 2016.  It can't be expected to

18   be as large.  But if we look at these articles, which we

19   have to refer back, and when we look at the T.R.O., we have

20   to do this treasure hunt to find out exactly what it is they

21   are complaining about, and we look at it and we say article

22   one.  What exactly is that white powder on Purple's

23   mattress?  Why wouldn't a consumer reporter have a right to

24   ask that question under the First Amendment and, frankly,

25   even under the Lanham Act?

```
 1            Even if we believe this entire conspiracy that
 2   this whole thing was cooked up back in October to be a
 3   shadow marketing campaign for GhostBed, that would require a
 4   degree of creativity and just a degree of plotting that even
 5   Alexander Dumas could not have imagined when he wrote the
 6   Count of Monte Cristo.
 7            THE COURT:  Well, Mr. Magleby imagines it.
 8            MR. RANDAZZA:  I would love to coauthor a novel
 9   with him, because his creativity and his writing ability are
10   outstanding, but these fantasies are probably best used in
11   fiction.
12            THE COURT:  He would say that you are describing
13   your client as a consumer -- what did you call it -- a
14   consumer advocate or --
15            MR. RANDAZZA:  Journalist.
16            THE COURT:  -- journalist is a fiction as well.
17   He wants me to begin with that premise, like that has been
18   proven.
19            MR. RANDAZZA:  Well, neither he, nor you, Your
20   Honor, have the right to ask us to prove that.  A journalist
21   is a journalist.
22            THE COURT:  Don't have the right to what?
23            MR. RANDAZZA:  Your Honor, that is not something
24   that a court has the right to make a legal determination
25   about.  In fact, we have briefed that --
```

```
 1            THE COURT:  I am not talking about a legal

 2   determination, sir, and you should be respectful to the

 3   Court, and I'm not telling you here today what you have the

 4   right to argue or you don't unless you go across a line.

 5   Already in your briefing you have accused this Court of

 6   unconstitutional behavior.  I would appreciate a little more

 7   respect.  You're here on pro hac vice authority.

 8            MR. RANDAZZA:  I beg your pardon, Your Honor.

 9            THE COURT:  I would appreciate you not telling me

10   what I don't have the right to do when I'm pointing out that

11   he says factually something that disagrees with your point

12   of view about what your client is --

13            MR. RANDAZZA:  Your Honor --

14            THE COURT:  -- and you want to begin with the

15   premise that factually he is this, and I assume when you say

16   consumer journalist, that he is some kind of independent

17   person who is like an investigative reporter for a

18   newspaper, if they exist anymore, and that is what I'm

19   pointing out.  He disagrees with your contention factually

20   that your client is a consumer journalist.

21            MR. RANDAZZA:  I understand, Your Honor, and I

22   apologize for how I presented it.  What I mean is that this

23   is not an inquiry that there is legal discretion to make a

24   distinction.  I can take a homeless person from the street

25   right now and hand them a pad of paper and say go write
```

1    about this.  They are a journalist at that moment.  So a

2    journalist is not something that has a legal definition.

3           In fact, we have briefed this issue for about a

4    half a page and provided a myriad of citations that show

5    that this is not anything that would matter one way or the

6    other, if he is an amateur or if he is a professional.

7           Now, if there is a distinction between him acting

8    as a marketing person for GhostBed or acting as a

9    journalist, that is a distinction that we can make here, but

10   I you understood your question to be, is he really a

11   journalist based on his level of skill and based on his

12   level of training and based on this publication.  Whether or

13   not he is a journalist, you look at what he does and not at

14   who he is.

15          Let's just say hypothetically that he actually

16   woke up one day and went over to work at GhostBed in their

17   northeast office as this transcript said that this person

18   said that he does, when he doesn't, he didn't go anywhere

19   near the northeast, but let's say he went there and then he

20   checks out for lunch and runs over to his office and writes

21   a review of a product that competes with GhostBed.  That

22   does not damage his independence.

23          If somebody works for Chevrolet they can certainly

24   write a consumer review for Car and Driver.  We have brought

25   up the example of Anthony Bourdain who owns his own

1    restaurant, and then spends his entire career reviewing

2    other restaurants.  So this chart that we have here, and I

3    know that we have admitted these facts, because we have

4    nothing to hide, that we have a contractor who is a

5    contractor to a contractor and we have no desire to hide

6    that relationship.  We have disclaimed it on our website

7    since October of 2016, since the site was launched.  We have

8    shown evidence of that, but even that does not taint this

9    person's right to report as a consumer journalist.

10          So what we have here in this T.R.O., begging Your

11   Honor's pardon, is an unconstitutional prior restraint.  An

12   unconstitutional prior restraint is any order, any

13   government action, including, and especially a court order,

14   that prohibits speech either before it happens or before

15   there is a determination that it is unlawful.

16          Now, these are granted sometimes, perhaps in the

17   circumstance of stopping the disclosure of classified troop

18   movements, but as an example that we gave in our briefing,

19   even in The New York Times case where the Pentagon papers

20   were being leaked to the press, and we're talking about

21   intelligence reports during wartime, and the Supreme Court

22   said that is not enough to issue a preliminary injunction

23   against speech.

24          Yet what Purple Mattress's marketing department

25   does not want out there -- how can we ever balance that as

1    greater than the constitutional mandate here that we can

2    even put out intelligence reports during war?  That is the

3    gravity of the problem here.

4          Perhaps had we been here at the time, we could

5    have raised that and we wouldn't be here now, but, Your

6    Honor, you can't expect a person like Mr. Monahan to receive

7    all of these documents -- I do not know exactly when he

8    received it or what he received, all I know is when he

9    called me and then when he retained me.  We did our best to

10   piece together what this T.R.O. was trying to tell us to do.

11   In no way, shape or form did we ignore any part of it

12   because of its unconstitutionality.

13         It was simply a matter of when you look at the

14   rule, the rule tells you that we cannot have any order in it

15   that refers to another document, the reason being it needs

16   to be clear.  Now, we still played the treasure map game and

17   we went and looked for what we could in the documents that

18   we could and did the best that we could.  I don't believe

19   that contempt is even something that we should be talking

20   about at this point when you look at the degree to which my

21   client adhered to this.

22         But really the central issue here I think is not

23   the contempt and not the T.R.O. and not whether you lift it

24   at this point or whether you convert this to a preliminary

25   injunction, because going forward from today we're walking

1    out of here either with a preliminary injunction in hand or

2    the T.R.O. is over.

3            There is no question that the First Amendment

4    governs commercial speech.  Even if this is commercial

5    speech, and we do admit that it is, but even if it is, you

6    still have this prior restraint prohibition on this speech.

7    We have a lot of innuendo here and a lot of speculation and

8    a lot of half quotes and bringing out just one word in a

9    sentence to show that this is somehow harmful and that this

10   is somehow a problem, but not one bit of this has been

11   adjudicated to be unlawful.  The fact is that it is not

12   commercial speech.  Therefore, you are defaulted back down

13   to is this a defamation case?

14           Let's go through the commercial speech test.  The

15   first question we have to ask is is this an advertisement?

16   It is not an advertisement.  You look at it on its face and

17   it has been reproduced and each article has been reproduced

18   in whole or in part to the extent that a forest will have to

19   be killed in order to print the record in this case.

20           Is it made with a commercial motive?  That is not

21   simply the commercial motive inherent in publishing

22   something, because if that were the case, then every piece

23   of journalism would have a commercial motive, even the front

24   page article in The Salt Lake Tribune today would have a

25   commercial motive, because they want to sell more papers and

1   they want to sell advertising, but the question is is this

2   actual article written with a commericial motive inherent in

3   it?

4          Of course he takes the position and he has taken

5   the position, and I have heard him that this is somehow, in

6   order to promote GhostBed, yet to hurt the Purple Mattress

7   company at the same time, despite the fact that we have in

8   the record evidence that my client has written negative

9   reviews of GhostBed's product.  Their luxury line --

10  myclient has determined that that is a bad value and has

11  ranked it as such.

12         We also have evidence in the record that we have

13  promoted Purple.  In fact, they had a fund-raising campaign

14  where they were trying to raise money in order to launch a

15  new product.  I believe that still remains on my client's

16  website despite this lawsuit.  Again, this is a very

17  convoluted conspiracy theory that just does not make any

18  sense.  It breaks apart.  If my client is actually engaging

19  in what he is saying he is, my client is so inept at it that

20  I don't know how this is a lawsuit.

21         Then we have to ask does it refer to a specific

22  product?  What consumer review would not refer to a specific

23  product?  You need all of those elements in order for this

24  to be commercial speech.  Then we have to look into whether

25  it is a Lanham Act violation.  Then it needs to be

1   commercial speech, but it also needs to be false.  So what

2   is false about asking what is this powder?  What is false

3   about asking why won't they disclose what it is?  What is

4   false about saying that we think that this is a company that

5   we're going to rate as poor because it will not disclose

6   this information?  What is false about that?

7         Even this cinnamon article or cinnamon post that

8   my friend pointed out, well, taken out of context you can

9   look at that and say why is that in there?  Put it in

10  context.  They have claimed that this powder is a nontoxic

11  powder.  Well, of course, and maybe it is and maybe the

12  plastic is nontoxic.  Cinnamon is nontoxic.  If you put

13  enough of it in your mouth, you can wind up dying from it.

14  Same thing with plastic.  If you make this plastic into a

15  cup and you pour water into it you may never suffer any

16  health effects.

17        But if it is atomized into particles that are 5.8

18  microns apart, well, that is a little over four microns too

19  small to keep them out of your lungs, so why wouldn't a

20  consumer have a right to know this?  I don't need to know

21  that it is harmful.  All I need to know is it is worthwhile

22  for a journalist to ask this.  When somebody is out there

23  buying a mattress, something they are going to spend a

24  fourth of their life on, why wouldn't they have a right to

25  know what is in it, even if that is an irrational question?

```
 1              The breadth of mattresses that there are has
 2    actually become shocking to me.  When I was a bachelor I
 3    lived on the cheapest mattress that I could find that would
 4    be delivered and when I moved I left it behind because I
 5    didn't care.  Then I got married and my wife starts buying
 6    these mattresses that I swear must be made from unicorn
 7    tails because it matters to her as a consumer.  To me it
 8    does not matter.  As long as I can sleep on it, I don't
 9    care.
10              To a consumer who is looking at that they are
11    going to put their family on this thing, why don't they get
12    to ask that question?  They don't get to ask that question
13    because right now there is prior restraint stopping my
14    client from asking that question.  That is not something
15    that the First Amendment can abide, Your Honor.
16               It probably shouldn't have been entered as a
17    T.R.O., but now that we are here to talk about it, I cannot
18    see any constitutional way that it can continue as a
19    preliminary injunction.
20              Your Honor, if you have any questions about the
21    facts that I have not detailed here -- I think that is all I
22    really need to say.
23              THE COURT:  Well, thank you.
24              Were there other counsel?
25              Remind me of your name.
```

1          MS. YOST:  Good morning, Your Honor.  Eleanor Yost

2    on behalf of GhostBed.

3          THE COURT:  All right.

4          MS. YOST:  I promise to be very brief.

5          THE COURT:  Well, you're fine.  Take all of the

6    time you need.

7          MS. YOST:  Sure.

8          As counsel previewed for you, GhostBed is of the

9    position that it had nothing to do with the website in

10   question.  To succeed on its motion here, putting aside my

11   co-counsel's statements, Purple needed to show that my

12   client, GhostBed, made the statements at issue or had

13   anything to do with the website that is talking about the

14   products and they have not done so.

15         Now, what they have done is suggested that there

16   is a coconspirator relationship between my client and

17   Mr. Monahan and the entity that I think no one disputes is

18   actually running the website.  They have not done that

19   either.

20         There are a few things in the record right now

21   that I would like to direct Your Honor's attention to,

22   including the sworn affidavits of Mr. Werner, who is the

23   C.E.O. of GhostBed, and the sworn affidavit of Mr. Monahan,

24   and those are both at dockets 30 and 31.

25         What they show is that GhostBed does not own the

1   website at issue.  GhostBed does not contribute any content

2   to the website at issue.  GhostBed has not encouraged anyone

3   to contribute any content to the website at issue, and

4   GhostBed does not compensate the website owner, which is

5   Honest Reviews, or Mr. Monahan in connection with that

6   website.

7          All Purple has offered you in connection with this

8   motion is speculation that there is a relationship between

9   GhostBed and Mr. Monahan.  But the affidavits that I have

10  pointed to show that Mr. Monahan is not and has never been a

11  GhostBed employee, which is one of the bases that Purple

12  included in its complaint to show that there is a

13  relationship.

14         Neither Honest Reviews nor Mr. Monahan have been

15  compensated by GhostBed to produce this website or any of

16  the content on it.  GhostBed has declared under the pains

17  and penalties of perjury that it had absolutely nothing to

18  do with the posts before or after the T.R.O. was entered.

19         Now, what Mr. Werner in his declaration did say

20  was that GhostBed as an entity learned of the website at the

21  same time everyone else in the general public learned of it

22  and had no participation in its creation.  Mr. Monahan, of

23  course, has no phone or e-mail address or office at

24  GhostBed's headquarters and he is not an employee.

25         Now, Mr. Werner did identify a relationship

1    between Mr. Monahan and GhostBed that is attenuated.  Mr.

2    Monahan is a marketing consultant and he works for many,

3    many organizations and clients which he testified to in his

4    sworn affidavit, including GhostBed, and we have been up

5    front about that.

6          Now, GhostBed has hired, as counsel very helpfully

7    put together, a company called Achieve, and Achieve is a

8    marketing consultant as well.  GhostBed uses Achieve for a

9    variety of things as set forth in Mr. Werner's affidavit,

10   including online presence and marketing.  Achieve, in turn,

11   uses a company along with many others that helps create

12   content for their clients as well.

13         As Purple shows, there is a very long chain

14   between GhostBed and Ryan Monahan, and what they want to

15   suggest is that you ignore all of these intermediate

16   entities and say, well, these are completely irrelevant to

17   the question of whether GhostBed and Monahan are working

18   together on this.  They are not.

19         Mr. Monahan works for many, many clients and what

20   Purple is proposing is that my client be enjoined from doing

21   certain things in a particular way, but I think the same

22   logic would apply to any one of Mr. Monahan's clients, and

23   he has testified that he represents many, including those in

24   the mattress industry.

25         What I think is glaring in counsel's presentation

1    here is there is no relationship between GhostBed and the

2    actual entity that is running the website.  There is no line

3    between Honest Reviews, which no one disputes is running the

4    website, and my client.  The evidence that counsel is

5    looking for, and not having seen their request for expedited

6    discovery earlier, and I will get to the point where this is

7    very broad, but what Purple has alleged is that Mr. Monahan

8    is either an employee or he is being paid by GhostBed to do

9    what he is doing.

10          What we have in the record is evidence from two

11    C.E.O.s, sworn declarations that he is not an employee, and

12    Purple has not come forward with any evidence to the

13    contrary.  Instead of coming to us and asking for employment

14    records or something very narrowly tailored to prove the

15    point, instead, you know, they espouse these very complex

16    conspiracy theories involving phone calls and marketing

17    folks and contractors.  I think the point here, though, is

18    that the injunction that is being requested has to relate to

19    my client's actions specifically.  Purple just has not

20    gotten there in their motion.

21          Thank you.

22          THE COURT:  You have seen Mr. Magleby's proposed

23    expedited discovery, and you just got it probably --

24          MS. YOST:  I just got it, yes.

25          THE COURT:  You said if they had just come to us

1    and asked us, and I see in his subparagraph on the second

2    page, number 9, he wants all documents relating to Monahan

3    providing any services to or for the benefit of GhostBed,

4    including tax forms, W-2s or 1099 forms, payment records and

5    so on.

6              Would you have an objection to providing that?

7              MS. YOST:  Well, I think the breadth of these as

8    they are drafted is a little burdensome for us.  I will tell

9    you why.  The fact that Mr. Monahan did any work for us at

10   all cannot be the scope of the discovery that they are

11   seeking here.  What we are really concerned about is what is

12   the relationship between GhostBed and this website and the

13   statements made on the website that are at issue here, but

14   they have asked for, for example, all e-mails to and from

15   marketing@ghostbed.com.  That is our general marketing

16   e-mail.  I can't imagine -- there must be hundreds and --

17             THE COURT:  I didn't ask you about that one.

18   You're going to number eight and I was asking about number

19   nine.

20             MS. YOST:  For number nine the question is will we

21   provide employment records to show that he is not an

22   employee?

23             THE COURT:  No.

24             MS. YOST:  I think that is fair.

25             THE COURT:  No.  I guess his main point that I

```
 1   have heard was why don't they tell us how much money has
 2   actually flowed to Mr. Monahan from these associations that
 3   can be directly connected to GhostBed?  That would be
 4   interesting.
 5            MS. YOST:  Mr. Werner testified in his affidavit
 6   that is in the record that GhostBed has paid Mr. Monahan
 7   exactly no money in connection with the website that Purple
 8   is complaining about.
 9            THE COURT:  I understand that and I have read
10   that.  But here Mr. Magleby on behalf of his client is
11   surmising that money is traveling, and that is the only
12   reason these entities exist, because they make money or they
13   couldn't I guess be in the business they are in, and he
14   would like to know how many of those dollars went to Mr.
15   Monahan.
16            MS. YOST:  No dollars.  Our payments were to
17   Achieve.
18            THE COURT:  Well --
19            MS. YOST:  We hired Achieve and what Achieve does
20   with its clients and its vendors and its people who are
21   supporting its work is Achieve's business.  Our vendor is
22   Achieve and Achieve goes out and uses companies that --
23            THE COURT:  Well, they would like to explore the
24   amount of money then that you give to Achieve.  You wouldn't
25   have a problem turning that over, I guess?
```

1              MS. YOST:  I would, Your Honor, because Achieve's

2     work has absolutely nothing to do with the website where

3     Purple is alleging there harm is occurring.

4              THE COURT:  Well, they are claiming it has a lot

5     to do with it.

6              MS. YOST:  No.  Achieve has nothing --

7              THE COURT:  No, I mean with the money trail, as I

8     understand it.

9              MS. YOST:  I understand, Your Honor, but we have

10    two sworn declarations that say that there is no money trail

11    between GhostBed and the website where Purple's harm is

12    happening.  To then go and allow Purple extensive discovery

13    into all of GhostBed's operations seems very burdensome to

14    us.

15             THE COURT:  Thank you very much.

16             MS. YOST:  Thank you.

17             THE COURT:  Other counsel planning to address the

18    Court on this side of the room?

19             MR. RANDAZZA:  Your Honor, if I may address one

20    issue about the discovery?

21             THE COURT:  Sure.

22             MR. RANDAZZA:  With respect to their requests for

23    expedited discovery, we don't have a problem with any that

24    are geared toward determining jurisdiction and venue.  We

25    have noted in our papers, and we have not had the time to

1    file it yet, but we do intend to file a motion to dismiss

2    under 12(b)(2) and 12(b)(3), and I think that if we did,

3    they would seek jurisdictional discovery again and we are

4    not going to resist that.  We would, however, resist this

5    discovery.  We think 12(b)(2) and 12(b)(3) should be

6    determined first.

7              THE COURT:  Thank you.

8              Mr. Mableby, your response.

9              MR. MAGLEBY:  Yes.  Thank you, Your Honor.

10             If they want to file a jurisdiction motion, we

11   would invite them to do it and we'll deal with the discovery

12   problem at that point.  I am pretty confident since, among

13   other things, one of the things that they posted on the blog

14   was a clip from K.U.T.V. or a Utah news report talking about

15   Purple, and I am pretty sure Mr. Monahan knows where Purple

16   is located, but we'll cross that bridge when we get there.

17             In terms of the resistance to the remainder of the

18   expedited discovery, I think it is very telling what Mr.

19   Randazza said.  We don't want to give you any of it.  There

20   is something I call a lawyer's fighting sense, where things

21   start to tingle in my brain, and I go that is interesting

22   and that must be something that I really want, because the

23   other side is not giving it to me.  I see that from what Mr.

24   Randazza said and I see that from what Ms. Yost said, where

25   you asked her about paragraph nine as a whole, and she very

1   clearly said, oh, well, I'm happy to give them an employment

2   form if that exists.  She is already narrowing the response

3   as defense lawyers do, because she knows it needs to be

4   narrow to keep documents out of our hands.

5           It is very interesting what Mr. Werner actually

6   says in his declaration.  He says we have not given any

7   money, quote, in connection with the website.  Okay.  Well,

8   again, a lawyer's fighting sense and a judge's fighting

9   sense might be going off here as well, which is why do you

10  qualify it like that?  I mean, I look at that and that is

11  something where I go, hum, that is an important

12  qualification.  What money have you given that is not in

13  connection with the website?  You get my point.

14          I'm going backwards through my notes, Your Honor.

15  Ms. Yost talks about the burden upon them.  We're in a

16  lawsuit that is worth tens of millions of dollars.  They

17  have hired New York counsel and Ms. Yost is from a very

18  expensive firm and clearly they are taking this seriously.

19  I don't know what GhostBed is worth, but I think it is in

20  the nine figures.

21          Here is my response on the burden.  If Mr. Monahan

22  had nothing to do with anything at GhostBed, then there

23  shouldn't be much of a burden at all and we will get a

24  couple of pages.  If he had a whole lot to do and there is a

25  big burden, that is actually directly relevant.  The size of

1        that burden is related to the extent of his contacts.

2              In thinking about that, I realized that I had

3        forgotten something as Ms. Yost was talking in my haste to

4        throw together the discovery records, and I also want the

5        telephone records and, in particular, the cell phone

6        telephone records.  I want to know how many calls went back

7        and forth between Mr. Monahan and Mr. Werner around the time

8        of all of these issues.  If we hurry up and get them we can

9        get the texts as well, but the way the cell phone companies

10       work, you have to issue those subpoenas, at least with

11       Verizon, within three months, and so we also need an order

12       that allows us to issue subpoenas to the mobile phone

13       carriers, and we need an order that directs the defendants

14       to give us the mobile phone numbers.

15             There is going to be a lot of argument about some

16       of it is privileged and some of it is irrelevant, but I

17       believe the phone companies can limit the production to

18       certain phone numbers.  That is something that we need to

19       deal with.

20             We got the no evidence argument that I predicted

21       from Ms. Yost, that there is simply no evidence.  Of course

22       all of the evidence is in their control and that is why we

23       want it.  She said there is no e-mail address from Mr.

24       Monahan at GhostBed.  Weird, because we found that document

25       that says ryan@ghostbed.com on a contest sheet that was

```
1    issued for GhostBed.  So I guess what she might be telling
2    us is there is no e-mail address now, or we have deleted all
3    of them, and if they have spoliated evidence, I am very
4    interested in that.  If it is a very clever representation
5    to the Court to say that he does not have one now but he
6    used to have one before, I'm very troubled by that, because
7    I think it is misleading, all of which comes to the point
8    that I think we need to do the discovery.
9            On Mr. Randazza's points, and let's see here, he
10   made exactly the argument I predicted, which is, gee, we are
11   just asking questions.  Again, if that was all that was
12   happening I would have a tougher argument but I still think
13   I would get there.  They are not asking questions.  They are
14   saying words like ovarian cancer, massive lawsuit, asthma,
15   respiratory problems, tens of thousands of consumers being
16   exposed, and the reason he avoids talking about those things
17   is because under the three-part test of the Lanham Act,
18   literally false, false by necessary implication, likely to
19   confuse consumers, we are there.
20           Mr. Randazza says, gosh, I don't know when
21   Mr. Monahan received the T.R.O.  I only know when he called
22   me.  Your Honor, if he does not know that when his client is
23   facing an order to show cause for contempt, that is
24   intentional ignorance.  The first question a lawyer -- and
25   Mr. Randazza is a good lawyer -- the first question a lawyer
```

1  asks his client is when did you know about the T.R.O.?  That

2  might be one of those things where it is kind of like a

3  criminal case, don't tell me if you actually stabbed him,

4  because I don't want to know.

5        In any event, this is not that kind of a case

6  where the witness can refuse to go on the stand under the

7  Fifth Amendment.  We are entitled to know.  If Mr. Randazza

8  did not bother to find out, we are entitled to find out.  I

9  think it is very troubling that answer of I never asked him

10  when he got notice, because it is either intentional or I

11  guess it could be a lack of confidence, but I don't think

12  that is Mr. Randazza's game plan.

13        About a journalist and not an inquiry with which

14  you have legal discretion, I was as surprised as you to hear

15  Mr. Randazza tell you that you couldn't make that inquiry.

16  I don't know the law and I am not going to purport to argue

17  one side of that or another, but what I do know you have is

18  the discretion to make an inquiry into is whether or not he

19  is independent and whether or not the statements are true or

20  not.  There is no I'm a journalist or I call myself a

21  journalist so I am suddenly completely and forever immune

22  from the Lanham Act.  If that were the case, then every

23  competitor would have a journalist part on their website.

24        The last couple of points are from Ms. Greenwood,

25  and in response to your question about the lost sales, she

1    has reminded me that the law says you get an injunction

2    under the Lanham Act even if you don't show damages, even if

3    all you have is a likelihood of confusion, and, of course,

4    the point here is we want to stop the damages, and that not

5    even actual confusion is required under the Lanham Act.

6    Again, it is likely confusion and I think we have met that.

7              Ms. Greenwood has given me a better answer to your

8    question as to what is still up on the website, the

9    Sleepopolis article, the powder gloves, the gofundme

10   fundraising site, which repeats a number of things that you

11   have ordered taken down, and the living a lie post.

12             Finally, I guess another piece of discovery, and I

13   think it is included in our request, and one thing we did do

14   is early on we provided an F.T.P. site with our letter

15   delivering the materials.  We did that for two reasons.  One

16   is it avoids the problem of a large document getting bounced

17   back from e-mail, but the other reason, and one of the

18   things I love about our F.T.P. site, is it tells you when

19   somebody accesses and downloads the document.

20             That complaint was downloaded like eight times

21   from Florida, from New York and from a bunch of different

22   places.  We'll want to do discovery into who is at those

23   F.T.P. sites and downloaded those documents.

24             Any questions for me?

25             THE COURT:  I don't have any now.  Thank you.

```
 1              Anything else from you, Mr. Randazza?

 2              MR. RANDAZZA:  Your Honor, just two things that he

 3    brought up that I would like to address.

 4              THE COURT:  Okay.

 5              MR. RANDAZZA:  He brought up this F.T.P. site, and

 6    I presume that that F.T.P. site, and when he saw all these

 7    I.P. addresses downloading the complaint, and he also

 8    delivered the T.R.O. through that site, and I didn't hear

 9    anything about when that was downloaded from that site.  So

10    perhaps that would illuminate some of these issues if there

11    is something that you're concentrating on.

12              He also brought up the gofundme page, which

13    apparently they are interpreting the T.R.O. as prohibiting

14    that.  To interpret the T.R.O. as prohibiting that --

15              THE COURT:  Which?  I missed that.  Go back just a

16    sentence.

17              MR. RANDAZZA:  The gofundme?

18              THE COURT:  Yes.  You said prohibiting what?

19              MR. RANDAZZA:  Prohibiting the publication of

20    that.

21              THE COURT:  What is that?

22              MR. RANDAZZA:  The gofundme page.

23              It is a fund-raising page.  It is a page

24    seeking -- my client is not as well off as some others in

25    this litigation.  My client is seeking funding to assist him
```

1  in paying my bills.  Well, to interpret this T.R.O. as

2  prohibiting, that really shines a light on what we have

3  here, because what we have here is a public figure,

4  37 million views to just one of their ads, one of their

5  viral ads, and yet they claim that they are not a public

6  figure.  So we have this public figure claiming defamation

7  and trying to use the Lanham Act as a cloak for it, and

8  throwing case law at you from trademark infringement

9  portions of the Lanham Act, not the false advertising

10 portions of the Lanham Act, and that is where likelihood of

11 confusion comes in, but I presume given your knowledge of

12 the patent act earlier, you knew that already.

13          When we look at this and we say how can this be?

14 How can they sustain this case, this defamation case against

15 my client without proving knowing falsity or a reckless

16 disregard for the truth?  Of course we always ran back to

17 New York Times versus Sullivan, and when I hear a plaintiff

18 saying that even the publication of a fund raising page is

19 somehow something that can be enjoined under the First

20 Amendment, how do we not think of New York Times versus

21 Sullivan, because that case itself focused on a fund-raising

22 advertisement in The New York Times.  It was a fund-raising

23 advertisement trying to seek a legal defense fund for Martin

24 Luther King.  In had numerous and perhaps erroneous

25 falsehoods in it.  In fact, they were admitted, but not

1    enough to sustain a defamation claim.

2           When I look at a case like this and I think if

3    only Commissioner Sullivan had thought to bring a Lanham Act

4    claim instead of a defamation claim, perhaps 60 years of

5    First Amendment jurisprudence would not exist.  That can't

6    possibly be what this Court intends to endorse.  I hope not

7    for the sake of the First Amendment.

8           MR. MAGLEBY:  Your Honor, if I could?

9           THE COURT:  Yes, you may.

10          MR. MAGLEBY:  I'm sorry.

11          It is an interesting argument that the gofundme

12   page is somehow exempt, and now there has been a

13   representation made that, gee, Mr. Monahan needs that to pay

14   his bills.  I would really like to know if GhostBed is

15   paying his legal bills.  That is part of the discovery.  If

16   they are going to make that an issue in this case, I want to

17   know if there is an indemnification agreement.  I know that

18   Ms. Yost's very expensive law firm represents Mr. Monahan in

19   responding to a subpoena in that other case.  I can't

20   believe that Mr. Randazza is doing this without a big

21   retainer.

22          What I also know is that the gofundme site can't

23   be used to skirt a court order.  It is just not that simple,

24   otherwise the Lanham Act wouldn't mean anything and we would

25   just go out and put up a gofundme site and call it a legal

1    defense fund and we could repeat every offensive statement

2    that we could find.  It is telling that New York Times

3    versus Sullivan was not a Lanham Act case.  Mr. Randazza

4    says, gee, it would have been awful if they had figured that

5    out and been able to stop Martin Luther King from raising a

6    civil defense fund.  Yes, that would -- but it wouldn't have

7    happened, because it was not a competitor, so we just need

8    to draw the line here.  It is real clear.  Commercial speech

9    is not protected by --

10            THE COURT:  You may be the beginning of 60 years

11   of horrible First Amendment jurisprudence.

12            MR. MAGLEBY:  I may be, but I would be defending

13   Martin Luther King's side on that one.  It is a different

14   set of facts.

15            THE COURT:  I will take these under advisement.

16   Thank you.

17            Court is in recess.

18            (Proceedings concluded.)

19

20

21

22

23

24

25