```
 1                IN THE UNITED STATES DISTRICT COURT

 2                        DISTRICT OF UTAH

 3                        CENTRAL DIVISION

 4

 5   PURPLE INNOVATIONS, a        )

 6   Delaware limited liability   )

 7   company,                     )

 8            Plaintiff,          )

 9   vs.                          )     Case No. 2:17-CV-138DB

10   HONEST REVIEWS, a Florida    )

11   corporation, et al.,         )

12            Defendants.         )

13   _____)

14

15

16             BEFORE THE HONORABLE DEE BENSON

17             -------------------------------

18                       July 7, 2017

19

20                      Motion Hearing

21

22

23

24

25
```

```
 1                    A P P E A R A N C E S

 2

 3    For Plaintiffs:          JAMES MAGLEBY
                               ADAM ALBA
 4                             CHRISTINE GREENWOOD
                               170 South Main Street
 5                             Suite 1100
                               Salt Lake City, Utah
 6

 7

 8    For Defendant:           ANDREW McCULLOUGH
      Honest Reviews           6885 South State Street
 9                             Suite 200
                               Midvale, Utah
10
                               D. GILL SPERLEIN
11                             345 Grove Street
                               San Francisco, California
12
                               MARC J. RANDAZZA
13                             4035 South El Capitan Way
                               Las Vegas, Nevada
14

15
      For Defendant:           ELEANOR YOST
16    GhostBed                 1025 Thomas Jefferson Street NW
                               Suite 400 West
17                             Washington , D.C.

18                             KATHRYN SMITH
                               102 South 200 East
19                             Suite 800
                               Salt Lake City, Utah
20

21

22

23
      Court Reporter:          Ed Young
24                             351 South West Temple
                               Room 3.302
25                             Salt Lake City, Utah 84101-2180
```

```
 1   July 7, 2017                              11:00 a.m.

 2                   P R O C E E D I N G S

 3

 4        THE COURT:  Good morning.

 5             Let me get my glasses out and I will read the name

 6   of this case.  Purple Innovations, L.L.C. versus Honest

 7   Reviews, L.L.C. and others.  The case number is 17-CV-138.

 8             I see at this table Mr. James Magleby.  I will ask

 9   him to stand up and introduce the other lawyers who are here

10   representing this side, because it looks like a lot of you,

11   and then I'll ask the other side to do the same.

12             With that --

13        MR. MAGLEBY:  Thank you, Your Honor.  I do need a

14   lot of help.  I have here with me Christine Greenwood and

15   Adam Alba of my office.  Also with us here is Casey

16   McGarvey, chief legal officer for Purple, Craig Heiman,

17   in-house counsel with Purple.  Jordan Cameron is here, but

18   he is not entering an appearance, but he consults with the

19   company on regulatory matters and he is here because this

20   case touches on the C.P.S.C. issues.

21             THE COURT:  He is not entering an appearance, he

22   is making an appearance.

23             MR. MAGLEBY:  He is.

24             THE COURT:  He is here.  Okay.

25             Is that everyone?
```

```
1                 MR. MAGLEBY:  Yes, he is here.

2                 THE COURT:  Okay.  Please.

3                 MR. RANDAZZA:  Yes, Your Honor.  Marc Randazza for

4      Honest Mattress Reviews, and Mr. Monahan.  I also have here

5      Mr. Gill Sperlein and Andy McCullough.

6                 THE COURT:  I know Mr. McCullough from way back.

7                 Which is Mr. Monahan?  Didn't you say --

8      representing Mr. Monahan.

9                 Who is next to you?

10                MR. RANDAZZA:  This is Mr. Gill Sperlein.

11                THE COURT:  Okay.

12                MR. RANDAZZA:  There is another team here as well.

13                THE COURT:  Mr. Sperlein is with -- I see it,

14     S-p-e-r-l-e-i-n.

15                MR. SPERLEIN:  That is correct, Your Honor.

16                THE COURT:  Nice to have you here.

17                Then behind you?

18                MS. SMITH:  Kathryn Smith, Your Honor, and this is

19     Eleanor Yost, and on behalf of the defendant GhostBed.

20                THE COURT:  Ms. Smith, you are with Strong &

21     Hanni?

22                MS. SMITH:  Yes.

23                THE COURT:  Ms. Yost, you are with Carlton Fields,

24     correct?

25                Nice to have you all here.
```

```
 1              We're here on GhostBed, Inc.'s motion to dismiss

 2    the first amended complaint on jurisdictional grounds and on

 3    Rule 12(b)(6) as to some of the causes of action.  We're

 4    also here on the plaintiff's motion for preliminary

 5    injunction.  You mix the word T.R.O. in there somehow as

 6    well, but this is only a preliminary injunction that you're

 7    seeking.  We have both sides here, and I think a T.R.O. is

 8    not even a thing under the federal rules when we have both

 9    sides represented.  It is either a preliminary injunction or

10    nothing.  Those are the motions.

11              Which order did you all want to take them up in?

12              MR. MAGLEBY:  Your Honor, although they did file

13    their motions first, in the T.R.O. motion we'll touch on a

14    bunch of the new evidence that led to the filing of the

15    injunction papers and it will overlap substantially with the

16    motions to dismiss.  It is also, of course, of great

17    importance to our client, so I think we should go with that

18    first and I think that will make the other motions more

19    streamlined.

20              MR. RANDAZZA:  Your Honor, we would naturally

21    disagree.  I think if the Court does not have jurisdiction,

22    then that would be the end of the day and we all go home a

23    little earlier.

24              THE COURT:  Well --

25              MR. RANDAZZA:  I respectfully say that the
```

1  12(b)(2) motion should be heard first.

2          THE COURT:  Well, their argument against your

3  motion will address the facts and it is all going to be one

4  big jumbled mess.  I don't know that it matters really.

5          Let's start with the motion to dismiss.  If they

6  win round one in this Ping-Pong match, then we'll see where

7  we get to, but I can't imagine we won't hit all of the same

8  issues addressing both of these motions here today.  We'll

9  start with the motion to dismiss.

10          Which one of you two wants to go first?

11          MR. RANDAZZA:  I believe I will defer to GhostBed,

12  Your Honor.

13          MS. YOST:  Thank you, Your Honor.

14          Before we begin, I do have two preliminary matters

15  if you would indulge me.

16          THE COURT:  I have a preliminary matter.  Would

17  you step up to the podium, please.

18          MS. YOST:  Certainly.

19          THE COURT:  What is your preliminary matter?

20          MS. YOST:  First, before we get to the substance

21  of the motion, we will be touching on certain information

22  that has been designated confidential under the protective

23  order and I, unfortunately, do not know the folks in the

24  gallery today, and I would like to ask Your Honor's

25  instruction on how you would like to handle that.

```
1              THE COURT:  I think they are all law clerks or law
2   interns.
3              Are you here representing anyone?
4              MR. KAPLAN:  Your Honor, Neil Kaplan.  I am really
5   observing.  If I need to be excused, that is fine.  I do
6   have affiliation with Purple, but I have not entered my
7   appearance in this case.  Whatever the Court would like to
8   do.
9              THE COURT:  This is Mr. Neil Kaplan.  He is a
10  lawyer in town.
11             Tell me what it is that you think we're going to
12  get into that is --
13             MS. YOST:  Very specifically in connection with
14  the motion to dismiss we're going to be talking a little bit
15  about GhostBed sales information with respect to its sales
16  to customers in Utah.
17             THE COURT:  Is that covered by some protective
18  order or agreement between the parties as confidential?
19             MS. YOST:  It is covered by the protective order.
20             THE COURT:  It is.
21             You agree with that?
22             MR. MAGLEBY:  Yes.  Excuse me, Your Honor.
23             They have designated that information as either
24  confidential or A.E.O., and so that is fair game, and if we
25  need to excuse somebody when we get to that piece of the
```

1    argument, I understand that.  Obviously my client

2    representatives need to be here for the rest of the

3    argument.  Frankly, I am not convinced that the information

4    is that particularly sensitive in nature, but that is not my

5    call.

6              THE COURT:  Well, apparently it was.  You entered

7    into some agreement.  The defendants here keep wanting to

8    remind me about the First Amendment, and there is a little

9    thing about courts being public, and we have too many of

10   these things.

11             MR. MAGLEBY:  Your Honor, we are operating under

12   the standard protective order in the Utah district which

13   automatically applies, and so they have designated materials

14   under that protective order and, of course, we're complying

15   with it.  We have not taken the time to challenge that

16   designation.  That didn't seem to be a good use of

17   resources.

18             THE COURT:  Well, the only person in court other

19   than the court personnel is the court security officer.  Mr.

20   Kaplan is the only -- if you get to a point where you think

21   he needs to be excused, or if someone else comes in and you

22   think this information is that important that it needs to be

23   kept confidential, then let me know and we'll ask Mr. Kaplan

24   to leave.

25             MS. YOST:  Thank you, Your Honor.  I will try to

1    keep it at a high level so maybe we won't need to do that.

2              THE COURT:  Okay.

3              MS. YOST:  The second preliminary issue that we

4    have is Your Honor might be aware that following all of the

5    briefing on both the motion to dismiss and on Purple's

6    preliminary injunction motion, Purple filed two supplemental

7    briefs in the last week and then, of course, there was a

8    flurry of additional filings complaining.

9              The issue that we have particular concern about is

10   whether we're going to be discussing the evidence included

11   with those, quote, unquote, supplemental briefs today.  In

12   particular, one brief that we have concern about that was

13   filed late last week involved a former employee of GhostBed,

14   the former director of marketing, and we understand that it

15   has come to light in the last few days that it is possible

16   that Purple's counsel was communicating with that former

17   employee while she was a current employee at GhostBed, and

18   we would ask that Your Honor disregard that information at

19   this time.

20             THE COURT:  Well, let me rule on that.  Thank you.

21             There is a motion to strike and for sanctions.

22   That motion is denied.  I am accepting all of the

23   supplemental authority in the supplemental memoranda.  There

24   was supplemental authority provided to the Court by your

25   client, I think --

```
 1              MS. YOST:  Yes, Your Honor.

 2              THE COURT:  -- if I am not getting the defendants

 3    mixed up.

 4              You are GhostBed?

 5              MS. YOST:  That is right.

 6              THE COURT:  I'm accepting that and I am accepting

 7    the two supplemental submissions by Purple.

 8              MS. YOST:  Thank you, Your Honor.

 9              In particular, though, with that one declaration

10    of our former employee, Purple's counsel was communicating

11    with her while she was a current employee.  In other words,

12    Purple's counsel, we understand it, was communicating before

13    she left her employment, which we understand, at least in

14    Utah, is an ethical violation.

15              THE COURT:  You have gone over that already and I

16    have denied any request to not consider it.  If you want to

17    bring that up later -- I didn't see that in any written

18    motion to strike.

19              MS. YOST:  No, Your Honor.  It just happened in

20    the last few days.

21              THE COURT:  Right.  You're telling me that today?

22              MS. YOST:  Is just happened.  This declaration was

23    submitted by Purple a few days ago.

24              THE COURT:  I know, but you had time to refer to

25    it in a footnote in your motion to strike the other
```

1    declaration.

2         MS. YOST:  No, Your Honor.  I am sorry.  Our

3    co-defendant filed that paper.

4         THE COURT:  Well, now I am getting confused.

5         MS. YOST:  I apologize if I confused you.

6         THE COURT:  I didn't see anything from you that

7    delivered this information that you are delivering today.

8         MS. YOST:  Right.  It just came to light.

9         THE COURT:  That won't cause me to not allow that

10   declaration to be considered today in connection with both

11   your motion to dismiss and in connection with their motion

12   for a preliminary injunction.

13        MS. YOST:  Thank you, Your Honor.

14        THE COURT:  Thank you.

15        MS. YOST:  Turning to the substance of GhostBed's

16   motion to dismiss, and I would like to primarily spend my

17   time talking about the jurisdictional issue.  GhostBed, as

18   you know, Your Honor, has moved to dismiss on the basis of a

19   lack of personal jurisdiction over GhostBed.

20        Turning first to the question of general

21   jurisdiction, which Purple has alleged exists here, as set

22   forth in the papers and in detail and, of course, in the

23   declaration of our C.E.O., Marc Werner, GhostBed has no

24   physical presence in Utah.  As Your Honor is aware, Purple

25   has sued three co-defendants that reside in Florida, and all

1     of the action, of course, in this case has taken place in

2     Florida.

3          As we set forth in our paper, we don't have any

4     offices in Utah.  We have no bank accounts in Utah.  We have

5     no travel into Utah for business purposes.  Truly there is

6     no home here in any meaningful sense.  These facts are

7     undisputed, and the facts set forth in Mr. Werner's

8     declaration are also undisputed.

9          Purple's opposition to our motion points to four

10    specific items in support of their contention that this

11    Court has general jurisdiction over GhostBed here.  First is

12    a small number of product shipments to Utah of GhostBed's

13    own products, which are not at issue in this litigation, and

14    those shipments were to addresses that were final addresses

15    in Utah itself.

16         Purple also points to GhostBed's registration of

17    warranties for some of those same products that were shipped

18    to Utah, a couple of communications with Utah consumers, or

19    at least communications over Facebook where the poster was

20    identified as sitting in Utah at the time of the

21    communication, and I think there were two or three of those.

22         Finally, they point to national Internet

23    advertisements that GhostBed makes on its own website and

24    through social media that were available anywhere in the

25    country.

```
 1              I would assert, Your Honor, that none of these
 2     show that there is a substantial and continuous connection
 3     between GhostBed and Utah that is required here for general
 4     jurisdiction.  While it is true that GhostBed does in fact
 5     advertise and sell its own products over the Internet and
 6     through its website, that website is equally available to
 7     all consumers in the country and, in fact, throughout the
 8     world.  Customers log in and order products through the
 9     website and in fact they can ask questions about the
10     products.
11              It is also true that through its website GhostBed
12     and its affiliate company have shipped a certain number of
13     products into Utah, but those sales, as set forth in the
14     papers, amount to roughly one percent of GhostBed's total
15     national sales, an incredibly small number in the grand
16     scheme of things.
17              GhostBed has also received truthfully a miniscule
18     number of warranty registrations from those Utah customers.
19     I believe Purple cited to three of them, which is also an
20     incredibly tiny number in the overall scheme of how many
21     warranty registrations GhostBed receives.
22              I believe that Purple also pointed to two cases
23     where customers contacted GhostBed with questions.  Of
24     course, we note that that was folks reaching out to
25     GhostBed, not GhostBed reaching into Utah.  That is it.
```

1    That is all of the evidence we have in the record concerning

2    this issue.  I would submit one percent of GhostBed's total

3    sales, three warranty registrations and a handful of

4    communications with folks could not approximate the required

5    physical presence within the state that we need to find

6    general jurisdiction here.

7           The cases that have been cited in the briefs are

8    pretty consistent in saying that engaging in commence with

9    regular use of the forum is not in and of itself the kind of

10   activity that equals a physical presence in the state, and

11   certainly a website might subject the defendant to general

12   jurisdiction, but only when we have actually and

13   deliberately engaged in a substantial number of sales such

14   that we can say that a defendant like GhostBed is actually

15   operating here and availing itself of Utah's laws,

16   essentially conceding that the numbers that we're talking

17   about here, particularly with respect to GhostBed's sales,

18   the customers are tiny, and Purple cites in its opposition

19   to a handful of cases that have found a defendant to be

20   subject to general jurisdiction in Utah when there have been

21   sales of their own products to customers.

22           Now, in all of those cases the number of sales

23   were substantial, and in the two particular cases that

24   Purple cited in its brief, not only were their sales of the

25   products into Utah, there are also additional indicia of

1   operating in Utah.  In fact, one case is the Icon Health

2   case, and they not only had a defendant who was selling

3   product into Utah, but they attended trade shows, they made

4   a large amount of sales, they had a network of distributors

5   locally here, and then had those folks go through a rather

6   extensive application process.  Of course, none of those

7   facts are present here.  The only thing we have here, again,

8   is barely one percent of the national sales that end up here

9   with final shipment addresses.

10          In short, GhostBed's contacts we submit are not

11  sufficient for general jurisdiction.

12          At this point, unless Your Honor has any

13  questions, I will turn to specific personal jurisdiction.

14          All of the contacts that Purple has cited in

15  connection with general jurisdiction of course need to be

16  put aside, because none of those contacts have anything to

17  do with their actual claims in this case, which all arise

18  from a third-party website which is operated by our

19  co-defendants, and that is the honestmattressreviews.com

20  website.  All of the conduct we're talking about occurred on

21  the website or is related to statements about the website

22  and various social media.  GhostBed has submitted evidence

23  that it does not own this website and it does not operate

24  this website.

25          THE COURT:  I didn't catch any of that.

1          MS. YOST:  I am sorry, Your Honor.

2          GhostBed has submitted evidence in connection with

3     its motion that it does not own or operate this website.  I

4     think it is at this point undisputed that it does not own

5     the website.  It does not control it in any way, as set

6     forth in both the declarations of our C.E.O., Marc Werner,

7     and also our co-defendant, Ryan Monahan, who is, as

8     co-counsel undoubtedly will get up and tell you himself, the

9     owner and operator of that website.

10          All of the record evidence in fact shows that

11     Defendant Monahan is not an employee of GhostBed.  We have

12     actually had a lot of briefing on that issue in particular,

13     and Purple's complaint as filed alleged essentially that

14     Mr. Monahan was a GhostBed employee but that is not true.

15     We have had several declarations now in the record to that

16     effect from GhostBed and Mr. Monahan himself.

17          Mr. Monahan has also indicated in his briefs that

18     he has not received any consideration of any kind including

19     a salary or payments from GhostBed for his work on this

20     third-party website.

21          All of that being said, the complaint about

22     activity here has all been conducted, even if we accept that

23     it happened and it is true, by our co-defendant.  GhostBed

24     had nothing to do with that.  There are none of the contacts

25     we need with Utah with respect to specific jurisdiction and

1   that also connect to the actual claims at issue in this case

2   that would give specific jurisdiction over GhostBed.

3        One other issue that was raised in Purple's brief

4   on this particular issue was essentially saying that because

5   GhostBed knew in some respect that Purple was located in

6   Utah, and I believe it is a Delaware corporation, although

7   counsel can correct me if I am wrong, but it should know

8   that its actions would affect Purple in Utah and knowing

9   about that effect, that would subject it to specific

10  jurisdiction here.

11       THE COURT:  Well, they claim more than that.  They

12  claim that it was intended to affect and harm the business.

13       MS. YOST:  That is right, but there is no evidence

14  for that, Your Honor.  There is nothing to say that GhostBed

15  made any statement whatsoever.  There is no evidence that --

16       THE COURT:  Well, but their allegation certainly

17  is that GhostBed was complicit with Mr. Monahan and that

18  they were working hand in hand.

19       MS. YOST:  Even if that were true, Your Honor, and

20  we, of course, dispute that, and you're right that Purple is

21  alleging that there is some kind of a conspiracy here or

22  that GhostBed was encouraging these things to happen, and as

23  co-counsel undoubtedly will tell you, and even if all of

24  that were true and the conspiracy existed, the website that

25  we're talking about here is a passive commentary website.

1   If we look at the cases involving specific jurisdiction,

2   there is just not enough to hail us into Utah even under

3   those facts.

4           There have been allegations that we directed all

5   of this activity toward Purple specifically, and I'm sure my

6   colleagues will talk to you specifically about the website

7   itself, but my understanding is that the website actually

8   speaks to many, many different products.  It would be one

9   thing, and there have been cases where someone has derived a

10  completely specific website directed at one party, even if

11  the domain name and the entire thing had to do with one part

12  entity, but that is not the case here.  This is a review

13  website that looks at various products from various

14  companies.

15          Certainly the passiveness of this commentary alone

16  would, as I am sure my colleagues will speak to, not give

17  rise to specific jurisdiction here under the same case law,

18  that we need more, we need more in Utah, and it would be

19  more appropriate, if that is the case, that all of this

20  activity which occurred in Florida and all of the defendants

21  reside in Florida, deal with that in Florida.

22          Turning quickly to the question of the burden here

23  on GhostBed and whether jurisdiction here is consistent with

24  fair play and substantial justice, as I mentioned GhostBed

25  is a Delaware corporation and its headquarters are in

1    Florida.

2            THE COURT:  When you attached Exhibit 3 to your

3    reply, and in it you're making the same argument you just

4    made to me here orally, and you say that the Honest Reviews

5    website does not rate GhostBed anymore highly than it rates

6    several other mattress companies.

7            Right?

8            MS. YOST:  That is true, Your Honor.  Yes.

9            THE COURT:  And then as I scroll through this,

10   there are multiple pages rating all of the different

11   mattresses.  When I get to the last page we get to Purple.

12   Of all of the ratings, that is the only one that has three

13   X's.  Do you see that?  I'm holding it up here.  So we're on

14   really the same page --

15           MS. YOST:  Yes, Your Honor.

16           THE COURT:  So you're going to stand there and

17   tell me, and I'm only speaking to their allegations, that

18   this is not directed at just seriously harming one company?

19           MS. YOST:  Your Honor, as far as --

20           THE COURT:  It is the only company that gets X's.

21   In fact, no other company even gets one X.

22           MS. YOST:  Certainly, Your Honor.

23           As far as I understand what the X's mean, and my

24   co-counsel can speak to that, but I understand that the X's

25   were put here after the compliant was filed by Mr. Monahan

```
 1   in response to being sued by Purple for expressing his
 2   opinion about the mattress.
 3                THE COURT:  Well --
 4                MS. YOST:  Certainly my co-counsel can correct me
 5   if that is wrong.
 6                THE COURT:  The X's mean poor and they are poor in
 7   every category.
 8                MR. RANDAZZA:  Your Honor, she is correct.
 9                THE COURT:  I can hear from you, sir, later.
10                I'm just going to your argument that you're
11   saying, well, it is a website and Honest Reviews is just
12   doing what it says it does, honest reviews, but when you
13   look at that, that is at least some evidence that they are
14   singling out one company, and you are saying that they did
15   it only because they got sued?
16                MS. YOST:  There is a blog post on this --
17                THE COURT:  Only because Purple sued GhostBed and
18   the Honest Reviews website owner.
19                MS. YOST:  Let me unpack that.  Mr. Monahan, who
20   operates this website, I believe posted these three X's
21   after the complaint was filed because Purple sued him.  It
22   had nothing to do with GhostBed.  We didn't tell anyone to
23   put X's anywhere.
24                THE COURT:  Well, of course --
25                MS. YOST:  These three --
```

THE COURT: Let me interrupt you.

You say that and you keep saying that GhostBed had nothing to do with this. In light of this most recent declaration of Ms. Anderson, and their allegations all along have been that GhostBed had everything to do with this, and --

MS. YOST: You are right, Your Honor, that --

THE COURT: -- that they and Mr. Monahan are working hand in hand to ruin their company. That is essentially their case. You want to talk today about how few sales percentage-wise GhostBed has in Utah and all of this, but when we get right down to the nub of this case, they are saying that GhostBed is complicit with Mr. Monahan, and I know I am repeating myself, reaching into Utah to attack a Utah company, and it may be incorporated in Delaware, but I don't think there is any dispute that it is a company that is headquartered here and has its main operation located in Utah.

That is what I need to grapple with, and based on taking their evidence in the light most favorable to them, to see if they have at this early -- it is not that early in this case, but this relatively early stage of the proceedings, whether they have made a prima facie case that your client, if their allegations are correct, and if they have enough allegations to support them, does not violate

```
 1    traditional notions of fair play and substantial justice and
 2    meets the other requirements of Utah's Long Arm Statute.
 3    That is what I need to focus on.
 4            MS. YOST:  Absolutely, Your Honor.
 5            If I could make three brief points in response to
 6    that, first, and just turning back to this website quickly,
 7    from what I understand from earlier filings in this case,
 8    Purple actually had a fairly good review on Honest Mattress
 9    Reviews, and then Mr. Monahan, and this is what I understand
10    from the pleadings, contacted them to ask questions about
11    certain powders that were in their mattress and didn't
12    receive a response, and then changed those good reviews
13    basically to say in blog posts, and I'm happy to go find
14    those particular posts for Your Honor, and I believe they
15    were filed as exhibits in response to the original T.R.O.
16    motion that Purple filed, but changed those because he felt
17    that he was not receiving a significant serious response
18    from Purple about his questions about their product and then
19    changed the response.
20            THE COURT:  I understand that side of the story,
21    and I heard that during the earlier briefing and argument on
22    the T.R.O. which I dissolved, mainly, or at least in
23    significant part, because I didn't see a connection between
24    GhostBed and Mr. Monahan and was operating with respect to
25    an argument that free speech should prevail so long as it is
```

1   something approaching fair free speech, and buying at least

2   that there was an argument, a credible argument it appeared

3   to me, and not assessing the credibility of witnesses, but

4   assessing the weight of the evidence that Mr. Monahan was

5   operating independently and that there was some basis from

6   an expert that maybe this powder was causing the kinds of

7   harms he wanted to claim it caused.

8          But in light of this most recent declaration of

9   Ms. Anderson, she says that Mr. Werner and Mr. Monahan were

10  working together very closely, and I'm sure you have read

11  the declaration, and that Mr. Werner, your client, would go

12  on rants about Purple and this powder.  I'm sure Mr. Magleby

13  is going to tell me when he stands up that that shows that

14  there was absolute collusion between what Honest Mattress

15  Reviews was stating and what Mr. Werner wanted it to state.

16         MS. YOST:  Yes, Your Honor.  I agree that looking

17  at Ms. Anderson's declaration, the first round it looks

18  concerning, it does, but if you dig down into what she

19  actually says, I think you'll see that what she does not say

20  is more important.

21         What she does not say is that GhostBed and Mr.

22  Monahan had anything to do together with respect to the

23  website that is at issue in this case.  She does not say

24  that GhostBed paid Mr. Monahan to create the website.  She

25  does not say that GhostBed had anything to do with the

```
 1    content on the website.  She makes no factual statement that

 2    GhostBed had any relationship whatsoever to the website that

 3    is at issue in the complaint here.

 4          While I understand Your Honor's reaction, which

 5    was the same as mine, which it looks like there is an

 6    internal employee who is blowing the whistle on something

 7    that she is concerned about, she also threatened the C.E.O.

 8    when she knew she was going be fired that she would go off

 9    and do activities like this that would damage the company.

10    In fact, she called counsel before she left the company to

11    give that information to them, you know, without going

12    through management or their counsel or anything else.

13          Now, I am sure that discovery we'll get into the

14    veracity of Ms. Anderson's statements, but very specifically

15    with respect to her evidence, it does not give us the

16    connection that we are looking for.  She does not say I saw

17    checks go out to Mr. Monahan, or I saw checks being sent to

18    Honest Reviews.  She was the director of marketing,

19    remember.

20          Now, she is the woman who is in charge of

21    GhostBed's outward facing advertising, and if anyone would

22    have information about these payments she would be able to

23    testify to it and she didn't because it does not exist.

24          THE COURT:  Well, she said that she thought he was

25    being paid under the table.  I guess we'll hear more about
```

1    that maybe later.  I don't know.  I just know that the

2    connection that she paints is entirely the opposite of what

3    I have been told by GhostBed's attorneys and Mr. Monahan's

4    attorneys before that declaration was filed.

5           MS. YOST:  Your Honor, with respect to the

6    connection, I want to be clear that we have been up front

7    since day one, since our first hearing in the case, that Mr.

8    Monahan was a consultant for the company.  He said that

9    specifically straight out in his declaration that was filed

10   before the last hearing on the T.R.O.  Mr. Werner said the

11   same thing.  There has never been a point in this case where

12   we have tried to hide the fact that Mr. Monahan was a

13   consultant with respect to certain GhostBed advertising on

14   Facebook.  Those are in the record and we have never tried

15   to hide that connection.

16           The connection that is relevant here, though, is

17   whether GhostBed has anything to do with Honest Reviews,

18   L.L.C., which is a separate company that Mr. Monahan has.

19   There is nothing, even in Ms. Anderson's declaration, and

20   even in the recent motion that was filed that draws that

21   connection.  Certainly what Mr. Monahan does in his spare

22   time, even if he worked on other projects with GhostBed,

23   cannot be just flatly imputed to GhostBed despite the fact

24   that they had a relationship.

25           The point here is Purple is trying to say, look,

```
1    there is smoke and, therefore, there must be fire.

2         THE COURT:  In Mr. Werner's, your client's

3    declaration, which I assume you knew about, in paragraph six

4    he says GhostBed does not have any affiliation whatsoever

5    with co-defendants Honest Reviews, L.L.C or Mr. Monahan.

6         MS. YOST:  I will pull up the declaration.  I am

7    confident, sir, that the declaration goes on to discuss the

8    fact that Mr. Monahan is an advertising consultant for

9    GhostBed.

10        THE COURT:  I think he says that but that is a

11   pretty straight statement.  He says no affiliation with Mr.

12   Monahan.  Disputed facts, and that is what cases are all

13   about, I suppose.

14        MS. YOST:  Yes, Your Honor.

15        If you don't mind, I would just turn briefly back

16   to the jurisdictional issue very quickly.

17        THE COURT:  I thought that is what we have always

18   been on.

19        MS. YOST:  Yes.

20        THE COURT:  I hoped.

21        MS. YOST:  That is right.

22        Again, regarding GhostBed's burden specifically,

23   because all of the witnesses and the activity, even if true,

24   even if all of this is true and even if the conspiracy is

25   true and even if we assume that, all of the activity took
```

1    place in Florida.  All three of the co-defendants are in

2    Florida.  The witnesses, including Ms. Anderson, who Purple

3    now relies on, is in Florida.  The documents are in Florida.

4    There is nothing other than Purple in Utah.  At this point

5    it seems that venue would be more appropriate now in

6    Florida.

7              THE COURT:  Before we get off your other argument

8    on jurisdiction, could I ask you this, because I was

9    intrigued by something you wrote in your reply brief.  You

10   say on page 3 even if we assume for the sake of argument

11   that GhostBed targeted Purple, a Utah business, Purple must,

12   nevertheless, show that Utah as the forum state was the

13   focal point of the alleged tort.  Then you cite a Tenth

14   Circuit case, a 2008 case, and you quote from it.  Some

15   courts have held that the expressly aimed portion of Calder,

16   which was the Supreme Court case, is satisfied when the

17   defendant individually targets a known forum resident.  We

18   have taken, and then there are ellipses, and I don't know

19   what is left out and I have not read it, but we have taken a

20   somewhat more restrictive approach holding that the forum

21   state itself must be the, quote, focal point of the tort.

22   We have more than a tort alleged here.

23              Anyway, I find that intriguing.  What is it that

24   you think that means, because the plaintiff's case here

25   clearly alleges that the focal point of the alleged

1    misconduct was against Purple, a Utah based business, but

2    you tell me that I need to look more at whether the

3    activity, even if the allegations are true, was directed at

4    the forum state.

5          Do you understand that difference, because I'm not

6    sure that I do?

7          MS. YOST:  Absolutely, Your Honor.

8          I think very succinctly what the Court is saying

9    here is the fact that Purple happens to be here, and it is

10   not headquartered here, but --

11         THE COURT:  Not happens, is here.

12         MS. YOST:  Has a facility here.

13         THE COURT:  Right.  They are directing their

14   wrongful conduct, if you assume that that is true for a

15   second, and I am asking a legal question, so what does that

16   mean that it has to be directed at the forum state?

17         MS. YOST:  I think it needs to be something more

18   than just the plaintiff in this case, that there has to be a

19   specific Utah connection, Utah consumers and Utah

20   advertising.

21         I think in the context, for example, of the Calder

22   case, what the Court was talking about there -- of course,

23   there was Ms. Jones who was allegedly the focal point of the

24   tort, but what the Court considered was that in California

25   and in the industry that she was in, Hollywood was the

1    broader focal point there.  I don't think that here we have

2    a mattress industry or something that apart from Purple has

3    any impact whatsoever on Utah.

4           To my knowledge, and I'm sure counsel will correct

5    me, I have not seen Utah consumers, for example, commenting

6    to GhostBed or to Mr. Monahan that --

7           THE COURT:  So you need something more than just

8    the fact that Purple is operating out of Utah.  What is that

9    something more, that the State of Utah is somehow a big

10   mattress state?

11          MS. YOST:  That is the one example I thought of,

12   Your Honor, and perhaps the plaintiff can think of others,

13   but I think there needs to be something beyond the fact that

14   the facility is located here, that the alleged conduct

15   focused on turning the minds of Utah consumers, for example.

16   I am now going down a path of hypotheticals that I have not

17   given too much thought to, but I think the idea is that the

18   facility is here and Purple is here, but unilateral conduct

19   or the existence of Purple in and of itself in the state is

20   not sufficient, at least in that case.  What we're looking

21   for here is something else, something that gives us the hook

22   into Utah beyond that.

23          Unfortunately, I don't have a great second or

24   third case to cite to you off the top of my head that

25   explains that in any helpful way, but I will ponder on it as

```
 1   we move forward.

 2             THE COURT:  Okay.

 3             MS. YOST:  Unless you have any other questions --

 4             THE COURT:  I don't.  Was your motion joined in by

 5   Mr. Monahan?

 6             MS. YOST:  Mr. Monahan has his own motion, but it

 7   is probably quite a bit along the same lines.

 8             THE COURT:  So next I guess then I'm going to hear

 9   from Mr. Randazza.

10             Did I say that right?  Randazza or Randazza?

11             MR. RANDAZZA:  Either one is okay, Your Honor.

12             THE COURT:  Which way do you --

13             MR. RANDAZZA:  Randazza.  The Z is as in pizza.

14   Randazza.

15             THE COURT:  Thank you.

16             MR. RANDAZZA:  Sure.

17             Yes, Your Honor, our motion is quite similar so

18   I'm not going to run over any of the same ground unless Your

19   Honor would like to do that.

20             I would like to pick up with perhaps some of your

21   questioning of Ms. Yost when it came to what is this test,

22   because a number of years ago we had, of course, Calder vs.

23   Jones, the Supreme Court test that said that personal

24   jurisdiction was reasonable in a defamation case.  In that

25   case because Ms. Jones lived in California, and the National
```

1   Inquirer was in Florida, but they knew that Ms. Jones lived

2   in California, but also the focal point of her life was

3   centered in California and the focal point of her industry

4   was centered in California.

5          I believe that this case would not rise to the

6   Calder level, but we have a higher standard here in the

7   Tenth Circuit, and we have a higher and more developed

8   standard now just over the past couple of decades.  The test

9   here essentially was developed from a Fourth Circuit case

10  called Young versus New Haven Advocate which had some

11  similarities.  The New Haven Advocate wrote an exposé on

12  prison conditions in a certain prison in Virginia.  Now,

13  with that fact pattern -- Young, just for the record, is 315

14  F3rd, 256, Fourth Circuit, 2002.

15         Now, in that case you might say, well, how could

16  The New Haven Advocate not have known that Mr. Young worked

17  at this certain prison in this certain town inside of the

18  confines of the State or Virginia?  Well, they did, but that

19  is not really what Calder was about and Young versus The New

20  Haven Advocate made that clear.  You are not saying is the

21  story merely about Virginia?  It is are you targeting

22  Virginia with the allegedly tortious activity?  Perhaps if

23  it were, I would say a newsletter for the sheriff's union in

24  Virginia, that would be targeting that audience.

25         So the Tenth Circuit in Dudnikov versus Chalk and

1    in Shrader versus Biddinger relied on Young versus The New

2    Haven Advocate and made it clear that this circuit has a

3    Calder plus test.  You really have to be doing something

4    else.  They said in Biddinger that there needed to be

5    indications that a defendant deliberately directed its

6    message at an audience in the forum state and intended to

7    harm the plaintiff occurring primarily or particularly in

8    the forum state.

9           Perhaps if this were a story about Senator Hatch

10   and aimed at this hometown, aimed at an audience here trying

11   to get them not to vote for him, for example, that, I say,

12   would probably satisfy the test.  But what we have here is

13   we merely have a review cite talking about dozens of

14   companies.

15          To direct this to the factual inquiry that you had

16   with Ms. Yost, before this case, yes, Purple was actually

17   rated quite well on the cite.  In fact, there is evidence in

18   the record from our prior hearing that Mr. Monahan or Honest

19   Mattress Reviews promoted Purple.  Purple had a kick-starter

20   campaign in order to raise money to create a new product.

21   Mr. Monahan, prior to believing that there was any question

22   here, actually promoted that product and promoted that

23   campaign to help them fund raise.  He didn't do that for

24   pay.  He just did it because he believed that this was a

25   company he wanted to support.  He liked the company before

1    he made the one inquiry, what is this powder?

2            Now, when he made the inquiry and he got the

3    runaround, he started to get suspicious.  Now, I don't know

4    if I would have done the same, but that is not the question.

5    If a journalist asks someone a question and they are evasive

6    about the answer, that tends to be like chum in the water to

7    a journalist.  That is what started to hurt their ratings,

8    that they were not being transparent about what was there.

9            Now, a lot of this that we're looking at is new

10   evidence created after the fact and after the suit.  I don't

11   really see anything that is specifically problematic when a

12   journalist gets sued and then decides perhaps this company

13   is suing me to silence debate on their product, that maybe

14   there is something wrong with the value of that product.

15           We also talked about and we see in the record that

16   they have now produced somebody who came to the conclusion,

17   in their opinion, that the powder is not dangerous, in

18   conflict with our expert who says it very well might be.

19           Now, this is not a products liability case.  I

20   don't need to prove that there is something wrong with this

21   powder and that it could cause health problems.  However, I

22   can say that after talking to our expert, I wouldn't put my

23   children on it.  It does have what is known as

24   nanoparticles, particles that are of such a small diameter

25   that they will pass into the bloodstream.  Now, that is

1    something, whether it is dangerous or not, even if it is

2    helpful to your health, wouldn't a consumer want to know

3    about that?  That is the nexus of all of this.  I don't see

4    anything here, and if we were aiming at perhaps the skiing

5    industry out here, then that would be a different story, but

6    here you don't have that.

7            What we do have are three defendants, all in

8    Florida.  What we do have also are two more parties that are

9    in the mix now that are also based in Florida.  They are not

10   defendants, but they have been served with subpoenas.  I

11   have at least been served with one letter objecting to the

12   subpoena from an attorney in Florida.  I have heard nothing

13   from the other ones.

14           Now we have five parties in Florida.  I am sorry,

15   Your Honor, we have six parties, because we're also adding

16   this former employee of GhostBed, so now we have six parties

17   in Florida that all have some connection to this, a Delaware

18   corporation with a facility in Alpine, Utah.

19           If we look at this Calder plus test that the

20   Circuit here looks at, I don't think that we have the

21   specific aiming that you need in order to satisfy it.  Now,

22   of course, Your Honor has a choice to make, whether if the

23   motion is well taken or not, to either dismiss the case and

24   let them refile it or to transfer it.  I think that would be

25   more to the 12(b)(3) argument that venue is certainly much

1    more proper in south Florida, for the very reason that we do

2    have these now five or six parties that are going to be

3    involved in discovery disputes and that have to be deposed

4    and that have to be responding to this case, and I don't see

5    what we are doing out here, as lovely as it is.

6            Now, the other issue that I would like for Your

7    Honor to take into account is the supplemental authority

8    that was submitted.  The Bristol-Myers case -- we are not

9    just looking at the old Volkswagen test of fair play and

10   substantial justice, that speaks to an equitable analysis,

11   but in Bristol-Myers, 137 Supreme Court, 1,773, very recent,

12   it instructs us that the issue is not one of mere equity but

13   one of federalism.  I think that that is probably an even

14   more important principle than we have here, because if we

15   change our seats and we look at this through the eye of

16   federalism, and we think about any consumer review cite

17   anywhere in the country, would it have to per se be subject

18   to jurisdiction being sued anywhere that it reviewed

19   anything if that is where that item was perhaps

20   manufactured?

21           So a health magazine that talks about maple syrup,

22   are we all going to Vermont for any case involving that if

23   there is a dispute over that?  Any car manufacturer, and if

24   anybody wants to write about the Tesla they are going to go

25   to northern California whether they like it or not.

1    Meanwhile each individual in each individual state has a
2    certain degree of free speech protection that they are
3    accustomed to because they are in that separate sovereign,
4    they are within the confines of that state.

5           Now, here we have a bit of a choice of law issue
6    to look at, because in this case I think the most
7    significant relationship to this matter would be Florida.
8    The Lanham Act analysis is going to be the same anywhere,
9    but the defamation analysis, I think that this Court would
10   likely see that the choice of law should be Florida.

11          We have a slightly different standard in Florida
12   and we have slightly different requirements in Florida.  We
13   have an anti-S.L.A.P.P. in Florida.  Just recently there was
14   the Diamond Ranch versus Filer case from this very court
15   that said that the California anti-S.L.A.P.P. law would be
16   applied to a defamation case in this state when you had an
17   out of state defendant.

18          So given all of those issues, and if we look at
19   the federalism issues, I think it makes it clear that even
20   if Your Honor were to find that somehow this case gets over
21   this Calder plus test, that federalism would require a
22   transfer at the very least.

23          THE COURT:  Thank you, Mr. Randazza.

24          MR. RANDAZZA:  Thank you, Your Honor.

25          THE COURT:  Mr. Mableby.

```
 1              MR. MAGLEBY:  Thank you, Your Honor.

 2              As the Court has noted, there have been some

 3   important and critical developments since the last time we

 4   were here, and so upon the discovery of substantial

 5   additional evidence and upon obtaining the as yet

 6   unchallenged safety studies proving that Purple's products

 7   are safe and that Mr. Monahan's messages are false, we filed

 8   the second T.R.O. and preliminary injunction motion, which

 9   addresses the concerns that you have now summarized for us

10   that you had in dissolving 5he original T.R.O.

11              We are in a completely different universe, but

12   then after we filed the second injunction motion, something

13   pretty incredible happened, and that is GhostBed's former

14   employee reached out to us through her uncle who is a

15   lawyer.  We did not talk to her about anything substantive.

16   In fact, I am not sure we talked to her at all until after

17   she had left GhostBed.

18              She has an incredible story to tell.  She confirms

19   the kinds of things that in most cases are never

20   demonstrated by evidence, because people hide and lie about

21   them and people keep these kinds of things out of writing.

22   Let's remember that Ms. Anderson was GhostBed's director of

23   marketing.  She was in fact identified by GhostBed in Marc

24   Werner's declaration, which you talked about in paragraph

25   six, which he filed in March of 2017, and which clearly the
```

```
 1   Court gave the benefit of the doubt to when the Court
 2   dissolved the T.R.O.
 3          She comes forward and says I quit because I didn't
 4   want to lie.  GhostBed's C.E.O. had me destroy and hide
 5   evidence.  GhostBed's C.E.O. has lied to the Court.  She got
 6   her hands on Mr. Werner's declaration.  We didn't give it to
 7   her.  That caused her a great deal of concern, including
 8   also the fact that Mr. Werner was attributing everything to
 9   her as the director of marketing when, in fact, Mr. Monahan
10   is the one that ran the show.
11          There is so much new evidence relating both to the
12   T.R.O. and to the motion to dismiss that it is hard for me
13   to summarize, but let me put it into an if then hypothetical
14   that applies to all of the motions.
15          So if a competitor conspired with its employee or
16   its consultant to create a fake website which claimed to be,
17   quote, independent and unbiased, with the purpose of the
18   site to knowingly make false statements about things like
19   cancer and poison and inhaling poison and asthma, and then
20   on top of that to go out and launch a concerted attack
21   across social media, pushing that false message, generating
22   hundreds of thousands or in one case I will talk about, Your
23   Honor, 1.7 million impressions with the goal of harming the
24   competitor, and if those same parties conspired to conceal
25   and destroy evidence of the connection, and if those same
```

1   parties submitted false statements to the Court, then would

2   there be jurisdiction?  Would a plaintiff be able to state a

3   claim?  Would there be grounds for a T.R.O. or an

4   injunction?

5           Of course the answer to all of that is yes.  I

6   pose that hypothetical because I am going to miss something

7   in this discussion, and I kept saying to myself how do I put

8   this all into one package that is easy to understand?  If

9   you look at it through that framework, everything is pretty

10  quickly decided.

11          Now, the three motions to dismiss, and I thought

12  they were tough motions when the defendants filed them, and

13  with the newly discovered evidence, the facts and the law

14  are just so clear that we do have jurisdiction at this early

15  stage, and it is clear to me that Your Honor understands

16  this very well down to paragraph six of the Werner

17  declaration.  So I am facing that situation when I know that

18  the Court is very, very familiar with the facts, but I am

19  compelled to run through some of them because this is an

20  extremely important issue for my client.  If you do not find

21  jurisdiction, then we do not get to the merits of the

22  preliminary injunction motion, and the defendants will have

23  succeeded in buying themselves another 30, 60, 90, 120 days

24  in which to continue to do horrendous damage to my client.

25          We see this as essentially a bet the company case.

1    I will talk about that when I talk about the irreparable

2    harm, because it has gotten so bad that it is magnitudes

3    worse than it was the last time we were here.

4         Let's talk about jurisdiction.  The first big

5    point, of course, is that Ms. Anderson's declaration is a

6    game changer.  We have new evidence of a conspiracy to harm

7    Purple, to hide and destroy evidence, to mislead the Court,

8    to intimidate and threaten witnesses and essentially suborn

9    perjury.

10        What Ms. Anderson has done is she has not only

11   confirmed evidence that was before the Court but, as you

12   pointed out, she also confirms the allegations, and she

13   confirms the inferences that we were going to ask you to

14   draw in denying the motion to dismiss and granting the

15   preliminary injunction, which you can do.  The Court can, of

16   course, draw reasonable inferences, particularly in

17   situations where as here nobody is going to admit to what

18   they did.  That is what circumstantial evidence is all

19   about.  She has actually confirmed a great deal of that.

20        Let me walk through some of the points in Ms.

21   Anderson's declaration and we'll talk about the significance

22   to these issues.  The first and the incredible thing that I

23   want to talk about is paragraphs 25 to 30 where she details

24   how GhostBed tried to destroy and hide evidence.  Here is

25   the really interesting thing, Your Honor.  They have had

1  this for about ten days, so a long time, and Mr. Werner has

2  not submitted a declaration contradicting Ms. Anderson in

3  any way or attempted to explain it away.

4         Frankly, I was surprised.  I expected we would get

5  a declaration which I was pretty sure would be packed full

6  of lies, but I thought we would get that.  And then it

7  occurred to me that because Mr. Warner had already perjured

8  himself, and we have proof of that, and because GhostBed's

9  lawyers are now retreating from some of the statements,

10  including in particular the one that you pointed out, and

11  they retreat from it in footnote one of their reply, and

12  maybe Mr. Warner made a calculation and said Ms. Anderson's

13  declaration was really bad for us, but, holy cow, if I

14  submit another false declaration I might actually get in

15  real trouble.  My point to the Court would be he ought to be

16  in real trouble.

17         He does not deny what Ms. Anderson says about

18  destroying or hiding the evidence and telling her to scrub

19  Mr. Monahan's presence from the Internet, which we had

20  already discovered and presented to you, which they tried to

21  point out was something innocent, and then confirming that

22  this was with ill intent when he asked for a list of the

23  vendors internal to GhostBed and says scrub his name from

24  that.

25         They have this argument of, gee, it was an

1    accident when Mr. Monahan said this to the public.  Well, if

2    that is just a mistake in what you say to the public, okay,

3    maybe you go and scrub it from the public, and I don't think

4    you really do, but why would you need to scrub it from the

5    internal documents?  Because GhostBed is in a lawsuit with

6    Casper and Mr. Werner is a sophisticated litigant and he

7    wants to hide that evidence and he tells Ms. Anderson Ryan

8    does not exist.

9         Note the timing.  It is shortly after she starts

10   and about the same time that he launches the Honest Mattress

11   Reviews website because they know what is coming.

12        Ms. Anderson goes on to talk about the false

13   statements made by Mr. Werner.  I will talk about those in

14   conjunction with the injunction motion.  There are also

15   additional false statements that have been given to the

16   Court.

17        She also talks about how Mr. Werner threatened to

18   sue her without mercy.  I'm not a criminal lawyer, Mr.

19   Kaplan is and maybe I will ask him, but to me it sounds a

20   lot like witness tampering or suborning perjury.  He is

21   basically saying to you keep your mouth shut.

22        Then, contrary to what GhostBed has represented to

23   the Court, she confirms not only that Mr. Monahan was the

24   marketing guy at GhostBed, but that he currently is.  I

25   expected their argument was going to be, well, he has not

1   been around since October, but he has been around and he

2   comes to the office.  Then contrary to what GhostBed told

3   this Court, Mr. Monahan created the blog post about the

4   injured GhostBed employee, and she identifies that the

5   Achieve relationship, which Ms. Yost talked about at the

6   last hearing and, oh, gee, there is this separation and we

7   have these different entities, and he is really a

8   consultant, that that actually has been maintained as a scam

9   to hide Mr. Monahan's direct relationship with GhostBed and

10   as a defense to the Casper lawsuit.

11          Then contrary to paragraph six where Mr. Werner

12   tells you under oath that I have no affiliation whatsoever,

13   I mean, these are words without wiggle room, right, and then

14   Mr. Monahan goes to dinner at Marc Werner's house and they

15   talk on the phone every day and he provides all of these

16   services to GhostBed.

17          She believes that Mr. Monahan is paid under the

18   table because Mr. Werner complains about what Achieve pays

19   him and gives Mr. Monahan credit for the success of the

20   company and Purple is a constant topic at the company.  Mr.

21   Werner goes on tirades about the powder to the employees,

22   about how it is talc and it causes cancer, which is, of

23   course, undeniably false.

24          Then, lo and behold, as we'll talk about, GhostBed

25   employees are telling people in chat messages that Purple's

```
1    products cause cancer and cause them to cough up blood.  Why

2    is that relevant to the jurisdiction motion?  Well, because

3    if you are engaged in a conspiracy, all of the contacts of

4    your co-conspirator are attributed to you.  So Mr. Werner

5    has very cleverly, carefully and consciously tried to

6    separate himself from Mr. Monahan.  We cite to you a couple

7    of cases, one from the District of Kansas and the other one

8    from the District of Mexico that say, look, if you're a

9    co-conspirator and your contracts are attributed to the

10   other co-conspirator for obvious reasons --

11              THE COURT:  You need to slow down.

12              MR. MAGLEBY:  I'm sorry.  I will.

13              THE COURT:  Thank you.

14              MR. MAGLEBY:  I get so nervous that I'm not going

15   to get it all in and that I am boring the Court.

16              THE COURT:  Did you say District of Mexico?

17              MR. MAGLEBY:  Yes.  The District Court of Kansas

18   and the District of Mexico --

19              THE COURT:  New Mexico.

20              MR. MAGLEBY:  Sorry.  New Mexico.  No, I am not

21   citing Mexican law.  I can say I have never done that.

22              Okay.  Slowing down.

23              THE COURT:  Getting around to the jurisdiction

24   issue --

25              MR. MAGLEBY:  Yes.
```

```
 1                THE COURT:  -- and Mr. Randazza addressed it, and

 2      maybe better than Ms. Yost, but she addressed it too, but I

 3      need to know, okay, if I give you all of your ifs, and

 4      you're stating your case from your point of view --

 5                MR. MAGLEBY:  Yes.

 6                THE COURT:  -- but I need to know, and maybe these

 7      two cases will help me, but I need to understand this Calder

 8      plus test, which they are referring to, Calder plus.

 9                MR. MAGLEBY:  Sure.

10                THE COURT:  If we assume everything that you're

11      alleging is true, that Mr. Monahan was working directly with

12      Mr. Werner and GhostBed to try to kill the competitor, which

13      is the theory of your case --

14                MR. MAGLEBY:  Yes.

15                THE COURT:  -- and that competitor is

16      headquartered in Utah.  That is where Purple mattress is,

17      right?

18                MR. MAGLEBY:  Yes.

19                THE COURT:  Even though they are a Delaware

20      corporation, is that enough to bestow personal jurisdiction?

21      I don't think that you have general jurisdiction so get past

22      that.  I don't think that that is even a close call.

23      Personal jurisdiction is tricky always, and I don't know how

24      many, but in 25 years I have probably dealt with -- well, I

25      don't know, but dozens and dozens and they are always new.
```

1    You can take Calder versus Jones and take those facts, and

2    every case is different it seems like when you get into the

3    ones that get contested, but this is a little different, and

4    Mr. Randazza frankly made a pretty good argument.  He said

5    that you're going to need something that does more than just

6    target, and if I misstating him he will correct me, but --

7             MR. RANDAZZA:  Yep.

8             THE COURT:  You need more than just targeting a

9    Utah based company.

10            MR. MAGLEBY:  Yes.  Sure.  I'm happy to talk about

11   that.  What they are relying upon is the Dudnikov case, and

12   they cite that at the start of their reply and the argument

13   is the forum state must be the, quote, focal point of the

14   tort.

15            THE COURT:  The state, not the resident in the

16   forum state.

17            MR. MAGLEBY:  Forum state, right, must be directed

18   to the forum state and then what is the something more, your

19   question.  I wrote that down.

20            Now, what is interesting is the defendants forget

21   when they make that argument, or at least they do not

22   discuss the facts and the outcome of the Dudnikov case.

23   That case found jurisdiction.  It found jurisdiction and, as

24   you pointed out, the facts are always different and

25   interesting and every case is different, but they found

1    jurisdiction based on facts that are substantially less

2    compelling than the facts that you have here.  What I was

3    going to do was talk about the facts and then apply the law,

4    but I am now going to talk about the law and then apply the

5    facts.  I will talk about the Dudnikov case.

6         In that case what happened is a defendant sent a

7    cease and desist notice to eBay in California saying you

8    need to cancel an auction for I think it was a print or

9    fabric or something like that, and it was being sold by a

10   California resident, and it was a small business that sold

11   fabric through eBay.  That was their business.  By sending

12   that cease and desist letter to California, it caused the

13   cancellation of the auction in Colorado.

14        In addition, what that does is it puts a black

15   mark on your record.  So the Colorado business or persons, I

16   don't know if they were individuals or not, filed a lawsuit

17   in Colorado and the defendants made the exact same argument

18   that they do here in this case.  What the court said is,

19   look, they knew the plaintiffs were in Colorado, and they

20   intended that the auction would be canceled in Colorado, and

21   they knew it was going to have consequences.  What was

22   missing, among other things, is all of the evidence of ill

23   will, right, and conspiracy and false statements to the

24   court and everything else that I will talk about.  That was

25   all missing.

1          What the court focused in on was the intent.  If

2     you look at page 1,078 of the Dudnikov case, and I love that

3     name, by the way, it says that actions for the purpose of

4     having consequences felt in the forum state are more than

5     sufficient.  So what they want to do is elevate this test

6     into what is basically an impossible test, that somehow it

7     is an attack upon the State of Utah before the State of Utah

8     will have jurisdiction.

9          That is a vast overstatement of both the holding

10    and the law in the Dudnikov case.  The Dudnikov case talks

11    about this in several places.  I didn't think I would go

12    into this level of detail but I'm going to.  One of the

13    arguments that the defendants made was, well, wait, the

14    cease and desist letter went to California.  That is where

15    eBay was.  We didn't really know they were in Colorado, nor

16    did we intend the harm to be in Colorado, so Colorado is not

17    the focal point.

18         The court rejected that and came up with something

19    I thought was interesting and it is the backboard theory.

20    You go to do a layup and you throw the ball up and you

21    intend to hit the backboard, but you mean for it to go

22    through the basket.  They said, look, you send that to

23    California but you know that it is going to have

24    consequences in Colorado.  The defendants in that case made

25    the argument, well, gee, we didn't really know that they

1    were in Colorado.  The Court said I find that hard to

2    believe because you obviously found the site on the website

3    and you tracked them down to know who they were, and if you

4    had done any kind of an investigation you would have known

5    they were in Colorado, but even with that fact dispute, the

6    Court said I'm going to construe the facts in favor of the

7    plaintiff, whether or not they made a prima facie case, and

8    I am going to say you knew they were in Colorado.

9          Here they obviously knew that Purple was in Utah.

10   We have set forth all kinds of evidence about that,

11   including that they copied, cut and pasted videos and images

12   from Purple's site about taking a tour of the mattress

13   company in Utah.

14         Here are some other quotes from Dudnikov.  In

15   assessing the question of Purple's full direction, Calder

16   stressed the fact that the Inquirer defendants knew that the

17   brunt of the injury would be felt in the forum state.  I

18   think they also distinguish actually the case that --

19         THE COURT:  Where did the cease and desist letter

20   go, to a California company?

21         MR. MAGLEBY:  It went to a California address.  It

22   went to eBay.

23         THE COURT:  Right.  As you were explaining the

24   case I remembered it.  I reviewed it in some significant

25   detail in assessing another personal jurisdiction case.

```
 1                  Thank you.

 2                  MR. MAGLEBY:  Yes.

 3                  Anyway, if you review Dudnikow what you will come

 4       away with is the conclusion that we clearly meet that test

 5       because what was in Dudnikov was far, far less significant.

 6                  Now, let me talk a little bit about some of the

 7       additional facts regarding the contacts that were not

 8       present in Dudnikov, but which further support jurisdiction.

 9                  In particular, Mr. Monahan and H.M.R. purchased

10       Purple products from Utah.  We have found that they bought

11       at least one mattress on February 11, 2017.  And, of course,

12       they posted negative reviews about the mattress, and it is

13       not surprising that you would buy something if you are going

14       to review it.  When I talk about the Diesel Power case that

15       is an important fact, but this is actually pretty

16       interesting.

17                  Mr. Monahan started reviewing the Purple mattress

18       on September 10, 2016.  We don't have a record of him buying

19       the product before that, so the conclusion you can reach,

20       Your Honor, is that either Mr. Monahan bought more than one

21       for purposes of his reviews and his attacks on Purple, or

22       the reviews starting in September of 2016 were absolutely

23       fake because he never had a product.

24                  Now, there is one other possible explanation, and

25       that is maybe GhostBed bought the mattress for him and gave
```

1    it to him, but under any one of those three circumstances,

2    what you have is a situation of purposeful direction

3    combined with at least one purchase but maybe more.  Again,

4    that becomes significant because the purpose is not

5    unrelated to the causes of action.  It is central to them

6    and core to them.

7            In addition, he bought a Purple pillow and gave it

8    a bad review.  Again, we can't find a record of him buying

9    it, so either he bought it under a different name and

10   presumedly he will say he bought it before he gave it a

11   review, or else the review is completely fake and directed

12   to Utah.  Of course, as you pointed out, Your Honor, the nub

13   of this is the false and misleading statements, the attacks

14   on Purple in social media.  We have got all of that, but we

15   also have Mr. Monahan copying and pasting from Purple's

16   website over and over and over again and using those images

17   and the language to launch his attacks on Purple.  They are

18   core and central to his attacks.

19           He also, of course, re-posts take a tour through

20   Purple's mattress factory in Utah.  A sneak peek inside

21   Purple's mattress factory in Utah.  He says that he spent

22   months trying to reach different members of Purple's team

23   but to no avail.  That is part of his argument, that Purple

24   is nonresponsive.  He uses that on his website to attack

25   Purple.

1          One of two things is true.  He either did make all

2     of those phone calls, and then he is using that to harm

3     Purple, or he is lying about making all of those phone

4     calls, in which case his intent and ill will is directed

5     specifically at Purple in the State of Utah.  He recorded

6     one call with customer service and he posted that on his

7     site and talks about it.

8          Then, of course, there are the misleading posts

9     about it and the Twitter communications, the posting on

10    Purple's Utah based Facebook, and all of the social media

11    attacks.  Again, in one instance he has generated

12    1.7 million hits.  I will talk about that in the injunction

13    motion.

14          On top of that, what else is new since we were

15    here?  Purple now has proof that we are losing sales and not

16    just across the country but in Utah.  We have Utah customers

17    returning products or rejecting Purple's products.  We have

18    3,277 users in Utah visiting the H.M.R. website.  Again, the

19    website is now a tiny component of the attack that is being

20    launched on Purple from multiple angles, but there are over

21    100 different locations in Utah that have gone to that site.

22          He follows seven Utah based Twitter accounts.  You

23    say why is that important?  Well, the reason you follow a

24    Twitter account is because it gives you access to Twitter

25    users who also follow those accounts.  He chooses seven of

1    them in Utah because he wants Utah people to follow his

2    accounts and his attacks on Purple.

3              So the overview I would say, Your Honor, is this.

4    If the facts of our case don't establish jurisdiction, then

5    you can never have jurisdiction over a defamation Lanham Act

6    case that is based upon electronic communications.  Not only

7    is there no electronic communications exception, but there

8    surely ought not to be one, because, let's face it,

9    everything is going electronic these days and the law will

10   adjust and adapt.

11             In fact, the law has.  It did it, among other

12   places, in Judge Nuffer's decision in 2015 in the Diesel

13   Power case, which we cite, which might be the most analogous

14   case in the country, but it is certainly the one we were

15   interested in because it is from this district.

16             The facts of that case are you had a Tennessee

17   defendant who purchased goods from a Utah company three

18   times and made basically a few postings on the Internet, not

19   on his website, but somewhere else on the Internet.  A

20   lawsuit was filed in Utah and a motion to dismiss was filed.

21   What Judge Nuffer said is a completely passive website

22   standing alone cannot give you jurisdiction just because it

23   can be accessed from Utah.  We don't have any quibble with

24   that.  But what Judge Nuffer said that was very interesting

25   is he said, however, the purchase of products combined with

1    defamatory online posts can establish jurisdiction, and that

2    is a minimal purchase, three products.

3            In this case Monahan purports to be reviewing all

4    of these Purple products and, apparently, at least two

5    mattresses and one Purple pillow, and then he got one that

6    he cut into.  He cut into a mattress and sent a piece of it

7    to Dr. Godleski.  Then he files a report with the C.P.S.P

8    where he says sleeping on his mattress is hurting his

9    asthma.

10           Of course he files that complaint before the

11   February mattress was actually delivered to him, so he must

12   have had another one and he must be sleeping on it, because

13   that is what he tells the C.P.S.C., but that can't be the

14   one he cut a piece out of, so now we are up to maybe four

15   mattresses or four major, major lies.  I don't know which

16   one, but we would like to get some discovery and find out.

17           Judge Nuffer says, boy, this minimal amount is

18   enough for me to exercise jurisdiction.  Then Judge Nuffer

19   goes on to say the limited contacts the defendant's website

20   creates with Utah may be specific to give Utah specific

21   jurisdiction over defendants in an injury arising from that

22   website but not for unrelated injuries.  So, in other words,

23   if the website is causing the problem, then the website

24   alone could establish jurisdiction.  I think we are clearly

25   there.

1          I would like to point out that Diesel Power

2    considered and rejected the same Dudnikov argument that Mr.

3    Randazaa advanced.  The Court considered it in that context

4    with far less significant contacts.

5          We cite a couple more cases which create

6    additional issues, and it goes to what I have talked about,

7    which is the copying of the website contents.  We cite to

8    the Kindig case and we cite to the Select Health case.

9    Kindig was a Judge Parrish case.  There were patent and

10   copyright claims, but also Lanham Act unfair competition

11   claims.  There was an interactive website and the defendant

12   went and copied content from the Utah website.  What Judge

13   Parrish said was copying that and putting that on your

14   website, even though your website is passive and is not

15   specifically directed to Utah, there is enough of a tie-in

16   there that we have jurisdiction.

17          I think that what is interesting is that case

18   included unfair competition claims which, of course, are

19   akin to false advertising claims.  There has been no

20   response from the defendants about that, and certainly they

21   have not denied that Mr. Monahan copied the heck out of

22   Purple's website and are still doing it today.

23          In the Select Health case there was a similar

24   analysis.  The defendant copied content from a Utah based

25   company and attached it to its website.  I have more there

1    on the Schrader case, but I am just going to move on.

2            In terms of the arising out of and the but for and

3    the proximate cause, just as the Diesel Power case said,

4    look, these facts meet both of the but for and the proximate

5    cause case, just as the Dudnikov case said, that you don't

6    need to draw a distinction between the two of them.  They

7    are easily met in this case.  Fair play and substantial

8    justice are really almost a throw away argument in personal

9    jurisdiction and jurisprudence.  You have to have an

10   extraordinary set of facts, or, as the Court said, a

11   compelling case, that there is something so different about

12   your case that it would not be fair even though there is

13   jurisdiction.

14           Venue.  Again, I think it is a throw away

15   argument.  The statute says if you have jurisdiction, then

16   venue is proper.  Then they ask you to transfer the case to

17   Florida.  Again, that is bordering on what I call a throw

18   away argument, and I don't mean that pejoratively about the

19   lawyers.  I just mean it is not a great argument.  What we

20   all know is that you evaluate the location of the parties

21   and the witnesses and the evidence and the inconvenience,

22   but there has to be an overwhelming disparity before you

23   would make that kind of decision.

24           What Ms. Yost said struck me, which is, gee, there

25   all these contacts to Purple and the only thing in Utah is

 1    Purple.  The only thing in Utah?  We have 700 employees.  We

 2    do lots of sales here.  Many, many of our witnesses are

 3    going to be here.  There are going to be people from our

 4    customer service department.  There are going to be people

 5    from the marketing department.  We are going to have our

 6    C.E.O. testify.  I mean, we'll probably have ten witnesses

 7    that are going to have to go into all of the harm that has

 8    been caused to the company and the actions that the company

 9    has taken.  Our expert witnesses are here.  Coincidentally,

10    none of the defendant's lawyers are located in Florida.

11    They have to get on a plane anyway.

12            What the case law says is in this day of

13    electronic discovery and air travel, you need to have

14    something more than that.

15            Let's talk about GhostBed.

16            THE COURT:  Are you about done?

17            MR. MAGLEBY:  I will wrap up in five minutes.

18            THE COURT:  Okay.

19            MR. MAGLEBY:  I get it.

20            In the first instance under the conspiracy case

21    law that they have not challenged, what I have described

22    establishes jurisdiction over Mr. Monahan and H.M.R. ten

23    ways to Sunday.  I mean, you could have a fraction of the

24    contacts and you have jurisdiction.  You attribute that to

25    GhostBed, and eventually we're going to ask you to attribute

1   that to Mr. Werner and Ashley Werner when we move to amend,

2   and you are going to have jurisdiction over all of them.  We

3   would have had that based upon inferences from the evidence

4   that was in the record, but now we have the Ms. Anderson

5   declaration and so GhostBed is in this case.

6        There is one other incredibly compelling set of

7   facts which the defendants have not mentioned, and that is

8   specific false statements from GhostBed targeted at Purple

9   to cause harm that are indisputably false.  By those I'm

10  talking about the statement that Purple's products cause

11  cancer and cause you to cough up blood.  That came to our

12  attention because somebody posted on Facebook, hey, I was

13  having an online chat with GhostBed about Purple and they

14  told me that your products caused cancer.

15       When that came in to what they call -- I don't

16  know if it is the customer happiness department at Purple --

17  it has a fun name -- one of the people there was so incensed

18  that they immediately got online, and they didn't know that

19  they were supposed to talk to lawyers before they do things

20  like this, but they got online and, guess what, the very

21  first contact they made with GhostBed is they had an instant

22  message which came back and said they use baby powder in

23  their mattresses which is now popping up as a hazard.  Small

24  traces of baby powder can cause cancer.  Our managers had to

25  inform us to let you guys know if asked, which is, of

 1    course, entirely consistent with paragraph 24 of Ms.

 2    Anderson's declaration, which says that Mr. Werner talks

 3    around telling these things to the employees.  How many

 4    other times did they say it where we didn't catch them,

 5    right?

 6            So in the first try that is the reaction that we

 7    get.  What Diesel Power says is just having the website be

 8    attached to the injury is enough to create jurisdiction.

 9    Well, these injuries arose from online chats, which are a

10    lot like a website, and which would be enough to establish

11    the injury.  Certainly we have made the prima facie case.

12    There is no denying that.  It is in writing.

13            With that, Your Honor, what I would say is you

14    should deny those motions and we should talk about the

15    T.R.O. and the preliminary injunction.

16            Do you have any questions for me?

17            THE COURT:  I don't have anymore.  Thank you.

18            Responses?  Ms. Yost, you can go first.

19            MS. YOST:  Very quickly, Your Honor.

20            When Mr. Magleby stood up, the first statement

21    that he made was that Your Honor should evaluate Ms.

22    Anderson's declaration because it came to their attention

23    through her uncle lawyer who contacted them after they filed

24    their T.R.O. motion.  Now, they filed that motion on

25    May 24th.  We have phone records, Your Honor, that show Ms.

1    Anderson talking to Mr. Magleby's law firm before that date.

2    What we don't understand is we have not heard a thing about

3    Ms. Anderson's testimony until a few days ago, so despite

4    the months that have passed since their first

5    communications, and we don't know when they started, and all

6    we have, Your Honor, are phone records, that I am happy to

7    give you a copy of, that show that she was talking to

8    counsel while she was an employee at GhostBed before this

9    motion occurred.

10          Now, Mr. Magleby tries to frame it so he can say

11   that this fell in our lap very recently, Your Honor.  That

12   is why we are only giving it to you now.  I think the

13   evidence shows by these phone records that this information

14   has been lying in wait.  He questioned why Mr. Werner has

15   not filed a declaration, since they filed this declaration

16   from Ms. Anderson a few days ago.  We had to investigate it,

17   Your Honor.  It was a five-day weekend.  It was not exactly

18   something where we had months and months to prepare, which,

19   according to the phone records, Mr. Magleby did.  I would

20   suggest to Your Honor that the credence that counsel is

21   asking you to give this testimony is higher than it

22   deserves.  I'm happy to give you the phone records if you

23   are interested, Your Honor.

24          Other than that, if you have any questions, we'll

25   be happy to address them.

```
 1                THE COURT:  I don't right now.  Thank you, Ms.

 2    Yost.

 3                Mr. Randazza.

 4                MR. RANDAZZA:  Your Honor, one, I think we have a

 5    dispute of law for you to resolve, and that is that as Mr.

 6    Magleby concluded his presentation he said he feels like he

 7    has at least gotten over the prima facie level.  I disagree.

 8    But I think since we are considering evidence outside of the

 9    complaint and exhibits that burden shifts to a preponderance

10    of the evidence, and I would rely on F.D.I.C. versus

11    Oaklawn, 959 F2nd, 170, from the Tenth Circuit in 1992 for

12    that proposition.

13                I, too, have some objections to this evidence.

14    The declaration itself, which we also only recently got and

15    I have not seen these phone records, and I would like to

16    respectfully ask that we move these into evidence to show

17    when this conversation first took place, but it is your

18    evidence.  I have not even seen these records yet, but if

19    that is the case, that would raise another objection, but I

20    would like to at least preserve that on the record if that

21    is the case.  We were surprised with this information when

22    the opposition had it and was soliciting employees at

23    GhostBed at the time and well before the motion was even

24    filed and the ambush I don't think should be given credence.

25    I would also like to object to the fact that it is nothing
```

 1    but hearsay and speculation, most of it, just so that is on

 2    the record.

 3              The thing that I see here that popped up in his

 4    presentation was this argument that we visited the website.

 5    Perhaps we did.  I mean, this is something he raised in the

 6    more last minute filing that all of a sudden they have

 7    discovered the terms of service that somehow would bind us

 8    to a forum selection clause.

 9              Now, in order to have a binding agreement somebody

10    must know about the agreement, but we are being asked to

11    believe that these terms and conditions, which are theirs,

12    were so well hidden that even they did not discover them

13    until last week, yet somehow Mr. Monahan and Honest Mattress

14    Reviews should have found them and then read them and then

15    agreed to them.  I think we have already briefed the

16    difference between browse-wrap and click-wrap, and if you

17    would like me to go through that orally, I can do that, but

18    I think that is pretty well laid out in our papers.

19              I wouldn't say that they were binding anyway, but

20    if they are, and if we are going to credit this argument as

21    being nonfrivolous, then why wouldn't my client's terms of

22    service apply and my client's terms of service clearly say

23    that jurisdiction and choice of law should be Florida.

24              THE COURT:  Thank you, Mr. Randazza.

25              I am going to take a short break and then I will

```
 1    hear the other motion, the motion for preliminary

 2    injunction.

 3             At this stage I am inclined to find jurisdiction,

 4    but I want to read the Dudnikov case and take that under

 5    advisement.  My inclination is that there is enough evidence

 6    that supports jurisdiction beyond the prima facie

 7    requirement, but I will take it under advisement.  That is

 8    my inclination.

 9             With that, I will take a ten-minute recess and

10    give Ed a chance to get ready for your next rapid-fire

11    talks.  We'll be back in ten minutes.

12             Court is in recess.

13             MR. MAGLEBY:  Thank you, Your Honor.

14             (Recess)

15             THE COURT:  We'll turn now to the plaintiff's

16    motion for preliminary injunction.

17             Mr. Magleby.

18             MR. MAGLEBY:  Yes.  Thank you, Your Honor.

19             I wanted to start briefly talking about the

20    standard for likelihood of success on the merits, and in

21    particular in light of you sharing with us today what your

22    concerns were that led to you dissolving the T.R.O., and

23    obviously we have substantial new evidence here.  We had it

24    and presented it when we filed the second motion for the

25    injunction, and then we obtained the Calisha Anderson
```

1    declaration, which, by the way, we filed it within days of

2    getting the information.  There was no sandbagging here.  It

3    does not do us any good to do sandbagging.

4              What I wanted to remind the Court of --

5              THE COURT:  Well, they have accused you of talking

6    to her while she was still an employee.

7              Do you have a response to that?

8              MR. MAGLEBY:  Yes.  Ms. Greenwood reminds me that

9    she had a short call with her at some point, which may have

10   been then, and she is not a member of the control group so

11   we are not worried about that.  What we do know is that she

12   didn't give us any substantive information at all and didn't

13   talk to us about that until after she had left.

14             THE COURT:  Who make that call, Ms. Greenwood or

15   Ms. Anderson?

16             MR. MAGLEBY:  In terms of downloading the

17   substance of what went into the declaration?

18             THE COURT:  No.  Who made that call that

19   happened --

20             MR. MAGLEBY:  The first call?

21             THE COURT:  -- while she was still an employee?

22             MR. MAGLEBY:  I don't know if --

23             THE COURT:  Did that come in to you or did it go

24   out to her?

25             MR. MAGLEBY:  The very first contact was I believe

     1    from Ms. Anderson's uncle who is a lawyer.  I think.

     2           MS. GREENWOOD:  Yes.  Just to clarify what

     3    happened, he called me and he said she didn't want to talk

     4    or she thought she didn't want to talk until she had found a

     5    new job and she intended to find a new job.  He gave me her

     6    number and I called her and we talked for a very brief

     7    period of time.  She essentially confirmed what he said,

     8    which is, you know, I have got some stuff to tell you but I

     9    am not going to tell you anything.  If we had had that

    10    information when we filed this motion that we're talking

    11    about right now, we certainly would have put it in as

    12    support for our claims.

    13           THE COURT:  Thank you.

    14           MS. GREENWOOD:  She later got a new job and she

    15    contacted us after that.

    16           THE COURT:  What do you mean that Ms. Greenwood is

    17    not part of the control group?

    18           MR. MAGLEBY:  Did I say Ms. Greenwood was not part

    19    of the control group?

    20           THE COURT:  Yes.

    21           MR. MAGLEBY:  She is part of my control group.

    22    Sorry.  Ms. Anderson is not part of the control group.

    23           THE COURT:  What is a control group?

    24           MR. MAGLEBY:  A control group is somebody who

    25    makes decisions for a party.

```
 1                THE COURT:  You mean a control group for --

 2                MR. MAGLEBY:  GhostBed.

 3                THE COURT:  -- GhostBed.  All right.  Okay.

 4                Go on with your motion.

 5                MR. MAGLEBY:  Anyway, getting back to the concerns

 6      that you had that led to the dissolution of the original

 7      T.R.O., just a reminder for all of us that we do not need to

 8      show a certainty of success.  We cited to a couple of Tenth

 9      Circuit cases where likelihood of success is preliminary

10      estimate and a party need not show a certainty of winning.

11      However, I would say with the evidence that we now have in

12      the record I think we do have a near certainty of winning,

13      and if we did an evidentiary hearing, it would become even

14      stronger.

15                There is also another thing I want to talk about

16      in terms of the standard, and this is the first time I

17      believe that we're going to meet this particular nuance,

18      which is in the Tenth Circuit if the other three factors,

19      other than the likelihood of success weigh heavily in favor

20      of the injunction, then the test is actually modified and

21      all we have to show is serious issues to be litigated and

22      investigated.  We cite to three Tenth Circuit cases, Greater

23      Yellowstone Col and so on.  What I'm going to do is actually

24      spend some amount of time on those other three factors when

25      I get to them.
```

```
 1              But regardless of whether it is the higher
 2      standard or the lower standard we meet it, especially with
 3      all of the new evidence.  I have broken it down into a
 4      number of categories.  I think I have five or six categories
 5      of new evidence that I want to talk about.  The first one is
 6      Ms. Anderson's declaration.  I have talked about that and
 7      the high points of that and how surprising it is to actually
 8      have confirmation of what you suspect and what you thought
 9      you were going to have to go to trial on, the circumstantial
10      evidence only.
11              As it relates to this motion, all of the things
12      that Ms. Anderson sets out relate to credibility and they
13      support all four of the factors, but there is one obvious
14      point that jumps out, and I don't want it to get lost,
15      because we spent so much time talking about the false
16      statements, but it is Mr. Monahan's claims of objectivity
17      and independence, and he promotes this through not just the
18      website but all of the social media.
19              I am doing social justice.  I am a do-gooder.  I
20      am concerned for your health.  That is completely destroyed
21      now.  In fact, there is no disagreement that Mr. Monahan is
22      there at GhostBed either in person or electronically working
23      day in and day out and is the de facto head of the GhostBed
24      marketing department.
25              THE COURT:  Well, there might be disagreement.
```

```
1    Ms. Yost indicated that they have not had a chance to

2    respond, or they have not responded because of the shortness

3    of time --

4              MR. MAGLEBY:  Sure.

5              THE COURT:  -- and you want me to take everything

6    that she says as true.

7              MR. MAGLEBY:  Yes.

8              THE COURT:  I have two competing declarations and

9    they can't be squared, I will give you that --

10             MR. MAGLEBY:  Yes.

11             THE COURT:  -- but that does not mean everything

12   that she said is true.

13             MR. MAGLEBY:  True.

14             Do you know what, Your Honor, we're happy to have

15   an evidentiary hearing if we need to if you have any

16   concerns about us meeting the burden.  I would love to have

17   Mr. Werner on that stand.  I'm sure you have some questions

18   for him as well.

19             The point is this.  What Ms. Anderson gives us is

20   what was demonstrated by the evidence already in the record

21   by the fact that they tried to scrub Ms. Monahan's role as

22   GhostBed's chief brand officer and all of the other stuff.

23   Mr. Monahan is not objective.  That is and constitutes false

24   advertising.

25             You don't have to take my word for it.  The F.T.C.
```

1    says it and numerous cases say it.  They say it is false and

2    misleading and a violation of the Lanham Act to falsely

3    claim independence and make a full disclosure, especially if

4    you purport to be a review site.

5          The F.T.C. guidelines are at 16 C.R.F. Sections

6    255.0 to 255.5, and they say if there exists a connection it

7    must be, quote, fully disclosed.  Here we have of course

8    more than a connection.  They don't say it has to be an

9    employer or employee connection it just says any connection.

10         Then we cite to you the Casper Sleep versus Derek

11   Hales case, and Mr. Hales runs a mattress review site called

12   Sleepopolis, where there were four separate statements of

13   independence that were found to be actionable because they

14   were not supported.  And then we cite the Casper Sleep

15   versus Mitcham case, holding that a false implication about

16   an existing economic relationship when there wasn't one was

17   actionable.  Then we cite numerous cases that say the Lanham

18   Act applies to a failure to disclose information if that

19   failure to disclose is misleading, just as much as it would

20   apply to an affirmative false statement.

21         That is really I think one of the most important

22   takeaways from Ms. Anderson's declaration, is that this lack

23   of independence and this tight relationship is incredibly

24   misleading.  Indeed, we know that because why wouldn't they

25   just otherwise disclose it?  Well, the answer is because

1  then people would not believe that Mr. Monahan was truly a

2  do-gooder.  That is one major portion of the relief that I

3  will request in a few minutes.

4          The second category of new evidence is GhostBed

5  going out and its customer service people telling consumers

6  that Purple's products use talc powder and it causes cancer

7  and leads people to cough up blood.  The answer to that is

8  that Mr. Werner does submit a declaration on that and he

9  says, oh, gee, it was a new guy and it was an accident.

10 Oops.  Sorry.  We didn't mean to.  We don't do it again.

11         Well, the first problem with that is it was an

12 accident that happened multiple times.  We only have

13 evidence of it happening two times, but it is pretty

14 incredible that the very first time somebody from Purple

15 initiates a chat with GhostBed, they get the same story that

16 was told in the Facebook post, and then how many other times

17 did it happen before then, and did it happen after that and

18 we don't know.  They have not given us any documents.

19         The second problem is there is no declaration from

20 this employee to say it was an accident and I was not told

21 to do this.  One wonders.  Perhaps this employee, just like

22 Ms. Anderson, was not willing to lie for the company and had

23 concerns about that and that is why it has to come from Mr.

24 Werner, because what this employee would say is, well, wait

25 a minute, Marc, you talk all the time about how Purple's

1    products cause cancer.  You're management.  Remember what

2    was said in that online post is pretty telling.  Our

3    management had to inform us to let you guys know if asked.

4    That is not equivocal or reflecting a misunderstanding by

5    this employee who presumably had some training in how to

6    interact with customers in an online chat.

7            Then the third problem, of course, is this idea

8    that it is an accident is kind of destroyed by Ms.

9    Anderson's declaration where she says Mr. Werner goes on

10   tirades about the powder and tells people these things.

11           But, Your Honor, I have got the solution.  If it

12   is really an accident and GhostBed didn't mean it, then they

13   should have no problem and no objection to an entry of an

14   immediate order that says they shouldn't do it, just to make

15   sure there are no more accidents, right?  It is not a big

16   deal because it says don't do that which you have said that

17   you will not do.

18           We, of course, would also like GhostBed to produce

19   any documents regarding these statements, because we wonder

20   how many other people were told the same thing.  If you have

21   any concerns about the jurisdiction motion, which I would

22   suggest you do not need to have after you read Dudnikov,

23   then we would like to do additional jurisdiction discovery

24   and find out how many other people GhostBed has told that

25   you can get cancer or you're going to be coughing up blood.

1          The next category of new evidence that I think is

2     very important are the false declarations and

3     representations submitted to the Court.  I want to pose

4     another hypothetical.  I started with my grand hypothetical

5     and let me post a more narrow one, which is is it a serious

6     matter to submit a false statement under oath to the Court

7     or to misrepresent a fact in a pleading to the Court?

8          With regard to Ms. Anderson's declaration,

9     remember that she quit her job because she wanted to avoid

10    being asked to lie.  She was very concerned when she saw Mr.

11    Werner's declaration.  She got her hands on it and that was

12    the driving force.  She affirms the falsity of Mr. Werner's

13    declaration, which, although she did not specifically talk

14    about Mr. Monahan's declaration, also confirms the falsity

15    of Mr. Monahan's declaration.  There is not one, not two,

16    not three, but there is actually instances where they have

17    told you something that is not true, which is frankly, even

18    in my short 19 years, a shocking level of dishonesty.

19         What I think is very troubling, and perhaps is

20    troubling to the Court and, in fact, you said it earlier

21    this morning, that the Court relied upon those statements

22    when it dissolved the T.R.O.  So this is not a no harm, no

23    foul kind of situation.  It made a material difference to

24    the case and as a result of that our client has been harmed,

25    as I will talk about to a great degree.

1          The first false statement is on March 9, 2017

2     GhostBed represented to the Court, quote, Monahan has never

3     and is not -- that is a typo -- is not worked for GhostBed

4     in connection with any competitive marketing concerning

5     Purple or anyone else.  That is an unequivocal statement.

6     Never, any and is not are absolute terms.  The new evidence,

7     and these are e-mails, and this is not from Ms. Anderson,

8     proves that these were demonstrably false.  There are

9     e-mails with Mr. Monahan, Ashler Werner and Marc Werner

10    talking about advertising, a blow to Purple.

11          In fact, in one of them he e-mails Mr. Werner for

12    permission and he says in it I wanted to ask you before I

13    get us in trouble, right, because he knows they are going

14    after Purple, and he knows it is going to hurt, and he knows

15    that he is treading on a thin line.  He talks about our

16    comparison and making fun of Purple and so on and so forth.

17          After we caught them in their reply, footnote one,

18    GhostBed tries to quietly retreat and says, oh, we withdraw

19    the statement.  Well, that is great.  Withdraw the statement

20    after all of the damage has been done.  What that tells you

21    is it was not true in the first place and it reflects poorly

22    on their credibility.

23          The second false statement you have honed in on,

24    and it is paragraph six, and Mr. Werner says GhostBed does

25    not have any affiliation whatsoever with co-defendants

1    Honest Mattress Reviews or Mr. Monahan.  Again, any and

2    whatsoever are absolute terms.  The same evidence and the

3    e-mails that I'm talking about demonstrate it was not true.

4    Not only is there an affiliation, but they are working on

5    competitive marketing against Purple.

6         Then, of course, Ms. Anderson comes forward in

7    paragraph 45 and says my employer was lying about Monahan's

8    work and relationship with the company and she says the no

9    affiliation statement is false.

10        By the way, here is something I thought was

11   interesting.  Evidence that would have shown those

12   statements are false, that is same evidence that Mr. Werner

13   had her scrub and destroy.  Maybe he felt comfortable making

14   those statements because he knew he had told Ms. Anderson to

15   go and take Ryan Monahan's name off of the vendor list and

16   we were not going to find it in discovery.  Maybe that is

17   why he was willing to be so bold.  The reason we don't have

18   a declaration from him today is because he is no longer

19   willing to be so bold, because he knows there is at least

20   one brave witness who he has threatened to sue without mercy

21   and who is willing to stand up to him.

22        The third thing is the denial of Mr. Monahan

23   having a GhostBed e-mail address.  That, of course, is

24   disproved by the fact we found e-mails online where people

25   would post responses from Mr. Monahan using the e-mail

1   address.  Then GhostBed produced a couple of e-mails that

2   say ryan@ghostbed.com, but they only agreed to produce

3   e-mails that have the word Purple in them.  We said, hey,

4   you have taken this position with the Court, but we would

5   like all of the e-mails for ryan@ghostbed.com.  Guess what?

6   They refuse to give them to us.

7        Ms. Anderson puts the nail in the coffin when she

8   said he uses it all the time.  Then, of course, in reply

9   they try to retreat again.  It is like the old, oh, that

10  e-mail address.  Do you mean that e-mail address?  Yes, he

11  did use that one.  But, again, it is after the Court has

12  relied upon these incorrect statements to the Court.

13       The fourth is where they say that calling Monahan

14  the chief brand officer was a mistake and Mr. Monahan was

15  not authorized to do that.  I think that is paragraph 14 of

16  Mr. Werner's declaration.  Mr. Monahan at one time

17  mistakenly identified himself on Twitter and LinkedIn as

18  chief brand officer.  Now, they said that because we had

19  Twitter and LinkedIn documents.  But I guess Mr. Werner

20  didn't know that we had our hands on e-mails where he

21  identifies himself as that.  Then, of course, they produced

22  a couple that I believe show that.  They have refused to

23  produce additional e-mails which I bet say chief brand

24  officer.  Then Ms. Anderson puts the nail in the coffin and

25  says this is not true.  Werner and others at GhostBed knew

1    he used that title and encouraged him to do so.  Then they

2    make the claim that Mr. Monahan was not the chief brand

3    officer.  So one false statement is that it was a mistake

4    and then the other one is he is not the chief brand officer.

5          Well, wait a minute.  He is on e-mails that are

6    being copied to others within the company and nobody within

7    the company said, hey, by the way, Ryan, you gotta change

8    your e-mail footer.  It is not correct and you forwarded an

9    e-mail exchange that you had with a customer.

10          Then the sixth false claim is they claim that the

11    sleep team wrote the post about the injured employee and it

12    wasn't really him.  The evidence we have presented are the

13    postings we discovered online, and then we present the

14    evidence that they changed the postings and altered it to

15    say the sleep team.

16          Then we found a whole bunch of old posts and blog

17    articles, because you post blog articles to drive traffic to

18    your site, on GhostBed's site in the archives where Mr.

19    Monahan is identified as writing them and now it says the

20    sleep team.

21          Here is the question, Your Honor.  Where is the

22    declaration from the sleep team?  Where is the declaration

23    from the person that actually wrote those articles?  Is that

24    somebody else who is not willing to lie for the company?  So

25    the conclusion is that the defendants have perjured

1    themselves and the lawyers have walked right up to or past a

2    line that they should not have walked on.  Then why lie

3    about it?  Well, the answer is because it is devastating to

4    their core argument of independence if, in fact, Mr. Monahan

5    has close ties to Mr. Werner.

6          You can and should consider credibility on an

7    injunction motion.  Just like in every trial I have ever

8    done, there is an instruction to the jury that says, hey, if

9    you find that a witness has willfully lied you can disregard

10   some or all of their testimony as you wish.  That is up to

11   Your Honor.

12         The next new evidence are the safety studies.  I

13   want to be clear about something.  Purple already knew that

14   its anti-talc powder was safe.  It conducted its own

15   investigation.  Its owners and founders are engineers who

16   had made medical products that have been sold in the United

17   States.  They have patents on medical products.  Striker is

18   one of their clients.  They conducted their investigation

19   with the manufacturer and, lo and behold, the other thing,

20   among the other things they learned, is that this powder has

21   been used in cosmetics for decades.  It is powder.  It goes

22   on the face.  Guess what?  People are not getting cancer and

23   coughing up blood.

24         But to close the loop on that, because that was

25   the challenge that was given to us, we had Dr. Michael

1    Lumpkin, a Ph.D. board certified toxicologist that works

2    with the E.P.A. and the C.D.C. and the D.O.D., among other

3    things, do studies.  He came up with two big picture

4    conclusions which are really important.

5           Number one, the powder is safer than the dust that

6    you and I are breathing in this room, even if you sleep on

7    the mattress every night for ten years, which is one of the

8    challenges that Monahan put out on his website.  You show me

9    that this is safe to breathe for ten years and I will

10   retract my statements.  Okay.  We took the challenge and we

11   showed him but he has not retracted the statements.

12          The second conclusion is that Dr. Godleksi's

13   critique is no critique at all.  We have the safety studies,

14   safe for asthma, safe for the most sensitive person, safe by

15   the E.P.A. standards and safe by the F.D.A. standards.  Then

16   we have Godleski, who said he was already highly suspect

17   because he admittedly did not know anything about exposure

18   levels, he didn't know what it was, he didn't do any of

19   those kinds of tests, and Dr. Lumpkin comes back and points

20   out all of these flaws, including that he did not conduct a

21   toxicology analysis that the products are not dangerous, and

22   this is my favorite one, that Dr. Godleski was writing about

23   the wrong material.

24          The defendants offer no reliable response to that.

25   Again, Dr. Godleski wasn't reliable anyway, but here is the

 1   thing, Your Honor.  They are touting and Mr. Monahan is

 2   touting through the Internet that I have a Harvard educated

 3   doctor and he is on retainer.  Well, great.  If he is on

 4   retainer why don't you have him respond to Dr. Lumpkin's

 5   report?  He has not responded because he can't and certainly

 6   you have no evidence to contradict it.  You can't get your

 7   expert to support you on this critical lawsuit?

 8            By the way, we asked to depose Dr. Godleski.  We

 9   wrote a letter and we said Mr. Monahan says he is interested

10   in the truth.  He says it all over his website.  We would

11   like to talk to Dr. Godleski.  I mean, please, convince us

12   that we are wrong and there is something that is not safe.

13   I will tell you what, Purple is founded by real people who

14   live down in Lehi who have 700 employees who are engineers

15   and who have made medical products, and if their product is

16   not safe they want to know about it.  Okay.  Tell us.  Give

17   us some evidence.  They refused to let us depose him.

18            So what do they come back with?  I love this.  I

19   have never seen this.  They come back and cite to an

20   anonymous post on reddit, and they say, aha, somebody on

21   reddit has disproven the safety studies.  Then Mr. Monahan

22   takes that and he puts it on the website and he blasts it

23   out on social media as though it is some kind of expert.

24            The problem is we don't know who posted it.  We

25   don't know their qualifications.  We wonder, is it Mr.

1    Monahan posting a fake posting so that he can then claim it

2    is somehow independent?  That seems to be his modus

3    operandi.  I am independent.  I am trying to get to the

4    bottom of the truth.

5         Do you know what, Your Honor, if the reddit post

6    and the critique was so accurate and it was so easy to tell

7    that Dr. Lumpkin's study was not accurate, couldn't they

8    just hand the reddit post to Dr. Godleski and have him

9    submit a declaration that says, yeah, this is right?

10        The conclusion from that and the takeaway is, Your

11   Honor, that all of the statements that they have made are

12   now demonstrably false.  I mean, they were demonstrably

13   false before because they didn't have any evidence, but my

14   point at the last hearing is this.  You can't come out and

15   say your product causes cancer unless you have evidence.  I

16   mean, I can't say, Coca-Cola, your product causes answer.

17   Then Coke comes back and says no, it does not.  Then I say,

18   aha, the burden is on you.

19        The messages that are being conveyed, and I will

20   summarize the list from the last hearing, cancer, poison,

21   lawsuits, Johnson & Johnson, baby powder, safety,

22   respiratory problems, asthma, administering a poison,

23   deceitful business practices, lung and respiratory

24   irritation, inhaling gasoline and so forth.

25        It is safe and the statements are false and they

1    didn't have any evidence to prove it was false when they

2    first made the statements and they have no evidence now.

3    Let me pause there.  They didn't have the Godleski report

4    when he made all of those statements either.  Right?  He

5    made all of those statements before he had anything to rely

6    upon other than his conversations with Mr. Werner.  Boy, do

7    you know what, I hate Purple, I hate this powder, we've got

8    to go after them, it causes cancer.

9            One more thing on the safety issue.  Mr. Randazza

10   said I wouldn't put my children on it.  Well, as long as

11   we're going to talk about what we believe, I have put my

12   father on it.  I bought one for him.  He is in an assisted

13   care facility and he has neck and back issues.  I bought him

14   a Purple mattress.  I am not worried about the safety

15   issues.

16           Let's talk about the additional and expanded false

17   statements.  Let me start with this point.  As soon as you

18   dissolved the T.R.O., they put everything back up.

19   Everything we talked about in the first hearing is back up.

20   They then expanded the scope and the depth of the attack.  I

21   wonder if the Court thought I'm giving them the benefit of

22   the doubt, and perhaps was thinking like we were hoping that

23   maybe they would act a little bit responsibly and think more

24   carefully about what it is they said.  No.  They were

25   emboldened and they expanded both the scope and the depth of

1      their attack.

2             So now we are dealing with these statements being

3      repeated on social media, YouTube, Twitter, Facebook, and I

4      mentioned reddit and reddit is a social media website, and I

5      had to learn about it from my children, and its users or its

6      members can post content.  In 2017, Your Honor, reddit had

7      over 500 million users a month.  Mr. Monahan posts one of

8      these things and it ends up either on the front page or the

9      trending page of reddit.

10            Mr. Monahan says he is very sophisticated with

11     social media.  He knew what he was doing.  Purple calls that

12     reddit Monday, because it was the equivalent of crashing the

13     server for the customer service department.  They were

14     suddenly overwhelmed with people -- does your product cause

15     cancer?  Does it do all of these horrible things?  What

16     we're now seeing are what appear to be fake Facebook

17     accounts and trolls.  A troll is somebody who tries to stir

18     up trouble on the Internet.  Accounts from the midwest with

19     no information and they are locked down and they are making

20     all of these posts.

21            Now, Facebook is the kind of thing where you get

22     on it but you want people to see you, right, and you want to

23     interact with them.  We have a group of these in one

24     geographic location attacking Purple.  We want to get to the

25     bottom of that.

1          So today Mr. Monahan has generated literally

2     hundreds of thousands of impressions across Twitter and

3     across YouTube, because people post and they comment on this

4     and they read it and they say things like I am not going to

5     die for this mattress.  Here is the one that is

6     overwhelming, and that is Mr. Monahan has created a YouTube

7     video that has 1.7 million views.  So one of the things that

8     Purple did which led to its success is called the raw egg

9     test.  If you go into YouTube and you search Purple, not

10    even Purple Mattress, just Purple, the first hit on YouTube

11    is this raw egg test video which has generated -- it is kind

12    of funny but it also physically shows the mattress and how

13    it works.

14          Well, Mr. Monahan has managed to get his YouTube

15    video up as the second hit.  It has 1.7 million views.

16    Okay.  1.7 million people have viewed that.  If you have

17    auto play on YouTube, when you finish watching the Purple

18    video it auto plays Mr. Monahan's video.  One of the things

19    that he does is he says I have scientific proof that their

20    products are not safe and he waves around the Godleski

21    report.  Right.  That is 1.7 million potentially lost

22    customers.  I will talk about that with the irreparable

23    harm.

24          It now appears, we believe, that Mr. Monahan is

25    doing what is called boosting, which is you pay money to

1   promote a message on Facebook or on YouTube or whatever.

2   You say to Facebook any time somebody searches mattress I

3   want my ad to come up or I want my video to come up.  Right?

4          That brings up the question why in the world would

5   an independent review site boost its attack on a mattress

6   company?  It does not make money from doing that.  It is

7   paying money.  So we wonder is GhostBed paying to boost

8   this?  Coincidently we are wondering is GhostBed paying for

9   the Godleski report?  Is GhostBed paying for Monahan's

10   lawyers?  Remember that Mr. Monahan claimed poverty to you

11   at the last hearing, submitting documents that said that the

12   only income we make from this website is $50 a day from

13   Google AdSense.  So where is he getting the money for all of

14   these things?  We have asked them to give that to us in

15   conjunction with the jurisdictional discovery because we

16   thought, hey, wouldn't it be pretty good evidence that he is

17   not independent if GhostBed is paying his defense in this

18   case?  Do you know what they said?  They said no.  They

19   didn't say it does not exist.  They said we are not going to

20   answer you and you can draw the inference from that.

21          Now, it gets worse.  Mr. Monahan is posting false

22   claims that Purple is making false Facebook posts, that

23   Purple is having its customer service people go out and make

24   fake postings pretending to be independent.  What I love

25   about that is they are implicitly endorsing the fact that it

 1   is wrong and a big deal to claim that you are independent

 2   when you are not.  Right?  That is his attack on us.

 3          We have submitted declarations from the people

 4   that he has identified that say I'm a Purple customer, and I

 5   was cutting and pasting from Purple's online response, and

 6   it was not that I am some secret person at Purple, this army

 7   of trolls.

 8          The next disturbing thing that he has done is

 9   regarding the Consumer Products Safety Commission.  So

10   Monahan created a post that made it look like he was working

11   with and endorsed by and affiliated with the government.  He

12   posts something, and it is T.R.O. motion Exhibit 13, Honest

13   Mattress Review with the U.S. Consumer Product Safety

14   Commission.  Then he has got association with a series of

15   tweets with the C.P.S.C.  What he is trying to do is make it

16   look like the C.P.S.C. is endorsing his attack on Purple and

17   that the products are not safe and obviously he is not

18   working with the C.P.S.C.  That is very troubling.

19          Again, why does a mattress review site do this?  A

20   mattress review site is supposed to be reviewing mattresses.

21   Now it is on this crusade.

22          Then there are the false statements that he has

23   made to the Consumer Product Safety Commission under his own

24   name.  A couple of them have been filed which we think were

25   him that are anonymous.  Right?  Then he does one under his

1    own name and he tells them his mattress is causing severe

2    breathing issues.  The mattress contains a powder that

3    causes severe breathing issues and asthma.  Well, at some

4    point we're going to have to get his medical records and see

5    if that is true.

6          Here is the problem with that.  The dates don't

7    line up.  He ordered a mattress on February 11, 2016 and the

8    C.P.S.C. complaint is March 2nd and the mattress was

9    delivered on March 6th.  The only other mattress that we're

10   aware of is the one that he cut a piece out of to give to

11   Dr. Godleski, so it makes you wonder did he order more

12   mattresses before that?  Was he just lying to the C.P.S.C.?

13   It is not his mattress.  It is kind of hard to believe that

14   he is sleeping on the Purple mattress when he said all of

15   these horrible things about it.

16         There are a number of other false statements.

17   Consumers are getting sick daily.  One of Harvard's most

18   renowned doctors has confirmed that the anti-talc powder is

19   dangerous.  In no way has he confirmed that.  He said if it

20   is this substance and if you inhale too much of it, it would

21   be dangerous.  Well, Your Honor, if you stick your head in a

22   bucket of water, water become dangerous.  If you drink a

23   little of it, you are okay.

24         It is a false statement that Purple is not

25   addressing the powder at all.  We have addressed it in nine

1    different ways.  He just does not like the answer, and then

2    he tells the world we're ignoring him, and then he says I

3    have had many with C.O.P.D., chronic obstructive pulmonary

4    disease, write to me saying how they are getting headaches

5    and nosebleeds and feel ill.

6           Their response to this, when we pointed out to you

7    that these statements are false, is not to come back and say

8    they are true.  They didn't submit anything to show that

9    they were true.  They didn't show these purported complaints

10   he has.  They argue that the First Amendment protects him.

11   What the First Amendment does not do is protect false and

12   misleading speech.  We have briefed that before.  Now you

13   have the unrefutable evidence that he is anything but an

14   independent reporter.  He is not a reporter.

15          Here is the question.  If GhostBed was directly

16   publishing advertisements saying that Purple's products

17   caused cancer, would it be actionable?  Of course it would.

18   Well, the evidence shows that that is essentially what is

19   happening here.

20          Now, I guess they might make this argument that

21   the C.P.S.C. complaint -- that is not really an

22   advertisement and you can't hold me responsible for that.

23   Well, I also think the Court might have that question so I

24   want to address it.  The first thing is it is just one more

25   layer of evidence that shows the conspiracy and the depths

1   that he will go to and that he is not behaving like a

2   mattress review site, because he is not.

3          In addition, Mr. Monahan is a smart guy.  He knows

4   that what might happen if he submits something to the

5   C.P.S.C. is that it will be published.  It will be published

6   by the C.P.S.C.  He puts that ball in motion.  What he is

7   really trying to do is manufacture evidence, because if the

8   C.P.S.C. publishes this complaint, right, he is then going

9   to take it and post it all over his website and push it out

10  and imply that he is working with them and there actually

11  will be no adjudication, no verification, no scientific

12  study, nothing that reviewed it.

13         Here is the thing, and we cite the Grant Air Mask

14  Corp case,the Southern District of New York, 1986, and it

15  says liability for the Lanham Act, quote, Section 43(a)

16  states that it extends to any person who knowingly causes a

17  false representation to be used in connection with goods and

18  services in commerce.  If you file a report with the

19  C.P.S.C. and you know they are going to publish it, you are

20  meeting that standard and you are knowingly causing that

21  false representation to be out there.

22         The final piece of new evidence, and this one is

23  particularly important and galling to my client and I will

24  explain why, is the repeated argument that Purple has not

25  responded at all.  Purple has not responded.  You say, come

1    on, there is an argument that could be had, and maybe they

2    have not responded the way he wants, he does not think it is

3    honest, but, first of all, he is saying at all.  It is not

4    inadequate or not enough he is saying at all, and then he is

5    promoting this narrative that Purple does not care about

6    consumers and that they are non-responsive.

7           We have responded from day one.  I remember when

8    we were down here, you said to me, Mr. Magleby, if you have

9    got the science why don't you just give it to them?  I think

10   you were, again, trusting them and giving them the benefit

11   of the doubt.  My view was I can't really trust them.  I

12   would like to get an order, because I can't really trust

13   them the way they have already twisted stuff.  Well, they

14   continue to do that.

15          But now we have responded with safety studies and

16   they continue to push this narrative.  Why it is so annoying

17   to my client is because you and I as lawyers can say, well,

18   it is an argument of semantics as to what our response is,

19   but the Internet cares.  They care a lot about a company

20   that is ignoring its consumers and the safety concerns, and

21   that company's silence is evidence of guilt, and Purple gets

22   all kinds of comments and communications to that effect.

23          Wrapping up with the likelihood of success on the

24   merits, remember there are three ways that a statement can

25   be false under the Lanham Act.  Number one, of course, is it

 1   can be literally false.  That is easy.  We have new evidence

 2   of abundant literally false statements.  First of all, Mr.

 3   Monahan is not independent.  Okay.  That is his whole shtick

 4   and it is established that that is not the case and the

 5   F.T.C. says you have to make a full disclosure of any

 6   connection, so it does not say you have to be an employee,

 7   and he has not made that disclosure.  In fact, he has made

 8   the opposite.

 9        The second prong of literally false is established

10   by the safety studies.  GhostBed has literally said your

11   products cause cancer and cause people to cough up blood.

12   Mr. Monahan has literally said that Purple is fake posting

13   on Facebook when it is not.

14        The second way you can be false under the Lanham

15   Act is false by necessary implication, which is you don't

16   actually say it, but the consumer will understand it as a

17   statement of fact as readily as if you did say it.  Your

18   Honor, you are capable of reading those comments that we

19   have put in front of you and determining that, but it is

20   even better because we have the actual evidence now that the

21   consumers are not viewing this as opinion as they would like

22   you to believe.

23        Consumers are viewing it as fact.  We put some of

24   those pieces of evidence in front of you.  Consumers are

25   saying I'm glad I didn't buy that.  Their products are

```
 1    dangerous.  Here is my favorite one, I am not going to die
 2    over this mattress.  What message did that consumer get from
 3    Mr. Monahan's posting to say I'm not going to die over this
 4    mattress?
 5              That reminds me of something I forgot to say.  In
 6    the Diesel Power case the Court also found significant for
 7    minimum contacts that the plaintiff had alleged that Utah
 8    customers had returned products.  I can't remember if it was
 9    an allegation, or if it was that one or two products had
10    actually been returned, but if products were returned it was
11    de minimis.  We have now put in front of you the evidence of
12    Utah customers who are saying things like I am not going to
13    die for this mattress.  Take this product back.  There is
14    another thing that we meet with Diesel Power and it is
15    another thing that meets the focal point test of Dudnikov.
16              The third way that you can do a Lanham Act
17    violation is if it is likely to mislead or confuse
18    consumers.  So if it is implicitly false, misleading in
19    context, likely to deceive, including clever innuendo,
20    indirect intimations and ambiguous suggestions, and we have
21    that everywhere, but now we have evidence that that message
22    is being driven home all over the place.
23              I mean, if you go on YouTube and you read the
24    comments or reddit or Facebook or our customer service
25    people, people are believing this.  The false statements
```

1    fall into all of those categories.

2           Let me move on to irreparable injury.  Let me

3    recap.  The Tenth Circuit has said that, quote, a showing of

4    probable irreparable harm is the single most important

5    prerequisite for the issuance of a preliminary injunction.

6    Remember that that is just probable irreparable harm.  It is

7    possible that there would be irreparable harm.  So query

8    another if then kind of hypothetical.  I guess it is not if

9    then.  What could possibly be worse than the false statement

10   that a product causes cancer?  I actually might have an

11   answer to that, incredibly, and it is that products cause

12   you to cough up blood.  Right?  That is what GhostBed

13   literally said.  By the way, anybody who has had cancer or

14   had cancer in their family, that is a visceral gut reaction

15   that they get, and anybody gets a visceral gut reaction to

16   coughing up blood.  I couldn't come up with something worse.

17          What the Lanham Act says is that false or

18   misleading statements are per se irreparable injury.  Once

19   you decide that they are either literally false, false by

20   necessary implication or likely to confuse, you find

21   irreparable harm.  But in this case I want to dwell on this,

22   because I don't know -- it is hard for me to convey how

23   serious this is.

24          The Court asked at the last hearing has Purple

25   lost sales?  What I said was we think so.  We don't have the

1    evidence yet.  By the way, Judge, you don't have to show

2    lost sales, it is the threat of lost sales, but it is an

3    interesting question.

4         Well, now we have new and direct evidence that

5    consumers are believing the false statements and that we

6    have lost sales.  One of my favorite ones, not my client's

7    favorite ones, but here is what somebody wrote.  I canceled

8    my order because the white powder that you refuse to

9    disclose information about -- not true, Purple has disclosed

10   lots of information.  Where did they get that message?  Mr.

11   Monahan.  I will continue to share articles and warn others

12   about this until you address the problem.

13        So now what Mr. Monahan has done is not only has

14   he convinced consumers of this false narrative, he is

15   turning them into warriors against Purple.  So Purple is now

16   inundated with powder concerns.  On a daily basis customer

17   service gets phone calls, they get e-mails, they have chats.

18   I left it at the office, and I had a stack of paper and I

19   was going to do the old drama, you know, Judge, this is how

20   many documents we have produced.  Judge, here is the paper

21   generated by 50 complaints and it is about that high.

22        Some of them are not very nice, F Purple, you

23   know, to hell with you and other choice words.  I am telling

24   everyone.  One fear is that he is creating this army of

25   people that are now going to do the evil for him.

1           Another one is that you're now enabling all of the

2    hypochondriacs in the world.  Somebody wakes up and says,

3    oh, my gosh, I have a cough today.  I happened to be

4    sleeping on a Purple mattress, it must be Purple.  Right?

5    It appears that that is working.  That is what is happening.

6    People are coming to Purple and saying all kinds of crazy

7    things have been caused by the mattress, even when they have

8    been sleeping on it with no complaints for a year.

9           Once people get that belief you can't shake it.

10   Right?  Let's say they are 50/50 and they see the bad stuff

11   and then maybe they read the stuff that Purple tries to

12   respond with, but if all things are equal, which mattress

13   are you going to buy?  This has happened with our customer

14   service representative and officers talking to their own

15   cousins.  Yeah, I have seen it, but I can't make myself do

16   it.

17          If you are familiar with Yelp, Your Honor, it is a

18   review site for restaurants.  My personal experience is I

19   can see a restaurant and if I read one bad review, I might

20   go to the next one down the block because it says the

21   waitress was rude.  In preparing for this hearing I figured

22   out that something like 16 percent of reviews on Yelp are

23   false and posted by their competitors.  So now I am going to

24   have an open mind.  I was shocked to see that and I was

25   shocked to see that I fell for it so easily.

```
1              Here is another one.  Somebody said they are going

2    to put a message on their truck, boycott your company.

3    Telling everyone, all caps, not to purchase your Purple

4    mattress.  Some signs are going to be made to put on the

5    truck as we drive to Burningham this year.  We'll be happy

6    to share our story with everyone about the powder.  I don't

7    know who this person is and they are so special that they

8    are driving to Burningham, but apparently now there are

9    going to be trucks with anti-Purple statements.

10             THE COURT:  How much longer are you going to be?

11             MR. MAGLEBY:  I will go seven minutes.

12             THE COURT:  Okay.

13             MR. MAGLEBY:  Can I have seven minutes?

14             THE COURT:  Yes, you can.

15             MR. MAGLEBY:  All right.

16             THE COURT:  I know you have a lot to say, and I

17   have read your briefing and I know what you have, and these

18   are --

19             MR. MAGLEBY:  So what is the potential harm facing

20   Purple?  Your Honor, the worst case is actually the loss of

21   the entire business, okay, hundreds of millions of dollars.

22   I hate to use Uber as an example.  I especially hate to use

23   Uber as an example because the evidence is that Uber

24   actually did the bad things that it is getting in trouble

25   for on social media.  But it is the most obvious example of
```

1    what will happen if social media turns on you.

2          Mr. Monahan is the match, okay, and the mattress

3    industry is a dry field.  What Mr. Monahan has been doing

4    and doing it as fast as he can since you dissolved the

5    T.R.O., probably because he knows another one is coming, is

6    trying to get that fire burning so it will burn.  There will

7    be nothing you nor I can do about that.

8          Uber's value has dropped something like

9    $15 billion because of the delete Uber handle.  People are

10   talking about the fact that the company could literally go

11   out of business overnight because people can shift to a

12   different app.  There is nothing holding the customers

13   there.  Purple's entire business is online marketing.  You

14   say, gee, Jim, maybe you are kind of overstating this, bet

15   the company case, end of the business, but our founders and

16   our owners are seriously concerned about that and all I have

17   to show is that it is impossible.  It is possible.

18         Let's talk about the bottom side.  Tens of

19   millions of dollars.  With 1.7 million views of Monahan's

20   YouTube video, if five percent of those are a lost sale, and

21   remember how people might get there, is they watch the

22   Purple video and then Monahan's video loads, and if

23   five percent are lost sales, so 85,000 people times $999 for

24   a mattress is $84.9 million in losses in four mounts.  That

25   is not a year.  We would be over $100 million in six months.

```
 1    It is not just that.  Purple loses the opportunity to get a
 2    satisfied customer, and noncustomers never become satisfied
 3    customers, and a huge part of Purple's growth has been
 4    people buying the mattress and telling their friends.  We
 5    are not going to be able to quantify that adequately.
 6          There is also a line of case law that says if the
 7    defendant can't pay the judgment, it also does not matter if
 8    you can quantify your damages.  Mr. Monahan has told you he
 9    does not have any money.  He makes $50 a day from AdSense.
10    We don't know what GhostBed has, but I doubt they can
11    satisfy a $100 million claim.
12          Now, let's go to the balance of the harms.  You
13    are balancing nothing against everything.  Bet the company.
14    Why do I say that, nothing?  Well, GhostBed is an easy
15    analysis.  They tell you they have nothing to do with the
16    website or anything Mr. Monahan does.  Great.  Then there is
17    no harm to balance by ordering GhostBed not to cooperate
18    with Monahan and not to control him and not to have him do
19    the things they say that he is not doing.
20          Then as to Mr. Monahan, what harm has he presented
21    to the Court?  None.  He has presented no discussion of
22    economic or other harm, and he tells you he makes $50 a day
23    from AdSense on Google through the website and that that is
24    what the website makes.  Of course that begs the question,
25    how much is GhostBed paying you to do some of this stuff?
```

```
 1              Here is what we're willing to do, Your Honor.  We
 2     will pay $50 a day into a performance bond with this Court
 3     if he takes down that website or you order it taken down.
 4     That is the only quantification that he has given you.
 5     Purple's potential harm is the loss of the entire business.
 6              Now we come to the public interest.  Remember that
 7     Purple's only burden -- we don't have to actually show that
 8     it is good for the public interest.  We just have to show
 9     that it is not bad for the public interest.  Of course, the
10     public has no interest in false and misleading statements.
11     The defendants have manufactured 1.7 million hits on YouTube
12     promoting a false narrative to help a hidden competitor and
13     they are successfully deceiving the public.  I ask you this
14     question.  Do you think those people would have the same
15     visceral reaction that they have had if there was something
16     that said and, by the way, Mr. Monahan has an association
17     with GhostBed and it is he used to be the chief brand
18     officer and he currently works for them and he is charge of
19     their marketing?  If he is paid by them, let's figure that
20     out.  It is not good for the public to be deceived.
21              Don't kid yourself, the H.M.R. defendants are not
22     engaged in a public service.  They are not trying to help
23     the universe.  They are not do-good crusaders.  If they are
24     so, quote, honest, then why not make a full disclosure about
25     Mr. Monahan's past relationship and current relationship
```

1   with GhostBed?  If his message is so compelling, then

2   certainly he ought to be forthcoming with the people that he

3   claims he is reporting to.

4            I said this at the last hearing, that an older

5   lawyer once said to me anytime somebody starts talking about

6   honesty and money, hold on to your wallet. That is what is

7   going on here.

8            Then the second thing is clearly the defendants

9   are doing this for the money.  Look at Mr. Werner's

10  declaration.  He said GhostBed did not and does not

11  remunerate Mr. Monahan or Honest Reviews, L.L.C. in any way

12  for anything they do in connection with the

13  honestmattress.com website.  Notice how carefully that is

14  worded.

15           In fact, you asked Ms. Yost questions about that

16  at the last hearing.  You saw that they were clearly trying

17  to dance around this.  Again, it does not pass the smell

18  test, that this mattress review site is doing these attacks

19  and not going to make any money from it and he is being paid

20  by GhostBed to purportedly do other stuff.

21           To make it worse, Mr. Monahan is actually raising

22  money from the public on the gofundme site where he is

23  repeating this false narrative.  It is the equivalent of a

24  false campaign.  I mean, he is telling people help me

25  protect First Amendment rights and spread the truth.

1          Let me go to the relief, Your Honor, because I'm

2     at my seven minutes, if you would indulge me.

3          Today we're really asking for two things.  I want

4     immediate relief against the defendants and an injunction

5     ordering that they knock this off, but the second thing I

6     want is a mechanism that -- well, maybe I don't need this.

7     What I thought I was going to ask for was a temporary

8     restraining order and then a preliminary injunction

9     evidentiary hearing.  Your Honor, if we are on a preliminary

10    injunction motion and you have enough evidence, then I'm

11    happy to get the preliminary injunction order.

12         If you have any concerns at all that we have not

13    met our burden, we would request -- we would beg that you

14    hold an evidentiary hearing.  I mean, this morning when you

15    said is Mr. Monahan here?  I got kind of excited.  I would

16    like to see him in person.  I would really like to see him

17    right there on the stand answering questions from me and

18    from his lawyer.  If you have any doubts let's have an

19    evidentiary hearing.  I don't think we need that, but that

20    is where we are.

21         In terms of the T.R.O., there are two parts.

22    Number one, full disclosure and, number two, stop the false

23    and misleading statements.  In terms of the full disclosure,

24    that needs to be made on H.M.R. media and on the website and

25    on all social media where Mr. Monahan has been doing these

1    things.

2          The other thing is anybody that he has e-mailed to

3    or any Facebook groups that he has been in, anything like

4    that, we want a corrective statement.  We want a corrective

5    statement to the C.P.S.C.  We want the full story out there.

6    This is not a burden.  This is low to no cost.  Monahan

7    claims an interest in the truth and he spends all day on

8    social media sites anyway doing this.  I mean, he answers

9    comments on YouTube.  He answers comments on reddit.  We

10   can't keep up with him.  I mean, we can't even keep up with

11   him.  He must just sit there at his computer all day doing

12   this.  Great.  Take some of that precious time, and God

13   knows who is paying you for it, and come clean.  What

14   legitimate reason would they have for opposing that?  Of

15   course, they need to take down the false and misleading

16   statements including things about cancer, coughing up blood,

17   poison, asthma, take down the Facebook postings, get rid of

18   the 1.7 million hit YouTube video, no more false or

19   misleading statements, and even though it is implicit in

20   such an order expressly, no boosting of the statements and

21   no paying to have them promoted on Facebook, and even though

22   it is implicit in the order, no false statements through

23   third parties or surrogates.  Don't go out and have other

24   people do it, that which you have been ordered not to do.

25          In conclusion, Your Honor, I feel like you gave

1   these guys the benefit of the doubt at the last hearing.

2   They came and they professed their innocence to the Court.

3   They made sworn statements under oath.  I believe the Court

4   believed their representations in dissolving the T.R.O., and

5   I believe the Court thought the defendants would act

6   responsibly and I believe they took advantage of the Court

7   giving them a little bit of slack.  What they came out and

8   did is they did not go back to the status quo, they turned

9   it up.  So instead of a match on the field, it is a

10  flamethrower.  They have demonstrated that without a strong

11  order they are going to find clever ways to harm Purple.  It

12  is a big deal.

13          With that, Your Honor, I will finally sit down.

14          THE COURT:  Thank you, Mr. Magleby.

15          Mr. Randazza.

16          MR. RANDAZZA:  Your Honor, let me start with just

17  the overarching issue here.  The harm is nothing if you gag

18  my client and then force my client to speak.  What is the

19  big deal?  He is only making 50 bucks a day.  That is what

20  my grandfather made a month when he fought in World War II

21  for that flag and the Constitution it represents.

22          I am disgusted that somebody would stand in this

23  courtroom under that flag and look at that eagle and say

24  that there is no harm because it is only 50 bucks a day.

25  How much is the First Amendment worth?  If you enter this

1    order, I guess we'll find out.  It is worth nothing if you

2    enter this order that they are asking you to enter.

3            He wants you to tell my client that my client

4    cannot speak about the case, cannot speak about his

5    suspicions, cannot report on this case, because that is what

6    that YouTube that he lied to you about is.  It is talking

7    about the case.  It is talking about the fact that he has

8    been sued.  Why is he doing that?  Because while these guys

9    are trying to sell what I'm convinced is a dangerous

10   product, my client is trying to spread the truth.

11           So if they are facing an existential crisis

12   because other people -- and I don't know how much of what he

13   read you're taking as evidence, I mean, if we have an

14   evidentiary hearing, I think witness number one is Mr.

15   Magleby given his presentation.  If that is an existential

16   crisis, what is it for a media company?  I realize that he

17   is trying to show you and trying to scream and yell that

18   this is just an arm of GhostBed, but that would be an

19   awfully strange arm given that GhostBed's luxury line, and

20   we showed this at the last hearing, was ranked very poorly

21   on this site.  Purple was ranked better.

22           So where is all of this coming from?  I don't

23   know, but if we're going to have a presentation like this

24   where we have speculation, I think the speculation should be

25   that this is a dangerous product.  In fact, he brought up

1    the fact that they came up with a guy who said that this is

2    just fine.  I did discuss that report with Dr. Godleski and

3    he said he was impressed by one part of it that was copied

4    verbatim from Dr. Godleski's textbook chapter on the

5    subject, but why do we need to put out another report?  Why

6    do we need to pay Dr. Godleski to do that?  This is not a

7    products liability case.  All it is is there a fair question

8    here?  Is this something that somebody should be able to

9    discuss?  That flag and that eagle tell me that it is.

10           Now, he wants us also to believe, but I am not

11   quite sure, because it changed in the presentation and it

12   changed from the pleadings, but not to issue reports to the

13   C.P.S.C. and not to file complaints with the government.  So

14   now we are not just talking about the free press or the free

15   speech clause.  We are also talking about the petition

16   clause.  I think the only clause left unscathed by this

17   order that he wants might be the religion clause, but maybe

18   that will fall next.

19           If we are violating, and I asked about that

20   C.P.S.C. issue, and if we are somehow violating the Lanham

21   Act by making a statement to the Consumer Products Safety

22   Commission asking that the government take a look at this,

23   wouldn't every complaint be the same?  Every one filed in

24   Federal Court.  I mean, isn't it just as likely that they

25   know they have got a dangerous product here, because I

1    remember at the last hearing you did ask them, well, what is

2    in the powder?  We still don't know.  They are still saying

3    they don't know.  I'm sorry.  They are not saying they don't

4    know.  They are saying they won't tell us.  It is patented

5    or patent pending, so they can't tell us about that.  Well,

6    then there is a fair question.

7           To shut this guy up from talking about that, from

8    even asking that question, from rating this as a good value

9    or a bad value, and then from talking about the case itself,

10   that wouldn't be acceptable even if this was about anything

11   short of a F.I.S.A. hearing.  I don't see how while this

12   company has the money and the wherewithal to put out its

13   public relations side of things, my client needs to be

14   gagged because my client has been hit with a S.L.A.P.P.

15   suit?  That is what this is.  Why is he so worried about the

16   money?  Because he hoped we would just cave in and shut

17   down.  Well, sometimes when the First Amendment is in play

18   people do fight, because they believe in the Constitution

19   and they believe in the freedom of expression.

20          THE COURT:  There is no constitutional right to

21   lie and defame.

22          MR. RANDAZZA:  Well, Your Honor, United States

23   versus Alvarez might say differently, but I think you're

24   correct.  People will be held liable.  Yes, if my client has

25   lied and defamed them, then we will figure that out in this

 1    case and there will be damages for that if my client has

 2    done that, but so far there is no evidence that my client

 3    has done that, none whatsoever.

 4           There is evidence that you have been lied to.  You

 5    have been lied to about the phone calls, because I have

 6    asked my friend here for a copy of this phone call record.

 7    Remember, this whole thing seems to turn on the new evidence

 8    of Ms. Anderson, yet I have a phone call here at 7:26 p.m.

 9    to their law firm that lasted for nine minutes.  Nobody

10    remembers what happened in that call?  That happened on

11    May 17th, but we're getting sandbagged with this, and this

12    is the primary piece of evidence that they are asking you to

13    rely on that somehow there is a great conspiracy that I

14    don't think Alexander Dumas could have cooked up in order to

15    come up with some kind of a justification that this review

16    site is nothing more than a campaign to destroy Purple.

17           Your Honor, we rely on our papers and we rely on

18    the arguments that we made last time.

19           I would like to move this into evidence, if I may.

20           Do you have other copies?

21           May I?

22           THE COURT:  Yes.  Hand it to my clerk, if you

23    wouldn't mind.

24           Do you have any objection to the Court receiving

25    this?

1          MR. MAGLEBY:  No, Your Honor, not at all.

2          THE COURT:  Whatever it is.

3          MR. MAGLEBY:  With the caveat that we may have

4   follow-up questions about additional evidence.  We have had

5   trouble getting documents from them.

6          THE COURT:  Okay.  I have received this.  We'll

7   mark it as Exhibit 1 to this hearing.

8          (Exhibit 1 was received

9           into evidence.)

10          MR. RANDAZZA:  Thank you, Your Honor.

11          THE COURT:  Thank you, Mr. Randazza.

12          Ms. Yost, were you going to address this as well?

13          MS. YOST:  Thank you, Your Honor.

14          We'll also be relying on our papers, except for

15   one I think overarching theme, and that is that Mr. Magleby

16   spent the better part of a half an hour speaking about

17   e-mails and conversations and connections between GhostBed

18   and Monahan, yet not one of these e-mails and not one of the

19   declarations he has produced to you, and not one piece of

20   testimony connects GhostBed to the Honest Mattress Reviews

21   website, the website that is at issue in this case.

22          We have been up front that Mr. Monahan has been a

23   consultant for GhostBed since day one.  There is not a

24   single e-mail, despite having discovery, despite having

25   every e-mail that uses the phrase Honest Mattress Reviews or

1   Honest Reviews or the name of the co-defendants, which there

2   are none, and then every e-mail regarding Ryan and his

3   connection with the company, and not one of them talks about

4   this website and suggests this website should be put out

5   there, talks about anything that was on the website,

6   nothing.

7        Yet Mr. Mableby would have you believe that this

8   conspiracy that resulted in the creation of an entirely new

9   website that had all of these YouTube videos that he talked

10  to you about, was done so surreptitiously that not even the

11  declarant that they are relying on who worked at the company

12  had any actual evidence of the existence of this which just

13  defies logic.

14       If she was working at the company, and it is not a

15  big company, and this is not hundreds of people, and

16  testifies to you that she thought there was a relationship

17  here, but what she does not tell you is that I overheard a

18  conversation where they were working on this website

19  together.  Or I overheard a conversation where the C.E.O.

20  told Mr. Monahan that this would be a good idea and he

21  should create this website to defame Purple.  Or I saw that

22  there were payments being made or anything.  It is hard to

23  prove a negative, Your Honor, but it is not there.  In all

24  of the evidence that they have produced to you, including

25  the new evidence that they are relying on, none of it

```
 1    connects to the actual website at issue and the statements

 2    that are being made.

 3            We would ask that you look through the smoke to

 4    see that there really is no fire here.

 5            Thank you.

 6            THE COURT:  Thank you, Ms. Yost.

 7            Anything else from you, Mr. Magleby?

 8            MR. MAGLEBY:  Yes.  I can't help myself.

 9            Ms. Yost says, well, you know, they have had

10    discovery and they have not found anything.  I have two

11    reactions to that.  Reaction number one is they actually

12    refused most of the discovery that we requested, some of

13    which I talked about, and then they refused to hold a Rule

14    26 conference.  We finally got the Court's order, and then

15    they delayed that for two or three weeks because they were

16    too busy.  When she says we have gotten discovery, we have

17    not gotten discovery.  We would love to have some discovery.

18            My second reaction is most conspirators don't

19    actually put it into writing.  That is what circumstantial

20    evidence is about.  Your Honor, of all of the people that

21    can evaluate the circumstantial evidence and whether someone

22    is truthful, it is you, and you have the evidence and I am

23    confident in your ability to do that.

24            With regard to Mr. Randazza's discussion, I hate

25    it, right, and here is what I hate.  I am disgusted that Mr.
```

1    Randazza would hide behind the First Amendment and

2    Mr. Monahan would hide behind the First Amendment, when what

3    they are doing and the evidence shows they are doing has

4    nothing to do with the First Amendment.  It is a commercial

5    enterprise designed to harm a commercial competitor.  So the

6    only thing worse than somebody who is dishonest or doing bad

7    things is a hypocrite.  That is the one thing I tell my

8    kids.  Don't be a hypocrite.  When all of this evidence

9    comes out I am going to remind all of us in this courtroom

10   of Mr. Randazza invoking the First Amendment for his client

11   who is most certainly not entitled to First Amendment

12   protections.

13          Now, he asks you what is the First Amendment

14   worth?  Well, it will be worth nothing if you grant this

15   order.  I appreciate the attempt to pull on the Court's

16   heartstrings, but what he has not done is given you any

17   balance of the harms.  He has given you nothing to weigh

18   against the evidence that we have presented.

19          He then argues that, gee, the website ranks

20   GhostBed kind of low.  Well, they have never posted anything

21   really negative about GhostBed, and they have manufactured

22   and changed the ratings after this lawsuit, so it is no

23   surprise, but here is the thing, saying something bad about

24   GhostBed does not make the false statements you have made to

25   the universe true.  It does not make them true and it does

```
1    not undo the damage.
2           Then he says, well, I did discuss the report with
3    Godleski and the only thing he was impressed with was the
4    quote of Godleski.  Great.  So they actually took the time
5    and the money and they spent the money to talk to Godleski
6    about Dr. Lumpkin's report but did not have him respond.
7    That is very telling.
8           Your Honor, I think we're entitled to the relief.
9    Again, if you have any concerns at all what I would say is
10   enter the order, and then let's set a preliminary injunction
11   hearing, and what I would say is you enter the order and you
12   say we will set the preliminary injunction hearing once the
13   defendants comply with the discovery.  That would unable us
14   to test the veracity --
15          THE COURT:  Say that last part again.
16          MR. MAGLEBY:  What I would say is you enter the
17   order, right, and if they want to challenge the order, then
18   we can hold an evidentiary hearing.
19          THE COURT:  If they want to challenge the order?
20   They are challenging the --
21          MR. MAGLEBY:  You are right, Your Honor.  I would
22   say enter the order.
23          THE COURT:  What order?
24          MR. MAGLEBY:  A preliminary injunction order that
25   does the two things that I requested.  Number one, full
```

1    disclosure and, number two, knock off the false statements.

2            THE COURT:  I know.  So I will do a preliminary

3    injunction that says knock it off.

4            MR. MAGLEBY:  I think the order will take some

5    time.

6            THE COURT:  What you asked for is to stop telling

7    falsehoods about your product.

8            MR. MAGLEBY:  Yes.

9            THE COURT:  All right.  Well, that order just

10   invites an order to show cause why I shouldn't hold them in

11   contempt.  It just makes for more litigation, because it is

12   very likely that what you think is false and misleading,

13   they are going to come back in with all cannons firing

14   saying it is not.  It is a fair interpretation of their

15   evidence, so an injunction that says that is difficult, and

16   then you say full disclosure.  Well, I don't know what

17   full -- do you want me to tell, from Ms. Anderson's

18   affidavit or declaration, to tell the defendants what has to

19   be disclosed on the Honest Mattress Reviews website?

20           MR. MAGLEBY:  Yes.

21           THE COURT:  And if the order says be honest in the

22   full connection between Mr. Monahan and GhostBed, do I say

23   it has to be consistent with what Ms. Anderson said?

24           MR. MAGLEBY:  No.  I think --

25           THE COURT:  Go further and then they say, well,

1    Ms. Anderson is not telling the truth.  She is a former

2    disgruntled employee.  I think that is almost redundant

3    sometimes, former and disgruntled, and so you want an

4    injunction, and I get that, and you say our evidence, our

5    scientist, who, by the way, and I don't mean this

6    critically, but it is a fact, I think, that you hired to --

7              MR. MAGLEBY:  Yes.

8              THE COURT:  Like the tobacco industry hired all of

9    the scientists to say that smoking wasn't harmful.

10             MR. MAGLEBY:  Not like that.

11             THE COURT:  Well, it is not like that, but there

12   is that suspicion.  You say we say our product is safe, and

13   so in light of all of this Internet traffic and this Honest

14   Mattress Reviews thing saying we are not, then we are going

15   to hire a guy and, guess what, he told us it is safe.  So

16   you want me to say that I should find, and it is a fair

17   request, that I should find that your guy is telling the

18   truth about your product and that it is completely safe and

19   it does not cause cancer and it does not have any unsafe

20   properties.

21             They come back and say, well, wait a second.  When

22   we said it is not safe, we had a report, too, and you say,

23   well, that report is junk because he just said if this and

24   this and this happens, then it might be unsafe.  Then you

25   used your sticking your head in a bucket of water metaphor,

1    and it is a pretty good one --

2              MR. MAGLEBY:  Yes.

3              THE COURT:  -- but help me out with this.  If I do

4    what you ask, why will that do anything other than create

5    more litigation?

6              MR. MAGLEBY:  Well, I oversimplified it when I

7    said that.  If you say two lines, line number one, make a

8    full disclosure, and, line number two, start making false

9    statements we will have more litigation.

10             THE COURT:  We will.

11             MR. MAGLEBY:  Probably.

12             In response to your questions about, gee, here is

13   the problem, and then they will come back with this and they

14   will come back with that, the time to do that actually was

15   before today.  If they wanted to come back and challenge Dr.

16   Lumpkin they had every opportunity to do it.  If they wanted

17   to come back and put in the evidence that you have just

18   recited that they didn't put in, they had every opportunity

19   to do it.  While it may be difficult for the Court and the

20   parties to craft an order that tracks what the evidence is,

21   and what I think the obvious conclusions are, we still have

22   to try to do it, because if we don't, what these defendants

23   will do is they will continue to try to take advantage of

24   the situation and, again, try to pour that gasoline on the

25   fire before they can be stopped.

1            If they come back and they want to come back with

2    that kind of evidence, then let them do it and let them

3    challenge the order, but let's not have them go out and

4    start the fire first.

5            I have thought about this and a couple of

6    different ways that we could do it.  One way is we craft an

7    order that identifies the things that Mr. Monahan has said,

8    which are now proven to be false and misleading, and we say

9    he cannot go out and say these things or promote them or

10   have third parties say them or things that are substantively

11   similar.

12           Yes, that poses the risk of litigation over what

13   is substantively similar.  So, for example, there was one

14   statement where he said ovarian cancer.  So maybe our order

15   says you can't say ovarian or cancer.  And then he comes

16   back, aha, Judge, your order was ambiguous.  You didn't say

17   I couldn't say brain cancer.  Well, we can have a hearing

18   about that and you can decide whether or not he is a man of

19   reasonable intelligence and understands that that is

20   substantively the same as saying cancer.

21           I mean, if that is what we have to do and we have

22   to have an order to show cause hearing, then so be it,

23   because when you're talking about a company with 700

24   employees whose jobs are at risk, and all of the other harm

25   that we have shown, that may just be our job.

1          Another way you could do it is you could enter

2   detailed findings of fact, again, which track the evidence

3   that we have presented and which says things like the truth,

4   right, that there was no response to the Ms. Anderson

5   declaration.  I find that the representations to the Court

6   about this and this and this were not true.  There has been

7   no evidence presented to challenge Dr. Lumpkin's report.

8   Dr. Lumpkin concludes as follows.  Dr. Godleski's report is

9   not reliable, including for the reasons set forth in the

10  Lumpkin report.  You do a detailed statement of findings of

11  fact which support the injunction order and you order them

12  to post that.  Right.  It is the equivalent of corrective

13  advertising.

14          You tell me what you're interested in and we will

15  draft it.  Do you want the findings of fact?  Do you want a

16  list of things that we think ought to be disclosed on the

17  website and through social media?  How do we push it out?

18  It is going to be complicated, and I apologize for that, but

19  let me just say this, that this mess that we're facing is

20  not the fault of Purple or the Court.  This mess would be a

21  lot simpler if Mr. Monahan had not turned up the dial to 11

22  after the T.R.O. was dissolved.  He created this mess and

23  we're left trying to have to find a way to fix it.

24          THE COURT:  How do you know you are not creating a

25  bigger mess?  What this should do is it should go to trial.

1          I remember years ago I had a case involving a

2     student at I think Bingham High School wearing a T-shirt

3     that -- I can't remember if it was about P.E.T.A. or

4     something, but, anyway it was difficult because the school

5     district had --

6          MR. MAGLEBY:  Yes.  It is not free speech they

7     say.

8          THE COURT:  -- so they told them not to wear the

9     T-shirt.  I must have agreed.  There was an injunction

10    entered and they had to comply with the school dress code.

11    The next day the kid showed up with a T-shirt that said my

12    lawyer told me I can't wear that T-shirt anymore.

13         I didn't look at it myself, and this is just

14    hearsay to me, and maybe it was from one of my clerks or

15    someone after I entered your initial T.R.O., then, as I

16    understand it, the other side of this, Mr. Monahan just did

17    the same thing as the T-shirt kid, the equivalent --

18         MR. MAGLEBY:  Right.

19         THE COURT:  -- by putting up I have been gagged.

20    That seems to be one of Mr. Randazza's favorite words.

21    You're going to gag my client.  Only if it is fair, but then

22    they jump on the Internet and say I have been gagged.  How

23    does that not hurt you maybe just as badly as they saying

24    your product is unsafe?

25         MR. MAGLEBY:  Well, I am glad you brought that up.

1    We have to have the equivalent of a gag order that says we

2    are not going to talk about this lawsuit until --

3              THE COURT:  That is where it gets complicated.

4              MR. MAGLEBY:  Yes.  The fact that it is

5    complicated, though, does not mean that you shouldn't try.

6    The courts are our mechanism for doing it.

7              THE COURT:  I think you have to recognize from

8    where I sit, which is objective, and I am the equivalent of

9    what they say Honest Reviews is and you say it isn't, but I

10   am in the middle, and I don't care if you win or if they

11   win.  I just want the law to be applied correctly.  From

12   where I sit there is another side to this story.

13             MR. MAGLEBY:  Sure.

14             THE COURT:  I will say this, that after Ms.

15   Anderson's declaration, your side, if you're thinking of the

16   scales of justice, the weight on your side just got a lot

17   stronger, a lot heavier in my mind.  You are closer,

18   substantially closer after having this thing aired out with

19   both sides having a chance to address it, you are closer to

20   meeting the standard of irreparable harm or the risk of it,

21   sufficient to grant some kind of injunctive relief, and to

22   meet the standard of starting to show me that you have a

23   substantial likelihood of success on the merits.

24             If I credit Mrs. Anderson's in particular, and

25   your other evidence of a circumstantial nature, then I think

```
 1    the balance of harms starts to tip in your favor as well.

 2    I'm much more inclined to grant injunctive relief now than I

 3    ever have been before.  I felt the first time I had relied

 4    too much on your side of the story.  You're a good advocate.

 5    You're able to stand there, and you would still be going if

 6    I had not limited you to another seven minutes, and you are

 7    a strong and effective advocate for your side, but they are

 8    for their side and I don't know the whole story yet.  I am

 9    going to need to mull this over.

10            I am inclined to hear evidence in an evidentiary

11    hearing.  That may be the best next step.  I think we need

12    to do that.

13            Tell me who you would expect to call as witnesses.

14            MR. MAGLEBY:  Sure.

15            THE COURT:  If we're going to do it and it is

16    going to be any help, and if I can get closer to believing

17    the essence of your case that what Mr. Monahan is doing is

18    collaborating with GhostBed, and Mr. Werner in particular,

19    to do a campaign of defamation against a competitor in the

20    commercial marketplace, then I am inclined to not find that

21    the First Amendment reaches that far, even in light of Mr.

22    Randazza's argument that he has somehow got a journalist in

23    the position of Mr. Monahan.  That would go away.  But other

24    than Ms. Anderson and Mr. Werner, who would you expect to

25    have at that evidentiary hearing?
```

1          MR. MAGLEBY:  Certainly, Your Honor.  I guess the

2    question back to the Court, and there is nothing more

3    irritating than a question back to a question --

4          THE COURT:  Well, if it is irritating I won't

5    answer it.

6          MR. MAGLEBY:  How do we want to put on the initial

7    case?  Would we do that by additional declarations and then

8    just have people cross-examine witnesses?  That does save

9    time.

10         THE COURT:  We need some cross-examination.

11         MR. MAGLEBY:  Absolutely.

12         If you said to me, Mr. Magleby, who would you

13   call, I would probably start out with the founders, right,

14   and then I would probably have some people from the customer

15   service department testify, and I would put on some evidence

16   of all of the e-mails and all of those kinds of things.  I

17   would have my experts testify.  I would have an Internet

18   expert talking about the irreparable harm and the threat to

19   the company.  I would have somebody talk about at least some

20   of the damages, you know, just to show that there is damage.

21   My fear is that we can't quantify it.  Also, that the damage

22   would be more than they could pay because that is

23   irreparable harm.  And then I certainly want to

24   cross-examine Marc Werner, Ashley Werner and Ryan Monahan.

25   I probably want to talk to Shack, the customer service

1    representative who said management told me to say cough up

2    blood.  I would like to do all of those.

3              I am sure they would want to talk to some of our

4    guys.  What I would say, Your Honor, is we have met our

5    burden.  There is a likelihood of success, but also if we

6    have the other three factors weighing heavily, you don't

7    even have to find likelihood of success.

8              THE COURT:  I heard your argument.  That

9    evidentiary hearing sounds like it is going to take a month.

10             MR. MAGLEBY:  No.  I think we can do it in three

11   days.  I think what we do is say each side submit your

12   affirmative case by declaration, and then you cross-examine

13   people on their declarations and all of that.

14             What I would say, though, Your Honor, is that we

15   are at a disadvantage because we don't have discovery.  What

16   I would say is you enter an order now and what you say is

17   we'll have the preliminary injunction once the defendants

18   have produced the evidence that is relevant to the

19   injunction hearing.  For example, we ask for all e-mails

20   that say ryan@ghostbed.com, because they have said that he

21   really didn't use that e-mail address.  We have asked for

22   all documents that say Ryan is the chief brand officer.

23   They have refused that.  We want phone records, and the

24   great thing I love about them bringing phone records is we

25   now know there are phone records.  We want Mr. Werner's

1    phone records.  We want Mr. Monahan's phone record, how

2    often do they talk on the phone and that kind of thing.  We

3    want to show where Mr. Monahan is getting the money to pay

4    for all of this, because here is my bad.

5            If we go and we have a preliminary injunction

6    hearing and what we discover is that Mr. Monahan is being

7    paid a bunch of money by GhostBed, and GhostBed is paying

8    for his defense, that is going to be pretty important to the

9    Court.  My fear is if we don't have an order in place they

10   are going to continue to try to light the fire.  Let's

11   create an incentive for them that they get that injunction

12   hearing to protect these, oh, so valuable First Amendment

13   rights, after they have given us the discovery that will

14   allow us to determine whether or not the --

15           THE COURT:  Say that last part again.  Let's get

16   an order --

17           MR. MAGLEBY:  Enter an order now, an injunction

18   order, and then let's set a hearing so you can further

19   evaluate the evidence.  What you say to them is, look, we're

20   going to call witnesses and so there needs to be discovery

21   and full disclosure relating to the issues I'm going to

22   consider at the hearing.  We'll have the hearing once

23   Magleby gets those documents, because I want the incentive

24   to be on them to cooperate and not to refuse to cooperate.

25           I think we need an order in the meantime, because

1   if there is no order in the meantime, and he has been

2   pouring gasoline on the fire, he is going to pour a tank

3   load of gasoline on the fire.  We can craft an order that is

4   narrow enough to satisfy Your Honor that it is tied to the

5   evidence that we have presented and what actually happened

6   here, whether you want it as a set of findings of fact or

7   whether you want it as to what is the direction that I'm

8   going to give.  We can do that.  Let us take a shot at that,

9   and then you can go back through and say, Jim, you have gone

10  too far.  I'm sure there will be someplace where you will

11  think that, but actually Ms. Greenwood, who is way more

12  reasonable than me, will take the lead on drafting the order

13  and I think you will find it appropriate.

14          THE COURT:  All right.  Thank you.

15          Anything you want to say about this last

16  discussion I have had with Mr. Magleby, Mr. Randazza?

17          MR. RANDAZZA:  Your Honor, it seems like what he

18  wants from you now is an order that we have a trial.  I

19  mean, this does not sound like a preliminary injunction

20  hearing.  I ask you to please keep in mind that our position

21  is that this is a S.L.A.P.P suit.  This is a suit filed not

22  because of the strength of the merits of the case, and I

23  realize if you look at Ms. Anderson's declaration, boy, that

24  looks really compelling.  It is lies.  I am going to prove

25  it is lies.  I hope that there will be sanctions when it

```
 1    shows that it is lies.  I hope she'll be charged with

 2    perjury when I can show she has lied.

 3           You know, this is a big win for them if they get

 4    us to come back again for another trial, or for really a

 5    pretrial before the trial, and we're at 148 documents in

 6    this case and there is not even an answer yet.  Every single

 7    motion here is the height of this table.  That is the point

 8    here.  That is what a S.L.A.P.P. suit is.  You file a

 9    strategic lawsuit against public participation, and you make

10    sure that somebody regrets exercising their First Amendment

11    rights.  I would ask that if Your Honor is going to do

12    something like this, that Your Honor also put a strong

13    element of control into it, because this is getting out of

14    control, and it is very unfortunate --

15           THE COURT:  What would be that element of control?

16           MR. RANDAZZA:  Tell them that the First Amendment

17    does apply and there is no preliminary injunction available

18    in a free speech case.  That is what I would say.  If they

19    want discovery, and they have asked for discovery, they have

20    bombed us with discovery, we have given it to them

21    previously, they are lying when they say they have not

22    gotten it.  They have got other discovery that they have

23    requested that is not due yet.  If we don't provide that,

24    let them file a motion to compel, or let us file a

25    protective order.  I don't know if Your Honor handles those
```

1   discovery matters yourself or refers them to a magistrate,

2   but that can be dealt with.  This is all just smoke and all

3   just hyperbole in order to try to get you to enter an

4   unconstitutional order again.  You let them write the last

5   one, and I don't think this next one is going to be any

6   better.

7               Thank you, Your Honor.

8               THE COURT:  Thank you.

9               Ms. Yost, did you have something?

10              MS. YOST:  Very quickly.  Thank you for indulging

11  me, Your Honor.

12              To Mr. Randazza's point that we have not even

13  entered an answer yet in this case, and the amount of

14  discovery that Mr. Magleby is asking for will take some

15  amount of time, now that we have had our Rule 26 conference

16  we are in the process of responding to discovery requests

17  that we already have, and I would urge Your Honor to let

18  that process proceed, without then pausing and having a

19  flurry of depositions and witnesses fly in from Florida and

20  muddy the waters when we can let the case take its natural

21  course.

22              THE COURT:  Thank you.

23              I'll take all of the motions, except the ones I

24  ruled on earlier about the supplemental briefing, under

25  advisement and try to get something out quickly.

1          Thank you for your arguments today.

2          The Court is in recess.

3          (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25