IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| **PURPLE INNOVATION, LLC, A** Delaware limited liability company,<br><br>Plaintiff,<br>v.<br><br>**HONEST REVIEWS, LLC, a Florida Corporation, RYAN MONAHAN, an individual, and GHOSTBED, INC., a Delaware corporation,**<br><br>Defendants. | **PRELIMINARY INJUNCTION ORDER**<br><br><br><br><br><br><br>Case No.:  2:17-cv-00138-DB<br><br>Honorable Dee Benson |

## INTRODUCTION

On May 24, 2017, Plaintiff Purple Innovation, LLC ("Purple") submitted its Motion for Preliminary Injunction (the "Motion") against Defendants Honest Reviews, LLC ("HMR"), Ryan Monahan ("Monahan"), and GhostBed, Inc. ("GhostBed") (collectively, "Defendants"). [Doc. 115].  On September 16, 2017, after full briefing by the parties, the Court held an evidentiary hearing on Purple's Motion.  Having carefully considered the Motion, the evidence presented at the hearing, the arguments of counsel, and the submissions of the parties, and for good cause appearing, the Court now enters the following findings of fact, conclusions of law, and Order.

## I. FINDINGS OF FACT

### Procedural History

1. On March 2, 2017, the Court entered a temporary restraining order ("TRO") against Defendants, requiring, among other things, that certain online articles and statements posted by Monahan and HMR (collectively, the "Monahan Defendants") on the honestmattressreviews.com (the "HMR website") and affiliated social media platforms (the "HMR Social Media") be taken down. [Doc. No. 16].

2. On March 15, 2017, the Court granted the Monahan Defendants' motion to dissolve the TRO and denied Purple's motion to convert the TRO into a preliminary injunction. [Doc. No. 59]. In doing so, the Court relied in part on the declarations of Monahan and GhostBed's CEO, Marc Werner ("Werner"), which generally disavowed any significant relationship between Monahan and GhostBed. [Doc. Nos. 30, 31].

3. Purple subsequently filed the instant Motion, again seeking preliminary injunctive relief. [Doc. No. 115]. On June 28, 2017, Purple submitted the Declaration of Calisha Anderson ("Anderson"), a former employee of GhostBed, in further support of the Motion. [Doc. No. 137].

4. Following a hearing on July 7, 2017, the Court set an evidentiary hearing on Purple's Motion. [Doc. No. 145].

5. The Court held the evidentiary hearing on September 16, 2017. The Court heard testimony from Monahan, Werner, and Anderson.

**Credibility of the Witnesses and Evidence Presented at the Hearing**

6. The Court found the testimony of Calisha Anderson to be credible and persuasive as to the relationship between Monahan and GhostBed.

7. Even without Anderson's testimony, the evidence in the record and presented at the hearing is sufficient to demonstrate the existence of a clear affiliation between Monahan and GhostBed.

8. In contrast to Anderson's testimony, the Court found the testimony of Monahan and Werner to be less than credible. In any event, their testimony did not convince the Court that no substantial relationship exists between Monahan and GhostBed.

9. Based on the testimony of Anderson and the documentary evidence presented at the hearing, the Court finds the declarations of Werner and Monahan submitted in support of their motion to dissolve the TRO to be very concerning. Certain statements in the declarations, including Werner's statement in Paragraph 12 of his declaration that "GhostBed does not have any affiliation whatsoever with . . . Mr. Monahan," [Doc. No. 31], are at best misleading, if not outright false. Subsequent paragraphs in Werner's declaration fail to elucidate the details of the relationship between Monahan and Werner in a forthcoming manner, and the declaration is in many respects misleading, oblique, and likely the product of careful attorney drafting.

10. The evidence also strongly calls into question the veracity of Monahan and Werner in the declarations to the effect that Monahan's use of the title "Chief Brand Officer" for GhostBed was unauthorized and a mistake.

### Monahan Establishes Honest Reviews, LLC and
### the HMR Website and Social Media

11. Monahan acquired the domain name honestmattressreviews.com on or about August 10, 2016. Monahan registered the domain name through Domains by Proxy, which conceals the name of the actual owner or controller of the domain name. [Ex. 7].

12. At or about the same time, Monahan created the HMR Social Media, including but not limited to a YouTube channel, Facebook and Twitter pages, and an Instagram account. Since its inception, Monahan simultaneously posts much of the content from the HMR website to the HMR Social Media.

13. Monahan is the sole owner of HMR. Monahan controls all of the content on the HMR Website, and he single-handedly runs the HMR Social Media.

14. Monahan formed Honest Reviews, LLC on October 10, 2016, when he filed the articles of organization for the company. [Ex. 6].

### Defendants Concealed and Failed to Disclose the
### Close Affiliation between Monahan and GhostBed

15. As discussed below, Monahan and GhostBed have an affiliation that dates back to at least 2015, including an economic relationship.

16. Despite Monahan's close association with GhostBed, the Monahan Defendants fail to disclose anything about the association on the HMR website or Social Media.

17. The disclosure on the HMR website that Monahan "consult[s] for many companies in this space as well as other industries at various capacities" does not adequately disclose Monahan's relationship with GhostBed.

18. Shortly after or simultaneously with Monahan's launch of the HMR Website and Social Media, Monahan and GhostBed engaged in efforts to remove evidence of their connections from the web.

19. Among other things, Monahan removed the "Chief Brand Officer" title from his LinkedIn and Twitter profiles, and GhostBed changed the author of various articles on the blog page of its website from Monahan to the "Sleepteam." The Court finds Defendants engaged in these efforts purposefully to hide from the public the affiliation between Monahan and GhostBed.

20. Beginning in 2015, Monahan provided extensive digital marketing and social media services to GhostBed. Monahan provided these services to GhostBed on an ongoing basis through his company, Social Media Sharks, LLC ("Social Media Sharks"), which acted as a subcontractor for Achieve Agency ("Achieve").[1]

21. GhostBed paid Achieve for its services on a monthly basis and, in turn, Achieve paid Social Media Sharks.

22. Based upon the Social Media Sharks invoices presented at the hearing, GhostBed, through Achieve, has paid SMS approximately $150,000.[2] Based upon Monahan's testimony, however, it appears that certain invoices may not have been produced, which means that the amount may be larger.

---

[1] Achieve is the successor in interest to a company known as Big Couch Media Group ("Big Couch"). For ease of reference, Achieve and Big Couch are referred to collectively as "Achieve."

[2] The invoices in Exhibit 177 total $128,887 through July 2017, yielding a total of $148,887 through September 2017, without including amounts from the missing invoices. [*See* Ex. 177].

23. GhostBed currently pays Social Media Sharks $10,000 per month for the services it provides to GhostBed through Achieve.

24. Monahan continues to provide digital marketing and social media services to GhostBed, through Social Media Sharks and Achieve, to this day.

25. Among other things, Monahan has been and is in charge of GhostBed's Facebook page, he has assisted with the design and content of the GhostBed website, and he has worked on sales promotions and marketing emails sent to GhostBed customers.

26. Monahan has worked on competitive advertising for GhostBed, including on advertising targeted at Purple, one of GhostBed's primary competitors.

27. On at least one occasion, Monahan contacted Werner to request permission to run an attack ad on Purple and target Purple users on GhostBed's behalf.

28. Monahan, with GhostBed's knowledge and consent, at times represented himself as GhostBed's "Chief Brand Officer" (before the references to his holding this title were scrubbed from the internet).

29. Monahan, with GhostBed's knowledge and consent, at times has used the email address ryan@ghostbed.com.

### The Monahan Defendants' Statements about Purple

30. Defendants Honest Reviews and Ryan Monahan (the "Monahan Defendants") posts about GhostBed on the HMR Website and Social Media have been favorable.

31. Indeed, it appears that one of the very first – if not the very first – mattress review posted by Monahan on the HMR website was a review of the GhostBed, which received over four stars. [Ex. 8].

32. By contrast, the statements and articles on the HMR website and Social Media have been – with relatively few exceptions – extremely critical of Purple. The Monahan Defendants, with GhostBed's knowledge and consent, have targeted Purple on the HMR Website and Social Media with a negative and inflammatory online campaign regarding the anti-tack powder that Purple uses on its mattresses and pillows.

33. Among other things, the articles and posts about the anti-tack powder state and imply in a false and misleading fashion that the powder is dangerous and causes cancer and respiratory problems, including for persons with asthma.

34. The articles and posts about the anti-tack powder state and imply in a false and misleading fashion that Purple is trying to deceive or hide the facts related to the anti-tack powder from consumers.

35. The Monahan Defendants' articles, posts, and videos have gone "viral," and have spread widely throughout the web, such that Purple's use of the anti-tack powder is now a common topic in various online fora.

36. Additionally, the Monahan Defendants' commentary on the lawsuit has spread widely throughout the web, including the YouTube video published on or about April 11, 2017, titled "Purple Mattress Sues Me Over These 4 Safety Questions" (the "Purple Video"). Monahan has pinned the Purple Video to the start of the HMR Facebook page, where it has been shared almost 4,000 times and has generated over 1,200 comments. HMR's YouTube channel, where Monahan has also pinned the Purple Video to the beginning of its home page, indicates that nearly 3.5 million users have watched the video.

37. As reported by consumers to Purple's customer service department and on various online platforms, including the HMR Website and Social Media, and including Purple's website and social media, the statements and assertions in the articles and related materials are causing consumer confusion. Numerous consumers are questioning the safety of Purple's products, and many consumers affirmatively believe that Purple's products are in fact dangerous, cause cancer, and cause respiratory problems.

38. The Monahan Defendants' statements and assertions have impacted consumers' purchasing decisions, causing them to return Purple products, decide not to Purchase products, and cancel their orders of Purple products.

### GhostBed's Statements about Purple

39. Werner admitted that in May 2016, his daughter Ashley Werner, who is employed by GhostBed, posted a false review of the Purple mattress on Amazon.com, under the fictional name "Cami J.," in which she implied that the Purple mattress uses the same powder at issue in lawsuits involving Johnson and Johnson, and makes reference to "all these people getting cancer from their powders." [Ex. 162].

40. The Monahan Defendants have made similar statements on the HMR website and Social Media, suggesting that Purple's anti-tack powder is baby powder or talc, such as that involved in the Johnson & Johnson lawsuits.

41. GhostBed's customer service representatives have made false and misleading statements to consumers to the effect that Purple uses baby powder on its products, that Purple's products cause cancer, and that Purple's products cause people to cough up blood (the "GhostBed False Statements"). [Exs. 102, 104].

42. GhostBed has not denied that the statements are false and, according to Werner, GhostBed has told its employees to cease making all such comments.

43. As a result of the statements on the HMR Website and Social Media, the false review on Amazon, and GhostBed's false statements to consumers, Purple has suffered irreparable harm, and it faces the prospect of continuing irreparable harm to its reputation and goodwill.

44. Also as a result of the online campaign against Purple, Purple has suffered lost sales in an amount that may be difficult to quantify.

## II. CONCLUSIONS OF LAW

1. Plaintiff has a substantial likelihood of prevailing on the merits of its claims against Defendants, and there are serious issues on the merits of those claims that merit further litigation, including in particular Plaintiff's claim for false advertising under Section 43(a)(2) of the Lanham Act.

2. The evidence shows that Purple is substantially likely to establish that (i) a strong connection and affiliation exists between Monahan and GhostBed, which relationship is not disclosed on the HMR Website or Social Media; (ii) the statements made on the HMR Website and Social Media regarding Purple and its products and services are false and misleading; (iii) that the omitted disclosures regarding the Monahan-GhostBed relationship and the negative statements about Purple are material and are impacting consumer's purchasing decisions; (iv) that the statements and omissions are made in commerce; (v) the omissions as to the Monahan-GhostBed relationship are likely to cause confusion and mistake and to deceive as to the affiliation between them; (vi) the false and misleading statements regarding Purple and its

9

products and services are made in commercial advertising or promotion; (vii) the false and misleading statements regarding Purple and its products and services misrepresent the nature, characteristics, and qualities Purple's goods, services, and commercial activities; and (viii) Purple is suffering damage as a result.

3. Unless a preliminary injunction issues, Plaintiff will continue to suffer irreparable harm, including but not limited to permanent injury to its goodwill and reputation, its ability to do business, and lost sales in an amount difficult or impossible to quantify.

4. An injunction would not be adverse to the public interest because it will promote fair and honest competition and advertising.

5. The threatened injury to Plaintiff outweighs any harm that might result to Defendants from the issuance of a preliminary injunction.

6. Therefore, under Rule 65 of the Federal Rules of Civil Procedure and 15 U.S.C. § 1116(a), Plaintiff is entitled to a preliminary injunction.

### III. ORDER

The Court therefore grants Plaintiff's Motion and ORDERS as follows:

1. This Order binds and is enforceable against Defendants and their officers, agents, servants, employees, and attorneys, and any other persons who are in active concert or participation with them.

#### A. Disclosures Regarding Affiliation

2. The Monahan Defendants shall immediately prominently display on the Honest Mattress Reviews website, www.honestmattressreviews.com ("the HMR website") and all associated social media platforms, including without limitation the HMR Facebook page,

YouTube Channel, and Twitter page (collectively, the "HMR Social Media"), a statement fully disclosing the relationship between Monahan and GhostBed (the "Disclosure Statement").

3. The Disclosure Statement must be clear and conspicuous and must appear at the top of the HMR website's home page and every other page of the HMR website. The Disclosure statement must also appear clearly and conspicuously at the top of each HMR Social Media platform.

4. The Disclosure Statement shall read as follows:

The owner of HMR, Ryan Monahan, has previously held himself out to the public and the court as independent and unbiased. However, the Federal District Court has found that Monahan has a significant business relationship with GhostBed and its CEO, Marc Werner, from which Monahan derives significant income. The Court also found that HMR has been consistently favorable to GhostBed, and unfairly critical of Purple's products, one of GhostBed's primary competitors. For more information, go to: [INSERT LINK TO THIS COURT'S PRELIMINARY INJUNCTION ORDER HERE].

**B.      Management of Previously Published Content**

5. The Monahan Defendants shall immediately remove and delete all online content previously published by them that include any statements or inferences to the effect that Purple uses baby or talc powder on its products, that Purple is affiliated with or similar to Johnson & Johnson, that Purple's products cause cancer, or that Purple's products cause people to cough up blood. Such content shall be removed from the HMR Website, HMR Social Media, and any other online location under the control of the Monahan Defendants.

6. The Monahan Defendants are prohibited from re-posting any of the foregoing materials online or in any other medium, and they are prohibited from soliciting, paying, hiring, or encouraging third parties to comment on or post material that would violate the above

prohibition. The Monahan Defendants are prohibited from boosting or otherwise promoting any comments or materials posted by third parties on these topics.

7. The Monahan Defendants shall clearly and conspicuously display the Disclosure Statement and a link to this Order on each page or video referencing Purple on the HMR website, HMR Social Media, and any other online location under the control of the Monahan Defendants. If the Monahan Defendants choose to post any new material regarding Purple, including any videos, the Disclosure Statement and a link to this Order shall be clearly and conspicuously displayed with the presentation and re-posting of the new material.

8. The Monahan Defendants will immediately cause the Disclosure Statement to be delivered through all media channels through which communications about Purple have previously been sent.

**C. Commentary on the Lawsuit**

9. The Monahan Defendants are prohibited from publishing or making statements related to this lawsuit online or elsewhere that misrepresent the nature of the lawsuit or this Court's orders.

10. In conjunction with any future statements about this lawsuit, including on the HMR website, the HMR Social Media, or through any other media, the Monahan Defendants shall display in a clear and conspicuous manner, consistent with the directives above, the Disclosure Statement and a link to this Order.

**D.     GhostBed**

11.     GhostBed shall not make any statements to the effect that Purple uses baby or talc powder on its products, that Purple's products cause cancer, or that Purple's products cause people to cough up blood.

12.     GhostBed shall remove from its website and social media all existing references to HMR as an independent, third party mattress review site.

13.     This Order is issued without bond.

DATED this 22nd day of September, 2017.

UNITED STATES DISTRICT COURT

_____
Judge Dee Benson