FRANCIS M. WIKSTROM, USB #3462
JULIETTE P. WHITE, USB #9616
KENNEDY K. LUVAI, USB #14559
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
FWikstrom@parsonsbehle.com
JWhite@parsonsbehle.com
KLuvai@parsonsbehle.com
ecf@parsonsbehle.com

*Attorneys for Defendant GHOSTBED, INC., a Delaware corporation*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| PURPLE INNOVATION, LLC, a Delaware limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>HONEST REVIEWS, LLC, a Florida corporation, RYAN MONAHAN, an individual, and GHOSTBED, INC., a Delaware corporation,<br><br>Defendants. | **DEFENDANT GHOSTBED, INC.'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR SANCTIONS**<br><br>Case No. 2:17-cv-00138-DB<br><br>The Honorable Dee Benson |

Defendant Ghostbed, Inc. ("GhostBed"), by and through its undersigned counsel of record, submits the following memorandum in opposition to Plaintiff Purple Innovation, LLC's ("Purple") Motion for Sanctions ("Motion") (Dkt. No. 220).

# **Table of Contents**

I.   INTRODUCTION ...................................................................................................... iii

II.  STATEMENT OF FACTS ........................................................................................ vi

   A.  Relevant Procedural History ............................................................................... vi

     1.  February through March 2017 ...................................................................... vi

   B.  The Alleged Misstatements by GhostBed and Mr. Werner ................................ ix

     1.  The "Affiliation" Statements ........................................................................ ix

     2.  The "Chief Brand Officer" Statements ........................................................ xi

     3.  The ryan@ghostbed.com Email Statements .............................................. xiii

     4.  The "Competitive Marketing" Statements ................................................. xiv

   C.  Prior Explanations and Clarifications of the Misstatements ............................. xv

   D.  Relevant Discovery Background ................................................................... xviii

   E.  Purple's Creation of and Reliance on False Information in Exhibit 195 ......................... xix

III.  ARGUMENT ............................................................................................................ 1

   A.  Sanctions Are Not Warranted in this Case Under the Legal Standards that Apply to the Court's Inherent Power to Impose Sanctions .................................................................. 1

   B.  Case-Terminating Sanctions Are Not Warranted Here. ...................................... 2

     1.  GhostBed has not Caused Actual Prejudice to Purple. ................................. 3

     2.  GhostBed Has Not Interfered with the Judicial Process. .............................. 6

     3.  Neither GhostBed Nor Mr. Werner Have Acted in Bad Faith. ...................... 8

     4.  This Court has not Issued Any Prior Warnings. .......................................... 10

     5.  Efficacy of Lesser Sanctions. ..................................................................... 11

   C.  The Alternative Relief of an Adverse Jury Instruction is Also Unwarranted. ................... 12

   D.  Purple Should Not Be Awarded Fees and Costs as a Sanction. ......................... 13

IV.  CONCLUSION ....................................................................................................... 14

4838-6284-5013v4

## I.   <u>INTRODUCTION</u>

At the outset of this case, GhostBed and its CEO, Marc Werner, submitted and relied on a declaration that, in certain instances, lacked the level of candor and attention to detail necessary to ensure that all of the material facts were clearly stated and understood by all parties and the Court, and that any relevant background information was sufficiently explained.  As a result, this Court has found that those statements were "at best misleading," "oblique," and "fail[ed] to elucidate the details" of the relevant disputed factual issues.[1]  GhostBed and Mr. Werner acknowledge that they should have proceeded with greater care at the outset, and conducted more due diligence prior to making the statements at issue.  They take the Court's concerns very seriously, and do not dispute the Court's conclusion that these statements were not the model of clarity that they should have been.

However, these missteps do not rise to the level of sanctionable offenses.  The law governing sanctions pursuant to the inherent powers of the Court, such as the ones requested by Purple here, has traditionally required a far greater level of misconduct and culpability than what is fairly presented here.  GhostBed respectfully submits that there are reasonable explanations for the statements at issue in the present Motion—explanations that the Court may find imperfect but that, nonetheless, in all their imperfection remain the same explanations that GhostBed has offered throughout this case.  In evaluating Purple's Motion, it is important to recall the history of this case and to evaluate Purple's current contentions objectively, because context is important.  Purple is trying to take statements made in the rush to respond to an *ex parte* temporary restraining order

---

[1] Preliminary Injunction Order, Dkt. No. 191, at 3, ¶ 9.

and the preliminary (and now indisputably) inaccurate allegations supporting that order, and recast those statements as deliberate misrepresentations.

But the statements at issue here were never intended to mislead or made in bad faith.  In their zeal to quickly rebut an undisputedly false allegation—*i.e.*, that Mr. Monahan is or ever was an employee of GhostBed—GhostBed and Mr. Werner concede that certain statements made by Mr. Werner in his March 8, 2017, declaration appeared to be misleading and created uncertainty about facts that, at the time, did not seem highly material.  Mr. Werner's intent at the time was to prove simply that Mr. Monahan was not an employee of GhostBed, and that GhostBed was not responsible for the Honest Mattress Reviews ("HMR") website—two factual allegations that remain unproven.  However misguided it might appear in retrospect, every statement at issue in Purple's present Motion ties back to and can be explained by GhostBed's original efforts to rebut the single allegation that Mr. Monahan was an employee.

Moreover, GhostBed is not the only party in this case that has presented arguably misleading or inaccurate information to the Court.  GhostBed recently determined that an exhibit proffered by Purple at the September 16, 2017 preliminary injunction hearing ("PI Hearing"), Exhibit 195, contains false information that likely influenced the Court's determination that "the testimony of . . . Werner [was] less than credible,"[2] and that Mr. Monahan targeted Purple on the HMR website "with GhostBed's knowledge and consent."[3]  At the PI Hearing, Purple claimed that Exhibit 195 contained hundreds of emails purporting to show direct evidence of communications between Mr. Monahan and GhostBed/Nature's Sleep regarding HMR, emails that had been

---

[2] PI Order, Dkt. No. 191, at 3 ¶ 8.
[3] Id. at ¶ 32.

produced by a third party, Achieve Agency ("Achieve"). When both Mr. Werner and Mr. Monahan were cross-examined by Purple's counsel, Exhibit 195 was a focal point of the cross-examination. And counsel for Purple used Exhibit 195 to create the impression that Mr. Werner was lying when he denied he was in constant communication with Mr. Monahan about HMR.

But when counsel for GhostBed reviewed the underlying native Excel spreadsheet from Achieve and the original native emails produced by Achieve, those source documents revealed that none of the emails in Purple's Exhibit 195 were actually sent to anyone at GhostBed (or Nature's Sleep). Thus, the Exhibit 195 that Purple created for the PI Hearing contains demonstrably false information. Exhibit 195 was used to create the misimpression that there were continuous, direct communications between Mr. Monahan and GhostBed/Nature's Sleep regarding HMR, when there were no such communications, and that Mr. Werner and Mr. Monahan were not credible when they denied any knowledge about those nonexistent communications,.

To be clear, GhostBed is not asking this Court to take any action at this time against Purple for creating and presenting this highly material, yet facially inaccurate, evidence at the PI Hearing.[4] Rather, GhostBed raises this evidentiary issue because Purple relied on Exhibit 195 when it cross-examined Mr. Werner at that hearing. When Mr. Werner struggled to recall or explain the documents on Purple's Exhibit 195 (and appeared to lack credibility as a result), he did so because those documents did not, and do not, actually exist. To the extent the Court reflects on Mr. Werner's credibility and intent when deciding Purple's Motion, GhostBed submits that it is important to appreciate that the first document Mr. Werner was shown by opposing counsel at the

---

[4] GhostBed is still trying to determine the reason for the factual errors in Exhibit 195, and reserves the right to move to strike or exclude Exhibit 195 in the future should Purple attempt to rely on that exhibit in any future filings or at trial.

PI Hearing falsely indicated that he was copied on emails he never actually received and colored the remainder of his live testimony that day.  And while Purple argued at the PI Hearing that GhostBed was "regularly notified about negative Purple comments that arise from the H.M.R. website," and that Achieve would "track these comments and send e-mail notices to [Monahan] and Ghostbed and Mr. Werner," those arguments are not supported by Exhibit 195 or any other direct evidence.[5]

GhostBed and Mr. Werner recognize that tunnel-vision led to mistakes and unclear statements in the Werner Declaration, acknowledge that they should have proceeded with greater care in the early days of this case, and regret that they did not do so.  But ever since the Werner Declaration was submitted, GhostBed and Mr. Werner have tried on multiple occasions to explain the context of Mr. Werner's original statements and his intent in making those statements, and to provide additional relevant information for further clarification.  As explained herein, their conduct does not rise to the level of intentional, willful, or bad faith conduct that would clearly and convincingly sustain an award of sanctions.  This Court should decline to sanction GhostBed for the statements at issue here, and the parties should be allowed to proceed with this case unfettered by case-terminating sanctions, adverse jury instructions, or monetary sanctions, so that a full and fair resolution can be reached on the merits.

## II.    STATEMENT OF FACTS

### A.    Relevant Procedural History

#### 1.    February through March 2017

---

[5] *See* infra at xxi-ii, ¶ 55.

1.      Plaintiff Purple Innovation, LLC ("Purple") filed its original Complaint in this action on February 24, 2017.  Dkt. No. 2.  In that Complaint, Purple alleged that Ryan Monahan, through his mattress review website Honest Mattress Reviews ("HMR"), was "directly or indirectly – and surreptitiously – working with GhostBed to make false and misleading statements of fact" about Purple, and that GhostBed was paying Mr. Monahan to do so.  *Id.* at ¶ 5.  As support for this theory, Purple relied repeatedly on the allegation that Mr. Monahan was a current or former employee of GhostBed.  *Id.* at ¶ 1 ("Upon information and belief, GhostBed, where Monahan is or recently was employed …"); at ¶ 3 ("Indeed, Monahan was previously employed as GhostBed's Chief Brand Officer …"); at ¶ 117 ("Specifically, Monahan was previously employed [as] GhostBed's Chief Brand Officer.").

2.      Three days later, on February 27, 2017, Purple filed an *ex parte* Motion for Temporary Restraining Order (the "TRO Motion").  In that TRO Motion, Purple continued to contend that Mr. Monahan was an employee of GhostBed to support its allegation that GhostBed should be held liable for Mr. Monahan's and/or HMR's conduct.  *See* Dkt. No. 8, at  iii ("Until at least October 2016, Monahan was employed as GhostBed's Chief Brand Officer."); at xlv ("Specifically, Monahan was previously employed [as] GhostBed's Chief Brand Officer.").  And on February 28, 2017, Purple filed a supplemental memorandum in support of its TRO Motion where it claimed to have uncovered additional information showing that Mr. Monahan was a member of GhostBed's marketing department and was thus "an employee and contractor" of GhostBed.  Dkt. No. 11, at 7.

3.      On March 1, 2017, this Court denied Purple's TRO Motion citing, among other grounds, Purple's failure to provide notice to defendants and an explanation as to why notice

should not be required.  That same day, after filing an affidavit regarding its efforts to provide notice to defendants, Purple sought an expedited hearing on its TRO Motion.  Dkt. No. 15.

4.      On March 2, 2017, this Court entered an order granting Purple's *ex parte* TRO Motion and entered the Temporary Restraining Order (the "TRO").  Dkt. No. 16.

5.      On March 3, 2017, Purple filed a Motion for an Order to Show Cause Why Defendants Should Not be Held in Contempt for allegedly violating the TRO ("Motion to Show Cause").  Dkt. No. 17.  In the Motion to Show Cause, Purple argued that GhostBed was "working together" with HMR and Mr. Monahan to violate the TRO.  *Id.* at 1-2.  Purple also argued that GhostBed should be held liable for materials posted on the HMR site in alleged violation of the TRO by contending, in relevant part, that Mr. Monahan (a) was a current employee of GhostBed's marketing department, (b) has an office at GhostBed's headquarters in Florida and a telephone extension at that office, and (c) could be reached using the email address marketing@ghostbed.com.  *Id.* at 4.

6.      Six days later, on March 9, 2017, defendants HMR and Mr. Monahan filed an emergency motion to stay and dissolve the TRO ("HMR Motion to Dissolve").  Dkt. No. 28.  In support of the Motion to Dissolve, HMR and Mr. Monahan submitted a declaration from Marc Werner, the CEO of GhostBed ("Werner Declaration").  Dkt. No. 31.  That same day, GhostBed also filed a motion to dissolve the TRO and to dismiss the complaint against GhostBed, and relied on the same Werner Declaration ("GhostBed Motion to Dissolve").  Dkt. No. 36.

7.      Mr. Werner's intent with the Werner Declaration was to address and rebut each of Purple's specific allegations that Mr. Monahan was or had ever been an employee of GhostBed, including that Mr. Monahan was a current employee of GhostBed, had an office at GhostBed, and

could be reached at a GhostBed email address.  *See, e.g.*, Werner Decl., at ¶¶ 15-19; Declaration of Marc Werner, filed concurrently with this opposition ("Second Werner Decl."), at ¶¶ 4, 10, 11, 13.

8.      Mr. Werner executed the Werner Declaration on March 8, 2017, only 7 days after first receiving Purple's TRO Motion, and within 5 days of Purple's filing of its Motion to Show Cause.

9.      On March 10, 2017, after defendants filed their motions to dissolve the TRO, Purple filed a motion for leave to conduct expedited discovery through which it sought information regarding defendants' relationships with each other, particularly as between GhostBed and Mr. Monahan.  Dkt. No. 39, at 2-3.  In setting forth the factual basis for the motion, Purple argued that Mr. Monahan's disputed status as an employee of GhostBed was a key issue for discovery.  *Id*. at v-vi, ¶¶ 7, 10.

10.     On March 15, 2017, the Court dissolved the *ex parte* TRO and denied Purple's motion for leave to conduct expedited discovery, among other rulings.  Dkt. No. 59.

B.      **The Alleged Misstatements by GhostBed and Mr. Werner**

1.      **The "Affiliation" Statements**

11.     GhostBed, like Purple, is a new, Internet-based, direct to consumer mattress company.  GhostBed was incorporated in early 2015, and first launched online and began selling products in November 2015—only two months before Purple—with a few key employees and a lean corporate structure.  Second Werner Decl. at ¶ 5.

4838-6284-5013v4

12.     For most of its first year, GhostBed did not have an employee devoted solely to marketing; rather, GhostBed outsourced all of its marketing and promotional work to a company now known as Achieve Agency ("Achieve").  Second Werner Decl. at ¶ 6.

13.     GhostBed first hired Achieve in August 2015, approximately three months before it launched online.  Dkt. No. 31, Werner Decl. at ¶ 12.  Achieve provided GhostBed with a range of marketing services.  *See generally* Second Werner Decl.

14.     From what GhostBed understands and has been able to learn, many of Achieve's services were provided by third parties, such as independent contractors and consultants, hired by Achieve.  One of those third parties was Mr. Monahan's company, Social Media Sharks.  Second Werner Decl. at ¶ 7.

15.     As of October 30, 2017, GhostBed has terminated its relationship with Achieve (and, by extension, any of its subcontractors), having now contracted with a different company to provide marketing and advertising services after searching for over a year.  *Id*. at ¶ 16.

16.     In paragraph 6 of the Werner Declaration, Mr. Werner stated that "GhostBed does not have any affiliation whatsoever with co-defendants Honest Reviews LLC [HMR] or Mr. Monahan."  What Mr. Werner intended to say was that there was no affiliation between GhostBed and HMR, or between GhostBed and Mr. Monahan as the individual responsible for HMR, in the sense of a close, formal business relationships, such as the one between a parent company and its subsidiary.  *Id*. at ¶ 8.

17.     Mr. Werner believed at the time that paragraph 12 of his declaration, where he briefly explained the business relationship between GhostBed and Achieve and Mr. Monahan (through Social Media Sharks) would be sufficient to provide clarity and context for the statement

x

in paragraph 6 of his declaration. *Id*. at ¶ 9. Mr. Werner recognizes now that the term "affiliation" is broader than what he originally meant, and that his statement could be viewed as a denial of any relationship at all between GhostBed and Mr. Monahan—a statement he never intended to make. *Id.* at ¶ 8.

18.     Consistent with Mr. Werner's intent, GhostBed explained in its March 9 Motion to Dissolve the *ex parte* TRO that GhostBed "does not have any affiliation whatsoever with co-defendant Honest Reviews, LLC, which is an entity that GhostBed believes is owned and operated by Mr. Monahan alone." Dkt. No. 36, at 4.

19.     Similarly, in that same motion, GhostBed also stated that "[a]lthough Mr. Monahan has been indirectly retained as a consultant by one of GhostBed's vendors on occasion, Mr. Monahan is not, and has never been, an employee of GhostBed." *Id*. GhostBed further explained that it had hired an outside marketing consultant, Big Couch Media Group which was later merged into the Achieve, and that it "understands and believes that Achieve used and uses an organization affiliated with Mr. Monahan as an outside consultant." *Id*. at 8.

20.     In several court filings between March 9, 2017, and September 16, 2017, GhostBed and Mr. Werner repeatedly tried to explain the facts regarding its business relationship with Mr. Monahan. *See* infra at ¶¶ 35, 40. Neither GhostBed nor Mr. Werner ever intended to, or believed that they were, hiding any relevant information regarding that business relationship. Second Werner Decl. at ¶ 15.

### 2.     The "Chief Brand Officer" Statements

21.     In paragraph 13 of the Werner Declaration, Mr. Werner stated that Mr. Monahan was not and had never been "Chief Brand Officer" at GhostBed. Again, Mr. Werner's intent was

to explain that Mr. Monahan was not an employee of GhostBed in that capacity, which was motivated by Purple's allegation that Mr. Monahan actually was and had been employed by GhostBed as its "Chief Brand Officer."  *Id*. at ¶ 10.

22.     At the time he signed the Werner Declaration, Mr. Werner had forgotten that, fifteen months earlier in December of 2015, he had an email exchange with Mr. Monahan in which he approved of Mr. Monahan's use of the title "Chief Brand Officer" for purposes of establishing GhostBed's Amazon Launchpad Page as part of the initial launch of the company online.  Werner had also been unaware at the time, or did not recall, the number of times that Mr. Monahan had used the "Chief Brand Officer" title in other marketing and promotional activities for GhostBed, such as setting up and running email marketing campaigns for GhostBed and running promotional campaigns for veterans. *Id*. at ¶ 12.

23.     GhostBed admits that Mr. Monahan had been authorized at various times to use the title "Chief Brand Officer" for specific purposes related to his consulting responsibilities. However, Mr. Monahan was never authorized to use that title for more general purposes, including for example on social media such as LinkedIn and Twitter, or at trade or industry conferences. *Id*.

24.     Thus, while Mr. Werner's statements regarding Mr. Monahan's use of the "Chief Brand Officer" title were literally true, they omitted important additional facts regarding when, to what extent, and for what purposes GhostBed had given Mr. Monahan permission to use the "Chief Brand Officer" title. *Id*.  Mr. Werner acknowledges that he should have tried to investigate these issues further before signing his declaration.  *Id*.

25.     GhostBed did not try to hide this information, and has produced documents as early as April 2017 evidencing Mr. Monahan's use of the "Chief Brand Officer" title.  *See* infra at ¶ 35.

Neither GhostBed nor Mr. Werner ever intended to, or believed that they were, hiding any relevant information regarding Mr. Monahan's authorized use of the "Chief Brand Officer" title in the past. Second Werner Decl. at ¶ 15.

### 3. The ryan@ghostbed.com Email Statements

26.     In paragraph 17 of the Werner Declaration, Mr. Werner stated that Mr. Monahan "does not have an GhostBed email address."  Again, Mr. Werner's intent was to explain that Mr. Monahan did not have a GhostBed email address at the time of his declaration, to further underscore the fact that Mr. Monahan was not an employee of GhostBed.  Second Werner Decl. at ¶ 13.

27.     GhostBed admits that it had authorized Mr. Monahan to use the email address ryan@ghostbed.com prior to March of 2017 for purposes of his consulting work including, for example, to conduct email marketing campaigns for GhostBed.  *Id*. at ¶ 14.

28.     Thus, while Mr. Werner's statements regarding whether Mr. Monahan had a GhostBed email in March 2017 were literally true, they omitted important additional facts regarding when, to what extent, and for what purposes GhostBed had given Mr. Monahan permission to use a GhostBed email address in the past. *Id*.  Mr. Werner recognizes that he should have reviewed his statement more carefully to ensure that there wasn't any missing information. *Id.*

29.     Once again, GhostBed did not try to hide this information, and has produced documents as early as April 2017 evidencing Mr. Monahan's use of the ryan@ghostbed.com email address.  *See* infra at ¶ 35.  Neither GhostBed nor Mr. Werner ever intended to, or believed that

they were, hiding any relevant information regarding Mr. Monahan's authorized use of the ryan@ghostbed.com email address in the past.

### 4.    The "Competitive Marketing" Statements

30.    GhostBed twice stated in court filings that Mr. Monahan had never "worked for GhostBed in connection with any competitive marketing concerning Purple or anyone else."  The first instance was on page 8 of GhostBed's Motion to Dissolve filed on March 9, 2017 (Dkt. No. 36), and the second was on page 16 if GhostBed's motion to dismiss Purple's First Amended Complaint filed on April 10, 2017 Dkt. No. 67.

31.    Purple objected to those statements in its opposition to GhostBed's motion to dismiss the first amended complaint on May 8, 2017, Dkt. No. 94, and also complained of them to GhostBed in subsequent correspondence to counsel.

32.    As explained infra at ¶ 37, in GhostBed's reply in support of its motion to dismiss, filed on May 22, 2017, GhostBed explains what it intended by those statements and further stated that, "to the extent any clarification is required, though, GhostBed withdraws the statement and says instead that Mr. Monahan is not, and has never been, a GhostBed employee, and any work he has done on the honestmattressreviews.com website was not as an employee or consultant of GhostBed." Dkt. No. 99 at 10 n. 7.  In so doing, GhostBed explained that the sentence at issue was meant to convey that Mr. Monahan did not work for GhostBed as an employee because he was not an employee and further noted that the sentence that *immediately* precedes this one specifically describes Mr. Monahan's consulting relationship with GhostBed.  *Id.*

33.    Accordingly, GhostBed has already explained, and to the extent necessary, withdrawn, the statements regarding competitive marketing since at least May 22, 2017.

34.     Moreover, documents clearly evidencing that Mr. Monahan did work on competitive advertising as a consultant for GhostBed were produced by GhostBed as early as April 2017, and have been cited and relied on by Purple in multiple court filings prior to the PI Hearing. GhostBed never intended to, nor believed that it was, hiding any relevant information regarding Mr. Monahan's work as a marketing consultant for GhostBed, including but not limited to any competitive marketing.

### C.     <u>Prior Explanations and Clarifications of the Misstatements</u>

35.     On April 10, 2017, GhostBed moved to dismiss Purple's first amended complaint. Dkt. No. 67.  In its opposition, filed on May 15, 2017, Purple raised many of the same arguments and factual disputes that are still at issue in the present Motion for Sanctions.  Dkt. No. 98.  At the same time, Purple acknowledged that it already had evidence in hand regarding those disputes. For example, Purple asserted that:

a.   "GhostBed and the Monahan Defendants have admitted that Monahan and GhostBed have a *current* business and financial tie." *Id.* at xii, ¶ 14.

b.   "Documents produced by GhostBed show that Monahan worked closely with Werner in 2016 to negatively target Purple in GhostBed's marketing activities" *id.* at xiv, ¶ 20, and cited three documents already produced by GhostBed to support this claim.  *Id.* at xiv – xvii, ¶¶ 21-26.

c.   "Documents recently produced by GhostBed also show that Monahan identified himself as Chief Brand Officer in communications with GhostBed customers, using the email address ryan@ghostbed.com."  *Id.* at xx, ¶ 31; *see also* xxiv, ¶ 38.

36.     In response, GhostBed's May 22, 2017, reply in support of its motion dismiss sought to clarify any confusion that might be remaining regarding certain factual issues.  Dkt. No. 99. For example:

a.   "But GhostBed stated in its initial motion, Dkt. 67 at 7, 16, that Mr. Monahan was a consultant, so that was never in dispute.  In fact, Mr. Monahan is a consultant to GhostBed and many other companies." *Id.* at iv.

b.   "Mr. Werner previously stated that Mr. Monahan does not 'have a[] GhostBed email address,' which was and remains a true statement. [. . . ] <u>For clarity</u>, GhostBed provided e-mail aliases to vendors or consultants, including Mr. Monahan, for certain durations to keep a consistent brand identity. GhostBed email addresses are also used when third-party vendors require a GhostBed email to open or manage accounts. For example, Outbrain, Tubular, and a contest software vendor that provided support for a GhostBed Veteran's Day contest all required such an email address. Yet, GhostBed shut down Mr. Monahan's access to the e-mail account before this lawsuit and Mr. Monahan has not actually accessed the account since November 2016. In any event, even if Mr. Monahan had a GhostBed e-mail address in the past, the fact remains that Mr. Monahan has never been a GhostBed employee." *Id.* at 6 (emphasis added).

37.     GhostBed also took the opportunity in its May 22 reply brief to explain, in a lengthy footnote, what it meant by the statement that Mr. Monahan never "worked for GhostBed in connection with any competitive marketing concerning Purple" and to withdraw the statement to the extent it was unclear:

> In context, though, the complained-of sentence meant that Mr. Monahan did not work for GhostBed as an employee because he was not an employee. The sentence that immediately precedes this one specifically describes Mr. Monahan's consulting relationship with GhostBed. <u>To the extent any clarification is required, though, GhostBed withdraws the statement</u> and says instead that Mr. Monahan is not, and has never been, a GhostBed employee, and any work he has done on the honestmattressreviews.com website was not as an employee or consultant of GhostBed.

*Id.* at 10 n. 7 (emphasis added).

38.    On May 24, 2017, Purple filed its motion for temporary restraining order, a preliminary injunction, expedited discovery, and scheduling order ("Motion for PI"). Dkt. No. 115.

39.    In its Motion for PI, Purple again relied on several documents that GhostBed had produced in the early months of the case—the same documents Purple had previously cited in its opposition to GhostBed's motion to dismiss the first amended complaint. *See, e.g.,* Dkt. No. 115, Exs. 16-19, 21.

40.    GhostBed, in its opposition to the Motion for PI, again explained the underlying facts relating to the Werner Declaration, including for example:

a. "There is no dispute (since the early days of this case) that Mr. Monahan is a social media consultant and has worked as such for GhostBed and several other companies.  Mr. Monahan is associated with Social Media Sharks, which is a consultant of the Achieve marketing agency, which in turn works as a consultant on GhostBed's marketing projects." Dkt. No. 125 at x.

b. "GhostBed provides e-mail aliases to vendors or consultants, including Mr. Monahan, for certain durations to keep a consistent brand identity. . . . Yet,

GhostBed shut down Mr. Monahan's access to the e-mail account since before this lawsuit and Mr. Monahan has not actually accessed the account since November 2016." *Id*. at xii.

### D.    **Relevant Discovery Background**

41.    As demonstrated herein, GhostBed and its counsel have cooperated with Purple in conducting extensive discovery since the outset of this case.  Beginning as early as April 2017, GhostBed has worked with opposing counsel to identify and produce relevant, responsive information in a timely manner.  To date, GhostBed has produced over 7,837 documents.

42.    For example, as noted supra at ¶ 35, GhostBed produced documents early in the case that are relevant to the issues in this Motion, including documents disclosing Mr. Monahan's use of the ryan@ghostbed.com email address, the "Chief Brand Officer" title, and Mr. Monahan's relationship with GhostBed through his company, Social Media Sharks, and Achieve.

43.    Importantly, one document that Purple is currently relying on—the December 7, 2015 email between Mr. Werner and Mr. Monahan regarding his first approval to use the "Chief Brand Officer" title—has not yet been produced by GhostBed because GhostBed has objected to Purple's discovery requests to the extent they seek documents and information prior to January 1, 2016.

44.    Specifically, on June 16, 2017, Purple served its first set of document requests on GhostBed.  GhostBed served its responses and objections to those document request on July 21, 2017, and in its objections specifically objected to producing any documents or information prior to January 1, 2016.  As a result, GhostBed would not have looked for or produced any emails from 2015 prior to the September Preliminary Injunction hearing, including but not limited to the email

from December 7, 2015, wherein Mr. Werner first discussed with Mr. Monahan use of the "Chief Brand Officer" title.

**E.     Purple's Creation of and Reliance on False Information in Exhibit 195.**

45.     At the PI Hearing on September 16, 2017, Purple's counsel proffered and relied on a document marked Exhibit 195, which it created for the purposes of the hearing.  Declaration of Juliette P. White ("White Declaration"), at ¶ 5, Ex. 2, (Pl. Ex. 195).

46.     At that hearing, counsel for Purple represented to counsel and to the Court that Exhibit 195 was "a document that we obtained from Achieve." Specifically, counsel for Purple showed Exhibit 195 to Mr. Monahan at the hearing, and then stated the following:

```
 8   Q.   I want to show you a document that we obtained from
 9   Achieve.  It is a large spreadsheet.  So Exhibit 195 is a
10   P.D.F.  In the binder it is 195-A.  It will either be a disk
11   or a zip drive that has the original.  Down in the bottom
12   left-hand corner here we have the Achieve control number,
13   which is ACH-4571.  Let me see if any of this refreshes your
14   recollection as to what Achieve does.
```

White Decl. at ¶ 6.

47.     Counsel for Purple also represented that Exhibit 195 "comprised" information from a native Excel Spreadsheet produced by Achieve.  White Decl. at ¶ 7.

48.     Purple's Exhibit 195 contains over 235 emails, all of which purport to show that one or more people at GhostBed or Nature's Sleep were copied on e-mail notifications sent to Mr. Monahan (at his Achieve account) about HMR, including for example when comments were posted on HMR's Facebook page.  White Decl. at ¶¶ 8, 28-34.

49.     Counsel for GhostBed has compared the emails identified in Exhibit 195 with the native Excel spreadsheet originally produced by Achieve and with the actual native emails produced by Achieve.  In every single instance, Exhibit 195 erroneously indicates that someone at GhostBed or Nature's Sleep was copied on the emails set forth in Exhibit 195.  The original source documents for Purple's Exhibit 195 do not indicate that the emails were ever copied to anyone at GhostBed or Nature's Sleep.  White Decl. at ¶¶ 9-12 and Ex. 3 thereto.

50.     When counsel for GhostBed examined data in the native spreadsheet, counsel confirmed that not only is there no data indicating that anyone at GhostBed or Nature's Sleep was copied on the emails, there is no one copied on the emails at all.  This conclusion is further affirmed by the actual native e-mails produced by Achieve and the metadata for those emails—not one of them shows that anyone at GhostBed or Nature's Sleep was copied on any of the emails in Exhibit 195, or that anyone was copied on the emails at all.  None of the "Recipients in cc line" in Exhibit 195 are found in the original underlying source evidence on which Exhibit 195 was purportedly based.  *Id*. at ¶¶ 11-12.

51.     For example, Purple's counsel cross-examined Mr. Monahan and Mr. Werner regarding an email about an individual named "Steve Hergert," which was sent to Mr. Monahan after "Steve Hergert" commenting on the Facebook Page for Honest Mattress Reviews.  Under the column header "Recipients in Cc line" for this email, Exhibit 195 lists eight email addresses, including those of GhostBed's Alan Hirschhorn and Ashley Werner, and individuals at Achieve and Big Couch Media:



| Recipients in Cc line |
|---|
| Joshua Miller <joshua@c-istudios.com>, Abbie Cessna <abbie@c-istudios.com>, Cynthia Howland <chowland@achieveagency.com>, Ryan Monahan <rmonahan@achieveagency.com>, Alan Hirschhorn <alan@naturessleep.com>, Georgianne Brown <georgianne.brown@bigcouchmedia.com>, William Bertoldi <wbertoldi@achieveagency.com>, Ashley Werner <Ashley@NaturesSleep.com> |

White Decl. at ¶ 16.

52.     In the original native Excel spreadsheet from Achieve, this email is shown in row 7916. There are no email addresses entered in the "Recipients in Cc line" column or any similar column containing "cc" or "bcc" data (Columns "L" (highlighted in yellow below) and "M") in that row entry:



White Decl. at ¶ 17.

53.     Similarly, the actual email regarding "Steve Hergert," as produced by Achieve as Achieve_0000136908, shows that it was not copied to anyone at GhostBed, as shown in the image below:



White Decl. at ¶ 18.

54.     Accordingly, the representation Purple's counsel made at the hearing to counsel, witnesses, and the Court that Exhibit 195 was a document they obtained from Achieve or that it comprised accurate information from a native spreadsheet obtained from Achieve was incorrect. *See id.* at ¶¶ 9-14.

55.     Counsel for Purple used Exhibit 195 at the PI Hearing to attempt to establish a direct line of communication between GhostBed and HMR.  Specifically, he asserted that Mr.

Monahan and Mr. Werner were "regularly notified about negative Purple comments that arise from the H.M.R. website," and that Achieve would "track these comments and send e-mail notices to [Monahan] and Ghostbed and Mr. Werner" based on the false information in Exhibit 195.  White Decl. at ¶ 28.  He also used Exhibit 195 at the hearing in an effort to prove that Mr. Werner would "receive e-mails through the Achieve system on various topics," such as comments made on HMR's Facebook page.  *Id.*

56.     Relying on the false information in Exhibit 195, counsel for Purple challenged and cross-examined Mr. Werner and Mr. Monahan on a critical issue in this case—whether there are relevant or material connections between Honest Mattress Reviews and GhostBed.  White Decl. at ¶¶ 28-34.  But because Exhibit 195 incorrectly indicates that the emails were sent to anyone at GhostBed or Nature's Sleep, there is no evidence that any of these allegations are true.

57.     Purple also relies on Exhibit 195 in support of the instant Motion.  Purple argues that sanctions are warranted, at least in part, due to GhostBed's alleged knowledge of or involvement with the HMR website, and Purple's oft-repeated claim that GhostBed has failed to produce critical documents.  Mot. at vi and n.5, at 8-9 and n.19.

58.     In addition, in recent correspondence regarding GhostBed's discovery responses, counsel for Purple has asserted that the "spreadsheet contains references to dozens (if not hundreds) of emails sent or received by employees of GhostBed/Nature's Sleep that relate to Honest Mattress Reviews," and demanded that GhostBed produce these emails.  As recently as September 28, 2017, counsel for Purple has continued to insist that GhostBed produce the documents reflected in Purple's Exhibit 195, even after counsel for GhostBed raised questions regarding whether Exhibit 195 was accurate.  White Decl. at ¶¶ 35-37, Ex. 4.

59.     But GhostBed cannot produce documents that do not exist, and the false information in Exhibit 195 cannot provide support for Purple's Motion for Sanctions.

III.   **ARGUMENT**

A.   **Sanctions Are Not Warranted in this Case Under the Legal Standards that Apply to the Court's Inherent Power to Impose Sanctions**

Purple's motion seeks the following sanctions against GhostBed: (a) striking of GhostBed's defenses and entry of judgment in Purple's favor, (b) dismissal of GhostBed's counterclaim, (c) entry of an adverse jury instruction against GhostBed, and (d) grant of monetary sanctions in the form of an award attorney's fees and costs connected with the preliminary injunction.  Purple does so on the basis of the Court's inherent power to do so.

The inherent powers of the courts are "governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). Part of the court's inherent power is the ability to select an appropriate sanction, if any, and courts have counseled that this power should be exercised with restraint and discretion. *Id.* at 44-45*; see also LaFleur v. Teen Help,* 342 F.3d 1145, 1149 (10th Cir. 2003).  The inherent power to sanction "is not a broad reservoir of power, ready at an imperial hand, but a limited source; an implied power squeezed from the need to make the court function." *Chambers*, 501 U.S. at 42.

Sanctions pursuant to the court's inherent powers should be limited to situations involving "abuse of the judicial process" or bad faith, not unintentional mistakes.  *See, e.g. Sun River Energy, Inc. v. Nelson*, 800 F.3d 1219, 1227 (10th Cir. 2015) ("A court's inherent power gives it the authority to impose 'a sanction for abuse of the judicial process, or, in other words, for bad faith conduct in litigation.'") (quoting *Farmer v. Banco Popular of N. Am.*, 791 F.3d 1246, 1256 (10th Cir. 2015); *Hutchinson v. Pfeil,* 208 F.3d 1180, 1186 n.9 (10th Cir. 2000) (noting "the inherent authority of a court to assess costs and attorney's fees . . . against a party who has acted in bad

faith, vexatiously, wantonly, or for oppressive reasons") (ellipses in original); *EEOC v. The Original Honeybaked Ham Company of Georgia, Inc.*, No. 11-cv-02560-MSK-MEH, 2013 WL 752912, at *2 (D. Colo. Feb. 27, 2013) (sanctions under the court's inherent authority "generally require a finding of bad faith.").  Before a court imposes sanctions against a party under its inherent power, it should find that the party "acted in bad faith, vexatiously, wantonly or for oppressive reasons." *Chambers.* 501 U.S. at 45-46.  Moreover, sanctions should be imposed only when "the party seeking sanctions makes that showing by clear and convincing evidence." *Xyngular Corp., v. Schenkel*, 200 F.Supp.3d 1273, 1312 (D. Utah 2016).

As explained herein, there is no evidence of willful, bad faith, vexatious, wanton, or oppressive misconduct on the part of GhostBed or Mr. Werner to support a finding by clear and convincing evidence that sanctions would be appropriate in this case.

### B.  <u>Case-Terminating Sanctions Are Not Warranted Here.</u>

In determining what type of sanction is warranted, courts in the Tenth Circuit rely on the *Ehrenhaus* factors: "(1) the degree of actual prejudice to the [moving party]; (2) the amount of interference with the judicial process; (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance; and (5) the efficacy of lesser sanctions." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 920-21 (10th Cir. 1992) (internal citations omitted).

As the Tenth Circuit observed in *Ehrenhaus*, "[a]t the outset, we recognize that dismissal represents an extreme sanction appropriate only in cases of willful misconduct." *Ehrenhaus,* 965 F.2d at 920 (citing *Meade v. Grubbs*, 841 F.2d 1512, 1520 (10th Cir. 1988) and *M.E.N. Co. v. Control Fluidics, Inc.*, 834 F.2d 869, 872-73 (10th Cir.1987)).  "Because dismissal with prejudice

2

'defeats altogether a litigant's right to access to the courts,' it should be used as 'a weapon of last, rather than first, resort.'" *Ehrenhaus,* 965 F.2d at 920 (quoting *Meade*, 841 F.2d at 1520 n.6). "Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits is dismissal an appropriate sanction." *Id.* at 921. Notably, Purple does not cite any Tenth Circuit cases supporting the entry of judgment in a plaintiff's favor on its affirmative claims as a sanction against the defendant. Rather, almost all the "case-terminating" sanctions involve dismissal of the offending party's claim.

As explained below, Purple has not met the standard for proving, by clear and convincing evidence, that it would be appropriate to strike GhostBed's defenses, enter judgment in favor of Purple, and dismiss GhostBed's counterclaim.

### 1.   GhostBed has not Caused Actual Prejudice to Purple.

Here, Purple complains that is was prejudiced because it was unable to obtain a preliminary injunction until six months into the case. *See* Mot. at 5. However, even if this delay was a result of GhostBed's statements, a contention that GhostBed disputes, that passage of time is by itself insufficient to warrant the case-terminating sanctions that Purple is asking the Court to enter now. "[D]elay involved in this case, by itself, would not be sufficient to warrant dismissal absent other justifying circumstances." *Ehrenhaus,* 965 F.2d at 921. There ordinarily must be something else, something beyond mere delay, to tip the scales towards a finding of prejudice. *See id.* Consistent with this view, the Eleventh Circuit has held that "delay alone, in the absence of bad faith, is insufficient to justify dismissal with prejudice," especially when the delay did not result in prejudice to the moving party's ability to defend the case. *See Pontenberg v. Boston Scientific Corp.,* 252 F.3d 1253, 1259 (11th Cir. 2001). Accordingly, a complete analysis of this factor

3

necessitates an examination of whether "other justifying circumstances" supporting case-terminating sanctions are present here. *See Ehrenhaus,* 965 F.2d at 921.

First, Purple claims that but for Mr. Werner and Mr. Monahan's declaration testimony, it would not have had to defend against the motion to dissolve the TRO, seek additional discovery, and prepare for an evidentiary hearing in support of their later motion for preliminary injunction. Mot. at 5. But Purple obtained the original TRO on an *ex parte* basis, and it is far from clear that Purple would have been able to successfully convert its TRO into a preliminary injunction without allowing at least some discovery and an opportunity for defendants to be heard. At a minimum, Purple would have been obligated to respond to GhostBed's arguments and evidence in short order regardless of whether it took place in the context of dissolving the TRO, or in seeking a preliminary injunction. And, it is not uncommon for preliminary injunctions in Lanham Act cases to involve at least some preliminary discovery and an evidentiary hearing, all of which would have taken, at a minimum, several weeks to complete.

More importantly, one of the key allegations supporting Purple's original *ex parte* TRO was that Mr. Monahan was a current or former employee of GhostBed. The focus of Mr. Werner's original declaration, and GhostBed's early briefing in this case, was to demonstrate that Mr. Monahan was not and had never been an employee of GhostBed. Once that allegation was disproved, it became necessary for Purple to engage in some discovery to support its eventual motion for a preliminary injunction. In this case, discovery quickly commenced, and Purple was able to file its motion for a preliminary injunction two months later, near the end of May, relying in no small part on documents that GhostBed had already produced by that point. In addition, the discovery that Purple and the defendants conducted is discovery that would have taken place in

4

this case regardless of whether Purple had already obtained a preliminary injunction, or still needed to seek one.  Accordingly, Purple's invocation of typical motion practice and litigation tasks that would have occurred in the ordinary course cannot sustain a finding that there are "justifying circumstances" for case-terminating sanctions.

Second, Purple claims prejudice as a result of GhostBed's alleged failure to produce relevant evidence regarding its relationship with Mr. Monahan.  Mot. at 5.[6]  But GhostBed produced documents as early as April 2017 demonstrating "Monahan's use of the Chief Brand Officer title and his GhostBed e-mail address," and Purple has repeatedly referred to and relied on some of these documents in court filings.  The only arguably "new" information that Purple obtained from Achieve was the December 2015 email between Mr. Monahan and Mr. Werner regarding Mr. Monahan's first use of the "Chief Brand Officer" title.  But GhostBed had not produced that email prior to the PI Hearing for reasons that are well known to Purple.  The fact that Purple obtained the December 2015 email from a third party before it obtained the same email from GhostBed does not change the fact that Purple was well aware of other documents and information relevant to the issues in this Motion that were produced by GhostBed at least four months before the PI Hearing.

This case is readily distinguishable from the cases Purple invokes in its brief, each of which involves deliberate and extensive disregard for the Court's authority and a significant negative impact on the proceeding.  For example, in *Whatcott v. City of Provo*, this Court held that the

---

[6] Purple further asserts that these alleged failures are independently sanctionable. *See id*.  Purple has not filed a motion to compel documents from GhostBed in this case, nor has it taken the necessary steps to obtain sanctions for discovery violations pursuant to Rule 37.  Purple should not be allowed to circumvent the normal discovery dispute process by relying on GhostBed's alleged failure to produce documents as support for this Motion.

plaintiff had caused actual prejudice after failing to respond to discovery despite two prior court orders compelling answers, which resulted in a delay of more than two years, and after concluding that the plaintiff acted with "blatant disregard" for the court's orders and that a prior imposition of sanctions against the plaintiff failed to change their behavior. 231 F.R.D. 627, 630-31 (D. Utah 2005) (Benson, J.), *aff'd*, 171 F. App'x 733 (10th Cir. 2006); *see also Xyngular*, 200 F. Supp. 3d at 1321 (finding prejudice where defendant improperly accessed and collected documents containing sensitive information belonging to potential adversaries in anticipation litigation); *Garcia v. Berkshire Life Ins. Co. of Am.*, 569 F.3d 1174, 1179-81 (finding prejudice where plaintiff intentionally submitted false evidence "over a several year period"). Here, by contrast, GhostBed has not been previously compelled to produce discovery, has not failed to obey any order of this Court, has not improperly accessed Purple's sensitive information, has not intentionally submitted false evidence over several years, and has not disregarded prior sanctions by this Court.

**2.   GhostBed Has Not Interfered with the Judicial Process.**

Purple has likewise failed to demonstrate "interference with the judicial process" on the part of Mr. Werner or GhostBed. This factor most commonly is found in situations where "a party flaunts a court's orders or complies only when it is convenient" and the court is forced "to devote attention to this ... failure to comply with Court orders." *Hawkinson v. Montoya,* 283 Fed. Appx. 659, 662 (10th Cir. 2008). In *Ehrenhaus*, for example, the plaintiff had "flouted the court's authority" where the court found that "Ehrenhaus simply and intentionally refused to appear, which the Court finds to be in bad faith and willful and intentional disobedience to two court orders." *Ehrenhaus,* 965 F.2d at 921; *see also Xyngular*, 200 F. Supp. 3d at 1322 (finding interference with the judicial process where the defendant failed to "play by the rules" and, in so

doing, "undermined . . . confidence in [the] proceedings"); *Garcia*, 569 F.3d at 1179 (finding that plaintiff "interfered egregiously with the court's administration of justice" when she willfully fabricated discovery documents).

Purple contends that there was an interference with the judicial process because the Court dissolved the *ex parte* TRO, Mr. Werner and Mr. Monahan allegedly failed to correct their testimony, and the dissolution of the *ex parte* TRO necessitated an evidentiary hearing.  Mot. at 6. However, it is important to recall that Purple had been relying primarily on its allegation that Mr. Monahan was a GhostBed employee at the time it obtained the *ex parte* TRO, and once that allegation was disproved, some sort of evidentiary hearing would have likely been requested by the parties and allowed by the Court prior to entering a preliminary injunction.

To the extent Purple relies on GhostBed's alleged failure to correct earlier misstatements, as explained above, GhostBed has repeatedly attempted to explain, clarify, and/or correct any potential misstatements that have been brought to its attention.  For example, when Purple objected to GhostBed's arguments about "competitive marketing," GhostBed explained in a May filing what it meant and took the additional step of withdrawing the statement to the extent it was unclear. Given GhostBed's withdrawal of its "competitive marketing" statement, and the fact that Mr. Werner never made this statement in his declaration, it is unclear why Purple nonetheless chose to question Mr. Werner about that statement at the PI Hearing.  It is understandable that Mr. Werner was unprepared to testify about so-called "competitive marketing" when he didn't believe it to be a disputed fact.  Given the history of GhostBed's efforts to explain, clarify, and provide further information about all of the contested statements at issue in this Motion, Purple cannot now complain about GhostBed's alleged failure to correct those statements.

### 3.    Neither GhostBed Nor Mr. Werner Have Acted in Bad Faith.

"[A] dismissal or default sanctions order should be predicated on 'willfulness, bad faith, or some fault' rather than just a simple 'inability to comply.'" *Lee v. Max Int'l, LLC*, 638 F.3d 1318, 1321 (10th Cir. 2011) (quoting *Archibeque v. Atchison, Topeka & Santa Fe Ry.*, 70 F.3d 1172, 1174 (10th Cir. 1995)).  Neither GhostBed nor Mr. Werner has acted willfully, in bad faith, or with some fault.  While Mr. Werner and GhostBed may have been imprecise in their early statements, and erred in focusing narrowly on the question of whether Mr. Monahan was a GhostBed employee, as opposed to the bigger picture, neither Mr. Werner nor GhostBed ever acted willfully or with bad faith.  Again, to be clear, GhostBed and Mr. Werner do not dispute that they could have, and should have, explained the facts with greater clarity from the outset of this case and taken steps to ensure that Mr. Werner's testimony was placed in the proper context.  But the record shows that they never intended to hide the relationship GhostBed had with Mr. Monahan or misrepresent any of the facts relating to that relationship.

Purple cites a number of cases in its brief where dismissal was imposed as a sanction, but those are distinguishable and provide important guidance regarding the culpability factor: *Lee*, 638 F.3d at 1324 (affirming finding of culpability after plaintiff "failed to comply with a document request and two court orders compelling production of materials within the party's control"); *Xyngular*, 200 F. Supp. 3d at 1322, 1324 (finding culpability where defendant acted willfully, in bad faith, and with fault by improperly accessing and collecting documents containing sensitive information belonging potential adversaries in anticipation litigation); *Chavez v. City of Albequerque*, 402 F.3d 1039, 1042, 1045 (10th Cir. 2005) (finding culpability where the plaintiff lied at trial about being a suspect in a crime); *Ehrenhaus*, 965 F.2d at 918, 922 (affirming finding

of culpability where the plaintiff failed to appear for a scheduled deposition after the court specifically ordered the plaintiff to appear); *Garcia*, 569 F.3d at 1179, 1181 (finding that plaintiff "acted willfully, knowingly, intentionally, after careful contemplation, for self-serving purposes, and with a full understanding of the impropriety involved" where she intentionally submitted false evidence "over a several year period"); *LaFleur*, 342 F.3d at 1150-51, 1154 (affirming the dismissal of a plaintiffs' claim as a sanction becuase plaintiff failed to provide discovery after two prior monetary sanctions and an order compelling production.).  Here neither GhostBed nor Mr. Werner has improperly accessed sensitive information to obtain an unfair advantage in litigation, lied about a crime or fabricated evidence in order to advance its cause, ignored court orders, or engaged in remotely similar willful and bad faith conduct.  None of these or comparable circumstances are present here.

For example, Mr. Werner's testimony that GhostBed does not have "any affiliation whatsoever" with HMR or Mr. Monahan is true with respect to HMR, and with respect to Mr. Monahan's conduct at HMR. Werner Decl., ¶ 6.  Given the wording of this paragraph, GhostBed and Mr. Werner acknowledge that the statement is, on its face, "at best misleading" as to Mr. Monahan.  But in the same declaration, Mr. Werner explained that there was a business relationship between GhostBed and Mr. Monahan, and in subsequent pleadings and document productions over the next few months, that relationship was explained further.  The apparent inconsistencies on the face of the Werner Declaration themselves demonstrate that Mr. Werner did not intend to hide this information or deceive anyone as to Mr. Monahan's consulting work for GhostBed.  So too does GhostBed's production of documents since April 2017 showing that Mr. Monahan did use the

"Chief Brand Officer" title and a GhostBed email address in certain capacities demonstrate GhostBed and Mr. Werner's lack of intent to deceive or engage in bad faith conduct.

### 4.     This Court has not Issued Any Prior Warnings.

Purple concedes that the Court has not issued a warning to defendants that dismissal was a possible sanction. Mot. at 7.  Purple argues that a warning would have made no difference because, in its view, defendants perjured themselves and have failed to correct or withdraw the offending statements.  *Id.* at 7-8.  But the record demonstrates that neither GhostBed nor Mr. Werner ever intentionally lied under oath, and to the extent their prior statements were misleading or lacking in detail, they tried on multiple subsequent occasions to clarify and correct those prior statements.

Moreover, Purple argues that it "obtained some of the most revealing evidence not from Defendants but from a third party, Achieve," to support its argument that no prior warning is necessary here.  Mot. at 8-9 and n.19.  Purple is referring to the information contained in Exhibit 195.  Yet, as explained above and in the White Declaration, none of the emails in Purple's Exhibit 195 were ever actually sent to anyone at GhostBed or Nature's Sleep, and all of the information in the "Recipients" column of that exhibit is inaccurate.  Thus, to the extent Purple continues to rely on Exhibit 195 to argue that GhostBed is hiding information that shows a link between GhostBed and HMR through those emails, that information is demonstrably false.

It is also worth noting that Purple appears to be circumventing the normal discovery dispute process by seeking sanctions in this Motion for GhostBed's alleged failure to produce documents. Prior to the filing of this Motion, the parties had been engaged in meet and confer conferences for the purpose of addressing their discovery disputes.  Purple has not filed a motion to compel against GhostBed, nor has it moved for sanctions under Rule 37—in no small part because GhostBed has,

10

and to this day continues to, produce hundreds of documents on a rolling basis.  Purple should not be allowed to shoehorn the parties' ongoing discovery negotiations into this motion as a basis for seeking case-terminating sanctions.

### 5. Efficacy of Lesser Sanctions.

When evaluating what sanction to impose against a party who is found to have engaged in bad faith misconduct, courts are advised to impose *the least severe sanction* that will punish the offending party for the wrongdoing, remedy the prejudice to and harm suffered by the adverse party and the judicial process, deter future litigants from engaging in similar conduct, and inspire confidence in the integrity of the judicial process.  *LaFleur*, 342 F.3d at 1149 (finding dismissal appropriate where "lesser sanctions would not be effective" because lesser sanctions had failed to influence plaintiff's behavior).

The relief Purple seeks, *i.e.* entry of judgment in favor of Purple and against GhostBed without allowing any discovery or a ruling on the merits, and the dismissal of GhostBed's counterclaim without any opportunity to pursue those claims beyond the initial pleading stage, would have a profound, dispositive effect on GhostBed's right to access the courts.  This is a sanction of last resort.  *Ehrenhaus,* 965 F.2d at 920.  Because Purple seeks case-terminating sanctions as a first resort, this factor also weighs against imposing such sanctions.

In summary, while GhostBed and Mr. Werner concede that his testimony should have been clearer and contained more detailed information, there was never an intent on GhostBed or Mr. Werner's part to mislead the parties or the Court as to any material facts.  The evidence and arguments upon which Purple relies do not clearly and convincingly demonstrate that case-terminating sanctions are warranted here.

11

**C.**      **The Alternative Relief of an Adverse Jury Instruction is Also Unwarranted.**

Consistent with the *Ehrenhaus* factors discussed above, an adverse jury instruction would also be inappropriate in this case.  Adverse inference instructions are most commonly used as a sanction to address evidence spoliation.  *See Schlumberger Tech. Corp. v. Greenwich Metals, Inc.*, No. 07-2252-EFM, 2009 WL 5252644, at *8 (D. Kan. Dec. 31, 2009) ("Before a litigant is entitled to a spoliation instruction, i.e., an adverse-inference instruction, there must be evidence of intentional destruction or bad faith."); *Clearone Commc'ns, Inc. v. Chiang*, No. 2:07CV37TC, 2008 WL 704228, at *4 (D. Utah Mar. 10, 2008) ("finding an adverse inference instruction inappropriate where there was "no evidence suggest[ing]" email spoliation "was done in bad faith").  Generally, adverse inference jury instructions are considered when there exists an "unexplained failure or refusal of a party ... to produce evidence that would tend to throw light on the issues." *Waterton Polymer Prod. USA, LLC v. Edizone, LLC*, No. 2:12-CV-17 TS, 2014 WL 12600469, at *1 (D. Utah Nov. 6, 2014).  "For the adverse inference rule to be applicable, certain factors must generally be present[:] . . . (1) it appears that the documentary evidence exists or existed; (2) the suppressing party has possession or control of the evidence; (3) the evidence is available to the suppressing party, but not to the party seeking production; (4) it appears that there has been actual suppression or withholding of evidence." *Id.*

But courts, on rare occasions, also use this sanction to address allegedly false testimony or evidence submitted to the court, but do so when such conduct is coupled with evidence spoliation or suppression on the topic of the false testimony. In *ClearOne*, the Court imposed an adverse inference instruction to address the defendant's false deposition testimony and involved facts, including the suppression or spoliation of evidence, that were especially serious, warranting such

12

a sanction. 2008 WL 704228, at *5.  There, the defendant had deleted comments from allegedly infringing source code, then lied about doing so in this deposition.  *Id.* at *1-3.  The court noted the seriousness of the remedy: "This is a serious remedy for a serious situation. It is not a dispositive or case-terminating remedy, but it is significant. Such a jury instruction will have a considerable impact on the jury. However, this is appropriate, given the nature of Yang's interference with the truth seeking process in this case. Any lesser sanction would not be proportionate to the effect of Dr. Yang's deliberate misrepresentation." *Id.* at *5.

*ClearOne* is distinguishable from the situation here because that case involved a party hiding evidence and not being truthful about the subject of the evidence.  Here, GhostBed and Mr. Werner have not hidden or destroyed evidence—to the contrary, they have produced documents from the beginning that are relevant to the statements at issue here.  And neither of them have been untruthful about the subject of any hidden or destroyed evidence. Accordingly, for these and the other reasons discussed above with regard to case-terminating sanctions under the *Ehrenhaus* factors, Purple cannot establish by clear and convincing evidence that an adverse jury instruction against GhostBed would be appropriate here.

### D.   Purple Should Not Be Awarded Fees and Costs as a Sanction.

In requesting that the Court impose a sanction against GhostBed in the form of attorneys' fees and costs it incurred in defending against the motion to dissolve the TRO, the second preliminary injunction motion, and the instant motion, Purple summarily contends that the *Ehrenhaus* factors favor such an award because GhostBed and Mr. Werner's "conduct was willful" and Purple was prejudiced because it was "forced to incur additional expenses and fees."  Mot. at 11.  Yet fees should be awarded under a court's inherent powers only to vindicate judicial

13

authority, not "as a matter of substantive remedy as, for example, in the case of a compensatory fee award to a prevailing party . . ." *Farmer v. Banco Popular of North America*, 791 F.3d 1246, 1258 (10th Cir. 2015); *see also Mellott v. MSN Communications Inc.*, 09-cv-02418-PAB-MJW, 2011 WL 4536975, at *21 (D. Colo. Sept. 30,  2011) (amount of sanction is "meant to do something very different than provide a substantive remedy to an aggrieved party . . . but rather to . . . vindicate judicial authority'"). And as explained throughout this Opposition brief, there was no intentional, willful, or bad faith conduct here.

For all the reasons explained above, including the lack of intentional or bad faith conduct and the efforts by GhostBed to provide additional information and clarify the record, Purple has failed to demonstrate by clear and convincing evidence that a punitive sanction in the form of Purple's past fees and costs is warranted in this case.

## IV.    <u>CONCLUSION</u>

As GhostBed and Mr. Werner stated at the outset of this brief, they recognize that certain statements made early in this case should have been clearer and more direct, and should have provided more background and context. But the missteps and errors of GhostBed and Mr. Werner, made in the heat of battle, were not made willfully or in bad faith, and do not rise to the level of sanctionable conduct. Moreover, this Court has already made its concerns clear in its Preliminary Injunction Order, and GhostBed and Mr. Werner acknowledge those concerns and take them very seriously. Accordingly, GhostBed requests that the Court deny Purple's motion for sanctions in its entirety.

DATED November 17, 2017.

/s/  Juliette P. White

Francis M. Wikstrom
Juliette P. White
Kennedy K. Luvai
PARSONS BEHLE & LATIMER

*Attorneys for Defendant GHOSTBED,
INC., a Delaware corporation*

15

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 17th day of November 2017, I caused to be electronically filed the foregoing with the Court by CM/ECF and the Court will send electronic notification to all counsel.

/s/ Juliette P. White

4838-6284-5013v4