1                THE UNITED STATES DISTRICT COURT

2                       DISTRICT OF UTAH

3                       CENTRAL DIVISION

4

5    PURPLE INNOVATIONS, a        )

6    Delaware limited liability  )

7    company,                     )

8              Plaintiff,         )

9    vs.                          )    Case No. 2:17-CV-138DB

10   HONEST REVIEWS, a Florida    )

11   corporation, et al.,         )

12             Defendants.        )

13   _____)

14

15

16           BEFORE THE HONORABLE DEE BENSON

17           --------------------------------

18                 September 16, 2017

19

20                   Motion Hearing

21

22                  REDACTED TRANSCRIPT

23                  --------------------

24

25

```
1                    A P P E A R A N C E S

2

3    For Plaintiffs:              JAMES MAGLEBY
                                  ADAM ALBA
4                                 CHRISTINE GREENWOOD
                                  170 South Main Street
5                                 Suite 1100
                                  Salt Lake City, Utah
6

7

8    For Defendant:              D. GILL SPERLEIN
     Honest Reviews              345 Grove Street
9                                San Francisco, California

10

11

12   For Defendant:              ELEANOR YOST
     GhostBed                    1025 Thomas Jefferson Street NW
13                               Suite 400 West
                                 Washington, D.C.
14
                                 ETHAN HORWITZ
15                               405 Lexington Avenue
                                 36th Floor
16                               New York, New York

17                               KARMEN SCHMID
                                 102 South 200 East
18                               Suite 800
                                 Salt Lake City, Utah
19

20

21

     Court Reporter:            Ed Young
22                              351 South West Temple
                                Room 3.302
23                              Salt Lake City, Utah 84101-2180
                                801-328-3202
24

25
```

```
1                         I N D E X

2      Witness                  Examination By              Page
       -------                  --------------              ----
3
       Ryan Monahan             Mr. Magleby (Cross)            9
4      Ryan Monahan             Mr. Sperlein (Redirect)       87
       Ryan Monahan             Mr. Horwitz (Redirect)       108
5      Ryan Monahan             Mr. Magleby (Recross)        112
       Ryan Monahan             Mr. Horwitz (Further Redirect) 116
6
       Marc Werner              Mr. Magleby (Cross)          118
7      Marc Werner              Mr. Horwitz (Redirect)       157
       Marc Werner              Mr. Magleby (Recross)        191
8
       Calisha Anderson         Mr. Horwitz (Cross)          198
9      Calisha Anderson         Mr. Magleby (Redirect)       248
       Calisha Anderson         Mr. Horwitz (Recross)        261
10

11

12

13     Exhibit                                          Received
       -------                                          --------
14
       (No exhibits received.)
15

16

17

18

19

20

21

22

23

24

25
```

```
 1    September 16, 2017                         9:00 a.m.

 2                     P R O C E E D I N G S

 3

 4         THE COURT:  Good morning.

 5         We'll go ahead in Purple Innovations, L.L.C.,

 6    versus Honest Reviews, L.L.C., and others.  The case number

 7    is 17-CV-138.

 8         Let me make sure that we have everybody who is

 9    here appearing for a party on the record.  Could I ask to

10    begin on this side over here.  Mr. Magleby, if you will

11    start off.  I think I know everyone, but I might miss a name

12    or two.

13         MR. MAGLEBY:  Yes, Your Honor.  I had actually to

14    write it down to make sure I didn't miss anyone.  Jim

15    Magleby, Christine Greenwood and Adam Alba from my law firm

16    on behalf of the plaintiff Purple Innovation, L.L.C.  Also

17    here with us is Casey McGarvey and Craig Climant, who are

18    in-house counsel with Purple.  Also here with us are

19    attorneys Jordan Cameron, Neil Kaplan and Anneli Smith, who

20    are counsel for Purple in one capacity or another.

21         My paralegal, Greg Waymant, will be around as

22    well.

23         THE COURT:  Did you say Ms. Smith?

24         MR. MAGLEBY:  Yes.

25         THE COURT:  She is behind.  I see her and I see
```

```
 1    Mr. Kaplan back there.

 2              That is quite a team.  That is all on the Purple

 3    side.  Thank you.

 4              Over here, please.

 5              MR. SPERLEIN:  Good morning, Your Honor.  Gill

 6    Sperlein representing the defendants Ryan Monahan and Honest

 7    Reviews.

 8              THE COURT:  Thank you.

 9              MR. HORWITZ:  Good morning, Your Honor.  Ethan

10    Horwitz, and I am here with Eleanor Yost and Karmen Schmid,

11    and in the audience is Mr. Werner.

12              THE COURT:  Right.  Which one is Mr. Werner?

13              Thank you.

14              It is Mr. Horwitz, Ms. Yost and Ms. Schmid?

15              MR. HORWITZ:  Correct, Your Honor.

16              MR. SPERLEIN:  Your Honor, I'm sorry.  I did fail

17    to mention that Mr. Monahan is also in the gallery.

18              THE COURT:  Okay.  Thank you.

19              As I indicated in the order I put out earlier this

20    week, and I listed the order of the appearance of the

21    witnesses, and we're going to take their declarations, which

22    I have in front of me as their direct examination, and then

23    we'll go from there.  The main issue and the only issue that

24    I plan on entertaining here today is the issue of the

25    relationship, whatever it is or isn't, between Mr. Monahan
```

1   and GhostBed.  That is what it boils down to.  In light of

2   the declaration of Calisha Anderson that was submitted some

3   weeks ago, the Court expressed then and still expresses its

4   desire to try and learn the facts about what that

5   relationship is.

6          It has been represented to this Court through

7   declarations and through argument of counsel that

8   Mr. Monahan is operating as an independent journalist,

9   completely independent from GhostBed or any other mattress

10  company.  Ms. Anderson's declaration put that question

11  somewhat at issue, and I would just like to hear what these

12  witnesses who have submitted declarations under penalty of

13  perjury to this Court have to say about that relationship.

14         I received yesterday a reply that is styled

15  GhostBed, Inc.'s reply in support of its offer of proof.  It

16  was submitted by Mr. Horwitz and Ms. Yost and Ms. Schmid.

17  It asks the Court to consider what they style an offer of

18  proof.  I have read that and the declaration of John

19  Godleski.  I have not examined it in careful detail, but I

20  read it this morning.  I didn't see it until this morning.

21  I will receive it as I have in the past, but that is not the

22  focus of today's hearing.  It just isn't.

23         They say in this declaration, or Dr. Godleski

24  seems to think that the public has a need to know or a right

25  to know about the composition of this powder.  GhostBed has

1    always been free to educate the public on that issue if they

2    feel they can do so properly.  Competitors can certainly

3    inform the public about what they think is going on with

4    their competition.

5            The issue in this case is whether this Court has

6    been appropriately informed about whether there is a

7    relationship between Mr. Monahan and GhostBed that has not

8    been disclosed, so that the public in that regard is being

9    told that a person is an independent, completely objective

10   reviewer of mattresses when he may have some relationship to

11   one of the competitors in the industry.  That is it.

12           So with that, Mr. Magleby, are you ready to go?  I

13   have forgotten the order.  Don't we have Mr. Monahan first?

14           MR. MAGLEBY:  Yes.

15           THE COURT:  Yes, sir.

16           MR. HORWITZ:  Your Honor, before we start two

17   issues of order.  First, we would ask for the sequestration

18   of witnesses.

19           THE COURT:  All right.  That motion is granted.

20           MR. HORWITZ:  The second is looking at the huge

21   amount of material that Mr. Magleby has to go through, I

22   want to make sure that, from a timing point of view, that

23   we're not going to be stuck at the end with five minutes to

24   cross-examine Ms. Anderson.  So is there some time limits

25   Your Honor wishes to impose?

1          THE COURT:  There is one timekeeper, me, and I'm

2     going to keep this thing moving as best I can.  I don't know

3     how much he has to go through.  I know he has boxes, but I

4     don't know the subject matter, and I hesitate to say this

5     because I know lawyers, but I don't see how it can go on a

6     long time.  We know what has been said in the declarations.

7     I will allow the Rules of Evidence to be applied for

8     purposes of impeachment and prior inconsistent statements

9     and so on, but I am going to try to keep a pretty tight lid

10    on this thing so that we are not here all day.

11         I appreciate everyone coming on a Saturday.  I

12    know it was done in large part, if not in sole, to

13    accommodate Ms. Anderson and her circumstances, so we have

14    got to get to her.  Every effort will be made to not give

15    unequal time to one witness and that witness's examination

16    over another.

17         MR. HORWITZ:  Thank you, Your Honor.

18         THE COURT:  With that, let's get started.

19         I will ask Mr. Werner -- Mr. Monahan is going to

20    be on the stand.

21         Sir, come on up and we'll have you sworn in as a

22    witness.

23         Mr. Werner and Ms. Anderson I'm going to ask to be

24    out in the hallway until their turn to testify.

25         Yes, sir.

1          MR. HORWITZ:  Your Honor, Mr. Werner is the

2    representative of a party.  Can he stay?

3          THE COURT:  Under these circumstances, I am going

4    to invoke Rule 615 to ask these three witnesses not to hear

5    the testimony of the other witnesses.

6          MR. HORWITZ:  Thank you.

7          THE COURT:  Okay.

8                         RYAN MONAHAN

9              Having been duly sworn, was examined

10                   and testified as follows:

11          THE WITNESS:  My name is Ryan Monahan, R-y-a-n,

12    M-o-n-a-h-a-n.

13                      CROSS-EXAMINATION

14    BY MR. MAGLEBY

15    Q.   Mr. Monahan, we met this morning very briefly.  My name

16    is Jim Magleby.  I represent Purple Innovations, L.L.C. in

17    this case and I'm going to be asking you some questions.

18          Just so I get it right, is it Monahan or Monahan?

19    A.   It is Monahan.

20    Q.   Okay.  Mr. Monahan, you live in Florida?

21    A.   Yes, sir.

22    Q.   You are familiar with the entity or the business known

23    as GhostBed?

24    A.   Yes, sir.

25    Q.   You know where GhostBed's offices are?

```
 1    A.    Yes, sir.

 2    Q.    It is a close drive to your home, is it not?

 3    A.    It is roughly 40 minutes.

 4    Q.    It is about 23 miles; is that correct?

 5    A.    I am not sure of the exact mileage.

 6    Q.    You also have an office in Florida?

 7    A.    Yes, sir.

 8    Q.    That is also a short drive to GhostBed?

 9    A.    It is roughly the same distance.

10    Q.    Does 24 miles sound about right?

11    A.    I'm not sure of the exact mileage.

12    Q.    You're familiar with the website with the domain name

13    honestmattressreviews.com, correct?

14    A.    Yes, sir.

15    Q.    I'm going to call that the H.M.R. website for short.

16          Do you or your company, Honest Reviews, L.L.C., own and

17    operate that website?

18    A.    Yes.

19    Q.    Did you incorporate Honest Reviews, L.L.C. in October

20    of 2016?

21    A.    I incorporated around that time.  I'm not sure exactly

22    when.

23    Q.    Let me have you look on the screen in front of you and

24    I'm going to put up Exhibit 6.

25          I ask you if you recognize Exhibit 6?
```

1    A.    Yes, sir.

2    Q.    Are those the articles of organization for Honest

3    Reviews, L.L.C.?

4    A.    Yes, sir.

5    Q.    Can you tell the Court what date these were filed?

6    Look at the top right-hand corner.

7    A.    February 27th, 2017.

8    Q.    I'm sorry, sir.  Maybe I misled you.  Let me try this.

9    I am running the risk of embarrassing myself with the

10   technology.

11   A.    Understood.

12   Q.    Can you see the file date there?

13   A.    Yes, sir.

14   Q.    October 10, 2016, correct?

15   A.    Yes, sir.

16   Q.    Do you know when Calisha Anderson was hired by

17   GhostBed?

18   A.    I believe around September-ish.

19   Q.    Would it surprise you if she was hired October 11,

20   2016, literally the day after you incorporated Honest

21   Reviews?

22   A.    It would be a complete coincidence.

23   Q.    All right.  When you registered the

24   honestmattressreviews.com website you did it secretly,

25   didn't you?

 1   A.   I enabled privacy on the domain, yes.

 2   Q.   Let's take a look at Exhibit 7.

 3        You're familiar with WhoIs, the website WhoIs and the

 4   services it provides?

 5   A.   Yes.

 6   Q.   It provides domain information for different websites;

 7   is that correct?

 8   A.   Yes.

 9   Q.   If we look at this domain registration -- sorry.  I did

10   this wrong.  What domain does this document relate to?

11   A.   Honestmattressreviews.com.

12   Q.   If we go down here under registrant contact, it is

13   Domains by Proxy, L.L.C.; is that correct?

14   A.   Correct.

15   Q.   This is one way that somebody can keep the name of the

16   actual owner out of the public record, correct?

17   A.   That is one way, yes.

18   Q.   Was this done to hide your connection with GhostBed?

19   A.   No, sir.

20   Q.   Now, it takes time and costs money to build a website,

21   does it not?

22   A.   It takes time, yes.

23   Q.   Does the H.M.R. website share any features that are the

24   same as the GhostBed website?

25   A.   They are both built on the word press concept

1    management system.

2    Q.    How do you happen to know that?

3    A.    Through consulting for Achieve we worked on the blog

4    for GhostBed, and that is the platform that Honest Mattress

5    Reviews is on.

6    Q.    Did you have anything to do with the development of the

7    GhostBed website while you were consulting through Achieve?

8    A.    I submitted design recommendations.

9    Q.    Does the H.M.R. website and the GhostBed website have

10   the same hosting company?

11   A.    Yes.

12   Q.    Did they use the same designer?

13   A.    I don't know who they used for their design, but they

14   have in-house and I designed Honest Mattress Reviews myself.

15   Q.    Are a number of the plug-ins the same?

16   A.    A number of the plug-ins are the most commonly used

17   plugins, yes.

18   Q.    Who pays the hosting fees for

19   honestmattressreviews.com?

20   A.    Social Media Sharks.

21   Q.    Did any money for the launch of the H.M.R. website come

22   from either GhostBed, Nature's Sleep, Marc or Ashley Werner

23   or any company affiliated with them?

24   A.    No, sir.

25   Q.    I'm going to call those persons the Werner parties for

```
 1   simplicity, so I don't have to repeat that as we go through

 2   this today.  If you are ever confused by my question, please

 3   let me know.

 4   A.   Yes, sir.

 5   Q.   Now, you claim that the H.M.R. website is a

 6   journalistic exercise; is that correct?

 7   A.   100 percent.

 8   Q.   The mattress review site, though, is also an economic

 9   enterprise, isn't it?

10   A.   It depends how it is structured for monetization.

11   Q.   Honest Reviews, L.L.C. is not a charitable 501C3

12   organization, is it?

13   A.   No, sir.

14   Q.   It is a for profit entity, isn't it?

15   A.   It is registered that way, yes.

16   Q.   Was your college degree in journalism?

17   A.   I didn't attend college.

18   Q.   So the answer to my question is, no, you do not have a

19   degree in journalism?

20   A.   I do not have a college degree in journalism, no.

21   Q.   Have you ever been a reporter for a newspaper?

22   A.   Not for a traditional newspaper, no.

23   Q.   You know that journalists take classes in journalism

24   ethics.  Have you ever taken such a class?

25   A.   No, sir.
```

```
 1    Q.    Does Honest Reviews, L.L.C. have any employees?

 2    A.    No, sir.

 3    Q.    You're the only one who provide services?

 4    A.    Yes, sir.

 5    Q.    Is work on the H.M.R. website a full-time job?

 6    A.    I focus roughly three hours a day on it.

 7    Q.    Three hours a day.  How much time was it when you

 8    launched it?

 9    A.    Roughly the same amount of time.

10    Q.    It took you about three hours a day to get it up?

11    A.    Yes, sir.

12    Q.    From when to when?  How long did it take from when you

13    started working on the site to when you got it up?

14    A.    I started roughly in August and got to what I would

15    call public ready by October.

16    Q.    So about 90 hours a month is what you spend on that

17    site?

18    A.    Three hours a day, whatever that equates out to.

19    Q.    30 days in a month, three hours a day, roughly 90?

20    A.    Yes, sir.

21    Q.    Are you able to work remotely and manage the H.M.R.

22    website?

23    A.    Yes, sir.

24    Q.    You have a laptop you travel with?

25    A.    Yes, sir.
```

1  Q.   You can do H.M.R. related work 24/7 from anywhere and

2  everywhere?

3  A.   As long as there is internet connectivity.

4  Q.   Let me ask you this.  This three hours a day related to

5  the H.M.R. website, does that include also hosting or

6  commenting on social media such as Facebook or Twitter in

7  relation to the H.M.R. website?

8  A.   I would say yes.

9  Q.   All right.  So when you're able to work from remote

10  locations you, in fact, were able to work last Saturday

11  during the hurricane and make this post that is on Exhibit

12  237; is that correct?

13  A.   Yes, sir.

14  Q.   All right.  We can see here, just to orient ourselves,

15  it is September 7th, 7:40 p.m., so sometimes you work after

16  traditional business hours?

17  A.   The internet is 24/7 and people read my content 24/7,

18  so there are no traditional business hours.

19  Q.   Excellent.  And you post here if you have had a health

20  issue due to a Purple mattress or pillow you can fill out a

21  short report online with the Consumer Products Safety

22  Commission in minutes and report your unsafe product, then

23  others will know.

24       Did you make that post on September 9th?

25  A.   Yes, sir.

1    Q.    When did you first meet Marc Werner?

2    A.    I met Marc Werner December of 2015.

3    Q.    In what capacity?

4    A.    Social Media Sharks does subcontracting for Big Couch

5    Media, which is now Achieve, so just for simplicity I will

6    just call it Achieve the whole time if that is okay.

7    Q.    That is great.  I was going to make the same

8    suggestion.

9    A.    Okay.  I started working with Achieve in September of

10   2015.  We were presented the project in November of 2015 and

11   we first met in December of 2015.

12   Q.    At that time Mr. Werner was associated with a company

13   known as Nature's Sleep, which is a traditional mattress

14   company?

15   A.    Yes, sir.

16   Q.    Does Mr. Werner also have a company called Werner Media

17   Partners?

18   A.    I believe so.

19   Q.    Do you know which one of those two entities Achieve

20   contracts with?

21   A.    I do not know.

22   Q.    And then GhostBed is a d/b/a of Nature's Sleep; is that

23   right?

24   A.    I believe so.  I am not sure of their structure.

25   Q.    Understood.

1          After you had been doing work for, I will just say

2     Nature's Sleep or Mr. Werner or his companies, did Mr.

3     Werner decide to start what is called a bed in a box

4     company?

5     A.    That was already in existence before we started.

6     Q.    Tell the Court just quickly, what is bed in a box?

7     A.    Bed in a box is basically the evolution of logistics.

8     A mattress is still a mattress, and a bed in a box is a

9     sector in which basically technology has allowed them to

10    vacuum seal it and deliver it via a traditional method like

11    FedEx or U.P.S.

12    Q.    It was a disruptive entrant into the mattress market,

13    this new line of product, correct?

14    A.    I wouldn't say it is a new line of product.  I would

15    say it is just an evolution in logistics.

16    Q.    All right.  The company or the d/b/a through which

17    GhostBeds are sold is called GhostBed, right?

18    A.    Again, I am not sure how they are structured.

19    Q.    You have been around since the early days of GhostBed.

20    Is that fair?

21    A.    Yes, sir.  I first found out about the project and met

22    them in December of 2015.

23    Q.    2015.  All right.  I am going to ask you to take a look

24    at Exhibit 199.  I will just ask you a couple of questions

25    about this, although it may predate your role.

1        Exhibit 199, the title of it is strategic marketing and

2    consulting and digital marketing management proposal,

3    August 31, 2015.  Up at the top it says Big Couch Media.

4    Just for clarity, Big Couch Media became Achieve; is that

5    correct?

6    A.   Yes, sir.

7    Q.   And then Nature's Sleep, that is the Marc Werner

8    company we have been talking about, right?

9    A.   Yes, sir.

10   Q.   Are you aware of initial marketing plans for GhostBed

11   involving attacking competitors with health claims?

12   A.   No, sir.

13   Q.   Did the initial marketing plan for GhostBed involve

14   trying to influence mattress reviewers?

15   A.   I am not aware of that.

16   Q.   Let's go to the second page of this document.  Let me

17   ask you a couple questions about the top here.

18        Last year, April of 2014, a new type of competitor

19   entered the market totally disrupting the category.

20        Do you agree with that statement?

21   A.   I agree that -- I wouldn't say necessarily a

22   competitor.  I would definitely say bed in a box became more

23   mainstream around that time.

24   Q.   This document identifies this competitor as Casper.

25        Are you familiar with Casper?

1   A.   I am.

2   Q.   Are they the market leader in the bed in a box segment?

3   A.   They were the most well-known brand.  I don't know as

4   far as volume of units or anything.

5   Q.   Further on here it says Casper has done a great job

6   with its marketing and P.R.

7        Do you agree with that?

8   A.   Absolutely.

9   Q.   And then down here these companies are using some

10  unconventional marketing and P.R. initiatives as well as

11  harnessing the power of social media channels, organic and

12  paid.

13       Do you agree with that?

14  A.   I would agree with they definitely leveraged digital

15  marketing, yes.

16  Q.   So digital marketing is pretty important for this

17  segment?

18  A.   It is important I think for all business today.

19  Q.   Is it particularly important for the bed in a box

20  industry?

21  A.   I think it is equally important for retail as bed in a

22  box.

23  Q.   All right.  Let's briefly look at this.  It says here

24  Nature Sleep's new D-2-C product line GhostBed -- does D-2-C

25  stand for direct to consumer?

1    A.   Yes, sir.

2    Q.   All right.  Here we go, to get its share of this fast

3    growing market Nature's Sleep has created its new D-2-C

4    brand GhostBed development site, www.ghostbed.com.

5         Do you believe that to be correct?

6    A.   Yes.

7    Q.   Let's go down to the bottom to the goals that are

8    expressed in this marketing material.  P.R. goals.

9         What does P.R. stand for as far as you know?

10   A.   Public relations and outreach.

11   Q.   Competitors are in the media daily.  Business pubs and

12   mainstream pubs, this space is vibrant and news making.  We

13   are not getting coverage.  Marc is highly frustrated.

14        Do you understand that to refer to Marc Werner?

15   A.   I understand that statement to refer to Marc Werner.

16   Q.   Then there is a primary goal.  Mainstream media

17   coverage, digital and traditional broadcast and print.

18   Mainstream media coverage.  Does that mean news coverage?

19   A.   I am not sure what they meant by that.  This is the

20   first time I have seen this document.

21   Q.   Understood.

22        Let me ask you a couple of questions about this next

23   page.  199.4.  There is a line here and it says how do we

24   maximize bloggers and influencer reviews?

25        Do you see that?

1    A.    I do.

2    Q.    Reviews.  Are there such things as mattress review

3    websites?

4    A.    Yes.

5    Q.    And there are a number of them?

6    A.    Yes, sir.

7    Q.    And they purport to evaluate and make recommendations

8    of certain mattresses?

9    A.    Yes.

10   Q.    Including the bed in a box segment?

11   A.    They include all mattresses regardless of how they are

12   sold.

13   Q.    When you have been working with GhostBed, has there

14   been discussion about maximizing bloggers and influencing

15   review sites?

16   A.    I have minimal involvement with anything as far as for

17   review sites.

18   Q.    Then it says health claims.  Have you been privy to any

19   discussion about a strategy by which GhostBed will make

20   health claims against its competitors?

21   A.    Not against their competitors.  The only knowledge I

22   have of health claims would be relative to the benefits of

23   sleeping on this mattress.

24   Q.    Understood.  But it is true, is it not, that Honest

25   Mattress Reviews is a mattress review site?

```
 1    A.    Yes, sir.

 2    Q.    And that you or H.M.R. have made health claims about

 3    Purple's products?

 4    A.    No, sir.  I ask questions about the product.

 5    Q.    It is true, sir, that you have asked health questions

 6    about Purple's products?

 7    A.    Yes, sir.  I just wanted to clarify that I did not make

 8    any claims, I just asked questions about it.

 9    Q.    Let's go to the bottom of this document.  There is a

10    marketing update, June of 2016.

11          Do you see that?

12    A.    I do.

13    Q.    By June of 2016 you were providing services to GhostBed

14    in relation to its products, correct?

15    A.    June of 2016, yes, sir.

16    Q.    All right.  And under competition it says leaders that

17    we watch, Casper, Leesa, Purple, Tuft & Needle.

18          Is that correct?

19    A.    Yes, sir.

20    Q.    Was that accurate in June of 2016 that GhostBed thought

21    these were four important leaders to watch?

22    A.    That must be what Georgianne felt.  She must have put

23    this together.

24    Q.    Do you agree with that?

25    A.    I think there are many competitors.  I think all of
```

1    these are top industry leaders, but I think there is more

2    than just this.

3    Q.   Let's talk a bit about the payment structure from

4    GhostBed to you.  I want to just put up a chart to make this

5    simple.

6         I want to start on the left and walk through this.  On

7    the top left I have GhostBed, Marc Werner, and I guess maybe

8    I could put Nature's Sleep or Werner Media Partners over

9    there, but for now let's just call this GhostBed.

10   A.   Uh-huh.

11   Q.   Is it true that GhostBed makes payments to Achieve for

12   services that you provide?

13   A.   GhostBed makes payments to Achieve for the contract and

14   services Achieve provides.  I subcontract for Achieve.

15   Q.   All right.  But one way or another GhostBed is paying

16   for your services, correct?

17   A.   GhostBed is paying for Achieve.  Achieve subcontracts

18   me.

19   Q.   Do your services benefit GhostBed?

20   A.   Yes, sir.

21   Q.   So part of the services that Achieve provides are your

22   services to GhostBed?

23   A.   Yes, sir.

24   Q.   All right.  And then Achieve is here and this is also

25   formerly Big Couch Media, right?

```
 1    A.    Yes, sir.

 2    Q.    Achieve in turn pays Social Media Sharks?

 3    A.    Correct.

 4    Q.    And Social Media Sharks is your company?

 5    A.    Yes.

 6    Q.    How many employees does Social Media Sharks have?

 7    A.    I have two partners and I have two subcontractors.

 8    Q.    All right.  Out of all of those, who provides the most

 9    services to GhostBed, you or the others?

10    A.    It is split 50/50 between me and William Bertolbe.

11    Q.    Then the money from Achieve that goes to Social Media

12    Sharks, at least some of it comes back to you; is that

13    right?

14    A.    Yes, sir.

15    Q.    How much of the money that goes from Achieve to Social

16    Media Sharks for GhostBed work comes back to you?

17    A.    Roughly 50 percent minus expenses.

18    Q.    50 person minus expenses?

19    A.    Yes.

20    Q.    But any way you look at it, the money originates with

21    GhostBed, right?

22    A.    Yes.

23    Q.    Is there any other relationship by which any money from

24    GhostBed or the Werner parties gets directly or indirectly

25    to Mr. Monahan?
```

1    A.    No, sir.

2    Q.    If GhostBed stopped paying Achieve, would Achieve stop

3    paying Social Media Sharks?

4    A.    For this project?  We work on many projects with

5    Achieve, so if the client, GhostBed, stops the relationship

6    with Achieve, payment would terminate for that project, but

7    would continue with the other projects.

8    Q.    So if you made Marc Werner angry, for example, that

9    would put at least some of your personal income at risk?

10   A.    I am not sure.

11   Q.    Well, would Marc Werner have the authority to terminate

12   the services that you provide through Achieve?

13   A.    Marc Werner could terminate the services through

14   Achieve, yes.

15   Q.    And so if he decided that he didn't like you or was mad

16   at you, that might put your income at risk, right?

17   A.    That could potentially, but equally the same if Achieve

18   replaced me with another subcontractor.

19   Q.    Let me ask this.  Has there been any discussion about

20   Achieve just being a middleman or a pass-through for the

21   monies that GhostBed pays that ultimately benefit you?

22   A.    Not to my knowledge.

23   Q.    Let me have you look at Exhibit 216.  This is a

24   document titled Move Forward Thoughts.  It was produced by

25   Achieve in this case.  There is something called social

1    media P.P.C. Management.

2         Do you see where I am?

3    A.   Yes, sir.

4    Q.   All right.  It says Social Media Sharks to provide

5    social media and P.P.C. Management.

6         Is P.P.C. pay per click?

7    A.   Yes.  That is relative to Google's advertising.

8    Q.   It says fees for these services to be a pass-through

9    directly to GhostBed, however, billed monthly by Achieve.

10        Do you see that?

11   A.   I see that, but this is the first time I'm seeing this

12   document.

13   Q.   Setting aside whether you have seen this document or

14   not, have you ever been privy to any discussion about, hey,

15   we're just going to have the money paid to Achieve for Ryan

16   Monahan or Social Media Sharks be a pass-through?

17   A.   The only knowledge I have is that Georgianne Brown, who

18   is the acting C.M.O., and she is also the C.M.O. for

19   Achieve, and she was going to take a lesser role in the

20   project, and so that is the only knowledge that I have.  We

21   expressed that we would like to continue working with the

22   project.

23   Q.   Does Achieve mark up your services and make money from

24   them?

25   A.   Absolutely.

```
1    Q.    Once you launched the H.M.R. website, did you have less

2    time to spend working on GhostBed and other projects?

3    A.    No, sir.

4    Q.    You had the same amount of time?

5    A.    Yes, sir.

6    Q.    Is it true, though, that you were paid more money by

7    GhostBed after you launched the H.M.R. website?

8    A.    We were paid more money when Big Couch became Achieve.

9    Originally we were at -- I am not sure of the exact dollar

10   amount, but when Achieve took over the owner of Achieve,

11   Clay Williams, increased our amount at that point.

12   Q.    I see.  Okay.  Let's look at 177.  These are a series

13   of invoices.  Just to orient ourselves, in the top left-hand

14   corner it says Social Media Sharks.  Is this Social Media

15   Sharks' -- your company's form of invoice?

16   A.    Yes, sir.

17   Q.    And then it says bill to MaryLu George, Big Couch

18   Media.  That is what is now Achieve, correct?

19   A.    Correct.

20   Q.    If we look here we can see the date kind of, but I

21   believe it is September of 2015.

22         Does that look right to you?

23   A.    No.  I believe it would have been November.

24   Q.    I'm sorry.  I misspoke.  You're right.  November.

25         This invoice actually does not have any money and it
```

1    does not look like there is actually a bill there; is that

2    right?

3    A.   I am not sure why it looks like this.

4    Q.   Let's flip down to the next one.  Here we are in

5    January of 2016 and there is a $1,200 amount; is that

6    correct?

7    A.   Yes.

8    Q.   Let's go to the next page.  Here we are in February of

9    2016 and there are a number of billings on here, which I

10   think there is a total down here, $6,387.

11        Is that correct?

12   A.   Yes, sir.

13   Q.   Let's go to the next page.  It looks like maybe

14   starting in March of 2016 there is a flat amount of $6,500;

15   is that correct?

16   A.   Yes.  This is the time we started doing pay per click

17   also.

18   Q.   And so the amount went up, is that why?

19   A.   Yes.

20   Q.   But in October of 2016 at the time that you launched

21   the H.M.R. website, it actually goes up to about 9,600,

22   doesn't it?

23   A.   Yes, sir.

24   Q.   Let's take a look at 177.9.

25        Here we have an invoice for November and now the amount

1    has gone up to 9,300; is that correct?

2    A.    Yes, sir.

3    Q.    And it continues at that amount for some time, does it

4    not?

5    A.    Yes, sir.  This was around the time, just to note, that

6    Big Couch converted over to Achieve and that is when Clay

7    raised it to this amount.

8    Q.    Okay.  Your testimony under oath is it had nothing to

9    do with your launch of the H.M.R. website at about the same

10   time?

11   A.    It had absolutely nothing to do with it.

12   Q.    All right.  Let's just flip forward.  These payments

13   are consistent through the months, are they not?

14   A.    Yes, sir.

15   Q.    Up until you get to March of 2017 and then it goes up

16   to $10,000 a month; is that correct?

17   A.    That is correct.

18   Q.    Do you know how much you have been paid in total by

19   GhostBed, at least as reflected by these invoices?

20   A.    I don't know the total.

21   Q.    We have prepared a little spreadsheet for the invoices

22   that we have.  By the way, are there invoices sent every

23   month?

24   A.    We receive a purchase order from Achieve and then we

25   submit an invoice every month, yes.

1    Q.    And so there should be a payment every month?

2    A.    Yes.

3    Q.    What we have done here on Exhibit 177-A is we have

4    summarized what we have, but it looks like there are some

5    months missing here.  For example, at the top we're missing

6    December of 2015, and maybe we're missing April of 2016, but

7    what you're telling me is there should be additional

8    invoices, we just don't have them?

9    A.    So the way that billing works with Achieve, it is

10   basically 30 days delayed, so if we accept a project, in

11   this instance, in November of 2015, the first bill would be

12   due in December of 2015.  So the first one -- there really

13   wouldn't be a bill until 30 days later but, yes, there

14   should be in April --

15   Q.    All right.  The invoices we do have total 128,000 and

16   some odd dollars, but we should also, if we want to be more

17   accurate, we would fill in the missing amounts?

18   A.    Yes.  If we want to be completely accurate, I believe

19   it was the February one that you pulled up, and it was 1,200

20   to us and roughly 5,000-ish to expenses.

21   Q.    Yes.  Since you started doing work for GhostBed through

22   Big Couch or Achieve you have been paid at least $130,000?

23   A.    Our company has, yes.

24   Q.    Is GhostBed the largest source of income that you have

25   right now?

1    A.    GhostBed is definitely in the top three.

2    Q.    Do you believe that if you attacked GhostBed on the

3    H.M.R. website, GhostBed would still want to pay you $10,000

4    a month?

5              MR. SPERLEIN:  Objection, speculation.

6              THE COURT:  Overruled.

7              THE WITNESS:  I am sorry.  Could you repeat?

8              MR. MAGLEBY:  Sure.

9    BY MR. MAGLEBY

10   Q.    If you decided to attack GhostBed on the H.M.R.

11   website, do you believe that GhostBed would still pay you

12   $10,000 a month?

13   A.    I don't attack.  If GhostBed did something that was

14   questionable, I would have no problem publishing that at the

15   risk of no longer working with them through consulting

16   through Achieve.

17   Q.    My question is a little different, sir.  Do you expect

18   that if you were, let's say, asking questions of GhostBed

19   the same way and with the same vigor that you have asked

20   questions of Purple, do you think GhostBed would still want

21   to pay you $10,000 a month?

22   A.    I don't know how they would respond.

23   Q.    Let's go back to Exhibit 155, which is the chart.

24         It is true, is it not, there are no written agreements,

25   written contracts or services agreements at these different

1   levels here that I have put the arrows on, GhostBed to

2   Achieve and Achieve to Social Media Sharks, right?

3   A.   As far as GhostBed to Achieve I don't know.  I have

4   never seen anything.  And then achieve to Social Media

5   Sharks, for all of our clients we have zero written

6   agreements.

7   Q.   So it is a monthly --

8   A.   Just a monthly -- yeah, basically a 30-day termination.

9   Q.   So there is nothing to stop GhostBed, for example, from

10  ceasing payments to Achieve that are for your services?

11  A.   To my knowledge it is a 30-day window.  They have to

12  provide 30 days to all clients.  But to answer your

13  question, yes, I believe after a 30-day notice, then they

14  can cease.

15  Q.   Have you ever discussed the future economic

16  relationship with Mr. Werner?

17  A.   In the very beginning I talked about just the

18  excitement of their business, but not as far as for being an

19  employee.

20  Q.   Any discussion about you getting a share of the profits

21  or a bonus or anything like that?

22  A.   Nothing.

23  Q.   Now, you have claimed under oath, have you not, sir,

24  that you make very little money from the H.M.R. website?

25  A.   When I first launched, yes.

```
 1   Q.   Well, has it gone up since you first launched?

 2   A.   It has gone up as my services have gone up, yes.

 3   Q.   Let's look at what you said in March of this year.  I'm

 4   going to put up on the screen your declaration filed in this

 5   case.

 6        Do you recognize this as the declaration you filed in

 7   this case in response or in support of a motion to stay a

 8   temporary restraining order?

 9             MR. HORWITZ:  Your Honor, could Mr. Magleby please

10   put the entire document in front of the witness as opposed

11   to just pulling out pieces?

12             MR. MAGLEBY:  Absolutely.  I'm happy to do that.

13   BY MR. MAGLEBY

14   Q.   Mr. Monahan, in front of you are three white binders.

15   Every exhibit that I'm putting up on the screen is contained

16   in those binders.

17             Just for the record, I have given courtesy copies

18   of the binders to both Mr. Horwitz's team and to

19   Mr. Sperlein's team.

20   BY MR. MAGLEBY

21   Q.   If you would like to take that binder right in front of

22   you, sir, and turn to tab number three or Exhibit Number 3.

23   If at any time in my examination you would like to look at

24   the entire exhibit in hard copy or electronically, just let

25   me know and I would be glad to do that.
```

1    A.   Yes, sir.

2         MR. MAGLEBY:  Your Honor, I also have a set of the

3    binders for your clerk, if they would like it.

4         THE COURT:  We are okay.  Just move on.

5         MR. MAGLEBY:  Yes.  Understood.

6    BY MR. MAGLEBY

7    Q.   Mr. Monahan, is this the declaration that you signed?

8    I will flip to the signature page.

9    A.   Yes, sir.

10   Q.   And on or about March 7, 2017?

11   A.   Yes, sir.

12   Q.   Let's go to the second page, paragraph 11.  You told

13   this Court in March of this year that Honest Reviews, L.L.C.

14   has a single source of income which is Google AdSense, which

15   places ads on each page key to each individual user's

16   browser history.

17        Is that true?

18   A.   Yes, sir.

19   Q.   And you only make about $50 a day from that; is that

20   right?

21   A.   Yes, at that time.

22   Q.   Has it gone up since then?

23   A.   Yes.

24   Q.   What is it at now?

25   A.   Roughly $100 a day.

1   Q.   So that would be around $3,000 a month now?

2   A.   Averaging, yes.

3   Q.   Let's go ahead and take a look at Exhibit 95.  This is

4   a FundMe page that you set up; is that correct?

5   A.   Yes, sir.

6   Q.   If we go to the second page, when you set this up, what

7   you represented to the public was you generate an average of

8   less than $50 per day from Google AdSense; is that correct?

9   A.   Yes, sir.

10  Q.   Now, at least up through March of 2017, at $50 a day

11  you are making about $1,500 a month?

12  A.   Yes, around that.

13  Q.   Your attorney fees in this case I assume have been more

14  than $1,500 a month?

15  A.   Yes, sir.

16  Q.   Your expert witness costs for Dr. Godleski I assume are

17  more than $1,500 a month?

18  A.   I paid a one-time fee.  Yes.

19  Q.   You paid a one-time fee to Dr. Godleski.  How much was

20  that?

21  A.   Roughly $3,000.

22  Q.   Where did that money come from?

23  A.   I had money saved from Social Media Sharks earned in

24  the past and my business Net Ninja earned in the past.

25  Q.   Did Mr. Werner, GhostBed or Nature's Sleep or any of

1    the Werner parties contribute or make any payments toward

2    the costs of Mr. Godleski?

3    A.    Not on my report, no.

4    Q.    Not on your report, did you say?

5    A.    Yes, sir.

6    Q.    You mean the initial report that he did?

7    A.    Yes.  I paid for that in full.

8    Q.    Since then he has submitted additional materials which

9    Judge Benson mentioned this morning.

10        Who paid for those?

11   A.    Ethan Horwitz and team had those reports, I didn't.

12   Q.    You didn't pay for those?

13   A.    No, sir.

14   Q.    Interesting.  Do you have any explanation as to why

15   GhostBed is footing the bill for an expert witness that you

16   hired in this case?

17   A.    Just simply to show proof is my understanding.

18   Q.    That saves you money having to pay Dr. Godleski

19   yourself, does it not?

20   A.    We're all paying money to defend ourselves, so I am not

21   sure --

22   Q.    You're not sure if that saves you money if somebody

23   pays a bill for your expert?

24   A.    I didn't know that he was doing that himself.  I didn't

25   know they had that report done.

1    Q.    You mean GhostBed's lawyers went to the expert that you

2    hired without your knowledge and paid him to prepare a

3    supplemental filing in this court?

4    A.    They worked with my attorney.  I am not sure.

5    Q.    Did you give permission for your expert to work

6    directly with GhostBed?

7    A.    I gave permission to my attorney to do whatever we

8    needed to do.

9    Q.    This is not the first time that GhostBed's attorneys

10   have appeared on your behalf, is it?

11   A.    No, sir.

12   Q.    In fact, there is litigation involving GhostBed and

13   Casper; is there not?

14   A.    There is.

15   Q.    And you received a subpoena in that case; is that

16   correct?

17   A.    I did.

18   Q.    And you prepared a response which we can see in Exhibit

19   64.

20         Is that your response?

21   A.    Yes, sir.

22   Q.    Who represented you in responding to that subpoena?

23   A.    Mr. Horwitz.

24   Q.    If we go to the last page, can you see Mr. Horwitz's

25   signature block?

```
1    A.    Yes.

2    Q.    Is that Mr. Horwitz's name right there?

3    A.    It is.

4    Q.    Who paid for Mr. Horwitz to represent you in the Casper

5    litigation?

6    A.    GhostBed and Nature's Sleep.

7    Q.    You didn't have to come out of pocket to respond to

8    that subpoena?

9    A.    No, sir.  I was made aware at the time since I was

10   simply a witness that that was totally fine.

11   Q.    Then did you go ahead and work with Mr. Horwitz

12   directly on how to respond to that subpoena?

13   A.    I worked with their law firm to put together this

14   information, yes.

15   Q.    That is not the only time Mr. Horwitz has stepped up

16   and represented your interests in a fight, is it?  He has

17   done that other times, hasn't he?

18   A.    I don't know.

19   Q.    Well, let's take a look at Exhibit 224.  Are you

20   familiar with Amerisleep.

21   A.    I am.

22   Q.    What I have put up here is a document dated December 6,

23   2016.  It is from the law firm of Jaburg Wilk and addressed

24   to you, Honest Reviews, L.L.C.

25         Do you see that?
```

1    A.    Yes.

2    Q.    It says this law firm represents One Mall Group, L.L.C.

3    and Astrabeds, L.L.C, d/b/a amerisleep.com.

4          Do you see that?

5    A.    I do.

6    Q.    They sell mattresses, right?

7    A.    They do.

8    Q.    In this demand letter they complain that you have

9    published an article that makes misleading statements; is

10   that correct?

11   A.    That was their claim.

12   Q.    And they say to you, given your position as the chief

13   brand officer of GhostBed, a direct competitor of

14   Amerisleep, the article appears to be an intentional hit

15   piece against Amerisleep disguised as a purported

16   investigative journalistic article by an employee or

17   contractor of a direct competitor.

18         It is similar to the allegations in this case, yes?

19   A.    That is what they said here, yes.

20   Q.    This letter was addressed to you, not to GhostBed?

21   A.    Correct.

22   Q.    Who responded to this letter?

23   A.    I believe both I received it and I do believe they

24   e-mailed GhostBed.  I don't know who at GhostBed.  I

25   responded to them also.

1    Q.   I have not seen your response.  Do you think you

2    produced it in this case?

3    A.   If I haven't, I easily can.

4    Q.   Here is a letter from Carlton Fields back to the Jaburg

5    Wilk firm dated December 8, 2016.

6         Have you seen this before?

7    A.   No.

8              MR. HORWITZ:  Your Honor -- Mr. Magleby, if you

9    could just highlight the first paragraph as well, please.

10             MR. MAGLEBY:  I am going to.  Don't worry, I will

11   get there.

12   BY MR. MAGLEBY

13   Q.   Let's take a look at the body of this.  Well, let's

14   start here.

15        Who signs this letter?

16   A.   From what I see it looks like Mr. Horwitz.

17   Q.   And Mr. Horwitz makes a representation.  Mr. Monahan is

18   not the chief brand officer.  He is not even an employee of

19   GhostBed.  Mr. Monahan has done some consulting for

20   GhostBed, but is not related to GhostBed in any way.

21        In December of 2016 aren't your monthly payments

22   $9,600?

23   A.   Yes, sir.

24   Q.   And then he writes, in addition, GhostBed has nothing

25   to do with Honest Mattress Reviews or with the article in

1    question, and then he writes GhostBed was not involved in

2    the article in any way and certainly is not in control of

3    what Mr. Monahan may write.

4         Do you see that?

5    A.   That is 100-percent true.  Yes.

6    Q.   Were you aware of this letter before it went out?

7    A.   I have never seen this letter before.

8    Q.   All right.  Did you prepare for this hearing with

9    GhostBed's attorneys in any way?

10   A.   No, sir.

11   Q.   Who is going to pay your travel costs for this hearing?

12   A.   I am paying it out of pocket.

13   Q.   Do you expect to be reimbursed by either Achieve or

14   GhostBed or any of the Werner parties?

15   A.   No, sir.  It is solely on me.

16   Q.   Do you have any verbal or indemnification agreement

17   with any of the Werner parties?

18   A.   No, sir.

19   Q.   Do you have any expectation or understanding that if

20   you lose this case the Werner parties will help pay your

21   bill?

22   A.   No, sir.

23   Q.   Let's talk about the very first review that you did on

24   the H.M.R. site.

25        Do you remember what it was?

1    A.    Probably Sunrising Bed.

2    Q.    Which one was it?

3    A.    Sunrising Bed.

4    Q.    Sunrising Bed.

5          What is the second one that you did?

6    A.    I don't remember the order to be honest.

7    Q.    Let's take a look at Exhibit 8.

8          MR. MAGLEBY:  What I will represent to the Court

9    and the parties is we have a number of screen shots that we

10   have captured at different times, some of which are from the

11   Wayback Machine and some which are directly from the

12   website.  What we have put up in the top here is some of the

13   information about when and where we captured it.  You can

14   see that this is honestmattressreviews.com.  It was probably

15   the result of a search, GhostBed and mattress reviews.

16   BY MR. MAGLEBY

17   Q.    In any event, sir, let me --

18         MR. SPERLEIN:  Your Honor, just one thing.  Unless

19   there is some sort of verification from someone at Wayback

20   Machine, I object as to authentication of anything that is

21   submitted from the Wayback Machine.

22         THE COURT:  Well, let's hear your next question.

23         MR. MAGLEBY:  Sure.

24         Your Honor, obviously we are in an injunction

25   hearing, so the Court is capable of weighing evidence

1    without the traditional application of the Rules of

2    Evidence.

3    BY MR. MAGLEBY

4    Q.   Let me ask you this question which I bet you can

5    answer, sir.  On August 10, 2016, did you do a review of

6    GhostBed's mattress?

7    A.   Yes, sir.  I don't remember the exact date, but

8    according to the date stamp here, yes, sir.

9    Q.   Does this look like it is from your website?

10   A.   100 percent.

11   Q.   Whether or not GhostBed was the first review you did,

12   coincidentally it was a very early review you did?

13   A.   Yes.

14        MR. HORWITZ:  Objection, Your Honor.  The kinds of

15   comments like coincidentally I think are uncalled for.  I

16   mean, just ask the question as opposed to coloring the

17   question.

18        THE COURT:  Well, it is cross-examination.  It is

19   okay.  Overruled.

20        Go ahead.

21        MR. MAGLEBY:  Just to be clear, and Christine has

22   reminded me, this is not the Wayback Machine.

23   BY MR. MAGLEBY

24   Q.   You gave the GhostBed mattress a little over four

25   stars; is that correct?

1    A.    My rating system, sir, does not go off stars.  You

2    actually have to go on to the review.  It is one to ten.

3    Q.    One to ten.  Okay.  Well, for some reason on your

4    website here you have four stars.

5    A.    That is just the star.  You actually have to go to the

6    page.  If you can pull up the actual review, I can show you

7    how I rate them.

8    Q.    These stars appear on this page from your website,

9    right?

10   A.    Correct.

11   Q.    If somebody came to this website and saw the page we

12   are looking at, they would see over four stars for GhostBed,

13   right?

14   A.    Correct.

15   Q.    In your declaration, and let's go to the fourth page of

16   it, paragraphs 16 and 17, you describe ordering a Purple

17   mattress; is that right?  Let me help you out here.

18        I recently ordered a Purple mattress and had it

19   delivered to my office; is that correct?

20   A.    That is.

21   Q.    And then you took photographs and video of it, and you

22   opened it up and you cut out a piece of it and you sent it

23   to Dr. Godleski?

24   A.    Yes, sir.

25   Q.    Do you recall when you ordered that mattress?

```
 1    A.    I don't remember the exact date.

 2    Q.    Let me see if I can help you out.  Let's take a look at

 3    Exhibit 158.  This is a document that says, hey, Ryan, your

 4    Purple order is confirmed.  Here is what you ordered.  Order

 5    date, February 11, 2017.

 6          Does that look right?

 7    A.    100 percent.

 8    Q.    That Purple mattress costs about $1,000, correct?

 9    A.    It does.

10    Q.    That would be at least at that time two-thirds of

11    Honest Reviews, L.L.C.'s monthly income; is that right?

12    A.    Should I pay in full.  I took the monthly payment

13    options.

14    Q.    So you paid over time for it?

15    A.    Yes, sir.

16    Q.    Did any money to purchase this mattress come from

17    GhostBed or the Werner parties?

18    A.    No, sir.

19    Q.    But back in September of 2016 you did a review of the

20    Purple mattress; is that right?

21    A.    Yes, sir.

22    Q.    And let's go here -- I have got it -- Exhibit 170, the

23    Purple mattress review here, August 11, 2016, correct?

24    A.    100 percent.

25    Q.    How did you review a Purple mattress if you hadn't
```

```
1    bought one yet?

2    A.   My review scale is not based on comfort.  It is based

3    on things such as warranty duration -- if you actually can

4    pull up my review I can walk you through it.  I have

5    reviewed many mattress that I didn't have at the time.  I

6    base it on things that are objective such as sleep trial

7    duration, warranty duration, things along those lines.

8    Everything I do is based on value over cost, not based on

9    comfort.

10   Q.   So you don't actually buy mattresses and have people

11   sleep on them?

12   A.   When I first started the review site, I did not have

13   the mattress.

14   Q.   I think there are roughly 24 mattresses that have been

15   viewed on your site right now.  Are you saying you didn't

16   buy any of them?

17   A.   I have 50 mattresses in my office right now.

18   Q.   When you first started you didn't actually have the

19   mattresses, you were reviewing them based on other things?

20   A.   Correct.  I needed to get started before other mattress

21   companies would start to send mattresses for review.

22   Q.   The first Purple mattress you ever bought was in

23   February of 2017?

24   A.   Yes, sir.

25   Q.   Okay.  Well, let's take a look at Exhibit 8.1.
```

1    What is the first side-by-side mattress review that you

2    did?

3    A.   I am not sure what I'm looking at.

4    Q.   Maybe I have the wrong exhibit.  I'm looking for the

5    September 27th, 2016 Purple versus GhostBed comparison.

6        In September of 2016 you did a Purple versus GhostBed

7    comparison?

8    A.   I don't have the date but I do recall a comparison,

9    yes.

10   Q.   So you didn't actually have a Purple mattress when you

11   did that review?

12   A.   I didn't have a GhostBed mattress at that time either.

13   Q.   So you posted a review and a comparison of a Purple and

14   GhostBed mattress without having either?

15   A.   Yes, sir.

16   Q.   Are you aware of the F.T.C.'s endorser guidelines?

17   A.   Only loosely.

18   Q.   Only loosely.  Let me just ask you, do you know, and I

19   have put up Exhibit 160, if they say anything about

20   reviewing a product that you don't have?

21   A.   I am not sure.

22   Q.   I am going to put up page 14.

23       MR. HORWITZ:  Objection, Your Honor.  I don't

24   understand how this goes to what is supposed to be the sole

25   issue, which is the relationship or lack of relationship

1    between GhostBed and Mr. Monahan.

2         MR. MAGLEBY:  Your Honor, it goes to his bias of

3    how he does reviews and whether or not this site is really a

4    journalistic site or whether it is just a sham.  He is

5    reviewing mattresses that he does not even have.  This all

6    goes to his credibility.  Then this particular piece will

7    become relevant later in questions I'm planning to ask.

8         MR. HORWITZ:  Your Honor, the witness has made it

9    clear that he is not reviewing them based on comfort, but

10   solely on objective criteria such as the length of the sleep

11   time, the guarantee, things that are objective as opposed --

12        THE COURT:  The objection is sustained.

13        Move on.

14        MR. MAGLEBY:  Thank you, Your Honor.

15   BY MR. MAGLEBY

16   Q.   Let's take a look at Exhibit 117.  Maybe this is the

17   one I was looking for.

18        Purple versus GhostBed mattress comparison.  By the

19   way, is this a page from the Honest Mattress Reviews

20   website?

21   A.   Yes, sir.

22   Q.   Can we find the date here that this comparison

23   happened?

24   A.   I can produce that.  I'm not sure.  It is not -- I

25   don't have any dates on it that way, but I can find it for

1    you.

2    Q.   Let's see if I have got it somewhere.  We will find the

3    September date.

4         Do you recall doing this review sometime early on in

5    the existence of Honest Mattress Reviews?

6    A.   I would say the September or October-ish time frame.  I

7    don't know it exact, but I can agree on that time frame,

8    yes.

9    Q.   That is perfect.  Thank you.

10        Was this the first side-by-side mattress review that

11   you had done?

12   A.   I am not sure which was the first.  It was definitely

13   in the beginning, but I don't know the order of publication.

14   Q.   All right.  You did a number of rounds in this review;

15   is that right?

16   A.   Yes.  Could you show the whole thing, though?

17   Q.   Sure.  If you want to open up the binder --

18   A.   I just want to make sure I can explain it clearly.

19   Q.   Sure.  I'm not sure if that is really helping you much.

20   A.   If you can do it from round one down to the nine points

21   just so that I can --

22        THE COURT:  Ask a question.  We have the time

23   down.  Just ask a question.

24        MR. MAGLEBY:  Yes.

25   BY MR. MAGLEBY

```
 1   Q.    You do round one right here; is that right?

 2   A.    Yes, sir.

 3   Q.    And then you do round two, cooling and comfort; is that

 4   right?

 5   A.    Yes, sir.

 6   Q.    Let's go to the next page and take a look at this round

 7   two discussion.  You have five different categories here.

 8   You have child comfort, teen comfort, millennial comfort,

 9   Gen X comfort and baby boomer comfort, right?

10   A.    Yes.

11   Q.    Five different categories?

12   A.    Yes, sir.

13   Q.    Let's go down to round two summary.  You told the

14   public this comparison required a large group of testers to

15   provide the most accurate comparison data.  For each segment

16   we tested ten different people for each age category.  This

17   provided us the ability to find the average total combined

18   scores.  The key takeaway from round two is that both

19   mattresses provide great cooling and comfort.

20   A.    Yes, sir.

21   Q.    So that would mean that you had to have ten people in

22   each of these five categories actually sleep on the

23   mattress?

24   A.    No.  The way I conducted this research was through

25   YouTube.
```

1    Q.    So you asked people to give you data?

2    A.    I researched what people's opinions were.

3    Q.    I see.  Do you think a consumer might think you

4    actually had people come in and test mattresses that you

5    provided?

6    A.    Based on what you read, yes, I can understand your

7    point there.

8    Q.    Let's talk a little bit about the work you do for

9    GhostBed.  But first, just to be clear, do you do any

10   separate work for Nature's Sleep or any other Werner related

11   company?

12   A.    No, sir.

13   Q.    Do you do any separate work for the Werners personally?

14   A.    No, sir.

15   Q.    You have an office that you go to when you work

16   sometimes?

17   A.    Yes.

18   Q.    Physical office, right?

19   A.    You mean my office?

20   Q.    Your office.

21   A.    Yes, I have a location.  Social Media Sharks has an

22   office in Boca Raton.

23   Q.    And sometimes you go to GhostBed to provide services,

24   right?

25   A.    No.  We do attend a meeting that used to be monthly,

1   the whole Achieve team, and then it went to pretty much

2   every couple months.

3   Q.   So there are regular meetings that you attend at

4   GhostBed?

5   A.   There were more in the beginning but, yes, Achieve

6   would attend meetings at GhostBed's office, say once every

7   month to month and a half.

8   Q.   And you can work remotely from wherever you are,

9   correct?

10  A.   As long as I have internet connectivity, yes, sir.

11  Q.   If you're doing work for the H.M.R. website, and then

12  you decide to do some work for GhostBed, do you get up out

13  of your chair and go sit at a different spot?

14  A.   No, sir.

15  Q.   Do you sometimes go back and forth, you're working for

16  GhostBed on moment and the next moment you are working for

17  H.M.R.?

18  A.   No, sir.

19  Q.   Do you keep track of your time?  Do you have time

20  sheets?

21  A.   No.  I structure my day differently.

22  Q.   I see.  You set aside some time for GhostBed and you

23  set aside some time for H.M.R.?

24  A.   Correct.

25  Q.   But literally you might be in the same chair when you

1    are working for one or the other?

2    A.   Yes, sir.

3    Q.   And you would be using the same computer?

4    A.   Yes, sir.

5    Q.   And you have attended GhostBed staff meetings or

6    marketing meetings, correct?

7    A.   I have attended the Achieve monthly meetings, yes.

8            MR. MAGLEBY:   Just for the record, we found the

9    date of this Purple versus GhostBed comparison.   It is

10   Exhibit 118.   I am just going to pop it up for a minute.

11   BY MR. MAGLEBY

12   Q.   Does that refresh your recollection, sir, as to the

13   date of that comparison, September 27, 2016?

14   A.   Yes, sir.

15   Q.   Going back to the staff meetings, does Marc Werner

16   attend those meetings?

17   A.   He attended some.

18   Q.   Does Ashley Werner, his daughter, attend those

19   meetings?

20   A.   She also attended some.

21   Q.   And there are agendas sometimes prepared for those

22   meetings?

23   A.   Yes, sir.

24   Q.   Are you listed on that agenda?

25   A.   From time to time.   Georgianne from Achieve generally

1    will put together the agenda.

2    Q.   Let me have you look at Exhibit 208 and ask if this is

3    one of those agendas?

4    A.   It looks like one, yes.

5    Q.   This one says GhostBed's weekly marketing update.  So

6    at some point in time were these meetings actually weekly?

7    A.   Not for on-site ever.

8    Q.   Not for on-site.  How about remotely?

9    A.   We have a telephone call, Achieve does, with GhostBed

10   every Tuesday.

11   Q.   Every Tuesday.  You have weekly meetings, they are just

12   not on-site?

13   A.   Correct.

14   Q.   And you participate in those weekly meetings?

15   A.   Yes, sir.

16   Q.   Have you done that since the beginning of the H.M.R.

17   website up through today?

18   A.   Yes, sir.

19   Q.   If we take a look here, and let's go to the third page

20   of Exhibit 208, for example, we can see here social media

21   review, Ryan.

22        Is that a reference to you?

23   A.   Yes, sir.

24   Q.   If we flip through these weekly meeting documents,

25   would we expect to see you represented in all of those

1    meetings addressing these kinds of social media issues?

2    A.   No.  Generally the social media wasn't a focal point on

3    here in the weekly meetings.

4    Q.   Understood.

5         Would you be listed in the weekly meetings as attending

6    if you were there?

7    A.   Yes, sir.

8    Q.   Do you ever talk to the Werners on the telephone?

9    A.   Yes, sir.

10   Q.   I guess I should be clear, Marc and Ashley Werner; is

11   that right?

12   A.   Yes.

13   Q.   Ms. Anderson, Ms. Calisha Anderson's declaration said

14   you had mobile telephone calls with Marc and Ashley Werner.

15   That is true?

16   A.   I have had mobile telephone calls, yes.

17   Q.   Do you sometimes talk to them in the evening?

18   A.   Yes.

19   Q.   Did you have mobile telephone calls with Marc and

20   Ashley Werner in October and November of 2016 when you were

21   launching the H.M.R. website?

22   A.   I don't believe with Ashley, but I speak with Marc,

23   yes.

24   Q.   Some of these calls are even after traditional business

25   hours, after 5:00 p.m., correct?

1   A.   Again, I don't function on traditional business hours,

2   because I get in at 9:00 in the morning and leave at 10:00

3   at night.

4   Q.   I understand.  My question wasn't that, though, sir.

5   It was that some of those calls are after 5:00 p.m.?

6   A.   Yes, sir.

7   Q.   Have you been to Marc Werner's house?

8   A.   Never.

9   Q.   Never been to his house.  Have you ever, even once

10  talked to Mark or Ashley Werner about how the H.M.R. website

11  is doing?

12  A.   Yes.

13  Q.   Have you ever talked to them about the content of the

14  H.M.R. website?

15  A.   Primarily focused just on my antithesis of affiliate

16  payments.

17          THE COURT:  Say that again.  Your antithesis of

18  what?

19          THE WITNESS:  Affiliate commission payments.  That

20  is a key differentiator with my site and every other site on

21  the planet.

22          THE COURT:  Put that in plain English, will you?

23          THE WITNESS:  Yes, sir.

24          Review websites generally make money from a

25  commission.  If you go to the website and click a product,

```
1    company A and buy, that reviewer gets a commission.  That is

2    how they monetize.  I have zero affiliate commission

3    programs with any company.

4    BY MR. MAGLEBY

5    Q.   Right.  You make money from Google AdSense at least for

6    the website?

7    A.   100 percent, yes.

8    Q.   Traditionally it has been $1,500 a month, but at some

9    point after March it has gone up to $3,000 a month?

10   A.   As more reviews have continued to be published, yes.

11   Q.   So Marc and Ashley Werner, they were aware that you

12   were going to launch the H.M.R. website, were they not?

13   A.   No, sir.

14   Q.   Total surprise to them?

15   A.   Yes, sir.

16   Q.   Never came up once in all of your discussions?

17   A.   No, sir.

18           MR. SPERLEIN:  Objection, Your Honor.

19           THE COURT:  Overruled.

20   BY MR. MAGLEBY

21   Q.   Will you admit that you have some affiliation with

22   GhostBed?

23   A.   Can you define affiliation?

24   Q.   Sure.  Business relationship, collaboration,

25   association.
```

1    A.    I do consulting and marketing through Achieve for

2    GhostBed, yes.

3    Q.    And in the past you have worked with GhostBed regarding

4    competitive marketing about Purple, correct?

5    A.    Yes, sir.

6    Q.    In fact, there are a number of e-mails with you on one

7    hand and people at GhostBed on the other hand talking about

8    targeting Purple with advertising, correct?

9    A.    If you bring them up I would be happy to confirm that,

10   yes.

11   Q.    But does that sound generally correct, that you would

12   have exchanged e-mails about Purple with GhostBed?

13   A.    I would have received probably e-mails about all

14   competitors.

15   Q.    Did GhostBed ever run advertising or an attack on

16   Purple about using recycled materials?

17   A.    I know there was a comparison chart.

18   Q.    Let's take a look at Exhibit 18.

19         Tell me if you recognize Exhibit 18.

20   A.    Yes, sir.

21   Q.    Who was involved in developing and approving this

22   advertisement?

23   A.    Myself and Georgianne Brown and Marc Werner.

24   Q.    Let's take a look at Exhibit 17.

25         This is an e-mail dated April 4, 2016 from you to Marc

1   Werner and also to Ashley Werner; is that correct?

2   A.   Yes, sir.

3   Q.   The tagline is Purple, right?

4   A.   Yes, sir.

5   Q.   And you write, I am asking permission rather than

6   forgiveness here, L.O.L.

7        L.O.L. stands for laugh out loud?

8   A.   Yes.

9   Q.   Why ask for permission rather than forgiveness?

10  A.   I am asking for permission because it is not my company

11  and I am not an employee, so when I built that ad, I know

12  that users are very graphical, so I didn't just want to just

13  publish something without their permission.

14  Q.   All right.  And you write can I create a graphic that

15  shows recycled materials versus new materials for Facebook,

16  then target Purple mattress users?

17       Correct?

18  A.   Yes, sir.

19  Q.   What you do is you create the graphic and if somebody

20  goes on Facebook and they search for the word Purple or

21  Purple mattress, this ad will pop up?

22  A.   No, sir.

23  Q.   No.  How does it work?

24  A.   You described more of a search query from Google.  On

25  Facebook all it was was targeting anyone interested in a

1    mattress, not specific to Purple's brand.

2    Q.    I see.  So it is a mistake when you typed then target

3    Purple mattress users?

4    A.    Yes.  The correct statement would be mattress buyers.

5    Q.    Then the last thing you write is it is a direct blow at

6    them, but figured I would ask before I get us in trouble.

7          You wrote that?

8    A.    Yes, sir.

9    Q.    So a moment ago you told me you were talking about all

10   mattress users and it was just a mistake, but when you write

11   it is a direct blow at them, are you referring to Purple?

12   A.    I am referring to Purple as far as for the graphic but

13   not for who is being targeted.

14   Q.    Understood.  Okay.  You asked Marc Werner for

15   permission rather than forgiveness before you attacked

16   Purple on the H.M.R. website?

17   A.    I never talked with Marc Werner about Purple on the

18   H.M.R. website.

19   Q.    Is GhostBed interested in how Purple related posts, so

20   posts and comments from the Internet, on the H.M.R. website

21   affect consumers?

22   A.    Can you ask that again?

23   Q.    Sure.  Does GhostBed track how Purple related posts on

24   the H.M.R. website or H.M.R. tweets affect consumers?

25   A.    I have no clue how GhostBed tracks anything.

1  Q.   Aren't you and Mr. Werner regularly notified about

2  negative Purple comments that arise from the H.M.R. website?

3  A.   I don't know how Mr. Werner would be notified.

4  Q.   All right.  Does Achieve, the company that GhostBed

5  pays and that pays you, track these comments and send e-mail

6  notices to you and GhostBed and Mr. Werner?

7  A.   Achieve has nothing to do with Honest Mattress Reviews.

8  Q.   I want to show you a document that we obtained from

9  Achieve.  It is a large spreadsheet.  So Exhibit 195 is a

10  P.D.F.  In the binder it is 195-A.  It will either be a disk

11  or a zip drive that has the original.  Down in the bottom

12  left-hand corner here we have the Achieve control number,

13  which is ACH-4571.  Let me see if any of this refreshes your

14  recollection as to what Achieve does.

15      Here we have in the top left-hand corner subject or

16  title, sender or created by, and recipients in the to line.

17  Under this first entry it says Steve Hergert commented on a

18  link Honest Mattress Reviews shared.

19      Is that a consumer making a comment on something Honest

20  Mattress Reviews published out to the internet?

21  A.   Yes.

22  Q.   And it says sender or created by Facebook.  So it is a

23  comment on Facebook?

24  A.   Yes.

25  Q.   Okay.

1          MR. HORWITZ:  Objection, Your Honor.  There is no

2    identification of what this document is, how it was created,

3    what it is there for.  I mean, Mr. Magleby could ask the

4    witness, but to put a document in front of him that is an

5    assumption of what an agency does when he has no knowledge

6    of it, and then basically make hypotheses based on that I

7    think is objectionable.

8          THE COURT:  Thank you.

9          The objection is overruled.

10          Go ahead.

11    BY MR. MAGLEBY

12    Q.   Under recipients in the to line it says

13    [REDACTED].

14          Is that an e-mail that you have?

15    A.   Yes, sir.

16    Q.   When this comment got posted on Facebook, did you get

17    an e-mail notification about this comment?

18    A.   Yes.  All my e-mails do, because that e-mail is part of

19    my business manager account.

20    Q.   Okay.

21    A.   So if I get an e-mail from Honest Mattress Reviews or

22    from Achieve's Facebook, Facebook would auto populate this

23    e-mail, yes.

24    Q.   And then you would get a notice?

25    A.   Yes, sir.

1    Q.    Then one of the things you might do is go read that

2    comment and comment back or reply?

3    A.    I could if I chose to.

4    Q.    If you chose to.  Let's continue over a little further.

5    Then it says received or created and we have the date 10-20,

6    2016; is that right?

7    A.    Yes, sir.

8    Q.    Okay.  Then there is recipients in the c.c. line over

9    here.

10        Are these people who also get that same e-mail that you

11    get?

12    A.    No.  I am not sure how they are there.

13    Q.    You don't know what that is?  If we take a look at the

14    recipients in this c.c. line, it has got your e-mail address

15    here, but it also has Ashley Werner at Nature's Sleep, does

16    it not?

17    A.    That is what I see, yes.

18    Q.    Do you have any reason to believe that that e-mail does

19    not go to the recipients in this c.c. line?

20    A.    The reason I would say they would not is they are not

21    in the business manager.  The way that Facebook sorts things

22    is through what is called a business manager.  So Honest

23    Mattress Reviews is my own, and I am not sure how these

24    people would have received that auto e-mail.

25    Q.    All right.  Let me ask this.  Have there been notices

1    of meetings to discuss the H.M.R. website that have been

2    sent out through this management software?

3    A.    No.

4    Q.    Let's go through this.  The same page, bottom of the

5    first page it says M.F.R.M., Honest Reviews, touch base.

6          Do you see that?

7    A.    I do.

8    Q.    Do you know what that is a reference to?

9    A.    I do.

10   Q.    What is it?

11   A.    That is one of the ongoing meetings I have with the

12   president and C.E.O. of Mattress Firm.

13   Q.    And then it says [REDACTED], and that is your Achieve

14   e-mail, right?

15   A.    Yes.  I would assume that this is probably a calendar

16   entry.

17   Q.    A calendar entry.  Let's go over to the right-hand side

18   and we see this is 3-3-17, and it says WebEx meeting,

19   meeting number access code.

20         That is how you joined this meeting; is that right?

21   A.    Yes, sir.

22   Q.    And Marc Werner is listed over here on the right, isn't

23   he?

24   A.    Yes, sir.

25   Q.    And if we go through this exhibit, would you be

1    surprised if we find a number of comments about Purple?

2    A.   Again, I'm not sure what that last column represents,

3    but I understand what it is, but I don't know how that

4    works.

5              MR. MAGLEBY:   Just for the Court and counsel, what

6    we have done is we have blown up various excerpts so that

7    the hard copies are in the possession of the Court, although

8    you can blow it up in P.D.F. and see it.   I just want to

9    look at one of them.

10   BY MR. MAGLEBY

11   Q.   Here is one of these notices.   That did not work the

12   way I wanted it to.   Hold on.   That is what happens when a

13   lawyer tries to use technology.   Let's start over.

14        We can see here Jessica Knoll commented that Honest

15   Mattress Reviews, honesty community support album, and that

16   is something related to the H.M.R. website, right?

17   A.   No, sir.   That is a Facebook album.

18   Q.   Facebook.   But it is Honest Mattress Reviews' Facebook?

19   A.   Yes, sir.

20   Q.   She says glad I saw this.   I was about to order a

21   Purple mattress but now I am thinking GhostBed is better.

22   Do you have reviews on that?   Reply to this e-mail.

23        Do you see that?

24   A.   I do.

25   Q.   Then in the recipients under the c.c. line we again see

1    Marc and Ashley Werner, correct?

2    A.   Yes.  But, again, I don't know how that -- I don't even

3    know what that is.  I understand it is an e-mail, but I

4    don't know how that got there or what it is.

5    Q.   Did you search for and produce these e-mail notices,

6    because I don't think we got them?

7    A.   No.  Some of the names on this list I have never seen

8    in my life.

9    Q.   At one point in time your online presence identified

10   you as the chief brand officer of GhostBed; is that correct?

11   A.   Yes.

12   Q.   And that included on LinkedIn and Twitter, correct?

13   A.   Yes, sir.

14   Q.   And in about October of 2016 these online references to

15   you as chief brand officer were taken down?

16   A.   Yes, sir.

17   Q.   Did it occur to you that consumers might search and

18   find online that you were identified as GhostBed's chief

19   brand officer, and that that might relate to how they view

20   the claim of independence by Honest Mattress Reviews?

21   A.   No, sir.

22   Q.   That didn't occur to you at all?

23   A.   No, sir.

24   Q.   LinkedIn is kind of like a resume, isn't it?

25   A.   I would agree with that, yes.

1    Q.   In fact, in this day and age of the electronic universe

2    we live in, some people don't even use resumes, they just

3    use LinkedIn.  Is that your experience?

4    A.   I could understand your position there, yes.

5    Q.   Okay.  With a resume don't you want to put in all of

6    your relevant experience?  It is kind of a self-promotion

7    tool, right?

8    A.   Yes, sir.

9    Q.   There is no reference to your work for GhostBed on your

10   LinkedIn profile, is there?

11   A.   At what time?

12   Q.   Currently.

13   A.   Currently, no, sir.

14   Q.   And not after October of 2016, correct?

15   A.   Correct.

16   Q.   Now, if Mr. Werner says you were never the chief brand

17   officer for GhostBed; is that true?

18   A.   That is true.

19   Q.   So when you were holding yourself out as the chief

20   brand officer for GhostBed, were you rogue?

21   A.   Yes, sir.

22   Q.   You did it without his permission and knowledge?

23   A.   When I published that, I published it in two places.  I

24   published it on LinkedIn and on Twitter.  I did it for when

25   I was actually presenting a case study at a conference for

1    digital marketing.

2    Q.   Let's take a look at Exhibit 53.

3         Now, Exhibit 53 is a video and it is the video of that

4    digital marketing conference.  Are you familiar with that

5    video?

6    A.   Yes, sir.

7    Q.   What I would like to do is play about a minute of that

8    video.  I am hoping the audio will come through.

9         It does not sound like it is coming through.  What I

10   would like to do very quickly is -- can we switch to that

11   laptop?

12            Sorry, Your Honor.  Lawyers and technology.  I am

13   going to come over here if that is okay.  I will lean over.

14   Hopefully these speakers are such that we can hear.

15            (WHEREUPON, a video excerpt was played.)

16   BY MR. MAGLEBY

17   Q.   How GhostBed actively launched a national brand using

18   Facebook.

19        Is that your presentation at this conference?

20   A.   Yes, sir.

21   Q.   Okay.  So did Marc Werner not know you were doing this?

22   A.   He was aware I was going the presentation, but I never

23   showed him my presentation.

24   Q.   Okay.  I want to go to I think 307.

25        Is this you being introduced at that conference?

```
 1   A.   Yes, sir.

 2             MR. MAGLEBY:  Your Honor, is that loud enough?

 3             THE COURT:  It is okay.

 4   BY MR. MAGLEBY

 5   Q.   Who told the presenter to identify you as the chief

 6   brand officer at GhostBed?

 7   A.   I did.

 8   Q.   He said he wanted to make sure he got it right.  Did

 9   you make sure with him beforehand that you would get the

10   title right?

11   A.   No, I added it at the end, right before I went on.

12             (WHEREUPON, a video excerpt was played.)

13   BY MR. MAGLEBY

14   Q.   Let's stop it there.

15        I notice on the stage there are a bunch of GhostBed

16   boxes.

17   A.   Yes, sir.

18   Q.   Did you get those from GhostBed?

19   A.   Yes, sir.

20   Q.   Did GhostBed pay to ship those to the conference?

21   A.   No, sir.

22   Q.   How did you get them there?

23   A.   I put them in my car.

24   Q.   So it was within driving distance?

25   A.   It was in Orlando.
```

```
1    Q.   Did you go to GhostBed and say, hey, I need these boxes
2    for this presentation?
3    A.   I told them that I was asked to present the Facebook
4    case study at this presentation and asked if I could bring
5    in the empty boxes just to bring on stage, yes.
6    Q.   Anybody ask you what you were going to represent your
7    role or position to be?
8    A.   Not at that time.
9    Q.   I see.
10            (WHEREUPON, a video excerpt was played.)
11   BY MR. MAGLEBY
12   Q.   You said my name is Ryan and I am chief brand officer
13   of GhostBed, and you told that to everybody in the room and
14   it wasn't true.  Is that what you're saying?
15   A.   Yes, sir.
16   Q.   You were being paid by GhostBed at the time, right?
17   A.   I was being paid by Achieve at the time for work on
18   GhostBed's project, yes.
19   Q.   Fair enough.
20        You did not say I am only a consultant for GhostBed,
21   did you?
22   A.   No, sir.
23   Q.   Have you spoken for GhostBed at other events?
24   A.   I believe I attended one other event in Boston.
25   Q.   All right.
```

1          MR. MAGLEBY:  Ron, can we go back to my laptop?

2    BY MR. MAGLEBY

3    Q.    Let me show you Exhibit 51.

4          Can you tell me what event this is?

5    A.    That is the exact same event you just played.

6    Q.    And it identifies you as being with GhostBed, not

7    Social Media Sharks, correct?

8    A.    Correct, but I do want to point out, if I can?

9    Q.    Sure.

10   A.    That conference, if you actually pull up the website,

11   the way that they presented me for months leading up just

12   said Ryan Monahan founder of Social Media Sharks.  I added

13   in the GhostBed.

14   Q.    You added in GhostBed without permission?

15   A.    Correct.

16   Q.    Was Mr. Werner upset when he found out you had said you

17   were chief brand officer?

18   A.    He was frustrated when I started using it on my own,

19   yes.

20   Q.    And he told you to take it down?

21   A.    Yes.

22   Q.    And that was around the time you launched the H.M.R.

23   website?

24   A.    I am not sure exactly when, but I know as soon as I was

25   asked I took it down.

1   Q.   You had previously been an author or at least certain

2   articles were attributed to you on the GhostBed website,

3   correct?

4   A.   I have had an account on GhostBed that my team used,

5   yes.

6   Q.   If I go to Exhibit 59, and this is a Google search, and

7   it says Ryan Monahan, GhostBed, and the returns of this

8   search say Ryan Monahan, author at GhostBed, and then there

9   is the domain name for the GhostBed website.

10      Do you see that?

11  A.   I do.

12          MR. SPERLEIN:   Objection, Your Honor.  I just want

13  to point out that Google returns are different on every

14  computer depending on the user.  What appears on the screen

15  here today is not what another user is going to see.

16          THE COURT:   Now we have got testimony from two

17  lawyers.

18          Overruled.

19          Go ahead.

20  BY MR. MAGLEBY

21  Q.   Well, Mr. Monahan, I think you just told me that you

22  were previously identified as the author on at least some of

23  these things on GhostBed's site, right?

24  A.   When Achieve was contracted, GhostBed provided access

25  to their blog, and this is the name that they registered the

1   account that we all used.

2   Q.   Sometime after you launched the H.M.R. website your

3   name was taken off, wasn't it?

4   A.   I am not sure.

5   Q.   You are not sure.  So if that happened, it was a

6   decision that was made by GhostBed?

7   A.   I am not sure.  The content we published, if you look

8   at these articles, it never had an author or tagline or

9   byline or anything like that.

10  Q.   All right.  If I go to Exhibit 60, these are some of

11  the same -- I will call them articles, but now the author is

12  identified as Sleepteam; is that correct?

13  A.   That is what I see, yes.

14  Q.   Now, you claim to be unbiased and independent on your

15  website, on the H.M.R. website?

16  A.   Yes, sir.  I cover the entire industry.

17  Q.   You want consumers to believe that the website is

18  independent and unbiased?

19  A.   I want consumers to have access to information about

20  all brands.

21  Q.   But setting aside all brands, access to information

22  about all brands, isn't part of your pitch to the public

23  that this is an independent and unbiased website?

24  A.   I don't use that terminology.  I just simply say I

25  cover the entire industry regardless of size, capital

1    investment, it does not matter.  However they are, as long

2    as they are in the sleep space, I cover them equally.

3    Q.   Do you think a review site should be transparent about

4    all of its financial ties with a product manufacturer?

5    A.   I think that is important.

6    Q.   Should a review site be transparent about its personal

7    relationships or ties with the product manufacturer?

8    A.   I do.  That is why I disclosed on my disclaimer that I

9    have done consulting in this space and outside of this

10   space.

11   Q.   Do you agree that it is better for a consumer to have

12   more truthful information than less?

13   A.   I agree that consumers should have access to

14   information, yes.

15   Q.   So you wouldn't have any objection to a truthful

16   disclaimer on your website?

17   A.   I would have no objection.

18   Q.   Well, let me have you look at a disclaimer that we put

19   together here.  I want to ask you if these things are true.

20        MR. HORWITZ:  Objection, Your Honor.  What does

21   his willingness to put something on his website in the

22   future have to do with the issue that we're here for?  This

23   is a hypothetical about what he may be willing to do in the

24   future and has nothing to do with what happened in the past

25   and the relationship or lack of relationship with GhostBed.

1          THE COURT:  I didn't hear it that way.  I heard

2    what I heard.

3          Overruled.  Go ahead.

4          Are you about done?

5          MR. MAGLEBY:  I probably have got 30 minutes.  I

6    know it pains the Court.

7          THE COURT:  All right.  Go ahead.

8          MR. MAGLEBY:  I apologize, Your Honor.

9          THE COURT:  Go ahead.

10   BY MR. MAGLEBY

11   Q.   The first bullet point is Ryan Monahan owns and

12   operates the honestmattressreview.com website.

13        True?

14   A.   True.

15   Q.   Second bullet point.  Monahan has been paid at least

16   $148,000 by mattress company GhostBed since November 2015.

17        True?

18   A.   False.

19   Q.   Ryan Monahan's company, Social Media Sharks, has been

20   paid at least $148,000 from Achieve, which money originates

21   at GhostBed, since November of 2015?

22          THE COURT:  We have been all over this.  This is

23   just a summary.  That is why I asked if you were about done.

24   This seems to me to be a summary.

25          Haven't we been over all of this?

1          MR. MAGLEBY:  We have.  This is to show the bias,

2     Your Honor.

3          THE COURT:  Well --

4          MR. MAGLEBY:  It is not an independent --

5          THE COURT:  We have been over it.  It has been

6     asked and answered.  You're summarizing.

7     BY MR. MAGLEBY

8     Q.   My question to you, Mr. Monahan, is would you have any

9     objection to putting truthful statements about your economic

10    relationship with GhostBed on Honest Mattress Reviews?

11    A.   I would have no problem with a disclaimer, but we have

12    to be clear that Honest Reviews has no relationship with

13    Werner or any other mattress company in that instance.

14    Q.   Other than the fact that GhostBed pays through a couple

15    different companies about $10,000 a month?

16    A.   A different business, yes.

17         THE COURT:  I am going to take a ten-minute break.

18    When we come back you're going to have ten minutes remaining

19    with this witness.

20         MR. MAGLEBY:  Understood, Your Honor.

21         THE COURT:  And then we'll hear whatever is asked

22    on redirect examination.

23         Court is in recess for ten minutes.

24         THE WITNESS:  May I step down?

25         THE COURT:  You may step down.

1          (Recess)

2          THE COURT:  Have you got it down to ten minutes?

3          MR. MAGLEBY:  I have to.

4          THE COURT:  Yes, you do.

5          Mr. Magleby, you may continue.

6          MR. MAGLEBY:  Thank you, Your Honor.

7    BY MR. MAGLEBY

8    Q.   Mr. Monahan, earlier in the examination you said that

9    you are just asking questions.  That is what you're doing on

10   the website, asking questions?

11   A.   In relation to what?  I have 900 articles.

12   Q.   Purple.

13   A.   With Purple I have asked questions but I have also

14   promoted Purple heavily.

15   Q.   One question or complaint you have about Purple is you

16   say that Purple does not acknowledge the possible risks of

17   the powder; is that right?

18   A.   Yes, sir.

19   Q.   And one complaint is that Purple does not have proof of

20   safety for the use of the powder on the mattress?

21   A.   Yes, sir.

22   Q.   And one complaint is that Purple does not have

23   scientific studies showing eight hours a night with ten

24   years of exposure is a safe level?

25   A.   Yes, sir.

1    Q.   Is it your position that GhostBed gets the same level

2    of review as Purple?

3    A.   Every company in the industry gets the same level of

4    review.

5    Q.   Okay.  So GhostBed uses a form of latex in its

6    mattresses, does it not?

7    A.   Yes, sir.

8    Q.   If we look at the GhostBed frequently asked questions,

9    which I have put up on Exhibit 241, there is a series of

10   statements.  What type of latex is used in the GhostBed

11   mattress?  Can the synthetic latex in the GhostBed mattress

12   cause allergies?

13       Do you see that?

14          MR. HORWITZ:  Your Honor, can Mr. Magleby identify

15   whether this is from Honest Mattress Reviews or from the

16   GhostBed website?

17          MR. MAGLEBY:  Sorry.  This is the GhostBed

18   website.

19          MR. HORWITZ:  Thank you.

20   BY MR. MAGLEBY

21   Q.   Have you seen this before?

22   A.   Yes.

23   Q.   I'm curious.  Have you ever publicly on the H.M.R.

24   website asked questions about GhostBed's use of latex that

25   are the same questions you have asked about Purple?

1    A.   No, and the reason is Purple never disclosed the powder

2    on their website until five months or four months after I

3    asked.

4    Q.   Once they disclosed it, though, you asked a number of

5    follow-up questions, like do you have scientific studies?

6    What is the powder?  I want to know the composition.  You

7    asked all of those kinds of questions, right?

8    A.   I asked what is it?  Is it safe?  Is it safe to touch?

9    Is it safe to inhale?

10   Q.   Right.  Have you ever asked on the H.M.R. website the

11   same questions about GhostBed's use of latex?

12   A.   No, sir.

13   Q.   Are you aware that latex allergies can cause death?

14        THE COURT:  Well, now we have gone beyond where I

15   want to be on this hearing.

16        MR. MAGLEBY:  Your Honor, it shows the bias.

17        THE COURT:  I understand.  I'm cutting you off.

18        MR. MAGLEBY:  I understand, Your Honor.  I was

19   really excited about that, too.

20        THE COURT:  You can pursue it at another time.

21        MR. MAGLEBY:  I will.

22   BY MR. MAGLEBY

23   Q.   Mr. Monahan, are you aware of the argument in this case

24   that you put a lot of work into the H.M.R. website, and it

25   would be a lot of work and it wouldn't make sense if the

1    website was just a sham for GhostBed?

2    A.    Am I aware that I put in a lot of work and it would be

3    a sham if it was just for GhostBed?

4    Q.    Yes.

5    A.    Yes.

6    Q.    So is that true that you do put in a lot of work?

7    A.    I put in a lot of work in my network and my platform,

8    yes.

9    Q.    And do you put a lot of work into writing the articles

10   that appear on the website?

11   A.    Yes.

12   Q.    So if we go to the home page, for example, and I

13   represent this is the page that I think we captured

14   yesterday, 9-15, 2017, from the H.M.R. website.

15        Does this appear to be your website?

16   A.    Yes.

17   Q.    And then there are these boxes down here and they say

18   things like breaking news, industry news, and these are some

19   of the articles that you say you write?

20   A.    Yes.  The order would be -- there are two that publish.

21   The two most recent are on the top, and then once a third

22   one comes, it pushes to the bottom left and works its way

23   over.

24   Q.    Then if we go down further, I guess here we can see

25   something about Purple on your home page even today, right?

```
 1   A.   Yes, sir.

 2   Q.   It is very expanded and kind of big, isn't it?

 3   A.   No, sir.

 4   Q.   You don't think that is bigger than the other articles?

 5   A.   No, sir.

 6   Q.   Okay.  Then if we go down, here are more of these

 7   articles here, right?

 8   A.   Yes, sir.

 9   Q.   Then you also have a news page, which I think is -- we

10   won't spend time on that.

11        Let me look at this article.  Is this an example of one

12   of the articles that you wrote?

13   A.   This is an example of content on my site, yes.

14   Q.   Content on your site?

15   A.   Yes.

16   Q.   You didn't write it?

17   A.   Some content is curated and some content is

18   republishing press releases and some is unique to me.

19   Q.   But this says by Honest Mattress Reviews, does it not?

20   A.   That is just the account author.

21   Q.   That is the account author.  Have you plagiarized

22   articles on your website?

23   A.   I have repurposed articles, yes.

24   Q.   Repurposed.  What do you mean when you say repurposed?

25   A.   Articles can exist elsewhere.  My goal is just to bring
```

1    all of the industry news about all brands to one centralized

2    location.

3    Q.   Have you published articles or information on your

4    website without attributing it to the original author?

5    A.   Yes.

6    Q.   In fact, if we put this one on the left and we put

7    Exhibit 139 up, Mattress Recycling, a U.S. Success Story,

8    written by Kirstin Linnenkoper, July 12, 2017, you don't

9    attribute this article to Ms. Linnenkoper, do you?

10   A.   Not in this instance, no.

11   Q.   Do you have a licensing agreement with Ms. Linnenkoper

12   where she allowed you to use this?

13   A.   No, sir.

14   Q.   If we look through Exhibits 140 and 141, would we see

15   the same thing repeated?  Here we have --

16              MR. HORWITZ:  Objection, Your Honor.  Again, this

17   is a -

18              THE WITNESS:  This a press release too.

19              MR. HORWITZ:  This has no relevance or any

20   possible relationship with GhostBed.

21              THE COURT:  Sustained.

22              Well, I don't know that I'm agreeing with you, but

23   I am saying it is beyond the scope of this hearing.

24              MR. MAGLEBY:  Sure.

25              MR. HORWITZ:  Thank you, Your Honor.

1          THE COURT:  It appears to me to be.

2          MR. MAGLEBY:  Your Honor, just for the record, the

3     point I was trying to make is at the last hearing Ms. Yost

4     argued it would be silly for Mr. Monahan to spend so much

5     time writing articles if this was just a sham.  The point is

6     he is not writing them.

7          MR. HORWITZ:  Your Honor, if this is the time for

8     argument, we have plenty of argument to make as well.

9          THE COURT:  Let's move on.

10         Your next question, please.

11    BY MR. MAGLEBY

12    Q.   Mr. Monahan, we asked you to produce all -- I am sorry.

13         MR. MAGLEBY:  My last three minutes, Your Honor.

14    BY MR. MAGLEBY

15    Q.   Let me have you take a look -- I can't find it.

16         I found it.  Sorry.

17         You said that Mr. Werner was upset when he found out

18    you were using the title chief brand officer; is that right?

19    A.   Yes.  He asked me to stop.

20    Q.   Let me have you look at Exhibit 48.  Let's go down to

21    the bottom here.  This is an e-mail exchange, and I may not

22    be on the earliest page, but at the bottom of the first page

23    there is an e-mail to Sherry Bullock and to you,

24    ryanmonahan@ghostbed.com.

25         Do you see that?

1    A.   I do.

2    Q.   What is the date?

3    A.   August 19th.

4    Q.   2016?

5    A.   Yes, sir.

6    Q.   And on this e-mail you have a signature block that says

7    Ryan Monahan, chief brand officer, GhostBed, Crafted

8    Perfection.

9         Do you see that?

10   A.   I do.

11   Q.   Was that an auto insert of your signature block?

12   A.   So this e-mail, if you look below the original

13   e-mail -- I'm sorry.  Leave it right there and I can

14   explain.

15   Q.   I was going to move it for you.

16   A.   That is fine.  Achieve was asked to start doing some

17   e-mail marketing, so I wanted to run a test to see if an

18   e-mail that comes across from a person as opposed to a

19   company, so an example would be if you got an e-mail from

20   Amazon, if you get an e-mail from Jeff Bezos at Amazon how

21   basically would users respond.  So it was in that e-mail

22   blast that I set that up and then this was just the response

23   from it.

24   Q.   So you sent out an e-mail blast that identified

25   yourself as chief brand officer to a number of potential

1    customers?

2    A.    To permission based opt end customers, yes.

3    Q.    How many?

4    A.    I don't know at this time.

5    Q.    More than ten?

6    A.    I have no clue the size of the e-mail.

7    Q.    1,000?

8    A.    Again, you would have to ask them.

9    Q.    Now, I noticed earlier when you were talking to Mr.

10   Werner you said I want to ask forgiveness rather than -- I

11   want to ask permission rather than forgiveness because it

12   was his company, right?

13   A.    Correct.

14   Q.    Did you ask Mr. Werner for permission rather than

15   forgiveness before you sent out this e-mail blast

16   identifying yourself as the chief brand officer?

17   A.    No, sir.  The e-mail that you brought up earlier was

18   from 4-14.  This e-mail is months later.

19   Q.    All right.  That is right, but my question was whether

20   you had asked permission.

21        Did others at GhostBed know you were using the title

22   chief brand officer?

23   A.    Others knew when I put it on the e-mail blast.

24   Q.    In fact, if we go to the top of this document you

25   write, hey, Sherry, let's track down Mr. Dennis.  He is the

1    man who can make things happen.  You carbon copy Dennis

2    Manning; is that right?

3    A.   Yes, because I have no authority at GhostBed.  I can't

4    offer a discount so I simply connected from the e-mail

5    marketing to the customer service.

6    Q.   So Mr. Manning saw you use chief brand officer; is that

7    right?

8    A.   I would assume.

9    Q.   And Mr. Manning is a GhostBed employee, correct?

10   A.   Yes.  I'm not sure of his exact title, but I know he

11   runs the customer experience.

12            MR. MAGLEBY:  That is it, Your Honor.  I will get

13   out of the way.  Thank you for your patience.

14            THE COURT:  Thank you.

15            Mr. Horwitz?

16            Mr. Sperlein, you'll be going first?

17            MR. SPERLEIN:  Bear with me for just a few

18   moments.

19            THE COURT:  Yes.

20                    REDIRECT EXAMINATION

21   BY MR. SPERLEIN

22   Q.   Good morning, Mr. Monahan.  How are you?

23   A.   I'm doing well, sir.  Thank you.

24   Q.   I will start off with a question.  Could you explain

25   your business plan for Honest Mattress Reviews, please.

1    A.    Yes, sir, and I will keep it quick.

2    Q.    Thank you.

3    A.    Honest Reviews I believe in ten years from now can

4    replace Consumer Reports.  My goal is to identify target

5    niche markets, so Honest Mattress Reviews is one of my five

6    sites that I operate today.  I also cover fashion,

7    technology, beauty, and we're getting into movies.

8    Q.    Let me interrupt you there.  This morning we have only

9    talked about a website called Honest Mattress Reviews.  Are

10   you saying that there are other websites using that same

11   Honest Reviews branding?

12   A.    Yes, sir.

13   Q.    Thank you for that.

14         Again, I want you to clarify one thing.  You said that

15   it could replace Consumer Reports?

16   A.    Yes, sir.

17   Q.    Just explain briefly for the Court what that is.

18   A.    There are two reasons I believe this.

19   Q.    No.  Explain, please, what Consumer Reports is.

20   A.    Consumer Reports is basically the staple and the

21   authority for reviews and they review everything from

22   ketchup to cars.

23   Q.    Have they been around for a long time?

24   A.    Yes, sir.

25   Q.    So you see yourself as a newer version of a review

1    site?

2    A.   I believe with the trajectory that they are on that

3    they are trending downward, and I believe there is going to

4    be a need as more consumers go to the internet to find a

5    replacement.

6    Q.   How do your websites, your honest review websites work?

7    A.   Honest Reviews works as a platform or a location.  My

8    goal and objective is to provide information.  So as Mr.

9    Magleby said, yes, I publish content and curate it.  Honest

10   Mattress Reviews has 900 articles.  I cover the entire

11   industry, whether it is a merger or a new product launch.  I

12   don't gate information the way that a --

13   Q.   I am going to interrupt you again.  What does that

14   mean, gate information?

15   A.   A lot of the major media sources such as Huffington

16   Post or Mashable choose to only publish what is most popular

17   in the news.  I publish all brands regardless of their

18   position.

19   Q.   Okay.  Thank you.

20        You said that you published over 900 articles on Honest

21   Mattress Reviews?

22   A.   Yes, sir.

23   Q.   Does this look familiar to you, Mr. Monahan?

24   A.   Yes, sir.  This is a listing of every article that is

25   on my site since launch.  Just to be clear, the left column

1    represents which brand or company it is about.  The middle

2    is the exact U.R.L.  The right would be the date it was last

3    modified, the article.

4    Q.   So these are all articles about different mattresses?

5    A.   Yes.  Not just mattresses, it also covers pillows,

6    sleep tech, anything sleep related.

7    Q.   Are all of the articles relevant to a single brand?

8    A.   No, sir.  It covers all brands.

9    Q.   Well, any single article -- what I'm asking is is each

10   article specific to a brand?  Do you only review or talk

11   about a particular brand in an article?

12   A.   No.  Some are individual and some are -- an example

13   would be a recent one had Leesa and Casper relative to the

14   West Elm deal that they did.  Some can have multiple brands

15   in an article and some can have a singular brand.

16   Q.   How about articles that are not related to any brand

17   whatsoever, but that are just relevant to the mattress

18   industry generally?

19   A.   Yes.  I also cover that.  An example would be mattress

20   recycling.  I publish a lot on that due to the fact that

21   they are filling up landfills.  An example would be recently

22   California just passed a law --

23   Q.   Let's slow down for the benefit of the court reporter

24   and for me.  He may be able to type that fast, but I am

25   going to cut you off briefly because I want to ask you

1    something.  You said that you published an article about

2    mattress recycling.  That was the article that Mr. Magleby

3    just had up a few minutes ago?

4    A.    That was one of them.  I have published many from

5    around the world.

6    Q.    Do you know if that article that he had up earlier had

7    any restrictions on republication?

8          THE COURT:  I am not going to allow that question.

9    I cut him off and I am not going to let you go into the same

10   thing.  I want to explore the association with GhostBed.

11         MR. SPERLEIN:  I understand.

12         THE COURT:  I don't think it is disputed that he

13   runs what he runs and that he has put out all of these

14   articles during this time running this website.  I think we

15   all know why we are here.  If we could focus on that I would

16   really appreciate it.

17         MR. SPERLEIN:  I certainly will, Your Honor, but I

18   think it is important to understand that what --

19         THE COURT:  Just let me hear your next question.

20         MR. SPERLEIN:  Okay.

21         THE COURT:  I cut him off and I will cut you off.

22   I just want to explore the association that was represented

23   to me in some declarations between this gentleman and

24   GhostBed.  That is what I have limited Mr. Magleby to, and

25   you apparently want to explain his entire business operation

1    and going into movies and fashion and all these articles.  I

2    just don't see how that is pertinent to what I want to have

3    happen here today.

4              MR. SPERLEIN:  I understand, Your Honor.

5              THE COURT:  Okay.

6              MR. SPERLEIN:  I will do my best.

7              THE COURT:  Please.

8    BY MR. SPERLEIN

9    Q.   Mr. Monahan, did you set up this website, Honest

10   Mattress Reviews, so that you could attack Purple to the

11   benefit of GhostBed?

12   A.   No, sir.  I actually am a huge fan of Purple, in the

13   beginning when I started the site.

14   Q.   Have you written articles that are favorable to

15   GhostBed?

16   A.   For GhostBed, yes.

17   Q.   And how about Purple?

18   A.   Yes.

19   Q.   That is what I meant to ask.

20             MR. MAGLEBY:  Your Honor, just for housekeeping

21   and Mr. Sperlein, maybe we should start numbering these in

22   the 500 range.

23             MR. SPERLEIN:  Okay.

24             MR. MAGLEBY:  Just so we have some number when I

25   go back to the office.

1            MR. SPERLEIN:  Absolutely.  Thank you, Jim.

2            If the first exhibit, which was the spreadsheet,

3    if we could mark that as Exhibit 500, please.

4            THE COURT:  You don't have your exhibits marked

5    until now?

6            MR. SPERLEIN:  I'm sorry, Your Honor.

7            This will be 501.

8    BY MR. SPERLEIN

9    Q.   Can you just take a look at that article that I handed

10   you and give me a brief explanation as to what it is?

11   A.   Yes, sir.  Around Halloween I published an article just

12   saying what we were going to be dressed up as for Halloween.

13   If you go to page 3 you can see the content.  So what we did

14   was we figured we would create our costumes, so what we did

15   was we took some of the top brands.  For example, Purple, we

16   included Goldilocks, Leesa, we included Tuft & Needle,

17   Casper and GhostBed.

18       If you go to the third page you can see we were

19   promoting all three of these brands with their individual

20   logos.

21   Q.   Thank you.

22       Were there other instances where you did that, just had

23   articles about all of the --

24   A.   Yes.  The most recent would be Labor Day.  I promoted

25   the entire mattress industry including Purple for the sale.

1    Q.    Thank you.

2          Mr. Monahan, could you look at Exhibit 195.1?  This is

3    the exhibit that Mr. Mableby was showing to you before which

4    appears to be some sort of spreadsheet.  I believe you said

5    that you had never seen this before; is that correct?

6    A.    That is correct.  I have never seen this in my life.

7    Q.    Can you explain to me what you believe it is?

8    A.    Just based on what it looks like, I have an Achieve

9    account that is connected also to my Facebook business

10   manager.  That is how you can manage different pages on

11   Facebook.  To me this looks like an auto populated e-mail,

12   because this bottom one with the president of Mattress

13   Firm -- I recall this.  This was an actual meeting I had had

14   with him, so I'm not sure how it is populated, but I do know

15   that it is somehow related to the Achieve account.

16   Q.    So this sends out auto notifications when there are

17   comments on a website?  Is that --

18   A.    No, sir.  Not on the website, on Facebook.

19   Q.    Facebook?

20   A.    Yes, sir.

21   Q.    Would that be articles about anything in the mattress

22   industry?

23   A.    To be honest I am not sure, because I have never seen

24   this before.  I can reference these comments just because I

25   see them, but I am not sure what --

1    Q.    Can you tell if it appears to be called out to just

2    deal with events or comments on Facebook that deal with

3    Honest Mattress Reviews?

4    A.    Just based on what I can see here in the far left

5    column, it does reference Honest Mattress Reviews, and then

6    the bottom one, again, that I remember as a meeting.

7    Q.    But would it make sense that it would also send e-mails

8    for other mattresses?

9    A.    Yes.  Well, it would make sense that it would send them

10   for anything connected to my business manager account, so

11   the 50 plus pages in there.

12   Q.    Thank you.

13         Has GhostBed paid you for anything related to this

14   website at all?

15   A.    No, sir.

16   Q.    Earlier when you were talking about the reviews on the

17   website, can you tell me what role consumer reviews play on

18   your website?

19   A.    Yes.  So my website has a review that I break down the

20   objective things such as sleep trial, materials, costs.

21   Additionally, every single mattress on my website has the

22   ability for consumers to go there and share their own

23   experience with each product.

24   Q.    Okay.  Do you select which reviews are published on the

25   website or not?

1    A.    No.   That is actually a differentiator between what I

2    do and the mattress companies.   The mattress companies have

3    the ability to filter what reviews are published.   Honest

4    Reviews uses the same technology but auto publish

5    everything.

6    Q.    Is that important to the value of your website?

7    A.    Yes.   In the future my objective and goal is to have a

8    completely community driven review.   My review score would

9    mean nothing.   I simply break down the products, here is the

10   value, pros and cons, and let consumers decide on the

11   overall rating.

12   Q.    For mattress companies they often publish consumer

13   reviews as well, don't they?

14   A.    Yes, sir.

15   Q.    Do they publish all reviews?

16   A.    No, sir.   Unfortunately in this industry what I have

17   seen is they hand select which ones to publish.

18   Q.    But sometimes you will see a one or two, low ratings on

19   those, right?

20   A.    Yes, sir.   But those, again, are hand selected so it

21   does not really provide consumers the true experience.   That

22   is the one stars, because they understand consumers want to

23   see one stars, but they are the hand selected one stars.

24   Q.    Mr. Magleby asked you some questions about your legal

25   fees.   I just want to double-check.   You're paying all of

1    your own legal fees for yourself individually and for Honest

2    Mattress Reviews; is that correct?

3    A.   Yes.  I have used up my entire savings on this.

4    Q.   Has it created a financial strain on you?

5    A.   Tremendous.

6    Q.   When did you first start Honest?

7    A.   I first conceptualized with William Bertolbe, my

8    partner at Social Media Sharks, as we were doing the

9    research back in December of 2015.  That is actually when I

10   registered my first domain name, Mattress Review Guru.  We

11   started talking about building a website and started buying

12   domain names, and then started putting it together, and then

13   I actually launched it myself August, September, October-ish

14   of 2016.  Originally the idea of building a review platform

15   started in December of 2015.

16   Q.   When did you start working for at the time Big Couch

17   Media or later Achieve?

18   A.   I started working with Achieve in September of 2015.

19   Q.   Okay.  When did you first meet Marc Werner?

20   A.   We were first made aware of the project in November of

21   2015 when Big Couch/Achieve asked if we wanted to work on

22   the project.  I first met him in December of 2015.

23   Q.   So that was after you had already launched your

24   website?

25   A.   That was after we had already started looking into it,

1    yes.

2    Q.    I'm sorry.  Repeat the date when you met Marc Werner

3    the first time.

4    A.    I met Marc Werner in December of 2015 and I purchased

5    my first domain in 2015.  We basically -- Achieve gave us a

6    month to do research, put together proposals, and in all of

7    that we realized that this industry was tremendously growing

8    and saw the need and value based on the current market with

9    the affiliates.

10   Q.    To reiterate, you don't accept affiliate payments?  In

11   other words, you don't get a bonus for promoting one

12   mattress over the other?

13   A.    No, sir.  It does not matter what product you buy or

14   don't buy.  I don't benefit in any way, shape or form.

15   Q.    But you do acknowledge that you have a relationship

16   with GhostBed outside of Honest Mattress Reviews; is that

17   correct?

18   A.    Yes, sir.

19   Q.    Do you disclose that anywhere on your website?

20   A.    Yes, sir.  Well, I disclosed in my disclaimer that I

21   have done consulting for companies in the space as well as

22   outside of the space.

23   Q.    Where does that disclaimer appear on your website?

24   A.    It appears on every single page on the footer, and then

25   on every single article it also is at the bottom of the

1   text, so it is on every page in two spots.

2   Q.   Okay.  If you click that, then it has a longer version?

3   A.   It has my picture, my name, and everything about me you

4   could ever pretty much want to know.

5        MR. SPERLEIN:  If you will give me just a minute,

6   Your Honor?

7        THE WITNESS:  In fact, I don't know if it helps,

8   but if you go to this page I can show you where it lives.

9   BY MR. SPERLEIN

10  Q.   That is Exhibit 501?

11  A.   Yes.  If you go to 501, for example, and then cruise

12  down to -- you can see the media outreach and I reach out to

13  Purple, and in this instance Casper, GhostBed, Tuft &

14  Needle, and then you can see at the bottom of this tweet

15  right here there is a disclaimer here, as well as if you

16  go to -- I don't know if this shows the footer -- also right

17  here.

18  Q.   That is at the bottom of the page?

19  A.   Yes, sir.

20  Q.   I asked Ms. Yost if she could pick up the actual

21  wording on that disclaimer.

22  A.   Yes.  For example, this is an article published

23  yesterday, so if you go down, you'll see it in two places.

24  Right here.  You will always see the disclaimer right there

25  on the left underneath that tweet, above the five shares,

```
1    and then additionally if you go down in the footer of every
2    page in the darker color, keep going all the way, right
3    here, a disclaimer on the very last line with the copyright.
4    Q.   Has that disclaimer been on your website since the
5    beginning?
6    A.   Yes.  I updated my disclaimer when I, quote, officially
7    launched.  This would have gone out September or October.  I
8    don't have the exact date on that, but this has been on
9    there unchanged even with the typos.
10   Q.   Yes.  Can you point out where it is that you
11   specifically say that you work in the space and do
12   consulting for others?
13   A.   Yes, sir.  If you go right below my tweet stream, right
14   here, this has been published.  I occasionally do speaking
15   engagements, but typically I am not paid for them.  I do
16   consult for many companies in the space as well as other
17   industries at various capacities.
18   Q.   Okay.  You wrote that?
19   A.   Yes, sir.
20   Q.   And that is true?
21   A.   It is 100-percent true.
22   Q.   Thank you.
23        Does your website have any other potential for
24   monetizing in the future since you don't accept affiliate
25   relationships?
```

1    A.    Yes.   There are two other revenue streams that since

2    March have launched.   I publish a report once a month that

3    covers the entire industry.   That is on sale and anyone can

4    purchase it.   Then I also am trying to build my own ad

5    network, where instead of Google running the ads on my site,

6    anyone can purchase the ads.   The differentiator with why I

7    want to move away from Google is Google charges based on

8    what they feel the value of the click is, so every time

9    someone clicks they have to pay.   I want to create a flat

10   fee.   Whether you are the biggest company or the smallest

11   company you pay the exact same amount for the exact same

12   exposure.

13   Q.    Thank you.

14        I am handing you another exhibit.   This is 502.   Is

15   this the monthly report?

16   A.    This is the monthly report, yes.

17   Q.    You said you sell this?

18   A.    Yes, sir.

19   Q.    To whom?

20   A.    Anyone.   Anyone can purchase this whether it is someone

21   in the space, a hedge fund, an investor, anyone who wants

22   access to kind of the state of the industry.

23   Q.    Okay.   Just very briefly, please, what kind of

24   information is in it?

25   A.    I will keep it very quick.   I break it into three

```
1    different categories.  The first is I survey the people who
2    come to my site to ask consumer insight questions.  My goal
3    is to be able to provide direct feedback to all mattress
4    companies based on what people are doing.  So a quick
5    example would be consumer insights.  What is the most
6    important factor when looking for brand on-site reviews?  I
7    run a survey monkey and collect the data and put it in here.
8    Q.    I think that is sufficient.  Thank you.
9    A.    Yes, sir.
10          I should note, too, that --
11               THE COURT:  There is no question.
12               THE WITNESS:  Okay.
13   BY MR. SPERLEIN
14   Q.    Earlier today you were talking about an e-mail blast
15   that you did that had a title, a GhostBed title at the
16   bottom of that e-mail.
17   A.    Yes, sir.
18   Q.    Explain to me again, and I'm not quite sure I
19   understand, this was a test; is that correct?
20   A.    Yes, sir.  Achieve was tasked with the objective to try
21   to do e-mail marketing to see how the results would be as
22   opposed to their internal team.  So when we put it together,
23   the test we created was to test how would a user respond if
24   it looked like it came from a real person, even though it
25   was an e-mail blast, relative to a company.
```

1    Q.   How did it come to be that you decided to use a made up

2    title for you instead of someone who was actually working in

3    the company?

4    A.   When I put it together -- I will be honest.  I just

5    built the e-mail and put my information in there.  I was

6    running the test.  I didn't ask anyone.  I just did it.

7    Q.   So you just didn't give it much thought?

8    A.   No.  I was more excited about running a test than --

9    Q.   What were the results of the test?

10   A.   Actually by putting a person -- making it seem

11   personal, it outperformed tremendously compared to just

12   coming from a brand or a company.

13   Q.   Did GhostBed act on that information?

14   A.   The only information then when we moved forward was we

15   obviously eliminated me and it just says coming from Marc or

16   the sleep team or different departments.  We started kind of

17   creating different department to see how that would work.

18   Q.   To the best of your knowledge, after that initial test

19   that had you listed in a fantasy title, was that title ever

20   used again in any e-mails?

21   A.   No, sir.

22   Q.   Mr. Magleby showed you some other e-mails that were

23   addressed to you throughout the day, a bunch of different

24   ones.  Were any of those e-mails directed to you at

25   [REDACTED]?

1    A.   I don't recall.  I don't think so.

2    Q.   Okay.  If you don't recall I will get them and have you

3    take a look.

4         If you would, look at Exhibit 17.

5    A.   Yes, sir.  This is my Big Couch e-mail.

6    Q.   Right.  Could you tell me the e-mail address?

7    A.   My e-mail address at Big Couch is

8    [REDACTED].

9    Q.   It is not from [REDACTED]?

10   A.   No, sir.

11   Q.   Did you ever receive any personal e-mails addressed to

12   you at [REDACTED]?

13   A.   I don't believe so, no.

14   Q.   Did you consider that to be your e-mail account?

15   A.   No.  We just simply used that when we were setting up

16   online marketing campaigns.

17   Q.   It was just for that testing; is that correct?

18   A.   Yes, that and one other service, but the same thing, to

19   test.  Once we would put it together, then we would turn it

20   over to the internal team.

21   Q.   Thank you.

22        Did you ever review Nature's Sleep?

23   A.   Yes.

24   Q.   Did you review that mattress during the initial month

25   or two of your website opening?

```
 1    A.    It would have been not the very first one.  I'm not

 2    sure exactly when because time has passed, but I did review

 3    one from Nature's Sleep, yes.

 4    Q.    What kind of rating did Nature's Sleep get?

 5    A.    Not very high.

 6    Q.    Can you remember and quantify it?

 7    A.    My rating system goes from world class, good, standard,

 8    average and poor.  It would be the fourth from the bottom.

 9    The cost value just does not equate.

10    Q.    And who owns Nature's Sleep?

11    A.    Marc Werner.

12    Q.    Is it a brand?

13    A.    It is --

14          THE COURT:  We have been over this with

15    Mr. Magleby and I understand the connection.

16          MR. SPERLEIN:  I will mark this as Exhibit 503.

17          THE COURT:  I am going to take a five-minute

18    recess and ask you to mark your exhibits so that we don't

19    have to wait while you are handing them to the court clerk.

20    I have not had this happen in years.  Five-minute recess.

21          Court is in recess.

22          MR. SPERLEIN:  Thank you, Your Honor.

23          (Recess)

24          THE COURT:  All right.  Please, your next

25    question.
```

```
 1            MR. SPERLEIN:  I apologize again to the Court.  I
 2   only have a few more and then Mr. Horwitz will ask a few.
 3            Does everyone have Exhibit 503?
 4            THE COURT:  Yes.
 5   BY MR. SPERLEIN
 6   Q.   Mr. Monahan, can you just tell me a little bit about
 7   this article again briefly?
 8   A.   Yes.  I will keep it brief.  This article was published
 9   either on the day or the day after Purple released one of
10   their new videos for a product launch.  I have always been a
11   huge fan of the Harmon brothers and their marketing so I
12   covered it here.  What it does is it does two parts.  It
13   talks about the video and it also puts on here about the
14   mattress protector, which was the product, as well as how to
15   buy and how to shop right on here.
16   Q.   Would you characterize this article as favorable toward
17   Purple?
18   A.   Yes.
19   Q.   Have you written other articles that you would
20   characterize the same way as being favorable to Purple?
21   A.   Absolutely.
22   Q.   And for right now I'm talking about the time prior to
23   the filing of this lawsuit.  Can you tell me approximately
24   how many other articles you --
25            THE COURT:  Could I interrupt you?  I'm going to
```

107

 1   not allow this.  This has been briefed and it has been shown

 2   and it is in the record.  The position that Mr. Monahan and

 3   the defendants have taken has been very clear to me before

 4   today.  The only thing that changed and that caused this

 5   hearing to happen was the declaration of Calisha Anderson

 6   that focused on the affiliation between Mr. Monahan and

 7   GhostBed.

 8            MR. SPERLEIN:  I understand, Your Honor, but --

 9            THE COURT:  We are plowing old ground.  You can

10   refer to it.  There will be briefing and you can refer to

11   the fact that he had some favorable reviews of Purple.

12            MR. SPERLEIN:  Okay.  Your Honor, thank you very

13   much.

14            THE COURT:  You're welcome.

15            MR. SPERLEIN:  That is exactly -- I won't argue.

16   BY MR. SPERLEIN

17   Q.   Eventually you wrote an article questioning the powder

18   on the Purple mattress; is that correct?

19   A.   Yes, sir.

20   Q.   Did Marc Werner tell you to write those articles?

21   A.   Absolutely not.

22   Q.   What motivated you to write those articles?

23   A.   Really what motivated me was when I saw the Sleep

24   Sherpa, who is another reviewer, unbox the Purple pillow, as

25   soon as he opened it I got concerned.

1    Q.    I have handed you Exhibit 504.

2          Can you tell me what you see in that exhibit?

3    A.    This is what I was just referencing.  This gentleman is

4    a reviewer named Ben.  He goes by the Sleep Sherpa.  He was

5    unboxing and showing kind of the first impression of the

6    Purple pillow.  In this review he kind of talks about the

7    technology, and then as he opens it, he lifts it and you

8    just see a tremendous amount of powder covering the pillow.

9    Q.    How did you come to view that video?

10   A.    I watch all the reviewers videos.

11   Q.    No one from GhostBed forwarded this video to you?

12   A.    No.  I follow all of these guys.

13         MR. SPERLEIN:  Your Honor, I am going to let Mr.

14   Horwitz ask a few questions, if that is okay with you.

15         THE COURT:  Thank you.

16         Mr. Horwitz.

17         MR. HORWITZ:  Thank you, Your Honor.

18                        REDIRECT EXAMINATION

19   BY MR. HORWITZ

20   Q.    Good morning, Mr. Monahan.

21   A.    Good morning, sir.

22   Q.    I am going to hand you what has been marked as Exhibit

23   705, which is also docket entry 31-2.

24         Can you tell me what that is?

25   A.    Yes, sir.  This looks like a screen grab of my mattress

109

```
 1    reviews page.

 2    Q.    Now, this is where you rate the mattresses?

 3    A.    Yes, sir.

 4    Q.    And you have a rating on the top, world class, good,

 5    standard, fair, poor, et cetera?

 6    A.    Yes, sir.

 7    Q.    Okay.  Now, looking down you rated ten mattresses as

 8    world class?

 9    A.    Yes, sir.

10    Q.    One of which is GhostBed?

11    A.    Yes, sir.

12    Q.    Did Mr. Werner call you up and say how dare you rate me

13    one of ten world class?  With the amount of money I'm paying

14    you I should be the only world class?

15    A.    No, sir.

16    Q.    Because he didn't pay you anything?

17    A.    Not to Honest Mattress Reviews.

18    Q.    And he has no input into what appears on Honest

19    Mattress Reviews?

20    A.    No one was input other than me.

21    Q.    Looking at the second page of this exhibit, it is the

22    eighth one down, is that Nature's Sleep?

23    A.    Yes, sir.

24    Q.    That has red with an arrow going down.  Is that rated

25    fair?
```

110

```
1    A.    Yes, sir.

2    Q.    Again, Mr. Werner didn't call you and say with

3    everything I'm paying you how dare you rate me as only fair?

4    A.    No, sir.

5    Q.    Again, can you tell me whether or not he has any input

6    into Honest Mattress Reviews?

7    A.    He has zero input in any form.

8    Q.    And he has not suggested any articles, forget about

9    whether it is Purple, any articles as to Honest Mattress

10   Reviews?

11   A.    No, sir.

12   Q.    Does he get advance notice of any articles on Honest

13   Mattress Reviews?

14   A.    No, sir.  No one gets advance notice.  Everyone gets

15   access once it's published live.

16   Q.    Now, I'm going to show you what has been marked as

17   Exhibit 799, which is one of the pages out of your website.

18         This is industry talk.  One-on-one interviews with the

19   industry's leaders.

20   A.    Yes, sir.

21   Q.    Let's go down to the first one.  Is that Mr. Billy

22   Williams?  Who is that?

23   A.    Mr. Billy Williams is the founder and C.E.O. of Urban

24   Mattress.

25   Q.    Let's go do to Mr. Alvaro Vaselli.
```

1    A.   He is the founder of Nuvanna.

2    Q.   Ms. Alexandra Setterian?

3    A.   She is one of four cofounders for Eat Sleep.

4    Q.   And Mr. Ken Murphy?

5    A.   He is the C.E.O and president of Mattress Firm.

6    Q.   And these are people who are industry leaders who you

7    have interviewed?

8    A.   Yes.

9    Q.   And you published their interviews?

10   A.   Yes.

11   Q.   Mr. Ken Murphy, did you publish one interview with him?

12   A.   No, sir.  I think there are roughly about ten.  So the

13   function was we would get on the call once a week and spend

14   about an hour talking about the interview and then publish

15   it the next week.

16   Q.   Is Mattress Firm a leader in the industry?

17   A.   Mattress Firm is the largest retail mattress company in

18   the United States.

19   Q.   Mr. Ken Murphy thought it important enough to spend a

20   lot of time with you to get these interviews published?

21   A.   Yes, sir.

22   Q.   And he thought that was good for his company?

23   A.   He thought that was great.

24   Q.   Once again, did Mr. Werner say, well, if it is good for

25   his company it is good for my company too, and why didn't

```
 1    you interview me as an industry leader because of all of

 2    this money I'm paying you to do the Honest Mattress Review

 3    site?

 4    A.    He never said anything like that.

 5    Q.    And he didn't pay you anything?

 6    A.    Zero dollars.

 7    Q.    He didn't influence you as to what to write?

 8    A.    No, sir.

 9    Q.    He didn't suggest anything about what to write?

10    A.    No, sir.

11    Q.    He didn't get any advance notice of what was being

12    written on the website?

13    A.    No, sir.

14            MR. HORWITZ:  No further questions, Your Honor.

15            THE COURT:  Thank you.

16            Mr. Magleby, anything further?

17            MR. MAGLEBY:  Just a couple on redirect, Your

18    Honor.

19            THE COURT:  Recross actually.

20            MR. MAGLEBY:  Recross.  Correct.

21                     RECROSS-EXAMINATION

22            MR. MAGLEBY:  Lawyers and technology.  I

23    apologize.

24    BY MR. MAGLEBY

25    Q.    Mr. Monahan, what was name of the first mattress you
```

1    think you reviewed?

2    A.    I don't remember the first one published, but the first

3    one I had in my possession was Sunrising Bed.

4    Q.    The first one you got was Sunrising Bed.  So would you

5    be surprised -- when did you review that?  When did you

6    publish the review?

7    A.    I don't recall the date.

8    Q.    Would you be surprised that if we go to your website,

9    and this is not an exhibit, because we just navigated to the

10   website, that the review we were able to find -- I can't

11   blow that up -- is dated January 22, 2017?

12   A.    I see that, yes.  I am not sure if that is the last

13   time I did an update on it though.

14   Q.    All right.  Understood.  Let's take a look at the

15   GhostBed review.  Let me get my technology going here.

16   Exhibit 8.1.  This is the GhostBed mattress review August

17   10, 2016; is that correct?

18   A.    Yes, sir.

19   Q.    Does that date have any other significance to you?

20   A.    No, sir.

21   Q.    Let's take a look at Exhibit 7.1.  This is the domain

22   name registration.  Is that the same day that you posted

23   that GhostBed review?

24   A.    That is the same day it is registered, but it does not

25   mean it is the same day I started working on the site.

114

```
1   Q.   Understood.  Doesn't this show the day you acquired the
2   domain name?
3           THE COURT:  We have covered this ground earlier.
4   You did.  I am listening.
5           MR. MAGLEBY:  I know you are, Your Honor.
6           THE COURT:  Do you have any new questions?
7           MR. MAGLEBY:  Let me see.
8   BY MR. MAGLEBY
9   Q.   You were asked about the H.M.R. business plan and that
10  you wanted to take over Consumer Reports.  You have two
11  sites, right?  One is Honest Mattress Reviews and that does
12  mattresses?
13  A.   I have five sites.
14  Q.   Okay.  And the other sites do other things, a wide
15  variety of things?
16  A.   They cover fitness, fashion, beauty and technology.
17  Q.   You were handed exhibit -- I believe it was 500.  You
18  have 900 articles; is that right?
19  A.   Yes, sir.
20  Q.   That spreadsheet.  You only spend three hours a day
21  working on the site, the H.M.R. website, right?
22  A.   Yes, sir.
23  Q.   So can we conclude from that that almost all of these
24  articles are actually copied from other sources?
25  A.   Some are.  Some are curated.  Some are press releases.
```

```
1    Some content the mattress companies submit to me in final
2    format for publishing.
3    Q.   Do you have a single copyright license agreement with
4    an article that you have copied from another website?
5               THE COURT:  Didn't I already ask you not to go
6    into this?
7               MR. HORWITZ:  Objection.
8               THE COURT:  Anything on true recross that was
9    truly redirect on the subject that --
10              MR. MAGLEBY:  I will try, Your Honor.
11              THE COURT:  Okay.  I think we are about done.
12              MR. MAGLEBY:  Your Honor, I am going to take your
13   lead, unless I see something just fascinating in my notes.
14   Yes.
15   BY MR. MAGLEBY
16   Q.   Exhibit 503 is this unboxing of the Purple pillow and
17   review, and that is when you first learned about the powder
18   on the Purple mattress?
19   A.   Pardon me?
20   Q.   You said Exhibit 503, this Purple pillow review dated
21   December 30, 2016, that is when you figured out there was
22   this powder on the mattress?
23   A.   No.  I discovered that when Sleepopolis did their
24   mattress unboxing roughly mid February of 2016.
25   Q.   Thank you.
```

```
1            MR. MAGLEBY:  No further questions, Your Honor.

2            THE COURT:  All right.

3            Any reason why we are not done here?

4            MR. HORWITZ:  One issue, Your Honor, and I will be

5    very quick about it.

6            THE COURT:  Okay.

7            MR. HORWITZ:  Could you leave that up, please?

8            MR. MAGLEBY:  Sure.

9                    FURTHER REDIRECT EXAMINATION

10   BY MR. HORWITZ

11   Q.   Is it very common to develop a website and then go

12   online on a certain day when the website is ready?

13   A.   Yes.

14   Q.   So you would have done reviews and all of that in

15   preparation for going live?

16   A.   Absolutely.

17   Q.   And then when you go live, that is the day that the

18   entire work that you have done -- I think you said you

19   worked on it for months beforehand, so everything that you

20   have done all of the previous months would be dated the day

21   you went live?

22   A.   Correct.

23   Q.   And the day you went live is the registration date of

24   the domain name?

25   A.   Yes.
```

```
 1    Q.    So the fact that it has -- whatever has this date means

 2    not that it was done on that date, but it went live on that

 3    date?

 4    A.    Yes, sir.

 5              MR. HORWITZ:  No further questions, Your Honor.

 6              MR. MAGLEBY:  Your Honor, no further questions for

 7    this witness.

 8              We call Marc Werner.

 9              THE COURT:  Thank you.

10              You can step down.

11              THE WITNESS:  Thank you all for your time.

12              THE COURT:  Now, is this witness excused or do you

13    suspect that he might be re-called?  Mr. Magleby?

14              MR. MAGLEBY:  I am not anticipating re-calling

15    him.  I think it is unlikely, but I would like him to stick

16    around just in case and in case the Court has some

17    follow-up.

18              THE COURT:  The answer is no?

19              MR. MAGLEBY:  The answer is no.

20              THE COURT:  Then this witness is not yet excused.

21              There is a slight possibility, Mr. Monahan, that

22    you might be re-called.  You need to stick around.  We'll

23    let you know.

24              MR. MONAHAN:  Yes, sir.

25              THE COURT:  Mr. Sperlein can help you with that.
```

```
1              MR. SPERLEIN:  Your Honor, can he go in the lobby
2    and be on the telephone?
3              THE COURT:  Yes.  He can roam around out there.
4    There is no one else in the building.  We'll see how we are
5    doing.  We might take a little lunch break in a while but
6    I'm not sure.
7              Mr. Werner, come forward, please, sir, and I'm
8    going to ask you to be sworn in as a witness in this
9    hearing.
10                        MARC WERNER
11            Having been duly sworn, was examined
12                  and testified as follows:
13             MR. HORWITZ:  If I may approach --
14             THE COURT:  Yes, you may.
15             MR. HORWITZ:  -- to give the witness some water?
16             THE WITNESS:  Marc Werner, M-a-r-c, W-e-r-n-e-r.
17             THE COURT:  Mr. Magleby, you may proceed.
18             MR. MAGLEBY:  Thank you.
19                     DIRECT EXAMINATION
20    BY MR. MAGLEBY
21    Q.   Mr. Werner, you claim that Mr. Monahan made a mistake
22    when he called himself the chief brand officer?
23    A.   Yes.
24    Q.   You didn't know that was going to happen?
25    A.   No.
```

 1    Q.    In fact, he filed a declaration with the Court that

 2    recited those facts; is that correct?

 3          Let me do it a different way, Mr. Werner.  I am going

 4    to show you what we have marked as Exhibit 1.  Now, I

 5    realize you were not here so I will repeat what I have said

 6    before.  Those three binders in front of you, sir, have hard

 7    copies of every exhibit that I will use.  If at any time you

 8    want to look at a hard copy or you think there is something

 9    on the screen that I'm not showing you, let me know.

10          Will you do that?

11    A.    Yes.

12    Q.    What I have done to try to save time is put up on the

13    screen something called the declaration of Marc Werner filed

14    in this case March 9, 2017.

15          Do you recall this document?

16    A.    Yes.

17    Q.    Did you review it?

18    A.    Yes.

19    Q.    Did you sign it?

20    A.    Yes.

21          Can you make it a little bigger?

22    Q.    Yes.  Absolutely.  Let me take you to the seventh page

23    and I will make it bigger.

24    A.    I can't see it that well.

25    Q.    I suffer from that as well.

120

```
 1        It says here pursuant to 28 U.S.C. Section 1746, I
 2   declare under penalty of perjury and under the laws of the
 3   United States of America that the foregoing is true and
 4   correct.
 5        There is your signature, correct?
 6   A.   Yes.
 7   Q.   You understood this was signed under the penalty of
 8   perjury?
 9   A.   Yes.
10        THE COURT:  Put that microphone over by your
11   mouth, please, so we can hear you.
12        THE WITNESS:  Is this better?
13        THE COURT:  That is a lot better.  Thank you.
14   BY MR. MAGLEBY
15   Q.   I want to go to the second page, sir, and paragraphs 13
16   and 14 which I have blown up.
17        Mr. Monahan is not and has never been chief brand
18   officer at GhostBed.  Do you stand by that today?
19   A.   Yes.
20   Q.   Mr. Monahan at one time mistakenly identified himself
21   on Twitter and LinkedIn as chief brand officer of GhostBed.
22        Do you stand by that today?
23   A.   Yes.
24   Q.   I notice it does not say, though, anything about
25   e-mails.  When Mr. Monahan was sending e-mails with the term
```

121

1   chief brand officer, was that also a mistake?

2   A.   Yes.

3   Q.   Okay.  Then you say in October of 2016 when GhostBed

4   learned that Mr. Monahan identified himself this way, it

5   requested that he delete these incorrect references.

6        Is that true?

7   A.   Yes.

8   Q.   Any coincidence that that is around the time that Mr.

9   Monahan incorporated Honest Reviews?

10  A.   No.

11  Q.   You say he immediately complied with this request.

12  This occurred well before the postings on the

13  honestmattressreviews.com website involved in this case.

14       You stand by that today as well?

15  A.   Yes.

16  Q.   Were there other times that you discovered Mr. Monahan

17  had used that title?  When you discovered in October of 2016

18  he had been using that title, did you learn that he had used

19  it on things other than Twitter and LinkedIn?

20  A.   At that time or subsequent to that time?

21  Q.   Let's start with that time.

22  A.   I believe we had learned that he used it in I believe

23  some speech he gave.

24  Q.   When did you learn that?

25  A.   I think about the same time.

1    Q.    Okay.  Did you subsequently learn that he had used that

2    title on e-mails?

3    A.    I did.

4    Q.    When did you learn that?

5    A.    I think it was maybe a little bit after that, around

6    that time, but I am not totally clear.

7    Q.    Around October of 2016?

8    A.    Plus or minus.

9    Q.    Let me show you Exhibit 48.

10         This is an e-mail exchange.  I will blow up the top of

11   this.  Mr. Monahan up at the top is sending an e-mail to

12   somebody named Sherry Bullock and copying Dennis Manning.

13   This is August 23rd, 2016.

14         Are you with me?

15   A.    Yes, sir.

16   Q.    All right.  Who is Dennis Manning?

17   A.    Dennis is our customer service manager.

18   Q.    He is a GhostBed employee?

19   A.    Yes.

20   Q.    In August of 2016 did Mr. Manning ever come to you and

21   say to you, oh, my gosh, I just found out that Mr. Monahan

22   is using this phrase chief brand officer, I am surprised and

23   I think it is inappropriate?

24   A.    He did not.  Dennis deals with thousands and thousands

25   of interactions.  He did not.

1    Q.    Clearly Mr. Monahan is here using the chief brand

2    officer title; is that correct?

3    A.    I see that, yes.

4    Q.    Okay.  Were you consulted in any way in advance about

5    Mr. Monahan using the term chief brand officer?

6    A.    No.

7    Q.    Did you ever --

8    A.    Not that I recall.

9    Q.    Not that you recall.  Did you ever give him permission

10   to use it?

11   A.    Not that I recall.

12   Q.    Were you upset when you learned that he had used it?

13   A.    I was bothered, yes.

14   Q.    Tell us why you were bothered.

15   A.    Because he is not the chief brand officer.

16   Q.    What was your concern?

17   A.    He is just not the chief brand officer.

18   Q.    Were you worried that that would reflect badly on the

19   company or something like that?

20   A.    Just that he was not the chief brand officer.

21   Q.    Let me show you an exhibit that we looked at earlier

22   today.  It is Exhibit 195.  It is a spreadsheet.  It is kind

23   of hard to read.  I am going to pull it up here.

24         Are you aware of an Achieve system by which notice is

25   provided of posts or comments in relation to the Honest

124

1    Mattress Reviews website?

2    A.   No.

3    Q.   You are not aware of that?

4    A.   No.

5    Q.   Just so that you can see what we saw earlier today,

6    under subject or title it says --

7              MR. HORWITZ:  Objection, Your Honor.  If this

8    witness has no knowledge of this, why are we just pointing

9    out things to him?

10             MR. MAGLEBY:  Your Honor, it is going to become so

11   relevant if you give me five minutes.

12             THE COURT:  Overruled.

13   BY MR. MAGLEBY

14   Q.   Here, Mr. Werner, the subject or title says Steve

15   Herger commented on a link Honest Mattress Reviews shared,

16   and then it says sender or created by Facebook, and then it

17   says recipient in the to line, and Ryan Monahan and Achieve

18   Agency.  Then I am going to take you over a little further

19   and blow it up.  Then it has a sent date, and in this case

20   it is October 20th, 2016, a summary, and then recipients in

21   the c.c line.  Down here under recipients in the c.c. line

22   right here it has Ashley Werner.

23        That is your daughter; is that right?

24   A.   That is correct.

25   Q.   It also has Alan Hirschhorn at Nature's Sleep.  Is Mr.

1    Hirschhorn an employee of Nature's Sleep?

2    A.    Yes.

3    Q.    Having walked through this, does any of this refresh

4    your recollection as to whether you would receive e-mails

5    through the Achieve system on various topics?

6    A.    I don't really understand the question.  Is the

7    question do I receive e-mails from people from Achieve?

8    A.    Yes.

9    Q.    Let's start there.

10   A.    Yes, I receive e-mails from people from Achieve Agency.

11   Q.    Now, are you aware that we asked GhostBed to produce

12   all e-mails where Mr. Monahan used the term chief brand

13   officer?

14   A.    Yes.

15   Q.    Are you aware that you have refused to produce them?

16   A.    I am not aware of that either way.

17           MR. HORWITZ:  Your Honor, we have produced them.

18           THE WITNESS:  I thought we gave a lot of

19   documents.

20   BY MR. MAGLEBY

21   Q.    You did.

22   A.    A lot of documents.

23   Q.    All right.  What I'm going to do is I am going to take

24   us to the original spreadsheet that comprised Exhibit 195.

25   It is a big document.  Again, it is in the folder.  I want

1   to direct your attention, sir, on the screen and we have

2   sender or created by Ryan Monahan.  The recipient in the to

3   line is Marc Werner.  If I tweedle over just a little bit,

4   the sent date is December 7, 2015.

5       Do you see that?

6   A.  Yes.

7   Q.  All right.  Then I'm going to go over a little further.

8   There is a discussion there and it says I would recommend

9   chief creative officer for Ashley, Ryan Monahan, social

10  media strategist, and underneath that it says Marc Werner on

11  December 7, 2015, Marc at Nature's Sleep wrote I like chief

12  brand officer.  What do you think we should call Ashley?

13      Mr. Werner, aren't you there referring to using the

14  title chief brand officer by Mr. Monahan?

15  A.  I don't recall this document.  I'm sorry.

16  Q.  All right.  Do you have a reason to believe that this

17  document from Achieve is not accurate?

18  A.  I have never seen this document before.  I don't know

19  anything about this document.

20  Q.  Does this refresh your recollection in any way that in

21  December of 2015 you were engaged in communications with Mr.

22  Monahan about him using the title chief brand officer?

23  A.  It really doesn't.

24  Q.  All right.

25  A.  Again, I have never seen this document before.  It is a

1    long spreadsheet, so I don't know what it is.

2    Q.   Let me ask this.  Is your e-mail [REDACTED]?

3    A.   It is.

4    Q.   Was that your e-mail in December of 2015?

5    A.   That was my e-mail at that point in time, but anything

6    below it, I don't know where that is coming from.  This does

7    not look like an e-mail to me.  This looks like a

8    spreadsheet.

9    Q.   If you had produced it, if GhostBed had produced all

10   documents with the phrase chief brand officer, and you had

11   sent this e-mail, if you had actually sent this e-mail --

12   strike that.

13        If you had actually sent this e-mail, would you have

14   been able to find it in your system?

15   A.   I would think -- we have turned over our systems to our

16   lawyers to go through and do all the searching stuff and

17   provide all of the information to you guys.

18   Q.   Did you hold anything back from your lawyers?

19   A.   Not that I know of.  We turned over our complete

20   system.

21   Q.   Have you deleted or destroyed e-mails from about

22   December 7, 2017?

23   A.   Did I --

24   Q.   To your knowledge has --

25   A.   To my knowledge?

1  Q.   -- Nature's Sleep or GhostBed deleted or destroyed

2  e-mails?

3  A.   Not to my knowledge, but in the ordinary course, you

4  might delete an e-mail the day you get it because it is

5  irrelevant.  But other than that, no.

6  Q.   Let's go up a little further.

7       I want to go to 1802.  This is message 1802 in the

8  spreadsheet.  The last one was line 1848.  I want to roll

9  over here.  I have the wrong one.

10      1803.  I apologize to everyone.  1803.  At the bottom

11 of the page, again, do you see that the sender was Ryan

12 Monahan?  Do you see the recipient was [REDACTED]?

13 You told us that was your e-mail in December of 2015,

14 correct?

15 A.   It was, but I don't see the date on whatever you're

16 showing me here.

17 Q.   Good news.  I found it.  It is under sent.  December 7,

18 2015, the same day as the prior entry under line 1848,

19 right?

20            MR. HORWITZ:  Your Honor, we have the paper copy

21 here.  Could Mr. Magleby refer to what page it is on the

22 paper copy so we know exactly what we're dealing with?

23            MR. MAGLEBY:  It is not on the paper copy because

24 Adam Alba, my trusty associate, found it this morning during

25 the examination.  It is on the electronic copy of the

129

1    spreadsheet which should be in the binders under tab 195-A.

2              MR. HORWITZ:  195-A.  I don't have a tab 195-A.

3              MR. MAGLEBY:  I am informed that my paralegal has

4    not provided the spreadsheet.  I will have him run it down.

5    BY MR. MAGLEBY

6    Q.   Let's go over to the summary line though.  Mr. Monahan

7    writes, hey, Marc, this is the image I use for tech related

8    publications.  I size it down so it will drop right into the

9    little circles.  Again, I'm honored to be a part of this.

10   For a title I was thinking chief brand officer, digital

11   marketing engineer and so on.

12        Do you see that?

13   A.   Yes.

14   Q.   Is this an e-mail or a text that preceded the one we

15   just looked at where you said I like chief brand officer?

16   A.   I don't know.  I don't have the sequencing.

17   Q.   Are you still going to stand by your declaration under

18   oath today that you never gave or never knew Mr. Monahan was

19   going to use the title chief brand officer?

20   A.   I don't recall that.

21   Q.   Let's take a look at Exhibit 165.  I will represent to

22   you, sir, that this is a chart that was produced by your

23   lawyers in this case.

24        Have you seen this before?

25   A.   Yes.

1          MR. MAGLEBY:  Let me pause there, Your Honor.

2          I have been reminded that my paralegal did include

3     it and it was in our box, so we have now passed out the disk

4     with that spreadsheet.  I am just going to put a copy up

5     here that can be marked as 195-A later.

6          THE COURT:  You can just do it later.

7          MR. MAGLEBY:  Yes.

8          Shame on me for blaming my staff.  They are

9     usually ahead of me.

10    BY MR. MAGLEBY

11    Q.   Mr. Werner, what is this chart?

12    A.   This looks like kind of an org operations chart.

13    Q.   The title of the P.D.F. that was sent by your lawyers

14    was Werner Media Company organizational chart.

15         Can you tell from looking at this if that is accurate

16    or is this something else?

17    A.   The title or the chart?

18    Q.   Is the chart Werner Media Company or is this GhostBed

19    or is it something else?

20    A.   Werner Media is the legal entity.  GhostBed is a

21    subsidiary.

22    Q.   Okay.

23    A.   Nature's Sleep is a d/b/a.  It operates as one in all,

24    so Nature's Sleep is a wholesale business selling to Sears

25    and people like that, not to get, you know, too wordy here,

```
1   but just to explain, and GhostBed is direct to the consumer.

2   We are a small business, a family business, so we have

3   people wearing multiple hats.

4   Q.    Fair enough.  In terms of the organizational structure

5   that relates to GhostBed, this is it then?

6   A.    These people would be active, yes.

7   Q.    If we go to the top we have you as the C.E.O., Donna

8   Werner -- is that your spouse?

9   A.    That is my wife.

10  Q.    She is the C.A.O.  Then the social media manager is

11  Ashley Werner.  That is your daughter; is that correct?

12  A.    That is correct.

13  Q.    If we go down here we see Dennis Manning.  That is the

14  gentleman we just saw on the e-mail that Mr. Monahan

15  e-mailed using the chief brand officer title, right?

16  A.    Correct.

17  Q.    And he is still with the company?

18  A.    Dennis?

19  Q.    Yes.

20  A.    Yes.

21  Q.    Then if we go down here, there is a gentleman named

22  Shaquel Lane.  Does he sometimes go by Shaq?

23  A.    He does.

24  Q.    Is he still with the company?

25  A.    He is.
```

1    Q.    So GhostBed is a relatively small organization, about

2    30, 40 people; is that right?

3    A.    That is correct.

4    Q.    Do you work in close proximity to each other?

5    A.    Pretty much.

6    Q.    Have you ever talked about Purple mattress or the

7    Purple mattress powder while you are at GhostBed in this

8    office with these 30 or 40 people?

9    A.    I have explained to our people, as Dennis explains in

10   his weekly meetings, that we don't want to talk about

11   competitors.  We want to stay very focused on talking about

12   GhostBed.

13   Q.    Have you ever talked about the Purple powder to your

14   employees?

15   A.    I have only said that we are not to discuss anything

16   about the Purple powder to anybody.

17   Q.    Let me show you Exhibit 102.  This is a Facebook post

18   which has been produced in this case.  It starts out and it

19   says I connected to live chat at GhostBed and told the

20   customer service agent, Shaq, that I was curious about the

21   softness level of their bed because I have extremely bad

22   back pain.  Then it goes on.

23         Have you seen this before?

24   A.    I might have seen it in some of the documents.

25   Q.    In relation to this case?

133

```
1   A.   Yes.

2   Q.   It goes on to say that I told him that the online

3   reviews that I had read recommended the Purple mattress and

4   that is when he told me that Purple was causing people to

5   acquire lung cancer and cough blood.

6        Do you see that?

7   A.   Yes.

8   Q.   When you saw this in relation to this case, did you go

9   talk to Shag, the gentleman we just saw in the org chart?

10  A.   I had multiple meetings with a number of people.

11  Q.   In those meetings did you tell them they couldn't say

12  that Purple mattress caused people to acquire lung cancer

13  and cough blood?

14  A.   Absolutely.

15  Q.   Did you ever get to the bottom of where they got this

16  idea?

17  A.   I never got to the bottom of where they got it other

18  than this gentleman, Shaq, was with us for about a week and

19  he indicated that he had just done some research on the

20  industry to try to be informative in his customer service

21  role, and he didn't realize our policy that we do not talk

22  about competitors on any level.  We just want to talk about

23  our product, the GhostBed.

24  Q.   Did you do any research to find out if Shaq had said

25  these things to more than one person?
```

```
 1                MR. HORWITZ:  Your Honor, objection.  What

 2    relevance does this have to the relationship between Mr.

 3    Monahan and GhostBed?

 4                THE COURT:  Good objection.

 5                How do you respond to it?

 6                MR. MAGLEBY:  Give me about five minutes' worth of

 7    questions and I will show you.

 8                THE COURT:  Just tell me.

 9                MR. MAGLEBY:  Well, I hate to do that with the

10    witness on the stand, Your Honor.

11                THE COURT:  Go ahead.  I will give you five

12    minutes.

13                MR. MAGLEBY:  This ties to the corporate strategy

14    and --

15                THE COURT:  Let me hear a question.

16                Go ahead.

17    BY MR. MAGLEBY

18    Q.   The thing you tell people is we are not going to talk

19    about our competitors?

20    A.   That is our policy.  That has been my policy for the

21    past 15 years.

22    Q.   Let me put up Exhibit 104.  It is a capture of a chat

23    on the GhostBed website.

24         Do you recognize this as the GhostBed website?

25    A.   I do.
```

135

1   Q.   Do you recognize this box in the bottom right-hand

2   corner as a chat box that will pop up if a consumer is

3   asking questions?

4   A.   I do.

5   Q.   This one starts out with, Shaq, hi.  Thanks for

6   contacting GhostBed.  Is that the same Shaq we have been

7   talking about?

8   A.   I believe so.

9   Q.   Let's go down a couple of pages in this chat to page

10  105.  The person writes I have also been looking at the

11  Purple mattress.  How are you two differentiated?

12       Do you see that reference?

13  A.   I do.

14  Q.   By the way, have you seen this before, this document?

15  A.   Which document?

16  Q.   Exhibit 104 and these chats.

17  A.   Yes.

18  Q.   Go to the next page.  Shaq writes, well, I know we

19  offer a better warranty and trail -- I think he means trial

20  period -- as well as we are one and a half inches thicker,

21  but they use baby powder in their mattress, which is now

22  popping up as a hazard.  We do not use any type of chemicals

23  at all.

24       Do you have any idea how Mr. -- I am just going to call

25  him Shaq -- came up with the concept that Purple was using

1   baby powder?

2   A.   My understanding is, again, he did some homework and

3   there are numerous entries of this around the internet.

4   Q.   All right.

5   A.   This relates to the same thing as your prior exhibit

6   with that Facebook person, from what I can tell here.

7   Q.   Do you know if Shaq got the idea from the Honest

8   Mattress Reviews website?

9   A.   I have no idea.

10  Q.   You didn't ask him?

11          MR. HORWITZ:   Your Honor, it has been five minutes

12  and I am at a loss to figure out what this has to do --

13          THE COURT:   Well, that last question went directly

14  to it.   He asked if he had any understanding if it came from

15  Honest Mattress Reviews.   That shows a connection.   That is

16  why we are here today.

17          MR. HORWITZ:   It shows, Your Honor, that he read

18  Honest Mattress Reviews.

19          THE COURT:   I don't need your explanation of what

20  it shows.   The question asked if he knew if it came from

21  Honest Mattress Reviews.   That is certainly pertinent to why

22  we are here today.

23          MR. HORWITZ:   Thank you, Your Honor.

24          THE COURT:   We heard the answer, so I think Mr.

25  Magleby was at least trying to keep it limited to what I

137

```
 1    wanted it limited to today.
 2              Let's hear your next question.
 3              MR. MAGLEBY:   Sure.
 4    BY MR. MAGLEBY
 5    Q.   If I go to the next page, which is 104.7, Shaq writes
 6    small traces of baby powder which can cause cancer, I
 7    promise I am not trying to bash them or be biased, and you
 8    can maybe find the article online.
 9         Did you ever ask Shaq if the article he was referring
10    to was on the Honest Mattress Reviews website?
11    A.   My understanding is that he looked at a review from
12    Sleepopolis from Derek Hales, and he has a video on it and
13    he refers to talcum baby powder on the mattress.
14    Q.   Did you and Mr. Monahan ever discuss that Monahan could
15    put up negative comments about Purple, and then GhostBed
16    could direct customers to the site, rather than have
17    GhostBed make negative comments directly to customers?
18    A.   No.
19    Q.   Let's go to 104.8.  Shaq writes, and this is a
20    continuation of the prior chat, but our managers had to
21    inform us to let you guys know if asked.
22         Are you management at GhostBed?
23    A.   I am management, but no management authorized that
24    whatsoever.
25    Q.   So Shaq was basically just lying when he posted this;
```

1    is that right?

2    A.    Shaq was a brand new, inexperienced person just

3    responding on his own volition.

4    Q.    So was it ever a corporate strategy to have Honest

5    Mattress Reviews post reviews and then GhostBed could link

6    to those reviews and direct consumers there to see favorable

7    reviews of GhostBed or reviews that were better than Purple?

8    A.    Never.

9    Q.    Did it ever happen that GhostBed was linked to Honest

10   Mattress Reviews' site and reviews?

11   A.    We have ads we run on Facebook that might have

12   different links to probably eight or ten or 12 different

13   mattress review sites.  They might be one of ten different

14   sites.

15   Q.    Let's take a look at Exhibit 246.

16          MR. MAGLEBY:  This, I will represent to the Court,

17   is the August 15th, 2016 GhostBed website from the Wayback

18   Machine.

19   BY MR. MAGLEBY

20   Q.    You can see up here in the top left-hand corner 15

21   August, 2016.

22          Let me just ask you, sir, does this look familiar?

23   A.    It looks reasonably familiar.

24   Q.    If you are in the market for a new mattress, here is a

25   comparison of the features and benefits of GhostBed versus

139

1    the Purple mattress.  Would you be surprised if there are

2    links below that direct the user to the H.M.R. website?

3    A.   No.  There are links for probably a half a dozen

4    different review sites.

5    Q.   The H.M.R. website went up on or about August 16, 2016,

6    didn't it?

7    A.   I don't know when it went up.

8    Q.   If we go further down on the page, there is a

9    third-party comparison, and can we see any links directing

10   consumers to Honest Mattress Reviews?

11   A.   The second one.

12   Q.   And also the fifth one; is that right?

13   A.   Yes.

14   Q.   How did you learn so quickly, within a day or two days

15   of the Honest Mattress Review site going up, how did you

16   learn so quickly that there were reviews on there of

17   GhostBed that you could link to?

18   A.   I don't know.  I don't know if the Wayback Machine is

19   the right date or the right time period.  I just don't know.

20   Q.   Did you know that Ryan Monahan was going to put up a

21   mattress review site in August of 2016?

22   A.   Did I know he was going to put up a --

23   Q.   Mattress review site.

24   A.   No.

25   Q.   So if this got put up within a day or two of him

```
 1   launching the site, it had nothing to do with Mr. Monahan
 2   telling you?  Is that what you're telling us?
 3   A.   That is correct.
 4   Q.   Just a coincidence.  Okay.
 5        Your daughter is Ashley Werner, correct?
 6   A.   Correct.
 7   Q.   Let me have you look at a document.  It is a review
 8   from amazon.com.  It is a customer review.  It is dated
 9   May 19, 2016.  The Purple bed, queen.  I did not purchase
10   the bed so I cannot comment on the order and delivery.  Then
11   it goes on.
12        Have you seen this review before?
13   A.   I have.
14   Q.   When was the first time you saw this review?
15   A.   I don't recall when the first time was.
16             MR. HORWITZ:  Excuse me.  What exhibit number is
17   this?
18             MR. MAGLEBY:  162.
19             MR. HORWITZ:  Thank you.
20             THE WITNESS:  I know within this litigation I have
21   seen it, but I don't know when the first time was.
22   BY MR. MAGLEBY
23   Q.   Are you familiar with the allegations in this
24   litigation by Purple that this was actually a post by your
25   daughter, Ashley Werner, under a different name?
```

```
 1    A.    Yes.

 2    Q.    Have you done anything to investigate whether that is

 3    true?

 4    A.    I have investigated that and I looked into it.

 5    Q.    What was your conclusion?

 6    A.    What happened was the Purple people were attacking and

 7    writing false reviews on Amazon and upsetting my daughter,

 8    and at a weak moment she wrote this, and she felt so bad --

 9    I never knew about it -- then she took it down the next day.

10    Q.    I see.

11    A.    She was very upset.  She was being attacked.

12    Q.    And so her reaction was to write a fake review about

13    Purple's product?

14    A.    She made a mistake.  She made a mistake and she

15    corrected it right away.

16    Q.    Was she disciplined by the company in any way?

17    A.    When I found out about it, yes, I told her that is not

18    an acceptable thing for our family or for any of our

19    employees or any behavior whatsoever.  She said she was just

20    being attacked and attacked on Facebook by a lot of haters,

21    and she just broke down and she just --

22    Q.    She broke down and posted --

23    A.    She corrected it.  I am proud that she corrected it

24    within a 24-hour period.

25    Q.    It didn't have anything to do with the fact that
```

1    somebody caught her and figured out that she was related to

2    you and posted that?

3    A.   No.

4    Q.   That was --

5    A.   No.

6    Q.   That was just a coincidence?

7    A.   That is a coincidence.

8    Q.   One of the things she wrote in here is with how much

9    bad press Johnson & Johnson is getting lately with all these

10   people getting cancer -- those same statements appeared on

11   the Honest Mattress Reviews site later, didn't they?

12   A.   I don't know.

13   Q.   Did you or Ms. Ashley Werner or Mr. Monahan ever

14   discuss whether or not the powder on the Purple mattress was

15   baby powder and the same powder as in the Johnson & Johnson

16   lawsuits?

17   A.   I don't recall specifically.  If it came to our

18   attention from the Sleepopolis review and a few other

19   reviewers that called out the baby powder --

20   Q.   We'll move on.

21        Let's talk about your communications with Purple.

22        Actually, let me back up.  Sorry.  Sorry.  Sorry.

23        164.  Did there come a time when you and Tony Pearce at

24   Purple exchanged e-mails and had a phone call?

25   A.   Yes.

143

1   Q.   Mr. Pearce had asked you to stop the negativity between

2   the companies?

3   A.   Yes.  I think we had multiple e-mail exchanges.  It was

4   extremely pleasant.  As soon as I got his letter I called

5   him within an hour and I wanted to resolve any of his

6   questions.  I took corrective action.  We had a pleasant

7   conversation.  He sent a pad for my wife who was in the

8   hospital, a C cushion.

9        I said your guys are being pretty aggressive.  He said

10  he would look into it.  He said we were.  I said I would

11  look into it.  We tried to get things resolved.  We talked

12  about some other -- just general business stuff.  I viewed

13  it as a very positive, upbeat, pleasant conversation.

14  Q.   Good.  I am glad.

15       This is an e-mail from Tony Pearce to you, May 24,

16  2016, so a few days after that Ashley Werner post that we

17  just looked at, right?

18  A.   I don't recall the date of that.

19  Q.   I will withdraw that question.

20       This is an e-mail from Tony Pearce to you, May 24,

21  2016, correct?

22  A.   Are you asking is this e-mail dated that?

23  Q.   Yes.

24  A.   Yes, that is the date on that.

25  Q.   Mr. Pearce says I hope your cushion arrived and your

1    wife is enjoying it.  That is the cushion he sent you after

2    you talked and found out that your wife was in the hospital?

3    A.    That is correct.

4    Q.    A little bit below, Mr. Pearce writes we just had a

5    loyal customer send us a string of evidence that Ashley

6    Werner, the C.E.O.'s daughter and creative director, is

7    still posting false comments and so on.

8         Was this actually the genesis for Ms. Werner taking

9    down that comment?

10   A.    No.

11   Q.    It wasn't that you got caught by Purple?

12   A.    No.

13   Q.    Let's take a look at a different e-mail.  236.  Sorry.

14   I need to go a little lower.  Actually I kind of screwed up.

15   Here is the bottom of that e-mail that we just looked at.

16        The last thing Mr. --

17   A.    You have got me a little confused.

18   Q.    Exhibit 236.  I am starting, and let me orient you, I

19   am starting here in the middle of the page.  Again, sir, it

20   is in the binder if you would like.  I will represent to you

21   this -- actually it is a different e-mail.  Good point.  I

22   thought it was the same.

23        The same day, Tony Pearce, Marc Werner, May 24, 2016,

24   correct?

25   A.    The same day as the prior e-mail, yes.

1    Q.   What Mr. Pearce writes is meanwhile I just saw a paid

2    ad from GhostBed that says Purple uses used materials which

3    is false, so there is still work to do.  I appreciate your

4    attitude about fixing it.

5         Did you respond to Mr. Pearce?

6    A.   I don't recall the exact sequence of that.  It goes

7    back a year and a half already.  But Mr. Pearce asked me --

8    I said what language would you like me to use in the

9    comparative ad?  So he provided me the language and we used

10   verbatim the language that he wanted.

11   Q.   You respond to Mr. Pearce here and you write I will

12   check on this ad.  To the best of my knowledge we don't run

13   any ads with Purple or anyone other than just GhostBed.

14        Isn't that inconsistent with what you just told me one

15   moment ago which is you responded to him about the language?

16   A.   No.  I am not saying that we don't run comparative ads.

17   We were running comparative ads.  That is why he reached out

18   to me.

19   Q.   In this e-mail, though, you're saying to the best of my

20   knowledge we don't run any ads with Purple or anyone other

21   than just GhostBed.

22        Was that not true?

23   A.   I'm a little confused with your question.  I will --

24   Q.   Let me re-ask it a simpler way.  I will make it simple

25   for you.

1    You say to Tony Pearce on May 24, 2016, quote, to the

2    best of my knowledge we don't run any ads with Purple or

3    anyone other than just GhostBed, end quote.

4    Was that true?

5    A.   So we run ads with GhostBed and we might run GhostBed

6    versus Purple, GhostBed versus Casper, GhostBed versus

7    Tempurpedic, other types of players in the space for

8    competitive analysis for consumers.

9    Q.   So it wasn't true?  What you told Mr. Pearce wasn't

10   true?

11   A.   I think it was true, because we used GhostBed as

12   something else, but what I'm trying to answer here is that

13   we are not running a dedicated Purple ad.

14   Q.   Okay.  In fact, when you say to the best of my

15   knowledge we don't run any ads with Purple, that wasn't true

16   because you had just approved a specific ad relating to

17   Purple, hadn't you?

18   A.   I don't recall.

19   Q.   Well, let me show you.  Let's take a look at Exhibit

20   17.  In Exhibit 17 Mr. Monahan e-mails you about a month

21   earlier, April 4, 2016, to you, Marc Werner, subject line

22   Purple, and Mr. Monahan asks so I am asking permission

23   rather that forgiveness here, L.O.L.  Can I create a graphic

24   that shows recycled materials versus new materials for

25   Facebook then target Purple mattress users?  It's a direct

1    blow at them, but figured I would ask before I get us in

2    trouble.

3        So about a month before you told Mr. Pearce you were

4    not aware of any competitive advertising with Purple, Mr.

5    Monahan asked you about competitive advertising with Purple,

6    didn't he?

7    A.   That e-mail is here.  I don't know if there was a

8    response or if there was an ad.

9    Q.   Do you know if the ad ran?

10   A.   I don't know.

11   Q.   Do you think Mr. Monahan would run an ad without your

12   permission?

13   A.   Well, Mr. Monahan puts ads on the Facebook platform and

14   he runs different ads, and there is a lot of different

15   taglines and photographs and messages.

16   Q.   In this particular instance he did ask your permission.

17   Would you have responded to him in the ordinary course and

18   given him your permission or your thumbs down?

19   A.   Again, this is a while ago, so I don't really recall,

20   but is there a response from me?

21   Q.   Well, I have got something better.

22       Did this ad run shortly after that e-mail exchange?

23   A.   It looks like it did.

24   Q.   In fact, that is the very same day as the e-mail

25   exchange we just saw, isn't it?

```
 1    A.    Yes.

 2    Q.    Let me show you a pleading in this case.  It is Exhibit

 3    166.  The defendant GhostBed's combined motion to dissolve

 4    the temporary restraining order and so on.  It was filed at

 5    this point in time by attorneys at Christensen & Jensen.

 6          Was this a paper filed on behalf of GhostBed?

 7                THE COURT:  I can take judicial notice of that.

 8                Move on.

 9                MR. MAGLEBY:  Thank you, Your Honor.

10    BY MR. MAGLEBY

11    Q.    Let me go to the second page and ask you a question,

12    sir.

13          In the middle of this paragraph GhostBed says, but Mr.

14    Monahan has never and is not now working for GhostBed in

15    connection with any competitive marketing concerning Purple

16    or anyone else.  It refers to paragraphs in your

17    declaration.

18          Do you see that?

19    A.    I do.

20    Q.    Is that true that Mr. Monahan had never worked for

21    GhostBed in connection with any competitive marketing

22    concerning Purple, or do you want to change that in light of

23    the e-mails that we just saw?

24    A.    I am still a little confused with the context, but he

25    helped put up ads that are competitive ads that are done in
```

1    the ordinary course in our industry.

2    Q.   And some of them target Purple?

3    A.   Some of them target Purple.  Some of them target ten or

4    15 other mattress brands.

5    Q.   So the statement that Mr. Monahan has never and is not

6    now working for GhostBed in connection with any marketing

7    concerning Purple wasn't true, was it?

8    A.   It doesn't appear to be, but I don't know what this

9    document is.  I am just seeing a paragraph, so I don't know

10   the context of it.

11   Q.   Let's take a look at your declaration and maybe you'll

12   have more insight.

13         Here is your declaration and this is the document we

14   already looked at.  Sir, I will take you to paragraph 6.

15   You write GhostBed does not have any affiliation whatsoever

16   with co-defendants Honest Reviews, L.L.C. or Mr. Monahan.

17         You submitted that under oath to this Court, right?

18   A.   Yes.

19   Q.   But Mr. Monahan does provide services to GhostBed

20   through Achieve, correct?

21   A.   Through Achieve.  We employ Achieve.

22   Q.   You employ Achieve?

23   A.   Yes.

24   Q.   Were you trying to be clever in your use of the word

25   affiliation with regard to Mr. Monahan, and what you meant

1    was he does not directly work for us?

2    A.    I am not trying to be clever whatsoever.  I am trying

3    to be accurate.  So if you go down a few more paragraphs,

4    what I try to do is spell out the relationship.

5    Q.    You have telephone calls with Mr. Monahan?  He has your

6    mobile number?

7    A.    He what?

8    Q.    Does Mr. Monahan have your mobile telephone number?

9    A.    Yes, he does.

10   Q.    Do you have his mobile telephone number?

11   A.    Yes.

12   Q.    Do you have telephone calls with him from time to time?

13   A.    Yes.

14   Q.    I am going to put up a document that was produced by

15   Mr. Monahan in this case that was represented to us to be

16   records of telephone calls between you and Ryan Purple.

17         Let me ask you, is [REDACTED], and the rest of that

18   number, your mobile telephone number?

19   A.    Yes, it is.

20   Q.    So what we can see here is in --

21   A.    Does that mean the whole world knows it now?

22   Q.    That is why I didn't say the last four digits.  I

23   specifically did not say the last four digits.  The exhibit

24   is here.  We can redact that if you would like.  Certain

25   exhibits are filed under seal anyway as a matter of course,

151

```
1    and all that has to happen is that Mr. Monahan designate
2    them as confidential.  I promise you, sir, I will not call
3    you.
4         There is a series of phone calls in February and
5    March of 2016, correct?
6    A.   Yes.
7    Q.   If we go down, there is more in March and April.  I'm
8    going to go to the third page.  There are more in April.
9    I'm going to go to the fourth page.  There is one or two in
10   June and July and one or two in August and one in September.
11        Does the volume of calls go way, way up in October of
12   2016?
13   A.   I don't know, but I'm sure when you flip the page I
14   will know.
15   Q.   All right.  Was there any reason that you would be
16   talking to Mr. Monahan a lot more in October of 2016?
17   A.   Our budget started going up and he does the Facebook
18   and that is an important thing, and we were moving into the
19   Christmas selling season, so in October of 2016 we have a
20   promotion for -- the GhostBed birthday is Halloween --
21   Q.   Any coincidence that that is when he registered Honest
22   Mattress Reviews, the website?
23   A.   No coincidence.
24   Q.   If we go to October, though, what we see is the calls
25   do indeed go way, way up, right?  All of a sudden there are
```

1    more calls than before.

2         Would you agree with that?

3    A.   I would agree with that.  Yes, I would agree with that.

4    Q.   Some of these are in the evening.  We have 7:00 p.m.

5    here.  We have 8:28 p.m. here.  We have 7:00 p.m.  You would

6    talk to Mr. Monahan after 5:00?

7    A.   Yes.  I tend to work 70 to 80 hours a week.  I often

8    don't get home until about 10:00 at night, so I would

9    sometimes talk to Ryan after the busy day.

10   Q.   So in all of these phone calls in October, did it ever

11   come up even once that Mr. Monahan was launching a website

12   called Honest Mattress Reviews which would be reviewing,

13   among other things, GhostBed?

14   A.   No.

15   Q.   If we go to the next page, which is page 8, we see a

16   whole bunch of calls continuing in October and November of

17   2016; is that correct?

18   A.   That is correct.

19   Q.   Now, are you aware that Mr. Monahan's discussion of the

20   Purple powder really began in earnest in late January and

21   early February of 2017?

22   A.   I'm aware of it from your documents.

23   Q.   Okay.  So if we look in that time frame, starting on

24   page 12 there is a number of calls in there in maybe the

25   first half of February, do you see those, and some of them

1    are at night, correct?

2    A.    Yes.

3    Q.    If we go to the next page, there is a whole bunch more

4    calls in February and March of 2017, right?

5    A.    Yes.

6    Q.    Do you think a mattress review site should be

7    transparent about all of its financial ties with the product

8    manufacturer?

9    A.    I do.

10   Q.    Do you think a mattress review site should be

11   transparent about all of its personal ties with a product

12   manufacturer?

13   A.    I think there should be disclosures.

14   Q.    Do you agree that for a consumer, having more truthful

15   information is better than having less?

16          MR. HORWITZ:   Objection, Your Honor.   This was not

17   allowed for Mr. Monahan and it is certainly not relevant to

18   Mr. Werner, and it is not relevant to the issue that we're

19   supposed to be here for.

20          THE COURT:   Well, it is in.

21          Go on with your next question.

22   BY MR. MAGLEBY

23   Q.   Would you have any objection to Mr. Monahan making a

24   statement on Honest Mattress Reviews to the effect that

25   GhostBed is paying $10,000 a month to Achieve, which then

```
 1   gets paid to Mr. Monahan's company, Social Media Sharks?
 2             MR. HORWITZ:  Your Honor, same objection.  This is
 3   a hypothetical question to a fact witness and not relevant.
 4             THE COURT:  I will sustain the objection.
 5             MR. MAGLEBY:  Your Honor, I would say that it is
 6   relevant to, first of all, the bias, and, second of all, to
 7   the irreparable harm.  If he does not think that that is a
 8   problem, that it weighs in our --
 9             THE COURT:  I understand why you're asking it.
10             The objection is sustained.
11             MR. MAGLEBY:  Understood.
12             THE WITNESS:  Does that mean I don't answer?
13   BY MR. MAGLEBY
14   Q.   That means you do not answer my question, sir.
15             MR. MAGLEBY:  Your Honor, can I ask questions
16   going to the issue then of whether or not GhostBed would
17   suffer any irreparable harm because of an injunction or
18   should I move on?
19             THE COURT:  Move on.  That will be briefed and
20   argued I think by all of you.
21   BY MR. MAGLEBY
22   Q.   Casper is the leader of the bed in the box industry or
23   at least it was at one point.
24        Do you agree with that?
25   A.   They are definitely one of the top players.
```

```
 1    Q.    You have heard of Casper the Friendly Ghost?

 2    A.    I have heard of that.

 3    Q.    All right.  Does the fact that you named your company

 4    GhostBed have anything to do with Casper the Friendly Ghost

 5    and maybe some relationship that consumers might draw

 6    between GhostBed and Casper?

 7    A.    Not at all.  GhostBed was named because I was afraid of

 8    ghosts under my bed as a little kid.  It is a name I have

 9    had in my inventory for many, many years.

10              MR. MAGLEBY:  No further questions.

11              MR. HORWITZ:  Your Honor, I have got quite a bit.

12    Can we just take a five-minute break before I start?

13              THE COURT:  Okay.  Do you need more than five

14    minutes?  Do you need ten?

15              MR. HORWITZ:  No.  Honestly, Your Honor, I just

16    need to go to the men's room.

17              MR. MAGLEBY:  So Mr. Horwitz does not feel alone,

18    so do I.

19              THE COURT:  Let's take a ten-minute recess.

20              MR. HORWITZ:  Your Honor, what is your plan in

21    terms of a lunch break?

22              THE COURT:  Well, I wanted to see how far along we

23    were.  What do you think?

24              MR. HORWITZ:  I have got probably about an hour

25    with Mr. Werner.
```

```
 1              THE COURT:  An hour?  You do know that his
 2    declaration served as the direct?
 3              MR. HORWITZ:  Yes, Your Honor.
 4              THE COURT:  I am going to be a little less
 5    indulgent with your leading questions.  I don't think that
 6    you asked a single non-leading question of the last witness.
 7              MR. HORWITZ:  Your Honor --
 8              THE COURT:  This is certainly affiliated with you,
 9    so an hour seems like a lot, but we're back to the timing
10    issue.
11              What would you anticipate after that?
12              MR. MAGLEBY:  Your Honor, I have to admit I have
13    fired all my guns.  It will be recross and I'm not sure, but
14    I wouldn't say more than a few minutes.
15              THE COURT:  Okay.  If you could trim that hour
16    down to something less that that -- what is your preference?
17    Is it 12:30?  That clock is in a bad spot.  The light is
18    right on it.  Is it 11:30 or 12:30?  What is your
19    preference?  Do you want to take a short lunch break now?
20              MR. MAGLEBY:  It is totally up to the Court, and
21    the court reporter is the one who -- I think is the one who
22    is under the most physically demanding part of the job.
23    We'll go on or we'll take a break.
24              THE COURT:  Well, that was just trying to curry
25    favor.
```

1          MR. MAGLEBY:  I'm not dumb.

2          MR. HORWITZ:  Whatever Your Honor wants.

3          THE COURT:  Let me consult with Ed and when we

4    come back in, we'll map out the rest of the plan.  It sounds

5    like we're going to get done today at least, early or mid

6    afternoon sometime.

7          Court is in recess for ten minutes.

8          (Recess)

9          THE COURT:  Mr. Werner, you're still under oath.

10         THE WITNESS:  Thank you.

11         THE COURT:  Mr. Horwitz, if you are ready to

12   proceed, let's start.

13         MR. HORWITZ:  Yes, Your Honor.

14                    REDIRECT EXAMINATION

15   BY MR. HORWITZ

16   Q.    I'm going to refer you to Exhibit 1 in the white book

17   which is your declaration.  Mr. Magleby pointed out on page

18   1 of your declaration paragraph 6, correct?

19   A.    Yes.

20   Q.    It said there that GhostBed does not have any

21   affiliation whatsoever with the co-defendants Honest

22   Reviews, L.L.C. or Mr. Monahan.

23   A.    Correct.

24   Q.    You mentioned that later in the declaration that you

25   had more information?

158

```
1    A.    Yes.

2    Q.    Would that be paragraph 12?

3    A.    Yes.

4    Q.    Could you read that to the Court?

5              THE COURT:  I have it.

6              MR. HORWITZ:  Okay.

7    BY MR. HORWITZ

8    Q.    Did you explain in paragraph 12 exactly what the

9    relationship was?

10             THE COURT:  That is a leading question.

11             MR. HORWITZ:  Okay.

12             THE COURT:  I have it in front of me.  I knew that

13   is what he meant earlier.

14             MR. HORWITZ:  Thank you, Your Honor.

15   BY MR. HORWITZ

16   Q.    I want to go a bit into the background.  Can you

17   explain what Nature's Sleep is and what GhostBed is and the

18   difference between them and why you have two companies

19   selling mattresses?

20   A.    Sure.  I started Nature's Sleep 15 plus years ago to

21   sell memory foam mattresses, toppers and pillows, dog beds,

22   slippers, et cetera, to the wholesale -- is the mike okay --

23   to the wholesale trade.

24   Q.    Who do you sell to?

25   A.    People like Sears and Kohl's or Amazon, furniture
```

```
 1    stores, it could be mattress firms, Mattress Giants, Rooms
 2    To Go, across the country for brick-and-mortar guys.  We
 3    sell the product to them under our various brands or
 4    sometimes private label, and then they resell the product
 5    either direct to consumers that walk in or --
 6              THE COURT:  I see no relevance to this.
 7              MR. HORWITZ:  Your Honor, I think the background
 8    of understanding what the companies were all about --
 9              THE COURT:  I understand it as much as I need to
10    today.
11              MR. HORWITZ:  Okay.
12              THE COURT:  Let's go to the purpose we're here
13    for.
14              MR. HORWITZ:  Right.
15              THE COURT:  Please.
16    BY MR. HORWITZ
17    Q.   How large is GhostBed and Nature's Sleep?  How many
18    employees do you have?
19              THE COURT:  We have heard that.
20              Go ahead.
21              THE WITNESS:  35 plus.
22    BY MR. HORWITZ
23    Q.   Is that a large number for the amount of sales that you
24    have?
25    A.   No.
```

1    Q.   What do you do to get the job done?

2    A.   When we started the business the whole concept was

3    outsourcing.

4    Q.   Okay.

5    A.   We created a partnership with FedEx.  We use their

6    warehouses around the country, eight of them, their shipping

7    logistics people, their packaging engineering people, and

8    the whole business, because I came from a business with lots

9    of factory and lots of fixed overhead, so when I started

10   this, I wanted to outsource as many things as we could

11   because we didn't have enough capital to hire 50 people and

12   build factories and do those kinds of things.  We get a

13   little from this and a little from that.

14   Q.   Is one of the things you outsourced was marketing?

15   A.   Yes.

16   Q.   Who did you outsource it to?

17   A.   When we started GhostBed we outsourced -- we had other

18   people prior to that, but we outsourced it to what was

19   called Big Couch Media, and then they merged with a company

20   called Achieve and now it is called Achieve.

21   Q.   Who is the team in Big Couch Media or Achieve that

22   worked on your products?

23   A.   So the person I met with who was the owner of the

24   company was a woman named Georgianne Brown, who has a lot of

25   experience, and then she has got Cynthia and she has got a

```
1    whole crew of people.  When I first hired them in September
2    of '15, I thought they had like 50 ad people or something
3    like that working for them and then they just assigned
4    different people.
5         What I found out as time went on was that they
6    themselves outsourced a lot of the tasks for different
7    things.  So if you need someone to be a copywriter, they
8    have got a copywriter.  It you need someone to do graphic
9    arts work, they have got that person.  I didn't give that
10   much thought.  I was never at their offices.
11   Q.   Who was Cynthia Howland?
12   A.   Cynthia is like an administrator on the account who
13   makes sure that each person does what they are supposed to
14   do.
15   Q.   Has she been described as the team leader?
16   A.   She has been described as the team leader.  I would
17   probably call her more the team administrator.
18   Q.   William Bertolbe?
19   A.   William does advertising just for Google, so the Google
20   platform for ads on Google.  That is his specialty.
21   Q.   And Ryan Monahan?
22   A.   His specialty is running ads on Facebook.
23   Q.   Michael Sherman?
24   A.   Michael does stuff with what they call influencers, to
25   get ahold of bloggers and different kinds of review sites or
```

162

1    celebrities and things like that and try to maybe get a

2    product to them and get some kind of a write-up.

3    Q.    And there are other people that deal in ad creation?

4    A.    There are.  They have a number of people in their

5    organization.

6    Q.    Is Ryan Monahan in any way the chief marketing officer

7    or chief brand officer either in title or in reality for

8    GhostBed?

9    A.    Not at all.  His vertical is taking care of Facebook

10   ads.  That is his primary role.  Georgianne Brown, when I

11   brought her on, I would refer to her as my ad hoc C.M.O.,

12   chief marketing officer, just in conversation.  She

13   represents many clients across many sectors.

14   Q.    I am going to hand you what has been marked as Exhibit

15   701.

16         Is that an e-mail from Calisha Anderson to a number of

17   people including yourself?

18   A.    Yes.

19   Q.    In that e-mail does Ms. Anderson state that Cynthia is

20   the team lead on the Achieve side?

21   A.    Yes.

22   Q.    If you look further down at the second e-mail it says,

23   hi, Calisha.  In looking at the sheet I think it would be

24   useful if you populated the sheet with the people directly

25   responsible for tasks.

1    A.    Yes, I see that.

2    Q.    Did Ms. Anderson do that on a regular basis, identify

3    who was doing what and what tasks were out there?

4    A.    Yes, she did.  That was her role as director of

5    marketing.

6    Q.    I am going to hand you a document marked as Exhibit

7    703.

8          Who prepared this document?

9    A.    This was prepared by Calisha, director of marketing.

10   Q.    Does it describe the various aspects of marketing for

11   GhostBed?

12   A.    Yes.  It pretty much lays everything out, the

13   campaigns, the different advertising venues, the strategy,

14   who we're working with, what we expect on deliverables.

15   Q.    I'm looking down there and in social, Facebook, it says

16   Ryan.  Is that Ryan Monahan?

17   A.    Yes.

18   Q.    Then on page, search, it ways William and Ryan and

19   Marc.  Is Ryan Ryan Monahan?

20   A.    Yes.

21   Q.    And then in website, organic customer, engagement and

22   content, is that Ryan?  At the end it ways Calisha, David,

23   Valeria and Ryan?

24   A.    Yes.  He is just in parens there.

25   Q.    Then if you look at marketing, e-mail, active

1   campaigns, it is Ryan and David?

2   A.   Yes.

3   Q.   Again, that is Ryan Monahan?

4   A.   Ryan Monahan and David our webmaster.

5   Q.   So those are the kinds of things that he worked on?

6   A.   Yes.

7   Q.   He was not in charge of marketing?

8   A.   Not at all.

9   Q.   In fact, he was not involved in many aspects of

10  marketing?

11  A.   Correct.

12  Q.   Calisha would be Calisha Anderson?

13  A.   Yes.

14  Q.   In fact, I see very few areas were she is not involved.

15  A.   Well, she is the director of marketing so she is

16  responsible for everything.

17  Q.   Now, with Ryan Monahan, did you look into his

18  background or learn about his background in terms of his

19  work with Facebook?

20  A.   No.  I met him through Big Couch that became Achieve.

21  Q.   Did your since learn about this background?

22  A.   Having worked with him, I found out that he is very

23  talented on the Facebook ad side.

24  Q.   Do you know of any other clients that he has?

25  A.   I know he has other mattress clients and I know that he

1   has a number of clients that are involved with the Shark

2   Tank.  I have seen him in pictures with some of the sharks,

3   and a number of high profile accounts, but he does not

4   discuss his clients just like I don't want my business

5   discussed.

6   Q.   He is not by any means unidimensional in working only

7   for GhostBed?

8   A.   Not at all.  Not at all.

9   Q.   Now, Honest Mattress Reviews, do you read it?

10  A.   I read it from time to time.

11  Q.   Do you have any advance notice of what is going to get

12  printed there?

13  A.   Never.

14  Q.   Does he discuss with you possible ideas for articles?

15  A.   Never.

16  Q.   Do others in the industry read it?

17  A.   It has become kind of the new go-to trade journal,

18  digital trade journal in the industry.  I have been in the

19  industry for a long time so I have a lot of friends on the

20  manufacturing side, the retail side, the old-school guys,

21  and they frequently read this now because it is a very good

22  source of information of what is happening in the industry.

23       If it is a deal with Serta, if it is a new mattress

24  from Tempurpedic, if it is a new product type, whatever it

25  is, new technology, he seems to break the news in record

1    time.

2         In fact, the industry trade journal that we have read

3    our whole lives, Furniture Today, and a friend of mine is

4    the senior editor writing mattresses, Dave Perry, and they

5    don't seem to get information out to us, the users of that

6    stuff, as quick as Honest does.

7    Q.   When you say other people in the industry look to it,

8    how do you know that?

9    A.   I am friends with a lot of guys.  It is a very close

10   industry.  We have trade association meetings.  We have

11   mattress fairs and shows in Vegas and in High Point, North

12   Carolina.  All the guys talk.  You're all part of the same

13   food chain because you need to get foam and you need to get

14   textiles and there are so many vendors and you interact with

15   these various vendors for making products, so you're talking

16   and this guy is telling you this and that guy is telling you

17   that, and it regularly comes up that people say, hey, I saw

18   this from Honest, this information and that story, and it

19   has become kind of a go-to thing for information.  It is a

20   repository.

21   Q.   If I understand correctly, people look at this as

22   authoritative in the industry?

23             MR. MAGLEBY:  Objection, lack of foundation and

24   calls for speculation, hearsay.

25             THE COURT:  Sustained.

1   BY MR. HORWITZ

2   Q.   Has anyone told you that they look at it as something

3   that they need to use in their business to understand what

4   the industry is doing?

5              MR. MAGLEBY:  Objection, hearsay.

6              THE COURT:  Sustained.

7              MR. HORWITZ:  Your Honor, I'm looking at state of

8   mind.  I'm not looking for the truth of it.  I'm looking at

9   people in the industry consider this to be a genuine

10  newspaper not a unidimensional product to attack Purple.

11             THE COURT:  Sustained.  The objection is

12  sustained.

13             MR. HORWITZ:  Thank you.

14  BY MR. HORWITZ

15  Q.   I'm going to show you what has been marked as Exhibit

16  704.  Are these a sampling of the kinds of articles that can

17  be found on the website Honest Mattress Reviews?

18  A.   Yes.

19  Q.   Obviously this was taken as a snapshot of one day, but

20  is this typical of the kinds of articles that are there?

21  A.   Yes.  He has all kinds of articles about mattresses,

22  pillows, sleep positions, retailers and interviews with

23  executives at companies like Mattress Firm, the biggest

24  company out there, on a regular basis.

25  Q.   Does he talk about medical issues with respect to

1    mattresses?

2    A.    Not really.

3    Q.    Well, let's divert for a while.  One of the things that

4    you planned on with respect to GhostBed was how it was --

5    can you tell me whether it had any medical aspects to it?

6    A.    Well, I mean, better sleep is a healthier thing.  It is

7    not a medical device, but by having the right kind of

8    comfort and foams, you're going to sleep better with less

9    pressure and you're going a help a bad back or a bad

10   shoulder.

11   Q.    Can you tell me a little bit about your personal

12   experience with that?

13   A.    Well, I have had three neck surgeries, so I have been a

14   victim of poor sleep and poor pillows my whole life and that

15   is how I started the whole business to begin with, because I

16   designed --

17             MR. MAGLEBY:  Objection, Your Honor, relevance.

18             THE COURT:  Sustained.

19             MR. HORWITZ:  Your Honor, Mr. Magleby showed a

20   document to the previous witness talking about a business

21   plan, one of which was medical issues, and I wanted Mr.

22   Werner to explain exactly what Mr. Magleby pointed out to

23   the previous witness.

24             THE COURT:  The objection is sustained.

25             MR. HORWITZ:  Thank you, Your Honor.

1              Your Honor, we previously marked Exhibit 705, and

2       if I could show that to the witness?

3       BY MR. HORWITZ

4       Q.   Is that a list of ratings from Honest Mattress Reviews?

5       A.   Yes.

6       Q.   Can you point out where GhostBed is?

7       A.   GhostBed is the third one down from the top.

8       Q.   It is rated world class?

9       A.   Yes.

10      Q.   How many other companies are rated world class?

11      A.   It looks like ten or 11.

12      Q.   Did you speak to Mr. Monahan about the rating that

13      GhostBed got?

14      A.   No.

15      Q.   Did you talk to him about whether or not other people

16      deserved that rating?

17      A.   No.

18      Q.   Did you talk to him about any investment you made in

19      Honest Mattress Reviews and whether this was a proper way to

20      deal with you after that investment?

21      A.   No.  There is no investment.  There is no nothing.

22      Q.   I'm going to refer you to the second page of that.

23           Does Nature's Sleep appear rated?

24      A.   Yes.

25      Q.   What was the rating it got?

1    A.    It got a poor rating.

2    Q.    Okay.  Well, fair or poor?

3    A.    According to his scale, fair.

4    Q.    Fair?

5    A.    Yes.

6    Q.    Again, Nature's Sleep and GhostBed are both owned by

7    you?

8    A.    They are both owned by us.  Nature's Sleep is the

9    wholesale business, so we don't offer returns like GhostBed

10   does, and his scale works on various factors I think that

11   just didn't qualify.

12   Q.    Does Honest Mattress Reviews have any articles about

13   GhostBed?

14   A.    They have a couple of articles.

15   Q.    How many?

16   A.    I would say three to five.

17   Q.    Out of how many total that are there?

18   A.    I have learned that there is like almost 1,000

19   articles.

20   Q.    Are those articles favorable?

21   A.    I wouldn't call them favorable.  I call them more

22   informational.

23   Q.    We have seen before an interview of the C.E.O. of

24   Mattress Firm, Ken Murphy.

25         Are you aware of that?

```
1   A.   I am aware of who Ken Murphy is.  I did read a few in

2   the series.  I thought that was very interesting.

3   Q.   How many articles were in the series?

4   A.   I think there was maybe eight or ten.  It was quite a

5   bit.  It was pretty impressive that the guy who runs the

6   largest mattress company in the world, a $4 billion company,

7   is giving time to a reviewer, because I have not seen any of

8   the other reviewers ever get an interview with a C.E.O.

9   Q.   Did Honest Mattress Reviews have any other interviews

10  of heads of companies, mattress companies?

11  A.   There were several.  There were several that I saw.

12  Q.   Is that something that helps sales?

13  A.   Helps sales for?

14  Q.   Well --

15  A.   Probably for Mattress Firm.

16  Q.   Yes.  That is what I am saying

17  A.   Yes, definitely for Mattress Firm.

18  Q.   Mr. Murphy would not be doing that if not for the fact

19  that it would help sales?

20  A.   I think it is part of his goodwill and getting the word

21  out about Mattress Firm.

22  Q.   Can you tell me whether or not it would help GhostBed's

23  sales if you were interviewed?

24  A.   It probably would.

25  Q.   Were you interviewed?
```

```
1    A.   No.

2    Q.   When did you first meet Mr. Ryan Monahan?

3    A.   I met him in about December of 2015.

4    Q.   Under what conditions did you meet him?

5    A.   Big Couch Media at the time and Georgianne Brown were

6    having a get-together at my office with a bunch of people

7    and she brought over a bunch of her people.  Quite frankly,

8    I didn't know who any of them were.  I couldn't have

9    repeated their names or identified any of them in a lineup.

10   Q.   Is Mr. Monahan a close personal friend?

11   A.   I never knew him before this GhostBed and Big Couch and

12   Achieve experience.

13   Q.   Is he now a close personal friend?

14   A.   I would consider him a friend, yes, definitely.  I

15   consider -- most people I work with over time, I become

16   friendly with them.  I am just an easygoing and friendly guy

17   and I think it is easier to have good relations.

18   Q.   How many times has he been over for dinner?

19   A.   Never.

20   Q.   How many times has he even been in your house?

21   A.   Never.  I don't know where he lives.  He has never been

22   to my house.

23   Q.   Do you normally invite people over to your house for

24   dinner?

25   A.   No.
```

```
 1    Q.    Why not?

 2    A.    Because I work late and I have a sick wife and I enjoy

 3    my family time.

 4    Q.    Is Mr. Monahan an employee of GhostBed?

 5    A.    No.

 6    Q.    Is he an officer of GhostBed?

 7    A.    No.

 8    Q.    Do you or any of your related companies have any

 9    ownership interest in Honest Mattress Reviews?

10    A.    Nothing.

11    Q.    Do you have any control over the content of Honest

12    Mattress Reviews?

13    A.    Nothing.

14    Q.    Do you have any idea what is going to be in Honest

15    Mattress Reviews until you see it?

16    A.    I have no knowledge of anything.

17    Q.    Now, specifically the articles that we're here talking

18    about now, about powder with respect to Purple, when did you

19    know that Honest Mattress Reviews was going to publish

20    articles in any way related to Purple and its powder?

21    A.    After I read them.

22    Q.    You read them in Honest Mattress Reviews?

23    A.    On their website.

24    Q.    Did you have anything to do with them?

25    A.    Nothing.
```

1    Q.   Did you suggest to Mr. Monahan that this may be an

2    interesting area to go into?

3    A.   No.

4    Q.   Did you arrange for those articles to be printed?

5    A.   No.

6    Q.   Did you even suggest to him that it may be something

7    worth investigating?

8    A.   No.

9    Q.   Now, at some point you became aware that Mr. Monahan

10   was using the title chief brand officer?

11   A.   Yes.

12   Q.   I'm going to show you Exhibit 708.

13        Do you recognize that letter?

14   A.   Yes.  This is a letter I got from a lawyer in New York.

15   Q.   If you look at the second page at the top, it says --

16   or starting at the bottom of the first page -- specifically

17   we have learned that the domain

18   www.honestmattressreviews.com was purchased in 2016 by Ryan

19   Monahan from Go Daddy, and have further discovered that Ryan

20   Monahan is the chief brand officer for GhostBed and the

21   author of the GhostBed blog which appears at a certain

22   website.

23   A.   Yes.

24   Q.   Do you see that?

25   A.   Yes.

1  Q.   Did something happen as a result of your receiving this

2  letter?

3  A.   Yes.  I became aware of this Honest Review site and

4  that is when I really got into this chief brand officer

5  thing and said that that is not acceptable and had to make

6  that change.

7  Q.   Can you tell me whether or not this letter is what

8  prompted you to deal with the issue of Mr. Monahan calling

9  himself the chief brand officer?

10  A.   This was the catalyst.

11  Q.   This was on October 14 of 2016?

12  A.   Yes.

13  Q.   It has been suggested that Mr. Monahan hid his

14  ownership of www.honestmattressreviews.com.  Did this

15  attorney have any problem figuring that out?

16          MR. MAGLEBY:  Objection, speculation.

17          THE COURT:  Overruled.

18          THE WITNESS:  I can answer?

19  BY MR. HORWITZ

20  Q.   Yes.

21  A.   I spoke to her.  She had no problem whatsoever.  She

22  told me directly.

23  Q.   So as a result of getting this letter, did you speak to

24  Mr. Monahan about his use of the title chief brand officer?

25  A.   Yes.

1   Q.   What did you say?

2   A.   Lose it.

3   Q.   I'm sorry?

4   A.   Get rid of it.  Don't use it.

5   Q.   As far as you know did he comply?

6   A.   I believe so.  I don't know how long it takes to do --

7   wherever he had it, but yes.

8   Q.   Did you look into whether he had an e-mail at

9   ghostbed.com?

10  A.   Yes.  That was ceased.

11  Q.   You stopped that?

12  A.   Yes.

13  Q.   Now, why did he have an e-mail?

14  A.   So as part of his role with the marketing agency, they

15  wanted to improve our e-mail marketing.  They didn't think

16  that we were doing it that well, so they suggested a few

17  people in-house that could help.  They wanted to change

18  software vendors that actually the e-mails get sent through.

19  In order to set that up, they would only set it up if you

20  have an e-mail extension to the company that it is going to

21  be set up.

22  Q.   What do you mean by extension?

23  A.   The e-mail has to be john@ghostbed.com.  If you have it

24  to the federal courthouse, they won't set it up unless the

25  e-mail account is for the federal courthouse.  The e-mail

1   account has to be tied back to what the title is in the

2   e-mail.  So we had to give him an e-mail in order to be able

3   to do that at that time.

4   Q.   So there had to be an e-mail with the name of the

5   company matching the name of the website?

6   A.   Yes.  Otherwise other people could just go in there and

7   hack around, so they had these protocols for security.

8   Q.   I'm going to show you Exhibit 709.

9        What is this?

10  A.   Okay.  So I come from a military family and so the

11  military is important to me, and so we wanted to get some

12  campaigns to kind of give back, and so we wanted to set up a

13  campaign for the military.  There are software sites out

14  there that can help run your contests, send out information,

15  keep track of things, and it is all automated so you don't

16  have to do it manually.

17       So at Achieve Ryan was given the task just to set that

18  up, again, with the same e-mail.  You needed that same

19  e-mail address in order to set it up.  So his job was to set

20  this up with the software company.

21  Q.   Now, if you look at the second page, under 13 it has to

22  request the name of the contest winner send either a

23  self-addressed stamped envelope to the address, attention

24  Ryan Monahan or, B, an e-mail to [REDACTED].

25  A.   I think there are some compliance legal rules with a

1    contest that you have to have certain information, and

2    because he was setting it up, he just dropped in that

3    information, and if anything came in, that would just get

4    forwarded over to the appropriate people at the company.

5    Q.   Now, your phone people, the people who answer phones,

6    is that outsourced?

7    A.   Originally it was outsourced and we were not happy with

8    it so we do it all in-house.

9    Q.   Now, there is a recording that was made of a

10   conversation with an investigator of Purple and someone

11   called Jamey.  Who is Jamey?

12   A.   Jamey's actual name is James.  James was a new employee

13   of ours and he was working in what we call a lease to own

14   program which is through Robert Half, which is a staffing

15   firm.  So often we bring people on through a staffing firm

16   so we can see how they work out in our environment, and then

17   after 90 or 120 days you can decide to make them an

18   employee.  You basically pay Robert Half for their services.

19   Q.   Do you have a training manual for people?

20   A.   We have a training manual.

21   Q.   I'm going to show you Exhibit 711.

22        Can you tell me what that is?

23   A.   This is our GhostBed customer service training manual

24   for our staff.

25   Q.   I'm going to refer you to page 3.  It starts at the top

1    with GhostBed and other competitors, bullet point, there are

2    other customers that sell products like our GhostBed.  If

3    asked about other companies and their products, our response

4    is as follows.  Quote, I can speak about my GhostBed and how

5    it is constructed.  With respect to other companies'

6    products, I would not know their specific details.

7         Another bullet is you may direct the customer to our

8    website.  That's the GhostBed website?

9    A.    Yes.

10   Q.    Has that been in your manual since day one?

11   A.    I believe so.

12   Q.    And is that communicated to the people who answer the

13   phones?

14   A.    It is.

15   Q.    So they have been instructed since day one not to talk

16   about other competitors?

17   A.    Adamantly.

18   Q.    Now, there is another one down there, if asked does

19   your mattress contain powder, and another bullet is do not

20   talk about the competitor or of powder.

21        Do you see that?

22   A.    Yes.

23   Q.    Was that added?

24   A.    Yes.

25   Q.    When was it added?

```
 1    A.   I would say in the last three to five months.  I am not

 2    exactly sure, but this is a living document.  As things come

 3    up, we want to add things so we can get the best practices

 4    in place right away.

 5    Q.   So you have tried your best not to have people discuss

 6    Purple or its powder?

 7    A.   I have tried to do everything and I keep redoing it and

 8    redoing it and talk to everyone myself the best I can, and

 9    it is discussed every week at their weekly meetings and

10    their staff huddles.  I don't want anyone talking about any

11    competitors.  Just focus on our products.

12    Q.   As you said, the top one has been in the GhostBed

13    manual since well before this issue with Purple?

14    A.   Well before.

15    Q.   All right.  There has also been some discussion about

16    ad copy making fun of Purple.

17         Do you recall that?

18    A.   Yes.

19    Q.   In the documents?

20    A.   Yes.

21    Q.   I'm going to show you Exhibit 712.

22         So this is the ad?

23    A.   This is the ad.

24    Q.   Where was the ad placed?

25    A.   This is placed on the Google network, so it is a text
```

1    ad as opposed to an ad with a photograph.

2    Q.   I'm sorry.  It is placed where?

3    A.   Through the Google ad network.  It is anywhere that

4    Google runs ads, so if you do a search for mattress or

5    something, an ad could come up and this might come up.

6    Q.   Making fun of Purple was just, quote, our bed is not

7    Purple, L.O.L.?

8    A.   We were not trying to make fun of anybody.  We were

9    just saying our bed is not Purple.

10   Q.   But it had nothing to do with powder?

11   A.   It has nothing to do with powder or anything.

12   Q.   Do you place other ads that are sort of making fun of

13   other competitors?

14   A.   Again, we are not trying to make fun of anyone, but we

15   run other ads that might be focused on lots of other

16   competitors.  It is a standard practice.  If you do a

17   mattress search, you'll see ad after ad where Casper is

18   doing it to Leesa and Leesa is doing it to Tempurpedic and

19   Serta is doing it to Seely and it just goes on and on and

20   on.

21   Q.   I'm going to show you Exhibit 714.

22        Can you tell me what this is?

23   A.   It is an e-mail from Ryan to Ashley or from Ashley to

24   Ryan.  I can't really tell.  We're just talking about

25   comparisons.  One of the things we pride -- we developed our

1    logistic system so we can ship our goods in 24 hours,

2    because we feel that the customers -- from Amazon Prime to

3    drive-through McDonald's -- if we are comparing ourselves to

4    other people that take two weeks or three weeks, whatever,

5    we point out to the customers that if you need it right away

6    we ship in 24 hours.

7    Q.   Where is that comparison?

8    A.   That comparison is I think on our website.

9    Q.   I am going to show you Exhibits 715, 716, 717, 718 and

10   719.

11        Can you tell me what those are?

12   A.   These are various comparative ads that we have on our

13   website.  We must have 15 or 20 plus.

14   Q.   These are just examples?

15   A.   These are just examples of some of them, yes.

16   Q.   Does this talk about -- so Purple is not the only one

17   you have a comparison with?

18   A.   We have at least 15 other players in the space.  In the

19   space there are 200 players today, 200 players in the bed in

20   a box space.

21   Q.   In looking back at Exhibit 714, this was just gathering

22   evidence or gathering information to put in the comparison?

23   A.   Yes.

24   Q.   Do you gather this for all of your competitors?

25   A.   We do.  We do.  What we try to do is we just point out

1    we're 11 inches and you're 10 inches, you cost 900 and we

2    cost 800.  It is those kinds of things.  It is just kind of

3    factual pieces of information and let the consumer look and

4    make a decision.  Everybody in this space has a generous

5    return policy, so if the customer does not like it they can

6    return it.

7    Q.   Now, did there come a time when one of your employees

8    was the subject of domestic abuse?

9    A.   Yes.

10   Q.   Can you tell me about that?

11   A.   It was a horrible thing.  One of our computer

12   programmers, Heilyn Pages, was coming to work on

13   September 26, 2016, almost a year ago, and her estranged

14   husband met her in our parking lot around 7:20 a.m. before

15   she came into our front door ten feet away and started to

16   beat on her and then poured gasoline on her and lit her on

17   fire in the car.  It was all caught on our video cameras in

18   our retail storefront of our corporate office.  It was just

19   a hideous, hideous thing.

20   Q.   Was she seriously injured?

21   A.   Yes.  She almost died.  She was in a coma for quite

22   some time.  The doctors who I spoke to didn't think she was

23   coming back.  So we spoke to her prior employer --

24   Q.   Let me show you an exhibit, Exhibit 720.

25        Can you tell me what that is?

1    A.    So this is an e-mail -- because we wanted to do one of

2    these GoFundMe pages to help raise money for her.

3    Q.    What is a GoFundMe page?

4    A.    GoFundMe is just a website, a huge website so when

5    there is crisis for anything, if your dog has a broken leg

6    or you mom is really sick, you can help and just reach out

7    to people's generosity and see if they will help fund your

8    campaign.  It is just an organized way of doing it.  I was

9    not that familiar with it myself at the time, but we knew we

10   wanted to try to do something to help her because the

11   expenses would be ridiculous.

12       We continued to pay her and help her with her medical

13   and do everything we could.  So we found that her prior

14   employer, which is a firm, a large firm in Florida, had

15   already started this GoFundMe.  So we communicated with them

16   and we just added a little bit to this GoFundMe page.  I

17   actually took that picture off her desk, with her child, to

18   put in here, and then what we tried to then do with it was

19   to try to blast it out on Facebook to as many people as we

20   knew, everyone's friend so we could help and try to raise

21   funds for her.

22   Q.    Did Ryan Monahan write this?

23   A.    No.  Costa Farms wrote it and then I believe I added

24   some language about us.

25   Q.    Did Mr. Monahan post this?

185

```
1    A.    I believe he posted it on his Facebook page.  Last I
2    checked there were over 700 different people across the
3    country who also posted it on their Facebook page.
4    Q.    Tell me, what does it mean to post something on your
5    Facebook page?
6    A.    It means you take something that is kind of on the
7    Facebook page, like this article that is somehow in your
8    feed or you go to the GoFundMe page and there is a little
9    button that says post it on your Facebook page, and then it
10   goes into like your individual Facebook link.
11   Q.    If I were to go to your Facebook page or someone else's
12   Facebook page and take any article I could --
13   A.    You could re-post it.
14   Q.    Is that a common practice?
15   A.    It is extremely common.  That is why Facebook has got a
16   billion users.
17   Q.    How many people re-posted this article --
18   A.    Well --
19   Q.    -- that you and her prior employer created?
20   A.    The last time I saw it, it was over 750 people had
21   re-posted it.
22   Q.    And not all of those people were your employees?
23   A.    No.  No.  Most of those people, I have no idea who they
24   are.  I only have 35 employees.
25   Q.    Did any of your friends re-post it?
```

186

1    A.    Yes.

2    Q.    Did any of your business associates re-post it?

3    A.    As many as I could reach out to.  Several mattress

4    reviewers re-posted it and made contributions.

5    Q.    Did any of employees re-post it?

6    A.    I believe so.

7    Q.    I'm going to refer you to Exhibit 721.

8    A.    If I could just add one more thing, because this was

9    really a horrible thing where a woman was burned on 70

10   percent of her body, she has come back to work in the last

11   month, so it is a very happy ending and we're glad to have

12   her back.

13   Q.    Good to hear.

14         Can you tell me what that picture is in Exhibit 721?

15   A.    So this is a picture of people that were in our office

16   that day in our showroom for the red nose -- it is a money

17   raiser for a different cause.

18   Q.    I happen to not be familiar with it.  What is it all

19   about?

20              THE COURT:  I don't see the relevance of this.

21              MR. HORWITZ:  Well, the plaintiff has claimed that

22   this picture shows that Mr. Monahan is employed by GhostBed.

23   I want to go into what this is and why it is that way and

24   why it has no relevance to the issue.

25              THE COURT:  Is Mr. Monahan in this photo?

```
1              MR. HORWITZ:  Yes, Your Honor.

2              THE COURT:  Go ahead.

3    BY MR. HORWITZ

4    Q.   Okay.

5    A.   This was a group of our employees plus outside vendors

6    that were at our premise that day.  So we had Josh and Abby

7    from a video production company, and we had Ryan there that

8    day, because he had something to do with the video and the

9    pictures or something like that and he was giving some

10   input, so we just took a group picture.  My grandson is in

11   the picture.

12   Q.   He is not an employee?

13   A.   My grandson is not an employee.  He is not --

14   Q.   How old is he?

15   A.   He was nine months there.

16   Q.   Now, Calisha Anderson, what was she hired as?

17   A.   She was hired -- originally I was looking for a

18   marketing manager, administrator, and then she asked if she

19   could have a larger title, which would be director of

20   marketing, so I acquiesced to that.  Then she wanted to

21   write her own job description, so I said that was a good

22   idea, so she wrote the job description as director of

23   awesomeness.  Officially with us it was director of

24   marketing.

25   Q.   I'm going to show you Exhibit 722 and 723 and ask if
```

188

```
 1    you can identify them for me.

 2    A.    Do I answer now?

 3    Q.    Go ahead.

 4    A.    These are very sensitive documents that relate to our

 5    detailed Amazon Media Group or advertising through Amazon.

 6    Amazon, besides being an e-commerce place, is like Google.

 7    They are a huge advertising company.  We have a very active,

 8    active relationship with them and obviously spend a lot of

 9    money in our nomenclature.  This is the detail of the

10    campaigns and how much we're spending by month and by

11    campaign and the results thereof.

12    Q.    Is this information confidential?

13    A.    It is extremely confidential.

14    Q.    Was Ms. Anderson aware that this is confidential?

15    A.    Very much so.

16    Q.    It bears the production numbers of Anderson 5 and

17    Anderson 217.  She produced it.  Was she aware that it was

18    confidential?

19    A.    Yes.

20              MR. MAGLEBY:  Objection, foundation, speculation.

21              THE COURT:  Overruled.

22    BY MR. HORWITZ

23    Q.    I'm going to show you Exhibit 725.

24    A.    Did you want me to answer what the second page was of

25    this first exhibit?
```

```
1    Q.    I am sorry.  That would be a good idea.

2    A.    The second page is an overall ad spend from 2016 by

3    advising venue, T.V., radio, C.B.S., you know, all of those

4    different kinds of things, broadcast, et cetera, the system

5    and the amount spent per month, an incredibly sensitive

6    document.

7    Q.    I'm going to show you Exhibit 725.

8          Can you identify that?

9    A.    Yes.  This is an incredibly sensitive document.  The

10   first thing is the numbers would tell someone how to do it,

11   and this document, which is actually probably over 600

12   pages, this is obviously an excerpt, would tell you what to

13   do, who to go after.  This is a customer segmentation and

14   profiling.

15         What that means is we have taken 12, 15,000 actual

16   addresses of customers who bought from us, and we sent it to

17   a very large firm called Prism, which is like the Nielsen

18   Ratings, and they run it through this grinder and they come

19   out and they tell you that your customer is this and this

20   and this and they fit in these kinds of things, so then you

21   know how to go after them.  This is really gold.  This is

22   highly, highly sensitive.

23   Q.    This was also produced by Ms. Anderson if you look --

24   A.    I see that.  That is very disturbing.

25   Q.    If you were a competitor, would you want these three
```

1    documents, 722, 723 and 725?

2    A.   Well, they would certainly be very helpful for your

3    business, but you obviously accessed it through improper

4    means and you would --

5    Q.   I am just asking whether it would be helpful.

6    A.   It would be extremely helpful.

7    Q.   Was Ms. Anderson aware of the value of this?

8    A.   Yes.  She is very schooled in -- she has a master's in

9    advertising research and she knows very well what this is.

10   She was involved with me when we did it, the research

11   report, and she was doing sub analysis from this data.  It

12   was very detailed, quantitative work on it.

13   Q.   Did there ever come a time when you asked Ms. Anderson

14   to put together a vendor list?

15   A.   Yes.

16   Q.   Can you tell me what that was all about?

17          MR. MAGLEBY:  Your Honor, I'm going to object.  I

18   don't know how this has anything to do with ties between

19   GhostBed and Mr. Monahan.  I have been patient, but I think

20   we're getting far afield.

21          THE COURT:  I do, too.

22          MR. HORWITZ:  Your Honor, it goes directly to Ms.

23   Anderson's declaration.

24          THE COURT:  Objection sustained.

25          Move on.

```
1              MR. HORWITZ:  No further questions, Your Honor.

2              THE COURT:  Okay.  Thank you.

3              Did you have any questions of this witness?

4              MR. SPERLEIN:  No, Your Honor.  Thank you.

5              THE COURT:  Okay.  Mr. Magleby, do you have other

6    questions of Mr. Werner?

7              MR. MAGLEBY:  I do.

8              THE COURT:  Okay.

9              MR. MAGLEBY:  I say that sheepishly.

10                       RECROSS-EXAMINATION

11   BY MR. MAGLEBY

12   Q.   With regard to Exhibit 721, that was the red nose day

13   at the office, right?

14   A.   Yes.

15   Q.   So at least on that particular day Mr. Monahan just

16   happened to be around; isn't that correct?

17   A.   Well, as I stated earlier in my testimony, we had an

18   outside vendor who does video production, Josh and Abby, and

19   so we asked them to come over because he was involved with

20   something -- looking at something that they were doing.

21   Q.   Does Mr. Monahan make those same kinds of visits to any

22   other mattress company?

23             MR. HORWITZ:  Objection, Your Honor.

24   BY MR. MAGLEBY

25   Q.   Does Mr. Monahan go and make those same kinds of
```

1    in-person visits to any other mattress company?

2    A.   I don't know what visits he makes.

3    Q.   All right.  Let's take a look at Exhibit 55.

4    A.   Is that in this stack?

5    Q.   It is in one of the white binders, but I will put it up

6    on the screen for you.  This is a post regarding that

7    horrific event with your employee, which I'm very sorry to

8    hear about.

9         This is a different post regarding it.  It starts out

10   Cheryl Galster says the following is a letter that was sent

11   to my e-mail that you might be able to respond to in the way

12   that you think will be of help.  It goes on and it talks

13   about these events of September 26th, if you can see where

14   my cursor is.

15        You were pretty involved in these posts going out and

16   trying to raise money for this employee, correct?

17   A.   I was involved with helping to set up GoFundMe.  I'm

18   not active in the Facebook type of reposting.

19   Q.   I see.  Well, let's just look at the bottom.  Can we

20   see who signed this letter that was posted on Facebook?

21   A.   It says Ryan.

22   Q.   Does it have a title for him?

23   A.   It does.

24   Q.   What is it?

25   A.   Chief brand officer.

193

```
1    Q.   Does he have an e-mail that says [REDACTED]?

2    A.   That is what it says.

3    Q.   All right.  You were handed Exhibits 712 and 714.  One

4    is I guess a text or something that says our bed is not

5    purple.  The other one has the subject line versus Purple

6    and it talks about the shipping.

7         Do you recall those two exhibits?

8    A.   Yes.

9    Q.   Those are in April of 2016; isn't that right?  I will

10   give you a moment to find them.

11   A.   April of 2016.

12   Q.   All right.  So at least in those two instances you were

13   doing comparative advertising with regard to Purple,

14   correct?

15   A.   This states that that was to be added to it.

16   Q.   All right.  Let's go back to this e-mail that you sent

17   to Tony Pearce.  On May 24, 2016, within a month of those

18   two documents you say to the best of my knowledge we don't

19   run any ads with Purple or anyone other than just GhostBed.

20        That wasn't true, at least with regard to the two

21   exhibit we just looked at, was it?

22   A.   Again, you're mischaracterizing it and misunderstanding

23   it.

24   Q.   All right.

25   A.   I'm saying we're running ads for GhostBed and I was
```

1    talking to Mr. Pearce specifically about making corrections

2    in the comparative ad we're running with him, and he gave me

3    language to put into that comparative ad.

4    Q.   Your position in this case is you don't have anything

5    to do with the H.M.R. website; is that right?

6    A.   That being who?

7    Q.   You don't have anything to do with the content.  Is

8    that your position?

9    A.   Are you talking about Honest Mattress Reviews?

10   Q.   The H.M.R. website.  Sorry.  That was the shorthand we

11   got with Mr. Monahan and I realize you were not in the room

12   when we did that.

13   A.   No.

14   Q.   Boy, you sure talk to a lot of people in the industry

15   about it and that is what you testified to with Mr. Horwitz,

16   right?  You talk to people in the industry about this

17   website.  It is the new up-and-coming website?

18   A.   People refer to this and say did you see this article

19   and so-and-so and I typically say yes or no.

20   Q.   Do you ever bring it up to people?

21   A.   No.

22   Q.   Wow.  This is the new up-and-coming website.  You

23   should read this.

24   A.   No.

25   Q.   Never?

```
1    A.    Never is a big word, but not that I recall.

2    Q.    So it is the up-and-coming website in the industry and

3    you believe that, but you don't ever mention it to any of

4    your friends in the industry?

5    A.    What is the need to?  They mention it to me.

6    Q.    All right.  Let's take a look at Exhibit 207.  This is

7    an e-mail, Calisha Anderson to Ryan Monahan, 11-10, '16,

8    7:05 p.m.  That is up at the top where my cursor is.

9          Do you see that?

10   A.    Ryan's name, yes.

11   Q.    Then if we go down a little bit, November 10, 2016,

12   Ryan Monahan is sending an e-mail from the Achieve Agency I

13   guess to Ms. Anderson.  He says I want you to be uber

14   successful because then we all are.  I am just recommending

15   we work as a team and so on and so forth.

16         Do you see that?

17   A.    Yes.

18   Q.    If we take a look -- sorry.  That is not what I meant

19   to do.  If we go down to the bottom we can see that e-mail

20   was produced by GhostBed.

21         Do you see that?

22   A.    Yes.

23   Q.    By the way, are you familiar with the control number

24   that identifies the party that produces a document?

25   A.    No.
```

196

1    Q.   Let's go back to the spreadsheet, Exhibit 195-A.

2         Sir, earlier I was asking you about this column here

3    which says I like chief brand officer.  What do you think we

4    should call Ashley?  Am I accurate that you can't tell me

5    one way or another whether that is a real e-mail that was

6    actually sent?  You don't know; is that right?

7    A.   I don't recall.

8    Q.   Let's go down to the e-mail directly below it, right

9    below it.  If we look at the date it is 11-10-16, 6:33 p.m.,

10   and if we look over in the summary it says I want you to be

11   uber successful because then we all are.  I am just

12   recommending that we work as a team, as that is the only way

13   to transfer knowledge.

14        That is the same language that we saw in this e-mail

15   that was actually produced by GhostBed, isn't it?

16   A.   That yellow highlighted copy is in that spreadsheet.

17   Q.   Yes.  Does that indicate to you that in any way maybe

18   this spreadsheet actually tracks e-mails that go through the

19   Achieve e-mail system?

20   A.   Not at all.

21   Q.   All right.

22             MR. MAGLEBY:  No further questions.

23             Mr. Horwitz, anything further from you?

24             MR. HORWITZ:  No, Your Honor.

25             THE COURT:  May this witness be excused?

```
 1              MR. MAGLEBY:  Again, Your Honor, never say never.
 2    I don't anticipate calling him back, but I may.
 3              THE COURT:  Mr. Werner, we have one more witness
 4    on the main program and I think you're probably finished,
 5    but there is a possibility that you might be re-called.
 6    We're going to ask you to stick around.  Your attorney can
 7    help you understand what that is all about.  You can leave
 8    the courtroom now.
 9              Thank you.
10              THE WITNESS:  Thank you, sir.
11              THE COURT:  Ms. Anderson, is she ready to go?
12              MR. MAGLEBY:  I believe they are out in the hall.
13    I can go look.
14              THE COURT:  Let's take five minutes while you get
15    her in here and then we'll begin with her.
16              I forgot.  I consulted with Ed and my people, but
17    I didn't tell you that we decided to just forge on through.
18              MR. MAGLEBY:  I guessed --
19              THE COURT:  Give me your estimate.  How much time
20    do you think you'll be with Ms. Anderson?
21              MR. HORWITZ:  Somewhere between an hour and an
22    hour and a half.  Not long.
23              THE COURT:  Well, that is long.  When we get
24    started, it is going to be a quarter to 2:00.  I am going to
25    ask you to be done by a quarter to 3:00.  That will be one
```

```
1    hour on cross-examination.
2              Court is in recess for five minutes.
3              (Recess)
4              THE COURT:  Is Ms. Anderson in the room?
5              Please come forward and be sworn in as a witness
6    in this hearing.  Thank you.
7                       CALISHA ANDERSON
8              Having been duly sworn, was examined
9                   and testified as follows:
10             MR. STRASSBERG:  Just one thing before she begins.
11   I am Evan Strassberg.  I am counsel for this witness.
12             THE COURT:  Thank you.
13             MR. MAGLEBY:  Your Honor, where would you like Mr.
14   Strassberg?  Should I move?
15             THE COURT:  Wherever he would like to sit.  Inside
16   of the jury box?  Okay.
17             Mr. Horwitz, anytime you are ready to proceed, you
18   may begin.
19             THE WITNESS:  C-a-l-i-s-h-a, A-n-d-e-r-s-o-n.
20                     CROSS-EXAMINATION
21   BY MR. HORWITZ
22   Q.  Good afternoon, Ms. Anderson.
23       I am going to show you Exhibit 750 which is your
24   declaration that you filed in this case.  Is that the
25   declaration that you filed in this case?
```

```
 1   A.   Yes, sir.

 2   Q.   Now, in paragraph five it says that I was to report

 3   directly to Marc Werner.  However, I quickly learned that

 4   Ryan Monahan was the one who oversaw marketing.

 5        Do you see that?

 6   A.   Yes, sir.

 7   Q.   How quickly did you learn that?

 8   A.   Well, I learned who Ryan was and got an impression of

 9   what his influence was probably within the first two or

10   three days.  It took probably a couple of weeks before I got

11   the real gravity of it.

12   Q.   In paragraph six it says immediately after I was hired

13   my co-workers told me that someone named Ryan, who worked

14   off-site, was in charge of GhostBed's marketing.

15   A.   Yes.

16   Q.   Do you see that?

17   A.   Yes.

18   Q.   And immediately is the same thing, within two or three

19   days?

20   A.   I would say relatively, yes, within two or three days

21   of me being hired.  Yes.

22   Q.   If you look at paragraph nine it says, in fact, it

23   became immediately apparent to me after I started that Ryan

24   controlled every aspect of GhostBed's marketing.  This

25   continued up until the day I resigned.
```

```
1    A.    Yes, sir.

2    Q.    That is your declaration?

3    A.    Yes, sir.

4    Q.    And that is correct?

5    A.    Yes, sir.

6    Q.    Did Mr. Monahan have responsibility for all aspects of

7    marketing or for social media?

8    A.    That is kind of a layered question.  Can you define

9    responsibility?

10   Q.    Well, you were talking about that he oversaw marketing,

11   was in charge of GhostBed's marketing, controlled every

12   aspect of GhostBed's marketing --

13   A.    So I would say that the word is not really

14   responsibility.  It is really authority.  He had authority

15   over the marketing.

16   Q.    Over all aspects of marketing?

17   A.    Yes.  So if you broke down the different branches of

18   the marketing between the social media and the website and

19   Amazon -- social media, website, Amazon and search engine

20   optimization, those were the primary areas -- the primary

21   channels that marketing was distributed, and Ryan was the

22   authoritative figure in all of them except for perhaps

23   Amazon.

24   Q.    I'm trying to understand.  Was he responsible, was he

25   the authority on all aspects of the marketing or was he
```

1    working only in some of them?

2    A.    Some of them.  The majority.

3    Q.    The majority of them?

4    A.    Yes.  But marketing is not necessarily something that

5    you can compartmentalize, because even if you're not

6    involved necessarily in the day-to-day aspects of the Amazon

7    marketing, if you are overseeing the brand and the creative,

8    you may not necessarily be making strategic decisions but

9    you are providing the creative for it.

10        Ryan may not have been making the strategic decisions

11   as far as like how much money to spend and where to put it,

12   but he was providing the creative.  So in that way he had

13   his hands in all aspects, but it was just on different

14   levels.

15   Q.    I'm trying to understand.  Did he have his hands in all

16   aspects or did he control all aspects of marketing?

17   A.    He had his hands in all aspects and controlled I would

18   say nearly all.  Marc Werner made the final decision about

19   like finance and spend, as far as how much money to spend,

20   but the way that the money was spent is what Ryan

21   controlled.

22   Q.    And that is true for all aspects of marketing?

23   A.    I would say with the exception of Amazon, yes.

24   Q.    I'm going to show you what has been marked as Exhibit

25   703, which we have seen before.  You have it.  It is this

```
 1   document here.
 2   A.    Uh-huh.
 3   Q.    Did you create that document?
 4   A.    I did.
 5   Q.    Did you create it around February of 2017?
 6   A.    I don't know if it was February.  I know that it was
 7   after the Purple lawsuit was announced.  That is when I was
 8   asked to create this document.  I don't know if that was
 9   February.  It seems like that was a little bit more into
10   March.
11   Q.    But it was well after you first got there?
12   A.    Yes.
13   Q.    I am sorry.
14   A.    This document is basically a representation of how -- I
15   had used a couple of weeks to try to get the internal team
16   to all work together, and I really saw it as an opportunity
17   to get a little bit more authority in the job that I thought
18   I was supposed to be doing.
19         Once the Purple lawsuit was announced I assumed that
20   Ryan would take a lesser role in things, so I got the
21   internal teams together and I said, okay, we're going to do
22   this.  We started running tests on the website and cleaning
23   things up and trying to do things as an internal team
24   without the outside influence.  I thought it was an
25   opportunity to show Marc, listen, I know what I'm doing.
```

203

1    You have a great team here and we can really do this.  That

2    is what this document reflects.  It is a very short span of

3    time, which was probably three weeks, and during that three

4    weeks is when the internal team took things over.

5    Q.   So the internal team took things over but let's go

6    through it.  Campaigns.  Is Ryan responsible for any of

7    that, the team members?

8    A.   Your question is is he responsible as far as this

9    document and this particular time or was he ever?

10   Q.   Did you list him as being responsible for campaigns?

11   A.   No, I did not.

12   Q.   Okay.  Advertising.  Digital.  Was he responsible for

13   that?

14   A.   So --

15        MR. MAGLEBY:  Objection as to time, Your Honor.  I

16   would like some foundation.

17        THE WITNESS:  The timing of this document is

18   really critical because, like I said, this document reflects

19   the team efforts that resulted from a couple of weeks of us

20   trying to rally up together and take inside influence and

21   inside control over things.

22        Now, the digital line item there -- Ryan was

23   actually only -- he was involved in getting creative for

24   those things, so he would provide the actual graphic design

25   assets for those three things, but it seems like he was not

204

```
 1    available either because he was unresponsive or he was

 2    missing deadlines, and that is when I took it upon myself to

 3    try and work with another vendor to provide that creative.

 4    BY MR. HORWITZ

 5    Q.   Social media was Ryan.  That was his specialty, was it

 6    not?

 7    A.   Yes.

 8    Q.   And page search, that was William's speciality, was it

 9    not?

10    A.   Yes, who was Ryan's partner.

11    Q.   Okay.  Amazon.  He is not listed there at all, is he?

12    A.   No, he is not.

13    Q.   Organic customer engagement and content.  He is listed

14    with parentheses.

15    A.   Yes.  So the content -- he created quite a bit of the

16    content on the website.

17    Q.   I am just asking you whether you listed him as being

18    responsible for it.

19    A.   Yes.

20    Q.   Okay.  But only in parentheses?

21    A.   In parentheses because I kind of saw it as a best case

22    scenario.  I think this document was really more of like a

23    vision.  Yes, this is what we have done over the last couple

24    of weeks, but this is where I see that the team could and

25    should go.
```

1    Q.    And then we see him again in the marketing e-mail?

2    A.    Yes.  My name is not there.

3    Q.    Right.  If you look, your name is almost throughout

4    this document as responsible team members?

5    A.    Well, ideally it should have been.  I was the director

6    of marketing and that is the impression that I was given

7    that my job was.  Like I said, over those couple of weeks I

8    really seized that opportunity to be the director, but it

9    was a very short-lived thing.

10   Q.    Let's look at Exhibit 763.

11         This is November of 2016?

12   A.    Uh-huh.

13   Q.    Was that far enough along after you had been hired so

14   that you're now well aware that Ryan controls all aspects of

15   marketing?

16   A.    I had been working there for about a month, and in that

17   time it was made very clear to me that, yes, I would not

18   make any progress or my voice would not be heard if Ryan

19   didn't have buy in.  Yes, that was clear.

20   Q.    Let's look at page 2 of that.  This is an e-mail from

21   you at the bottom.

22   A.    Okay.

23   Q.    So Ryan Monahan is listed only on one issue, is he not?

24   A.    Which one?  You said the e-mail at the bottom?

25   Q.    Make note that next Thursday the following drafts are

206

```
 1    due for discussion.  One, social ad words, ideas presented

 2    at team meeting.

 3         He is not listed there, is he?

 4    A.   I am sorry.  I don't see where -- can you point to

 5    where you are talking about?

 6    Q.   If you look at page 2, the e-mail from you, November 4

 7    at 4:50 p.m.

 8              MR. MAGLEBY:  It is the third page.

 9              THE WITNESS:  It is the third page.

10              MR. HORWITZ:  I'm sorry.

11    BY MR. HORWITZ

12    Q.   Make note that next Thursday the following drafts are

13    due for discussion.  First is social and ad words, ideas

14    presented at team meeting.

15         He is not responsible for that?  He is not listed as

16    being responsible for that, is he?

17    Q.   Well, if we go back to this other exhibit, the ad words

18    was William's responsibility, and it was really just kind of

19    a given that anything that had to do with social or ad

20    words, since they were included on the e-mail, they knew

21    that that was their deliverable.

22    Q.   But he is not listed here as it being his deliverable,

23    is he?

24    A.   No.

25    Q.   E-mail blasts, creative drafts due, present at team
```

207

```
 1    meeting.  He is not listed there as being responsible for

 2    that?

 3    A.    No.

 4    Q.    Correct?

 5          E-mail strategy and lead nurturing due, Ryan Monahan.

 6          So he is responsible for that?

 7    A.    Yes.  So he --

 8    Q.    Landing page draft due, present at team meeting.

 9          He is not listed as being responsible for that?

10    A.    No.

11    Q.    And press release draft due, he is not listed as being

12    responsible for that, is he?

13    A.    No, he is not.

14    Q.    Sorry?

15    A.    No, he is not.

16    Q.    Okay.  I'm going to show you Exhibit 764.

17    A.    If I may just say that the strategy --

18    Q.    There is not a question pending.

19    A.    Sorry.

20    Q.    That is an e-mail from Gergeianne Brown to a number of

21    people including yourself?

22    A.    Yes.

23    Q.    It is dated January 14, 2017?

24    A.    Yes.

25    Q.    That is well after you say you were made aware that
```

1    Ryan controlled everything?

2    A.   Yes.

3    Q.   Let's look down I think to the third paragraph, all

4    creative projects would be coordinated by Cynthia.

5         Do you see that?

6    A.   Yes.

7    Q.   And the good news is Ryan, as part of the Achieve team,

8    can ensure brand continuity.

9    A.   Yes.

10   Q.   He is not the team leader, is he?  He does not

11   coordinate things, does he?

12   A.   Lead or coordinate?

13   Q.   Either one.

14   A.   According to this, no.

15   Q.   Now, I refer you to Exhibit 765.  These are a series of

16   text messages between you and Cynthia Howland?

17   A.   Yes.

18   Q.   And Cynthia Howland is who?

19   A.   I'm not really sure what her title was, but she was

20   part of the Achieve team.

21   Q.   She was the team leader of the Achieve team, was she

22   not?

23   A.   Well, Georgianne Brown was the C.M.O., so I perceived

24   her as having the highest, most authoritative title.  I

25   would think Cynthia was more of a coordinator.

```
 1   Q.   Let's look at the second page.  This is dated 10-18 of

 2   2016, right?

 3   A.   Okay.

 4   Q.   Look at the second page.  At 3:43 p.m. you say, and

 5   from Marc I almost got verbatim that he wanted me to be his

 6   eyes and ears for all things marketing.  Then you say I am

 7   pretty confident in saying that he wants me to be the hub

 8   and have my hands in all things.

 9   A.   Yes.

10   Q.   And Cynthia later on responds, that was exactly my

11   understanding.

12        Is this where everybody is telling you and was Cynthia

13   Howland telling you that Ryan is in charge of everything?

14   A.   I don't --

15   Q.   Is this one of the ways that you learned that Ryan was

16   in charge of everything?

17   A.   No.

18   Q.   Let's go to Exhibit 766.  This is a series of e-mails

19   from Georgianne Brown to a number of people including

20   yourself, correct?

21   A.   Yes, sir.

22   Q.   And if you look at page 2, she is calling a meeting,

23   correct?

24   A.   Yes, sir.

25   Q.   This is dated January of 2017, correct?
```

1   A.   Yes, sir.

2   Q.   Well after you have been made aware that Ryan is in

3   charge of everything relating to marketing, right?

4   A.   Yes, sir.

5   Q.   Okay.  Look at the meeting and it says Ryan Monahan

6   optional.

7        Do you see that?

8   A.   I do.

9   Q.   So he is optional at a marketing meeting when he is in

10  charge of everything?

11  A.   That is what this says.

12  Q.   Let's look at Exhibit 767.  This is in May of 2017.

13  This is an e-mail from you to Marc Werner and other people?

14  A.   Yes.

15  Q.   And that   [REDACTED],   that is your personal

16  e-mail?

17  A.   Yes.

18  Q.   Now, if you look at the third paragraph, as the only

19  director level person in the company who reports to you,

20  perhaps an additional layer would provide more constant

21  oversight, right?

22  A.   Yes, sir.

23  Q.   But Ryan Monahan was in charge of all marketing, so he

24  was an additional layer over you and he controlled

25  everything related to marketing.

```
1              Why did you need an additional layer?

2    A.    Could I elaborate?

3    Q.    Well, was he an additional layer?  Was he responsible

4    for all of the marketing and was telling you what to do?

5    A.    You're asking me to elaborate?

6    Q.    I am asking you whether he was an additional layer on

7    top of you, responsible for all of marketing?

8    A.    Yes.

9    Q.    But, nevertheless, you're saying as the only director

10   level person -- reports to you.  The to you is Marc Werner?

11   A.    Yes, sir.

12   Q.    An additional layer would have been Mr. Monahan if he

13   was in charge of all marketing, correct?

14   A.    That is kind of a complicated question and I am not

15   sure how to --

16   Q.    An additional layer is somebody who you report to who

17   then reports to Marc, and you said that Mr. Monahan

18   controlled all aspects of marketing.

19   A.    Yes.

20   Q.    And you had to pass everything by him, correct?

21              MR. MAGLEBY:  Your Honor, I would like Mr. Horwitz

22   to give the witness the courtesy of letting her finish her

23   answers.

24              MR. HORWITZ:  Your Honor, I am --

25              THE WITNESS:  I just wasn't sure if this is
```

```
1   something I should elaborate on or give a yes or no answer.
2   BY MR. HORWITZ
3   Q.   Give a yes or no answer.  Was there an additional layer
4   of Mr. Monahan who you had to pass all marketing decisions
5   through?
6   A.   So elaborate?
7   Q.   No.  Yes or no, was there an additional layer of Mr.
8   Monahan --
9   A.   Yes, sir.
10  Q.   Okay.  Thank you.
11       I am going to ask you to look at Exhibit 768.  This is
12  an e-mail from you to Marc Werner and Alan Hirschhorn,
13  correct?
14  A.   Yes, sir.
15  Q.   And this is January 9 of 2017?
16  A.   Yes, sir.
17  Q.   If you look at the third paragraph it says, if I -- and
18  that is you, right?
19  A.   Yes.
20  Q.   -- may make a recommendation, I would like to focus on
21  the plans to optimize the spend on Google and Facebook.
22       Do you see that?
23  A.   Yes.
24  Q.   All other aspects of the marketing are now being
25  handled in-house.
```

```
 1          Do you see that?
 2    A.    Yes, sir.
 3    Q.    I'm sorry?
 4    A.    Yes, sir.
 5    Q.    Okay.  So this is January prior to what you described
 6    as the litigation with Purple, right?
 7    A.    Yes, sir.
 8    Q.    So this is prior to you trying to reorganize as you
 9    described in Exhibit 703, right?
10    A.    I don't know that we finalized what the date of this
11    was, because I can't recall what the date of this was.
12    Q.    You said it was after the litigation with Purple began,
13    correct?
14    A.    It seems like that is what I remember, yes, sir.
15    Q.    Campaigns.  Is everybody listed there in-house?
16    A.    Yes, sir.
17    Q.    And then digital and social and Facebook -- let's go
18    down to the website.  Other than Ryan in parentheses, is
19    everybody there in-house?
20    A.    Yes, sir.
21    Q.    Let's go down to Amazon advertising.  Is everybody
22    there in-house?
23    A.    Yes, sir.
24    Q.    And then marketing and e-mail and you have Ryan there,
25    but other than that, is everybody there listed in-house?
```

```
1    A.   Yes, sir.

2    Q.   So in January of 2017 you say that you had taken

3    everything except Google and Facebook in-house, and within a

4    month or two after that you list what everybody is doing and

5    it is all in-house people except for a couple of special

6    items of Facebook and social and Ryan on e-mail.

7         So when you said that you took it all in-house, you

8    were responsible for all of it, weren't you?

9    A.   I am sorry.  I wasn't --

10   Q.   Was Ryan Monahan in-house?

11   A.   No, he was not.

12   Q.   So when you say that you took it in-house, you meant

13   you.  You were the director of marketing at the time, were

14   you not?

15   A.   That was my title.

16   Q.   You were in-house, were you not?

17   A.   Yes, sir, I was.

18   Q.   And the other people listed in here are all in-house?

19   A.   Yes, sir.

20   Q.   But you say despite that you had taken it in-house,

21   Ryan, who was not in-house, controlled everything at this

22   time, right?  That is what your declaration says?

23   A.   He had a great deal of influence over every aspect,

24   yes.

25   Q.   I didn't ask you whether he had a great deal of
```

```
 1    influence.  I asked you whether in your declaration you said
 2    not that he had influence -- let's look directly at what
 3    your declaration said.  Your declaration said, paragraph
 4    nine, in fact, it became immediately apparent to me after I
 5    started that Ryan controlled every aspect of GhostBed's
 6    marketing and this continued up until the day I resigned.
 7    A.    Yes, sir.
 8    Q.    Had you resigned at the time that you created this?
 9    A.    No, sir.
10    Q.    Had you resigned at the time that you said that all
11    other aspects other than Facebook and Google were being done
12    in-house?
13    A.    No, sir.
14    Q.    Ryan was not in-house at this time, was he?
15    A.    No, sir.
16    Q.    He was not in-house at any time, was he?
17    A.    Can you define in-house, please?
18    Q.    Was he employed by GhostBed?
19    A.    Employed in what way?
20    Q.    Employed in any definition.  Was he being paid a salary
21    by GhostBed?  Was he an employee?  Do you understand what
22    that means?
23    A.    Well, because --
24          MR. MAGLEBY:  Your Honor, there are three
25    questions there.  It is compound and argumentative.
```

```
 1            MR. HORWITZ:  Let me start over.

 2            THE COURT:  You are getting a tad argumentative

 3   and a bit badgering.

 4            MR. HORWITZ:  I apologize.

 5            THE COURT:  A little more courtesy might be nice.

 6   BY MR. HORWITZ

 7   Q.   When it says all other aspects of marketing are now

 8   being handled in-house, you meant Ryan Monahan as in-house?

 9   A.   I think that the caveat to that question is that

10   Facebook and Google were 75 percent of the marketing, and

11   that a lot of the other things, you know, with Amazon being

12   the other 25 percent as far as like the spend and the amount

13   of effort that was needed.

14        A lot of the other things were like creative, you know,

15   making ads and graphic designs.  Did Ryan have a physical

16   location at GhostBed?  No.  He came periodically for

17   meetings.  Was he an employee as far as being on salary?  I

18   am not the H.R. person and I am not accounts payable.  I

19   would have to say no, he was not.  Was his influence at a

20   level where I felt like he was constantly in control over

21   everything?  I would have to say yes.

22   Q.   Okay.  So all other aspects of marketing are now being

23   handled in-house, but you are saying that is just a really

24   small piece of the marketing?  Is that what you're saying?

25   A.   Yes.
```

1    Q.    When we look at the list, what percentage did the

2    holiday sales campaign comprise of marketing?

3    A.    Well, that was probably just like a four-week promotion

4    or something, so like that was a temporary promotion.  It

5    was not something that was ongoing.  The same with

6    promotional campaigns.  They were just like sporadic things

7    that happened throughout the year.

8    Q.    Did they comprise a significant portion of sales?

9    A.    The sales came through Facebook and Google, so --

10   Q.    I'm asking whether these comprised, however they came

11   in, did the efforts in the holiday sales campaign and

12   promotional campaign comprise a significant amount of the

13   sales of GhostBed?

14   A.    I mean, that is like asking me to compare did three

15   week of sales comprise a significant amount compared to the

16   other 48 weeks of sales.  I am not really sure how to answer

17   that as far as like scale.  What I will say is that any

18   retail company does definitely depend on holidays and

19   seasonality to see like a bump in sales.

20   Q.    And promotional campaigns to see a bump in sales?

21   A.    Depending on seasonality, yes.

22   Q.    And digital for a bump in sales?

23   A.    The digital campaigns were never really a big priority

24   for Marc.  They were definitely not a large portion of the

25   spend or the revenue.  Much of the digital campaigns were

1    seen more for like branding and exposure.  I think of it as

2    like an online billboard almost.

3    Q.   So an online billboard, that shouldn't be a significant

4    part of the sales efforts?

5    A.   Of the sales revenue or sales efforts?

6    Q.   Either one.

7    A.   They are different things.  I would say that the

8    digital campaigns were not a large portion of the sales

9    revenue, as far as those specific digital campaigns listed

10   there on that line item.  That is all retargeting, et

11   cetera.  The bulk, and I mean 75 percent of the revenue,

12   came from Facebook and Google AdWords.

13   Q.   And so the Amazon advertising --

14   A.   Was about 25 percent.

15   Q.   Was about 25 percent?

16   A.   24 percent.  Those other little things, they did not

17   have a huge influence.

18   Q.   Branding did not have a huge influence?

19   A.   Branding actually does not make sales.  Branding is

20   just about a consistent voice and how you represent your

21   product to the public.

22   Q.   Your e-mail here to Mr. Werner is a little bit

23   deceptive.  All other aspects of marketing are now being

24   handled in-house.  That was just a very small piece of it

25   you were talking about?

```
 1    A.    So in the marketing world, if you were to

 2    compartmentalize these different sections here, there are

 3    the ones that make the money and then there are the ones

 4    that are essentially creative.  If you read between the

 5    lines of what did make money here and what was also

 6    continuous, because a lot of campaigns, like I said, were

 7    sporadic, and the campaigns intersected with the digital

 8    ads, and the digital ads intersected with the website, so

 9    like all of this is very intertwined.

10         What it was that we took in-house was some of the

11    creative so that the deadlines could be met and some of the

12    edits on the website.

13    Q.    In other words, when you say other than Google and

14    Facebook all other aspects of marketing are being done

15    in-house, it is just a little bit of creative, a little bit

16    of this and a little bit of that and it is nothing much, and

17    that is what this e-mail says?

18    A.    Yes, sir.

19    Q.    Okay.  Let's go on to paragraph 10 of your declaration.

20    In my attempts to clarify my position at the company I met

21    with Marc's wife, Donna, who oversaw human resources, at

22    least twice asking for a clarified job description with

23    delineated roles.  Donna told me point-blank that I could

24    never have succeeded at my job because Ryan was doing all of

25    the marketing duties and they wanted him to continue to do
```

```
 1    them.
 2    A.   Verbatim, yes, sir.
 3    Q.   That is verbatim?
 4    A.   Yes.
 5    Q.   Exhibit 769.  This is an e-mail from you to somebody at
 6    Mr. Magleby's firm?
 7    A.   Yes, sir.
 8    Q.   Yes.  What you point out to him is that the earlier
 9    draft of your declaration does not have paragraph 10 about
10    your meetings with Marc's wife Donna.
11    A.   Yes.
12    Q.   And you wanted that added?
13    A.   Yes, sir.
14    Q.   Let's look at Exhibit 770.  First of all, this is
15    February 21?
16    A.   Yes, sir.
17    Q.   This is well after you were told that Ryan controlled
18    all aspects of marketing?
19    A.   Well after I was told?  I said in my declaration that I
20    got the impression and that it was clear to me, but I didn't
21    say anyone said that until my meeting with Donna.  That is
22    actually when it was verbally told to me was this meeting
23    with Donna.
24    Q.   Well, look at paragraph six of your declaration.
25    Immediately after I was hired, my co-workers told me that
```

1   someone named Ryan, who worked off-site, was in charge of

2   GhostBed's marketing.

3   A.   So when your coworker tells you something and when your

4   coworker says casually, oh, you may not want to do that

5   because Ryan is doing that, you know, you kind of take it

6   with a grain of salt because your title is director.  That

7   is obviously something that you're going to be able to find

8   a work around or work with this person, but when the owner's

9   wife tells you, who is also the director of human resources,

10  that Ryan is doing the digital work and they want him to do

11  the digital work, you take it a little bit differently.

12  Q.   Okay.  In paragraph 8, the second sentence, in fact,

13  Ashley Werner, Marc Werner's daughter, told me that Ryan was

14  the real director of marketing.  Somebody told you that he

15  was in charge of marketing, did they not?

16  A.   Yes.  I think at that point I definitely did not know

17  Ashley's position either.  That conversation was probably in

18  my first two weeks of starting.  I was under the impression

19  that she was just -- her only role was responding to

20  comments on Facebook, and I knew that she was very close to

21  Ryan.

22       When she said to me -- when I asked her like what am I

23  supposed to do if there is something that he is doing that I

24  don't agree with or that I think could be done better, who

25  do I talk to about it?  She was like, oh, he is fine.  Just

```
1    let him roll with it.  I said, okay.  So Ryan is the real
2    director of marketing?  At that point I was kind of being
3    facetious.  I was kind of joking.  She said, yeah, very
4    casually.
5        I didn't really know how to take that at that point.
6    It kind of threw me for a loop.  Again, I didn't understand
7    really what role Ashley was playing.
8    Q.   When we started what this question was about was you
9    said nobody told me, I just learned about it, and now two
10   sets of people tell you, coworkers told you and --
11   A.   Yes, they did.
12   Q.   -- Ashley Werner told you?
13   A.   Yes.
14   Q.   So people did tell you that?
15   A.   Yes.
16   Q.   And Donna Werner told you that?
17   A.   Donna Werner told me.  She looked at my job
18   description.  There is no way you could have succeeded in
19   this role.  Ryan is performing these duties and we want him
20   to perform these duties.
21   Q.   Let's look at Exhibit 770, dated February 21, 2017,
22   well after you're aware that Ryan Monahan controlled all
23   aspects of marketing, right?
24   A.   That was actually the purpose of this meeting, yes.
25   Q.   Right.  It says, dear Donna, thank you for taking time
```

```
 1    to meet with me yesterday.  I woke up feeling refreshed and
 2    reassured that I can and will be successful at Nature's
 3    Sleep.  This is the e-mail you sent her after she tells you
 4    that you can't be successful?
 5    A.   Because she followed it up with a -- let me go and talk
 6    to some folks and let's come up with a plan.  So even if her
 7    answer was let's come up with a plan, to me that was an
 8    opportunity.  I saw it as, okay, if he is going to be in
 9    charge of that, just give me another lane to drive in and I
10    will own it.  That is why I said, in that second to the last
11    paragraph, the one detail that I'm headstrong on addressing
12    is the delineation of roles.
13    Q.   Let's go back to what you said in your declaration.
14    A.   Yes, sir.
15    Q.   In my attempts to clarify my position at the company, I
16    met with Marc's wife Donna, who oversaw human resources at
17    least twice asking for a clarified job description with
18    delineated roles.  Donna told me point-blank that I could
19    never succeed at my job because Ryan was doing all the
20    marketing duties and they wanted him to continue to do them.
21    After meeting with her you send her a letter saying that you
22    woke up refreshed, that now you know you can succeed at your
23    job.
24         Is that correct?
25    A.   Yes, sir, because she said let's develop a plan.
```

224

```
1    Q.   She told you point-blank that you could never succeed
2    at your job, but let's develop a plan?
3    A.   Yes, sir.
4    Q.   Thank you for taking the time.  I woke up feeling
5    refreshed and reassured that I can and will be successful at
6    Nature's Sleep.
7    A.   Yes, sir.
8    Q.   All that because she said you can never succeed at your
9    job, but we'll try a plan?
10   A.   No.  All of that because I had been with the company
11   for five months and that was the first time that anyone had
12   even addressed what I was going through.  Marc just
13   completely ignored me.  It was the first time that anyone
14   finally said let's figure out what your role is.  So I felt
15   like if she was serious about developing a plan that I could
16   be okay.
17   Q.   Let's go back to Exhibit 765.  This is a text message
18   between you and --
19   A.   I am sorry.  Do I have that?
20   Q.   Yes, you do.
21   A.   Okay.
22   Q.   It is the text message.
23   A.   Yes, sir.  I have it.
24   Q.   Look at the last page.  From Marc I got almost verbatim
25   that he wanted me to be his eyes and ears in all things
```

1    marketing.  I am pretty confident in saying that he wants me

2    to be the hub and have my hands in all things.

3         So you say Marc never addressed what he wanted you to

4    do, and that meeting with Donna was the first time that you

5    had an understanding of what was being required of you?

6    A.   Meeting with Donna was the first time that I felt like

7    anyone was going to help me understand what was required of

8    me.  This messaging back and forth with Cynthia was about

9    four days after I was hired.

10   Q.   Cynthia Howland is saying that she was the coordinator

11   and the team leader for the group at Achieve and she is

12   saying that that was exactly my understanding?

13   A.   Yes, because I am asking her the question and I said

14   shouldn't the director of marketing be involved in

15   everything?  I didn't understand why I was being excluded

16   from so much.

17   Q.   Well, after the first couple of days you were being

18   excluded from so much?  This is October 18th.

19   A.   Yes, sir.

20   Q.   What you said before was that nobody delineated your

21   role.  How much more of a delineation could Marc have said?

22   You got almost verbatim that he wanted you to be his eyes

23   and ears of all things marketing, and I am pretty confident

24   saying that he wants me to be the hub and have my hands in

25   all things, and the head of the Achieve group that Ryan

226

1    reported to says that was exactly my understanding.

2    A.    Cynthia was not the head of the Achieve group.  She was

3    more of a coordinator.  I don't think that she ever really

4    had a strong understanding of what -- she said that is what

5    her impression was.  I don't see that as a definitive answer

6    from her, but she was definitely not a lead in that group.

7    Q.    Does she say that was my impression or that was my

8    understanding?

9    A.    She said that was my understanding.

10   Q.    Okay.  Thank you.

11         Let's look at paragraph 11 of your declaration.  For

12   example, Ryan managed and controlled every aspect of the

13   GhostBed website from before the time I was hired until the

14   day that I left GhostBed.  I assume that he still does.

15         Do you see that?

16   A.    Yes, sir.

17   Q.    That is true?

18   A.    Yes, sir.

19   Q.    Let's look at Exhibit 773.

20         That is an e-mail exchange between you and Marc Werner

21   and Ashley Werner, right?

22   A.    Yes.

23   Q.    And you are talking about the website?

24   A.    Yes, sir.

25   Q.    If you look at the e-mail, the first e-mail, the one at

1    the bottom --

2    A.    That is the first e-mail that is included on this

3    paper, but there is a lot of conversation missing from this

4    e-mail chain.

5    Q.    Okay.  If you look at the second page, it says but the

6    approval process -- that is the approval process for the

7    website?

8    A.    Yes, sir.

9    Q.    -- starts and ends with the director of marketing.

10         That is you?

11   A.    Yes, sir.

12   Q.    Then Marc Werner responds by saying I decide what

13   happens to the website?

14   A.    Yes, sir.

15   Q.    It does not say Ryan decides, does it?

16   A.    The e-mail that is not included in this does say that,

17   from Ashley.

18   Q.    Is Ashley the president of the company?

19   A.    No, sir, she is not.

20   Q.    Marc is the president of the company?

21   A.    Yes sir.

22   Q.    Marc says to you I decide what happens to the website?

23   A.    Yes, sir.

24   Q.    He does not say that Ryan does?

25   A.    Absolutely.

1   Q.   And then you respond clearly and absolutely and any

2   decision we implement internally directly involves you

3   through me?

4   A.   Yes, sir.

5   Q.   It doesn't say through Ryan, does it?

6   A.   No, sir.

7   Q.   And it does not say that we have to check with Ryan

8   before we do anything, does it?

9   A.   The piece that is missing from -- no, it does not say

10  that.

11  Q.   Now, if you look at paragraph 13 of your declaration it

12  says, for example, Ryan posted the GhostBed blog post about

13  the terrible incident concerning a GhostBed employee who was

14  injured because of domestic violence.

15       Do you see that?

16  A.   Yes, sir.

17  Q.   When was that posted?

18  A.   I don't recall.

19  Q.   In fact, it was posted before you came to the company,

20  wasn't it?

21  A.   I don't recall.  I know that the incident occurred just

22  a few days before I started, but I'm not sure if the blog

23  post was done within a couple of days, a couple of days

24  after.  I don't recall.

25  Q.   You have no personal knowledge who created that post,

1    do you?

2    A.    Through what employees told me.

3    Q.    Through what employees told you?

4    A.    Yes.

5    Q.    But you have no personal knowledge of who created that

6    post?

7    A.    Meaning did I see him create it or did I ask him to

8    create it?  No, I did not.

9    Q.    Did he ever tell you he created it?

10   A.    You know, I don't recall.  I think I may have had a

11   conversation with him about it, but I don't think it went

12   into much detail and it is not a memory that I probably

13   would have gone out of my way to retain.

14   Q.    In fact, wasn't it created by her prior employer?

15   A.    I know nothing about that, sir.

16   Q.    Wasn't it created and then Marc made some word changes

17   and added a picture?

18   A.    I know nothing about that, sir.  I know that there was

19   a blog post and that there was the GoFundMe account.  I know

20   that one of them and -- the employee who works on the

21   website told me that Ryan did that.

22   Q.    The information that you had was that Ryan wrote that?

23   A.    That Ryan posted one of those things about Heilyn being

24   injured, yes.

25   Q.    Let's look at paragraph 21 of your declaration.

230

```
1    A.    Yes, sir.
2    Q.    Ryan would often go over to Marc Werner's house for
3    dinner.
4          How do you know that?
5    A.    Marc would tell me.
6    Q.    Marc would tell you?
7    A.    Yeah.  He would say Ryan was over for dinner.
8    Q.    He would tell you that.  Paragraph 22 says I suspect
9    that Ryan is being paid under the table by GhostBed.
10         You suspect?  You have no knowledge of that?
11   A.    No knowledge, sir.
12   Q.    But it didn't stop you from putting it in a declaration
13   that you suspect it?
14   A.    I guess that is why it says suspect.
15   Q.    Right.  But you were putting everything in this
16   declaration that you could possibly think of to damage
17   GhostBed, didn't you?
18   A.    To damage?  No.  I think it was more just sharing my
19   story and what I observed.
20   Q.    Well, let's look at your declaration.  Can you point
21   out any place in your declaration where you say you know or
22   you suspect that Mr. Werner or GhostBed are involved or
23   behind or arranged for the posting of anything on Honest
24   Mattress Reviews?
25   A.    I actually was not asked to comment on that.
```

```
1    Q.   I didn't ask what you were asked to comment on.  Does

2    anything in your declaration say anything about GhostBed's

3    relationship with Honest Mattress Reviews?

4    A.   No, sir.

5    Q.   Now, you are aware that GhostBed had confidential

6    information, are you not?

7    A.   Actually, I'm sorry, there is something here in

8    reference to Honest Mattress Reviews, paragraph 38.

9    Q.   28?

10   A.   38.

11   Q.   38.

12   A.   And 39 and 40 and 41 and that whole page.

13   Q.   38.  I read the declaration that Marc Werner filed in

14   this case which is attached.  That relates to Honest

15   Mattress Reviews?

16   A.   Yes, sir.

17   Q.   Okay.  Many of the statements in Marc's declaration

18   were false.  That is Honest Mattress Reviews?

19   A.   Yes, sir.

20   Q.   It says GhostBed does not have any affiliation

21   whatsoever with defendant Mr. Monahan.  You say that is not

22   true.  That has to do with Honest Mattress Reviews?

23   A.   With Ryan being associated with or the creator of

24   Honest Mattress Reviews, yes.

25   Q.   Okay.  So the fact that they have a close relationship
```

1    means that he is involved in every aspect of what Ryan does?

2    A.   Can you rephrase that?

3    Q.   No.  We can go on.

4         You were responsible for ensuring that confidential

5    information of GhostBed was not disclosed, were you not?

6    A.   Responsible in what way, sir?

7    Q.   You were responsible for ensuring in any way that

8    confidential information of GhostBed wasn't revealed; is

9    that correct?

10   A.   I never signed anything saying that.  I don't know what

11   would be defined as me being responsible for it.

12   Q.   I am going to show you Exhibit 754.

13        This is a nondisclosure agreement signed by you, if you

14   look at the last page.

15             MR. MAGLEBY:  Is there a copy for us?

16             MR. HORWITZ:  Yes, sir.

17             THE WITNESS:  Yes.  This is an N.D.A. that was

18   sent to an outside S.E.O. consultant, Rich Bernstein.

19   BY MR. HORWITZ

20   Q.   You were responsible for making sure that Rich

21   Bernstein was aware and signed an agreement that certain

22   information was confidential, right?

23   A.   For making sure that Rich Bernstein was aware of that,

24   yes, Marc did give me the authority to sign this document.

25   Q.   You were certainly aware that there was such

233

1   confidential information, were you not?

2   A.   Yes, sir.

3   Q.   And you were aware that there was a handbook that you

4   acknowledge reading that talked about how such confidential

5   information should not be brought home, right?

6   A.   No, sir.  I am not aware of that.

7   Q.   No?

8   A.   At least I don't remember what the specifics of the

9   handbook said.

10  Q.   Let's look at Exhibit 752.

11       MR. MAGLEBY:  Your Honor, again, I have tried not

12  to interrupt and it is cross, but with regard to the

13  specific issue of Mr. Monahan's ties to GhostBed, I don't

14  see how it is relevant.  If they want to do this in a

15  different context, great, but this is not discovery for --

16       MR. HORWITZ:  Your Honor, this directly relates to

17  the credibility of the witness, where the witness takes

18  confidential information, highly confidential information

19  and applies for jobs elsewhere in the mattress industry.

20       THE COURT:  Do you have her on such an agreement?

21       MR. HORWITZ:  Yes, Your Honor.

22       THE COURT:  Really?

23       MR. HORWITZ:  Yes, the GhostBed employee handbook

24  that she acknowledged, and the --

25       THE COURT:  But on an agreement like this one, a

```
 1   nondisclosure agreement?
 2           MR. SPERLEIN:  Not with that, Your Honor, but with
 3   the employee handbook that she acknowledged reading and
 4   agreeing to.
 5           THE COURT:  I understand what you're trying to do.
 6   I'm sustaining the objection.  It is beyond the scope of
 7   this hearing.
 8   BY MR. HORWITZ
 9   Q.   You called Purple's lawyers, did you not?
10   A.   No, I did not.
11   Q.   You did not?
12   A.   Not that I recall.
13   Q.   Okay.  That is a declaration by Christine Greenwood, an
14   attorney in this case for Purple.
15   A.   Yes, sir.
16   Q.   If you look at paragraph 7 it says shortly after my
17   discussion with Mr. Oglesby.  Who is Mr. Oglesby?
18   A.   He is an attorney who is also my uncle.
19   Q.   I had a phone conversation with Ms. Anderson.
20   A.   Yes, sir.
21   Q.   So you did speak to Purple's attorneys?
22   A.   I can't remember if I called -- you asked me did I call
23   them.  I can't remember if I called them or if they called
24   me.  I can't recall.
25   Q.   Okay.  Let's look at Exhibit 783.
```

```
 1          MR. MAGLEBY:  Your Honor, again, objection, beyond

 2   the scope of the hearing.

 3          THE COURT:  Well, I will overrule that.  Let's

 4   hear what he asks.  I assume Mr. Horwitz is saying it goes

 5   to bias or something like that.

 6          Right?

 7          MR. HORWITZ:  Yes, Your Honor.

 8          THE COURT:  If I had had the nondisclosure

 9   agreement, I might have let the last one go.  This is a

10   little closer.  Let me hear your next question, please.

11   BY MR. HORWITZ

12   Q.   That is the phone record, so you did call her?

13          THE COURT:  You have asked that question.  Neither

14   one of them could remember.

15          MR. HORWITZ:  Yes, but there is the phone record

16   showing that Ms. Anderson made the call.

17          THE COURT:  Well, that is you testifying now.

18   BY MR. SPERLEIN

19   Q.   I am asking this witness is that your phone number?

20   A.   This is my phone number, but the column here says to

21   and from, so I can't tell if that is saying I made the phone

22   call or the phone call came in to me.

23   Q.   Okay.  Looking at paragraph 7 of Ms. Greenwood's

24   declaration --

25   A.   Okay.
```

```
1   Q.    -- we briefly discussed the fact that Ms. Anderson was

2   employed by GhostBed, that she was looking for a new job and

3   was interested in working with Purple, and that she had

4   information that might be relevant to the lawsuit, and that

5   she did not want to talk about or reveal the information

6   until she had left GhostBed.

7   A.    Yes.

8   Q.    Do you see that?

9   A.    Yes, sir.

10  Q.    Is that an accurate representation of what you said?

11  A.    Yes, sir.

12  Q.    So what you said to them is I'm looking for a job and I

13  can help you with a lawsuit, but not until you hire me?

14  A.    No, not at all.  The word help definitely never came

15  out of my mouth.  It was more like I am going to be a free

16  agent soon.  I am a very hungry professional and I would

17  like to join your company.  I want to say absolutely that I

18  have been indirectly involved in this case, and it disturbs

19  me, and I don't want to say anything about it.

20        Yes, I said I had been indirectly involved, meaning,

21  yeah, I had seen a lot and I have heard a lot, but I don't

22  want to discuss it.  I did the same thing when I reached out

23  to other competitors asking if they were hiring.  I said I

24  will not discuss GhostBed.

25  Q.    This says I have something relevant to the lawsuit.
```

```
 1   You're dangling in front of them that you have information
 2   that will be helpful once I leave and I need a new job in
 3   order to leave.
 4        Isn't that what this says?
 5   A.   Absolutely not.
 6   Q.   Now, if you look at Exhibit 786, this is an e-mail you
 7   sent to Purple on May 30, 2017?
 8   A.   Yes, sir.
 9   Q.   And the phone call you had was on May 17th, right?
10   A.   Yes, sir.
11   Q.   So on May 17 you called the lawyers in the lawsuit and
12   said, would Purple be interested in hiring me?  And not
13   until 13 days later did you actually send an e-mail to
14   Purple?
15   A.   Like I said, I can't remember if I called them or if
16   they called me.  I had my uncle reach out to them.  I waited
17   a couple of days at the advice of counsel to submit my
18   resume to Savannah.
19   Q.   Are you in the habit of applying for jobs at companies
20   by giving a call to their attorneys?
21   A.   I wanted the attorneys to know that I had honest
22   intentions, that I was not trying to -- I was not trying to
23   like spy or anything crazy like that.  I wanted them to
24   know, look, listen, I am just a professional looking for a
25   place to land.
```

1   Q.   So you thought it appropriate to apply for a job by

2   speaking to attorneys?

3   A.   I did not apply for a job.

4   Q.   You said that you were looking for a job.

5   A.   I didn't apply with them.  I didn't apply with the

6   attorneys.  I reached out directly to the communications

7   director at Purple, who I figured would be a good person to

8   assess my potential fit in the company.

9   Q.   But that was later.  Why did you first call the

10  attorneys if not to dangle in front of them the fact that

11  you could help them in the litigation?

12  A.   It was definitely not to dangle.  If it were to dangle,

13  then I would have offered information up and I never did,

14  not to anyone, not to any competitor and I never would have,

15  ever.

16  Q.   Let me understand you correctly.  You said to them that

17  I want to leave GhostBed.  I need another job.  I have

18  relevant information that I can't tell you until I have

19  another job.

20  A.   I did not say I can't tell you.  I didn't say I can't

21  tell you in terms of I am going to hold it close until you

22  hire me or don't hire me.  I made it very clear to my uncle

23  that I was leaving GhostBed.  Not might.  No, it was

24  happening.  That I was applying to several places, many of

25  whom were not even in this industry, and if it happened that

1    Purple saw me to be a good fit to come and work for their

2    company, that would have been awesome.

3        If they didn't, listen, here is who I am and I know

4    that I'm going to be deposed, because Marc and Ryan both put

5    my name in their depositions with false statements and they

6    brought me into this.  I know I'm going to be deposed.  One

7    way or another if I am going to be called to get involved in

8    this case, it might as well be to tell the truth.

9    Q.   So you're saying here -- Ms. Greenwood says we briefly

10   discussed that fact that Ms. Anderson was employed by

11   GhostBed.

12       That is correct, right?

13   A.   Yes.

14   Q.   That she was looking for a new job and was interested

15   in working with Purple.

16       That is correct?

17   A.   Yes, sir.

18   Q.   That she had information that might be relevant to the

19   lawsuit.

20       That is correct?

21   A.   Yes, sir.

22   Q.   And that she did not want to talk about or reveal the

23   information until she had left GhostBed and secured a new

24   job.

25       That is correct?

```
 1   A.   Yes, sir.

 2   Q.   That is correct?

 3   A.   Yes, sir.

 4   Q.   In other words, what you were saying is that I have got

 5   good stuff, and as soon as I leave GhostBed I can tell you,

 6   and I need a new job in order to leave GhostBed.  Isn't that

 7   what you were saying?

 8   A.   My moral compass would never even allow that thought to

 9   come into my head.  I think that this is a case of maybe

10   some missed punctuation, maybe a few periods or a few

11   paragraphs missing, because it wasn't a streamed

12   conversation where it was like I am looking for a job and I

13   have got information.  It was not like that.  It was more

14   like if I do happen to go to work for Purple, that would be

15   great, but there are other people out there who want me as

16   well.  I made that very clear.

17        I was talking to another competitor and that should be

18   in the evidence as well, and I made it clear to that

19   competitor that I will not discuss GhostBed.

20   Q.   The reason you called the lawyers -- with the other

21   competitor, did you call their lawyers?

22   A.   I did not call -- I do not recall if I called any

23   lawyers or if they called me.

24   Q.   No.  I'm asking with the other competitor did you deal

25   with lawyers or did you deal with the company?
```

```
 1   A.   The other competitor didn't have a pending lawsuit.

 2   Q.   I didn't ask that.  I asked whether you spoke to the

 3   company or you spoke to the lawyers?

 4   A.   I sent an e-mail via LinkedIn to a representative at

 5   the company.

 6   Q.   But here you spoke to lawyers saying I got information

 7   that is relevant.  I can't talk about it until I leave.

 8   Please give me a job at Purple.

 9        Right?

10   A.   Not at all, sir.

11   Q.   That is not what it says?

12             THE COURT:  This has been asked and answered.

13             MR. HORWITZ:  I'm fine, Your Honor.

14             THE COURT:  You're past your hour.

15             MR. HORWITZ:  I have a little bit more with some

16   leeway.

17             THE COURT:  I will give you some leeway, but not

18   when you ask the same question probably eight times.

19             MR. HORWITZ:  Okay.

20   BY MR. HORWITZ

21   Q.   Exhibit 788.

22        Before we get to that, you have your counsel here,

23   right?

24   A.   Yes, sir.

25   Q.   Who is paying for the counsel?
```

```
1    A.   I am not.

2    Q.   You are not?

3    A.   No, sir.

4    Q.   You don't know who is?

5    A.   I understand that Purple is.

6    Q.   Going to Exhibit 788, is this a letter from your lawyer

7    to Nature's Sleep?

8    A.   Yes, sir.

9    Q.   If you look at paragraph --

10   A.   Not him, though.  This was something different.

11   Q.   I understand.  But this is another lawyer representing

12   you?

13   A.   It was an employment lawyer that I reached out to in

14   seek of counsel, yes.

15   Q.   In paragraph four it says in light of Nature's conduct,

16   Ms. Anderson is seeking the following:  A fair and

17   reasonable settlement for back wages, future wages,

18   non-pecuniary damages, benefits and attorneys' fees and

19   costs and a positive letter of recommendation.

20        That is what you were looking for?

21   A.   Yes, sir.

22   Q.   When you left GhostBed did you get other employment?

23   A.   Eventually, yes.

24   Q.   How long were you out of work?

25   A.   How long was I out of work?
```

```
 1    Q.    Yes.

 2    A.    A week, maybe.

 3    Q.    A week?

 4    A.    Around a week.

 5    Q.    When you say eventually it took a week?

 6    A.    I had been in search of employment, but I had a week

 7    because -- no, it was probably a little bit closer to two

 8    weeks, because when I gave my two weeks' notice, Marc

 9    basically kicked me out of the building, so I had two weeks.

10    Q.    You had a job lined up before you left GhostBed?

11    A.    I had a prospect.  I had several prospects.

12    Q.    Let's look at Exhibit 789.

13          This is an e-mail from your attorney?

14    A.    I never saw this e-mail, but it would appear to be so,

15    yeah.

16    Q.    And it is to GhostBed's attorney?

17    A.    I would assume so.  I am not familiar with that name.

18    Q.    Did you authorize your attorney to ask for a settlement

19    of $25,000?

20          MR. MAGLEBY:  Your Honor, I don't know, and she is

21    not my client, but that is privileged.

22          MR. HORWITZ:  No, Your Honor.  This is a letter,

23    and I didn't ask whether she was advised --

24          THE COURT:  Overruled.

25          MR. HORWITZ:  -- I asked whether it was
```

```
 1   authorized --
 2              THE COURT:  Overruled.
 3              That is privileged.  Sustained.
 4              MR. HORWITZ:  Your Honor, I think facts are not
 5   privileged.  Whether she was advised to do it or not advised
 6   to do it is one thing, but --
 7              THE COURT:  That is what I thought your question
 8   was.
 9              MR. HORWITZ:  No.  My question was whether she
10   authorized him to make this offer of settlement.
11              THE COURT:  How does that not reach into the
12   communication between herself and her attorney?
13              MR. HORWITZ:  Because it is a factual issue.  It
14   is not an advice issue.
15              THE COURT:  Thank you for that lecture.
16              Sustained.
17              MR. HORWITZ:  Thank you.
18   BY MR. SPERLEIN
19   Q.   You were asking for $25,000 from GhostBed?
20   A.   I reached out in a letter strictly because Marc Werner
21   threatened me on my last day, and I did not know how a girl
22   like me was going to fight a millionaire like him, when he
23   made it very clear that if any little thing happened he
24   didn't like, he would come after me without mercy.
25   Q.   So --
```

1   A.   I reached out to a lawyer and I asked that lawyer to

2   help me see if there were any employment laws, anything that

3   would help me have some insulation and some protection.

4   Whether or not I got involved with the Purple case, I was

5   scared of him.

6   Q.   In other words, you were afraid of what he would do so

7   you demanded $25,000 from him?

8   A.   I am not going to say I demanded anything, sir.

9   Q.   Your attorney demanded $25,000 as a way of insulating

10  you from him?

11  A.   You know, I felt like I was completely misled in this

12  whole thing.  I felt like I was treated horribly.  I just

13  thought, you know what, maybe there is something out there,

14  some kind of employment law that covers the damage that this

15  has done to my life.

16  Q.   And calling up Purple's attorneys and saying I have

17  relevant information, why don't you hire me, was a way of --

18  A.   Completely unrelated instances.

19  Q.   Unrelated?

20  A.   I was not trying to insulate myself with Purple at all.

21  I called this attorney because he is an employment attorney,

22  and I know enough about my mental knowledge of the law to

23  know that that is a very specific area, especially in an at

24  will state, but I just assumed that from the way that they

25  treated me, that there might be something out there for me

1   to get those eight or nine months of my life back because it

2   was horrible.

3   Q.   It was so horrible that you had to reach out and get

4   back at them by helping Purple?

5   A.   You know, I didn't want to get back at anyone.  I still

6   don't want to get back at anyone.  I am not even here

7   today -- I didn't leave my family in the face of a hurricane

8   to get back at anyone.  I am just here to tell the truth.

9   Q.   You're here to tell the truth, but you initiated the

10   contact with Purple, did you not?

11   A.   Because Marc threatened me, and I knew that no matter

12   what, I needed to find some way to have legal

13   representation, not insulation regarding my experience, but

14   just to make sure that they couldn't bring me into this

15   lawsuit.  I reached out to Purple because initially, hey,

16   I'm on the market.  I am smart and educated.  I am going to

17   be available.

18      I wanted to speak to the lawyers because I wanted them

19   to know that I was not an unscrupulous person just because I

20   was coming from an unscrupulous place.  I have honest

21   intentions.

22   Q.   So Marc threatened you you say the last day that you

23   were there?

24   A.   When I turned in my two weeks' notice, Marc called me

25   into his office and he said if anything about this company

```
1    appears anywhere, including your resume, I will come after
2    you litigiously and without mercy.  I said, sir, I know
3    enough about you at this point to know that.  You don't have
4    to threaten me.
5    Q.   In order to protect yourself, a couple months before
6    that you contacted Purple?  The fact that you --
7    A.   That had nothing to do with protection.  That was
8    transparency.
9    Q.   That was transparency?
10   A.   Yes, sir.
11   Q.   You were volunteering to help somebody while you were
12   working for GhostBed?
13   A.   No, sir.  I wouldn't say that I was volunteering to
14   help anyone.
15   Q.   You said to them I have relevant information.  Were you
16   working for GhostBed at the time that you called them and
17   said I have relevant information?
18   A.   I will not confirm -- I cannot recall if I called them
19   or if --
20              THE COURT:  Sustained.
21              MR. MAGLEBY:  Objection.
22              MR. HORWITZ:  No further questions, Your Honor.
23              THE COURT:  Thank you.
24              Mr. Magleby.
25              Could I ask, are you planning to ask any
```

```
 1   questions?

 2            MR. SPERLEIN:  No, Your Honor.  Thank you.

 3            THE COURT:  Okay.  How long do you expect to be?

 4            MR. MAGLEBY:  15 minutes.

 5            THE COURT:  Well, then let's just go ahead.

 6            MR. MAGLEBY:  All right.

 7                      REDIRECT EXAMINATION

 8   BY MR. MAGLEBY

 9   Q.   Was one reason that you reached out to Purple was

10   because you got your hands on a declaration signed by Marc

11   Werner?

12   A.   Yes, that had my name in it and it freaked me out.

13   Q.   Did you also get a copy of a declaration signed by Ryan

14   Monahan?

15   A.   Yes, sir.  Same response.

16   Q.   Did Mr. Werner or Mr. Monahan ever tell you that they

17   were going to put your name in a declaration?

18   A.   No.

19   Q.   Were you upset?

20   A.   I was scared.  I am scared.

21   Q.   Why were you scared?

22   A.   Because I had been working for these people for a

23   certain amount of time and I wasn't treated very well, so to

24   think that I was involved with people with that low level of

25   like ethical conduct, that they would treat me that way, to
```

```
1    be a smoke screen for what Ryan was doing and then put my

2    name in the declaration to make themselves look innocent,

3    like what kind of people am I dealing with here?

4    Q.   Was one of your concerns that because your name was in

5    those documents that Purple might think you were

6    cooperating?

7    A.   Absolutely.  Absolutely.  You know, there was no way,

8    shape or form that I could ever be implicated with Honest

9    Mattress Reviews.  I didn't even know about it until I saw

10   the lawsuit papers.  But by putting my name in there and by

11   being the director of marketing, I am like, oh my God, what

12   if they do try to throw me under the bus.

13   Q.   Was one reason you reached out to our firm was because

14   that you were worried that if you applied at Purple and your

15   name had been in that declaration, that Purple would think

16   that --

17   A.   That they would never consider --

18            MR. SPERLEIN:  Objection, Your Honor, leading.

19            THE COURT:  It is leading and it is your witness.

20   Try not to lead quite so much.

21            MR. MAGLEBY:  I will try not to lead.

22   BY MR. MAGLEBY

23   Q.   Tell us again why you reached out to the lawyers before

24   you sent a resume to Purple.

25   A.   I felt like having my name in that declaration was kind
```

1    of like damaging what my potential reputation could be

2    anywhere.  You know, if you Google my name right now that

3    declaration P.D.F. comes up with my name in it.  In this

4    world you have got your reputation, and it scared me into

5    thinking if I do apply at Purple and here my name is in this

6    declaration, or if I apply anywhere else, you know, people

7    are going to see that and think I was involved in this.  It

8    is just not the case.

9    Q.   Was Purple paying for your counsel something that we

10   offered to do?

11   A.   I certainly didn't ask.

12   Q.   Would you change your testimony because we offered to

13   pay for your counsel in Utah?

14   A.   No, sir.

15   Q.   By the way, did Purple ever give you a job?

16   A.   No, they did not.  The chain of communication -- I sent

17   my resume to Savannah, who was the director of

18   communications, and she connected me with H.R.  I tried on

19   multiple occasions to follow up with H.R. but it never

20   really came to fruition.  I was not willing to pick my

21   family up and move to Utah, and it seemed like they were not

22   really interested in having remote workers, which is

23   definitely a risk I was totally prepared for.

24   Q.   So you got a job somewhere else?

25   A.   I did.

251

```
 1   Q.   All right.  Take a look at Exhibit 773 that Mr. Horwitz
 2   showed you.
 3   A.   Yes, sir.
 4   Q.   I think you indicated there maybe were other e-mails
 5   that you were not shown?
 6   A.   This conversation chain -- yes.  So this conversation
 7   chain was actually quite long.  Yes, there is a lot missing
 8   from here.
 9   Q.   While you were working at GhostBed, did you from time
10   to time try to assert your control as the director of
11   marketing?
12   A.   I wouldn't say it was control.  I tried to assert my
13   potential, because I thought that that was the role that I
14   thought I was hired to do.  It was not trying to assert
15   control.  It was more to demonstrate my ability and to ask
16   for the authority that I thought I was hired to hold and be
17   responsible for.
18   Q.   How did that work out?
19   A.   Every single time I was told Ryan knows what he is
20   doing.  Leave him alone.  Whether it was pointing out
21   grammatical errors or deadlines being missed by like several
22   weeks, or things that I found to be unethical or borderline
23   harassing in some of the marketing strategies, I would go to
24   Marc or Ashley or Georgi or Alan, and I would go to anyone
25   that I felt like had a voice of influence or a direct line
```

1    to Ryan and I would say we need to talk about this.  You

2    know, I understand that Ryan is very good when it comes to

3    the digital stuff, but some of these foundational marketing

4    things, they are just really way off.  Every single time I

5    did that, I was told to stay in my place and Ryan knows what

6    he is doing.  That was the response from everyone.

7    Q.    So in some of the e-mails Mr. Horwitz showed you, is

8    that you trying to assert your potential?

9    A.    Yes.  Absolutely.

10   Q.    Did it work?

11   A.    Not at all.  I was trying to show Marc, listen, you

12   have got a great director, you have a good in-house guy that

13   can do some of the web stuff, and we just hired a developer

14   and, like, we can form a team around this.

15   Q.    All right.

16   A.    He got very upset with me.  He would pull me in his

17   office and berate me for like an hour.  It was not fun.

18   Q.    You were shown Exhibit 703 which is a spreadsheet I

19   think you put together with duties or roles.

20         Do you have that?

21   A.    Yes, I do.  You know what, the more that I think about

22   that spreadsheet, Alan Hirschhorn was the one that asked me

23   to do that spreadsheet and he asked me to design it in a

24   best case scenario.  He said list all of the marketing

25   activities that are being performed or what all the

1    different fields would be and how you see them playing out

2    best case scenario.

3         So that list was, well, Alan, funny that you say that.

4    We have been taking a couple of weeks to mobilize the

5    internal team and getting everyone moving forward on one

6    accord and this is the direction I see it going.  I think it

7    has a lot of potential and we can do this.

8    Q.    Were you excited that you were finally going to be able

9    to do your job?

10   A.    I thought I was going to be able to, yes.  I was

11   thrilled.

12   Q.    So is what is listed on that an accurate depiction of

13   what really happened?

14   A.    What really happened like throughout or after this?

15   Q.    After that.

16   A.    Well, after this document, like I said, I can't

17   remember the exact timing of what was done here and when

18   this was done, but after this document, it wasn't much

19   longer after that that my name was kind of removed.   In

20   theory my name was removed from quite a few things.   You

21   know, some things here -- I think it is also important to

22   point out that some things here I was making

23   recommendations, like the surveys and the research at the

24   very bottom.  I have a master's degree in research.  It is

25   my foundation for all things marketing.  I was suggesting

1    these things to be done to Marc and he did not see any value

2    in the research.  He didn't see any value in the things that

3    were my skill set, which he was very aware of on my resume.

4    Everything just really became focused on Facebook and

5    Google.  Facebook and Google was 75 percent of the business

6    like I said before.

7         Does that answer your question?

8    Q.   Yes.  Who was in charge of that?

9    A.   Ryan and William.

10   Q.   I think you may have said something, but I don't want

11   to put words in your mouth, but when you first looked at

12   this document, you said, well, this came about because there

13   was discussion maybe along the lines of reducing Ryan's

14   role.

15        Did I get that wrong?

16   A.   Okay.  There was an e-mail that the gentleman

17   presented, and I have defined it here, but it was an e-mail

18   from Georgianne, and, yeah, what brought that e-mail about

19   was Ryan habitually missed deadlines.  In marketing timing

20   is life, especially when it comes to like promotions and

21   holidays and things like that.  He would habitually miss

22   deadlines and we would not have the creative that we needed.

23        I went out and I started to work with Anne Marie, who

24   is on here as Brandy, down there at the bottom, and she is

25   under partners.  I went out and I started to work with Anne

```
 1    Marie who had worked with GhostBed on the periphery and I
 2    tried to bring her more involved.  Once I did that, the
 3    Achieve team -- they didn't seem too happy that they were
 4    not doing all of the creative.  They were still doing a big
 5    chunk of it but not all of it.
 6    Q.   All right.  Let me have you look at a couple of
 7    exhibits quickly.  Let me have you look at Exhibit 207.  It
 8    is going to show up on the screen.  A hard copy is in front
 9    of you in the binder if you want to look at it.  In the
10    interest of time I am just going to go to page 6 here.
11         This is an e-mail from you to Mr. Monahan, November 10,
12    2016.  Ryan, I think it comes off that I am challenging you
13    without merit.  If so, I apologize.  That is not my intent.
14    Obviously you're the man and this is your show.
15         What is going on here?
16    A.   I could totally understand if Ryan was territorial
17    about the GhostBed brand.  I could totally understand if he
18    felt like it was his baby, something that he gave birth to,
19    and he didn't want to relinquish any of the control and that
20    is why I got so much resistance.  So I finally, and this is
21    less then a month after I started, I finally just said,
22    listen, dude, this is your show.  I just want to help.  Can
23    I get involved?
24    Q.   Are you trying to work it out with him?
25    A.   I was trying.
```

1    Q.    How did that go?

2    A.    Not good.

3    Q.    All right.  Let me have you look at the first page of

4    Exhibit 229, December of 2016, and Mr. Monahan says to you,

5    update language, for graphics always come straight to me.

6    A.    Yes.

7    Q.    In other words -- well, what is going on here?

8    A.    Well, like with Anne Marie, when he decided he was

9    going to be late, or if he was late or even if he was on

10   time, there would be serious grammatical errors and no time

11   for revisions.  You know, if you have got a deadline with a

12   vendor and you need to get creative to them by 3:00 on

13   Tuesday or you're going to miss your Black Friday promotion,

14   4:30 on Tuesday does not cut it.

15           Furthermore, the director of marketing needs to see it

16   maybe the previous Friday or Monday to go through the

17   revision process.  That never happened.  It was always last

18   minute and then something was wrong with it.  Even after

19   like two months, and especially going through like the

20   holiday season, I was like if I don't have to deal with this

21   I'm not going to.  Let me try to bring in Anne Marie to do

22   some of the graphics.  That was his response.  Come straight

23   to me.

24   Q.    So it didn't work out?

25   A.    No.

1    Q.    Your respon, Ryan, I work for Marc Werner and I am the

2    director of marketing.  When the time comes I know how to

3    reach you.  Thank you.

4         Again, were you trying to do your job?

5    A.    Yes.

6    Q.    How did this work out?

7    A.    Not well.

8    Q.    Let's go to Exhibit 233.  I think it is the second

9    page.  Ashley Werner, February 16, 2017.  I agree that these

10   changes should not be happening without Ryan's knowledge and

11   approval.

12        Is that the e-mail that you were thinking about earlier

13   that --

14   A.    Absolutely.

15   Q.    -- Mr. Horwitz didn't show you?

16   A.    Absolutely.

17            THE COURT:  Now you're leading all over the place.

18   I think we are just covering ground that is in the

19   declaration or very closely related.  You don't have to

20   cover everything he covered if it is already, in fairness,

21   addressed in her declaration.

22            MR. MAGLEBY:  Well, let me try and you can tell me

23   if I need to be quiet, Your Honor.

24   BY MR. MAGLEBY

25   Q.    February 24, 2017, an e-mail from you to Donna, and you

1    start out by saying Marc is very upset with me.  I want to

2    go to the end of it.  You close with I cannot lose this job

3    under these terms.  My marriage and my family would not

4    survive.  I will be the employee that Nature's Sleep needs,

5    end of story.

6         Why were you telling this to Donna?

7    A.   Because this was after that e-mail where Ashley said

8    that everything should be approved on the website, and when

9    I said that my response was that as the director of

10   marketing I approve everything, and I didn't say that I was

11   the end all, be all, or El Jefe.  I just said that the

12   approval process starts and ends with the director of

13   marketing.

14        Marc got so angry with me -- I mean, I was in his

15   office for an hour and a half under a very personal attack

16   about -- he accused me of being a dictator, he said that I

17   wasn't being a team player, and that's the consistent

18   narrative that they tried to enforce is that I wasn't being

19   a team player.  Really the definition of being a team player

20   meant me being sort of -- subservient to Ryan, and this is

21   kind of the point when I realized that.

22   Q.   Okay.

23             MR. MAGLEBY:  Two more, Your Honor, and I am done.

24   BY MR. MAGLEBY

25   Q.   This is an e-mail dated March 16, 2017.  You write

1    there is no need for me to attend the weekly P.P.P. calls or

2    marketing on-site discussions.  My title will remain the

3    same until another solution is figured out.  However, I now

4    fully recognize that it is figurative.

5        What did you mean my title is figurative?

6    A.   This was at least my fourth attempt to get my job -- my

7    job and my role clarified for me.  From the time that I went

8    and I asked Donna for a plan and she said, look, we'll put

9    together a plan, and I felt so good and then I just never

10   heard from her again.  And so I followed up with her again

11   and I never heard from her again.  It was clearly not a

12   priority.

13       So I said, do you know what, I'm going to devise a

14   solution.  Here is how we can make this work.  I'm just

15   going to remove myself from the digital team.  It was mostly

16   because I realized that even if I was as good a digital

17   marketer as Ryan, anything that I said that was

18   contradictory or challenging of anything that he said, Marc

19   would not agree with.  He would take it very personally.  So

20   anything that I had to do in working with Ryan's team, it

21   automatically put me in a position of not succeeding.

22       I am a tiger.  I'm a competitive person.  I wanted to

23   know what my job was and I wanted to succeed.  I wrote this

24   e-mail and I told Donna, listen, I don't need to deal with

25   the external marketing team.  I don't need to deal with the

1    digital.  Here are the ways that I can be an effective

2    employee of the company and earn my paycheck.

3    Q.    Did this work out?

4    A.    No.

5    Q.    Was it after this that Marc called you into his office

6    or was that before this?

7    A.    That was actually after -- you know, I don't think --

8    Q.    It does not matter.  I withdraw the question.

9          You were asked some questions by Mr. Horwitz regarding

10   your feelings toward GhostBed.  Regardless of your feelings

11   towards GhostBed, would you lie for anybody?

12   A.    Absolutely not.

13   Q.    Has Purple offered you a free mattress to lie in this

14   case?

15   A.    Absolutely not.

16   Q.    Did you get any benefit out of filing that declaration?

17   A.    No, sir.

18   Q.    Are you terrified that you're going to be sued?

19   A.    Absolutely.

20   Q.    Why in the world did you do that?  Why would you come

21   forward knowing that you might be sued?

22   A.    Because at this point it is already -- like once he put

23   my name in that declaration he got me involved, and because

24   of the ethical plain that I operate on, which goes back to

25   me begging them to give me work, like I am sitting here

1    collecting a paycheck, give me something to do.  Let me earn

2    my money.  Let me prove myself.

3         That just goes back to my ethical high ground.  No,

4    once he put my name in that document I knew I was going to

5    get involved one way or another.  Somebody was going to ask

6    me a question and I was going to answer it honestly.  Was I

7    going to answer it honestly while I was an employee at

8    GhostBed and already felt a very contentious environment, or

9    try to take things into my own hands and just tell the truth

10   on different terms?

11             THE COURT:  Aren't you done?

12             MR. MAGLEBY:  Okay.  I'm done.

13             It is not an employment case.  I won't ask that

14   question.

15             THE COURT:  Thank you.

16             Mr. Horwitz, anything further from you, sir?

17             MR. HORWITZ:  A little bit, Your Honor.

18             THE COURT:  Okay.

19                       RECROSS-EXAMINATION

20   BY MR. HORWITZ

21   Q.   I want to bring Exhibit 761 up on the monitor.  You

22   were talking about that you could do it as well as Ryan

23   Monahan could?

24   A.   No, I never said that.

25   Q.   Okay.  But here you're saying what he does is pretty

```
 1   amazing and you are eager to sponge as much as possible.
 2   That was you asserting yourself and trying to be a leader as
 3   the director of marketing?
 4   A.   That was me complimenting Ryan and saying, you know,
 5   when it comes to digital marketing, I realize I could learn
 6   a lot from you and I am happy to do that.
 7   Q.   Let's look at Exhibit 777.
 8        MR. MAGLEBY:  Is there a copy of that for us?
 9        MR. HORWITZ:  Yes.
10   BY MR. HORWITZ
11   Q.   This is what you just saw before, right?
12   A.   Yes, sir.
13   Q.   And Ryan sends you a message, for graphics always come
14   straight to me, the fastest route without any message in
15   between, and, going down, don't hesitate to call me
16   directly.  I am available 24-7.
17        Do you see that?
18   A.   Yes, sir.
19   Q.   And your answer was I work for Marc Werner and I am the
20   director of marketing.  When the time comes I know how to
21   reach you.  Thank you.
22   A.   Yes, sir.
23   Q.   Is that your attempt to work together as a team?
24   A.   The date on this e-mail is December 27th.  The previous
25   conversation is that the creative for the holiday campaign
```

```
1    was due on December 9th and it just simply never came, not

2    that it was a couple weeks late, not that it was a couple

3    days late, it just never came.  I had to shuffle and find

4    somebody to do the holiday campaign, and then without Ryan

5    even apologizing for being late, he comes to me and says for

6    creative always come to me.  Dude, the creative was due from

7    you December 9th and it just never came.

8         At that point I was like I work for Marc and I am going

9    to try and follow Marc's lead on this.

10   Q.   Marc's lead was to be -- I mean to me it is insulting.

11   When the time comes I know how to reach you.  That was

12   Marc's lead?

13   A.   No, that was me saying that.  I don't think that it is

14   insulting for the director of a company who is trying to

15   assume a director role to say that to a person who is

16   assumed to be an outside consultant.  I don't think that

17   that is insulting at all.

18   Q.   It is not insulting to say when the time comes I know

19   how to reach you?

20          MR. MAGLEBY:  Asked and answered.

21   BY MR. HORWITZ

22   Q.   Were you spoken to a number of times by Mrs. Werner and

23   by other people in the company in terms of your

24   interpersonal skills?

25   A.   I think that that is a really good question, because --
```

1   Q.   I just asked the question and the answer is yes or no.

2   A.   No.  No.  The answer is no, but the caveat is very

3   important and I will answer it if you want me to.

4   Q.   So nobody ever said to you that you have got to make

5   more of an effort to get along with other people and that

6   this is a team effort?  Nobody ever said that to you?

7   A.   What Donna said was that she did not think that I was

8   being a team player.  When I asked her for specific

9   instances she couldn't tell me, so I forwarded her all of

10  the conversations with Ryan and I, and I said to her, I said

11  for my own professional development, because I really want

12  to know, how is it that I could have done better here?  I

13  never received a response.

14  Q.   And you never apologized for some things that you said

15  to people, other employees for being --

16  A.   I am not aware of any employee in that building that

17  didn't consider me to be a very professional person, a great

18  teammate and a great person to work with.

19  Q.   Okay.  Now, you talked about your ethics, right?

20  A.   Yes, sir.

21  Q.   You were aware that there was a lot of confidential

22  information that was --

23       MR. MAGLEBY:  Your Honor, irrelevant.

24       MR. HORWITZ:  Your Honor, the witness brought it

25  up in terms of her ethics.  I have the right to explore

1    that.

2              THE COURT:  The objection is sustained.  It is

3    beyond the scope of this hearing.

4              MR. HORWITZ:  Your Honor --

5              THE COURT:  I have ruled.

6              MR. HORWITZ:  Thank you, Your Honor.

7              No further questions.

8              THE COURT:  All right.  Any other questions from

9    you, sir?

10             You can step down.  You are excused as a witness.

11             MR. MAGLEBY:  No.

12             THE COURT:  There is no rebuttal, I take it?

13             MR. SPERLEIN:  No.

14             THE COURT:  All of the witnesses are excused as

15   witnesses.

16             I have pending a motion, and I mentioned earlier

17   GhostBed's short form discovery motion to compel documents,

18   and that motion is denied.  I find nothing irregular or

19   improper done by the law firm of Magleby Cataxinos &

20   Greenwood and no merit, therefore, to the motion or its

21   accompanying request for the award of attorneys' fees.

22             I want to say this before we finish today.  Based

23   on the evidence I have heard at this hearing and the

24   evidence previously submitted in the record, there are

25   several things that I am inclined to do.  I am inclined to

1    grant a preliminary injunction in some degree.  I find that

2    Honest Mattress Reviews is not independent and unbiased as

3    represented to this Court in previous declarations and with

4    great vigor by Mr. Randazza in the past, that we had an

5    independent journalist who was entitled to full protection

6    as an independent journalist with all of the First Amendment

7    rights of journalists.  That was based primarily on the

8    representation of Mr. Monahan running that site in a way

9    that was unassociated in any significant way with GhostBed.

10         I am reading now the declarations of Mr. Werner

11   and Mr. Monahan, and I am not claiming that they were

12   actively trying to mislead the Court, but they in many

13   respects, to say it most diplomatically, failed to address

14   the issue that the Court needed to learn about in order to

15   do its job, and that is to fully illuminate those

16   associations.  I don't quite know how those declarations got

17   worded the way they did.  The Court finds them difficult to

18   reconcile with what the Court has heard from the evidence.

19         This is without regard to Ms. Anderson and just

20   listening to Mr. Werner and Mr. Monahan.  These declarations

21   trouble the Court.  Even the way Mr. Werner, for example,

22   tried to defend his very straightforward statement in

23   paragraph six that GhostBed does not have any affiliation

24   whatsoever with Honest Reviews, L.L.C. or Mr. Monahan, by

25   referring the Court, and Mr. Horwitz did as well in this

1    questioning, to paragraph 12, where the paragraph very

2    obliquely and indirectly refers to Achieve using another

3    entity, Social Media Sharks, to consult an online presence,

4    and then it ends with these sentences, I understand that Mr.

5    Monahan is associated with Social Media Sharks.  It would

6    have been helpful to the Court, let's face it, to explain

7    what that relationship was, that GhostBed was paying through

8    Achieve, Social Media Sharks and Mr. Monahan, who was

9    getting 50 percent of that income on a regular monthly

10   basis.

11         He then gives me what I can only think might be

12   placed in the category of misdirection, and then jumps to I

13   became aware of Mr. Monahan in December of 2015.  I

14   understand that Mr. Monahan also consults for a number of

15   other mattress companies.  This is largely, or at least a

16   predominant reason why I dissolved the original T.R.O.,

17   which on an ex parte basis I found to be quite persuasive.

18   I relied on this.

19         Later in paragraph 21, and it is clever lawyer

20   drafting, I suppose, Mr. Werner says I understand -- this is

21   the Court trying to get helpful information and Mr. Werner

22   in his declaration, which seemed more impressive at the

23   time, in support of GhostBed, coupled with Mr. Randazza's

24   and Mr. Sperlein's vigorous defense that their client was an

25   independent, objective journalist, and paragraph 21 says I

1    understand that Purple claims that GhostBed has a

2    relationship with the honestmattressreviews.com website,

3    because that site rates the GhostBed mattress highly.

4           Then he takes the liberty to say that I would

5    point out that the website also rates nine other mattresses

6    as high as GhostBed.  Then it says I would also point out

7    that GhostBed's sister company, Nature's Sleep, has a

8    mattress rated on the website and that rating is one of the

9    lowest rated mattresses.  So I have a fact witness sort of

10   educating the Court, apparently, and, thus, no inference

11   should be made that there is a relationship between the

12   website and GhostBed.

13          From the information that I have heard today,

14   there is a lot of evidence that I find persuasive of a

15   relationship between that website and GhostBed.  There is no

16   question in my mind about a relationship between Mr.

17   Monahan, who is the only owner of that website, and

18   GhostBed.  The e-mails or communications traffic between Mr.

19   Werner and Mr. Monahan about the question of whether Mr.

20   Monahan should be allowed to designate himself as the chief

21   brand officer at GhostBed I find to be clearly in Purple's

22   favor.

23          I have serious credibility issues with both Mr.

24   Werner and Mr. Monahan in their description of the

25   association between the two.  I find Ms. Anderson's

1    testimony to be quite credible.  I think there was

2    difficulty with her personality and others in the company,

3    and she is clearly a very assertive person to me, but it has

4    not undercut the essence of her declaration.

5         From the previous record that has been

6    represented, it is clear to the Court that the Honest

7    Mattress Reviews website is, under any examination,

8    critical, significantly critical of Purple mattresses.

9    There are some efforts to be more evenhanded, but overall

10   there is no question, in my review of the record, that that

11   website has been highly critical of Purple mattresses.

12        I know there are submissions to suggest that -- I

13   have forgotten his name -- doctor --

14        MR. MAGLEBY:  Dr. Godleski.

15        THE COURT:  -- has some information about

16   polyethylene or whatever it is that might have some effect

17   on someone's respiratory system, and GhostBed is certainly

18   free as a competitor in the industry, I would think, so long

19   as it is lawful and legal, to point that out to the public,

20   but not through a blog site or a website that is not

21   disclosing the connections that exist between that website

22   and GhostBed.

23        So at a minimum I'm inclined to grant a

24   preliminary injunction requiring a full disclosure of the

25   relationship between Mr. Monahan and Mr. Werner and GhostBed

1    as I have summarized briefly here this afternoon.

2         Two other matters.  I guess I would like some

3    briefing and a request from the plaintiff and some response

4    from the defendants.  I don't know quite what to do at this

5    point about restricting Mr. Monahan completely, or, if I

6    don't restrict him in a more complete manner, to restrict

7    him from improper comments on this lawsuit.  That is tricky

8    to draft.  I don't want to unfairly muzzle somebody.

9         I will also request in that submission what other

10   restrictions should be placed on the content of that

11   website, should it appear to be appropriate for Purple.

12        Thank you for indulging a Saturday all-day hearing

13   on this matter.

14        Is there anything else from either side before we

15   take a recess?

16        MR. MAGLEBY:  Your Honor, we would like to get

17   that disclaimer up, and not just on the website but any time

18   there is a YouTube post, social media, Facebook, I mean, he

19   pushes this stuff out on a daily basis 24/7, as he said.  So

20   what I would like to do is submit a proposed disclaimer and

21   proposed order on that aspect of the Court's ruling.  We'll

22   just, rather than try to work it out with the other side,

23   let's face it, we are not going to work it out, so let us

24   submit it and they can respond to it and Your Honor can

25   address it.

Case 2:17-cv-00138-DB   Document 286   Filed 01/31/18   Page 271 of 275
271

```
 1              THE COURT:  I would like to get something out
 2   early next week.
 3              MR. MAGLEBY:  We will submit something to you by
 4   Monday at noon.
 5              THE COURT:  Well, I will look at it.
 6              MR. MAGLEBY:  Let me say Monday at 5:00.
 7              THE COURT:  Close of business Monday and then
 8   let's see where we are.  I don't know how urgent it is, but
 9   I assume it is urgent to the plaintiffs.
10              MR. MAGLEBY:  Very.
11              THE COURT:  Mr. Horwitz or someone said earlier
12   that they thought your sales were going up.  I don't know.
13   What is most discouraging to me is that I feel the Court has
14   been somewhat not fairly -- well, it would have been nice to
15   have more information.  I don't know if we would be at this
16   juncture but for Ms. Anderson coming forward.
17              As I said earlier, without her testimony, what was
18   able to be presented today, just through the examination of
19   Mr. Werner and Mr. Monahan, satisfied the Court that there
20   is a relationship there that has never been fully disclosed
21   and in some ways has been misrepresented.
22              Mr. Horwitz?
23              MR. HORWITZ:  Your Honor, we will be able to get
24   back to you, and if he submits something to you by 5:00 on
25   Monday, we'll be able to get back to you by Tuesday.
```

1          THE COURT:  Tuesday.

2          MR. HORWITZ:  You will have it Wednesday morning

3     when you get in.

4          THE COURT:  Okay.  All right.  Thank you.

5          Have a good rest of the weekend.

6          MR. SPERLEIN:  I am sorry, Your Honor.  I'm a

7     little bit unclear of what you are going to be getting back.

8     Did you say you wanted briefing or are you just looking for

9     statements and how to implement the preliminary injunction?

10         THE COURT:  I am inclined to grant a preliminary

11    injunction.  The exact contours of it I have not fleshed out

12    yet.  I would like a submission from the plaintiff to

13    request what they would like to have in that preliminary

14    injunction.  I would like to give both the defendants a

15    chance, as Mr. Horwitz just mentioned, by the following day

16    to respond to that request.

17         It is basically going to focus on three things, I

18    think a commentary on the lawsuit and a restriction of

19    content, and I don't know how far the plaintiff wants to

20    urge the Court to go in that regard, and that would be

21    content about whether this is cancer causing and that kind

22    of thing.  Then the third thing and the one I'm most

23    educated on after today's hearing is a full disclosure of

24    the relationship between Mr. Monahan and his website and

25    GhostBed and Mr. Werner.

1          MR. SPERLEIN:  So it would be fair to refer to

2    what you are asking for as a proposed order, more or less?

3    That is what we're talking about?

4          THE COURT:  Yes.  I think that is fair.

5          MR. HORWITZ:  Your Honor, I thought that you

6    wanted the disclosure information by Monday, and we'll

7    respond on the disclosure, but then you want briefing on the

8    rest of it?

9          THE COURT:  I would like it all on Monday and then

10   your response by Tuesday.  I think it is high time we did

11   something here.  I might reserve on the latter two, but

12   let's get this started by -- I assume you guys are ready to

13   go with a request?

14         MR. MAGLEBY:  That is easy for me to say.  I work

15   all weekend anyway, but my team is --

16         THE COURT:  Well, make it by Tuesday then, but I

17   want to get it done this next week.

18         MR. HORWITZ:  Your Honor, if they get it to you by

19   Tuesday, and I am out of pocket starting Wednesday for the

20   Jewish holidays, but --

21         MR. MAGLEBY:  We will get it done by Monday, Your

22   Honor.

23         THE COURT:  Monday.  If you can get me something

24   by Tuesday, and if there is a reason to reserve on the

25   content and the lawsuit aspects of it, then I can reserve on

1    that and require immediately there to be a full disclosure

2    of the association by Tuesday.

3              MR. HORWITZ:  What I am suggesting, Your Honor, is

4    that we will address the disclosure by -- they will do it by

5    Monday and we will do it by Tuesday, but that the other

6    issues will follow very quickly but with full briefing.

7              MR. MAGLEBY:  Your Honor, we'll submit all three,

8    and then --

9              THE COURT:  Submit all three and then you seek

10   leave of court to have more time to address the other

11   matters rather than disclosure if you don't have time.

12             MR. HORWITZ:  I would urge Your Honor -- we will

13   seek it now --

14             THE COURT:  Okay.

15             MR. HORWITZ:  -- because I know what is going to

16   happen.  Wednesday I get on a plane to go to my daughter's

17   for the holidays.

18             THE COURT:  I appreciate that, but I am sure there

19   are other attorneys.  Ms. Yost I think could work on it.  I

20   don't know that -- I'm sure that you are quite

21   indispensable, but there may be other people in --

22             MR. HORWITZ:  Your Honor, you are disappointing

23   me.  I would like to believe that I am totally

24   indispensable.

25             THE COURT:  We'll put you under oath and you

1    probably -- he thinks the same thing.

2            MR. HORWITZ:  Your Honor, I have convinced myself

3    of that, whether it is true or not.

4            THE COURT:  Well, I would assume that you all knew

5    what was likely to be coming after this hearing, so I don't

6    know how much more briefing it needs, but it has all been

7    pretty well briefed.

8            I understand.  I will probably give you more time

9    on those other two aspect if you need it.

10           MR. HORWITZ:  I appreciate that.

11           THE COURT:  Okay.

12           We're in recess.

13           (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25