IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| PURPLE INNOVATION, LLC, a Delaware limited liability company,<br><br>     Plaintiff,<br><br>v.<br><br>HONEST REVIEWS, LLC, a Florida Corporation, RYAN MONAHAN, an individual, and GHOSTBED, INC., a Delaware corporation,<br><br>     Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:17-cv-138-DB<br><br>District Judge Dee Benson |

  Before the court is Plaintiff's Motion for Sanctions. (Dkt. No. 229.) In its motion, Plaintiff requests sanctions for Defendants' submission of misleading and false statements to the court in opposing Plaintiff's request for preliminary injunction. Pursuant to civil rule 7-1(f) of the United States District Court for the District of Utah Rules of Practice, the court elects to determine the motion on the basis of the written memoranda and finds that oral argument would not be helpful or necessary. DUCivR 7-1(f).

FACTUAL BACKGROUND

  Plaintiff is a manufacturer of bed-in-a-box mattresses and other bedding products. (Compl.[1] at ¶¶ 19-29.) Plaintiff advertises and sells its products solely through an e-commerce platform, rather than maintaining brick and mortar stores. (*Id.* at ¶ 29.) Because Plaintiff relies strictly on an e-commerce sales strategy, online comment and review websites can have a significant impact on Plaintiff's business. (*Id.* at ¶¶ 38-39.)

---

[1] All references to the Complaint herein refer to the Second Amended Complaint. (Dkt. No. 266.)

In January 2017, a new mattress review website—www.honestmattressreviews.com—owned by Defendant Honest Reviews, LLC ("HMR") and operated by HMR's sole owner, Defendant Ryan Monahan ("Monahan"), began to post reviews of various mattress and bedding products. (*Id.* at ¶¶ 9, 10, 44.) HMR's reviews or "articles" about Plaintiff's products suggested a link between a white powder used on some of Plaintiff's products and cancer-causing agents. (*Id.* at ¶¶ 47, 53-54.) For example, one article compared the powder to a "ground down…plastic mustard container" or "glass coke bottle," which consumers will inhale every night for "eight to ten hours." (*Id.* at ¶ 71.) The article, alluding to Plaintiff's product, also included a video of the "cinnamon challenge," in which people were coughing, gagging, spitting, crying, and choking on cinnamon. (*Id.* at ¶¶ 72-74.) Plaintiff received low marks on the HMR site, including an image of a large red "X," while its competitors, including Defendant GhostBed, Inc. ("GhostBed"), received favorable marks. (*Id.* at ¶ 82.)

The HMR website repeatedly stated that it was not influenced by any mattress company and that it did not receive financial compensation for its reviews. (*Id.* at ¶¶ 155-64.) Some of those statements included that HMR "receives zero affiliate commissions," "does not have any affiliate commission sales relationships with mattress companies," and is "free from corporate or conglomerates…[that] silence or shape editorial narratives and truths." (*Id.* at ¶¶ 158-63.) The site also asserted that the posts on HMR "have total editorial independence" for which "[n]o one has influence." (*Id.* at ¶ 163.) The HMR website also stated that it is not interested in "influencing a purchase decision to promote a company" or in "a few large companies controlling the narrative." (*Id.* at ¶ 164.)

Plaintiff filed its Complaint on February 24, 2017, alleging claims for false advertising and false association under the Lanham Act and Utah common law, tortious interference with economic relations, defamation, trade libel and injurious falsehood, civil conspiracy, and violation of the Utah Truth in Advertising Act. (Compl. at ¶¶ 220-72.) Plaintiff alleged that the statements made about its products, including their connection to cancer-causing agents, are false. (*Id.* at ¶¶ 221-25.) Plaintiff also alleged that the statements on the HMR website regarding its intellectual and financial independence from any mattress company are false, and that Monahan, the sole owner and operator of HMR, was closely affiliated with Plaintiff's direct competitor, GhostBed. (*Id.* at ¶ 168.) Accordingly, Plaintiff concluded that HMR's purported "reviews" were actually commercial advertising and promotion that "materially misrepresented the nature, characteristics, and qualities" of Plaintiff's products, while failing to disclose the close affiliation with its competitor. (*Id.* at ¶¶ 222-23.)

On February 27, 2017, Plaintiff requested an ex parte Temporary Restraining Order to prohibit Defendants from posting false or misleading statements regarding its products. (Dkt. No. 8.) The court originally denied Plaintiff's motion for ex parte relief, holding that the Plaintiff had "failed to meet its burden to show what efforts ha[d] been made to provide notice, why notice should not be required in this case, and whether immediate irreparable injury [would] result before the adverse party [could] be heard in opposition." (Dkt. No. 13.) Following entry of that Order, Plaintiff's attorney submitted an additional declaration outlining multiple efforts made to notify Defendants of the case, including indications that Defendants had received actual notice and that Defendants appeared to be avoiding service of process. (Dkt. No. 14.) Based on this showing, along with Plaintiff's evidence of a strong showing of an affiliation between

Defendants and substantial likelihood of success on the merits, the court entered Plaintiff's requested Temporary Restraining Order on March 2, 2017. (Dkt. No. 16.)

The following day, on March 3, 2017, Plaintiff filed a Motion for Order to Show Cause Why Defendants Should Not Be Held in Contempt. (Dkt. No. 17.) In that Motion, Plaintiff argued that Defendants had failed to comply with the Temporary Restraining Order and had, instead, posted an inflammatory article about the lawsuit on the HMR website. (*Id.*) Defendants opposed the Motion and filed Motions to Dissolve the T.R.O. on March 9, 2017. (Dkt. Nos. 28, 36.) In support of their Motions, Defendants submitted two Declarations, the Declaration of Marc Werner (Dkt. No. 31) and the Declaration of Ryan Monahan. (Dkt. No. 30.)

In his Declaration, Marc Werner, CEO of GhostBed ("Werner"), stated that "GhostBed does not have any affiliation whatsoever with co-defendants Honest Reviews LLC or Mr. Monahan." (Dkt. No. 31 at ¶ 6.) Werner stated that GhostBed does not own, operate, direct, control or contribute to honestmattressreviews.com and that GhostBed "did not, and does not, remunerate Mr. Monahan or Honest Reviews LLC in any way for anything they do in connection with the honestmattressreviews.com website." (*Id.* at ¶ 4-7.) Werner affirmed that "Mr. Monahan is not, and has never been, an employee, director, or officer of GhostBed," (*Id.* at ¶ 11,) and that when Monahan identified himself on Twitter and LinkedIn as "Chief Brand Officer" of GhostBed, he did so "mistakenly." (*Id.* at ¶ 14.) Werner further stated that Monahan is "not a member of GhostBed's marketing department or any other GhostBed department" and does not have an office, phone extension, or email address with GhostBed. (*Id.* at ¶¶ 15-19.) Werner stated that Monahan has "no monetary interest in the success of GhostBed" and "receives no

compensation either directly or indirectly from GhostBed for the content he publishes on honestmattressreviews.com." (*Id.* at ¶ 20.)

Werner acknowledged GhostBed's connection with Monahan in only one paragraph, stating that GhostBed uses Achieve Marketing for branding and marketing consultation services and that "[i]n the past, Achieve used another entity, Social Media Sharks, to consult on online presence issues for its clients, including GhostBed." (*Id.* at ¶ 12.) Werner acknowledged that Social Media Sharks is associated with Monahan, but did not acknowledge any current relationship between GhostBed and Social Media Sharks or GhostBed and Monahan. (*Id.*)

Monahan's Declaration similarly disavowed any significant business relationship between GhostBed and Monahan. Monahan stated that he is the sole member and president of Honest Reviews, LLC, which operates honestmattressreviews.com, and the founder, co-owner, and CEO of Social Media Sharks, a Florida marketing company. (Dkt. No. 30 at ¶¶ 2-3.) Monahan stated that "Defendant GhostBed currently contracts with Achieve Agency to perform social media marketing. Achieve Agency in turn engages Social Media Sharks to provide a portion of those services. Social Media Sharks provides similar services to over twenty-five other companies." (*Id.* at ¶ 6.) Although Monahan admitted that he identified himself as Chief Brand Officer of GhostBed on LinkedIn, Twitter, and at a conference in September 2016, he stated that he did so without GhostBed's knowledge and that GhostBed "scolded [him] for doing so, and insisted that [he] stop." (*Id.* at ¶¶ 7-8.) Monahan also stated that he has never had an office or phone extension with GhostBed. (*Id.* at ¶ 9.)

Monahan similarly disavowed a financial relationship between the Honest Mattress Reviews website and GhostBed. He stated that the website has a single source of income—

Google Adsense—and that Honest Reviews, LLC has never received any consideration from GhostBed, nor has any company, person, or product had any influence over reviews on the HMR website. (*Id.* at ¶¶ 11-13.)

The court held a hearing on the Motions regarding the Temporary Restraining Order on March 14, 2017. At the hearing, counsel for Defendants reiterated the content of the Declarations submitted by their clients. Mr. Randazza, counsel for Monahan, strongly argued that Monahan was an independent journalist entitled to full protection under the First Amendment. Mr. Randazza repeatedly referred to Monahan as a "consumer journalist" and "consumer reporter" (March 14, 2017 Hearing Transcript at 44: 14-15, 23), even asserting that the court did not have authority to find otherwise. (*Id.* at 46-47.) He referred to the HMR site as a "consumer journalist publication just like Consumer Reports[.]" (*Id.* at 44: 15-16.) With respect to the allegation that Monahan was, in fact, closely affiliated with GhostBed, Mr. Randazza stated: "if we believe this entire conspiracy that this whole thing was cooked up back in October to be a shadow marketing campaign for GhostBed, that would require a degree of creativity and just a degree of plotting that even Alexander Dumas could not have imagined when he wrote the Count of Monte Cristo" and stated that "these fantasies are probably best used in fiction." (*Id.* at 46:1-6, 8-11.) Mr. Randazza's coy acknowledgement of a relationship between Monahan and GhostBed was only in passing: "we have a contractor who is a contractor to a contractor and we have no desire to hide that relationship." (*Id.* at 49: 4-6.) Mr. Randazza referred to the alleged close relationship between Monahan and GhostBed as "a very convoluted conspiracy theory that just does not make any sense." (*Id.* at 52: 16-18.)

Counsel for GhostBed, Ms. Yost, similarly indicated that no relevant business relationship existed between Monahan and GhostBed. Ms. Yost referred the court to Werner's Declaration testimony that "GhostBed does not compensate the website owner, which is Honest Reviews, or Mr. Monahan in connection with that website." (*Id.* at 56: 4-6.) Ms. Yost further emphasized: "Neither Honest Reviews nor Mr. Monahan have been compensated by GhostBed to produce this website or any of the content on it. GhostBed has declared under the pains and penalties of perjury that it had absolutely nothing to do with the posts before or after the T.R.O. was entered." (*Id.* at 56: 14-18.) Ms. Yost acknowledged an "attenuated" relationship between Monahan and GhostBed, stating that "Monahan is a marketing consultant and he works for many, many organizations and clients …, including GhostBed[.]" (*Id.* at 57: 3-4.) However, Ms. Yost argued that GhostBed was no different from any of Monahan's other marketing clients and that "two sworn declarations … say that there is no money trail between GhostBed and the website where Purple's harm is happening." (*Id.* at 57: 19-24; 61: 10-12.)

Based on the strong representation from both Werner and Monahan and their lawyers' arguments regarding the absence of a relevant, current business relationship between them, the court dissolved the Temporary Restraining Order. (Dkt. No. 59.)

On May 24, 2017, Plaintiff filed a Motion for Preliminary Injunction, which was based on evidence and a request for relief similar to that in Plaintiff's original Motion for Temporary Restraining Order. (Dkt. No. 115.) Plaintiff did not appear to have sufficient new evidence to support entry of a Preliminary Injunction. However, approximately one month later, on June 28, 2017, Plaintiff submitted a Supplemental Memorandum in support of its Motion, attaching a newly obtained Declaration from GhostBed's former Director of Marketing, Ms. Calisha

Anderson. (Dkt. No. 137.) In that Declaration, Ms. Anderson confirmed the bulk of Plaintiff's suspicions regarding the relationship between Monahan and GhostBed. (*Id.*)

In her Declaration, Ms. Anderson explained that:

- She was employed as Director of Marketing of GhostBed from October 2016 until June 7, 2017. (Dkt. No. 137-1 at ¶ 4.)

- Shortly after beginning her new job, she learned she had "very little actual authority for GhostBed's marketing" and Monahan "was the real 'Director of Marketing.'" (*Id.* at ¶¶ 5, 8.)

- Monahan "controlled every aspect of the GhostBed website from before the time [Ms. Anderson] was hired until the day that [she] left GhostBed." (*Id.* at ¶ 11.)

- Monahan "was on the agenda" for every weekly staff meeting Ms. Anderson attended. (*Id.* at ¶¶ 14, 15.)

- Monahan attended GhostBed staff meetings telephonically and "led the discussion" regarding marketing. (*Id.* at ¶ 16.)

- Monahan "frequently used the email address ryan@ghostbed.com to communicate with others, including in the system used to send out email blasts." (*Id.* at ¶ 43.)

- Monahan "was the Chief Brand Officer of GhostBed, and he held himself out as such in his communications with others…." (*Id.* at ¶ 41.)

- During Ms. Anderson's employment, Monahan spoke on the telephone regularly with Werner and visited GhostBed's offices from time to time. (*Id.* at ¶¶ 17, 21.)

- Shortly after being hired, Ms. Anderson was informed by CEO Werner's daughter, Ashley Werner, "that Ryan was the real 'Director of Marketing'" and that "Monahan's marketing decisions trumped [Ms. Anderson's] marketing decisions." (*Id.* at ¶ 8.)

8

- Monahan "could and did on several occasions veto [Ms. Anderson's] decisions." (*Id.*)
- Based on Ms. Anderson's observations and experience, she "suspect[ed] that [Monahan] is being paid under the table by GhostBed." (*Id.* at ¶ 22.)

Ms. Anderson's Declaration also provided support for the proposition that GhostBed independently made statements substantially similar to those alleged in the Complaint. She stated that CEO Werner "would tell [Anderson] and other GhostBed employees about a powder on [Plaintiff's] mattress", "saying that a competitor was using talcum powder and talking about lawsuits against Johnson & Johnson because talcum powder caused cancer." (*Id.* at ¶ 24.) Ms. Anderson further stated that she believed that Werner "wanted consumers to know about this." (*Id.*)

The court held a hearing on the Motion for Preliminary Injunction on July 7, 2017. At the hearing, counsel for Defendants strongly disputed Ms. Anderson's Declaration. Mr. Randazza stated: "I realize if you look at Ms. Anderson's declaration, boy, that looks really compelling. It is lies. I am going to prove it is lies. I hope that there will be sanctions when it shows that it is lies. I hope she'll be charged with perjury when I can show she has lied." (July 7, 2017 Hearing Transcript at 123: 22-25—124: 1-2.) In light of the directly conflicting Declaration testimony before the court, the court "determined that an evidentiary hearing [would] aid the court in ruling on the pending motion, particularly in determining the nature of the relationship between Defendant Ryan Monahan and Defendant GhostBed, Inc." (Dkt. No. 145.) Accordingly, the court ordered the three witnesses who had submitted Declaration testimony to appear at an evidentiary hearing for purposes of cross examination. (*Id.*)

9

The court held the Evidentiary Hearing on September 16, 2017. (Dkt. No. 187.) At the hearing, the court heard testimony from Marc Werner, Ryan Monahan, and Calisha Anderson. The evidence elicited at the hearing from all witnesses established, among other facts, that: 1) Monahan continues to provide extensive marketing services to GhostBed (September 16, 2016 Hearing Transcript at 161-64); 2) Monahan's company, Social Media Sharks, has received over $130,000 from GhostBed, and continues to receive $10,000 per month, for Monahan's marketing services to GhostBed, of which Monahan receives approximately half (*id.* at 25, 28-31); 3) Monahan used the title "Chief Brand Officer" of GhostBed with GhostBed's knowledge and without protest (*id.* at 84-85, 103, 120-22); and 4) Monahan helped GhostBed place competitive ads that targeted Plaintiff. (*id.* at 59, 148-49.) At the conclusion of that testimony, the court determined that Monahan and Werner had materially misrepresented the relationship between HMR and GhostBed, as well as Monahan's status as an independent journalist. (*Id* at 165-70.) The court found the testimony of Ms. Anderson to be credible and persuasive, and it was not seriously challenged by cross-examination.[2] (*Id.*) After considering all the evidence presented to the court, particularly the close relationship and substantial financial ties between Monahan and GhostBed, the court entered a Preliminary Injunction. (Dkt. No. 191.)

On October 25, 2017, Plaintiff filed its Motion for Sanctions. (Dkt. No. 229.) Plaintiff argues that Defendants' willful misrepresentations prejudiced Plaintiff's case and interfered with these proceedings. (*Id.*) Plaintiff accordingly requests that the court strike Defendants' answers and defenses to Plaintiff's complaint, grant judgment in favor of Plaintiff, and dismiss GhostBed's counterclaim against it. (*Id.*) Defendants maintain that none of the challenged

---

[2] Mr. Randazza did not attend the hearing to cross-examine Ms. Anderson, despite his confident assertions that he would expose Ms. Anderson as a liar.

statements were willful, intentional, or made in bad faith, and that they do not rise to the level of sanctionable conduct. (Dkt. Nos. 247, 250.)

## DISCUSSION

District Courts have "very broad discretion to exercise their inherent powers to sanction a full range of litigation misconduct that abuses the judicial process." *Xyngular Corp. v. Schenkel*, 200 F. Supp. 3d 1273, 1300-01 (D. Utah 2016). However, "[d]ismissal is a severe sanction [which] should be imposed only if a 'lesser sanction would not serve the ends of justice.'" *LaFleur v. Teen Help*, 342 F.3d 1145, 1151 (10th Cir. 2003)(quoting *Reed v. Bennett*, 312 F.3d 1190, 1195 (10th Cir. 2002)). The Tenth Circuit has provided five factors for a court to consider in determining the appropriateness of sanctions:

> (1) the degree of actual prejudice to the [party requesting sanctions], (2) the degree of interference with the judicial process, (3) the litigant's culpability, (4) whether the litigant was warned in advance that dismissal was a likely sanction, and (5) whether lesser sanctions would be effective.

*LaFleur*, 342 F.3d at 1151 (citing *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992). These factors provide a "flexible framework" to "adequately punish [the Defendants'] misconduct, remedy the prejudice to and harm suffered by [Plaintiff] and the judicial process, deter future litigants from engaging in this type of misconduct, and engender public trust in the integrity of the judicial proceedings. *Xyngular Corp.*, 200 F. Supp. 3d at 1320-21.

*The Degree of Actual Prejudice to Plaintiff*

The court finds that Plaintiff was significantly prejudiced by Defendants' misrepresentations in this action. Plaintiff sought and obtained a T.R.O. in this matter, which was dissolved by the court due to the strong representations of Werner and Monahan and their counsel that they did not maintain a relevant business relationship, and that Monahan was an

11

independent consumer journalist. However, the evidence at the Evidentiary Hearing showed an entirely different picture. Monahan continues to maintain a significant business relationship with GhostBed and during the relevant time period effectively acted as its head of marketing. When presented with the truth regarding Monahan and GhostBed's relationship, the court reinstated the injunctive relief initially requested by Plaintiff. Plaintiff was deprived of this injunctive relief in the interim and was required to expend time and resources to obtain the requested relief the second time.

*The Degree of Interference with the Judicial Process*

The court also finds that the degree of interference with the judicial process here was substantial. Defendants and their counsel adamantly defended misleading representations that Monahan and GhostBed had no meaningful association and that Monahan was a consumer journalist entitled to the fullest possible protection of the First Amendment. They vigorously asserted those misrepresentations even after the court received Ms. Anderson's declaration, which caused the court to hold a full day evidentiary hearing to determine the truth. Such a hearing could have been avoided had Defendants been honest and forthcoming regarding their relationship in the first instance.

*The Litigant's Culpability*

Defendants now acknowledge that the misrepresentations "lacked the level of candor and attention to detail necessary to ensure that all of the material facts were clearly stated and understood by all parties and the Court" but claim they were "made in the heat of battle." (Dkt. No. 247 at iii, 14.) While the court appreciates Defendants' acknowledgment of some responsibility, the court does not agree that these material misrepresentations were merely

inadvertent missteps. Monahan, Werner, and counsel for each were given numerous opportunities in several hearings prior to the September 16 Evidentiary Hearing to correct and clarify their previous, misleading testimony. Instead, Defendants doubled down on their statements and continued to actively conceal the truth from Plaintiff and the court. Werner and Monahan actively misrepresented the nature of their relationship for months. These misleading statements could not be reasonably classified as mere oversight.

*Advance Warning*

The court did not explicitly warn Defendants that misleading the court by sworn testimony was sanctionable conduct but it could hardly be expected that such a warning would be given. It is expected and presumed that parties and their counsel will not knowingly misrepresent material facts to the court. The declarations of Monahan and Werner were signed under penalty of perjury, and counsel, as officers of the court, are under strict ethical rules to be honest in all of their dealings with the court, and to never assist in the subornation of perjury. Mr. Randazza's statements at the July 7, 2017 hearing—that he would expose Ms. Anderson's statements to be lies and that he "hope[d] that there will be sanctions…[and] she'll be charged with perjury when [he could] show she has lied"—demonstrates a clear understanding that submitting a false declaration to the court could result in sanctions. Indeed, based on the court's careful consideration of the testimony given at the Evidentiary Hearing, the misrepresentations by Werner and Monahan were sufficiently egregious that perjury prosecutions would, and perhaps should be, an appropriate consideration.

*Efficacy of a Lesser Sanction*

All of the previous factors weigh in favor of assessing sanctions against Defendants. The court must now determine whether a sanction less than dismissal would remedy the harm to Plaintiff and "deter the errant part[ies] from future misconduct." *Ehrenhaus*, 965 F.2d at 920. Dismissal is "an extreme sanction" and "should be used as a weapon of last, rather than first resort." *Id.* (citing *Meade v. Grubbs*, 841 F.2d 1512, 1520 (10th Cir. 1988)). "Only when the aggravating factors outweigh the judicial system's strong predisposition to resolve cases on their merits is dismissal an appropriate sanction." *Meade*, 841 F.2d at 1520. Here, the court does not find that case-terminating sanctions are the only appropriate remedy for Defendants' misconduct. However, given the egregious nature of Werner's misrepresentations, the court finds that striking GhostBed's counterclaims is appropriate. Furthermore, sanctions will be, and hereby are, awarded for Plaintiff's reasonable attorneys' fees and costs expended in pursuing its second Motion for Preliminary Injunction (Dkt. No. 115) and this Motion for Sanctions. Defendants Ryan Monahan and Honest Mattress Reviews, LLC shall jointly pay one half of those fees and costs, and GhostBed, Inc. shall pay the other half. The court will also issue an adverse jury instruction if deemed appropriate when this case goes to trial.

## CONCLUSION

For the foregoing reasons, Defendant GhostBed's counterclaims are hereby stricken and sanctions are awarded for Plaintiffs' reasonable attorneys' fees and costs in pursuing its second Motion for Preliminary Injunction and Motion for Sanctions, and an adverse jury instruction shall be given if deemed appropriate at the time of trial.

DATED this 9th day of February, 2018.

BY THE COURT:

Dee Benson
United States District Judge